**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALEXANDRIA McGAUGHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-01498 |
| v. | ) | |
| | ) | Judge Richard J. Leon |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Alexandria McGaughey respectfully submits this Opposition to Defendant

District of Columbia's ("District's") Motion for Judgment on the Pleadings.

**STATEMENT OF FACTS**

**A.     ALLEGATIONS IN PLAINTIFF'S COMPLAINT.**

In the early morning hours of Saturday, December 9, 2006, Plaintiff Alexandria

McGaughey, a nineteen year-old sophomore at Howard University, was sexually assaulted at an

off-campus party in the District of Columbia.  Complaint ¶ 1.  Ms. McGaughey likely was anally

penetrated after having been given a date rape drug that rendered her semiconscious or

incoherent for hours, including during the assault and during her visit to Defendant Howard

University Hospital ("HUH") immediately thereafter.  *Id.*

Immediately after the assault, Ms. McGaughey – accompanied by several witnesses –

sought desperately needed medical care at HUH, which holds itself out to be the premiere

hospital in the area for assisting sexual assault victims.  *Id.* ¶ 2.  She also later sought care again

at HUH, as well as at the George Washington University Hospital ("GWUH").  *Id.* ¶¶ 43-45, 58-

65.  Nonetheless, due to the negligence of the District's Metropolitan Police Department

("MPD"), HUH, and GWUH, Ms. McGaughey did not receive the basic treatment appropriate for a victim of sexual assault. *E.g.*, *id.* ¶¶ 2, 4. Proper treatment not only would have alleviated Ms. McGaughey's physical harm and emotional suffering, but it would have provided the most definitive proof of the perpetrator of the sexual assault and the nature of that assault, including whether and how she was drugged. *See id.* Compounding these failures, the MPD continues to refuse to investigate the crime. *Id.* ¶ 2.

Despite the District's acknowledgment that, at this stage, the pleadings must be viewed in the light most favorable to Plaintiff, *see* Dist. Mem. at 5,[1] the District's statement of facts contains numerous significant errors that are at odds with the express allegations of Plaintiff's Complaint (as well as with the discovery conducted to date).[2] For example:

- The District incorrectly asserts that "Plaintiff believes she was drugged by Bilal Curtis," *id.* at 1, whereas Plaintiff alleges in the Complaint that – as a direct result of negligence by the Defendant medical providers and the MPD – she does not know who drugged and assaulted her and any evidence in or on her body at the time she visited HUH and GWUH was forever lost. *See, e.g.*, Complaint ¶¶ 28, 46-54, 61-62, 65, 88-101.

- The District incorrectly states that Plaintiff's friends did not take her to HUH until she woke up on the morning of December 9, 2006, hours after they initially suspected she had been raped and drugged, Dist. Mem. at 3, whereas the Complaint plainly states that

---

[1] Plaintiff cites to the Memorandum of Points & Authorities Supporting the District of Columbia's Motion for Judgment on the Pleadings as "Dist. Mem." The District did not number the pages of its memorandum of points and authorities, and thus the page number references are to the page numbers assigned to Document 41 of the ECF system (*i.e.* pages 1-13).

[2] Below, Plaintiff describes some of the evidence developed in discovery to date that supports and strengthens her allegations against the District. Although, as explained below, the District's motion should be denied based on the pleadings alone, to the extent that "matters outside the pleadings are presented to and not excluded by the court, the motion [for judgment on the pleadings] must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

her two friends took her to HUH to seek treatment and testing immediately after leaving

the party.  *See, e.g.*, Complaint ¶¶ 2, 27.

- The District incorrectly states that "MPD did not provide Plaintiff with a rape kit," Dist.

  Mem. at 4, erroneously implying that the provision of a sexual assault medical forensic

  exam (the proper medical name for what is sometimes called a "rape kit" or, inaptly, "sex

  kit," *id.* ) is properly a police decision, rather than a medical and personal decision of the

  victim.  As the Complaint alleges, Plaintiff went to the hospitals seeking medical

  treatment and collection of evidence of her rape and drugging, and police personnel

  improperly interfered with both of these objectives (as well as failed in their duty to assist

  her).  *See, e.g.*, Complaint ¶¶ 28, 46-54, 61-62, 65, 88-101.

- The District incorrectly asserts that the Complaint is "based on the purported failure of

  MPD officers to adequately protect Plaintiff by properly investigating her sexual assault

  allegations," Dist. Mem. at 4, whereas the Complaint in fact alleges that the MPD

  inserted itself into Plaintiff's medical treatment, interfered with the collection of medical

  forensic evidence, as well as negligently failed to investigate Plaintiff's allegation of

  drug-facilitated rape.  *See, e.g.,* Complaint ¶¶ 28, 46-54, 61-62, 65, 88-101.  All of these

  alleged failings occurred *after* Plaintiff's sexual assault and thus had nothing to do with a

  failure by MPD "to adequately protect Plaintiff" from harm by a third-party.  *Cf.* Dist.

  Mem. at 4.  They had everything to do with affirmative acts of negligence by MPD that

  caused direct injury to Plaintiff.  *See, e.g.,* Complaint ¶¶ 28, 46-54, 61-62, 65, 88-101.

As the Complaint explains, HUH failed to treat Plaintiff when she first attempted to seek

treatment there immediately following the assault.  Complaint ¶¶ 27-42.  During Plaintiff's

second visit to HUH, the hospital personnel finally called the MPD to report Plaintiff's case as a

sexual assault.  Complaint ¶ 46.  MPD Officer M.A. Minor arrived at HUH and questioned

Plaintiff.  *Id.*  She told him that she thought she had been raped earlier that morning and

described the pain she was experiencing.  *Id.*  Plaintiff's friend Ms. Reid also spoke with Office

Minor and confirmed that she too believed that Plaintiff had been raped, describing in detail the

events of the night before, including the suspicious behavior of the young men at the party and

the pain and disorientation experienced by Plaintiff.  *Id.*  Officer Minor did not appear to take

notes of Ms. Reid's statement, other than writing down a few names.  *Id.*  Officer Minor did not

ask to speak with Ms. Diké, Ms. Lockett, or any other witness from the night before.  *Id.*

Officer Minor phoned Detective Spriggs, who then spoke with Plaintiff by phone.

Complaint ¶ 47.  Without coming to the hospital to interview Plaintiff and based solely on his

brief phone conversation with her, Detective Spriggs told her that "we don't have a case for a

rape kit."  *Id.*  Detective Spriggs told Plaintiff that she needed to provide the name of the alleged

assailant in order to have a case.  *Id.*  From that point forward, HUH declined to perform a sexual

assault medical forensic examination of Plaintiff on the purported grounds that HUH personnel

needed police approval to administer such an examination and that the police had not authorized

one.  *Id.*

Detective Spriggs did not come to the hospital to speak with Plaintiff, and he did not

speak to any other witness in the case (including Ms. Reid, Ms. Diké or Ms. Lockett) either by

phone or in person.  Complaint ¶ 48.  Nor did Officer Minor or any other MPD officer interview

Ms. Diké or Ms. Lockett.  *Id.*  On information and belief, neither Detective Spriggs, Officer

Minor, or any other MPD officer has spoken to Mr. Curtis, Mr. Lowery, Mr. Thrasher or any

other individual who attended the party.  *Id.*  On information and belief, MPD has conducted no

further investigation of Plaintiff's allegations of rape and drugging. *Id.* Neither Officer Minor nor Detective Spriggs completed a police report concerning Ms. McGaughey's complaint. *Id.*

Before Plaintiff's second visit to HUH, she had contacted her sister, Raegen McGaughey (hereinafter "Raegen"), who lives in the area, to inform her about the assault and subsequent events. Complaint ¶ 49. Raegen arrived at HUH after Officer Minor had departed and after Plaintiff had spoken to Detective Spriggs on the phone. *Id.* After hearing from Plaintiff that the police would not authorize a sexual assault medical forensic examination or do any further investigation, Raegen called the police to demand a proper investigation, including authorization of a sexual assault medical forensic examination. *Id.* After hours of waiting and multiple phone calls, two MPD officers – Officers Leveque and Green – finally showed up at the hospital. *Id.*[3]

Officers Leveque and Green spoke briefly with Plaintiff. Complaint ¶ 50. They were very rude and dismissive of her complaint. *Id.* Contrary to MPD's own standards for helping traumatized sexual assault victims, the officers questioned Plaintiff as if she were lying or had done something wrong, and they even threatened her that she could be arrested for lying. *Id.* Their demeanor and questioning made her feel very uncomfortable to relate what she was able to remember about what had happened to her. *Id.* The officers conveyed their skepticism of her claim to have blacked out at the party, betraying an ignorance of the effects of date rape drugs. *Id.* The officers' dismissive and condescending attitude toward Plaintiff is memorialized in the

---

[3] That Raegen called the MPD on Plaintiff's behalf belies the District's erroneous and unsupported assertion that Plaintiff "never contacted the police." Dist. Mem. at 6. The District's insinuation that Plaintiff somehow should have done more to contact police is equally incorrect and misleading because, as the MPD's guidance to the public makes clear, a victim of sexual assault should "[g]o to a hospital emergency room or your own doctor for medical care immediately." http://mpdc.dc.gov/mpdc/cwp/view,a,1237,q,547802,mpdcNav_GID,1551.asp. The hospitals eventually contacted the police on Plaintiff's behalf, and, as the Complaint makes clear, the police had extensive and continuing contact with Plaintiff and the hospitals throughout Plaintiff's ordeal. *See, e.g.*, Complaint ¶¶ 46-54, 61-62, 65, 88-101

police report that they filed, which states that they emphasized to Plaintiff the "importance of truth" and that they needed something more "concrete" to authorize a rape kit or even to conduct a further investigation. *Id.* The officers even failed to recognize Plaintiff's complaint as an alleged sexual assault, instead categorizing it as a "miscellaneous" incident. *Id.*

The officers were also rude and unprofessional to Raegen. Complaint ¶ 51. They refused to give their names to Raegen, and after Raegen had been attempting to communicate with them for a brief period of time, they stated that they were "done talking to [her]." *Id.* The MPD touts its Sex Assault Unit as being "specially trained in the investigation of sexual assault," and states that its "detectives recognize and understand the sensitive, personal and invasive nature of sexual assault crimes. Sexual assault crimes are investigated with respect for the rights of the accused and the victim." *Id.*; *see* http://mpdc.dc.gov/mpdc/cwp/view,a,1232,q,556783,mpdcNav_GID, 1523,mpdcNav,|31417|.asp. The MPD officers' treatment of Plaintiff and her sister Raegen plainly fell well below the very standards to which MPD claims to adhere. Complaint ¶ 51.

Before departing HUH, Officers Leveque and Green placed a call to MPD and informed Plaintiff and Raegen that they had spoken to Detective Wheeler, whose supervisor, Detective Rice, had stated that the case had been "cleared" previously without a report and that Detective Wheeler would be contacting Plaintiff in the next few days to explain the situation further. Complaint ¶ 52. Plaintiff never received a call from Detective Wheeler. *Id.* Upon information and belief, no further investigation of Plaintiff's case was conducted by Officers Leveque and Green, or any other MPD officer or detective. *Id.*

Officers Leveque and Green thereafter submitted a false and misleading police report in which they grossly misclassified Plaintiff's complaint of rape and drugging as a "miscellaneous" incident, rather than as a sexual assault. Complaint ¶ 53. Their report falsely claimed that

Plaintiff "changed her story" and that she said she was simply "drunk" as opposed to having been drugged. *Id.* Moreover, the clear and erroneous implication of their report is that if Plaintiff were "drunk" then she could not also have been raped, and therefore, no further investigation was warranted. *Id.* This implication is borne out by all of the ways in which the officers failed to follow up on Plaintiff's allegations. *Id.*

Although Officers Leveque and Green acknowledge in their written report that Plaintiff told them that her rectum hurt in a way that made her feel she had been anally penetrated the night before when she was unconscious or semiconscious, they wrote that they needed something "more concrete" in order to investigate further or authorize a sexual assault medical forensic examination. Complaint ¶ 54. Yet, the MPD officers as well as the detectives from the MPD's sexual assault unit failed to speak with Ms. Diké, Ms. Reid or Ms. Lockett, all of whom were with Plaintiff at the party, and all of whom suspected based on what they observed that she had been drugged and raped. *Id.* The officers and detectives also failed to speak with any other individuals who had been at the party, and, in particular, to the young men who had behaved so suspiciously. *Id.* Neither these officers nor the detective or supervisors to whom they spoke with by phone would "authorize" HUH or GWUH to do a forensic rape examination. *Id.* And although the hospitals did not need police "authorization" to do an examination, the police led HUH and GWUH to believe that they did. *Id.*[4]

## B.     ADDITIONAL EVIDENCE DEVELOPED IN DISCOVERY TO DATE.

To defeat the District's motion for judgment on the pleadings, Plaintiff need only identify allegations in her Complaint that state a claim – as she does herein. Plaintiff notes, however, that

---

[4] As the Complaint explains, the MPD's interference with Plaintiff's medical treatment and its other negligent actions do not excuse the medical Defendants' failure to provide Plaintiff with adequate care and treatment as required by federal and state law.

the limited discovery conducted to date has uncovered significant evidence of the following

points supporting Plaintiff's allegations against the District, elaborated in more detail below:

- the District's interference with Plaintiff's medical treatment;

- the District's interference with the collection of medical forensic evidence from Plaintiff;

- the District's practice of interfering with sexual assault victims' (including Plaintiff's) medical testing and treatment by "unfounding" sexual assault complaints where, based on a superficial review by untrained officers and improperly trained sexual assault detectives, either the Plaintiff cannot identify her attacker (often due to drug facilitation of the assault) or the detectives view the case as difficult to investigate or prove;

- the District's failure to document at all or to properly document sexual assault victims' (including Plaintiff's) complaints of sexual assault; and

- the District's failure properly to train its officers and detectives to handle sexual assault cases, including with respect to the collection and preservation of medical forensic evidence.

**The District's Failure to Train MPD Personnel Regarding The Proper Handling of Sexual Assault Complaints.**

As discovery to date has revealed, the MPD's failures in Plaintiff's case were entirely

predictable given the District's practice of sending untrained officers to conduct the initial

interview of sexual assault victims such as Plaintiff.[5]  The patrol officers who responded to HUH

---

[5] Plaintiff has diligently pursued discovery against the District throughout the discovery period. To date, Plaintiff has deposed three MPD officers – all of whom personally interacted with Plaintiff.  In addition, Plaintiff has long attempted to schedule the depositions of several other MPD employees (including sexual assault unit detectives) who were directly involved in the handling of Plaintiff's allegations of sexual assault.  Plaintiff has six outstanding depositions noticed in this regard.  Although the District has recently retreated from a position set forth for the first time on June 16, 2008 that it would refuse to produce any additional witnesses for deposition, the District has cancelled the depositions of MPD personnel that had been noticed for

to interview Plaintiff have uniformly testified that they are not members of the MPD's sexual assault unit, have never received any significant training in the investigation of sexual assaults, have never received any training on the subject of date rape drugs, and are unaware of critical aspects of the District's supposed response system for sexual assault victims, such as the Sexual Assault Response Team ("SART") or the D.C. Rape Crisis Center.  *See* Leveque Dep. at 38, 57, 60-63, 67-68, 119-21, attached hereto as Exhibit A; Green Dep. at 28-30, 46-47, 49, 178-79, attached hereto as Exhibit B; Minor Dep. at 12, 17, 20-23, 26-29, attached hereto as Exhibit C.

As deposition testimony has confirmed, in Plaintiff's case, the MPD interfered with her medical treatment and the collection of medical forensic evidence based solely on in-person interviews by untrained patrol officers and *phone* interviews by sexual assault detectives – rather than based upon the sexual assault detectives' in-person interviews and investigation, as MPD policy requires.  *See* Leveque Dep. at 38-40, 44-45.  Indeed, Officer Leveque confirmed in her deposition that, despite MPD policy requiring the sexual assault unit detectives to "respond to the location," Plaintiff's experience was not atypical.  *Id.* at 40, 44-45.

**The MPD's Improper Practice of "Unfounding" Complaints of Sexual Assault.**

Discovery to date also has shown that the MPD has attempted to shield itself from review of its handling of sexual assault cases such as Plaintiff's through a practice of *not* taking a report in cases where the sexual assault detectives determine not to investigate further; MPD personnel have referred to such cases as "unfounded."  *See* Leveque Dep. at 48-49, 72-74, 157-58, 205-10; Green Dep. at 62-64, 68-69, 103; Minor Dep. at 35-36, 40-41.  This apparently widespread practice of "unfounding" without a report is directly contrary to MPD policy, which requires

---

this week.  Plaintiff is working with the District schedule the six outstanding depositions, and, as Plaintiff previously has notified the Court, Plaintiff intends to request an extension of the discovery period and permission to take additional depositions, including of District witnesses.

"that members shall file a report for all reported crimes and incidents brought to his/her attention."  MPD Field Reporting System, GO-SPT-401.01, March 4, 2004, Ex. 4 to Green Dep. (attached hereto as Exhibit D).  Yet none of the MPD officers who responded to HUH to interview Plaintiff either recalled or were aware of this MPD policy, and indeed, believed that their practice of *not* taking a report was consistent with MPD policy.  *See* Leveque Dep. at 50-51, 55-57; Green Dep. at 200-02; Minor Dep. at 46-47.

Remarkably, Officer Leveque testified that of the approximately five sexual assault complaints to which she has responded in her police career, only *one* had been determined to be "founded."  Leveque Dep. at 67-68, 71-73.  According to Officer Leveque, the cases determined to be "unfounded" – like Plaintiff's – often involved drug or alcohol facilitation where the victim did not know for certain who had assaulted her or precisely what had happened.  *See id.* at 221-22, 236, 345, 256.  Officer Green similarly testified that about *half* of the sexual assault complaints to which she has responded were deemed "unfounded."  Green Dep. at 64.  And, as with Officer Leveque, many of Officer Green's so-called "unfounded" cases involved victims who could not identify their attackers, potentially due to drug-facilitation of the assaults.  *Id.* at 70-73.  Likewise, Officer Minor testified that of the approximately twelve sexual assault complaints to which he has responded, almost *half* had been deemed "unfounded," and therefore, he took no report of the complaint.  Minor Dep. at 46-49.

### The MPD's Interference With Plaintiff's Medical Treatment and the Collection of Medical Forensic Evidence.

The deposition testimony to date also clearly supports Plaintiff's allegations that MPD personnel inserted themselves into the decision making over Plaintiff's medical treatment and interfered with Plaintiff's attempt to have medical forensic evidence collected by the hospitals.  *Compare, e.g.*, Complaint ¶¶ 46-54, 61-62, 65, 88-101, *with, e.g.*, Green Dep. at 85 (testifying

that Plaintiff told Officer Green that "nurse told her that the only way she could get [a sexual

assault medical forensic exam] done was to get the police to say to do one."), *id.* at 103.  Officer

Green's testimony on this point is particularly illuminating:

Q   Okay.  And did you speak with any of the  hospital personnel?

A   On the – on the time of the interview, or afterwards, or what?

Q   At the – at the time – well, any time on that day concerning, you know, this matter.

 A   No.

Q   Okay.  Did any of them seek to ask you any questions?

A   No.

Q   I'm sorry.  When I say "them," I'm talking about any hospital personnel?

A   No.  Just a disposition.

Q   When – and when you say "disposition," what do you mean?

A   What did the – what the Sexual Assault Unit detective said in reference to a sexual

kit.

Q   Okay.  And who asked you about that?

A   It was one of the nurse.

Q   Uh-huh.  And what did you tell her?

A   *Told her that Detective Wheeler said no.*

Q   *Said no – and when you said – you said no, what did – what did you mean?*

A   *In reference to having a sexual kit performed.*

Q   *That – that – that Detective Wheeler said that no sexual assault kit should be*

*performed?*

A   *That no – there would be no sexual kit done.*

Q   *Okay.  You told the nurse that Detective Wheeler said that no sexual assault kit*

*would be done?*

MR. BANKS:  Objection.  Asked and answered.

MR. JEFFERSON:  Objection.  Asked and answered.

MS. COSTANTINO:  Just joining in the objection.

BY MR. SPIVA:

Q   *Is that correct?*

11

*A*    *That's correct.*

*Q*    *And – and why did you tell her that?*

*A*    *Because they wanted to know whether or not they needed to do a kit.*

Green Dep. at 115-17. Officer Minor likewise testified that the "sex squad unit" of MPD plays

"a great role in" the determination of "whether the hospital actually does a sexual assault

examination." Minor Dep. at 84.[6]

## ARGUMENT

**THE DISTRICT IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS BASED ON THE "PUBLIC DUTY DOCTRINE."**

> **A.    The "Public Duty Doctrine" Does Not Bar Plaintiff's Claims Against The District.**

The public duty doctrine does not bar Plaintiff's three negligence claims against the

District, for at least two reasons, as detailed below.  First, the public duty doctrine is largely, if

not completely, inapposite in this case. As courts, including this Court, have recognized, the

public duty doctrine does not apply where, as here, a plaintiff is alleging that public officials

have affirmatively caused her harm, rather than – as in *Varner v. District Columbia*, 891 A.2d

260 (D.C. 2006) and other typical public duty cases – that the public officials have failed to

protect the plaintiff from crime or have failed to properly address an emergency situation.

Plaintiff is not claiming that the District failed to protect her from sexual assault or that the

District is responsible for those injuries, but is claiming, among other things, that the District

harmed her by affirmatively interfering with her medical treatment and her ability to have

---

[6] As discussed herein, the District's Motion can be disposed of by reference to the pleadings alone, as Plaintiff's three counts against the District are not barred by the public duty doctrine. It is noteworthy, however, that discovery to date – which will be developed further in the coming weeks as the District finally makes available for deposition detectives and other personnel in the MPD's sexual assault unit – strongly supports Plaintiff's legal arguments that the public duty doctrine is not applicable on the facts of this case, both because of the nature of Plaintiff's claims and because the District established a "special relationship" with Plaintiff. *See infra.*

evidence collected to determine who sexually assaulted her and whether (as likely) she was subjected to date rape drugs.

Second, as even the District recognizes, there is an exception to the public duty doctrine for individuals with a "special relationship" to the District. *See* Dist. Mem. at 6. Even assuming that the public duty doctrine applies to some or all of Plaintiff's claims in this case, the "special relationship" exception permits Plaintiff's claims. As the Complaint sets forth in detail, Plaintiff was no stranger to District officials, but rather had extensive and continuing contact with the District throughout her ordeal. *See, e.g.*, Complaint ¶¶ 46-54, 61-62, 65, 88-101. She relied on District agents to handle their contacts with her properly and non-negligently, but they did not. *See id.* Rather, in gross violation of the ordinary standard of care, District officials interfered with Plaintiff's medical treatment and ability to have evidence collected and preserved concerning her sexual assault. *See id.* In circumstances such as these, a "special relationship" exists and the public duty doctrine does not bar Plaintiff's claims.

### 1.     Plaintiff's Allegations Against the District.

The District completely mischaracterizes Plaintiff's allegations against the District, claiming that her complaint is merely that the police failed adequately to protect her. *See* Dist. Mem at 4. Plaintiff's claim is not that the District failed to protect her, or even that the District simply failed to investigate her case. Rather, as set forth in detail in the Complaint, Plaintiff alleges that the District affirmatively interfered with her medical treatment and the collection of evidence by directly interfering with medical personnel at two hospitals. As set forth in the Complaint, Plaintiff has alleged three separate claims of negligence against the District. *See* Complaint ¶¶ 46-65, 88-101.

Count V alleges that the District is liable for negligence as a result of its failure to

properly hire, train and supervise MPD employees, including with respect to the proper

assessment and treatment of sexual assault victims, investigation of sexual assault cases, and

collection and retention of medical forensic evidence of sexual assault.  Complaint ¶¶ 88-93.

This negligence claim hinges on the District's inadequate policies and practices regarding the

handling of sexual assault victims, which, according to Plaintiff's allegations, led the District to

interfere with Plaintiff's medical treatment, to exacerbate her physical and emotional harm and

pain and suffering, and to prevent the collection and preservation of evidence relevant to her

sexual assault and likely drugging.  *See id.*

Count VI alleges that the District is liable for negligence based upon its employees'

interference with Plaintiff's treatment by the hospitals, including District employees' obstruction

of the hospitals' collection of medical forensic evidence and performance of a medical forensic

examination of Plaintiff.  Complaint ¶¶ 94-97.  Among other things, this claim is based on MPD

employees stating without basis that Plaintiff's complaint of sexual assault did not justify

treating her as a sexual assault victim or performing relevant tests and procedures.  *See id.*

Plaintiff alleges that these actions by District employees exacerbated her physical and emotional

harm and pain and suffering, as well as prevented the collection and preservation of evidence

relevant to her sexual assault.  *See id.*

Count VII alleges that the District is liable for negligence based on its officers' failure to

investigate Plaintiff's sexual assault, including their preparation of a false and misleading police

report and their refusal to treat Plaintiff's complaint as an alleged sexual assault.  Complaint

¶¶ 98-101.  Plaintiff brings this claim in light of the District's special duty to sexual assault

victims created by the District's partnership with area hospitals and by the District's insertion of

itself into hospitals' treatment of sexual assault victims, as in Plaintiff's case.  *See id.*  Plaintiff

alleges that the District's negligence caused substantial injury to Plaintiff, including the loss of evidence to identify and hold responsible her assailant.  *See id.*

**2.**    **The Public Duty Doctrine Does Not Apply To This Case.**

The public duty doctrine exempts the District from liability in "cases where individuals seek to hold the District liable for negligence or wrongful death because of a <u>failure to protect</u> a person."  *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001) (emphasis added). As courts have explained, the public duty doctrine "is wholly inapposite in a case such as this, where the alleged harm was brought about directly by the officers themselves, and where there is no allegation of a failure to protect."  *Liser v. Smith*, 254 F. Supp. 2d 89, 102 (D.D.C. 2003) (citing *District of Columbia v. Evans*, 644 A.2d 1008, 1017 n.8 (D.C. 1994) ("In this case, the harm to Virtus Evans was caused directly by the officers at the scene.  There is no allegation of failure to protect.  The public duty doctrine, therefore, has no relevance to this case.")); *see, e.g.*, *Briggs v. Washington Metro. Area Transit Auth.*, 293 F. Supp. 2d 8, 12 (D.D.C. 2003) (explaining that for the District "to have immunity under the public duty doctrine, the plaintiff must allege that one of the city's public services failed to protect the decedent"); *Johnson v. District of Columbia*, 580 A.2d 140, 142-43 (D.C. 1990) (the public duty doctrine does not apply where "affirmative acts" of public officials "worsened" the plaintiff's condition).[7]

*Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) – the primary case relied upon by the District for its public duty argument – exemplifies why the public duty doctrine does not

---

[7] A caveat to *Johnson* is that public officials are not ordinarily susceptible to suit for "affirmatively worsening" a plaintiff's condition in the exigency of a rescue operation.  *See, e.g.*, *Miller v. District of Columbia*, 841 A.2d 1244, 1248 (D.C. 2004) (in a case involving a fire rescue operation, explaining that "the actions of the police during a rescue operation are protected by the public duty doctrine and are not subject to retrospective dissection at trial"). Because Plaintiff's claims against the District do not pertain to an alleged duty to protect, never mind in the context of a rescue operation, the public duty doctrine is inapposite here.

apply in this case.  *Varner* was a wrongful death and survival action brought on behalf of a murdered Gallaudet student, Varner.  *Id.* at 263.  The murderer had previously killed another Gallaudet student, but had not been apprehended by the authorities at the time he killed Varner.  *Id.* at 264.  The plaintiffs alleged that the District was "negligent in their investigation of the [first] murder," and that "if the police had exercised reasonable care in investigating that murder, [the perpetrator] would have been swiftly apprehended, and he would therefore have had no opportunity to kill Benjamin Varner."  *Id.* at 273-74.  The D.C. Court of Appeals affirmed a grant of summary judgment in favor of the District based on the public duty doctrine.  *Id.* at 273-77.  The Court of Appeals explained that "'under the public duty doctrine, public officials such as police officers cannot be held liable for harm caused by criminals unless there was a "special relationship" between the victim and the official.'"  *Id.* at 275 (quoting trial court).  The Court concluded that the "special relationship" exception did not apply because plaintiffs "'present no argument or evidence, however, to show that Benjamin Varner himself had any direct or continuing contact with the MPD,'" *id.* (quoting trial court), even assuming that the police had made general assurances to the 2000-person Gallaudet campus that District officials were doing all they could to protect everyone on campus, *id.* at 275-76.

As the Complaint makes clear, Plaintiff is not alleging that the District failed to protect her from criminal acts or other harm caused by a third party.  Rather, Plaintiff's allegations are that the District's policies and the actions of its employees directly harmed her by affirmatively interfering with her medical treatment and preventing the collection and preservation of evidence about her sexual assault, adding to and exacerbating her physical and emotional harm, and pain and suffering, and preventing her from obtaining evidence relevant to her sexual assault and likely drugging.  Complaint ¶¶ 46-65, 88-101.  Such evidence was relevant not only to a

potential criminal prosecution by the District, but also to her proper medical treatment and to any effort to hold her assailant civilly responsible for his actions. Thus, Plaintiff's allegation is not that the police failed to prevent her sexual assault, or that they failed to respond to the scene of an emergency, but rather that they improperly inserted themselves into Plaintiff's treatment and the collection of evidence at the hospital, causing her injury. In this context, the public duty doctrine is inapposite.

The District's public duty argument does not differentiate among Plaintiff's three separate negligence claims against the District. One might argue, however, that even if Counts V and VI – both of which allege direct harm to Plaintiff through the affirmative acts of the police – are not barred by the public duty doctrine, that doctrine bars Count VII, which is Plaintiff's "failure to investigate" claim. Importantly, Plaintiff's failure to investigate claim is unlike the "failure to investigate" claim barred in *Varner* and similar cases, in which plaintiffs sought to hold the District liable for the criminal actions of third parties based on the District's failure to investigate or respond to criminal activity. That is <u>not</u> Plaintiff's claim in Count VII. Plaintiff's claim is that the District's investigation of her sexual assault claim fell woefully short of the standard of care and prevented her from being able to identify her assailant and bring him to justice. This is not the sort of "failure to investigate" claim precluded by the public duty doctrine, which, as explained above, insulates government officials from liability for failing to protect individuals from harm by others – not for directly causing individuals harm.[8]

---

[8] For the same reasons, the other cases cited by the District for the proposition that MPD had no duty to protect Plaintiff are entirely inapposite, because they each involved allegations that the police or other emergency personnel had negligently failed to protect the plaintiff from harm caused by a third party, or failed to rescue the plaintiff in a timely and effective manner. *See Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990) (holding, in a case where the decedent's estate alleged that District personnel negligently *failed to rescue* decedent from a stroke, that a single phone call could not create a special relationship); *Hines v. District of*

17

### 3. Even Were The Public Duty Doctrine Applicable, The "Special Relationship" Exception Permits Plaintiff's Claims.

Even assuming the applicability of the public duty doctrine to all or some of Plaintiff's claims against the District, the District is not entitled to judgment on the pleadings because Plaintiff has pleaded a "special relationship" with the District – a well-established exception to the public duty doctrine, and one acknowledged by the District. *See* Dist. Mem. at 6. The "special relationship" exception distinguishes individuals in the general public – to whom public officials owe no specific duty – from individuals who have established contact with public officials and to whom a duty is owed.

To establish a "special relationship," a plaintiff must show: (1) "'a direct and continuing contact between the victim and the police department'" and (2) "'justifiable reliance on that contact by the victim.'" *Varner*, 891 A.2d at 275; *accord, e.g.*, Dist. Mem. at 6. Plaintiff has pleaded a special relationship with the District based on her numerous contacts with District employees. *See* Complaint ¶¶ 46-65, 88-101. The Complaint makes clear that based on Plaintiff's direct and repeated interactions with District employees in the MPD's touted "Sex

---

*Columbia*, 580 A.2d 133, 136 (D.C. 1990) (granting summary judgment, after full discovery, against the plaintiff's claim that failure to provide adequate emergency services caused plaintiff's death); *Platt v. District of Columbia*, 467 A.2d 149, 150 (D.C. 1983) (holding that the public duty doctrine barred a claim alleging that the District, by negligently enforcing the fire and occupancy code, failed to prevent a fire that killed the plaintiffs); *Morgan v. District of Columbia*, 468 A.2d 1306, 1308 (D.C. 1983) (upholding the trial court's judgment notwithstanding the verdict on the grounds that the public duty doctrine barred a claim against the District for a "failure to protect" an individual citizen from crime, and that the report a wife made to the police supervisor of her police officer husband did not create a special duty); *Warren v. District of Columbia*, 444 A.2d 1, 2 (D.C. 1981) (holding that the public duty doctrine barred a failure to protect claim alleging that the police negligently responded to a crime in progress and thus failed to prevent injury to the plaintiffs caused by criminal third-parties). In contrast to these cases, the public duty doctrine is entirely inapplicable in this case without even considering the "special relationship" exception, because Plaintiff does not allege that the police failed to protect her from the initial drugging and sexual assault. Her allegation is that District personnel injured her through affirmative acts of negligence, including interference with her treatment by medical personnel and the collection of medical forensic evidence by those personnel.

Assault Unit," Plaintiff relied on the District to take reasonable efforts to assist her as a sexual assault victim and to investigate her case, *e.g.*, *id.* ¶ 51, including to follow up with her after the traumatic odyssey at the hospitals, *id.* ¶ 52.  As the Complaint alleges, the District wholly failed in these regards.  Because Plaintiff has pleaded facts to support both a direct and continuing contact with District officials and justifiable reliance on those contacts, she has pleaded a "special relationship" and the District is not entitled to judgment on the pleadings.[9]

**B.    At The Very Least, Decision On The Public Duty Issue Must Await Full Discovery.**

For the reasons stated above, the Court should rule, as a matter of law, that the public duty doctrine does not bar Plaintiff's claims against the District.  At the very least, however, the Court should not resolve the public duty issue in the District's favor prior to full discovery.

As elaborated above, Plaintiff has adequately pleaded that the public duty doctrine does not apply in this case, among other reasons, because the District established a "special relationship" with the Plaintiff, *e.g.*, Complaint ¶ 100.  Plaintiff's Complaint is thus adequate to withstand a motion for judgment on the pleadings, and she should be allowed the opportunity to continue to develop facts in discovery to further support her claim that the public duty doctrine does not apply.  As described above, the discovery that Plaintiff has been able to develop to date indicates extremely strong support not only for her ultimate claims against the District, but also for the inapplicability of the public duty doctrine, based both on the evidence of widespread

---

[9] The cases cited by the District illustrate, by way of contrast, why a "special relationship" has been properly pleaded in this case.  For example, in *Varner*, the Court of Appeals rejected the "special relationship" exception on summary judgment because the plaintiff could not establish any direct contact between the police and plaintiff's murdered son, but rather attempted to rely on generalized assurances made by the police to the entire 2000-person Gallaudet student body. *Varner*, 891 A.2d at 276.  In stark contrast, the police were continually and directly involved with Plaintiff, including through repeated interference with Plaintiff's medical care and treatment, and the collection of evidence that would have enabled her to identify her attacker.

policy failures and on the evidence that the District established a special relationship through its contacts with Plaintiff.  *See supra* Statement of Facts, Section B.  Thus, as in numerous other cases resolving the public duty issue at trial (or on summary judgment), Plaintiff should be permitted to continue discovery concerning the applicability of the public duty doctrine, including with respect to whether a "special relationship" was formed.

## <u>CONCLUSION</u>

For the foregoing reasons, and all others apparent to the Court, the District's Motion for Judgment on the Pleadings should be denied.

Dated:  June 30, 2008                                    Respectfully submitted,

                                                         _____/s/_____
                                                         Bruce V. Spiva, D.C. Bar. No. 443754
                                                            bspiva@spivahartnett.com
                                                         Kathleen R. Hartnett, D.C. Bar. No. 483250
                                                            khartnett@spivahartnett.com
                                                         SPIVA & HARTNETT LLP
                                                         1776 Massachusetts Avenue, N.W.
                                                         Suite 600
                                                         Washington, D.C. 20036
                                                         Telephone:  (202) 785-0601
                                                         Facsimile:  (202) 785-0697

                                                         *Attorneys for Plaintiff*

# Exhibit A

**To Plaintiff's Opposition to Defendant District of Columbia's
Motion for Judgment on the Pleadings**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL) (D.D.C.)

Page 1

        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,              :
                                   :
        Plaintiff,                 :
                                   :
             v.                    : Case No.
                                   : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al., :
                                   :
        Defendants.                :
- - - - - - - - - - - - - - - - x

                        Washington, D.C.

                        Monday, April 14, 2008


Video Deposition of

        OFFICER GINETTE LEVEQUE, called for

examination by counsel for Plaintiff, pursuant

to notice, at the Law Offices of Spiva & Hartnett,

LLP, 1776 Massachusetts Avenue, NW, Suite 600,

Washington, D.C., commensing at 12:54 p.m., before

Barbara A. Huber, Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                              April 14, 2008

Washington, DC

Page 38

1    Q   Okay.  And are you a member of the MPD
2  sexual assault unit?
3    A   No.
4    Q   And were you ever a member of the MPD
5  sexual assault unit?
6    A   No.
7    Q   Have you ever had any training in the
8  investigation of sexual assaults?
9    A   No.
10   Q   Have you ever had any training in the
11 treatment of sexual assault victims?
12   A   No.
13   Q   Have you ever had any training in -- let
14 me back up.
15       Have you -- have you ever been trained
16 about -- on the subject of date rape drugs?
17   A   No.
18   Q   And what are -- what are MPD's policies,
19 if you know, for investigating alleged sexual
20 assaults?
21   A   Repeat the question.
22   Q   What are MPD's policies for

Page 39

1  investigating alleged sexual assaults?
2    A   I can't tell you exactly what MPD's
3  policies are for sexual assaults.  But I know from
4  an officer's standpoint.
5    Q   Okay.  Tell me from an officer's
6  standpoint what the policies are for investigating
7  sexual assaults.
8    A   I respond to the location.  I interview
9  the complainant.  And I notify a sex squad
10 detective.  They respond to the location.  And
11 they deem it a confirmed sexual assault or a
12 matter that needs to be further investigated.  And
13 I take the report.
14   Q   And you said you notify a sexual assault
15 detective.
16       How do you -- how do you typically do
17 that?
18       What's the procedure for doing that?
19   A   I go through the Third District
20 dispatcher.
21   Q   Okay.  And do you actually talk -- is
22 the -- is the procedure to actually -- for you

Page 40

1  actually to talk with the sexual assault
2  detective?
3    A   You can either notify the dispatcher to
4  have them snap page them, or if you have their
5  land line, you can call them on a land line, as
6  well.
7    Q   Okay.  And you -- you mentioned that the
8  procedure is that they respond to the location.
9        What do you mean by that?
10       I'm sorry.  Let me make sure I'm -- the
11 record's clear.
12       When I say "they," I'm talking about
13 that the -- the sexual assault detective
14 actually responds to the location.
15       What do you mean by that?
16   A   They come interview the complainant.
17   Q   In person?
18   A   In person.  Or I've had them also --
19 scratch that.  Excuse me.  I'm sorry.  I'm a bit
20 nervous.
21   Q   That's okay.
22   A   They could respond to the location.

Page 41

1    Q   Okay.  Well, but now I -- that kind of
2  repeats the original phrase.  And I want to make
3  sure I understand.
4        When you say --
5    A   Sure.
6    Q   -- respond to the location, do you mean
7  that they actually come physically to the
8  location?
9    A   Yes.
10   Q   Okay.  And -- and do they come there and
11 they talk to the -- the victim, the person that
12 you've talked to?  Was that the policy or the
13 procedure?
14       MR. JEFFERSON:  Objection, to the extent
15 that this is being characterized as the policy or
16 procedures.  This officer's already testified that
17 she is speaking from an officer's --
18       MR. SPIVA:  Now you're --
19       MR. JEFFERSON:  -- perspective.
20       MR. SPIVA:  -- coaching.  Wait a minute.
21 Wait a minute.  You can -- you can object if you
22 want to, but --

11 (Pages 38 to 41)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 42

1    MR. JEFFERSON: -- understanding what
2  she said.
3    MR. SPIVA: -- but -- but -- but you're
4  not going to coach the witness.
5    MR. JEFFERSON: She said she's speaking
6  from the officer's perspective.
7  BY MR. SPIVA:
8    Q   Yeah, yeah.
9    I -- my question is -- and the record
10  reflects what it reflects -- is it the -- the
11  procedure, in your understanding, that the
12  officer -- when you say that the officer responds
13  to the location, that the officer physically comes
14  to at the location?
15    MR. JEFFERSON: Same objection.
16    THE WITNESS: I respond to the location,
17  yes. And I'm supposed to notify a sex squad
18  detective.
19  BY MR. SPIVA:
20    Q   Uh-huh. Okay. And then you -- you said
21  earlier, though, that then the detective responds
22  to the location; is that right?

Page 43

1    A   Yeah, they respond.
2    Q   Okay.
3    A   Yes, they respond.
4    Q   Okay. When you said that they respond
5  to the location, did you mean that they actually
6  physically come to the location?
7    A   Yes, they do. But I've had some
8  instances where they don't respond to the
9  location.
10    Q   Okay. Now, is the -- do you know
11  whether it is MPD policy and procedure for the
12  sexual assault detective to come to the location,
13  physically come to the location?
14    MR. JEFFERSON: Objection. Asked and
15  answered.
16    MR. SPIVA: No, it's not.
17  BY MR. SPIVA:
18    Q   You can answer.
19    A   That, I don't know. What their aspect
20  of -- you know, their part of the sexual assault
21  investigation, that, I don't know. But from an
22  officer's standpoint, I know what I'm supposed to

Page 44

1  do.
2    Q   Okay. And from an officer's standpoint,
3  do you know what the detective is supposed to do?
4    A   I know they're supposed to -- well,
5  through what I tell them, they investigate --
6  because I get their version first. And then I
7  tell them.
8    Q   Uh-huh.
9    A   And then from there, they decipher what
10  they're going to do in reference to whatever I've
11  told them.
12    Q   Okay. And in your experience, has that
13  included the detective actually coming physically
14  to the location to interview the victim?
15    A   I've had -- I've had them respond and
16  also not respond.
17    Q   Now, you say respond and also not
18  respond.
19    When you say respond, you mean actually
20  come to the location?
21    A   Yes.
22    Q   Okay. And when you say not respond,

Page 45

1  what do you mean by that?
2    A   I've also had them not respond to the
3  location.
4    Q   So not come physically to the location?
5    A   Yes.
6    Q   Okay. And when they don't come
7  physically to the location, what do they do, if
8  anything?
9    A   I don't know. They -- because they
10  don't respond.
11    Q   Uh-huh.
12    A   I don't know what they -- I can't answer
13  for them. I don't --
14    Q   Okay.
15    A   -- know what they do.
16    Q   That -- that's fair enough.
17    When you -- after you've interviewed
18  the -- the victim and you've communicated with the
19  sexual assault detective, do you remain at the
20  location until a detective comes to the location?
21    MR. JEFFERSON: Objection, to the extent
22  that the hypothet -- that's been posed can't apply

12 (Pages 42 to 45)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 46

1  in circumstances where the -- as she testified
2  already -- where the detective does not respond to
3  the location.
4  BY MR. SPIVA:
5    Q   Okay. When the -- when the detective
6  responds to the location, do you stay there until
7  they get there? Is that -- is -- is that --
8    A   Yes.
9    Q   -- your experience?
10     Yes, it is?
11   A   Yes, sir.
12   Q   Okay. And when the -- in the -- in the
13 instances where the detective has not responded to
14 the location, when do you leave?
15   A   When I clear my assignment with the
16 dispatcher.
17   Q   Okay. And what does that mean, you
18 clear your assignment with the dispatcher?
19   A   Meaning that I'm done with my assignment
20 and I'm ready to take a call.
21   Q   Okay. And -- and how do you know that?
22 Is that based on a communication with the

Page 47

1  dispatcher?
2    A   No. I'm just -- the -- the matter is
3  not being investigated, so I'm done with the call.
4    Q   Uh-huh. How do you know that you're
5  done with the call?
6    A   Because I -- it depends on the call. If
7  the -- if there isn't a crime that hasn't been
8  committed or it's unfounded or there's not enough
9  to investigate, I clear the assignment.
10   Q   Do you decide when to clear the
11 assignment, or is that a determination that's made
12 by someone else?
13   A   Usually through communication with the
14 sex squad detective --
15   Q   Uh-huh.
16   A   -- it's determined whether the case is
17 unfounded or founded.
18   Q   Uh-huh. And -- and if the sex squad
19 detective is determines that the case is
20 unfounded, at that point you leave the scene?
21   A   Yes, sir.
22   Q   And if the detective determines that the

Page 48

1  sexual assault is founded, what -- what -- what
2  role, if any, do you have from that point on?
3    A   I take the report.
4    Q   Okay. And when you say take the report,
5  what are you referring to? What report are you
6  returning to?
7    A   251, a PD 251 and PD 252.
8    Q   Okay. And if the -- and who do you take
9  that report from?
10   A   The complainant.
11   Q   Uh-huh. If the detective determines
12 that the complaint is unfounded, does that mean
13 you don't take a report?
14   A   I don't take arrest report. What the
15 detectives do, I don't -- that's up to them.
16   Q   Okay. But -- but -- but your
17 understanding is that -- well, let me strike --
18 let me step back.
19     Your practice at that point is not to
20 take a report?
21   A   From an officer's point of view, I don't
22 take the report as an officer. I can't testify as

Page 49

1  to what they do.
2    Q   Okay. And is that something that you
3  have been trained to do?
4      And when I say "that," I mean when
5  the -- when the complaint is -- is determined to
6  be unfounded by the detective, that you're trained
7  to not take a report?
8    A   There's not a report that needs to be
9  taken, so I -- yes.
10   Q   And -- and -- and when you say there
11 isn't a report that needs to be taken --
12   A   I --
13     MR. JEFFERSON: Let him finish.
14 BY MR. SPIVA:
15   Q   -- are you basing that on a policy of
16 MPD, or -- or something else?
17   A   Like I said before, I'm not sure of the
18 policies. I just know how to respond to a scene
19 when I respond as an officer.
20   Q   Okay. And -- and what -- how do you
21 know how to respond to a scene as an officer?
22 Where do you -- where do you get that

13 (Pages 46 to 49)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 50

1  understanding?
2     A   It's just the protocol that I take for
3  taking reports.
4     Q   Okay. Where do you get that protocol?
5     A   From experience.
6     Q   Okay. So just from your experience,
7  that's it?
8     A   Right. If a crime is committed, I -- I
9  take down the information, and I take a report.
10    Q   And so -- so you determine whether or
11 not you need to actually take a report based on
12 your experience; is that correct?
13    A   Based on what the complaint -- the
14 interview, the circumstances --
15    Q   Uh-huh.
16    A   -- what exactly has happened.
17    Q   Uh-huh.
18    A   And then I base it on the report. You
19 know, I write a report, excuse me.
20    Q   Are there any policies or procedures of
21 MPD, that you're aware of, that state when you are
22 and are not to take a report?

Page 51

1     A   I can't recall what exactly what
2  policies that I -- you know, I follow. But I know
3  when to take a report when a crime has been
4  committed.
5     Q   Do -- do you know if such policies
6  exist?
7        Am I confusing you with the question?
8     A   Yes, you are.
9     Q   I'm sorry.
10       Do you know if such policies that tell
11 you when you need to take a report and when, if
12 ever, you don't need to take a report, whether --
13 whether such policies exist?
14    A   In my general orders.
15    Q   There -- there are policies within your
16 general orders?
17    A   (Nodding).
18    Q   Okay. And what do you --
19       THE REPORTER: I didn't hear the
20 response to the question.
21       THE WITNESS: In my general orders.
22 BY MR. SPIVA:

Page 52

1     Q   And, actually, this is another thing.
2  You got to remember to say "yes" or "no," rather
3  than -- I -- I -- I heard you because you nodded,
4  but --
5     A   Right.
6     Q   -- but it's a good reminder to both of
7  us.
8        When you -- you said that there are the
9  policies that tell you when and when not to take a
10 report are in your general orders? Is that what
11 you said?
12    A   Yes.
13    Q   Okay. And what do those general orders
14 -- well, first of all, can you -- can -- do -- can
15 you tell me what -- which general orders you're
16 referring to?
17    A   No.
18    Q   And who puts out general orders?
19    A   I'm not sure.
20    Q   Are general orders something that you as
21 an officer are required to abide by?
22    A   Yes.

Page 53

1     Q   And are you trained in the content of
2  general orders that apply to you as an officer?
3     A   Yes.
4     Q   Okay. Where did you receive that
5  training?
6     A   In the academy we received our general
7  orders.
8     Q   And do you ever get any kind of updated
9  training or, you know, ongoing, continuing
10 training about what -- what's required by general
11 orders that pertain to you as an officer?
12    A   Yes.
13    Q   Okay. And how does that happen?
14    A   Forty-hour in-service training at the
15 academy.
16    Q   Uh-huh. What is the 40-hour in-service
17 training at the academy?
18    A   It's a refresher course at the academy
19 for officers to take once a year.
20    Q   So every year you have to take 40 hours
21 in-service training at -- at the academy?
22    A   Yes.

14  (Pages 50 to 53)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque

April 14, 2008

Washington, DC

Page 54

```
 1    Q   And that's something that's required of
 2  all officers in the MPD?
 3    A   Yes.
 4    Q   All right.  And how many times have you
 5  had to do that since your initial training?
 6    A   Since I've been -- since I've been an
 7  officer.
 8    Q   Uh-huh.  How many times have you had to
 9  go back for the 40-hour training?
10    A   Three times.
11    Q   And how much of that training involves
12  education, updating about the general orders?
13    A   I can't recall.
14    Q   Is it a substantial part of the training
15  or -- or -- or a, you know, a minimal part of the
16  training?
17    A   I can't recall.
18    Q   Uh-huh.  And you said you recalled that
19  there is something in the general orders that says
20  when you are or are not supposed to take a report.
21        Can you recall -- I know you can't
22  recall what the report specifically is, but can
```

Page 55

```
 1  you recall what the general orders say about when
 2  you are or are not supposed to take a report?
 3        MR. JEFFERSON:  Objection, to the extent
 4  that counsel's summarization of the testimony
 5  mischaracterizes it.
 6        But you can --
 7  BY MR. SPIVA:
 8    Q   Okay.  If I mischaracterize your
 9  testimony, just -- just correct me.  But I -- I
10  think I'm actually just -- I think that's what you
11  said, is that there was -- there was something in
12  the general orders that told you when or when
13  you -- when you needed to or didn't need to take a
14  report.
15        Is that -- is that a fair
16  characterization of what you said?
17    A   Repeat that.
18    Q   That there is something in the general
19  orders or in a general order that gives you
20  guidance on when you need to take a report and
21  when you don't need to take a report?
22    A   Yes.
```

Page 56

```
 1    Q   Okay.  And can you tell me what that
 2  guidance provides?
 3    A   I can't recall.
 4    Q   Okay.  Can you recall anything about it?
 5    A   No.
 6    Q   Okay.  And as it pertains to sexual
 7  assault cases, do you have any recollection
 8  sitting here today of what the general orders or
 9  order say about when you should or should not take
10  a report?
11        MR. JEFFERSON:  Objection, to the extent
12  that the witness has already testified about her
13  training or absence of training in sexual assault.
14  BY MR. SPIVA:
15    Q   Can -- can -- can you answer that?
16    A   No.
17    Q   Okay.  I better -- we better clarify the
18  record, because I want to make sure I understand
19  what the "no" is to.
20        Sitting here today, do you have any
21  recollection of anything in any general order that
22  gives you any guidance about when in a sexual
```

Page 57

```
 1  assault case you should or should not take a
 2  report?
 3        MR. JEFFERSON:  Same objection.
 4        THE WITNESS:  I can't -- I can't recall.
 5  BY MR. SPIVA:
 6    Q   Okay.  Have you studied or reviewed any
 7  documents dealing with the proper treatment of
 8  sexual assault victims?
 9    A   No.
10    Q   Have you studied or reviewed any
11  documents dealing with the proper investigation of
12  sexual assault complaints?
13    A   No.
14    Q   Have you studied or reviewed any
15  documents involving the protocol for the
16  administration of sexual assault forensic
17  examinations?
18    A   No.
19    Q   Do you -- when I say sexual assault
20  forensic examination, do you -- do you know what
21  I'm referring to?
22    A   Yes.
```

15 (Pages 54 to 57)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 58

```
 1    Q   Okay.  Is that what you've been calling
 2   a sex kit?
 3    A   Yes.
 4    Q   Okay.  And if I call it a rape kit,
 5   would -- would that -- would you consider that to
 6   be the same thing?
 7    A   It's not the term that I use.
 8    Q   Okay.  Where did you learn the term "sex
 9   kit"?
10    A   From my experiences with these types of
11   calls.
12    Q   Okay.  And can you specifically tell me
13   where -- where you first heard that term "sex
14   kit"?
15    A   In the hospitals --
16    Q   Okay.
17    A   -- when I responded to the calls.
18    Q   Okay.  Did you hear that at Howard
19   University Hospital?
20    A   Yes.
21    Q   Who used the term "sex kit" at Howard
22   University Hospital?
```

Page 59

```
 1         MR. JEFFERSON:  Objection, to the extent
 2   that this question is overly vague.  I mean if
 3   there's a particular time or instance you want to
 4   point to, or all the times that she's heard it.  I
 5   mean it's confusing.
 6   BY MR. SPIVA:
 7    Q   Can you recall any particular time when
 8   you heard somebody at Howard University use the
 9   term "sex kit"?
10    A   From the complainant.
11    Q   Okay.  Have you heard any doctor use the
12   term "sex kit"?
13    A   No.
14    Q   Okay.  Any nurse?
15    A   No.
16    Q   Okay.  And when you say the
17   complainants, you're talking other -- I mean
18   strike that.
19         When you say complainants, who are you
20   referring to?
21    A   From -- from the person that's
22   alleging a criminal assault.
```

Page 60

```
 1    Q   Is that the term you've heard used by
 2   victims of sexual assault?
 3    A   Yes.
 4    Q   Okay.  Have you ever reviewed -- strike
 5   that.
 6         What -- what's your understanding of the
 7   term "date rape drug," if any?
 8    A   It's -- from my understanding --
 9    Q   Uh-huh.
10    A   -- something used to -- something used
11   to lower a -- a young lady's inhibitions so that
12   she can give in to, you know, sex.
13    Q   Uh-huh.  And can you -- can you name
14   any -- any date rape drugs?
15    A   Not off the top of my head, no.
16    Q   Have you ever had any training in -- in
17   identifying date rape drugs?
18    A   No.
19    Q   You ever read any literature on -- on
20   the affects of date rape drugs?
21    A   No.
22    Q   At the academy, did they have any kind
```

Page 61

```
 1   of a -- a module or training on -- on the affect
 2   of date rape drugs?
 3    A   No.
 4    Q   What are the typical affects of a date
 5   rape drug, if you know?
 6    A   I don't know.  I'm not --
 7    Q   Okay.
 8    A   -- I'm not sure.
 9    Q   Do you know of any of the symptoms of --
10   that someone would display if they used any type
11   of -- or if they were given any type of a date
12   rape drug?
13         MR. JEFFERSON:  Objection.  Asked and
14   answered.  Symptoms, affects, it's the -- it's the
15   same thing.
16         But subject to that.
17   BY MR. SPIVA:
18    Q   Do -- do you know of any symptoms that
19   might be displayed by a person who had ingested a
20   date rape drug?
21    A   I've heard that someone can get
22   sluggish.
```

16 (Pages 58 to 61)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque

April 14, 2008

Washington, DC

Page 62

1    Q   Uh-huh.
2        MR. JEFFERSON: Go ahead and finish your
3    answer.
4        THE WITNESS: That's my answer.
5    BY MR. SPIVA:
6    Q   Uh-huh. Okay.
7        Anything else?
8    A   No.
9    Q   Are you aware of whether there are any
10   tests to determine if a date rape drug is present
11   in someone's body?
12   A   No.
13   Q   And I take it from that answer that you
14   are prob -- that you're not aware of how long
15   after a date rape drug is ingested its presence
16   can be detected in the body by any type of test?
17   A   No.
18   Q   And I take it from your answer earlier,
19   but I just want to make -- this is a slightly
20   different question, but I apologize it does sound
21   very similar.
22       Have you -- have you been trained

Page 63

1    regarding the importance of testing for such drugs
2    as early as possible after their ingestion?
3    A   No.
4    Q   In your experience as an officer,
5    would -- would such a test be relevant to a
6    criminal investigation of rape?
7    A   Repeat that question.
8    Q   As an officer, would you consider it
9    important to have a test -- strike that. Let
10   me -- let me -- let me start over.
11       As an officer, would you consider it
12   important to your criminal investigation of -- of
13   rape to know whether the alleged victim had
14   ingested a date rape drug?
15       MR. MONAHAN: Objection, foundation.
16       MS. TURNER: Same objection.
17   BY MR. SPIVA:
18   Q   Would you consider that important to
19   your investigation?
20       MR. MONAHAN: Same objection.
21       MS. TURNER: Same objection.
22   BY MR. SPIVA:

Page 64

1    Q   You can answer.
2    A   That's up to a detective.
3    Q   Uh-huh. Okay.
4    A   I can't -- I can't further investigate
5    that. That's up to a detective, sir.
6    Q   Okay. Now, if -- if a -- if a -- if
7    a -- an alleged victim of sexual assault told you
8    that they believed they had been drugged, is that
9    information that you would pass on to the sexual
10   assault detective when you -- when you talked to
11   them?
12   A   Yes.
13   Q   And why would you pass that information
14   on?
15   A   It's a part of the investigation. I
16   have to pass on all the information from the
17   complainant to the detective.
18   Q   And is that because you consider it
19   important in some way to the detective's invest --
20   investigation?
21   A   Yes.
22   Q   Okay. Why do you consider it important?

Page 65

1    A   It's her version of events that I have
2    to tell the detective.
3    Q   Uh-huh. Have you been told by any
4    detective that that's important information for
5    them know?
6        And when I say "that information,"
7    whether the -- the victim complains of having been
8    drugged?
9    A   No. A detective's never told me to tell
10   them that. I know to tell them that.
11   Q   And -- and -- and why do you -- how do
12   you know?
13       MR. JEFFERSON: Objection. Asked and
14   answered.
15       THE WITNESS: Because I have to tell the
16   detective everything the complainant tells me.
17   BY MR. SPIVA:
18   Q   Uh-huh. Do you consider it important
19   information?
20       MR. JEFFERSON: Same objection.
21   BY MR. SPIVA:
22   Q   You can answer.

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008

Washington, DC

Page 66

1    A   Yeah.
2        MS. TURNER: I also object.
3    BY MR. SPIVA:
4    Q   Do -- do you consider it important
5    information?
6    A   Yes.
7    Q   Uh-huh. Why?
8        MR. JEFFERSON: Asked and answered.
9        THE WITNESS: Because it's what the
10   complainant has told me.
11   BY MR. SPIVA:
12   Q   Uh-huh. If the complainant told you
13   that, you know, she'd had eggs for breakfast,
14   would you pass that on to the detective?
15       MS. TURNER: Objection.
16       THE WITNESS: That does not pertain to
17   the investigation, so no.
18   BY MR. SPIVA:
19   Q   Okay. But whether the complainant said
20   that she had been drugged, that does pertain to
21   the investigation?
22   A   Yes.

Page 67

1    Q   Okay. What is the SART program?
2    A   Repeat.
3    Q   What is the SART program?
4    A   I don't know.
5    Q   Have you ever heard of the sexual
6    assault response team?
7    A   No.
8    Q   Okay. And are you familiar with the --
9    the SANE program?
10   A   No.
11   Q   Okay. Have you ever heard of a -- of a
12   sexual assault nurse examiner?
13   A   No.
14   Q   Do you have any familiarity with the
15   D.C. Rape Crisis Center?
16   A   No.
17   Q   How many sexual assault complaints have
18   you responded to in your police career?
19   A   I would say approximately maybe five.
20   Q   Uh-huh. And how many of those five have
21   been determined, to use our terminology from
22   earlier, to be founded?

Page 68

1        MR. MONAHAN: Objection. Foundation.
2    BY MR. SPIVA:
3    Q   You can answer.
4    A   One.
5    Q   And when -- when was that?
6    A   I don't recall.
7    Q   Do you recall what year it was?
8    A   I believe last year.
9    Q   When you say last year, you mean 2007?
10   A   Yes, sir.
11   Q   Okay. Do you remember what season of
12   the year it was?
13   A   I can't --
14       MR. JEFFERSON: Objection. Asked and
15   answered.
16   BY MR. SPIVA:
17   Q   And do you -- was that a -- a sexual
18   assault complaint that you received at Howard
19   University Hospital?
20   A   Yes, sir.
21   Q   And who were the detectives who were
22   involved in -- in investigating that sexual

Page 69

1    assault?
2    A   Detective Paci.
3    Q   "Casey," did you say?
4    A   Pasi.
5    Q   How do you spell that?
6    A   P-A-C-I.
7    Q   Uh-huh. Anybody else?
8    A   I can't recall the other.
9    Q   And in that particular complaint where I
10   take it Detective Paci was the one who determined
11   that it was -- that it was founded?
12   A   I believe so, yes, sir.
13   Q   Okay. What was the procedure which was
14   followed after Detective Paci determined that the
15   sexual assault was founded?
16   A   I don't know what she did. I took the
17   report.
18   Q   Okay. Do you know what happened at the
19   hospital after that point?
20   A   No, sir.
21   Q   Did Detective Paci come to the hospital
22   to talk to the victim?

18 (Pages 66 to 69)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque

April 14, 2008

Washington, DC

<table>
<tr><td>

Page 70

1   A   Yes.
2   Q   And did you interview the victim also?
3   A   Yes.
4   Q   And were you there -- were you present
5   during Detective Paci's interview of the victim?
6   A   Yes.
7   Q   Can you describe the circumstances of
8   that sexual assault complaint?
9       MR. JEFFERSON: At this point, I'm just
10  going to object to the extent that this line of
11  questioning fridges upon any privacy rights that
12  particular victim may have. This is a delicate
13  area. And I would counsel some measure of
14  trepidation in that regard.
15  BY MR. SPIVA:
16  Q   Yeah. Well, we'll -- we'll certainly
17  get to that topic in a minute. I haven't asked
18  for anybody's name. But I would like to know the
19  circumstances of that -- that sexual assault
20  report. So you can answer the question.
21  A   The complainant advised me that her
22  husband beat her, dragged her into the bathroom,

</td><td>

Page 72

1   Q   Okay. And so there were three others.
2       When did those occur?
3   A   I can't recall, sir.
4   Q   Okay. Did they occur before or after
5   December 9th -- before or after the -- the
6   complaint at issue here, December --
7   A   I don't know.
8   Q   Okay. Could be before, could be after?
9   A   Sure.
10  Q   Okay. And why were those complaints
11  found to be unfounded?
12  A   I can't recall, sir.
13  Q   Okay. Do you recall the circumstances
14  of any of those complaints?
15      MR. JEFFERSON: Here again I'm going to
16  state the objection on privacy grounds with
17  respect to these other incidents.
18      But subject to that.
19  BY MR. SPIVA:
20  Q   You can answer.
21  A   No, I don't -- I can't recall the
22  circumstances.

</td></tr>
<tr><td>

Page 71

1   placed his fingers in her anus, continued to have
2   sex without her consent, fondled her with an
3   hanger, and beat her with a belt.
4   Q   Uh-huh. Okay. And you related that to
5   the detective?
6   A   Yes.
7   Q   Okay. And to your knowledge, did -- was
8   a -- was a -- a rape kit performed on the
9   complainant?
10      MS. TURNER: Objection.
11      THE WITNESS: I don't know. I took the
12  report.
13  BY MR. SPIVA:
14  Q   Okay. And you said in the other four
15  out of the five the complaint was the determined
16  to be unfounded; is that right?
17  A   Yes.
18  Q   Okay. And in those four instances -- I
19  take it one of those four is the instance
20  involving my client, the Plaintiff; is that
21  correct?
22  A   Yes.

</td><td>

Page 73

1   Q   Okay. Do you -- did you take a report
2   in any of those other cert -- any of those other
3   cases where the -- the complaint was -- was found
4   to be unfounded?
5   A   No.
6   Q   And who made the determination that
7   those other complaints -- I'm excluding now the --
8   the -- you know, my client's complaint.
9       Who made the determination that those
10  complaints were unfounded?
11  A   Sex squad detectives.
12  Q   Uh-huh. And can you name those sex
13  squad detectives?
14  A   No, I can't.
15  Q   Okay. Do you recall any of the sex
16  squad detectives who made any such determination?
17  A   No.
18  Q   Okay. And you said you did not take a
19  report?
20  A   No.
21  Q   Okay. Is there any paperwork whatsoever
22  in existence relating to those three instances?

</td></tr>
</table>

19 (Pages 70 to 73)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 70

1    A   Yes.
2    Q   And did you interview the victim also?
3    A   Yes.
4    Q   And were you there -- were you present
5  during Detective Paci's interview of the victim?
6    A   Yes.
7    Q   Can you describe the circumstances of
8  that sexual assault complaint?
9        MR. JEFFERSON:  At this point, I'm just
10 going to object to the extent that this line of
11 questioning fridges upon any privacy rights that
12 particular victim may have.  This is a delicate
13 area.  And I would counsel some measure of
14 trepidation in that regard.
15 BY MR. SPIVA:
16   Q   Yeah.  Well, we'll -- we'll certainly
17 get to that topic in a minute.  I haven't asked
18 for anybody's name.  But I would like to know the
19 circumstances of that -- that sexual assault
20 report.  So you can answer the question.
21   A   The complainant advised me that her
22 husband beat her, dragged her into the bathroom,

Page 71

1  placed his fingers in her anus, continued to have
2  sex without her consent, fondled her with an
3  hanger, and beat her with a belt.
4    Q   Uh-huh.  Okay.  And you related that to
5  the detective?
6    A   Yes.
7    Q   Okay.  And to your knowledge, did -- was
8  a -- was a -- a rape kit performed on the
9  complainant?
10       MS. TURNER:  Objection.
11       THE WITNESS:  I don't know.  I took the
12 report.
13 BY MR. SPIVA:
14   Q   Okay.  And you said in the other four
15 out of the five the complaint was the determined
16 to be unfounded; is that right?
17   A   Yes.
18   Q   Okay.  And in those four instances -- I
19 take it one of those four is the instance
20 involving my client, the Plaintiff; is that
21 correct?
22   A   Yes.

Page 72

1    Q   Okay.  And so there were three others.
2        When did those occur?
3    A   I can't recall, sir.
4    Q   Okay.  Did they occur before or after
5  December 9th -- before or after the -- the
6  complaint at issue here, December --
7    A   I don't know.
8    Q   Okay.  Could be before, could be after?
9    A   Sure.
10   Q   Okay.  And why were those complaints
11 found to be unfounded?
12   A   I can't recall, sir.
13   Q   Okay.  Do you recall the circumstances
14 of any of those complaints?
15       MR. JEFFERSON:  Here again I'm going to
16 state the objection on privacy grounds with
17 respect to these other incidents.
18       But subject to that.
19 BY MR. SPIVA:
20   Q   You can answer.
21   A   No, I don't -- I can't recall the
22 circumstances.

Page 73

1    Q   Okay.  Do you -- did you take a report
2  in any of those other cert -- any of those other
3  cases where the -- the complaint was -- was found
4  to be unfounded?
5    A   No.
6    Q   And who made the determination that
7  those other complaints -- I'm excluding now the --
8  the -- you know, my client's complaint.
9        Who made the determination that those
10 complaints were unfounded?
11   A   Sex squad detectives.
12   Q   Uh-huh.  And can you name those sex
13 squad detectives?
14   A   No, I can't.
15   Q   Okay.  Do you recall any of the sex
16 squad detectives who made any such determination?
17   A   No.
18   Q   Okay.  And you said you did not take a
19 report?
20   A   No.
21   Q   Okay.  Is there any paperwork whatsoever
22 in existence relating to those three instances?

19 (Pages 70 to 73)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 74

1    A   No.
2    Q   And did the detective in those three
3  instances come to the hos -- any of those three
4  instances come to the hospital -- let me step
5  back.
6        Did the detective come to the location
7  to interview the victim?
8    A   I can't recall which times a detective
9  did or did not. There are times when they don't,
10  and there are times when they do.
11   Q   Okay. Let -- let's out of those three,
12  how many times did they actually come to the
13  location?
14       MR. JEFFERSON: Objection. Asked and
15  answered. She already said that she can't recall.
16       MR. SPIVA: No, she didn't.
17  BY MR. SPIVA:
18   Q   Out of those three, how many times did
19  they actually come to the location?
20   A   I can't recall, sir.
21   Q   Okay. And can you recall any of the
22  instances -- in any of the instances where they

Page 75

1  did not come to the location why they did not come
2  to the location?
3    A   One instance was because it was the
4  second time that they had been notified, and they
5  were aware of the situation. And it was like a
6  repeat call, so they didn't come. And the other
7  circumstance, I can't recall; or the other
8  circumstances, the other times when they didn't
9  come, I can't recall.
10   Q   Uh-huh. In those other circumstances --
11  and, again, I want to put to one side the
12  complaint of my client -- did you come to a
13  conclusion that the complaint was unfounded, in
14  any of those three circumstances?
15   A   I can't recall the circumstances, so
16  therefore I can't answer that question.
17   Q   Uh-huh. But -- but now I'm not asking
18  you about the particular circumstances.
19       I'm asking you whether you actually came
20  to a conclusion about whether or not any of those
21  complaints were founded or unfounded?
22   A   No, I --

Page 76

1        MR. JEFFERSON: Objection. Asked and
2  answered.
3        MR. SPIVA: Wait a second. Wait --
4  she's --
5  BY MS. HARTNETT:
6    Q   Go -- go ahead.
7    A   No, I don't -- no, I don't come to the
8  conclusion.
9    Q   Okay. Was there anything that you
10  related to the detective that you, in your view as
11  an officer, supported the conclusion that the
12  complaint was unfounded?
13   A   No.
14   Q   So did you think that those complaints
15  actually were founded?
16   A   I don't have --
17       MR. JEFFERSON: Objection. Asked and
18  answered.
19  BY MR. SPIVA:
20   Q   You can answer.
21   A   I don't have an opinion. The
22  complainant tells me their version of the events,

Page 77

1  And I tell the detective. I'm unbiased.
2    Q   Okay. So just -- let me just make sure
3  I understand the procedure that you follow for
4  investigating sexual assault.
5        You don't apply any judgment whatsoever
6  to the facts you received from the victim?
7    A   I can't. No.
8    Q   Okay. You just take down what they say?
9    A   Yes, sir.
10   Q   Okay. And then you relate it to the
11  detective?
12   A   Yes, sir.
13   Q   Okay. And what is the purpose of having
14  you do that as opposed to having the victim talk
15  directly to the detective?
16   A   Because I'm going to be the reporting
17  officer. I have to respond to the location which
18  is on my beat which is a part of routine patrol.
19  I respond. I interview the complainant, and
20  notify the detective.
21   Q   Okay. Are there any differences in the
22  procedure you fol -- the procedures you follow

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 118

1   think I know the answer to this, but I just want
2   to clarify it for the record.
3           After you left the hospital that day,
4   did you have any role whatsoever in investigating
5   or following up on the complainant's complaint of
6   sexual assault?
7       A   I'm not a detective, sir; so no, I did
8   not.
9       Q   Did not. Okay.
10          And to your knowledge, did Officer Green
11  have any role in following up or investigating in
12  any way complainant's complaint of sexual assault?
13      A   She's not a detective, either. And
14  officers don't follow up.
15      Q   Okay. And so I take it from that you
16  didn't talk -- you didn't visit the scene or -- or
17  talk to any other potential witnesses?
18      A   We're not detectives. That's -- we
19  don't do that.
20      Q   And I gather from your answers that
21  that's something that would be the detective's
22  role to do?

Page 119

1       A   Yes, sir.
2       Q   Okay. What is your understanding of a
3   sexual assault medical forensic examination or a
4   rape kit?
5       A   I don't -- I don't deal with the -- the
6   sex kit.
7       Q   Okay. Do you have any idea what one
8   entails?
9       A   No.
10          MR. JEFFERSON: Objection, to the extent
11  that it calls for speculation, and asked and
12  answered.
13  BY MR. SPIVA:
14      Q   Do you have any idea what the purpose of
15  a -- a rape kit is?
16      A   No. That's for the detectives.
17      Q   Okay. And I take it from that that you
18  wouldn't have any idea whether the length of time
19  between a sexual assault and the time a rape kit
20  is administered makes any difference in terms of
21  the kit's effectiveness in collecting evidence?
22          MS. TURNER: Objection.

Page 120

1   BY MR. SPIVA:
2       Q   You can answer.
3       A   I wouldn't know anything about that,
4   sir.
5       Q   Okay. Do you know anything about
6   whether any precautions must be taken to make sure
7   that evidence on a victim's body is not
8   inadvertently destroyed?
9       A   That -- no, sir.
10      Q   Okay. Is it part of your duty as a
11  responding officer to ensure that evidence of a
12  crime is not destroyed?
13      A   Yes, when there's a crime scene
14  established.
15      Q   Would you consider the victim of a
16  sexual assault's body to be a crime scene?
17      A   That decision is made by the sex squad
18  after I tell them what the complainant has told
19  me.
20      Q   Have you ever received any training in
21  what -- what to advise victims of sexual assault
22  in terms of preserving evidence on their body

Page 121

1   until the determination by the detective is made?
2       A   No.
3       Q   What, to your knowledge, is the police
4   role in the administration of rape kits?
5       A   I don't have any knowledge of that, sir.
6       Q   Okay. Is it your understanding that in
7   the District of Columbia police authorization is
8   required before a hospital can administer a rape
9   kit?
10      A   I don't know what the hospital can or
11  cannot do. I know what -- as an officer, what I'm
12  supposed to do.
13      Q   And do you -- as an officer, is -- is
14  your authorization required before the hospital
15  can administer a rape kit?
16          MR. JEFFERSON: Objection. Asked and
17  answered.
18          MS. TURNER: Objection.
19          MR. SPIVA: No, it hasn't been.
20  BY MR. SPIVA:
21      Q   You can answer.
22      A   I don't --

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                          April 14, 2008

Washington, DC

Page 154

1   the full name and address and phone number of --
2   of the wife on -- on a public document?
3       A   Because it's a public document, meaning
4   anyone might be able to gain access to that
5   report. And we went to respect their privacy.
6       Q   Okay. And is that a particular rule in
7   sexual -- in -- in cases of allegations of sexual
8   assault, that you don't put the -- the -- the full
9   name, address, and other personally identifying
10  information of the alleged victim in a PD 251?
11      A   If their report is classified as a
12  sexual abuse crime, yes.
13      Q   Okay. And so I take it that if this
14  report had been classified as a sexual abuse
15  report, then it would not have been proper
16  procedure to do -- to put down Ms. McGaughey's
17  full name, address, or it's date, telephone
18  number; is that correct?
19      A   Repeat the question one more time.
20      Q   If this had been classified as a sexual
21  abuse report, it would not have been proper under
22  D.C. -- MPD policy to put down Ms. McGaughey's

Page 155

1   full name, address, birth date, phone number,
2   would it have been?
3       A   No, it wouldn't have been proper if it
4   was deemed sexual abuse.
5       Q   Who decides what gets put in box number
6   13?
7       A   The reporting officer.
8       Q   Okay. So in this instance, Officer
9   Green would have decided what got put in box
10  number 13; is that right?
11      A   I didn't write the report, sir.
12      Q   It's my question. I -- I -- I didn't
13  ask you what. I said I -- okay. Sorry. Let me
14  step back.
15          In -- in this in this particular report,
16  would it have been Officer Green who would have
17  made the determination of what to put in box
18  number 13?
19      A   Yes.
20      Q   And just as in the case that you
21  described a minute ago, the wife who was sexually
22  abused by her husband, you made the determination,

Page 156

1   as the reporting officer, to put sexual abuse in
2   box number 13; isn't that correct?
3       A   Negative.
4       Q   Why is that negative?
5       A   The sexual assault detective advises
6   what classification to put on the report. I take
7   the report.
8       Q   Okay.
9       A   They advice me the classification of the
10  report.
11      Q   Okay. So you -- so the detective told
12  you what to put in box number 13 in the -- in that
13  instance?
14      A   In my -- yes.
15      Q   Okay. And is that standard policy, that
16  the detective tells you what to put in box number
17  13?
18      A   If deemed a sexual crime of some sort,
19  yes.
20      Q   Uh-huh. And if not deemed a sexual
21  crime of some sort, how is it determined what to
22  put in box number 13 for a -- excuse me -- who

Page 157

1   determines what to put in box number 13?
2       A   The reporting officer.
3       Q   Okay. So and -- and in the instances
4   where -- in the -- in the cases of the -- of
5   alleged sexual abuse, other than the one of the
6   wife and the -- the husband that you've described,
7   what did you put in box number 13?
8       A   That is advised to me by a sexual squad
9   detective. It de -- it determines on the crime.
10      Q   Uh-huh. Okay. But you've already said
11  that -- that that was the only one where the
12  allegation of sexual abuse was deemed to be
13  founded.
14          So I take it all the others were deemed
15  to be unfounded; is --
16      A   That's correct.
17      Q   -- that right? Okay.
18          And in those instances, who decided what
19  to put in box number 13?
20      A   I didn't take a report when they were
21  unfounded.
22      Q   So you didn't take any report

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                              April 14, 2008

Washington, DC

Page 158

1  whatsoever?
2  A  None.
3  Q  Okay. No PD 251?
4  A  None.
5  Q  Okay. No PD 252?
6  A  None.
7  Q  And do you know whether that is
8  consistent with -- with police policy?
9      MR. JEFFERSON: Objection.
10 BY MR. SPIVA:
11 Q  Of MPD policy?
12     MR. JEFFERSON: Foundation.
13     MR. SPIVA: I'm asking her if she know
14 whether that's consistent with MPD policy.
15     MR. JEFFERSON: What's the "that" to
16 which you refer?
17     MR. SPIVA: The "that" is not to take a
18 report at all when the allegation of sexual
19 assault is found to be unfounded.
20     THE WITNESS: As the reporting officer,
21 yes.
22 BY MR. SPIVA:

Page 159

1  Q  And when you say as the reporting
2  officer, are you making a distinction as between
3  the reporting officer and some other police
4  personnel?
5  A  Yes.
6  Q  Okay. Who -- who --
7  A  I don't take the report. I'm done with
8  the assignment. What the sex squad's detectives
9  do, I don't know.
10 Q  Okay. But as the reporting officer, you
11 take no report if the allegation of sexual assault
12 is -- is found to be unfounded?
13 A  Yes.
14 Q  And do you know whether that, and "that"
15 meaning as a -- the reporting officer doing no
16 report, in a -- in a case involving alleged sexual
17 abuse is consistent with MPD policy?
18 A  You're confusing me. Repeat the
19 question.
20 Q  The question is do you know whether not
21 doing a report at all in a case of alleged sexual
22 abuse is consistent with MPD policy?

Page 160

1      MR. JEFFERSON: Objection. Foundation.
2  And I think you meant to put in there when it's
3  unfounded. I don't think that's in your question.
4  BY MR. SPIVA:
5  Q  Well, let's -- let's leave it -- let's
6  leave it broader than that. Because I -- you have
7  some confusion with the question. And I think it
8  might be easier if we break it -- if we -- if we
9  start it broader. And we can then go narrower if
10 need be. Let me repeat the question.
11     The question is do you know, in a case
12 of alleged sexual abuse, whether it is consistent
13 with MPD policy not -- for the reporting not to
14 take a report?
15 A  I know that as a reporting officer I do
16 not take report if there's a report that doesn't
17 need to be made. Unfounded, it's clear. I don't
18 take a report.
19 Q  Okay. Okay. Now limiting it to an
20 instance where it -- the allegation has been
21 deemed to be unfounded, do you know whether it is
22 consistent with MPD policy not to take a report in

Page 161

1  a case of alleged sexual abuse?
2  A  Yes.
3  Q  You believe that is consistent with MPD
4  policy?
5      MR. JEFFERSON: Asked and answered.
6      THE WITNESS: Yes.
7  BY MR. SPIVA:
8  Q  And in such a case, such a case being a
9  case where the allegation is deemed by the
10 detective to be unfounded, is it consistent with
11 MPD policy, to your knowledge, to set forth
12 personally identifying details of the victim in a
13 PD 251?
14 A  Repeat the question. Because it doesn't
15 make sense to me. Can you repeat it?
16 Q  Actually, let me ask you a different
17 question.
18     Do you consider this to be a report?
19 A  Yes.
20 Q  Okay. But this was a case where the
21 allegation was deemed by the detective to be
22 unfounded, correct?

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                                    April 14, 2008

Washington, DC

Page 202

1  friends, about her friends, 3:00 a.m. I don't
2  know anything about that.
3      Q   Okay. And so even though the report
4  that you signed characterizes what happened on --
5  at that day and visit, you actually, in fact, have
6  no knowledge whatsoever about what happened on
7  that 3:00 a.m. visit?
8          MS. TURNER: Objection.
9          MR. JEFFERSON: Objection.
10         MR. MONAHAN: Objection to the
11 foundation.
12         MS. ROBOKOS: Same objection.
13         THE WITNESS: Sir, I don't know. That's
14 all I'm going to say. I don't know.
15 BY MR. SPIVA:
16     Q   Okay. In the report that you signed, it
17 says that C1 reported to both officers on the
18 scene.
19         I assume that's you and Officer Green?
20     A   Yes.
21     Q   Okay. That she attended a house party
22 at the listed location, and doesn't know if

Page 203

1  anything happened to her. C1 reports she blacked
2  out.
3          What is your recollection, if any, about
4  why she thought something might have happened to
5  her?
6      A   Let's see. She stated she blacked out.
7  She said I think someone might have put something
8  in my drink. And then she said I was drunk.
9      Q   Uh-huh. Did she say anything else about
10 why she thought something -- some type of sexual
11 assault or sexual abuse might have happened to her
12 at that party?
13     A   She said she didn't know what had
14 happened.
15     Q   Okay. Did she say that she thought
16 something had happened?
17     A   No. Actually, she said I don't know
18 what happened.
19     Q   Okay. Did she tell you why she bothered
20 to come to the hospital?
21     A   She wanted a sex kit --
22     Q   Okay.

Page 204

1      A   -- to see if she had been assaulted.
2  She didn't know whether she had or not.
3      Q   Okay. But she had no reason -- she
4  didn't give you any reason whatsoever why she
5  thought she might have been assaulted?
6      A   She didn't know what happened. She said
7  she blacked out.
8      Q   Okay. Did she tell you why she had
9  bothered to call the police?
10     A   She came to the hospital.
11     Q   Uh-huh.
12         MS. TURNER: Objection.
13         MR. MONAHAN: Objection to foundation.
14         MS. ROBOKOS: Same objection.
15 BY MR. SPIVA:
16     Q   Go ahead.
17     A   She came to the hospital.
18     Q   Uh-huh.
19     A   For a sex kit.
20     Q   Uh-huh.
21     A   I don't know who called the police. I
22 responded to my radio run.

Page 205

1      Q   Uh-huh. Uh-uh. Okay.
2          Did the fact -- did the fact that she
3  had blacked out at the party seem suspicious to
4  you?
5          MR. JEFFERSON: Objection.
6          THE WITNESS: No.
7  BY MR. SPIVA:
8      Q   Did you have a basis to think that she
9  was lying about that?
10     A   No.
11     Q   Have you ever, other than this instance,
12 had a -- an alleged rape victim report to you
13 having blacked out?
14     A   Repeat that question again.
15     Q   Have you ever had, other than in this
16 matter, a potential or a -- an alleged rape victim
17 report to you having blacked out?
18     A   Yes.
19     Q   Okay. When did that happen?
20     A   When? I can't recall when that was.
21     Q   And was that in the matter involving
22 the -- the husband and wife that you described

52  (Pages 202 to 205)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque

April 14, 2008

Washington, DC

---

Page 206

1  earlier?
2  A  No.
3  Q  Okay.  Was -- it was one of the five
4  instances that you've reported on in terms of
5  sexual assault?
6  A  Yes.
7  Q  Okay.  And can you describe that
8  incident?
9  MR. JEFFERSON:  And just -- before she
10 goes into that, I'm going to renew my statement
11 about the privacy of the people involved.  Subject
12 to that, she can answer the question.
13 MR. MONAHAN:  I object to relevancy.
14 MS. ROBOKOS:  Same objection.
15 BY MR. SPIVA:
16 Q  You can -- you can answer.
17 MS. TURNER:  Join.
18 THE WITNESS:  I had a young lady tell me
19 that she got drunk at a business party, and she
20 passed out and thought she might have had sex with
21 a co-worker and didn't know if it was consentual
22 or not.

---

Page 207

1  BY MR. SPIVA:
2  Q  Where did they report that to you?
3  A  I can't recall.
4  Q  Do you recall whether it was at a
5  hospital or somewhere else?
6  A  Oh, at a hospital.
7  Q  Okay.  Which hospital?
8  A  Howard.
9  Q  Uh-huh.  And did she -- she said that
10 she -- that -- that complainant said that she had
11 believed she had had some type of sexual contact
12 with someone while she was blacked out?
13 A  She said she just got drunk and didn't
14 know if she had had sexual contact.
15 Q  Was there something that made her think
16 that she might have had sexual contact?
17 MS. ROBOKOS:  Note my objection.
18 MS. TURNER:  Continuing objection.
19 BY MR. SPIVA:
20 Q  You can answer.
21 A  I can't recall the exact like
22 circumstances.

---

Page 208

1  Q  And was that one of the instances that
2  was found to be unfounded?
3  A  Yes.
4  Q  Okay.  Do you know why that was
5  determined to be unfounded?
6  A  No.
7  Q  Do you know the detective -- first of
8  all let me ask you, was it a detective who made
9  the determination that it was unfounded?
10 A  Yes.
11 Q  And do you know which detective it was
12 that made that determination?
13 A  I can't recall.  A dif -- a different
14 detective comes out every time --
15 Q  Uh-huh.
16 A  -- so I can't recall.
17 Q  And did that detective actually come out
18 to the scene and interview the -- the victim?
19 A  Yes.
20 Q  Okay.  And you were present there when
21 he interviewed her, he or she?
22 A  Yes.

---

Page 209

1  Q  Okay.  Did he tell you why he was making
2  the determination that it was unfounded?
3  A  I can't recall, sir.
4  Q  Can't recall whether he told you?
5  A  Yeah.
6  Q  Is there anything that would refresh
7  your recollection?
8  A  No.
9  Q  Is there any document that exists that
10 would refresh your recollection?
11 A  No.
12 Q  Was a report taken in that instance?
13 A  No.
14 Q  Do you know whether Howard administered
15 a rape kit in that instance?
16 MS. TURNER:  Objection.
17 THE WITNESS:  No.
18 BY MR. SPIVA:
19 Q  I'm sorry.  When you say no, you mean no
20 you don't recall whether or not they administered
21 one, or no you don't know whether they
22 administered one?

---

53 (Pages 206 to 209)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 210

1      MR. MONAHAN: Or no none exists.
2      MR. JEFFERSON: Can you repeat his
3   question and her answer?
4          (Whereupon the reporter read
5          the record as requested.)
6      MR. JEFFERSON: Okay. In that context,
7   you can answer his current question.
8      And if you would read, too, the one
9   that's pending from the gentleman.
10         (Whereupon the reporter read
11         the record as requested.)
12  BY MR. SPIVA:
13   Q   And I -- actually, I want to adopt
14  the -- the part of the objection, or no none was
15  administered?
16   A   No, none was administered.
17   Q   And so you know, sitting here today,
18  that none was administered in that instance?
19   A   Yes.
20   Q   Okay. Do you know why one wasn't
21  administered?
22   A   No.

Page 211

1    Q   Did you talk to any of the hospital
2   personnel in that instance?
3    A   No.
4    Q   Was that something that happened this
5   year?
6    A   I can't recall.
7    Q   It may have happened this year but you
8   just can't recall?
9    A   I can't recall, sir.
10   Q   Okay. Was it something that happened
11  before or after the -- the complaint in this case?
12   A   I can't -- I can't -- I can't recall the
13  date, sir.
14   Q   So -- so you don't know whether it was
15  before or after December of 2006?
16      MR. JEFFERSON: Objection --
17      MS. TURNER: Objection.
18      MR. JEFFERSON: -- asked and answered.
19      THE WITNESS: No, I -- sir, I don't
20  know.
21  BY MR. SPIVA:
22   Q   Okay. Did you take any notes of -- of

Page 212

1   your interview with Ms. McGaughey?
2    A   No.
3    Q   Okay. Do you have a field notebook?
4    A   Yes.
5    Q   And did you put anything in the field
6   notebook during your -- as a result of your
7   interview with Ms. McGaughey?
8    A   No.
9    Q   Okay. The other incident or reported
10  rape that you mentioned a minute ago, where the
11  other victim reported having blacked out and where
12  it was determined to be unfounded, did you keep
13  any notes of that?
14   A   No.
15   Q   Okay. Did you take any report of that?
16   A   No.
17   Q   What do you use your field notebook for?
18   A   To take notes.
19   Q   And in what circumstances do you use it
20  to take notes?
21   A   When I take reports.
22   Q   So you only -- you only use it when

Page 213

1   you're going to take a report?
2    A   No. I take notes when it's necessary,
3   when I -- when I need to take notes on a matter
4   or --
5    Q   Uh-huh. How do you decide when it's
6   necessary.
7    A   Usually when I take a report, when I
8   take a look out for a robbery --
9    Q   Uh-huh.
10   A   -- tags, stollen tags, things of that
11  nature, police matter.
12   Q   Why didn't you take any notes of your
13  interview with Ms. McGaughey?
14      MS. TURNER: Objection.
15      MR. MONAHAN: Objection to foundation.
16      THE WITNESS: At that time, my partner
17  was -- like -- like I said, her personality, she
18  was the lead officer on this scene.
19  BY MR. SPIVA:
20   Q   Uh-huh.
21   A   So I kind of just let her be the lead
22  officer on the scene. And I didn't feel as if I

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 218

1  he look like, excuse me, what's he look like, his
2  name --
3      Q   Uh-huh.
4      A   -- date of birth, social.  I can't
5  remember that off the top of the head.  That's a
6  suspect.
7      Q   Uh-huh.  Uh-huh.  And -- and when did
8  you -- did you take the notes before you wrote the
9  report or -- or after you wrote the report?
10      MR. JEFFERSON:  This is in the context
11  of what --
12      MR. SPIVA:  The same incident she just
13  described, yes.
14      THE WITNESS:  Actually, like
15  simultaneously while -- while I'm taking the
16  report, I'm taking notes in my notebook that I
17  will need.
18  BY MR. SPIVA:
19      Q   Uh-huh.  Uh-huh.  And when in that
20  instance, where the -- the event -- the alleged
21  sexual abuse was -- was determined to be founded,
22  when did you decide you were going to need notes?

Page 219

1      A   While I was taking the report.
2      Q   Uh-huh.
3      A   And then -- she told her story to me
4  several times, so it depends on when -- at which
5  point she told --
6      Q   Uh-huh.
7      A   -- you know, the story over again at
8  that --
9      Q   Uh-huh.
10      A   -- at which time, I don't know.
11      Q   So if first she told the story you
12  didn't take notes?
13      A   No.  Because I listened.
14      Q   Okay.
15      A   The first thing I do is listen.
16      Q   But the second time she told, you
17  started taking notes?
18      A   Like I just said, I can't recall which
19  time --
20      Q   Uh-huh.
21      A   -- which time she told me --
22      Q   Uh-huh.

Page 220

1      A   -- the story when I started to take
2  notes.
3      Q   Okay.
4      A   The first time I listened.
5      Q   Further on in this -- we're back to
6  Exhibit Leveque 2.
7      It says, C1 was informed that a
8  report -- a report could not be taken based on the
9  statement she things something happened.
10      What does -- what does that mean when
11  it -- when it refers to a report?
12      MR. JEFFERSON:  Where are you reading
13  from, Counsel?
14      MR. SPIVA:  It's in the narrative.  And
15  it is --
16      MR. GLEASON:  After she --
17      MR. JEFFERSON:  Okay.
18      MR. GLEASON:  -- blacked out.
19      MR. JEFFERSON:  Okay.
20      MR. SPIVA:  Yeah.  Exactly.
21      MR. JEFFERSON:  Got it.
22  BY MR. SPIVA:

Page 221

1      Q   Do you see that, where it says, C1 was
2  informed that a report could not be taken based on
3  the statement she thinks something happened?
4      A   Yes.
5      Q   And what report that you signed -- I'm
6  sorry.  Strike that.
7      What report is being referred to here?
8      A   Sexual abuse report.
9      Q   Okay.  In your view, could she have
10  pressed charges against anyone based on what she
11  told you?
12      A   There was no suspect.  No.
13      Q   So the answer is she could not have
14  pressed charges at that point based on what she
15  told you?
16      A   There's no suspect information.  No.
17      Q   I just want to get clear.
18      So that -- the answer to my question is
19  no?
20      A   No.
21      Q   Okay.  Why couldn't a sexual assault
22  report be taken based on an alleged rape victim

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque

April 14, 2008

Washington, DC

Page 222

1   thinking something had happened to her?
2     A   Because she doesn't know what happened
3   to her, and there is no suspect.
4     Q   So in your view, there has to be a
5   suspect in order for a sexual assault report to be
6   taken?
7     A   In this instance she had no suspect, she
8   doesn't know what happened to her, she doesn't
9   know how she even sustained the pain in her anus.
10     Q   Uh-huh.
11     A   There's no -- I don't know -- I don't
12   know what a detective could investigate.
13     Q   Uh-huh. Who -- who made the
14   determination that a -- sorry. Let -- let me
15   strike.
16      This report is -- is -- is relating in
17   that sentence what she was told, correct, by -- by
18   Officer Green, correct?
19     A   Yes.
20     Q   Okay. What -- and Officer Green told
21   her that?
22      And it's an obvious question, but I just

Page 223

1   want to make sure that Officer Green in fact told
2   her that a report could not be taken based on what
3   she was telling her?
4     A   Could I refresh this --
5     Q   Sure. Sure.
6     A   -- to see what Officer Green wrote in
7   the report?
8     Q   Sure.
9     A   (Witness examined document).
10      MR. JEFFERSON: Take your time.
11      THE WITNESS: (Witness examined
12   document). She was informed that a report could
13   not be taken based on that she -- just -- just on
14   the fact that something happened.
15   BY MR. SPIVA:
16     Q   Okay. And she was informed that by
17   Officer Green, correct?
18     A   Yes.
19     Q   Okay. Did -- did she -- did Officer
20   Green inform her of -- of that before or after
21   talking to the sexual assault detective?
22      MR. JEFFERSON: Objection. Foundation.

Page 224

1      Answer to --
2   BY MR. SPIVA:
3     Q   You can answer.
4      MR. JEFFERSON: -- the extent that you
5   know.
6      THE WITNESS: I can't recall when she
7   informed her, but I do know she informed her of
8   that.
9   BY MR. SPIVA:
10     Q   Okay. You can't recall whether she told
11   her that before calling the detective?
12     A   Yeah, that -- yeah --
13     Q   That's --
14     A   -- I can't recall that.
15     Q   -- that's fuzzy?
16     A   Yeah.
17     Q   Okay. Now, is that, to your knowledge,
18   MPD policy, that a report can't be taken based on
19   alleged rape victim thinking something had
20   happened?
21     A   I can't quote MPD policies --
22     Q   Uh-huh.

Page 225

1     A   -- but an officer can't take a report if
2   they can't establish that a crime has been
3   committed.
4     Q   Okay. And what -- what is -- what is
5   your understanding of what constitutes the crime
6   of sex abuse?
7     A   What constitutes the crime of sex abuse?
8   Non-consensual sex.
9     Q   Uh-huh. What is a sexual act?
10     A   A sexual act could be just like fondling
11   or touching --
12     Q   Uh-huh.
13     A   -- which is also a form of sexual abuse,
14   but it's in a -- in a lesser -- in a certain other
15   degree. I can't say which one. I'd have to refer
16   to my general -- my D.C. code to be exact.
17     Q   Okay. Have you -- have you had to -- to
18   look at the D.C. code on that as part of your
19   training at any point?
20     A   In the academy --
21     Q   Uh-huh.
22     A   -- for testing purposes.

57 (Pages 222 to 225)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

| Page 234 |
| --- |

1  the bathroom and a guy followed her in there and
2  touched her breasts and private parts and then she
3  blacked out.
4        That's what your -- you -- you sign --
5  that's what the report that you signed says she
6  told you, correct?
7        MR. JEFFERSON: Objection. Foundation.
8        THE WITNESS: Yeah. Yes.
9  BY MR. SPIVA:
10     Q    And -- and my only question is -- is --
11 is not whether in fact that happened; but does
12 a -- does a person following a woman into a
13 bathroom and touching her breasts and private
14 party without permission constitute a crime in the
15 District of Columbia?
16        MR. JEFFERSON: Objection. Asked and
17 answered.
18        THE WITNESS: Not --
19        MR. JEFFERSON: In fact, she's going to
20 stand by her prior answer. Okay. I mean --
21        MR. SPIVA: Counsel, it's totally
22 inappropriate.

| Page 235 |
| --- |

1        MR. JEFFERSON: If you could --
2        MR. SPIVA: Totally inappropriate.
3        MR. JEFFERSON: -- ask her a question --
4        MR. SPIVA: Yeah.
5        MR. JEFFERSON: -- and then continue on.
6        MR. SPIVA: Yeah.
7        MR. JEFFERSON: I'll tell you what. I'm
8  going to let her answer this question --
9        MR. SPIVA: Uh-huh.
10        MR. JEFFERSON: -- but, you know, you've
11 only got seven hours.
12        MR. SPIVA: Yeah. Well, that's right.
13 We do.
14        MR. JEFFERSON: I wish we could get a
15 question and answer move on.
16        MR. SPIVA: If -- if we stop having
17 these kinds of interruptions, we -- we --
18        MR. JEFFERSON: There have been very
19 few.
20        MR. SPIVA: -- we'd be just fine.
21 BY MR. SPIVA:
22     Q    Does -- does a -- does a person

| Page 236 |
| --- |

1  following a woman into a bathroom and touching her
2  breasts and private parts without permission
3  constitute a crime in the District of Columbia?
4     A    Not in this incident, sir. She --
5     Q    Okay.
6     A    -- could not establish what had happened
7  to her clearly, and had no suspect information.
8     Q    Okay. So in order to have it constitute
9  a crime, does the victim have to have suspect
10 information?
11    A    She has to know what had happened to
12 her.
13    Q    Okay.
14    A    She doesn't --
15    Q    Okay. Let's -- let's -- let's -- we're
16 not talking about this incident now.
17       We're talking about as a general matter,
18 does a person following a woman into a bathroom
19 and touching a breasts and private parts without
20 permission constitute a crime in the District of
21 Columbia?
22    A    I don't know.

| Page 237 |
| --- |

1     Q    Does an unwanted touching or invasion of
2  one's rectum by another constitute a crime in the
3  District of Columbia?
4        MR. JEFFERSON: Objection. Foundation.
5  BY MR. SPIVA:
6     Q    I'm not asking about this instance.
7        I'm asking you just in general does a
8  unwanting -- wanted touching or invasion of one's
9  rectum by another constitute a crime in the
10 District of Columbia?
11       MS. ROBOKOS: Objection to the form of
12 the question.
13       THE WITNESS: Repeat the question.
14 BY MR. SPIVA:
15    Q    Does an unwanted touching or invasion of
16 one's rectum by another constitute a crime in the
17 District of Columbia?
18    A    If you know it's unwanted, yeah.
19    Q    I'm sorry. I didn't understand your
20 answer.
21       What do you mean if --
22    A    Yes.

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                              April 14, 2008

Washington, DC

Page 242

1   touching or penetrating her rectum?
2          MS. TURNER: Objection.
3          MR. JEFFERSON: Objection. Foundation.
4   Presupposes facts not in evidence.
5          MS. ROBOKOS: Same objection.
6   BY MR. SPIVA:
7      Q   You can answer.
8      A   She didn't discuss cons -- con --
9   consentual actively at all. She didn't know what
10  had happened.
11     Q   Okay. Now, she told you and Officer
12  Green that her rectum hurt.
13         Did you have any reason to believe that
14  she was lying about that?
15         MR. MONAHAN: That's been asked about --
16         MS. TURNER: Objection.
17         MR. MONAHAN: -- six times. Can we move
18  on?
19  BY MR. SPIVA:
20     Q   You can answer the question.
21     A   No.
22     Q   Okay. Now, in -- in the next part of

Page 243

1   the report it says, C1 stated she went from one
2   extreme to another so someone had to put something
3   in her drink. Then C1 changed her story and
4   stated I was drunk.
5          What -- what did -- what did -- what was
6   your understanding of what she meant by she went
7   from one stream to another?
8          MR. JEFFERSON: Objection. Foundation.
9   BY MR. SPIVA:
10     Q   You can answer.
11     A   She stated that she was really, really
12  drunk and out of it.
13     Q   Uh-huh. Did -- did it matter to your
14  investigation of a potential rape whether the
15  victim was -- was drunk?
16     A   Repeat the question, sir.
17     Q   Did it matter to your potential -- your
18  investigation of a potential rape that the victim
19  was drunk?
20     A   No.
21     Q   Okay. Now, if she -- if she had been
22  drunk, would that mean that she could not have

Page 244

1   been the victim of -- of the crime of sexual
2   abuse?
3      A   Repeat the question.
4      Q   If she had been drunk, would that mean
5   that she could not have been the victim of the
6   crime of sexual abuse?
7      A   Yes, she -- I -- I'm confused again.
8   Repeat it one more time.
9      Q   Okay. If she had been drunk --
10     A   Yes.
11     Q   -- would that mean she could -- she
12  could not have been the victim of the crime of
13  sexual abuse?
14     A   Could not have been?
15     Q   Yeah.
16     A   No, she still -- no.
17     Q   You can be drunk and still be sexually
18  abused, correct?
19     A   Yes.
20     Q   Okay. C1 -- the next part says, C1 was
21  then advised that in order to take a report I
22  have -- it's got a little error in here. It says

Page 245

1   I have -- I think it's have to have something, but
2   it says have have something concrete and not have
3   anything any guesses.
4          What did -- did you view as concrete?
5      A   That a crime had to be established.
6      Q   Uh-huh. And did you think she needed to
7   know what had happened to her exactly?
8      A   Yes.
9      Q   Okay. And did you think she needed to
10  know that she had been penetrated?
11     A   Yes.
12     Q   And do you think she needed to know that
13  she had been touched?
14     A   Yes.
15     Q   And did you think she needed to know who
16  had sexually assaulted her?
17     A   Not necessarily.
18     Q   Okay. I take it that you did not view
19  her claim that she had been touched on her breasts
20  and private parts as concrete?
21     A   I didn't know -- I didn't know what her
22  claim was because she didn't know what had

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 254

1   done. C1 then asked if we had sisters or kids and
2   wouldn't we want them to be tested. C1 was
3   informed again that we are not going to lie. C1
4   then stated okay I'll just say I was raped to get
5   the kit done. C1 was advised that it doesn't work
6   like that, and advised about the importance of
7   truth. That's -- that's the part that wasn't
8   read.
9       MR. JEFFERSON: Thank you, Counsel.
10      MR. SPIVA: And that has nothing to do
11  with my question.
12      MR. GLEASON: You said it was the next
13  section in --
14      MR. SPIVA: Well, that --
15      MR. GLEASON: -- the report, Counsel.
16      MR. SPIVA: -- okay.
17      MR. GLEASON: And I -- I don't want that
18  misrepresentation to go --
19      MR. SPIVA: You don't --
20      MR. GLEASON: -- un-commented --
21      MR. SPIVA: -- Counsel --
22      MR. GLEASON: -- I -- I'm speaking. I'm

Page 255

1   not raising my voice --
2       MR. SPIVA: Yes.
3       MR. GLEASON: -- and I'm not
4   interrupting you while you're speaking. You said
5   this was the next section in the report. That's
6   not correct. You omitted a significant portion of
7   the report. I have now read it into the record.
8       MR. JEFFERSON: Okay. Thank you,
9   Counsel.
10      MR. SPIVA: Yeah, Counsel, my reference
11  to the next section was an error. But it had
12  nothing to do with my question. The report is a
13  written document that speaks for itself. So the
14  idea that I would somehow omit that with the
15  thought that it was somehow never going to appear
16  again is absurd.
17      MS. TURNER: Just like your objection
18  earlier. It speaks for itself.
19  BY MR. SPIVA:
20      Q   All right. Let me go back to the
21  section that I wanted to ask you about, which was
22  the section that reads, C1 was advised that we

Page 256

1   didn't have enough to take a sexual report but we
2   would notify detective at the sexual assault unit
3   and report our conversation and her statements.
4   Detective Wheeler was notified. Detective Wheeler
5   advised he talked to his supervisor who was aware
6   of her case earlier that the previous unit cleared
7   with no report. A copy of this report was faxed
8   to Detective Wheeler.
9       What was your understanding, if any,
10  about the previous interview with -- with the
11  complainant?
12      A   I don't really know anything about the
13  previous --
14      Q   Okay.
15      A   -- assignment or whoever reported it. I
16  don't know.
17      Q   Okay. And what would have been enough
18  to take a sexual assault report, in your view?
19      A   If she knew what happened.
20      Q   Uh-huh. Is there a certain standard a
21  victim must prove in order for you to take a
22  sexual assault report?

Page 257

1       A   I don't know. The sex squad detective
2   would know more about the standards of classifying
3   and when a report is taken.
4       Q   Okay. Are you aware that it's -- that
5   MPD policy requires that a sexual assault report
6   be taken in all cases of reported sexual abuse?
7       MR. JEFFERSON: Objection. Foundation.
8       MR. MONAHAN: Object to the foundation.
9   BY MR. SPIVA:
10      Q   You can answer.
11      MS. ROBOKOS: Objection.
12      THE WITNESS: No.
13  BY MR. SPIVA:
14      Q   You say you -- well, the report that you
15  signed states that Detective Wheeler was notified.
16      Is he in the sexual assault unit?
17      A   Yes.
18      Q   Okay. And when was he notified?
19      A   I -- I don't know. When he was on the
20  scene --
21      Q   Uh-huh.
22      A   -- by Officer Green. But I can't say

65  (Pages 254 to 257)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

# Exhibit B

**To Plaintiff's Opposition to Defendant District of Columbia's
Motion for Judgment on the Pleadings**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL) (D.D.C.)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,            :
                                 :
        Plaintiff,               :
                                 :
            v.                   : Case No.
                                 : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al.,    :
                                 :
        Defendants.              :
- - - - - - - - - - - - - - - x

                            Washington, D.C.

                            Thursday, May 8, 2008

Video Deposition of

        OFFICER TANDREIA GREEN, called for

examination by counsel for Plaintiff, pursuant

to notice, at the Law Offices of Spiva & Hartnett,

LLP, 1776 Massachusetts Avenue, NW, Suite 600,

Washington, D.C., commensing at 9:58 a.m., before

Barbara A. Huber, Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 26

1  video, do you recall, about doing sexual assault
2  investigations?
3      A   I don't recall.
4      Q   And are you -- are you aware that the --
5  the MPD has a Sexual Assault Unit?
6      A   Yes, I am.
7      Q   Okay. And are you a member of the -- of
8  the Sexual Assault Unit?
9      A   No, I am not.
10     Q   What -- what, if any, interaction do you
11 have with -- with the Sexual Assault Unit?
12     A   As it pertains to what?
13     Q   Anything.
14     A   I don't have any dealings with them
15 unless it's in reference to a -- a call for
16 service and they are summonsed.
17     Q   Uh-huh. And when you say, "a call for
18 service," and -- and you said they are -- they are
19 summonsed?
20         Is that what you said?
21     A   Correct.
22     Q   What -- what do you mean by that?

Page 27

1      A   They're called.
2      Q   Uh-huh. And under what circumstances
3  does that happen?
4      A   Sexual abuse, criminal assault.
5      Q   Uh-huh. And -- and -- and tell me about
6  that. What -- what's the procedure? In what
7  circumstances would you -- strike that.
8          How would that come about that --
9          Are you the one who would call them?
10     A   In reference to a criminal assault?
11     Q   Yes.
12     A   Yes.
13     Q   Okay. And -- and describe for me the
14 circumstances in which you would -- you would need
15 to call them in reference to a -- a sexual
16 assault?
17     A   Any time a criminal assault comes out,
18 we -- we notify them of that.
19     Q   Okay. Have you had any training by
20 anyone in the Sexual Assault Unit?
21     A   No.
22     Q   Do you recall reviewing any documents

Page 28

1  regarding investigating sexual assaults?
2      A   When?
3      Q   Any time since you've been on the MPD.
4      A   Do I recall -- I'm sorry. Repeat it --
5  the question.
6      Q   Reviewing any documents -- let me -- let
7  me be a little more specific.
8          Do you -- did you ever have to study any
9  documents about the procedures for investigating
10 sexual assault?
11     A   Those procedures are in the -- in the
12 general order.
13     Q   Uh-huh. Okay. And isn't that the --
14 the general order you -- you made reference to
15 earlier in the deposition?
16     A   Yes.
17     Q   Okay. Anything other than that you've
18 had -- you've had to review or study in terms of
19 documents about the procedures for investigating a
20 sexual assault?
21     A   No.
22     Q   Okay. What are -- if -- if you can,

Page 29

1  describe for me MPD's policies for investigating
2  alleged sexual assaults?
3      A   Well, generally if we get a call, we go
4  out. The -- the officer conducts an interview.
5      Q   Uh-huh.
6      A   Does the preliminary investigation and
7  find out if a criminal assault took place.
8          After I get that information, I notify
9  my sergeant and somebody from the Sexual -- Sexual
10 Assault Unit.
11     Q   Uh-huh. And you said that you -- you go
12 out and you conduct an -- an interview.
13         An interview with -- with who?
14     A   The Complainant. Whoever -- whoever is
15 there.
16     Q   Okay.
17     A   The Complainant.
18     Q   All right. And you said, I think, that
19 part of the purpose of the interview is to
20 determine whether a sexual assault took place; is
21 that correct?
22     A   To find out what type of sexual assault

8 (Pages 26 to 29)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008

Washington, DC

Page 30

1    took place.
2       Q   Okay.  And whenever you end up doing one
3    of these interviews with a Complainant, is it --
4    is it standard procedure for you to call the
5    Sexual Assault Unit, you know, regardless?
6          Or -- or is there some -- some
7    circumstances where you don't call the Sexual
8    Assault Unit?
9       A   No.  You call them regardless.
10      Q   Okay.  And do you -- do you make any
11   kind of assessment of whether the -- the complaint
12   that you're -- you're -- you're there to interview
13   the -- the Complainant about is -- is founded or
14   unfounded?
15      A   No.  That's not in my job criteria.
16      Q   Okay.
17      A   That's the Sexual Assault Unit.
18      Q   Okay.  And -- and in terms of
19   interviewing the -- the Complainant, what type of
20   training have you had in terms of, you know, what
21   types of questions you would need to ask them?
22      A   You ask them types of questions about

Page 31

1    what took place, suspect's information, location,
2    time, place.
3       Q   Uh-huh.
4       A   That type of stuff.
5       Q   Okay.  And -- and is that -- did -- how
6    did you know -- you know, I mean, what -- what --
7    how did you -- how do you know what questions are
8    pertinent?  I mean, is it -- from -- from your
9    training, is there some --
10      A   From -- from training.  And -- and some
11   of that information is in the general order.
12      Q   Uh-huh.  Let me -- let me step back for
13   a minute.  Because I -- these general orders, I
14   mean, how -- do you have any idea how many there
15   are, just in general, I mean, that -- that are
16   pertinent to your -- your job?
17         I'm not just specifying sexual assault.
18   But just, you know, for any -- any type of
19   investigation that you might have to do as an
20   officer?
21      A   I don't know.  I -- I couldn't tell you
22   how many specific.  But there -- there -- there's

Page 32

1    different series, from 100 to 800, I believe.
2       Q   Uh-huh.  Okay.  And do each of the
3    series pertain to a particular --
4       A   Different subjects.
5       Q   Different subjects.  Okay.
6          And it -- and is -- and I -- and I take
7    it there's a series dealing with sexual assault
8    investigations?
9       A   Yes.
10      Q   Okay.  And -- and where are -- where are
11   these general orders kept?  I mean, if you wanted
12   to access them, where -- where do you go to get
13   them?
14      A   Well, everyone is given general orders.
15      Q   Uh-huh.  Do you have like a book or
16   something that has all of them in it -- in them?
17      A   Yes.
18      Q   And do you -- do you -- do you review
19   that periodically?
20      A   If I have time.
21      Q   Uh-huh.  Okay.  How about when there are
22   new general orders that come out, how do -- how do

Page 33

1    you find out about those?
2       A   They send them to the district, and you
3    have to sign for them.
4       Q   And then do -- is there -- this book
5    that you have with them, is that like a notebook
6    or something where you can put new ones in?
7       A   I mean, if you -- if you put holes in
8    them and you put them a binder, then that's --
9    that's fine.  If you have a folder in your place
10   and you do it that way -- you know, however you
11   handle your general orders.
12      Q   Okay.  But it's -- that's kind of up to
13   the individual officer?
14      A   Uh-huh.
15      Q   Where do -- where do -- how do you keep
16   yours?
17      A   I just have a stack.
18      Q   Uh-huh.  And what -- tell me, what is
19   a -- what is a special order?  It's -- it's a term
20   I've seen in some of the documents.
21         Do you know -- have any familiarity with
22   what a special order is?

9  (Pages 30 to 33)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008

Washington, DC

---

Page 46

1    A   I didn't say nothing about the test --
2    top -- top -- test.
3    Q   Oh, okay. I'm sorry. I misunderstood.
4        The training touched on -- on -- on the
5    issue of date rape drugs?
6    A   There was a training --
7    Q   Uh-huh.
8    A   -- that talked about date rape drugs.
9    Q   Okay. And do you recall anything about
10   that training?
11   A   No.
12   Q   Okay. Do you recall when it occurred,
13   in terms of year?
14   A   I don't recall.
15   Q   Okay. But it was during one of these
16   in-services?
17   A   Yes.
18   Q   Okay. Do you recall who the person was
19   who gave the training?
20   A   No.
21   Q   Have -- have you been trained regarding
22   the importance of -- of testing for such drugs,

---

Page 47

1    for date rape drugs?
2        MR. JEFFERSON: Object to form.
3    BY MR. SPIVA:
4    Q   You can answer.
5    A   That's -- that's not even in my job
6    description.
7    Q   Okay. So -- so you haven't been trained
8    regarding the importance of testing for date rape
9    drugs?
10       MR. JEFFERSON: Asked and answered.
11       MR. BANKS: Asked and answered.
12   BY MR. SPIVA:
13   Q   I just want to make sure the answer's
14   no, you -- you haven't been trained regarding the
15   importance of testing for date rape drugs?
16   A   It's not in my job to do that.
17   Q   So that's no?
18   A   No.
19   Q   Okay. And -- and would -- do you know
20   whether a test for the presence of date rape
21   drugs, would that be relevant to a criminal
22   investigation of rape?

---

Page 48

1        MR. JEFFERSON: Object to form.
2        THE WITNESS: You're asking me -- repeat
3    the question.
4    BY MR. SPIVA:
5    Q   Yeah. Would a -- would a -- would a
6    test for -- talking about a test of, you know,
7    someone's bloodstream for the presence of a date
8    rape drug.
9        Would such a test be relevant to a
10   criminal investigation of rape?
11       MR. BANKS: Objection to foundation.
12   BY MR. SPIVA:
13   Q   You can answer.
14   A   You would have to ask somebody from the
15   Sexual Assault Unit. They -- they deal with that.
16   Q   Okay. So -- and just -- just to make
17   sure the record is clear.
18       The answer is no, you don't know whether
19   or not that would be relevant to a criminal
20   investigation of rape?
21       MR. JEFFERSON: Objection. Asked and
22   answered.

---

Page 49

1    BY MR. SPIVA:
2    Q   Is the answer no?
3    A   The answer's no.
4    Q   Okay. What is the SART program, if you
5    know?
6    A   I'm sorry. The who?
7    Q   The SART program. The Sexual Assault
8    Response Team. Do you -- do you know anything
9    about that?
10   A   No.
11   Q   Okay. Have you had any interaction at
12   all with -- with the SART team?
13       That's short for the Sexual Assault
14   Response Team.
15   A   No.
16   Q   Are you familiar with the SANE program?
17   The Sexual Assault Nurse Examiner program?
18   A   I know what that -- that pertains to.
19   But that doesn't really fall under what I do.
20   Q   Okay. Can you describe for me, as best
21   you know, what the -- what the SANE program is?
22   A   I know at -- at Howard, they have a SANE

---

13 (Pages 46 to 49)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 62

1    A    I'm no longer in the picture.
2    Q    Okay. But do you come to know whether
3  or not the -- the -- the sexual assault is
4  determined to be, you know, founded or unfounded?
5    A    Sometimes.
6    Q    Okay. How do you come to know that?
7    A    They make -- when they tell me they're
8  taking over.
9    Q    Okay. Let me -- let me back up and ask
10 you -- I'm sorry.
11        When they tell you they're taking over,
12 what -- what do you mean by that? That -- that
13 they tell you whether or not it's --
14   A    That they're -- they're handling the
15 report. They're handling the investigation.
16   Q    Okay. And what -- does that mean that
17 it's founded if they're taking over?
18   A    Generally.
19   Q    Okay.
20   A    It means that they're going to do an
21 investigation.
22   Q    Okay. And -- and what happens when it's

Page 63

1  unfounded?
2    A    On my part or their part?
3    Q    On your part.
4    A    When it's unfounded?
5    Q    Yes.
6    A    They tell me -- if the SAU tells me that
7  it's unfounded, then nothing happens on my part.
8    Q    Okay. Do you do any kind of report?
9    A    Generally, no.
10   Q    Okay. What does founded and unfounded
11 mean, if you know?
12   A    What does founded and unfounded mean?
13   Q    Yeah. In this context. Of course, I
14 know you know -- I know you know what the words
15 mean. But in this context that we've been
16 discussing of -- of sexual assault complaints.
17   A    In this -- in this context, founded
18 means that they have some -- some ground basis for
19 furthering their investigation.
20   Q    Okay. And --
21   A    Unfounded, there's -- there's no grounds
22 for them to continue.

Page 64

1    Q    Okay. And in an unfounded case, do you
2  fill out any kind of a form, you know, PD -- you
3  got all of these numbers, PD 251, PD 252.
4        Do you -- do you fill out any of that?
5        MR. JEFFERSON: Objection. Asked and
6  answered.
7        THE WITNESS: No. Generally, no.
8  BY MR. SPIVA:
9    Q    Of the -- of the sexual assaults that
10 you've responded to -- sexual assault complaints
11 that you've respond to, how many have resulted in
12 no report being filed? Approximately?
13   A    Several.
14   Q    Uh-huh. Would you say it's the majority
15 of the ones that you've responded to?
16        MR. JEFFERSON: Objection.
17        THE WITNESS: I don't -- I don't recall.
18 It would probably be half-and-half, maybe.
19 BY MR. SPIVA:
20   Q    Uh-huh. And is that because the --
21        MR. SPIVA: Did you have something you
22 want to say?

Page 65

1        MR. JEFFERSON: I'm just going to
2  instruct the witness not to speculate.
3        MR. SPIVA: Okay. I -- she's not
4  speculating. And I don't think that's a proper
5  instruction.
6        She's -- you know, she's -- she's giving
7  her best recollection.
8        MR. JEFFERSON: Barbara, could you read
9  her last response, please?
10       (Whereupon the reporter read
11        the record as requested.)
12       MR. SPIVA: Not speculation. It's
13 best -- best recollection.
14 BY MR. SPIVA:
15   Q    So -- and let me ask you, was that
16 because those were deemed to be unfounded, the
17 ones where no report was done?
18   A    Yes.
19   Q    And -- and that was a determination, I
20 take it, that was made by the Sexual Assault Unit?
21       MR. JEFFERSON: Objection. Asked and
22 answered.

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 66

1   BY MR. SPIVA:
2       Q   Is that right?
3       A   Yes.
4       Q   Okay.  And they told you it's not
5   necessary to do the report because it's unfounded?
6       A   Yes.
7       Q   Do you remember the circumstances of any
8   of these that were -- other than the case we're
9   here for, do you remember the circumstances of any
10  of these other ones that were deemed to be
11  unfounded?
12      A   Yes.
13      Q   Can -- can you describe the ones that
14  you can recall?
15          MR. JEFFERSON:  At this point, I'm just
16  going to enter a general objection to the extent
17  that any information that this question elicits
18  infringes upon any privacy interests of the
19  victims of sexual assault or people who came with
20  complaints of sexual assault.
21          But subject to that, certainly answer.
22  BY MR. SPIVA:

Page 67

1       Q   Okay.  And I'm not asking for names.
2   I'm just asking you to --
3          MR. BANKS:  I also want to object on the
4   basis that this line of questioning is irrelevant.
5   Just note a continuing objection.
6   BY MR. SPIVA:
7       Q   Okay.  You -- you can answer.  These are
8   all abjections for the record.
9          And I'm not asking you for the names
10  of -- of any of these individuals.
11          But can you describe the circumstances
12  that you can -- that you can recall where the
13  sexual assault complaint was found to be
14  unfounded?
15      A   In one instance -- incident, one lady
16  comes in -- in Howard maybe once a month, or
17  frequently.
18      Q   Uh-huh.
19      A   She reports a sexual assault all the
20  time.
21      Q   Uh-huh.
22      A   And every time she -- she comes -- I

Page 68

1   know that I've been on maybe three calls for her
2   alone.
3       Q   Uh-huh.
4       A   On different occasions.
5       Q   Uh-huh.
6       A   They were all unfounded.
7       Q   Uh-huh.  And do -- do you know whether
8   she -- has she -- has she -- do you know whether
9   she has some kind of mental illness or something
10  like that that, you know, leads her to think she's
11  been sexual assault -- assaulted, when she hasn't
12  been?
13      A   I don't know.
14      Q   Okay.  Has she been claiming that she's
15  been sexually assaulted by someone she knows, like
16  a spouse?
17      A   No.
18      Q   And is there any documentation that is
19  kept when this woman who comes in, you know, once
20  a month or whatever, any documentation of that?
21      A   No.
22      Q   Okay.  And let me back up for just a

Page 69

1   second before I ask you about the other
2   incidences.
3          When there's no report done, do you have
4   any documentation at all of -- of the call and --
5   and the circumstances?
6       A   Generally, no.
7       Q   Okay.  What about your field notebook?
8   Do you make notes in your -- in your field
9   notebook?
10      A   Some people do on the scene.  But I
11  don't -- didn't have any.
12      Q   Okay.  You -- you -- it's generally your
13  practice not to make notes when -- when this
14  happens?
15      A   Right.  I'm just there to -- to get the
16  basis of the story.
17      Q   Uh-huh.
18      A   And if there's a report to be done, then
19  someone from SAU will do it.
20      Q   Uh-huh.  Okay.  And it's typically --
21  whether it's founded or unfounded, typically
22  you -- you are not the one who writes the report?

                                    18  (Pages 66 to 69)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 70

1    A    Correct.
2    Q    Okay. Let me -- you -- you told us
3  about the instance of the -- the woman who came in
4  repeatedly.
5        Can you recall any of the other
6  instances where the sexual assault complaint
7  was -- was found to be unfounded?
8    A    Another female came in and she didn't
9  know if any anything had happened to her. And
10 they interviewed her further. And that was
11 unfounded.
12   Q    Uh-huh. And -- and why was it she
13 didn't know if anything had happened to her?
14   A    I don't know.
15   Q    Why was she -- I mean, you -- you
16 interviewed her, I take it?
17   A    Yes.
18   Q    Okay. And did she say why she was
19 there?
20   A    She was high.
21   Q    She was -- she was high?
22   A    Uh-huh.

Page 71

1    Q    At the time you interviewed her?
2    A    No.
3    Q    At -- when was she high?
4    A    She was high at some point during the --
5  during the time of that incident.
6    Q    Okay. And -- but -- and -- and what did
7  she say about what happened when she was high?
8    A    I don't recall any of that.
9    Q    Okay. But was she there because she
10 thought she had been sexually assaulted?
11   A    She was there to see if she can get a
12 sexual assault kit.
13   Q    Okay. And -- and -- and she -- is that
14 because she thought she had been sexually
15 assaulted.
16       MR. JEFFERSON: Object to form.
17       THE WITNESS: She just wouldn't -- from
18 her explanation, she just wanted to see if
19 something happened.
20 BY MR. SPIVA:
21   Q    Okay. Is that what -- what she said, I
22 just want to see if something happened?

Page 72

1    A    She wanted to know if something happened
2  to her.
3    Q    Okay. But she didn't know for sure
4  whether --
5    A    Correct.
6    Q    And -- and was the reason that she gave
7  you that she didn't know whether something
8  happened was that she was high during the time
9  that something might have happened?
10   A    No. The reason she gave me was that she
11 was -- she was high.
12   Q    Okay.
13   A    She had done some -- done some drugs.
14   Q    Uh-huh. Uh-huh. Did -- did she say
15 that she was with someone during the time that --
16 that -- that she was high?
17   A    I don't recall.
18   Q    Okay. And -- and -- and did she say
19 that she thought that someone had -- had sexually
20 assaulted her during the time she was high?
21   A    I don't recall her saying that.
22   Q    Okay. Do you recall whether she said

Page 73

1  why she came to the hospital?
2    A    To -- to see if something happened to
3  her.
4    Q    Uh-huh.
5    A    To get a kit.
6    Q    Okay. And do you recall whether she
7  said why she wanted to get a -- a kit?
8    A    Because she was high.
9    Q    So she was high, and therefore she
10 came -- she told you she came to the hospital just
11 to see if something might have happened?
12   A    Yes.
13       MR. JEFFERSON: Objection. Asked and
14 answered.
15 BY MR. SPIVA:
16   Q    Okay. Any -- any other circumstances
17 that you can recall where the complaint of sexual
18 assault was -- was found to be unfounded?
19   A    No.
20   Q    Okay. But there were others, I take it,
21 other than these --
22   A    Yes.

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 82

1  center in general?
2      Q   Just in general.
3          What -- what do you know about it, if
4  anything?
5      A   I don't know anything about it.
6      Q   Okay.
7      A   Except for they have a hotline.
8      Q   Okay. What's the purpose of the
9  hotline?
10     A   It's to assist people that, you know,
11 have been sexually assaulted.
12     Q   Uh-huh.
13     A   Give them some -- a support system.
14     Q   Have you ever had to interact with
15 anybody at the D.C. Rape Crisis Center?
16     A   No. Not to my knowledge, I haven't.
17     Q   Okay. And have you ever received any
18 training or a presentation from anyone at the D.C.
19 Rape Crisis Center?
20     A   Not that I recall.
21     Q   Okay. Do you know what their role is in
22 sexual assault cases?

Page 83

1      A   No, I don't.
2      Q   Okay. What did you do to prepare for
3  the deposition today?
4      A   Nothing.
5      Q   Okay. You -- you didn't review any
6  documents?
7      A   When I met with counsel.
8      Q   Okay.
9          MR. JEFFERSON: And just -- I'll state
10 for the record that any communications between
11 Officer Green and myself are protected by the
12 attorney/client privilege. Certainly you can know
13 that -- that we met.
14         And I'll state for the record that she
15 did review the incident report, as well as the
16 citizen complaint that was produced in discovery.
17         MR. SPIVA: Uh-huh.
18         MR. JEFFERSON: And you're certainly
19 free to ask about those items.
20 BY MR. SPIVA:
21     Q   Okay. Did -- did any of the documents
22 that you reviewed when you met with counsel

Page 84

1  refresh your recollection about the events in this
2  lawsuit?
3      A   No more than what I generally already
4  had.
5      Q   Okay. And did you review anything else
6  other than the two documents here your counsel
7  just mentioned?
8      A   No.
9      Q   Okay. Did you speak to anyone else
10 prior to your deposition regarding, you know, this
11 case?
12     A   No.
13     Q   Okay. Didn't speak to Officer Leveque?
14     A   No.
15     Q   And I take it from that answer that you
16 haven't talked to her about her deposition since
17 then?
18     A   No.
19     Q   Okay. Do you have any recollection of
20 the events that occurred on December 9th, 2006,
21 that are the subject of this law -- lawsuit?
22     A   Generally.

Page 85

1      Q   Okay. Give -- give me your best
2  recollection.
3      A   We got a call for -- a criminal assault
4  call. Responded to the hospital.
5      Q   Uh-huh.
6      A   We interviewed the Complainant. She
7  stated that she wanted to get a sex kit done.
8  That she had been to a party on Bryant Street
9  somewhere. And that she don't know if anything
10 happened or not, but she wanted to get a sexual
11 kit done.
12         And the nurse told her that the only way
13 she could get it done was to get the police to say
14 to do one.
15     Q   Uh-huh. Okay. And you say she said she
16 didn't know whether anything happened or not.
17         Did -- did you ask her what she meant by
18 that?
19         MR. JEFFERSON: Object to form.
20         THE WITNESS: Yes.
21 BY MR. SPIVA:
22     Q   Okay. And what did she say?

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008

Washington, DC

Page 102

1  during the time that you were there?
2    A   No.
3    Q   Do you know whether he came to the
4  hospital at any time?
5    A   I don't know.
6    Q   And can you give me -- I know you can't
7  recall, you said word for word, but can you give
8  me a general description of what you said to
9  Detective Wheeler on the phone?
10   A   Basically anything that she reported to
11 me, I told to him.
12   Q   Okay.  And what did he say to you in
13 response?
14   A   I don't recall all -- everything that he
15 said.
16   Q   Uh-huh.  Do you recall anything
17 generally that he said?
18   A   No.
19   Q   Okay.  Do you recall whether he spoke
20 with Ms. McGaughey?
21   A   I don't recall if he spoke to her.
22   Q   Okay.  And do you recall whether he

Page 103

1  spoke with Officer Leveque?
2    A   I don't recall.
3    Q   Okay.  Did -- did you do a report -- I'm
4  sorry.  Let -- let --
5        Do you recall whether this complaint of
6  sexual assault was -- was found to be unfounded or
7  founded?
8    A   Yes, I do.
9    Q   Okay.  What do you recall about that?
10   A   Detective Wheeler informed me that no
11 report was going to be done.
12   Q   Okay.  And did he say why no report was
13 going to be done?
14   A   No.
15   Q   Okay.  And when he said no report was
16 going to be done, what did you understand him to
17 mean?
18   A   That there was no -- there was no report
19 going to be done for a sexual crime or kit.
20   Q   Okay.  But he didn't explain why?
21   A   No.
22   Q   Okay.  And did you do any kind of a

Page 104

1  report?
2    A   Yes, I did.
3    Q   What did you do?
4    A   Miscellaneous report.
5    Q   Okay.  And why did you do a
6  miscellaneous report?
7    A   To document what happened on the scene.
8    Q   Okay.  Now, if I recall correctly from
9  our discussion of kind of other sexual assault
10 investigations, you had said that typically you
11 don't do any kind of a report when -- when a case
12 is found to be unfounded.
13       Why did you do one in this case?
14       MR. JEFFERSON:  Object to the form to
15 the extent it mischaracterizes the witness's
16 testimony.
17       I think the precise term she used was
18 "generally."
19       MR. SPIVA:  All right.  You can object
20 to the form.
21       But you're -- you're now moving into
22 coaching.

Page 105

1  BY MR. SPIVA:
2    Q   But, Officer Green, if I mischaracterize
3  your testimony at some point, it's certainly
4  unintentional.  And please just let me know.
5        I'm -- I'm just trying to situate the
6  question here so we both know what -- what I'm --
7  what I'm asking you.
8        I think you said that generally you
9  don't do a report when it's -- it's found to be
10 unfounded.
11       And I guess what I'm asking is, here you
12 did do some type of report, a miscellaneous
13 report.
14       Why -- why was this different, if it was
15 different?
16   A   I did a report because basically my
17 sergeant advised me either notebook or do a
18 miscellaneous report.  Because I have never had
19 anybody on any case that I've been on tell me that
20 they would lie to get the report done.
21   Q   Uh-huh.  And so you -- you thought this
22 was -- you thought this was unusual because you --

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                              May 8, 2008

Washington, DC

---

Page 114

1    Q   Okay. Did Ms. McGaughey's sister say
2  anything to you?
3        MR. JEFFERSON: Objection. Asked and
4  answered.
5        THE WITNESS: No.
6  BY MR. SPIVA:
7    Q   And do you recall having any interaction
8  whatsoever with -- with Ms. McGaughey's sister?
9    A   There was a female with her. I -- I
10 don't know who she was.
11   Q   Uh-huh.
12   A   She was not a part of the -- she wasn't
13 a witness or anything like that.
14       So, no, I had no contact with her.
15   Q   Uh-huh. Okay. And did you talk with
16 anyone else, any other, you know, witnesses or
17 potential witnesses other than Ms. McGaughey?
18   A   No.
19       MR. JEFFERSON: Object to form.
20 BY MR. SPIVA:
21   Q   Do you recall whether you talked to
22 someone named Kerston Reid at the hospital?

---

Page 115

1    A   No, I don't recall.
2    Q   Okay. And did you speak with any of the
3  hospital personnel?
4    A   On the -- on the time of the interview,
5  or afterwards, or what?
6    Q   At the -- at the time -- well, any time
7  on that day concerning, you know, this matter.
8    A   No.
9    Q   Okay. Did any of them seek to ask you
10 any questions?
11   A   No.
12   Q   I'm sorry. When I say "them," I'm
13 talking about any hospital personnel?
14   A   No. Just a disposition.
15   Q   When -- and when you say "disposition,"
16 what do you mean?
17   A   What did the -- what the Sexual Assault
18 Unit detective said in reference to a sexual kit.
19   Q   Okay. And who asked you about that?
20   A   It was one of the nurse.
21   Q   Uh-huh. And what did you tell her?
22   A   Told her that Detective Wheeler said no.

---

Page 116

1    Q   Said no -- and when you said -- you said
2  no, what did -- what did you mean?
3    A   In reference to having a sexual kit
4  performed.
5    Q   That -- that -- that Detective Wheeler
6  said that no sexual assault kit should be
7  performed?
8    A   That no -- there would be no sexual kit
9  done.
10   Q   Okay. You told the nurse that Detective
11 Wheeler said that no sexual assault kit would be
12 done?
13       MR. BANKS: Objection. Asked and
14 answered.
15       MR. JEFFERSON: Objection. Asked and
16 answered.
17       MS. COSTANTINO: Just joining in the
18 objection.
19 BY MR. SPIVA:
20   Q   Is that correct?
21   A   That's correct.
22   Q   And -- and why did you tell her that?

---

Page 117

1    A   Because they wanted to know whether or
2  not they needed to do a kit.
3    Q   Uh-huh. Okay. Did you talk to anybody
4  else at the hospital about that?
5    A   No.
6    Q   Did Detective Wheeler tell you why --
7  why no sexual assault kit should be done?
8    A   No.
9    Q   I think I -- I -- you may have answered
10 this. I apologize. But I just want to make sure
11 I've got this clear.
12       Did any detective come to the hospital
13 during the time that -- that you were there?
14   A   No.
15   Q   And I think you mentioned that -- that
16 there was some kind of policy or something that
17 said that the -- the sergeant needed to respond to
18 the -- the scene when there's a complaint of
19 sexual assault.
20       Was that -- is that what you said?
21   A   Yes.
22   Q   And -- and what -- what is that policy

---

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 178

1    Q   Okay.  And what does it mean to clear in
2  this context?
3    A   It means that you're -- you're finished
4  on that assignment.
5    Q   Okay.  Let me -- let me give you -- let
6  me have another document marked.
7         MR. JEFFERSON:  We're done with Green 1?
8         MR. SPIVA:  I think so.  We may return
9  to it later.  But I think we're done with it.
10        If we could mark this as Green Exhibit
11  2.
12             (Green Deposition Exhibit
13             No. 2 marked for
14             identification.)
15  BY MR. SPIVA:
16   Q   Okay.  Officer Green, you've been handed
17  what has been marked as Green Exhibit 2.  And its
18  title is, Handling Sexual Abuse Cases.
19        First of all, have -- do you recognize
20  this document at all?
21   A   No.
22   Q   Okay.  And -- and I take it from that,

Page 179

1  you've never reviewed it?
2    A   I don't recall.
3    Q   This is labeled SO-07.
4         I take it "SO" is special order?
5    A   Yes.
6    Q   Okay.  And -- and you may have answered
7  this earlier.  So I apologize if you did.
8         But are special orders something that
9  are disseminated to all officers?
10   A   To my knowledge, yes.
11   Q   Okay.  Do you know whether this SO-07,
12  whether that's still in effect?
13   A   I don't know.
14   Q   Officer Green, do -- do you know from
15  looking at this whether this is an order that
16  would apply to you as an officer?
17   A   There's probably some sections in here
18  that would apply to me as an officer.  But most --
19   Q   Okay.
20   A   -- most of the orders, they'll let you
21  know.
22   Q   I'm sorry?

Page 180

1    A   They'll let you know in the orders.
2    Q   I see.
3         Where -- where would they let you know
4  that?  Is there somewhere up front or something?
5    A   No.  Once -- once you read them.
6    Q   Oh, you mean somebody will actually tell
7  you that this is something that's applicable to
8  you?
9    A   No.  The -- the writing will indicate
10  what you're -- what you're supposed to do.
11   Q   Okay.  Okay.  Since you haven't reviewed
12  this, I'm -- I'm not going to ask you any more
13  questions about it.
14        But let me -- let me ask you one more
15  question about Exhibit 1, Green 1, your report.
16        MR. JEFFERSON:  What -- what page?
17        MR. SPIVA:  I think it's on the first
18  page.  It's where Detective Wheeler signed this.
19  BY MR. SPIVA:
20   Q   And I -- I guess my question doesn't
21  actually require you to look at the report.
22        But do you know whether Detective

Page 181

1  Wheeler actually reviewed this report?
2    A   I don't know.  I faxed it.  I couldn't
3  tell you if he reviewed it or not.
4    Q   Okay.  He never said to you, I've --
5  I've taken a look at it and I'm going to sign off
6  on it?
7    A   No.  I just faxed it over there.
8    Q   Okay.  Let me give you another document.
9  I'm going to have it marked as Green Exhibit 3.
10             (Green Deposition Exhibit
11             No. 3 marked for
12             identification.)
13        MR. SPIVA:  Hopefully --
14        This, again, can be off the record, at
15  least the typing record.
16             (Discussion off the record)
17        THE WITNESS:  (Witness examined
18  document).
19        MR. JEFFERSON:  I think the witness is
20  ready.
21  BY MR. SPIVA:
22   Q   Oh, okay.  Sorry.

46 (Pages 178 to 181)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008

Washington, DC

---

Page 198

1   that?
2       A   Sometimes, maybe.
3       Q   Okay. And -- and why is it that you
4   sometimes put notes in your field notebook for,
5   say, someone who's a victim of robbery that you're
6   interviewing, but you never put notes in your
7   field notebook with respect to individuals who
8   have complained of sexual assault?
9       MR. JEFFERSON: Object to the form.
10      THE WITNESS: Because if it's a sexual
11  assault, it's going to be handled by SAU. So
12  they're -- all I'm doing is the preliminary
13  investigation to ask them questions. They're
14  going to go into details. They're going to -- if
15  there is a crime scene, they're -- they're going
16  to handle all that.
17  BY MR. SPIVA:
18      Q   Okay. And -- and with respect to, say,
19  for instance, the example of the robbery we were
20  talking about, who handles that?
21      A   If it's -- if it's a robbery case, then
22  I would be responsible.

---

Page 199

1       Q   Is -- is that because there's not some
2   separate unit akin to the Sexual Assault Unit who
3   would handle the follow-up on robberies?
4       A   Correct.
5       MR. JEFFERSON: Object to form.
6   BY MR. SPIVA:
7       Q   In the -- in the -- in the District's
8   initial disclosures to us in this case, they refer
9   to a category of documents called, internal
10  unpublished guidelines governing the MPD Sex
11  Assault Unit.
12      Have you ever seen any such guidelines?
13      A   No.
14      Q   Okay.
15      A   Not that I recall.
16      Q   Have you ever been trained on them?
17      MR. JEFFERSON: Object to the form.
18      THE WITNESS: Not that I recall.
19  BY MR. SPIVA:
20      Q   Let me give you one more document.
21      MR. SPIVA: And if we could mark this
22  Green 4, I think we're at.

---

Page 200

1           (Green Deposition Exhibit
2           No. 4 marked for
3           identification.)
4       MR. SPIVA: Again, this part doesn't
5   need to be on the record.
6           (Discussion off the record)
7       THE WITNESS: (Witness examined
8   document).
9       MR. JEFFERSON: Are you ready?
10      THE WITNESS: Yep.
11      MR. JEFFERSON: The witness is ready.
12      MR. SPIVA: Okay.
13  BY MR. SPIVA:
14      Q   Officer Green, you've been handed
15  what's been marked Green Exhibit 4. And the title
16  of it is, Field Reporting System. It has a topic
17  number GOSPT 401.01. And it says, effective date,
18  March 4th, 2004.
19      First of all, do you recognize this
20  document?
21      A   I've -- I've seen it before. I can't
22  recall everything that's in it, but yes.

---

Page 201

1       Q   Okay. And -- and is this -- have you
2   been trained on it?
3       Has anybody kind of walked you through
4   it in a training?
5       MR. BANKS: Objection to form.
6       THE WITNESS: No.
7   BY MR. SPIVA:
8       Q   Okay. Do you know what it -- what the
9   purpose of it -- of the document is?
10      A   It's a guideline.
11      Q   Uh-huh. And is it something that
12  applies to you as an officer?
13      A   Some of it pertains to me.
14      Q   Okay. And, again, here, this -- this
15  notes that it replaces or rescinds several other
16  -- or a couple of other orders or general orders
17  or special orders.
18      What is your practice when you get --
19  when you receive a general order that says it
20  replaces another order?
21      How do you -- how do you deal with that?
22      A   Just add it to my -- my pile.

---

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Page 202

1    Q   Okay. Do you take the other one out?
2        Or -- or what's -- what's your practice
3    in respect to that?
4    A   No. I just add it to my pile.
5    Q   Okay. Is this something that you --
6    that was reviewed in any of the in-service
7    trainings that you've had over the years?
8    A   I can't recall.
9    Q   Okay. Are the general -- well, strike
10   that.
11       Let me refer you to page 1, Roman
12   Numeral II. It says there, among other things,
13   that the policy of the Metropolitan Police
14   Department is that members shall file a report for
15   all reported crimes and incidents brought to his
16   or her attention.
17       Is that part -- is that part of this
18   policy, is that something that would be applicable
19   to you as an officer, or no?
20   A   Yes.
21   Q   And you -- you had stated earlier when
22   we were talking about the investigations -- or

Page 203

1    interviews of other sexual assaults, that other
2    than this case where you filed the miscellaneous
3    report, that you typically don't file a report.
4        Is that -- that a fair characterization
5    of your testimony?
6        MR. JEFFERSON: Object to the form.
7        THE WITNESS: Now, what are you asking
8    me?
9    BY MR. SPIVA:
10   Q   In other sexual assault cases that
11   you've done where -- where it's been found to be
12   unfounded, it's -- it's typically not your
13   practice to file a report?
14   A   This is -- no. I don't file a report.
15   Q   Okay. And -- and as far as you know, no
16   one within the Department files a report in those
17   instances?
18       MR. JEFFERSON: Object to form.
19       THE WITNESS: I couldn't answer for
20   everybody else.
21   BY MR. SPIVA:
22   Q   Okay. Do you know whether it's the

Page 204

1    practice of, say, the detectives in the Sexual
2    Assault Unit to file a report where they find a
3    sexual assault claim to be unfounded?
4    A   I couldn't answer that.
5    Q   Don't -- don't know?
6    A   No.
7    Q   Officer Green, have -- are you familiar
8    with someone named David Rosenbaum?
9        MR. JEFFERSON: Objection. Relevance.
10   I'm going to make my objection continuing.
11       And certainly, Counsel, we'll entertain
12   some of these questions, particularly the one
13   you've just asked.
14       MR. BANKS: I'll join.
15       MS. COSTANTINO: I'll join in the
16   objection.
17       MR. JEFFERSON: But going forward.
18   BY MR. SPIVA:
19   Q   You -- you familiar with someone named
20   David Rosenbaum?
21   A   Not that I recall.
22   Q   Okay. And do -- do you know anything

Page 205

1    about an investigation into the handling of -- of
2    someone named David Rosenbaum's case?
3        MR. JEFFERSON: Objection. Asked and
4    answered.
5        THE WITNESS: Don't recall.
6        MR. SPIVA: I have no further questions
7    at this time.
8        MR. BANKS: No questions here.
9        MR. JEFFERSON: Going once, going twice.
10       MR. SPIVA: Now, the only thing, I'll --
11   I'll do my usual reservations. If we get some of
12   these other documents --
13       MR. JEFFERSON: Right.
14       MR. SPIVA: -- and there's a need, I
15   may -- I'm going to keep it -- formally keep it
16   open.
17       But I don't have any other questions.
18       MR. JEFFERSON: Right. Specifically
19   you're talking about the precursors to 3046?
20       MR. SPIVA: Specifically that's what I
21   have in mind now.
22       But if I get something else at a later

52 (Pages 202 to 205)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

# Exhibit C

**To Plaintiff's Opposition to Defendant District of Columbia's
Motion for Judgment on the Pleadings**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL) (D.D.C.)**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - X

ALEXANDRIA McGAUGHEY,                    :

            Plaintiff,        :  Case No.

     v.                       :  1:07-cv-01498 (RJL)

DISTRICT OF COLUMBIA, et al., :

            Defendants.       :

- - - - - - - - - - - - - - - - X

                    Washington, D.C.

                    Wednesday, May 14, 2008

            Telephone Videotape Deposition of MICHAEL

A. MINOR, a witness herein, called for examination by

counsel for Plaintiff in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

SUSAN L. CIMINELLI, a Notary Public in and for the

District of Columbia, taken at the offices of Spiva &

Hartnett, LLP, 1776 Massachusetts Avenue, N.W.,

Washington, D.C. at 9:55 a.m., Wednesday, May 14,

2008, and the proceedings being taken down by

Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and

transcribed under her direction.

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                May 14, 2008

Washington, DC

1    Q.   Let me just refresh you on a few of the
2  ground rules basically. As you know, we have a court
3  reporter here, and she's taking down what you say and
4  what I say. And so if you can just try to let me get
5  the whole question out before you answer, and I'll do
6  my best to let you get the whole answer out before I
7  ask you another question. If anything I ask you, you
8  know, if it's not clear, if you don't understand,
9  please let me know, so I can do my best to clarify
10  it.
11       If you can remember to give verbal
12  answers, you know, yes, no, explanation as opposed to
13  head shake or a nod, just again, so she can get it
14  down. If you need a break at any time, please let me
15  know. I understand there is some circumstances that
16  may require, you know, a break, and we will take a
17  break right away if you need one.
18       Other than that, counsel around the table
19  may object, your counsel may object to some of the
20  questions that I ask you, but unless they instruct
21  you specifically not to answer, then you can go ahead
22  and answer the question. Let's see. Does that all

1  sound pretty clear?
2    A.   Yes.
3    Q.   Okay. And is there any reason why you
4  can't testify completely and accurately today?
5    A.   No.
6    Q.   Okay. All right. Thank you, sir. So you
7  started with MPD 22 years ago. Was this the first
8  police department that you worked for?
9    A.   Exactly. It was.
10    Q.   And did you receive any training at the
11  beginning before you -- before you started on the,
12  with MPD?
13    A.   Yes. At the training academy. Yes.
14    Q.   All right. And what -- can you describe
15  for me the training program. I know it's been a
16  while now, but the training program that you went
17  through prior to starting?
18    A.   It consisted of several things. I can't
19  remember all of them.
20    Q.   Sure.
21    A.   One of them was firearms training.
22  Driving skills. The department general orders. I

1  can't remember all of those back then, but we did
2  have classes on those.
3    Q.   Okay. Do you recall whether at that time,
4  before you started, whether you received any
5  instruction or training on dealing with sexual
6  assault cases?
7    A.   No.
8    Q.   Let me just make sure I got it clear for
9  the record, was that no, you don't recall, or no, you
10  did not receive any such training?
11    A.   No. Not for the police department.
12    Q.   Did not receive the training?
13    A.   No. No training. No.
14       MR. JEFFERSON: Bruce, I just want to be
15  clear. You're saying you didn't receive any sexual
16  assault training in police academy?
17       THE WITNESS: No training in police
18  academy. Yes. Right.
19       BY MR. SPIVA:
20    Q.   Thank you. And let me ask you, before we
21  go more into training. Did you have any jobs, work
22  experience prior to starting at the Metropolitan

1  Police Department?
2    A.   Yes. I was a security officer about maybe
3  four, five years.
4    Q.   And where did you work as a security
5  officer?
6    A.   It was at a private company in the State
7  of Maryland. Just an officer. Wasn't actually
8  certified to actually carry a gun or anything like
9  that, so it's more like you had limited powers and
10  stuff like that. It's almost like civilian powers.
11    Q.   And prior to that job as a security guard,
12  did you have any work experience prior to that?
13    A.   I did. But I can't remember those.
14  Because after that, it was several after that, but I
15  can't remember.
16    Q.   And were those other security guard
17  positions?
18    A.   No. No.
19    Q.   And have you -- can you describe for me
20  briefly your educational background?
21    A.   Graduated from high school. Started first
22  year of college, didn't finish.

Alderson Reporting Company
1-800-FOR-DEPO

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                    May 14, 2008

Washington, DC

---

Page 14

1    Q.   Okay. And let's go back to the training
2    prior to beginning with MPD. What year did you
3    actually assume duties as an officer at MPD?
4        A.   Well, actually, I was sworn in the academy
5    October 14th, 1986. I actually was assigned to a
6    patrol district in 1987.
7        Q.   And between October and the time that you
8    were assigned to a patrol district in 2007, what were
9    you doing in that period?
10       A.   I actually finished the academy at the end
11   of '87. So we were still pretty much in training in
12   the academy. Then once we graduated, I don't know
13   what date in '87, but we had actually been assigned
14   to a district.
15       Q.   So you went straight from graduating from
16   the academy to an assignment in a district?
17       A.   Exactly.
18       Q.   Okay. What is your current rank and
19   title?
20       A.   Patrol officer.
21       Q.   All right. And have you had any other
22   ranks or titles within MPD since you -- in your 22

Page 15

1    years there?
2        A.   No. I haven't.
3        Q.   And I take it from that, that your title,
4    your title or rank as of December of 2006 was also
5    patrol officer?
6        A.   Exactly.
7        Q.   All right. What district are you
8    currently assigned to?
9        A.   Third district.
10       Q.   And what, I think it's called a PSA. What
11   PSA are you assigned to currently?
12       A.   At that present time, it was PSA 305.
13       Q.   At the present time?
14       A.   No. At that present time, 305. It's a
15   different PSA right now.
16       Q.   Let me go back, then, because I appreciate
17   you clarifying that. When you say at that present
18   time, you mean December of '06?
19       A.   Yes. Yes.
20       Q.   And what district were you assigned to in
21   December of '06?
22       A.   Third district.

Page 16

1    Q.   And how about now, currently, as of today,
2    are you still assigned to the same district and PSA?
3        A.   No. It's a different PSA from that time
4    period.
5        Q.   What PSA are you currently assigned to?
6        A.   304.
7        Q.   Since you started at MPD now going past
8    the academy days, have you had any additional
9    training since you've been an officer with MPD?
10       A.   No. No additional training, other than
11   what I had in the academy. No.
12       Q.   Do you have any periodic in-service
13   training or anything like that?
14       A.   Yes. We do have that.
15       Q.   Can you describe that for me?
16       A.   What it basically covers is what you would
17   cover while you out this in the street, certain
18   things, refresher courses. It's a refresher course
19   is what it is. Pretty much what you had in the
20   academy, just to make sure that you still have
21   knowledge of those items.
22       Q.   And Officer Minor, do you have any -- let

Page 17

1    me back up. How often does that happen, do the
2    in-service trainings occur?
3        A.   It normally occurs once a year. Yes.
4        Q.   Okay. And are there ever other trainings
5    other than the annual trainings you have, the annual
6    in-service trainings --
7        A.   They do have specialized unit trainings,
8    but I haven't applied for those.
9        Q.   Do you recall whether in any of those
10   in-service trainings that you've been to, have you
11   ever received any training on dealing with sexual
12   assault cases?
13       A.   I can't remember.
14       Q.   Okay. None that you can recall?
15       A.   None. No.
16       Q.   And this is, this is -- may seem like a
17   charged question, but I ask it of everyone, so take
18   no offense. Have you ever been disciplined by the
19   Metropolitan Police Department?
20       A.   Yes. Probably about -- from today's date,
21   probably about eight years ago.
22       Q.   Was that the only time you'd ever been

5 (Pages 14 to 17)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                           May 14, 2008
                              Washington, DC

Page 18

1   disciplined by MPD?
2      A.   Yes. Yes.
3      Q.   And can you describe for me what the
4   discipline was?
5      A.   For -- got a -- what we call a one
6   suspension day for missing a couple days of court.
7      Q.   So this is for not attending a court
8   hearing or something?
9      A.   Yes. Yes. Yes.
10     Q.   And was there any other charge related to
11  that discipline?
12     A.   Not that I can remember. No.
13     Q.   And other than that one time eight years
14  ago, either since or before, have you ever been
15  disciplined by the MPD?
16     A.   Not that I can remember.
17     Q.   And have you ever been the subject of a
18  civilian complaint at the Metropolitan Police
19  Department?
20     A.   Not that I recall.
21     Q.   Are you aware that the MPD has a sexual
22  assault unit?

Page 19

1      A.   Yes.
2      Q.   And are you a member of MPD's sexual
3   assault unit?
4      A.   No.
5      Q.   And what type of interaction, if any, do
6   you have with the sexual assault unit?
7      A.   The only time I have any type of
8   interaction with them if I'm on a case where a person
9   has been sexually assaulted, where I need to contact
10  one of the detectives. That's the only time, because
11  they pretty much do the investigation. I take the
12  preliminary, such as the complainant's name, date of
13  birth, address, and they do a follow up. They do a
14  detailed investigation.
15     Q.   Okay. Can you describe for me the
16  procedure that you follow in sexual assault cases?
17          MR. JEFFERSON: Objection. Asked and
18  answered.
19          BY MR. SPIVA:
20     Q.   You can answer.
21     A.   Okay. What I would normally do, if I get
22  a call for a case like that, I would go to the

Page 20

1   location where the victim is. I would do the initial
2   investigation, such as, you know, getting her name,
3   date of birth, address, suspect information, if I
4   can. And from there, I would relay the information
5   to the sex squad detective, either by having a
6   dispatcher contact him or phone him. I can contact
7   him myself.
8      Q.   Okay. And has that always been the
9   procedure in dealing with sexual assault cases since
10  you've been on the force?
11     A.   Yes.
12     Q.   Has a sexual assault unit been in place
13  for the whole 22 years that you've been there?
14     A.   Yes.
15     Q.   And I know this is -- this is kind of a
16  subset of something I asked you earlier, but I just
17  want to kind of see if this sparks any kind of
18  recollection. Did you ever view a video training
19  about sexual assault investigations?
20     A.   I can't recall.
21     Q.   Okay. And what are MPD's policies for
22  investigating alleged sexual assaults, to your

Page 21

1   knowledge?
2          MR. JEFFERSON: Object to form.
3          BY MR. SPIVA:
4      Q.   To your knowledge. You can answer.
5      A.   I don't have the full policy in front of
6   me, so I don't want to give no incorrect answers
7   because I don't have the policy in front of me. But
8   I know what I'd do as patrol officer, which I
9   initially do the initial investigation, then I will
10  contact the sex squad, and have them do the follow-up
11  investigation, because their investigation is more in
12  detail. We don't go into detail with it.
13     Q.   Okay.
14     A.   Yeah.
15     Q.   And when you -- when you contact the
16  sexual assault unit, what type of information do you
17  give them on a sexual assault case?
18     A.   I will give them the victim's name. I
19  will try to give them the date of birth and address,
20  any suspect information, the information about the
21  case, not in detail. I give them what I have, and
22  let them know that it was a sex crime and then they

6 (Pages 18 to 21)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                            May 14, 2008

Washington, DC

Page 22

1  take it from there.
2     Q.   Okay.  Now, when you say not in detail,
3  what do you mean by that?
4     A.   I don't go into detail as to, you know,
5  the location or where it actually occurred, whether
6  or not it occurred in the B room and stuff like that,
7  or were any people present and stuff like that or any
8  witnesses, anything like that.  I just let them come
9  out because they're going to go into detail more with
10  those questions.  Yeah.
11     Q.   Is that information that you ask of the
12  victim, or do you leave that to the sexual assault
13  unit to ask those kinds of detail?
14     A.   I let the sexual assault detectives ask
15  those questions, because sometimes that will upset a
16  victim, specially when she has to tell her story over
17  and over again, so that's why I don't go into detail.
18     Q.   Okay.  And let me go back to the question
19  about MPD's policies.  To your knowledge, are there
20  any written documents that set forth MPD's policies
21  for the investigation of sexual assaults?
22     MR. JEFFERSON:  Object to form.

Page 23

1     BY MR. SPIVA:
2     Q.   Do you know?
3     A.   They do have policies, but like I said, I
4  don't have that in front of me.  I don't know.
5     Q.   Have you been trained on those policies?
6     A.   No.  Not for sex crimes.  No.
7     Q.   And the practice that you described a few
8  minutes ago for how you handle sexual assault cases,
9  is that -- is that something that you -- you find in
10  a written document somewhere or did you, you know,
11  determine that some other way?
12     Actually, let me strike that, because I
13  can see it's a -- it's a confusing question.  And
14  actually because I lost my train of thought in the
15  middle of my question, I actually think I want to
16  ask a different question.
17     The way you describe handling, you know,
18  the way you handle at least the initial, you know,
19  interview with the sexual assault cases, is that any
20  different from the way you would investigate or
21  handle other types of criminal investigations?
22     A.   No.  It wouldn't.  No.  It wouldn't.  No.

Page 24

1     Q.   For instance, if you were investigating a
2  robbery, do you -- is there like a robbery unit that
3  you would --
4     A.   There is.  There is.  Yeah.  There is
5  there is.
6     Q.   Are there any types of criminal
7  investigations that you actually handle the entire
8  investigation or -- well, strike that.  Let me step
9  back.  Are there any types of criminal investigations
10  where you handle more of the investigation yourself
11  than you would, say, in a sexual assault
12  investigation?
13     A.   Those investigations that are criminal,
14  they require detective involvement, so I wouldn't go
15  into detail with them.  No.
16     Q.   Have you seen any, that you recall, any
17  general orders from the department dealing with
18  sexual assault investigations?
19     A.   Yes.  I have.
20     Q.   Do you recall anything about what those
21  general orders provided?
22     A.   I've read them, but I can't remember, you

Page 25

1  know, what -- the entire thing of them, so I don't
2  want to guess at that.
3     Q.   Okay.  How does -- how does that type of
4  information get to you, information in a general
5  order?  Is there some kind of a standard procedure
6  for you receiving that information?
7     A.   Yes.  We get them from the administrative
8  office.  It comes down to patrol section.  And what
9  they do, they pass them out for each officer and we
10  incorporate them in our general orders.  And I try to
11  read all of them, but a lot of information I can't
12  remember all of it, but I do try to read them.
13     Q.   Sure.  Sure.  Can you give me your best
14  estimate of how many of these general orders come to
15  you say in a given month, let's take it.
16     A.   In a given month, I'll say at least seven.
17     Q.   Okay.  Okay.  So there are a fair number
18  of these?
19     A.   Yes.
20     Q.   Over the course of a year?
21     A.   Yes.
22     MR. JEFFERSON:  Object to form.

7 (Pages 22 to 25)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Page 26

1       BY MR. SPIVA:
2       Q.   Is there some way that you, that you
3   personally keep these? I mean, do you have a
4   notebook or something like that where you keep all
5   the general orders?
6       A.   Yes. I do have a notebook. I do.
7       Q.   Okay. And do you ever receive any type
8   of, you know, specific training either in one of
9   these in-services or otherwise of what's in the
10  general orders?
11      A.   Sometimes.
12      Q.   How does that occur typically?
13      A.   They will pick a general order for a
14  particular day, and they will read them in roll call
15  at the beginning of the tour of duty. And if we have
16  questions about the general order, we can ask them.
17  And they will give us a chance to, to have any -- if
18  we have any objections to it, we go over that. They
19  will sometimes, you know, let us know what the
20  appropriate answers could be, or they will have us at
21  least try to give the correct answer and stuff, you
22  know, so --

Page 27

1       Q.   And sitting here today, you don't recall
2   any such specific training like that on a general
3   order dealing with sexual assaults?
4       A.   No.
5       Q.   And are you familiar with the term special
6   order?
7       A.   Yes.
8       Q.   And can you tell me what the difference is
9   between a special order and a general order, if there
10  is one?
11      A.   I can't give you specific term of it. A
12  special order is when there is a change that's going
13  to occur to a general order, so it's just that comes
14  out very quickly, and then the change comes after
15  that.
16      Q.   Okay. And do you ever receive any kind of
17  specific training, say, like what you were talking
18  about a minute ago on the content of a special order?
19      A.   No.
20      Q.   They don't ever read those out at, say,
21  roll call from time to time?
22      A.   They have. They have. I do recall. They

Page 28

1   have.
2       Q.   And do you recall ever receiving any
3   specific training on a special order involving how to
4   handle a sexual assault case?
5       A.   I can't recall that.
6       Q.   Do you have any familiarity with the term
7   date rape drug?
8           MR. JEFFERSON: Object to form.
9           BY MR. SPIVA:
10      Q.   You can answer.
11      A.   I've heard about that particular drug, you
12  know, away from the police department. But no, I
13  have no training in that area.
14      Q.   Okay. So the police department has not
15  trained you on the issue of date rape drugs?
16      A.   No. No.
17      Q.   And what have you heard outside of the
18  context of the police department?
19      A.   It's only through what you get through the
20  news media and stuff like that, but as far as having
21  experience in that area, I don't.
22      Q.   Okay.

Page 29

1       A.   Yeah.
2       Q.   And this is probably an obvious question,
3   based on what you just said, but I have to get it on
4   the record. Are you aware of any tests to determine
5   if a date rape drug is present in a person's body?
6           MR. JEFFERSON: Object to form.
7           THE WITNESS: No. I have no knowledge of
8   that.
9           BY MR. SPIVA:
10      Q.   Okay. And I take it you haven't received
11  any training on how long, you know, after a date rape
12  drug is ingested by a person, how long its presence
13  can be detected by a, by a test?
14          MR. JEFFERSON: Object to form.
15          BY MR. SPIVA:
16      Q.   You can answer.
17      A.   No. I have no knowledge.
18      Q.   Do you have any familiarity with the
19  sexual assault response team, I think it's called
20  SART for short?
21      A.   There is a sex unit, but I'm familiar --
22  how familiar?

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Page 34

1  A.  I can't remember the details of it.
2  Q.  Do you know how long ago that change was?
3  A.  I believe it was in December 22nd.
4  Q.  Of what --
5  A.  '06.
6  Q.  Okay.  But you don't recall specifically
7  that that required any kind of change in the way that
8  you would respond to, say, a sexual assault?
9  A.  No.
10  Q.  Are you familiar with the -- the notion of
11  finding a sexual assault complaint unfounded?  Have
12  you heard that terminology?
13  A.  Probably with the sex squad detective,
14  they would use that terminology, but I wouldn't.
15  Q.  Okay.
16  A.  Yeah.
17  Q.  What is your understanding of that
18  terminology?
19  A.  My understanding?
20  Q.  Yes.
21  A.  I guess once the sex squad detective does
22  an investigation, and he has all the facts, and it's

Page 35

1  to a point where he can't actually prove anything
2  that a crime was committed, then the case would be
3  unfounded.
4      MR. JEFFERSON:  Object to the
5  responsiveness of the answer.  Speculative.
6      BY MR. SPIVA:
7  Q.  Of the cases you've investigated over the
8  years, I think you said you've investigated about 12
9  approximately.  Do you know how many of those have
10  been found to be founded or unfounded?
11  A.  No.  I don't know.
12  Q.  Is that information that you normally
13  receive, say, from the detective whether or not the
14  allegation is found to be unfounded?
15  A.  He wouldn't exactly tell me like that.
16  More they would say not to take a report, and they
17  would do that investigation, and find out whether or
18  not it would be unfounded.  So yeah.
19  Q.  Now, when you say they would say not to
20  take a report, in what kinds of cases would they say
21  not to take a report?
22  A.  Where they have a case where, you know,

Page 36

1  they can't prove the information, stories are
2  conflicting, they would say do not take a report,
3  we'll handle, you know, so --
4  Q.  Okay.
5  A.  Yes.
6  Q.  And I take it they direct you not to take
7  a report?
8  A.  Exactly.
9  Q.  Okay.  And are there cases in which you
10  actually, they tell you to take a report.
11  A.  Yes.
12  Q.  And what do they typically say to you in a
13  case like that, where they say to take a report?
14  A.  Once they gathered all the information
15  from the victim, and they deemed it to be credible,
16  then they will say yes, go ahead, and get report
17  number for such and such.
18  Q.  And is that something that happens, you
19  know, on the same day that you actually go out and
20  interview the victim, you know, you either take a
21  report or don't take a report?  Is that something
22  that is determined and that either happens or doesn't

Page 37

1  happen on the day that you actually interview the
2  victim?
3  A.  I've had cases where the detectives
4  actually took a report the next day, but they are
5  going to have me take a report right then and there
6  because they handle the situation.  Because you prove
7  the information that the victim was giving at that
8  particular time, so --
9  Q.  And have you had cases where you actually
10  personally did some kind of a report that same day?
11  A.  Yes.  Yes.
12  Q.  And in those cases, what kind of report
13  are you taking, is it a -- for instance, is it a PD
14  251 or PD 252 or something else?
15  A.  That would be a 251.
16  Q.  And in cases where you do take a report,
17  in a sexual assault case, are there any special ways
18  that you handle that, preparing that PD 251 that are
19  different from, say, another type of criminal
20  investigation?
21      MR. JEFFERSON:  Object to form.
22      BY MR. SPIVA:

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                          May 14, 2008

Washington, DC

Page 38

1    Q.   Let me just -- what I'm getting at is, is
2    there anything you do differently in terms of
3    identifying the victim on the PD 251 in a sexual
4    assault case, say, as opposed to some other type of
5    case?
6    A.   Yes.  We don't put the victim's name in
7    the report.  We just give the hundred block of where
8    the incident occurred.  We don't put the victim's
9    address in there.
10   Q.   Okay.
11   A.   Yeah.
12   Q.   And how is the victim's name and address
13   and all that kind of information, how is that
14   recorded in a case where you take a PD 251 report?
15   A.   Actually, it's recorded on another report,
16   which is a 252, and a lot of times the detective
17   handling the case, he will prepare that, yes.
18   Q.   Is that typical, the detective is the one
19   that would do the 252?
20   A.   Sometimes it will.  Yes.
21   Q.   Do you sometimes prepare the PD 252?
22   A.   Yes.  If directed, I'll do that, yeah,

Page 39

1    yeah.
2    Q.   And would that be the detective that would
3    direct you to do that in the case where you needed to
4    do a PD 252?
5    A.   Yes.
6    Q.   In cases where you don't take a report,
7    cases of sexual assault, how do you document the
8    interview you do of the -- of the victim?
9    A.   I put the information in my notebook.  Get
10   as much information as I can from the victim and keep
11   that in my notebook.
12   Q.   And do you do anything with that
13   information?  What, if anything, do you do with that
14   information?
15   A.   Well, it's there for record, in case I
16   need it again.  That's why everything that I come on
17   the scene, any type of investigation, I try to record
18   the basic information, so I know it's there.  So I
19   can refer to it again if I have to.
20   Q.   Okay.  And do you pass on that information
21   to the detective, for instance, you give him a copy,
22   say, of your pages from your notebook?

Page 40

1    A.   No.  No.
2    Q.   And do you convey it some other way to the
3    detective?
4    A.   No.  Either tell him verbally about what I
5    have.  Because he does his own detailed
6    investigation.  What I have in my notebook is the
7    basic information, then there is much more, so --
8    yeah.
9    Q.   Now, in the cases where a detective has
10   directed you not to do a report, have they ever
11   explained why you shouldn't do a report in those
12   cases, and here focusing on the sexual assault
13   investigations?
14   A.   In those cases, where there is further
15   investigation is needed before we actually take the
16   report, that's the only time.  That's one of the
17   times -- that's the only time.
18   Q.   Okay.
19   A.   They need further investigation or if the
20   report -- if the information they feel it's not
21   credible, can't prove anything, they direct me, don't
22   take a report.

Page 41

1    Q.   And do they explain why not go ahead and
2    take the report, even if it's deemed to be not
3    credible, or there's some inconsistency?
4    A.   Well, that's their area of expertise.  I
5    won't question that, because they had training and I
6    haven't.
7    Q.   Understood.  Understood.  Do you know
8    whether -- let me step back for a minute.  Would you
9    say that it's the typical practice when a -- when a
10   detective says that a sexual assault case needs
11   further investigation, is it -- is it the typical
12   practice for them to tell you not to take a report?
13        MR. JEFFERSON:  Object to form.
14        BY MR. SPIVA:
15   Q.   You can answer.
16   A.   They can say that.
17   Q.   Is that usually in a case where they say
18   it needs additional investigation?
19        MR. JEFFERSON:  Object to form.
20        THE WITNESS:  It's not always said like
21   that, so it's -- it's rephrased in different verbs,
22   so -- it's not like that.

11 (Pages 38 to 41)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Page 46

1  take a report in a case of alleged sexual assault?
2       MR. JEFFERSON: Object to form.
3       THE WITNESS: Only situation that we have
4  is if a sergeant or somebody demands that you take a
5  report, then the official above the detective demands
6  you take the report, yes, go ahead and take the
7  report.
8       BY MR. SPIVA:
9    Q.  But no one has ever said that in all
10 instances, you should take a report?
11   A.  No. No.
12      MR. JEFFERSON: Wait until he finishes his
13 question.
14      BY MR. SPIVA:
15   Q.  I think it probably was clear enough, but
16 you're right, let me just make sure. Just so we get
17 it clear on the record, it doesn't come across clear
18 in the transcript. Let me just ask the question
19 again. It's going to be the same question. No one
20 has ever said to you that in all instances of sexual
21 assault complaints, that you should take a report?
22      MR. JEFFERSON: Object to form.

Page 47

1       BY MR. SPIVA:
2    Q.  You can answer.
3    A.  Did I just give an answer to that?
4    Q.  You did. But I want to make sure it's
5  clear on the record, because it came in the middle of
6  a question, and I didn't finish the question.
7    A.  So I don't want to answer it a different
8  way.
9    Q.  I'm not trying to get you to answer it a
10 different way. There was nothing wrong with your
11 answer. It's just that you said -- the transcript
12 says, no, but it's in the middle of the question and
13 so I want to make sure it's clear what you were
14 saying no to. So let me ask it again and if you
15 could just give the answer again. No one from MPD
16 has ever said to you that in all cases of alleged
17 sexual assault that you as a patrol officer should
18 take a report?
19      MR. JEFFERSON: Objection to form.
20      THE WITNESS: No.
21      BY MR. SPIVA:
22   Q.  And out of the 12 or so sexual assaults

Page 48

1  that you've responded to, do you know
2  approximately -- in approximately how many of those
3  you've had to take a report, and how many of those
4  the detectives have said, don't take a report?
5       MR. JEFFERSON: Including this case?
6       BY MR. SPIVA:
7    Q.  Including this case. Yes.
8    A.  I'm trying to understand this correctly.
9  Which I had to take a report?
10   Q.  Yes.
11   A.  Okay. Probably about seven.
12   Q.  Seven in which you have had to take a
13 report?
14   A.  Yes. But that's just an estimate.
15   Q.  Best estimate?
16   A.  Yes. Best estimate. Yes.
17   Q.  So that means, I take it, that roughly
18 five or so, you did not have to take a report?
19   A.  Yes.
20   Q.  And that's because the detective told you,
21 don't take a report in this case?
22      MR. JEFFERSON: Object to form. Leading.

Page 49

1       BY MR. SPIVA:
2    Q.  Is that correct?
3    A.  You said the detective in this case.
4    Q.  In those cases where you didn't take a
5  report, it was because the detective told you that
6  you didn't need to take a report?
7       MR. JEFFERSON: Same objection.
8       BY MR. SPIVA:
9    Q.  Is that right?
10   A.  Yes.
11   Q.  And in any of those cases, did the
12 detective tell you why you didn't need to take a
13 report?
14   A.  I can't remember his exact words to those
15 cases. I can only give, you know, my answer, I can't
16 give his, because that's so long ago. But in most
17 cases like that, they were either unfounded because
18 the information that was given to him by the
19 complainant was conflicting or there was not enough
20 information, so -- but that's, I can't give his
21 because it was so long ago, but in cases like that,
22 it's usually because of conflicting information.

13  (Pages 46 to 49)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

# Exhibit D

**To Plaintiff's Opposition to Defendant District of Columbia's
Motion for Judgment on the Pleadings**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL) (D.D.C.)

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Title** | |
| **Field Reporting System** | |
| **Topic/Number** | |
| **GO-SPT-401.01** | |
| **Effective Date** | **Distribution** |
| **March 4, 2004** | **A** |
| **Replaces/ Rescinds:** | |
| **General Order 401.1 (Field Reporting System)** | |
| **Special Order 86-12 (Canceling Central Complaint Numbers)** | |

I. Background.........................Page 1
II. Policy................................Page 1
III. Definitions ........................Page 1

IV. Regulations.........................Page 2
V. Procedural Guidelines ..........Page 3
VI. Cross References................Page 16

## I.   BACKGROUND

A Field Reporting System that provides accurate information to members within the Department and to the citizens we serve is an essential part of delivering effective law enforcement services. The Metropolitan Police Department (MPD) has a comprehensive reporting system that captures information of reported crimes and incidents, which occur within the District of Columbia, in violation of local and federal laws.

The need to document and preserve information gathered from reported crimes and incidents serves two purposes. First, it provides a record for action taken by law enforcement members, whether it is self-initiated or in response to a request for police service. This will help to ensure that appropriate enforcement action is taken when conducting investigations. Second, the information can be internally used to identify crime trends and solve crimes.

## II.   POLICY

The policy of the Metropolitan Police Department is that members shall file a report for all reported crimes and incidents brought to his/her attention. Self-initiated police action taken and calls for police service shall be accurately and thoroughly documented to ensure that a follow-up investigation can be conducted for potential adjudication.

## III.   DEFINITIONS

For the purpose of this directive, the following terms shall have the designated meanings:

1.   Serious Crimes - homicides, rapes, critical injury assaults, robberies, burglaries, stolen autos, bombings, arsons and a loss of other property in excess of $10,000.00.

EXHIBIT

0005

2.      Unusual Incidents – deaths, other than homicides, that fall under the statutory jurisdiction of the Medical Examiner's office, missing persons, bomb scares and natural disasters.

3.      Preliminary Investigations - the first investigative effort undertaken by a member of the MPD; normally, the investigative effort of a patrol officer seeking to verify that a crime has occurred and identifying whether there are solvability factors present.

4.      Follow-up Investigations - the continued inquiry into a crime or incident due to pending leads, the complexity of the case, new information or time constraints. This process can involve interviews, press releases, and further evidence examination.

5.      Solvability Factors - leads that require further investigation to determine if they will lead investigators to identifying the person(s) who committed the criminal act. The factors include the suspect's name and/or address, their description, physical evidence, identifiable automobile, known modus operandi, etc.

## IV.    REGULATIONS

A.      Members shall investigate and complete the appropriate reports and paperwork as outlined in this General Order in the following situations: (CALEA 82.2.2)

1.      For all reports of crimes or offenses that occurred in the District of Columbia as defined by the D.C. Official Code. (CALEA 82.2.2 a)

2.      For all citizens' complaints filed against Metropolitan Police Officers, that are not investigated by the Office of Citizen Complaint Review (OCCR). (CALEA 82.2.2 b)

3.      Any incident or crime that results in a member being dispatched or assigned to calls for service. (CALEA 82.2.2 c)

4.      All criminal or incident responses initiated by sworn members. (CALEA 82.2.2 d)

5.      All incidents or crimes resulting in an arrest, the issuance of a citation, or the issuance of a summons. (CALEA 82.2.2 e)

B.      A report shall be written for all reported offenses or incidents that occurred in the District of Columbia and shall be classified based on the elements of the crime if the offense/incident is in violation of the law established in the District of Columbia or U.S. Criminal Codes. (CALEA 82.2.1 a)

C.    Complaints in which multiple offenses have occurred shall be classified to reflect the most serious offense, as determined by the penalty in the D.C. Official Code. Remaining offenses shall be listed in the additional reporting blocks and described in the narrative portion of the report.

D.    It shall be the responsibility of the first member on the scene, regardless of his/her assignment, to begin conducting the preliminary investigation after safety precautions have been taken and the investigation does not interfere with the criminal case or defeat the ends of justice. Such determination shall be made in conjunction with the field supervisor. Once the assigned unit arrives on the scene, he/she shall resume the primary preliminary investigation, unless directed otherwise by an official.

E.    Whenever members prepare reports on the scene involving serious offenses or unusual incidents, he/she shall request a district official to respond to the scene of the offense or incident. The reporting member shall be responsible for preparing all applicable reports and making the necessary notifications. The report prepared for a serious crime or unusual incident shall include the name and organizational element of the supervising official who responded to the scene, the station clerk notified, if necessary, and any additional notifications made regarding the crime/incident. (CALEA 82.2.1 a)

F.    Members shall canvass the area with complainant(s), in instances when the suspect may still be in the immediate area and identification can be made. Further, a member shall advise the dispatcher that the complainant(s) is in the vehicle mileage, prior to canvassing and immediately after the complainant(s) exits the vehicle.

G.    Members may find it necessary to leave a scene immediately with a complainant when there is a concern for safety. Under these circumstances, the dispatcher shall be advised. The location and mileage shall be given to the dispatcher upon leaving the scene and once a destination is reached.

H.    If a member, other than the primary assigned member, handles the report, the dispatcher shall be notified and the Central Complaint Number (CCN) issued for that report shall be turned over to the member preparing the report. The dispatcher shall confirm the name and CAD identification number of the member who is now responsible for the report.

V.    PROCEDURAL GUIDELINES

A.    The preliminary investigation is the combination of those actions that should be carried out, as soon as possible, after the first responding member arrives on the scene. At a minimum, he/she shall:

1.    Ensure that injured or sick persons receive medical attention.

2.    Secure the crime scene to prevent the evidence from being lost or contaminated.

3.    Determine whether a crime has been committed and, if so, the exact nature of the offense or incident.

4.    Determine the identity of the suspect and make an apprehension when appropriate.

5.    Provide lookout information to the dispatcher and other units, such as descriptions, method and direction of travel, whether armed or unarmed, and any other identifiable information about any suspect(s) and/or the suspect's vehicle.

6.    Identify, interview, and take statements from all victims, witnesses and suspects to determine in detail the exact circumstances of the offense or incident.

7.    Arrange for the collection of evidence.

8.    Take any other action that may aid in resolving the situation or solving the crime as directed by a supervisor.

B.    The preliminary investigation begins when the first Metropolitan Police Officer arrives on the scene of a crime or incident. The purpose of the investigation is to determine the facts of an offense or incident. Report numbers (CCN) and all information obtained shall be documented on the appropriate forms and submitted to the supervisor for review and signature. The reports generated from the investigation should contain information gathered at the scene. If known, the reports should also include the following: (CALEA 82.2.1 c)

1.    The names and demographic information of all victims, suspects and witnesses;

2.    The type of crime committed, what was used to commit the crime and whether any evidence was recovered;

3.    In the case of property crimes, a description of, and value assigned to, any property that was stolen, damaged or destroyed (including the make, model, tag and VIN number of any vehicles stolen);

4.    In the case of property crimes, a description and the location of any stolen property that has been recovered;

5.    In the case of drug-related offenses, the results of any drug tests taken by the suspect(s);

6.    The time, date and location where the crime or incident occurred;

7.    The condition of the victim and where he/she was found and taken for treatment;

8.   How was the crime committed, sometimes referred to as the "Modus Operandi;"

9.   The circumstances surrounding the commission of the crime, including, but not limited to, any motive the suspect(s) had to commit the crime and the relationship between the suspect(s), victim(s) and witness(es);

10.  Information about whether the crime involved a domestic relationship and/or disagreement, whether a TPO/CPO was outstanding and whether a PD Form 387-A (Domestic Violence Brochure) was issued.

11.  The current case status information (whether the case is open, suspended or unfounded (and the reason for unfounding it), or whether an arrest has been made.

C.   The objective of a follow-up investigation is to accumulate sufficient information and evidence that corroborates probable cause for affecting an arrest. It typically involves interviewing victims and witnesses, as well as interrogation and interview of suspects.

D.   The solvability factors can give insight for potentially solving criminal cases. The information supplied can be examined in its totality to help determine the likelihood an arrest will be made, and any resources that may need to be allocated. The following factors shall be submitted on a PD Form 252 (Supplement), if known, as a part of the preliminary investigation:

Note: Each offense specified for a particular case shall be closed on a separate PD Form 252.

1.   A summary of the names of witnesses to the crime and statements, if provided.

2.   The name and location of the suspect, if known. If the suspect is not known, the member shall report whether the witnesses or victim(s) can identify or construct a composite of the suspect. Any criminal history on the suspect should be included.

3.   The member shall report a listing of any evidence, contraband, fruits or instruments involved in the crime. The member shall also report whether the suspect may have the "fruits of the crime" or evidence. The report should relate the current condition and location of any evidence.

4.   The reporting member shall document statements made by the victim, including a description of the crime. When necessary, describe the exact injuries and/or the medical or mental condition of the victim.

E.  Members initiating reports shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary, unless an illness or injury has occurred while in the performance of duty. In that case, the member's supervisor shall ensure the report is submitted before relieved from duty. (CALEA 82.2.1 e)

F.  The check-off official for that tour of duty shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary to the district Crime Analysis Unit.

G.  The district Crime Analyst/PD-93 Clerk shall prepare a PD Form 93 (24-Hour Crime Report) each morning for his/her commander, and enter basic information from the PD Form 251s (Event Report) associated with reports received over the past 24 hours into the Analytical Services Application (ASAP).

H.  Within 24 hours after submission of the report, the district Crime Analyst/PD 93 Clerk shall forward the original and two (2) copies of offense/incident and traffic reports for analysis and screening, with an attached transmittal, as follows:

    1.  Homicides - to the Office of Superintendent of Detectives (OSD) Violent Crimes Branch;

    2.  Sexual assaults against adults - to the OSD Sex Crimes Branch;

    3.  Sexual assaults against juveniles - to the Youth and Preventive Services Division;

    4.  Arsons – to the OSD Arson Unit; and

    5.  All other reports – to the OSD Investigative Review Officer (IRO).

        Note:  The IRO and/or reporting official in the specialty unit shall make a determination about whether the case shall be returned to the officer assigned to a specialty unit or maintained within the district OSD. (CALEA 82.2.5)

I.  Field reporting procedures. (CALEA 82.2.1 d)

    1.  Each member initiating a field report shall sign the report in the appropriate space on the form. Only the reporting member shall sign the field report (unless incapacitated), then an official shall sign the report.

    2.  All field reports shall either be computer-generated, typed or hand printed in black ink. The reporting member is responsible for ensuring that the report is accurate and legible prior to submitting it to a supervisor. Also, the reporting member shall maintain adequate notes of the offense in his/her notebook. (CALEA 82.2.1 e)

f.   PD Form 47 (Miranda Right's Card) - used to document and advise a suspect of his/her rights.

g.   PD Form 379 (Juvenile Truant, Court, Contact and Juvenile Curfew) - used to document all physical contact made with juveniles.  Records the reported incidents or offenses committed by juveniles.  This report records the violation of the laws and ordinances established in the District of Columbia and the United States.

h.   PD Form 118 (Defendant/Suspect Statement) - for documenting statements taken from a defendant/suspect.

i.   PD Form 119 (Complainant/Witness Statement) - for documenting statements taken from complainants/witnesses and members of the Department.

j.   PD Form 119A (Witness Statement - Driving Under the Influence/Driving While Intoxicated) – for documenting statements taken from witnesses and members for DUI/DWI investigations.

k.   PD Form 202A (Continuation Report) a continuation form.

l.   PD Form 10 (Traffic Accident Report) - for recording traffic accident investigations.

m.   PD Form 81 (Property Record) - for documenting all property that comes into the custody of the Department.

n.   BTA Form 51 (Notice of Infraction) - used to cite violators of the District of Columbia Municipal Regulations, Title 18, Vehicle and Traffic.

o.   PD Form 61D (Warning/Violation Citation) - used to cite violators of the District of Columbia Municipal Regulations, Title 24, Public Space and Safety.

p.   PD Form 901-e (Use of Force Incident Report) – used for any use of force by a member, which is required by GO-RAR-901.08 (Use of Force Investigations).

q.   PD Form 387-A (Domestic Violence Brochure).

7.   Members assigned to foot, bike or scooter patrol shall assist with canvasses when lookouts are broadcast in his/her patrol area.  When in receipt of an original complaint in which an offense or incident report is required, member(s) shall record the necessary information in his/her notebook and prepare the report.  At a minimum, these

members shall handle the following reports, unless directed otherwise by an official: (CALEA 82.2.1 a)

a.     Animal bite;

b.     Destruction of property;

c.     Thefts (all types);

d.     Lost property;

e.     Robbery (PBS and pickpocket);

f.     Sick or injured person (only those occurring on public space);

g.     Simple assault;

h.     Stolen bicycle;

i.     Stolen automobile;

j.     Miscellaneous reports.

8.     When a member is assigned to a school crossing or traffic post, he/she shall not leave it to take a report. In such cases, he/she shall assist the complainant by contacting the dispatcher and requesting a uniform patrol car to respond to the scene to handle the complaint.

9.     During the course of a preliminary investigation and when appropriate, members shall provide referral information to individuals who are in need of victim/witness assistance services. (See GO-OPS-204.06, Victim Services Program)

a.     Members shall provide information to the victim/witness about applicable services available within the District of Columbia, such as counseling, medical attention, and the crime victims compensation program. (CALEA 55.2.3 a)

b.     Members shall advise the victim/witness about what to do if the suspect or anyone known to the suspect, threatens or otherwise intimidates him or her. (CALEA 55.2.3 b)

c.     Members shall give the victim/witness the CCN numbers, explain the immediate steps in processing the case, consistent with the Department 's guidelines, and a contact telephone number, so that the victim/ witness can call to report additional information or inquire about the status of the case. (CALEA 55.2.3 c & d)

J.    Reports involving juveniles

1.    When members are preparing a PD Form 251 on a juvenile victim, he/she shall not disclose identifiers of the complainant. First and last initials shall be used in the name category, age range only shall be given, street blocks shall be used rather than specific addresses, and phone numbers shall be omitted. The PD Form 251 should only include basic information (a brief description of what happened) so the complainant is not forced to repeat him or herself, especially in more sensitive cases.

2.    When members are preparing a PD Form 251, incident report, on a juvenile victim, he/she shall not disclose the complainant's full name, exact address, exact age and phone number, if applicable. Otherwise, a full detailed description of what happened shall be given and the report filled out as described in section V, B and D, of this directive.

3.    The PD Form 252 shall be used to disclose all pertinent information involving juvenile victims.

K.    Evaluation of lost or stolen property. (CALEA 82.2.1 d)

1.    When a member completes a PD Form 251 or 252 for a lost or stolen property report, if available, the serial numbers, as well as identifiable marking, shall be listed in the report. The member shall comply with the following guidelines when assigning a fair and equitable valuation to the property:

a.    The fair market value shall be used for articles, which are subject to depreciation because of wear and tear, age, or other factors that cause the value to decrease with use.

b.    The wholesale cost to the merchant shall be used for goods stolen from retail establishments or warehouses. Members shall use the dollar value representing the actual cash loss to the victim, without any markup or profit added.

c.    The complainant's evaluation shall be used on items such as jewelry, watches, antiques and other similar goods, which decrease in value only slightly or not at all.

d.    The replacement cost or actual cash cost to the victim shall be used for new or almost new items such as clothing, auto accessories, and bicycles.

2.    Instruments such as traveler's checks, personal checks, money orders, stocks and bonds shall be reported as a theft or loss, and a monetary value of twenty-five cents (.25) shall be assigned to each item, or items so reported.

3.   Instruments such as bonds payable to the bearer, U.S. Government Bonds and U.S. Treasury Bonds, shall be valued at current market price at the time of theft or loss.

4.   When completing reports on lost or stolen property, members shall enter in the blocks provided, the complainant's estimate of the value of the property and his/her own estimated evaluation of the property.

5.   When more than one item is reported lost or stolen, the property shall be itemized and each item assigned a police department value.

6.   When property is recovered, the value originally reported shall be assigned, unless it is obvious that the value has depreciated. This procedure does not apply to vehicles.

L.   Canceling Central Complaint Numbers and unfounded reports. (CALEA 82.2.3)

1.   A PD Form 252 must be prepared to cancel or unfound a CCN number. The Staff Review Unit of the Records Department, Corporate Support, shall also accept PD Form 252 to cancel CCNs under the following conditions:

a.   Duplicate Numbers - If a situation occurs where two numbers are issued for the same report, a PD Form 252 must be prepared bearing the CCN that will be cancelled. The body of the report must state it is a duplicate number and list the CCN reflecting the actual PD Form 251 report that was prepared.

b.   Dispatcher's Error - If a unit is credited with a report due for a CCN that was given in error, the unit being held accountable shall prepare a PD 252, explaining the circumstances for a "No Report" disposition and identify the dispatcher that committed the error. A Communications official shall then cancel the CCN.

2.   The PD Form 252 is filed in the above situations to provide continuity and documentation to support the integrity of the reporting system.

3.   When Computer Aided Dispatcher has issued a CCN for a report and it is immediately determined the incident or crime did not occur, the original PD Form 251 is to be prepared and marked as unfounded. A PD Form 252 shall only be accepted after the original PD Form 251 has been submitted, or if it is submitted along with the PD Form 251. In both cases, a statement must be written in the body of the report confirming the fact that after conducting an investigation it was determined the incident did not occur.

4.   A supervisor must approve all unfounded reports.

M.   Reporting offenses or incidents occurring in another district.
     (CALEA 82.2.2 c)

     1.   When members are dispatched to the scene of an incident outside
          his/her assigned district, or when an incident is reported to them that
          occurred outside of his/her assigned district, they shall prepare the
          appropriate report. A CCN number from the Public Safety
          Communications Center (PSCC) shall be obtained and the report shall
          be forwarded through normal channels to be processed in the Staff
          Review Unit, Records Department, Corporate Support.

     2.   The reporting member shall also relay all information on the report to
          the Station Clerk of the district in which the event occurred, by faxing a
          copy of the report, if possible. The name and unit of the member
          receiving the information shall be entered in the narrative portion of the
          PD Form 251. The Station Clerk of the district where the reporting
          member is assigned shall be responsible for transmitting the report
          over the teletype when appropriate.

     3.   When a motor vehicle is stolen from the District of Columbia and
          recovered in the District of Columbia, members shall:

          a.   Enter the district/PSA where the motor vehicle was stolen from
               in boxes #1 and #2 of the PD Form 252, the district/PSA where
               the motor vehicle was recovered from in box #7 and both pieces
               of information in the narrative (or at least the location of the
               recovery).

          b.   If the district where the motor vehicle is stolen is different from
               the district where it is recovered, the original of the PD Form
               252 for the recovery shall be sent to the district from which the
               motor vehicle was stolen.

N.   Reporting the recovery of property stolen from another jurisdiction, members
     shall:

     1.   Obtain CCN numbers and prepare a PD Form 251 (Recovered Stolen
          Property), PD Form 252 and a PD Form 81 (Property Record);

     2.   Obtain the Originating Case Agency (OCA) numbers from the
          originating jurisdiction where the property was stolen and add them in
          the narrative part of the PD Form 251.

O.   Reports requiring response to medical facilities. (CALEA 82.2.2 c)

     1.   Members dispatched to a medical facility located outside of his/her
          assigned organizational element, to take or complete a sick or injured
          person's report, shall notify the dispatcher to contact a district official
          for authorization, prior to responding.

2.  Members, who respond to a medical facility to investigate complaints, shall prepare the necessary reports, as well as sign and date the patient's chart when requested by hospital authorities.

3.  If there is any indication that an individual shall be or is admitted into the hospital and no next of kin has been notified, the reporting member shall notify the Telecommunications Branch of the Information Technology Division by telephone. The teletype operator shall be given the individual's identity, a brief report of his/her circumstances and the CCN, when applicable.

4.  In cases when persons are transported to a District of Columbia medical facility for treatment of injuries that occurred in another jurisdiction and requires a police investigation, the member responding for the assignment shall notify the dispatcher to contact the appropriate agency that is responsible for conducting the investigation.

5.  In the interest of expediting police action in the above cases, the reporting member shall provide all necessary information to that agency. Telephone calls involving toll charges shall be handled in accordance with GO-SPT-302.03 (Department Telephones).

6.  When persons are admitted to hospitals in the District of Columbia, as the result of a traffic accident that occurred outside the District of Columbia, and their condition is listed as critical or death occurs, the reporting member shall notify the Major Crash Unit of the Special Investigation Division. If the member is unable to notify a member of the Major Crash Unit, the dispatcher shall make the notification. In the case of a death, a PSCC supervisor shall notify the appropriate law enforcement agency where the next of kin resides to make the notification.

P.  Reports involving a community correctional facility (Halfway House). (CALEA 82.2.2 c)

1.  Members dispatched to investigate an offense that occurred within the confines of a community correctional facility shall notify his/her district official who shall monitor the call. If necessary, an official shall respond to the scene and assist the reporting member.

2.  Upon completion of all required reports, the responding official shall notify the Watch Commander and provide a brief account of the

    incident or offense to be documented on the PD Form 150 (Watch Commanders Report).

Q.  Inter-jurisdictional police departments. (CALEA 82.2.2 c)

1.  Inter-jurisdictional police departments are responsible for conducting their own investigations of those incidents/offenses that occur in their

jurisdictions, except deaths. Members shall promptly notify the appropriate police agency of any incident or offense brought to their attention that occurs inter-jurisdictional.

2. All deaths shall be reported to and investigated by MPD. In addition, the required Metropolitan Police Department's reports dealing with deaths shall reflect the time and date the inter-jurisdictional police agency was notified, including the name of the official or member receiving the information.

R. Industrial accidents are those incidents occurring at the workplace and involving bodily injury. In such circumstances, MPD shall respond to assist at the scene. (CALEA 82.2.2 c)

1. Members who respond to an industrial accident shall prepare a PD Form 251 and, as soon as practicable, notify the Office of Occupational Safety and Health of the D.C. Department of Employment Services. Members shall report the date, time and location of the accident, as well as any other information required by the Office of Occupational Safety and Health.

2. The date, time and name of the person notified, at the Office of Occupational Safety and Health, shall be entered on PD Form 251, along with the name of the member who made the notification. If unable to notify a member of the Office of Occupational Safety and Health, the Emergency Management Agency shall be notified and the above information shall be recorded on the PD Form 251.

3. The Office of Occupational Safety and Health business hours are from 0830 to 1700, Monday through Friday.

Note: Any serious crimes or unusual incidents shall be reported to the elements watch commander and the Synchronized Operations Command Center (SOCC), by the reporting member, as soon as practicable.

S. Station Clerk responsibilities.

1. When a Station Clerk receives notification that a crime or incident has occurred in a district, from a member of another district, that does not require any investigation, he/she shall obtain the pertinent information and prepare a report. The Watch Commander shall be notified if it is a serious crime or unusual incident.

2. The Station Clerk receiving a crime, incident or traffic report from a sworn member in another district shall be responsible for preparing a duplicate and information-only copy for the OSD and the Crime Analysis Section. The Crime Analyst/PD 93 Clerk shall be responsible for all Part 1 offenses on the occurring district's PD Form 93 (24-Hour Crime Report). The notation "duplicate report" shall be written in bold

FIELD REPORTING SYSTEM (GO-SPT-401.01)

## VI.    CROSS REFERENCES

1.    GO-RAR-901.08 (Use of Force Investigations)

2.    GO-OPS-204.06 (Victim Services Program)

3.    GO-SPT-302.03 (Department Telephones)


// SIGNED //
Charles H. Ramsey
Chief of Police

CHR:NMJ:MAR:njg