**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALEXANDRIA McGAUGHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-01498 (RJL) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT LANG'S OPPOSITION TO
PLAINTIFF'S MOTION TO MODIFY SCHEDULING ORDER AND
<u>INCREASE NUMBER OF DEPOSITIONS PLAINTIFF MAY TAKE</u>**

Plaintiff respectfully submits this Reply to Defendant Lang's Opposition to Plaintiff's

Motion to Modify Scheduling Order and Increase Number of Depositions Plaintiff May Take.

Plaintiff filed her Motion on July 14, 2008, and opposition briefs thus were due yesterday, July

28, 2008.  Because Defendant Lang submitted his opposition brief early (on July 17, 2008),

Plaintiff's reply to Lang's opposition is due today.  No other Defendant has submitted an

opposition brief to date, although Defendant the District of Columbia has filed a formal notice of

its intent to file an opposition brief by July 30, 2008, and Plaintiff expects that other Defendants

may do the same because they have informed Plaintiff that they do not consent to the relief

sought by Plaintiff.[1]  Accordingly, Plaintiff today submits this short reply with respect to certain

---

[1] Plaintiff reserves her right to argue that all Defendants' oppositions other than Dr. Lang's are
untimely, assuming that they are eventually filed.  Local Civil Rule 7(b) provides that if an
opposition brief "is not filed within the prescribed time, the Court may treat the motion as
conceded."

issues raised by Defendant Lang.  Plaintiff will file a consolidated reply with respect to all

Defendants once all Defendants have filed responsive briefs.[2]

## I.     PLAINTIFF'S DISCOVERY EXTENSION IS REQUIRED, IN PART, BECAUSE OF DR. LANG'S PROFESSED LACK OF KNOWLEDGE ABOUT KEY ISSUES.

Dr. Lang's opposition to Plaintiff's requested extension of the discovery period and

permission to take additional depositions is replete with unsubstantiated and erroneous claims,

such as:  that this case is "languish[ing]" based on Plaintiff's alleged lack of diligence, Lang

Opp. at 2, that the District of Columbia has already provided a "wealth of documents and

information," *id.* at 3,[3] and that Plaintiff's counsel "routine[ly] fail[s] to limit their inquiry to

relevant topics appropriately tailored to the subject deponent," *id.* at 5.[4]  These and Dr. Lang's

---

[2] Neither the Federal Rules nor the Local Rules provide guidance as to the timing and consolidation of reply memoranda, where, as here, one defendant in a multi-defendant matter submits an opposition brief prior to submissions of other defendants.  On July 25, 2008, undersigned counsel contacted the Court Clerk's Office to seek guidance, but was transferred to Chambers.  Undersigned counsel thereafter spoke with the Court's Courtroom Deputy, also on July 25, 2008, who conferred with the civil case administrator in the Clerk's Office and informed undersigned counsel that it was our decision whether to consolidate our reply briefing and that we should refer to the Local Rules for the timing of that briefing.  In an abundance of caution, Plaintiff submits this reply memorandum now with respect to Defendant Lang, but reserves her right to make all necessary arguments against Dr. Lang and all other Defendants in the consolidated reply brief that she will file if other Defendants respond to her Motion.

[3] Plaintiff is not "disappointed with the lack of existing documents relevant to her case," Lang Opp. at 4, but is disappointed that some Defendants have failed to provide plainly relevant documents altogether or in a timely fashion.  For example, it was not until days before the close of discovery – during the lunch break of a key deposition – that the District of Columbia produced two polices of core relevance to this case.  *See* Mot. at 7-8 & n.7.  As Plaintiff's Motion explains, it is now clear that other Defendants' productions are also deficient.  Plaintiff has attempted to obtain all relevant documents from Defendants in this case, but it now appears that it may be necessary for Plaintiff to subpoena documents from third parties, such as the D.C. Rape Crisis Center.  *Cf.* Lang Opp. at 5.  Experience in this case teaches that it will take at least the 90 days proposed by Plaintiff to depose necessary witnesses and resolve issues related to some Defendants' deficient document productions identified in the Motion.

[4] Notably, it was defense counsel's depositions of each of <u>Plaintiff's</u> witnesses that took all day, that involved hours of harassing and irrelevant questioning, and that were made longer still by

other unsupported allegations could not be further from the truth.  Plaintiff has no desire whatsoever to expend unnecessary time and money on the discovery process, but, out of necessity, has sought the requested expansion of the schedule and the number of depositions in order to obtain highly critical discovery that, to date, has not been provided despite its existence.

From the inception of discovery, Plaintiff has diligently pursued written discovery and depositions.  Depositions were extremely difficult to schedule, due to the need to coordinate the schedules of all five sets of defense counsel – all of whom attend every deposition.[5]  For example, Dr. Lang's deposition alone was rescheduled multiple times due to scheduling issues on his end.  All depositions sought by Plaintiff are of witnesses with direct knowledge about Plaintiff's case or with critical institutional knowledge (such as regarding institutional policies, practices, procedures and training) that individual deponents have not been able to provide – or have not been permitted by their counsel to provide.[6]  In contrast to Plaintiff's thorough

---

repetitive questioning from all five sets of counsel.  In contrast, undersigned counsel has made every effort to efficiently depose Defendants' witnesses, but has been hampered by various obstructionist activities, including:  lengthy and repetitive speaking objections; delayed start times (due to tardiness of defense counsel, scheduling problems at locations requested by defense counsel, and defense witness availability); and late returns from lunch breaks by defense counsel.

[5] One option would be for counsel for Dr. Lang to attend some depositions by phone – as some defense counsel have chosen to do – or to not attend depositions that counsel for Dr. Lang deems unimportant to Dr. Lang's issues in this matter.  Yet, to date, counsel for Dr. Lang has chosen to attend each and every deposition in person.

[6] Plaintiff does not seek additional depositions because the witnesses are all newly discovered, as Dr. Lang incorrectly suggests.  *See* Lang Opp. at 6.  Plaintiff previously alerted the Court to the likely need for many of these depositions, and the Court's April 16, 2008 Minute Order expressly contemplated that Plaintiff could seek additional time for discovery and depositions "if necessary, at a later date."  The Court also did not purport to set a permanent "proper balance" in that Minute Order, as Dr. Lang incorrectly claims.  Lang Opp. at 7.  Notably, Dr. Lang does not point to a single specific witness who has been deposed, or whom Plaintiff proposes to depose, who either has not had or is unlikely to have discoverable information pertinent to this lawsuit.  What Dr. Lang really argues for is an arbitrary limit on Plaintiff's proper discovery, rather than a limit with any conceivable connection to the number of witnesses with relevant information.

explanations of the need for her proposed depositions, *see* Mot. at 5-13, Dr. Lang's claim that Plaintiff has deposed "marginally involved witness[es] with no independent recollection of the subject events," Lang Opp. at 6, is unsupported and incorrect.  All witnesses that Plaintiff has deposed to date were directly involved in the handling of Plaintiff's case in December 2006 and were disclosed as persons with knowledge by Defendants.[7]  Moreover, as detailed in Plaintiff's Motion, it is now clear – based on recent deposition testimony, among other things – that several Defendants have not complied with their responsibility to submit complete document productions.  Dr. Lang offers nothing but baseless rhetoric in claiming that Plaintiff has an "insatiable desire for discovery."  Lang Opp. at 8.  What Plaintiff seeks is the discovery that she needs in this complex, multi-defendant matter in order fairly to litigate her claims.

Dr. Lang's own discovery responses and deposition are illustrative of the difficulties Plaintiff has faced.  To date, Dr. Lang has produced only two documents in Response to Plaintiff's forty-two Requests for Production (other than documents subpoenaed from third parties by Dr. Lang):  a five-page curriculum vitae and a one-page declaration page from an insurance policy.  He has objected to nearly all of Plaintiff's Requests, including one that merely

---

Such an arbitrary truncation of legitimate discovery finds no support in the Federal Rules – and indeed runs contrary to their letter and spirit – and would result in the long-abandoned practice of trial by surprise and litigation as gamesmanship.  *See* Fed. R. Civ. P. 30(a)(2) (providing that "the court must grant leave" for a party to take additional depositions "to the extent consistent with Rule 26(b)(2)").  Plaintiff has made a detailed showing of need for additional depositions, and, beyond conclusory assertions, Dr. Lang has made no showing that any of the discovery Plaintiff seeks would run afoul of the guidelines set forth in Rule 26(b)(2) for limiting "discovery otherwise allowed by [the federal] rules."  Moreover, arbitrarily truncating discovery in the manner Dr. Lang advocates likely would lead to inefficiency at the motion stage, in that Rule 56(f) should entitle Plaintiff to depose any witness that she is not permitted to depose now to the extent necessary to defend against any summary judgment motions filed by Defendants.

[7] Even with regard to individuals Defendants have disclosed as persons with relevant knowledge, Plaintiff has exercised judgment, and has not sought to depose each individual disclosed by Defendants.

restates Dr. Lang's initial disclosure obligations under Rule 26.[8]  In addition, Dr. Lang has

"refuse[d] to respond" to many of Plaintiff's document requests – apparently based on objections

or assertions of privilege – but has not produced a privilege log to date.[9]  Moreover, for over half

of Plaintiff's Requests for Production (twenty-three of forty-two), Dr. Lang responded merely

that he "does not maintain or control the documents" regarding policies, practices and procedures

of Defendants District Hospital Partners d/b/a George Washington University Hospital

("GWUH") and The George Washington University ("GWU"), of his own employer Medical

Faculty Associates, Inc., or of other entities relevant to this lawsuit.  Although – as Plaintiff

separately addresses with counsel for Dr. Lang – these responses were incomplete because

Plaintiff seeks a broader category of responsive documents, the point here is that Dr. Lang has

repeatedly claimed that he has no information regarding the policies and practices of institutions

with which he is closely affiliated, but rather can only speak to his own experience.  *See infra* pp.

6-7.  Responses like these are part of why Plaintiff requires additional depositions and time for

discovery – for example, to take Rule 30(b)(6) depositions of institutions like GWU and GWUH,

to determine institutional policies and practices about which Dr. Lang professes ignorance.

Dr. Lang's deposition occurred less than three weeks before the close of discovery and

was transcribed as of July 14, 2008, just days before the close of discovery.  That deposition was

equally telling about the apparent limitations of Dr. Lang's knowledge and provides further

support for Plaintiff's need for additional discovery from the institutions with which Dr. Lang is

---

[8] Dr. Lang objected and "refuse[d] to respond" to Plaintiff's request for all non-privileged
"[d]ocuments that You may use to support your defenses in this action."  Dr. Lang's Responses
to Plaintiff's Requests for Production of Documents, ¶ 39.

[9] No Defendant has produced a privilege log, despite all Defendants' claims of privilege in their
responses to Plaintiff's requests for production.  Plaintiff produced a privilege log prior to the
present close of the discovery period.

affiliated, such as GWUH and GWU.  For example, despite having spent his medical residency

in the GWUH Department of Emergency Medicine and having practiced in GWUH's emergency

room as an attending physician since 2006, Dr. Lang at his deposition professed no knowledge of

any policies or procedures that govern his work in the GWUH emergency department, or any

training on any such policies and procedures.  *E.g.*, Lang Dep. (cited excerpts attached hereto as

Exhibit A), at 85-87.  He also stated that he is unaware of any institutional policies from GWUH,

GWU or elsewhere that govern his supervision of residents and the amount of participation

required by the attending physician, *id.* at 92-93, 125-27 – policies that are particularly critical

now that the depositions have made clear that it was a first-year resident that physically

examined Plaintiff during her treatment at GWUH.  Dr. Lang also has professed near-complete

ignorance about sexual assault medical forensic examinations, hospitals' role and involvement in

such examinations in the District of Columbia, and GWUH's policies and practices with respect

to the handling of alleged sexual assault victims.  *E.g.*, *id.* at 69-71, 75-76, 78-79, 139-40, 143-

44, 149, 159-63, 342-43, 345-47.  Indeed, Dr. Lang repeatedly stated that he could not testify to

anything beyond his own limited experience with two individual sexual assault victims

(including Plaintiff).  *E.g.*, *id.* at 141-42, 148-49, 154-55.

Furthermore, and incredibly, Dr. Lang stated that prior to his deposition he had never

before seen or reviewed GWUH's Protocol on Sexual Assault,[10] *id.* at 163-65, which counsel for

GWUH has stated was in effect as of December 2006, and which – by its plain terms – applies to

"Emergency Department Attending Physicians" such as Dr. Lang, *see* June 5, 2008 Letter from

A. Kelley to K. Hartnett, attaching Protocol (attached hereto as Exhibit B).  At his deposition,

Dr. Lang was unable to answer questions concerning that key policy and defense counsel

---

[10] That protocol appears to be part of the GWUH Emergency Department Practice Manual, but
GWUH has produced no documents from that manual other than the sexual assault protocol.

objected to such questioning based on a lack of foundation. *See* Lang Dep. at 165-207. Dr. Lang also was unable to explain the representations on GWU's website that the GWUH emergency department performs sexual assault medical forensic examinations and conforms to the national standard of care with respect to such examinations, based on his apparent unfamiliarity with those representations and issues. *Id.* at 212-16. Finally, Dr. Lang was unable to provide certain critical information about the workings of the electronic medical record system at GWUH, *id.* at 98, 256-63, 266-68, 273-75, 342-43.

As these detailed examples make clear, Dr. Lang's limited knowledge claimed in his discovery responses and at his deposition provide a sound basis for Plaintiff's request for additional discovery from witnesses with the knowledge that Dr. Lang evidently lacks.

## II.     DR. LANG WILL NOT BE PREJUDICED BY THE LIMITED EXTENSION OF ALL DISCOVERY DEADLINES REQUESTED BY PLAINTIFF.

Dr. Lang also claims that he will be prejudiced by Plaintiff's request that all deadlines in the case be moved forward by 90 days – including with respect to his selection of experts – and he thus proposes that if the Court allows Plaintiff's request for additional discovery, no other deadlines in the case should be moved. *See* Lang Opp. at 2, 7-8. Lang's argument lacks merit and should be rejected. As the Court is aware, the Court adopted <u>Defendants'</u> proposed ordering of expert disclosures and depositions, such that Plaintiff will be required to produce her expert reports and disclosures and have her experts deposed <u>before</u> Defendants are required to produce their expert testimony. This ordering of expert discovery ensures that Defendants will have abundant time to discover the position of Plaintiff's experts before having to submit their own experts' conclusions. Thus, there is no prejudice to Dr. Lang from moving all deadlines in the case forward by 90 days to permit Plaintiff (and all other parties, as needed) to complete

discovery.  To the contrary, moving all of the deadlines is the only and best way to preserve the schedule that the Court has adopted in this case.

Moreover, Dr. Lang's position that all deadlines should remain intact other than the close of fact discovery would lead to the fundamentally unfair, inefficient, and illogical situation of requiring Plaintiff to present her expert reports and disclosures over a month prior to the close of fact discovery, whereas Defendant would have no obligation to produce any such expert testimony until well after factual discovery has been completed.  Obviously, the additional discovery sought by Plaintiff – including critical Rule 30(b)(6) testimony from Defendants regarding institutional policies, practices and training, and additional factual testimony from individuals directly involved in Plaintiff's case – will be highly relevant to the conclusions reached by all of Plaintiff's experts.  Notably, the additional discovery sought by Plaintiff is relevant not only to her physician expert testimony, but also to her expert testimony regarding SANE/SART procedures and police procedures.  Finally, there is no merit to Dr. Lang's contention that moving the other deadlines in this case creates a barrier to Dr. Lang's "preparation of his defense and selection of his own experts," Lang Opp. at 2.  Plaintiff's detailed Complaint, the depositions in this matter (including of Dr. Lang), and Plaintiff's extensive and detailed responses to all Defendants' written discovery provides a more than ample basis for Dr. Lang to prepare his defense and consult necessary experts.  Plaintiff is eager to continue prosecuting her case against all the Defendants, including disclosure of her experts and their opinions based on a complete factual record, but it would be unfair to require her to make such disclosures without a complete factual record from which her experts can formulate their opinions, particularly in light of the critical nature of that discovery and Plaintiff's concrete plan for obtaining that discovery as efficiently as possible.

## **CONCLUSION**

For the above reasons, as well as those in Plaintiff's Motion and forthcoming consolidated reply brief, Plaintiff respectfully requests that the Court grant Plaintiff's Motion to Modify Scheduling Order and Increase Number of Depositions Plaintiff May Take.

Dated:  July 29, 2008                                    Respectfully submitted,

/s/ Bruce V. Spiva
Bruce V. Spiva, D.C. Bar. No. 443754
   bspiva@spivahartnett.com
Kathleen R. Hartnett, D.C. Bar. No. 483250
   khartnett@spivahartnett.com
SPIVA & HARTNETT LLP
1776 Massachusetts Avenue, N.W.,
Suite 600
Washington, D.C. 20036
Telephone:  (202) 785-0601
Facsimile:  (202) 785-0697

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Plaintiff's Reply to

Defendant Lang's Opposition to Plaintiff's Motion to Modify Scheduling Order and Increase

Number of Depositions Plaintiff May Take, was served on July 29, 2008, by electronic filing

with the Court's ECF system, upon:

Thomas V. Monahan, Jr.
  tvm@gdldlaw.com
Adam Kelley
  axk@gdldlaw. com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, Suite 2000
Baltimore, MD 21202

Dwayne Jefferson
  dwayne.jefferson@dc.gov
OFFICE OF THE ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001

Larry D. McAfee
  lmcafee@gleason-law.com
GLEASON, FLYNN, EMIG & FOGLEMAN,
  CHARTERED
11 North Washington Street, Suite 400
Rockville, MD 20850

Robert W. Goodson
  robert.goodson@wilsonelser.com
Deidre L. Robokos
  deidre.robokos@wilsonelser.com
Christine M. Costantino
  chrissy.costantino@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN &
  DICKER, LLP
1341 G Street, NW, Suite 500
Washington, D.C. 20005-3105

Karen R. Turner
  karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814

/s/ Bruce V. Spiva
Bruce V. Spiva

# Exhibit A

**To Plaintiff's Reply to Defendant Lang's Opposition to Plaintiff's Motion to Modify Scheduling Order and Increase Number of Depositions Plaintiff May Take**

***McGaughey v. District of Columbia, et al.***, No. 1:07-cv-01498 (RJL)

Page 1

          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,          :
                               :
        Plaintiff,             :
                               :
            v.                 : Case No.
                               : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al.,  :
                               :
        Defendants.            :
- - - - - - - - - - - - - - - x


                         Washington, D.C.

                    Friday, June 27, 2008


Video Deposition of

        CHRISTOPHER R. LANG, M.D., called for

examination by counsel for Plaintiff, pursuant to

notice, at the Law Offices of Wilson Elser

Moskowitz Edelman & Dicker, LLP, 1341 G Street,

Northwest, Fifth Floor, Washington, D.C.,

commensing at 9:15 a.m., before Barbara A. Huber,

Notary Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
Washington, DC

Page 66

```
 1     A   No.
 2     Q   Have you received any -- have you
 3   attended any trainings or any other courses from
 4   ACEP?
 5     A   They had a national conference that I --
 6   that I think I attended one lecture on emergency
 7   medical records.
 8     Q   Do you recall anything at the conference
 9   addressing the sexual assault patients?
10     A   No.
11     Q   It also mentions member of EMRA.
12         Can you explain what that is?
13     A   That's the Emergency Medicine Residents
14   Association.
15     Q   What does that group do?
16     A   It's more of social networking with
17   emergency medicine physicians.  I wasn't that
18   involved with it.
19     Q   And I take it that now that you're not a
20   resident, you're no longer a member?
21     A   That's correct.
22     Q   Just so we don't have to walk through
```

Page 67

```
 1   each and every --
 2     A   Sure.
 3     Q   -- employment, but I -- my main question
 4   is whether, in the course of your duties in the
 5   other entries on this second page, physician, navy
 6   reservist, and etc., whether any of those duties
 7   involved treating or caring for sexual assault
 8   patients?
 9         If you want to take a minute and look.
10   I don't want to rush you.
11         But --
12     A   Sure.
13     Q   -- if you could tell me if any of
14   those --
15     A   No, they don't.
16     Q   And I notice that you've listed on this
17   page and the next page, the page 3, three
18   publications and research entries?
19     A   Uh-huh.
20     Q   Did any of those have to do with sexual
21   assault patients?
22     A   No.
```

Page 68

```
 1     Q   And just for the second one, that you
 2   have listed on the top of page 3, Comparison of
 3   psychometric and clinimetric methods for measuring
 4   patient satisfaction?
 5     A   Uh-huh.
 6     Q   What -- what was that about?
 7     A   Basically, measuring the patient
 8   satisfaction in the internal medicine clinic.
 9     Q   And just again I -- I think the
10   remainder of this page is your honors and
11   recognitions.
12     A   Uh-huh.
13     Q   And I just -- if you could look at those
14   and let me know if any of those had to do with --
15   were related to the treatment of sexual assault
16   victims?
17     A   No.
18     Q   And turning to the next page, where it
19   lists your undergraduate honors and scholarships.
20     A   Uh-huh.
21     Q   Did any of these involve treatment or
22   care of sexual assault patient -- or victims?
```

Page 69

```
 1         I know you weren't a physician at that
 2   point.
 3     A   No, it didn't.
 4     Q   Do you know what a sexual assault
 5   medical forensic examination is?
 6         MR. GOODSON:  Objection to form.
 7         THE WITNESS:  No.
 8   BY MS. HARTNETT:
 9     Q   Is there another name that you would use
10   professionally for the examination that's done of
11   a sexual assault victim?
12     A   I've never performed one personally, so
13   I -- I don't -- I couldn't tell you the -- the
14   names associated with it.
15     Q   Do you know if performing a sexual
16   assault examination is part of the core competency
17   for a resident in internal -- for emergency
18   medicine?
19         MR. McAFEE:  For a resident?
20         MR. GOODSON:  Objection to the form.
21         MR. McAFEE:  Objection.  Form, and
22   foundation as well.
```

18 (Pages 66 to 69)

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

| Page 70 | Page 72 |
|---|---|

**Page 70**

1        MR. GOODSON:  You haven't established
2  what you're asking about, what type of exam.  I
3  think you need to establish what you're first
4  referring to before you ask him what --
5        MS. HARTNETT:  I understand.  Thank you.
6  BY MS. HARTNETT:
7     Q    Do you have an understanding of what
8  treatment a -- I understand you haven't performed
9  a sexual assault examination personally.
10    A    Uh-huh.
11    Q    Is there some specific treatment that a
12  sexual assault patient receives -- a specific
13  examination a sexual assault patient receives, for
14  example at the Howard University Hospital that you
15  described earlier?
16        MS. TURNER:  Objection.  Foundation.
17        MR. McAFEE:  Objection.
18        THE WITNESS:  I'm not sure I can
19  comment, because I'm not -- I'm not -- I don't
20  know.
21  BY MS. HARTNETT:
22    Q    So you -- you -- you do not have an

**Page 71**

1  understanding of what, if any, examination occurs
2  to a patient who's complaining of sexual assault?
3     A    My understanding is it's a forensic
4  exam -- I'm not sure what it -- it includes -- to
5  assist the police department, whoever is the
6  governing body over that, to ensure chain of
7  custody of specific types of specimens and
8  other -- whatever else is required in that kit.
9        MR. JEFFERSON:  I'm going to object and
10  move to strike on the basis of speculation.
11  BY MS. HARTNETT:
12    Q    And where did you get that understanding
13  that you just described?
14    A    Well --
15        MR. GOODSON:  Let me just object,
16  because he said he wasn't sure what it was.  So I
17  don't know what he -- what you're referring to as
18  what he described.
19        MS. HARTNETT:  He just described a kit,
20  something about chain of custody, the police, and
21  so had -- he had some understanding of something.
22  And I'm asking where he got that understanding

**Page 72**

1  from.
2        MR. GOODSON:  I'll object to the form.
3        You can answer.
4        THE WITNESS:  I assume it was the same
5  as if -- if someone was assaulted.  It's the
6  same -- you know, we -- it's protocol as far as
7  the Metropolitan Police Department is alerted.
8  They make a decision.  And then they go ahead and
9  do whatever.  We assist the police department in
10  whatever they need, if the decision is made that
11  they're going to go ahead and pursue something.
12        MR. JEFFERSON:  I'm going to object and
13  move to strike on the basis that the witness
14  testified that he's assuming; so, again,
15  speculation.
16  BY MS. HARTNETT:
17    Q    Have you been involved in not
18  necessarily sexual assault, but have you been
19  involved in the care or treatment of a patient
20  that's been assaulted?
21    A    Yes.
22    Q    Have you given medical center or

**Page 73**

1  treatment to such a patient, not -- not a sexual
2  assault, but another type of assaulted patient?
3     A    How do you define medical care?
4     Q    What I'm trying to understand is have
5  you performed any of this sort of examination on a
6  patient, not a sexual assault patient but another
7  type of patient that's been assaulted?
8        MR. GOODSON:  Okay.  I'm going to
9  object.  Because you referred to some sort of
10  examination and haven't defined what you're
11  referring to.  So I'll object to the form.
12  BY MS. HARTNETT:
13    Q    And I'm referring to whatever you're --
14  you -- you described some sort of forensic
15  examination that you -- you believe happens with
16  assaulted patients.  And I'm asking if you've ever
17  participated in that type of examination not with
18  sexually assaulted patients but with other --
19  otherwise assaulted patients?
20        MR. GOODSON:  I'll object.  He -- he's
21  never made any mentioned at all about some
22  forensic examination.  You haven't established

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                              June 27, 2008
                    Washington, DC

---

Page 74

1  that.  You simply ask him a question:  Has he
2  treated an assault victim?  So you haven't
3  established any forensic examination foundation
4  testimony for that question.
5          MS. HARTNETT:  Okay.
6          MR. GOODSON:  You can answer, though.
7          THE WITNESS:  I performed medical
8  examinations on assaulted patients.
9  BY MS. HARTNETT:
10     Q   In any of those cases, is it -- have --
11 have you learned from the police or otherwise that
12 some type of forensic examination is also being
13 performed on that patient?
14         MR. JEFFERSON:  Object to form and
15 foundation.
16         THE WITNESS:  The -- typically, if the
17 police are involved, they'll ask the -- who the
18 name is of the attending physician that's in the
19 emergency room.  And we'll, from that point on,
20 you know, ask if the stab -- if the patient is
21 stable, if we -- if we feel that the patient is
22 going to be admitted to the hospital.

---

Page 75

1  BY MS. HARTNETT:
2      Q   But in your experiences with these
3  assaulted patients in which the police are
4  involved, is any of your -- I don't want to use
5  the word treatment, but does any of your
6  interaction with that patient involve the
7  collection of forensic evidence?
8      A   We've -- you know, you -- we have a
9  gunshot wound patient.  Whatever clothes is on
10 that body, you -- you attempt to preserve for
11 forensic evidence.  So that's an example I can
12 give as to what we do.
13     Q   Do you know what the sexual nurse --
14 assault nurse examiner is?
15     A   I've never worked with them, so -- I
16 know that they perform some sort of examination.
17     Q   Have you ever interacted with anyone in
18 the -- in Washington, D.C. who is a SANE examiner?
19     A   No.
20     Q   I guess I don't want to limit it to
21 Washington, D.C., but have you ever interacted
22 with a SANE examiner anywhere?

---

Page 76

1      A   No.
2      Q   With respect to your practice when a
3  sexual assault victim presents and you direct them
4  to the police and then they are -- I -- from my --
5  what I understand you -- they are then directed to
6  the Howard University Hospital; is that correct?
7      A   With my interactions, that's what I've
8  seen happen.
9      Q   And do you have any understanding of
10 what happens to that patient when they arrive at
11 the Howard University Hospital?
12     A   I don't know that --
13         MR. JEFFERSON:  Object to form and
14 foundation.
15         THE WITNESS:  I'm not sure of the
16 intricacies.  I know they're a funded program that
17 deals with that issue.
18 BY MS. HARTNETT:
19     Q   And when you say --
20     A   They're the -- they're the center, you
21 know, for sexual assault for the city.  And my
22 understanding is they get fed -- they get -- I

---

Page 77

1  don't know if it's federally funded, or it's by
2  the District to be that center.
3      Q   Do you have an understanding of who pays
4  for the treatment of patients that -- the sexual
5  assault patients that go to Howard University
6  Hospital?
7      A   No, I have no understanding.
8      Q   And where did you get your
9  understanding, what limited understanding you may
10 have of what happens at Howard University
11 Hospital, whatever understanding you've described?
12     A   I'm not sure if it was, you know, during
13 my training as a resident that I heard something.
14 I'm -- I'm not --
15     Q   Was that your under -- prior to December
16 2006 when the patient in this case presented at
17 The George Washington University Hospital, was
18 that your understanding of how the system worked?
19     A   As far as?
20     Q   Sexual assault patients and how they
21 should be directed and where they should seek
22 treatment in the District of Columbia?

---

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 78

1    A   My understanding is you con -- you
2  initially contact the Metropolitan Police
3  Department, who then will provide assistance with
4  what needs to be done in that situation.
5    Q   Do you have an understanding of the
6  medical treatment that would be provided to a
7  sexual assault victim separate and apart from any
8  forensic evidence function that occurs with that
9  patient?
10    A   Yeah, I mean I -- I -- they would be
11  treated like any other patient that came in with a
12  complaint.  And you would address the complaint,
13  correlate with what their complaint is, what --
14  what their physical findings are, and come up with
15  a diagnosis and treatment plan.
16    Q   Would there -- at The George Washington
17  University Hospital, is there a treatment plan
18  specific to sexual assault patients?
19    A   Not to my knowledge.
20    Q   Is there a diagnosis specific to sexual
21  assault patients at The George Washington
22  University Hospital?

Page 79

1    A   Not to my knowledge.
2    Q   Do you know what the model of the
3  clinical practice of emergency medicine is?
4    A   The model for the --
5    Q   Clinical practice of emergency medicine?
6    A   Never heard of it.
7    Q   Do you know what date rape drugs are?
8    A   There's drugs -- there's medications
9  that -- I shouldn't say medications.  There's
10  drugs that can be given to potentially distort
11  someone's perception of things.
12    Q   Do you know the names of any drugs that
13  could be used for this purpose?
14    A   There are a lot of different types of
15  medications.  There's a -- there's a -- there's a
16  plethora, so --
17    Q   And do you -- can you explain any
18  typical affects or symptoms that -- for -- for
19  someone who's been given a date rape drug, who's
20  ingested a date rape drug?
21    A   You know, there's -- there's -- there's
22  a wide array.  So it just -- it just depends on --

Page 80

1  and, again, I don't have personal experience in --
2  in someone that's taken in a, quote/unquote, date
3  rape drug and presented to me in an altered mental
4  status state complaining that they were raped.
5  Never had that situation.
6    Q   Are you aware of any health risks to the
7  patient, separate from the perhaps increased
8  suseptibility of a rape of ingesting a date rape
9  drug?
10    A   It all depends on which drug it is.  You
11  know, all drugs have different types side-effects.
12  So, you know, there's -- there's.  Again, it
13  depends on what it is.  And -- and we make the
14  determination at that point.
15    Q   Just as an example, can you identify
16  one -- a drug that could be used for this purpose?
17    A   GHB would be one that come to mind.
18    Q   And what are -- what are some of the
19  symptoms of having ingested GHB?
20    A   I would say that the -- some of the
21  symptoms -- again, I've had very limited
22  experience on these type of ingestions, as far as

Page 81

1  the presentations to the emergency department.
2  But there is some sort of intoxicated maybe look
3  to them.  And then, you know, they could --
4  depending on the dosage of the medication, they
5  can become more tired or somnolent, etc.
6    Q   And are there any potential long-term
7  health affects or -- that could be to a patient
8  that's had the -- ingested the GHB?
9      MR. JEFFERSON:  Object to form and
10  foundation.
11      THE WITNESS:  Not to my knowledge,
12  outside of any secondary effects of when they
13  actually ingest it at that time.
14  BY MS. HARTNETT:
15    Q   And where did you come to the
16  understanding that you've described of GHB?
17    A   My reading in the literature about the
18  effects of the drug.
19    Q   And was this something that -- the
20  understanding that you described, is this an
21  understanding that you had as of December of 2006?
22      MR. JEFFERSON:  What understanding are

21 (Pages 78 to 81)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

Page 82

1  you talking about?
2        MS. HARTNETT: Well, he's -- whatever
3  he's testified so far as to the GHB.
4  BY MS. HARTNETT:
5        Q   Is that something that you understood as
6  of December of 2006?
7        A   I would -- I would say that the general
8  principles of the medication. But, again, there's
9  many other medications, so --
10       Q   And -- and understanding that this is an
11  example, have you done any research or reading
12  about GHB since December 2006?
13       A   No.
14       Q   Other than GHB, is there any other date
15  rape drug that you can identify specific --
16       A   Well, there's a lot of different types
17  of medications. You know, you can give them, you
18  know, any sort of sedatives, hypnotics. You know,
19  there's a -- there's a whole plethora of
20  medications, you know, ecstasy, you know. There's
21  just -- just a -- like I said, there's a wide
22  range. And that's why we like to kind of step

Page 83

1  back from when people term it as date rape,
2  because it can mean a -- a lot of different types
3  of medications.
4        Q   And have you received any training or
5  instruction during your time at The George
6  Washington University Hospital regarding date rape
7  drugs?
8        A   Not that I rec -- can recollect.
9        Q   Sorry. Just turning back to your CV for
10  one more moment.
11            Have you written any other publications
12  in whole or in part other than the three that are
13  listed here regarding medicine?
14       A   No.
15       Q   And other than the memberships in ACEP
16  and EMRA that we described, are there any other
17  professional memberships that you've had or -- or
18  currently have, as far as an association?
19       A   American College of Internal Medicine, I
20  think it was, when I was a -- back when I was an
21  intern at Bethesda.
22       Q   And anything else at present?

Page 84

1        A   No.
2        Q   Are there any publications that you view
3  as authoritative with regard to the treatment and
4  care of sexual assault patient?
5        MR. GOODSON: Objection to form.
6        You may answer.
7        THE WITNESS: Can you re -- repeat that?
8  Sorry.
9  BY MS. HARTNETT:
10       Q   Are there any publications that you
11  consider authoritative with respect to the
12  treatment or care of a sexual assault patient?
13       MR. GOODSON: Objection to form.
14       MR. JEFFERSON: I'll join.
15       THE WITNESS: No, not to my knowledge.
16  BY MS. HARTNETT:
17       Q   I'm assuming the answer is no, but have
18  you had your hospital privileges revoked or
19  suspended anywhere?
20       A   No.
21       Q   And have you ever had your license
22  revoked or suspended?

Page 85

1        A   No.
2        Q   Have you been disciplined by any state
3  medical board?
4        A   No.
5        Q   Have you ever been sued before regarding
6  your professional duties?
7        A   No.
8        Q   I apologize for asking this, but have
9  you been convicted of any crimes?
10       A   No.
11       VIDEOGRAPHER: This concludes tape one
12  in the deposition of Dr. Christopher Lang. Off
13  the record at 10:45:35.
14            (Recess)
15       VIDEOGRAPHER: This begins tape two in
16  the deposition of Dr. Christopher Lang. On the
17  record at 10:49:10.
18  BY MS. HARTNETT:
19       Q   Dr. Lang, are there policies and
20  procedures that govern your work in The George
21  Washington University emergency department?
22       A   Not to my knowledge.

22 (Pages 82 to 85)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                      June 27, 2008
                    Washington, DC

Page 86

1    Q   Are there -- I -- how do you as an
2  attending physician in that emergency department
3  learn of the -- the policies or practices of how
4  you're supposed to perform your duties in the
5  emergency -- emergency department there?
6    A   My duty as the attending physician is
7  perform the duties that I was trained to do, which
8  is act as an emergency physician.
9    Q   So in the course of your work at the
10 emergency department at George Washington
11 University Hospital, do you have any occasion to
12 refer to the policies or practices that the -- the
13 hospital may have?
14   A   No.
15   Q   Have you received any training on any
16 hospital policies or procedures?
17   A   No.
18   Q   Has that been your experience at the
19 Naval Hospital as well, that -- sorry, just to be
20 clear, that -- are there any policies or
21 procedures from the Naval Hospital that you follow
22 when you're doing your work there?

Page 87

1    A   It's is same as -- as at George
2  Washington University.
3    Q   And that your -- your work as an
4  attending physician doesn't require you to consult
5  any hospital policies or procedures at the Naval
6  Hospital?
7    A   Not to my knowledge.
8    Q   Do you know if there are hospital policy
9  and procedures for the emergency department at The
10 George Washington University Hospital?
11      MR. KELLEY:  Object to the form.
12      THE WITNESS:  No --
13      MR. GOODSON:  Same objection.
14      You -- you can answer.
15      THE WITNESS:  Not to my knowledge.
16 BY MS. HARTNETT:
17   Q   If you have a question regarding -- in
18 the -- in your care of a patient at George
19 Washington University Hospital regarding the
20 appropriate procedure or treatment to -- for a
21 patient, is there someone you ask -- is there
22 somewhere you can ask that question, someone you

Page 88

1  can ask it to?
2    A   Yes.
3    Q   Where would you go?
4    A   Initially the charge nurse.
5    Q   And why would you go to the charge
6  nurse?
7    A   They're the -- the main person that's
8  in -- during that shift that's really in charge
9  of, you know, the nurses and techs and movement of
10 patients.  They're kind of the quarterback on that
11 side of the house.
12   Q   When you say side of the house, what --
13 what are you referring to?
14   A   Nurses, techs, flow of the emergency
15 room.
16   Q   On a given shift in The George
17 Washington University emergency department -- and
18 this is during your time as an attending
19 physician --
20   A   Sure.
21   Q   -- what other personnel are -- medical
22 personnel are in the emergency department other

Page 89

1  than the attending physician?
2    A   There'll be residents.  And typically
3  there's three teams that -- on the main -- I'll
4  speak first on the main side.  There is the
5  attending physician, potentially a second one --
6  usually just one -- with three residents and
7  sometimes a senior resident on top of it.  There
8  could -- there's usually medical students -- and
9  that could range from zero to ten -- physician's
10 assistants, and physician assistant students.
11      And then on the nursing side, there's --
12 you know, there's a charge nurse.  There's triage
13 nurses that take intake from the front.  There's
14 what's called float nurses that if there's issues
15 that are going on in the ER that the nurses are
16 maybe consumed with another patient, that they'll
17 go ahead and help them out with their other
18 patients.  And then there's the nurses that are
19 assigned to each one of the patients.
20      And then from there there's techs that,
21 you know, will assist the nurse in things such as
22 EKG's, blood work, bringing patients down to

23 (Pages 86 to 89)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  x-ray, those types of -- and then there's a front
2  desk like clerk.  And their roles and
3  responsibilities are to get the admissions into
4  the computer system, answer the phone, page people
5  for us maybe.
6      Q    And when you're on a shift as the
7  attending, which, if any, of these -- the people
8  that you described are you supervising?
9      A    My supervision is -- how do you define
10 supervision?
11     Q    I guess which of those individuals are
12 you responsible for what -- what their doing, the
13 tasks they're performing in the emergency
14 department?
15     A    You mean our responsibilities with the
16 physicians or physician train -- trainees?
17     Q    As far as the nursing staff goes you --
18 I mean I take it that you can direct them to do
19 something for the care of the patient, and they --
20 they have to do what you say?
21     A    Oh, I wouldn't like to refer to it as
22 that.  I think it's a very collegial relationship

**Page 91**

1  that they will honor what we have to say, unless
2  they think it's such an extreme, you know,
3  aversion to what the -- you know, what -- what
4  appropriate care may be for that patient.
5      Q    I take it you -- I just want to be clear
6  that you -- do you have -- since you -- I didn't
7  want to use the words supervision if that's
8  confusing, but do you have oversight over what the
9  nurses are doing with respect to the patients that
10 you're caring for?
11         MR. GOODSON:  Object to form.
12         You can answer.
13         THE WITNESS:  I mean we make sure that
14 they're getting, you know, things performed
15 which -- whatever their job description is to get
16 those done.  And there's a mechanism, if I have an
17 issue, to go to people.  But, again, they're not
18 under my direct supervision.  I don't have the
19 authority to -- to counsel, you know, write them
20 up, etc.  That's --
21 BY MS. HARTNETT:
22     Q    And are the physician assistants and the

**Page 92**

1  physician assistant students under your
2  supervision?
3      A    Yes.
4      Q    And is there any -- be it from George
5  Washington University Hospital or elsewhere, are
6  there any policies or -- or guidelines that you
7  follow in how you supervise the -- the personnel
8  that are under your supervision in the emergency
9  department?
10     A    Not to my knowledge.
11     Q    Are there any medical faculty associates
12 policies or procedures regarding supervision of
13 residents or other medical personnel?
14     A    Not that I've seen.
15     Q    How did you develop your understanding
16 of what is entailed in supervision of the medical
17 personnel that are under your supervision at
18 the -- in the emergency department?
19     A    It's -- it's well known just in the
20 medical field of how the -- you know, you graduate
21 medical school.  As a medical student, you're
22 first thrown into the -- the throws of rotating

**Page 93**

1  around the special -- with each specialty.  And
2  there's a hierarchy system of a medical student,
3  you know, resident, and attending physician.  And
4  so during that process is -- is how you, you know,
5  how you learn how, for a lack of a better term,
6  chain of command exists.
7      Q    And just for example in your own
8  experience at The George Washington University
9  Hospital versus the Naval Hospital, do you employ
10 the same basic -- your own same practices with
11 regard to supervision of the -- any medical
12 personnel that are under your supervision?
13     A    Yes.
14     Q    And I -- I just want to make sure I was
15 clear, because I -- I had mentioned George
16 Washington University Hospital policies that --
17 there any George Washington University policies
18 that you're aware of that govern your work as an
19 attending physician in the emergency department?
20     A    Not to my knowledge.
21     Q    The -- the work address that you gave
22 earlier in the deposition, is that an office?

24 (Pages 90 to 93)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                    Washington, DC

| Page 98 |
| --- |

1  your training you learn of seeing patients and --
2  and how to treat that way.  Then there's on-line
3  searches that you could potentially do.  But I
4  don't have a specific on-line search that I use in
5  my medical practice.
6      Q   In your work at the emergency department
7  at George Washington University Hospital, what is
8  your -- what is the system for keeping any --
9  keeping records about the patients that you see?
10     A   We have an electronic medical record.
11     Q   Is that something that you were trained
12  on when you first began your work in the emergency
13  department at GW?
14     A   Yes.
15     Q   Is this during your residency that you
16  received that training, or is this when you became
17  an attending?
18     A   It was during my residency.
19     Q   And are there any guidebooks or manuals
20  with respect to, you know, how to keep the records
21  in that electronic system?
22     A   Not to my knowledge.

| Page 99 |
| --- |

1      Q   Do you recall what the training entailed
2  regarding the -- making the -- using the
3  electronic medical record system?
4      A   When they brought it on-line, it was --
5  I believe it was two or three, you know, four- or
6  five-hour sessions on -- on how the electronic
7  medical record is utilized.
8      Q   And you -- can you describe what your
9  practice is for making entries into the electronic
10  medical record?
11         MR. GOODSON:  What year?
12  BY MS. HARTNETT:
13     Q   Well, let's start with current.
14     A   My current?
15     Q   Yes, please.
16     A   I mean depends.  There's several
17  different types of entries you put into the
18  medical record.
19     Q   Is an attending order some of the
20  different types that you can put in?
21     A   Order of laboratory testing, diagnostic
22  testing, medications.

| Page 100 |
| --- |

1      Q   Do you use the medical record to diag --
2  to document your interactions with the patient?
3      A   Yes.
4      Q   And how do you -- how do you denote that
5  in the medical record?
6      A   There's a section.  There's an attending
7  section that you can denote.
8      Q   And what's your practice for what you --
9  you put into the attending section of the medical
10  record?
11     A   My practice is a -- whatever my
12  encounter is what that patient, and would describe
13  that encounter.
14     Q   And in the course of treating a patient,
15  I'm just trying to understand is it that you
16  put -- do you input the entries into the
17  electronic record while you're seeing them, or do
18  you do it sometime after you've seen them, or does
19  it just vary depending on the situation?
20     A   Yeah, it's so variable, especially a
21  large metropolitan emergency room.  It's just --
22  it's vari -- it's variable.

| Page 101 |
| --- |

1      Q   Are there any guidelines or practices
2  that you're aware of as to like how soon you're
3  supposed to put the -- the information into the
4  record or anything of that sort?
5      A   There's no guidelines.  I -- I think
6  it's common practice to before your shift is done
7  to make sure that your notes are completed.
8      Q   And separate from the medical record,
9  regarding your supervision of the residents
10  specifically, is there some way you keep track of
11  each resident's work during the shift that you're
12  working with them?
13         Is there any way that you make notations
14  or -- or any records of that?
15     A   Outside of what they input into the
16  electronic medical record that's -- that I'm privy
17  to, you know, their entries, there's -- there's no
18  other documents.
19     Q   Is part of your role as attending to
20  evaluate the work of the residents?
21     A   Yes.
22     Q   And how do you -- how do you -- how do

26 (Pages 98 to 101)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 122

1    A   Yes.
2    Q   Do you do residents ever ask for you to
3  be present while they're doing some sort of
4  examination or treatment of a patient?
5    A   Yes.
6    Q   In what circumstances?
7    A   When they don't feel comfortable about
8  the specific type -- it's usually procedure that
9  they're doing, or if they found a -- if they have
10  a physical finding.
11    Q   Before you actually talk to the patient,
12  are there -- do you look at any electronic records
13  that have been generated to that point by the
14  nurse -- other nurses or other personnel?
15    A   Can you clarify the question?
16    Q   Sure.  I get -- what I'm trying to
17  understand is before you actually go physically
18  see the patient and talk --
19    A   Uh-huh.
20    Q   -- to them, do you look at a chart or
21  any other electronic record to get some background
22  on what -- what the patient's status is?

Page 123

1    A   Some -- if I can, sometimes.  You know,
2  it -- it -- again, it depends on how -- how busy
3  it is.  And it's not only busy in volume, but it's
4  also just if I'm walking and there -- and I'm in
5  room two and there so happens to be someone that
6  rolled into -- right into room three, I'll go in
7  there because we always have to go back to a
8  central location to do our data input.  We
9  don't -- you know, it's not done -- [inaudible] --
10  so --
11        THE REPORTER:  It's not done what?
12        THE WITNESS:  At bedside.  So we go
13  ahead and -- I would go ahead and do it that way.
14  BY MS. HARTNETT:
15    Q   At that point, you would just talk to
16  the patient to get the basic information that you
17  need to proceed further?
18    A   That's correct, I -- yeah.
19    Q   Okay.  Are there times when the nurse or
20  some other personnel will orally explain -- say
21  something about the patient to kind of brief you
22  on that patient as opposed to you looking at the

Page 124

1  computer or reading their chart before you see
2  them?
3    A   Yes.
4    Q   Any particular situations where a nurse
5  would do that, or just depends on the situation?
6    A   Yeah, it's -- it's -- it's variable.
7    Q   What's the minimum that you have to do
8  as an attending to actually be able to have that
9  patient kind of properly received and -- and
10  discharged from the -- from the -- from the
11  emergency department?
12        MR. GOODSON:  Objection.  Form.
13        THE WITNESS:  Me, personally, or --
14  BY MS. HARTNETT:
15    Q   An attending.  I guess what's the
16  minimum task that an attending must do for any
17  patient that presents in the emergency department
18  before they're discharged?
19        MR. GOODSON:  Objection to form.
20        THE WITNESS:  The minimum task would be
21  to -- to have a discussion with whoever saw the
22  patient, come up with a treatment plan, and go

Page 125

1  from there.
2  BY MS. HARTNETT:
3    Q   Are there situations where the patients
4  actually come in and is discharged without you
5  personally ever -- as the attending ever
6  interacting with the patient directly?
7    A   Me, personally, yes.  Very limited.
8    Q   Are there any particular kinds of cases
9  where that would occur, or is it -- or does it
10  vary?
11    A   Yeah, I mean it's mainly you cut your
12  finger.  You had sutures placed in five days ago.
13  The physician's assistant remove the sutures.
14    Q   Right.
15    A   Everything seemed to be fine.  I don't
16  necessarily go and take a look at those patients.
17    Q   In your understanding of the basic
18  minimum that you have -- I understand that you
19  probably do more than the minimum, but -- but your
20  understanding of the minimum that you as the
21  attending need to do for supervision for each
22  patient, where does that come from?  What informs

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                          Washington, DC

Page 126

1  your understanding?
2     A   From my training.
3     Q   Are there any specific written
4  guidelines or policies that you or -- or training
5  materials that you -- that come to mind when
6  you -- for this topic?
7     A   No.
8     Q   Can a patient be accompanied by a friend
9  or relative when they're being treated in the
10 emergency department at GW?
11         MR. JEFFERSON:  Object to form and
12 foundation.
13         THE WITNESS:  It depends on the
14 situation.
15 BY MS. HARTNETT:
16    Q   What is your practice in that regard?
17    A   It's, one, if the patient doesn't want
18 the family member to come back, we honor that.  If
19 they feel that they're -- that person is of danger
20 to them for any sort, we don't allow them to come
21 back.  Or in a critical patient, where we're doing
22 lots of procedures with lots of people in the room

Page 127

1  and we don't have space to put -- to bring them
2  back yet, or we don't want them to see the patient
3  in that fashion quite yet, we would wait, but
4  allow them to come back at some point.
5     Q   And again, regarding your practice,
6  would that topic of when a patient could be
7  accompanied, where does that come from, as far as
8  you're -- what --
9     A   I get it from my training.
10    Q   And are there any particular written
11 policies or -- or training materials that -- that
12 you're referring to?
13    A   No, not that I'm aware of.
14    Q   The patient that presents for treatment
15 reports having lost consciousness --
16    A   Uh-huh.
17    Q   -- can you describe what would be part
18 of that -- your assessment of that patient or --
19 and your treatment of that patient?
20         MR. GOODSON:  Objection.  At what point
21 in time and what circumstance?  I mean it's such a
22 broad question.

Page 128

1  BY MS. HARTNETT:
2     Q   Within the last 24 hours had lost
3  consciousness?
4         MR. GOODSON:  And they're still
5  unconscious?
6  BY MS. HARTNETT:
7     Q   No.  They're there and they regain
8  consciousness there.  And they reported that to
9  you.
10         Can you describe what your --
11         MR. GOODSON:  Let me just object to --
12         THE WITNESS:  Well, first, they've got
13 to complain to me that they've lost consciousness.
14 Okay.  And then after their complaint of losing
15 consciousness, we would then dive into how they
16 lost consciousness.
17 BY MS. HARTNETT:
18    Q   So it would just depend on how they lost
19 consciousness kind of where you went from there?
20    A   Exactly.
21    Q   As of December 2006, had you worked with
22 Dr. Khozeimeh previously?

Page 129

1     A   I believe so.
2     Q   Do you have any recollection of your
3  work with her prior to December of 2006?
4     A   Not -- not -- nothing that sticks out to
5  me, no.
6     Q   Have you worked with her since December
7  2006?
8     A   Not to my knowledge.
9     Q   Do you know what your -- where she was
10 in her residency program in December 2006?
11    A   Yes.  I believe she was a -- a surgical
12 resident.
13    Q   And what does that mean?
14    A   She is persuing a residency in general
15 surgery.
16    Q   So why -- why was she in the emergency
17 department at that point?
18    A   They rotate through.
19    Q   And, sorry, just -- do you know what
20 year of the program she was in at that point,
21 12/06?
22    A   I believe she was first year.

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 138

1  calling the police and then the -- the patient
2  would be transferred to Howard if necessary, where
3  did that understanding come to you from, a person
4  or a document?
5      MR. JEFFERSON: Object to form and
6  foundation, particularly to the
7  mischaracterization of the witness's testimony.
8  The question presupposes that the patient was in
9  fact sexually assaulted or had a complaint of
10 sexual assault.
11     MS. TURNER: Same objection.
12     THE WITNESS: The -- again, the patient
13 is -- they have the intake. And then the
14 Metropolitan Police Department is is -- is
15 contacted. And that's what has been my training
16 for any assault case that comes in, that we call
17 the Metropolitan Police Department.
18 BY MS. HARTNETT:
19     Q  Okay. So understanding -- I don't want
20 to separate out sexual assaults if that's
21 incorrect with respect to your experience.
22     And where did that train -- you said

Page 139

1  that's what we'd been trained on.
2      Where did that come from?
3      A  Seeing assaulted patients during my
4  residency training.
5      Q  And any anywhere else?
6      Anywhere that this understanding of the
7  practice of the -- the procedure that you would
8  follow in a case of an assaulted patient, anywhere
9  else that understanding came from?
10     A  No.
11     Q  Okay. Do you know if The George
12 Washington University Hospital is involved in the
13 SANE program?
14     MR. GOODSON: I'll object to the form of
15 the questions as to involved.
16     You can answer.
17     THE WITNESS: Not to my knowledge.
18 BY MS. HARTNETT:
19     Q  And do you know what the -- sorry. I
20 should ask this first.
21     But do you know what the SANE program
22 is?

Page 140

1      A  I think I -- I -- I think we discussed
2  this before. I have a very limited knowledge on
3  the program. But it is a -- there is a designated
4  center where people are processed once the
5  decision is made that this a sexual assault case.
6      MR. JEFFERSON: Object to the
7  responsiveness of the answer. Move to strike.
8  Speculation.
9      MS. TURNER: Same objection.
10 BY MS. HARTNETT:
11     Q  Are you aware of any situation, either
12 from your own treatment or from some other
13 knowledge you have of any patient being treated
14 for, once it's determined it is a sexual assault
15 case, as you put it, being treated at The George
16 Washington University Hospital with regard to that
17 sexual assault?
18     A  I'm not aware --
19     MR. JEFFERSON: Object to form and
20 foundation.
21     THE WITNESS: I'm not aware of any case.
22 BY MS. HARTNETT:

Page 141

1      Q  Is your -- is your understanding that
2  there are any cases or any situations in which
3  that sexual assault patient who has been some --
4  someone has made the decision this is a sexual
5  assault case, are you aware of any of -- any
6  situations in which those patients would be
7  treated at The George Washington University
8  Hospital?
9      MR. JEFFERSON: Same objection.
10     MS. TURNER: I'll object to also the
11 term "someone."
12     You can answer.
13     THE WITNESS: I've never been in a
14 specific situation to be able to answer that
15 question.
16 BY MS. HARTNETT:
17     Q  So is it fair to say you don't know
18 whether there are situations in which a patient
19 who has been -- well, that -- whether this has
20 been made as a sexual assault case that could be
21 treated at The George Wash -- George Washington
22 University Hospital?

                              36 (Pages 138 to 141)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                    Washington, DC

---

Page 142

1     MR. JEFFERSON:  Object to form.
2     THE WITNESS:  We have a conversation
3  with the Metropolitan Police Department, and
4  whatever their decision is to do.  And I've only
5  had those two -- the two instances.  So I only can
6  comment on that.
7  BY MS. HARTNETT:
8     Q    And I take it your -- from your
9  experience, your understanding is that it's the
10  Metropolitan Police Department's decision as to
11  whether the patient is going to be treated as a
12  sexual assault case or not?
13     MR. JEFFERSON:  Object to form and
14  foundation.
15     THE WITNESS:  My job as a physician is
16  to make sure that the patient's medically safe.
17  BY MS. HARTNETT:
18     Q    And I -- I -- I understand that.  I -- I
19  just -- from your two experiences with --
20     A    Uh-huh.
21     Q    -- these personal experiences in these
22  two patients' --

---

Page 143

1     A    Uh-huh.
2     Q    -- treatment --
3     A    Uh-huh?
4     Q    -- was your understanding from that that
5  the police were the ones making a decision as to
6  whether that was going to be a sexual assault
7  patient treated pursuant to the other procedures
8  you described, or assaults, or it's just going to
9  be a regular patient in your medical care?
10     MR. JEFFERSON:  Same objection.  Form
11  and foundation.
12     THE WITNESS:  We don't have the means,
13  you know, to perform forensic exams without the
14  aid of Metropolitan Police Department.  Our duties
15  as the physician in treating is to make sure that
16  the patient is adequately treated, and any -- any
17  injuries due to the -- you know, any sort of
18  assault or whatever it may be is taken care of;
19  and any forensic issues, that we will be under the
20  guidance of whoever that governing body is to
21  respond to.
22  BY MS. HARTNETT:

---

Page 144

1     Q    What do you mean when you say forensic
2  issues under the guidance?
3     What role, if any, would you have in
4  those forensic issues?
5     A    I've never been involved, so I'm not
6  sure.
7     Q    Okay.  And I understand your
8  responsibility -- we'll get to the -- the means
9  point that you brought up.
10     But my understanding, from the second
11  patient at least, was that some -- that patient
12  was moved to the, in your understanding, the
13  Howard University Hospital for treatment; is that
14  correct?
15     A    That's correct.
16     MR. JEFFERSON:  Object to the form of
17  the question.
18  BY MS. HARTNETT:
19     Q    And I -- my -- my question is who made
20  the decision that that was going to be a case in
21  which the patient was going to be transferred to
22  the Howard University Hospital?  Was that decision

---

Page 145

1  made by the police, or by somebody else?
2     MR. JEFFERSON:  Same objection.
3     THE WITNESS:  We called the Metropolitan
4  Police Department.
5  BY MS. HARTNETT:
6     Q    Yep.
7     A    They came and did intake.  They came
8  back to me and said, Dr. Lang, I'm taking this
9  patient over to Howard University Hospital.
10     Q    Is it fair to say, from that experience
11  at least, that second experience, that it was the
12  police that made the decision about the -- that
13  the patient would be receiving care at the Howard
14  University Hospital rather than at The George
15  Washington University Hospital?
16     MR. JEFFERSON:  Object to the form and
17  foundation, asked and answered as well.
18     THE WITNESS:  My understanding is that
19  the Metropolitan Police Department is the -- as
20  far as any criminal prosecution for any forensic
21  exam, is the -- the appropriate personnel to be
22  involved.  And I -- I -- I think the only

---

37 (Pages 142 to 145)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 146

1  personnel to be involved, to my knowledge.
2  BY MS. HARTNETT:
3      Q    Did you provide any medical center to
4  that -- the second patient, the second patient
5  that presented with the sexual assault claim?
6      A    No.
7      Q    And my question is why did you not
8  provide medical care to that patient?
9      A    Well, I guess we have to clarify what
10 medical care is.
11     Q    Please do.
12     A    She was triaged.  She had stable vital
13 signs.  And she had no obvious concerns about
14 being transported to another facility.
15     Q    Was it your decision as the attending to
16 send her to the Howard University Hospital for
17 medical -- for additional care?
18     A    No.
19     Q    Whose decision was it?
20     A    The Metropolitan Police Department came.
21 And they told me they're taking the patient to
22 Howard University Hospital for further evaluation.

Page 147

1      Q    To your knowledge, does a SANE nurse
2  ever come to the emergency department at Howard
3  University Hospital during the time that you've
4  been there to perform any sort of medical care or
5  treatment?
6          MR. GOODSON:  Can we, just for the
7  record, you're referring to a capital S, capital
8  A, capital N, capital E nurse, correct?
9          MS. HARTNETT:  Absolutely.
10         MR. GOODSON:  Okay.
11         You can answer.  Make sure it's
12 confirmed for the record.
13         THE WITNESS:  I don't work at that
14 institution, so I can't comment on that.
15 BY MS. HARTNETT:
16     Q    Did I say Howard University Hospital?
17     A    Uh-huh.
18         MS. TURNER:  You did.
19         MS. HARTNETT:  Sorry.  I was looking at
20 you.
21 BY MS. HARTNETT:
22     Q    Okay.  Sorry.  I mean The George

Page 148

1  Washington University Hospital.  I'm sorry for
2  that.
3      A    Can -- can you just repeat --
4      Q    Sure.
5      A    -- the question, please?
6      Q    To your knowledge, during your time at
7  The George Washington University Hospital
8  emergency department, are you aware of a SANE
9  nurse ever coming to the emergency department to
10 participate in the care and treatment of a
11 patient?
12     A    I've only been involved in those two
13 cases, so no.  I mean the -- as I stated prior,
14 I've only had two experiences at George Washington
15 University.  And that's all I can comment on.
16     Q    And I understood those to be ones in
17 which you were personally involved in the care of
18 the patient.
19         I was --
20     A    I'm referring to that.
21     Q    -- trying to -- trying to actually just
22 go a little bit broader and ask you if you're --

Page 149

1      A    Oh.
2      Q    -- aware of any other situation where
3  the SANE nurse had come to give care or treatment?
4      A    Gotcha, yeah.  No, I'm not.
5      Q    Okay.  Was any part of your medical
6  training, did you receive any training on how to
7  actually, for lack of a better term, perform the
8  SANE examination or a SANE kit on a patient?
9      A    No.
10     Q    Have you ever observed a SANE kit or a
11 SANE exam being performed on a patient?
12     A    No.
13     Q    And have you ever assisted anyone in any
14 part of a SANE exam or SANE kit?
15     A    No.
16     Q    Is it your understanding, as an
17 emergency room physician, that that's something
18 that you -- that is -- that could be required of
19 you to do in some sort of -- in -- in some
20 circumstance, to actually perform a SANE exam or a
21 SANE kit?
22         MR. GOODSON:  Objection to form, the

38 (Pages 146 to 149)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
                 Washington, DC

Page 154

1  what extent that presence is -- could be, I have
2  no clue.
3       MR. JEFFERSON:  Move to strike the
4  response as speculation as what he stated his
5  position is.
6  BY MS. HARTNETT:
7     Q   Going back to your practice at The
8  George Washington University Hospital, you've
9  testified -- we -- we've covered what happens when
10 the police or somebody else, whoever determines
11 it's a sexual assault case, that it's going to
12 proceed that way.
13      What happens in the case of it's a
14 patient who complains of sexual assault, but for
15 whatever reason it is not going to be handled as a
16 sexual assault case after speaking to the
17 Metropolitan Police Department, what happens at
18 the --
19      MR. JEFFERSON:  Object to form --
20 BY MS. HARTNETT:
21    Q   -- to that --
22      MR. JEFFERSON:  -- and foundation.

Page 155

1  BY MS. HARTNETT:
2     Q   -- to that patient at the hospital?
3       MR. GOODSON:  Same objection.
4       THE WITNESS:  I only can comment on my
5  experience that I had with this.  And this is this
6  case.
7  BY MS. HARTNETT:
8     Q   Okay.  And what was your -- what -- what
9  was your practice in that situation?
10      MR. GOODSON:  Are you asking him what
11 his practice was on this case, or --
12      MS. HARTNETT:  I'm asking --
13      MR. GOODSON:  -- in general?
14      MS. HARTNETT:  -- what his practice is
15 in general --
16      THE WITNESS:  Can you rephrase --
17      MS. HARTNETT:  -- what the -- sorry.
18      THE WITNESS:  I mean can you -- can you
19 ask the question again?
20 BY MS. HARTNETT:
21    Q   Sure.
22      What I'm -- what I'm asking you is what

Page 156

1  your --
2     A   Uh-huh.
3     Q   -- present practice is regard -- this
4  case or not, but what is your practice with
5  respect to a patient that the Metropolitan Police
6  Department determined is not -- or somebody else
7  determines is not a sexual assault case, and thus
8  the patient remains at The George Washington
9  University Hospital?  What's your practice with
10 respect to that patient?
11      MR. JEFFERSON:  Object to form and
12 foundation.
13      THE WITNESS:  We would make sure that
14 they're med -- they're -- they're medical
15 treatment, and they're medically safe, that we --
16 we've -- we've treated all their issues
17 accordingly, have a treatment plan.
18 BY MS. HARTNETT:
19    Q   And I know depends on if the patient has
20 particular injuries, but in general as a -- is
21 there any general treatment plan for a patient
22 that's complained of sexual assault?

Page 157

1       MR. GOODSON:  Objection to form.
2  BY MS. HARTNETT:
3     Q   That you're going to -- that you're to
4  see but that's not going to be going elsewhere?
5     A   There's certain prophylactic medication
6  that we offer the patient.
7     Q   And what medication is that?
8     A   The morning-after pill, we offer that.
9  We offer -- offer GC/chlamydia coverage.
10    Q   Uh-huh.
11    A   GC meaning gonococcal/chlamydia, and HIV
12 prophylactic medication.
13    Q   And where did you learn that this -- or
14 come to an understanding that this is the
15 treatment -- potential treatment regimen for a
16 patient complaining of sexual assault?
17    A   I wouldn't put them as just a patient
18 complaining of sexual assault.  I think anyone
19 that had sexual contact with an unknown individual
20 or individual they -- they -- they don't know what
21 their sexual histories were, these are the types
22 of things that are offered to them.

40 (Pages 154 to 157)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                      Washington, DC

Page 158

1    Q   Okay.  As far as you -- you know, are
2   there differences in how the procedure for
3   treating a patient -- this is not just sexual
4   assault patients -- if they're a GW student or
5   personnel versus just a -- other person that comes
6   up to the emergency department?
7       And this is with respect to the
8   emergency department.
9    A   No.
10   Q   And just -- so specifically with respect
11  to sexual assault, it -- there wouldn't be a
12  distinction made between the GW students or
13  employees or other people that come with a
14  complaint of sexual assault?
15   A   Only if you -- for university police,
16  for example, they may want to know, for example,
17  if Metropolitan -- you know, we would call
18  university police in -- instead of Metropolitan
19  Police, per se.  That would be the only
20  distinction.
21   Q   And is that something that's true for
22  all categories of assault, as well?

Page 159

1    A   I don't know if there's any guidelines
2   or procedures.  But anything that happens on
3   campus, the Met -- the -- the campus police want
4   to be aware of that situation.
5    Q   Okay.
6    A   But, you know, to -- to further -- my
7   standard question to a patient isn't:  Are you a
8   GW student?  Okay.  That is not part of my medical
9   screening process.  It's not part of my treatment
10  plan.  It's not -- it's part of any sort of
11  authorities to be getting involved outside of the
12  university police that this is something to -- or
13  to be pursued.
14   Q   Understood.
15      Have you ever -- sorry.
16      Do you know any physician that's
17  performed a sexual assault exam or a SANE exam on
18  a patient?
19   A   No, not personally.
20   Q   Do you have any knowledge as to whether
21  the length of time that passes between the alleged
22  assault and the time when the patient is --

Page 160

1   receives this sexual assault forensic exam whether
2   that affects the effectiveness of the exam?
3    A   No, I don't -- I don't know of any time
4   constraints.
5    Q   And do you know of any things such as
6   eating, drinking, etc., that a patient should not
7   do between the time that an alleged assault and
8   the time they get the sexual assault exam in order
9   to maximize the effectiveness of the exam?
10   A   Again, not being part of a -- that type
11  of examination, I -- it's really hard for me to
12  answer.  Because I don't know what they take,
13  draw, etc.  I don't -- I don't know all the
14  intricacies of that.
15   Q   So, for example, in the situation of the
16  second patient, not -- not the one in this case --
17   A   Uh-huh.
18   Q   -- was there any guidance you provided
19  to that patient as to what to do or not to do
20  between the time she saw you and the time she was
21  going to be at Howard University Hospital?
22   A   She was escorted by the police.

Page 161

1    Q   So I take it you didn't have any
2   interactions about what she should or shouldn't do
3   between the time she saw you and going to Howard
4   University Hospital?
5    A   No.
6    Q   Do you know if a patient urinating
7   between the time of the assault and the time of a
8   sexual assault exam would have some affect on the
9   effectiveness of that exam?
10      MR. JEFFERSON:  Objection.  Asked and
11  answered.
12      THE WITNESS:  Again, to my knowledge, I
13  don't know what they're testing for to know if
14  that would be useful information or not.
15  BY MS. HARTNETT:
16   Q   How about defecating?
17      MR. JEFFERSON:  Same objection.
18      THE WITNESS:  Same answer.
19  BY MS. HARTNETT:
20   Q   I'm just -- I'm going to ask you a
21  couple of them --
22   A   Okay.

41 (Pages 158 to 161)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
                Washington, DC

Page 162

1    Q    -- and you can answer same or not --
2    A    Okay.
3    Q    -- but --
4    A    Okay.
5    Q    How about eating?
6    A    Again, I -- I'm not sure what they're
7    testing for, so I can't comment on that.
8    Q    And drinking?
9    A    Again, I'm not sure what they're testing
10   for, so I can't comment on it.
11   Q    Okay. Showering?
12   A    I'm not sure what they're testing for,
13   so I can't comment on it.
14   Q    Last one. Brushing teeth?
15   A    I'm -- I'm not sure what they're testing
16   on, so I can't comment on it.
17   Q    Is there any form that you're aware of
18   or any written document that would outline
19   procedures or practices for treating a sexual
20   assault patient at George Washington University
21   Hospital, a patient that presents with a complaint
22   of sexual assault?

Page 163

1    A    No, I'm not aware.
2    Q    Just give me a moment, please.
3        VIDEOGRAPHER:  This concludes tape two
4    in the deposition of Dr. Christopher Lane.  Off
5    the record at 12:08:15.
6            (Recess)
7        VIDEOGRAPHER:  This begins tape three in
8    the deposition of Dr. Christopher Lane.  On the
9    record at 12:19:15.
10       MS. HARTNETT:  Let's mark this as Lang
11   2, please.
12           (Lang Deposition Exhibit
13           No. 2 was marked for
14           identification.)
15   BY MS. HARTNETT:
16   Q    Dr. Lang, I've handed you what's marked
17   as Lang 2. It's a document that was produced to
18   us by The George Washington University Hospital.
19       Do you know what this document is?
20   A    (Witness examined document).  No.
21   Q    Have you ever seen it before?
22   A    No.

Page 164

1    Q    Have you ever seen any document with the
2    heading, George Washington University Hospital
3    emergency department practice manual?
4    A    No.
5    Q    And if I asked you where is the practice
6    manual located, would you have any idea?
7    A    No.
8    Q    Looking at the face of the policy under
9    scope, I notice it says, Emergency department
10   attending physicians, emergency department
11   registered nurses.
12       Is this some pol -- does this policy
13   apply to you?
14       MR. GOODSON:  Objection.
15       MR. KELLEY:  Same objection.
16       MR. GOODSON:  But I'll also object to
17   the form and foundation, because you've already
18   established that he's never seen this document
19   before.  So how would he know whether it applied
20   to him or not?
21       MS. HARTNETT:  I'm -- I'm asking him if
22   reference to the scope section helps him determine

Page 165

1    whether it applies to him or not.
2        THE WITNESS:  No.
3    BY MS. HARTNETT:
4    Q    I understand you haven't seen this
5    document. I'm going to ask you some questions as
6    to whether it's consistent with your practice.
7    I'm just going to direct you to number -- if you
8    at -- at any time would like to read more of the
9    document, please let me know.  And we can stop.
10   And you can read as much as you like.
11       The second paragraph under -- just to
12   get the context, it says, If a patient comes to
13   the emergency department with a history of alleged
14   sexual assault -- this is on the first page, the
15   second sentence -- the following should be
16   accomplished by the nurse.
17       Directing down to three it says,
18   Notification of the Metropolitan Police Department
19   after permission is granted by the patient.
20       Is this consistent with your
21   understanding of the experience of the practice in
22   The George Washington University emergency

42 (Pages 162 to 165)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                    Washington, DC

| Page 166 | Page 168 |
|---|---|
| 1  department? | 1  Metropolitan Police Department, if this is the |
| 2      MR. GOODSON:  Can -- can we have a time | 2  initial complaint of the patient.  There's -- |
| 3  frame you're talking about? | 3  there's a lot of variables within that -- within |
| 4  BY MS. HARTNETT: | 4  that.  So I would say that is a typical practice, |
| 5      Q   I would say -- I mean my time frame is | 5  but that doesn't encompass every single situation |
| 6  both December '06 through the present, but let me | 6  that -- coming to the emergency department. |
| 7  know if there's any difference in that. | 7      Q   Okay.  Just moving down to the sentence |
| 8      MR. McAFEE:  Let me object.  I think | 8  that says after the one through seven, there's a |
| 9  this witness's testimony earlier was to his | 9  sentence that starts, The following should be |
| 10  experience.  And you've asked a question about the | 10  accomplished by a doctor -- by the doctor, with |
| 11  entire institutional experience, but -- | 11  the assistance of the nurse? |
| 12  BY MS. HARTNETT: | 12      A   Uh-huh. |
| 13      Q   I -- I think I asked -- well, is it | 13      Q   And number one says, A general |
| 14  consistent with your practice in the emergency | 14  explanation of what will transpire in the |
| 15  department? | 15  department? |
| 16      MR. GOODSON:  Let me just object again. | 16      A   Uh-huh. |
| 17  I asked you to please clarify.  We -- you've given | 17      Q   Is that consistent with your practice |
| 18  a document that appears to have a date of 1984, | 18  regarding patients that present with a complaint |
| 19  and 2003.  And I'd like you to clarify for him | 19  of sexual assault to the emergency department? |
| 20  what you're referring to is the year that it would | 20      MR. GOODSON:  Objection to form and |
| 21  be his practice. | 21  foundation. |
| 22      MS. HARTNETT:  I'll be happy to make it | 22  BY MS. HARTNETT: |

| Page 167 | Page 169 |
|---|---|
| 1  clear again. | 1      Q   And, again, this is -- these questions |
| 2  BY MS. HARTNETT: | 2  are from Dec -- including December 2006 to the |
| 3      Q   But I'm -- I'm -- what I'm -- these | 3  present. |
| 4  questions pertain to your practice from December | 4      A   Again, the -- I've only had two cases -- |
| 5  2006 to the present. | 5      Q   Uh-huh. |
| 6      MR. GOODSON:  So you're referring to | 6      A   -- that I've discussed before.  One was |
| 7  anything after the date of the alleged incident in | 7  already seen at the District of Columbia's SANE |
| 8  this case?  Is that what your question is? | 8  center prior to arrival to my department.  And the |
| 9      MS. HARTNETT:  No.  I'm actually | 9  second one was brought to the SANE center |
| 10  referring to December 2006, including December | 10  immediately from my department over there. |
| 11  2006 and forward to the present. | 11      Q   Is your -- to your understanding, is |
| 12      MR. GOODSON:  Do you know what the -- | 12  there any sexual assault case -- situation of a |
| 13  recall what the question is? | 13  sexual assault patient presenting in which number |
| 14      THE WITNESS:  I guess she's asking me to | 14  one would be the -- would be your practice? |
| 15  look at number three? | 15      MR. GOODSON:  All right.  You're -- |
| 16  BY MS. HARTNETT: | 16  listen, you've got a document from Exhibit 2. |
| 17      Q   Informed by the fact that there's a | 17  Okay.  And in -- in Exhibit 2, there are two |
| 18  sentence leading into that. | 18  different number one's listed.  So please don't |
| 19      But is that consistent with your | 19  confuse the witness with asking a question as to |
| 20  practice at the emergency department? | 20  whether number one applies. |
| 21      A   Again, this -- this is -- it all -- it | 21      MS. HARTNETT:  I think our questions |
| 22  depends on if the patient was seen before by the | 22  were -- I apologized if I confused the witness.  I |

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

---

Page 170

1  think we were focused on the doctor portion of it,
2  and number one, which you were just discussing.
3  BY MS. HARTNETT:
4     Q    But I'm happy to clarify that I'm -- my
5  question is, under the doc -- we're now under the
6  doctor numbers.
7        The following should be accomplished by
8  the doctor with the assistance of the nurse:  A
9  general explanation of what will transpire in the
10 department.
11       Is that your understanding of the
12 practice that applies to sexual assault patients
13 in The George Washington emergency department?
14       MR. GOODSON:  Objection to form and
15 foundation.  And there's also -- there's no
16 establishment in the document as to what time
17 they're referring to.
18       So I -- don't answer the question if you
19 have to guess or speculate.
20       THE WITNESS:  I'll be guessing or
21 speculating.
22       MS. HARTNETT:  I'm not asking about --

---

Page 171

1  I'm asking him if the words in the document that
2  describe a procedure are consistent with his
3  understanding of the practice in The George
4  Washington emergency department from 12/06 to the
5  present, including 12/06.
6        MR. GOODSON:  And I'll object, because
7  you haven't -- you've already established he has
8  never seen this document.  Second, the document
9  speaks for itself.  And the third, he said he
10 can't answer the question because he cannot
11 understand what is written there.  So he --
12       MS. HARTNETT:  I don't think he said
13 that.
14       MR. McAFEE:  I object.  You -- you just
15 now changed it back to consistent with the
16 practice at George Washington, as opposed to this
17 witness's --
18       MS. HARTNETT:  I said his understanding
19 of the practice, which is -- I think I said it
20 twice now, but I'm happy to make it clear again
21 that's what I'm asking.
22 BY MS. HARTNETT:

---

Page 172

1     Q    I'm asking you what your understanding
2  is of the current practice in The George
3  Washington emergency department with reference to
4  a document that states, at least on its face,
5  Emergency department practice manual; Title:
6  Sexual assault; Scope:  Emergency department
7  attending physicians.
8        I understand you haven't read the
9  document.
10       But all I -- what I'm asking you -- and
11 I -- I'd like to be clear, so please let me know
12 if I'm not being clear -- whether the following
13 should be accomplished by a doctor:  A general
14 explanation of what will transpire in the
15 department, is consistent with your understanding
16 of the practice in the emergency department at The
17 George Washington University Hospital?
18       MR. McAFEE:  Objection to form and
19 foundation.
20       MR. GOODSON:  Same objection.
21       MR. KELLEY:  Same objection.
22       THE WITNESS:  Again, as stated,

---

Page 173

1  there's -- there's variables as to is this the
2  initial presentation of a sexual assault victim?
3  Is it the fifth presentation of a sexual assault
4  victim for the same case?  Are they going right
5  to -- there's -- there's variabilities.  And I
6  think the -- a general explanation, I can't -- I
7  don't know what -- what's involved in the general
8  explanation.  I think that has a lot of
9  interpretations.
10    Q    Okay.  I -- I accept that.
11       Under number two under the -- The
12 following should be accomplished by the doctor
13 with the assistance of the nurse, it states,
14 Assessment of the patient's support systems.  The
15 patient may be allowed to have a relative or
16 companion with them during the examination as long
17 as he/she does not interfere with medical
18 procedures.
19       Is the description in number two
20 consistent with your understanding of the practice
21 of --
22    A    Again, of the --

---

44 (Pages 170 to 173)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                        Washington, DC

---

Page 174

1          MR. GOODSON:  Objection to form and
2    foundation.
3          MR. McAFEE:  Objection.  Form and
4    foundation.
5          MR. KELLEY:  Same objection.
6          THE WITNESS:  The first sentence, again,
7    seems ambiguous and very general.  The second --
8    so I have no comment on that.  The second
9    sentence, as I believe I've answered before,
10   the -- there are certain situations where family
11   members are not allowed to come back into the
12   room.
13   BY MS. HARTNETT:
14       Q   And I understood your earlier answer on
15   that point.  Thank you.
16          Just to be completely clear, moving
17   back --
18       A   Uh-huh.
19       Q   -- up to the nurse --
20       A   Uh-huh.
21       Q   -- directive, if the patient comes to
22   the emergency department with a history of sex --

---

Page 175

1    alleged sexual assault --
2        A   Uh-huh.
3        Q   -- the following should be accomplished
4    by the nurse.
5           And moving down to number six --
6        A   Uh-huh.
7        Q   -- it says, Notify the attending
8    physician in the emergency department or an
9    emergency medicine resident licensed in the
10   District of Columbia to perform the necessary
11   gynecologic exam and laboratory procedures.
12          For completion, it goes on to state, At
13   the request of the patient, a private licensed
14   gynecologist on staff at The George Washington
15   University Hospital may be perform the
16   examination.
17          Is what's described in number six
18   consistent with your understanding of the practice
19   at The George Washington University Hospital in
20   the 12/06 to present time period?
21          MR. GOODSON:  Objection.  Form and
22   foundation.

---

Page 176

1          MR. McAFEE:  Join.
2          MR. KELLEY:  Objection.
3          MR. GOODSON:  And there's also no time
4    frame listed on that.
5          But you can answer.
6          THE WITNESS:  (Witness examined
7    document).  Again, I -- I believe they're making
8    the assumption on this statement that the -- that
9    there has been communication with the Metropolitan
10   Police Department and a decision to -- to move
11   ahead with some sort of a sexual assault kit.
12          MR. JEFFERSON:  Object to the
13   responsiveness --
14          THE REPORTER:  Object to the -- I'm
15   sorry.  I didn't hear.
16          MR. JEFFERSON:  Responsiveness of the
17   answer.  The witness stated that he is assuming.
18   Speculation.
19   BY MS. HARTNETT:
20       Q   Understanding that your prior
21   response -- assuming that the -- they had decided
22   to go ahead with the sex kit or what -- what you

---

Page 177

1    just said, is it consistent with your
2    understanding of the practice at The George
3    Washington University Hospital that the -- the
4    attending physician in the emergency department
5    would be notified or an emergency medicine
6    resident licensed in the District of Columbia
7    would be notified to perform the necessary
8    gynecologic exam and laboratory procedures?
9          MR. GOODSON:  Objection.  Form and
10   foundation, and also no timeframe.
11          MR. McAFEE:  I join.
12          THE WITNESS:  I can't comment because I
13   have -- I haven't been part of a sexual assault or
14   rape kit.  So I can't comment on what the
15   requirements are.
16   BY MS. HARTNETT:
17       Q   I'm -- I'm -- just to be clear, I'm not
18   asking about the requirements for a sex kit,
19   but -- or a rape kit, but I'm -- what I'm asking
20   is, is it consistent with your understanding and
21   practice that the physician or the -- the
22   attending physician or the resident at GWH would

---

45 (Pages 174 to 177)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

Page 178

1  be notified to perform the necessary gynecologic
2  exam and laboratories procedures in the case of
3  where the police have decided to proceed with the
4  case?
5          MR. GOODSON: Objection. Form and
6  foundation.
7          MR. McAFEE: I join.
8          MR. JEFFERSON: I join.
9          MR. GOODSON: I think this is the third
10 time you've asked the same question.
11         You can answer.
12         THE WITNESS: If this is a forensic
13 exam, I'm not sure what the requirements are for
14 the District of Columbia or the Metropolitan
15 Police Department to perform that exam.
16 BY MS. HARTNETT:
17    Q   But in your -- at least your experience,
18 assuming the exam -- or the police were going to
19 go forward with the kit or case, are the necessary
20 gynecologic exam and laboratory procedures
21 performed by personnel in the GW emergency
22 department, or are they performed elsewhere?

Page 179

1          MR. GOODSON: Objection. Form and
2  foundation.
3          MR. JEFFERSON: Objection. Form and
4  foundation.
5          MR. McAFEE: I join.
6          MR. KELLEY: I join.
7          THE WITNESS: I've never been part of a
8  rape kit that was processed through the -- The
9  George Washington University Hospital. So it's
10 difficult for me to comment on that.
11 BY MS. HARTNETT:
12    Q   Well, for example, in the second case
13 that you had described --
14    A   Uh-huh.
15    Q   -- earlier in the deposition, where the
16 patient presented with a complaint of sexual
17 assault --
18    A   Uh-huh.
19    Q   -- were you notified to perform the
20 necessary gynecologic exam and laboratory
21 procedures with respect to that patient?
22    A   No. The Metropolitan Police Department

Page 180

1  took the intake and said they were going to be
2  taking them to Howard University Hospital to
3  process the patient.
4    Q   Okay. Moving back to the doctor
5  sentence and follow-on numbers, The following
6  should be accomplished by the doctor with the
7  assistance of the nurse.
8          Turning to page 2.
9    A   Uh-huh.
10   Q   Notification of -- number three.
11         Notification of the arrival of the
12 sexual assault victim to a representative of the
13 case management department for their assistance,
14 evaluation, and recommendations.
15         My question is whether number -- what's
16 described in number three there under the doctor
17 section is consistent with your understanding of
18 the practice at the emergency department at the GW
19 Hospital for patients presenting with a complaint
20 of sexual assault?
21         MR. GOODSON: Objection. Form and
22 foundation.

Page 181

1          MR. McAFEE: I join.
2          MR. KELLEY: Join.
3          THE WITNESS: I've only had two
4  experiences. And with both of those experiences,
5  this does not apply to me. And I --
6  BY MS. HARTNETT:
7    Q   Do you know --
8    A   Sorry.
9    Q   Are you done?
10   A   Uh-huh.
11   Q   Do you know what the case management
12 department is?
13   A   I've never had to utilize their
14 services, so I'd have to say no.
15   Q   Is there a case management department at
16 the GW Hospital?
17   A   I don't know.
18   Q   Okay.
19   A   I don't know.
20   Q   I just -- I just don't want to -- I want
21 to be clear that we're still in --
22   A   Sure.

46 (Pages 178 to 181)

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                      June 27, 2008
                    Washington, DC

Page 182

1    Q    -- the doctor section, number four, on
2  page 2.
3         An explanation of the PD-124 form and
4  the implications of signing this form.
5         Do you know what a PD-124 form is?
6    A   No.
7    Q   And is this number four -- what's
8  described in number four consistent with your
9  understanding of the practice at The George
10 Washington University Hospital emergency
11 department?
12        MR. JEFFERSON: Objection. Form --
13        MR. GOODSON: Objection. Form and
14 foundation.
15        MR. JEFFERSON: -- and foundation. The
16 witness has already testified he doesn't even know
17 what a PD-124 is.
18        MR. McAFEE: I join Mr. Goodson's
19 objection.
20 BY MS. HARTNETT:
21    Q   You can answer.
22    A   I don't know what the PD-124 form is, so

Page 183

1  I can't answer to if that's a standard practice to
2  have a person sign that.
3    Q   Number five says, Inform the patient not
4  to bathe/shower, or change clothes, douche, smoke
5  or drink in the emergency department before the
6  examination is performed, otherwise vital evidence
7  may be destroyed.
8         Is that sentence consistent with your
9  understanding of the practice in The George
10 Washington University Hospital emergency
11 department?
12        MR. GOODSON: Objection. Form and
13 foundation.
14        MR. McAFEE: I join.
15        MR. KELLEY: Join.
16        THE WITNESS: I haven't had an instance
17 where I've had to apply this, so my answer would
18 be no.
19 BY MS. HARTNETT:
20    Q   Is there any instance where you would
21 have to apply this?
22        MR. GOODSON: Objection. Form and

Page 184

1  foundation, and speculation as to any instance.
2         THE WITNESS: I'm not sure. I mean if a
3  patient were to present, I would take in the
4  information and see what I needed to do with the
5  patient.
6  BY MS. HARTNETT:
7    Q   Just previously you'd said that there --
8  you haven't had an instance in which you had
9  provided this information.
10        Is there any specific instance that
11 comes to mind as when -- when you would, as a
12 matter of your practice, provide this information
13 to a patient?
14    A   I haven't been confronted with this
15 specific issue, so I would have to comment I don't
16 know.
17    Q   And when you say specific issue, what do
18 you mean?
19    A   A patient that is coming into my
20 emergency department that has been confirmed to be
21 sexual assault, first presentation, and a rape
22 kit's being brought over, or brought over to our

Page 185

1  emergency department to process.
2    Q   Do you have any -- do you have an
3  understanding that that's something that could --
4  that could happen, that a rape kit could be
5  brought to your hospital to process?
6         MR. GOODSON: Objection.
7         MR. KELLEY: Object to form.
8         MR. GOODSON: Foundation, also
9  speculation.
10        You can answer, though.
11        THE WITNESS: I'm not sure. Again,
12 looking over this, I'm assuming that a PD-124 form
13 is some sort of police department. But, again,
14 that's speculation --
15        MR. JEFFERSON: Object.
16        THE WITNESS: -- so -- sorry.
17        MR. JEFFERSON: Foundation.
18        THE WITNESS: It looks like a lot of
19 these questions are -- are formulated after the
20 decision of some sort of a kit has been presented
21 to the -- to a department or their -- wherever
22 this kit is going to be performed.

47 (Pages 182 to 185)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
                 Washington, DC

Page 186

1        MR. JEFFERSON: Object to the
2   responsiveness of the -- of the answer. Move to
3   strike. Speculation. The witness confirmed that
4   he's making assumptions.
5        MR. McAFEE: Kathleen, when you have a
6   minute, I'd like to flip-flop with Jim Gleason,
7   who's holding, backing me up.
8        MS. HARTNETT: Sure.
9        VIDEOGRAPHER: Off the record at
10  12:38:34.
11        (Discussion off the record)
12        (Whereupon Mr. Gleason
13        replaced, via telephone,
14        Mr. McAfee in representing
15        Defendant George Washington
16        University.)
17        VIDEOGRAPHER: On the record at
18  12:41:25.
19  BY MS. HARTNETT:
20    Q   Dr. Lang, we're still on the -- what's
21  been marked as Lang 2, and the second page.
22        I think we had left off with number five

Page 187

1   under the numbered paragraphs on this page, with
2   respect to number six, which states, Inform the
3   patient that the clothing the patient is wearing
4   may be collected as evidence, place in a paper bag
5   and labeled as evidence.
6        My question is whether that statement is
7   consistent with your understanding of the practice
8   as a doctor in the emergency department at The
9   George Washington University Hospital?
10        MR. GOODSON: Objection. Form and
11  foundation.
12        THE WITNESS: Again, I believe this is
13  under -- under the assumption that there's going
14  to be some sort of forensic collection to be done.
15  I can't comment any further than that.
16  BY MS. HARTNETT:
17    Q   For example, in the second case, where
18  from your earlier testimony I take it that the
19  forensic examination was going to be done, is
20  there a reason why this, Inform the patient that
21  the clothing the patient's wearing may not -- may
22  be collected as evidence, place in a paper bag and

Page 188

1   labeled as evidence, is that something that didn't
2   apply to you?
3        Is that not your practice in that
4   situation?
5        MR. GOODSON: Objection to form and
6   foundation. You just asked the same question.
7        MR. JEFFERSON: I'll join in the
8   objection.
9        THE WITNESS: As stated prior, the
10  patient was processed in the Metropolitan Police
11  Department. And I don't think I'd put a patient
12  through walking through public in a -- in a
13  hospital gown to go to expeditious processing over
14  at Howard University Hospital. And I've never
15  seen this statement or this document before.
16  BY MS. HARTNETT:
17    Q   I understand.
18        With respect to number seven, A history
19  of present illness should be collected to
20  include -- and then there's questions A through
21  I --
22    A   Uh-huh.

Page 189

1    Q   -- in your practice, are these -- and
2   please take the time you need to read them so I
3   don't have to belabor the point. But I'm reading
4   for the record, although I'll have you do if you
5   want.
6        Are any of these questions, questions
7   that you in your practice ask patients that
8   present with complaint of sexual assault at the
9   general -- at The George Washington University
10  Hospital?
11        MR. GOODSON: Objection. Form and
12  foundation.
13        THE WITNESS: Again, my job as a
14  physician is to treat the patient with a medical
15  screening exam. Any other types of information
16  that needs to be done by the proper or appropriate
17  authorities, I will do under guidance. I've never
18  seen this document before.
19  BY MS. HARTNETT:
20    Q   Do you have an understanding one way or
21  the other of whether it's the practice of the
22  physicians in the emergency department at The

48 (Pages 186 to 189)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

Page 190

1  George Washington University Hospital to ask these
2  questions of sexual assault patients that present?
3        MR. GOODSON: Objection. Form and
4  foundation.
5        MR. KELLEY: Adam Kelley. I'll join.
6        THE WITNESS: I've never been party to
7  any other situation with any other physician in
8  the department.
9  BY MS. HARTNETT:
10   Q   Reading number eight, A careful medical
11  history and assessment of physical injuries not
12  related to the sexual assault should be collected
13  and documented by the doctor.
14       Is the information in that sentence
15  consistent with your understanding of the practice
16  of the doctors in the emergency department at The
17  George Washington University Hospital?
18   A   The practice --
19   Q   Sorry.
20   A   I'm sorry. The practice of physicians
21  at The George Washington University Hospital
22  emergency department is to medically assess the

Page 191

1  patient and make sure they're medically safe. So
2  whatever is required to do that, we will perform.
3   Q   Okay. And number nine states, A
4  complete and full -- states, A complete physical
5  examination, including pelvic, should be
6  performed. Specimens will be taken according to
7  the policies in the relevant jurisdiction for
8  collection of evidence. Note: All specimens are
9  to be collected following evidence collection
10  guidelines.
11       Are you aware of any evidence collection
12  guidelines, what that refers -- is that a term
13  that has meaning to you?
14       MR. GOODSON: Objection. Form and
15  foundation.
16       THE WITNESS: I've never collected
17  evidence in any specific situation, so I'd have to
18  answer no.
19  BY MS. HARTNETT:
20   Q   Okay. 9-B states, A cotton -- I'm not
21  trying to -- feel free to read any part that you
22  need to answer the question, but B states, A

Page 192

1  cotton applicator to be used to swab the vaginal
2  vault and placed on one slide with one drop of
3  saline solution and a cover slip for the examining
4  physician's use for determination of the presence
5  of motile sperm.
6        Do -- do you understand -- have an
7  understanding of the term "motile sperm"?
8        MR. GOODSON: Objection. Form and
9  foundation.
10       THE WITNESS: Again making an
11  assumption, but motile sperm would be sperm that
12  are actively moving.
13  BY MS. HARTNETT:
14   Q   And what assumption are you making to
15  answer that?
16   A   Motile sperm would be sperm that are
17  actually -- I would assume; I've never done this
18  before -- but that are actually moving under the
19  slide. So you're looking under a microscope,
20  you'd see movement.
21   Q   And are you -- you're saying you assume
22  that because you haven't actually seen it before,

Page 193

1  but that's what you understand those words to
2  mean?
3   A   Right. I'm assuming.
4   Q   Well, what does the word -- does the
5  word "motile" have a meaning in medical practice?
6   A   Not necessarily.
7   Q   Okay. And I understand from what you
8  said that you haven't done what's described in B,
9  9-B here before.
10       Is this consist -- is it consistent with
11  your understanding of the practice of the
12  physicians in The George Washington University
13  Hospital emergency department that this procedure
14  is performed for patients that complain of sexual
15  assault?
16       MR. KELLEY: Object to form and
17  foundation. Adam Kelley.
18       MR. GOODSON: Same objection.
19       THE WITNESS: I've never been part of a
20  sexual assault outside of the two cases that I
21  mentioned before.
22  BY MS. HARTNETT:

49 (Pages 190 to 193)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 194

1    Q   And outside of those cases, do you have
2  any understanding of whether this description in
3  9-B is the practice of the emergency department
4  physicians at The George Washington University
5  Hospital?
6    A   I've never seen it practiced.
7    Q   I'm just going to move to D, but please
8  feel free to read what you need to, to answer the
9  question.
10   D states, A wet culturette swab to be
11  used to swab the cervix for the determination of
12  GC and Chlamydia, in place of the TM plate.  The
13  oral pharynx and rectum may also be cultured
14  separately if indicated.
15       Do you have an understanding of what
16  determination of GC means?
17   A   Determination if -- if they have
18  gonococcal gonorrhea, what's -- what's the common
19  term.
20   Q   And do you know what a TM plate is?
21   A   Never seen that.
22   Q   What is the oral pharynx?

Page 195

1    A   It's your mouth.
2    Q   And do you have an understanding of the
3  -- well, what does -- what does indicated mean?
4       MR. GOODSON:  Objection.  Form and
5  foundation.
6       THE WITNESS:  If there was a
7  presentation on physical exam of -- of violations
8  of those areas, then that would be a
9  consideration.
10  BY MS. HARTNETT:
11   Q   And what's described in D, is that
12  consistent with your understanding of the practice
13  of emergency department physicians at The George
14  Washington University Hospital for patients
15  presenting with sexual assault complaint?
16       MR. GOODSON:  Objection foundation.
17       MR. KELLEY:  Join.
18       THE WITNESS:  I've never been in a
19  situation to be able to answer that question.
20  BY MS. HARTNETT:
21   Q   And I understand that you're not -- you
22  haven't personally had the situation.

Page 196

1       Do you have an understanding one way or
2  other of whether this is the practice in the
3  emergency department of emergency department
4  physicians at The George Washington University
5  Hospital?
6       MR. GOODSON:  Objection.  Form and
7  foundation.
8       THE WITNESS:  I don't know, because I've
9  never -- I -- I -- I don't know.  I don't know if
10  it is or not.
11  BY MS. HARTNETT:
12   Q   Okay.  10, I'm going to move to 10,
13  which goes onto the next page.
14       After completion of the pelvic
15  examination the following specimens can be
16  collected.
17       And then 10-A states, Urine for the
18  determination of pregnancy.
19       With respect to 10-A, is that consistent
20  with your understanding of the practice at The
21  George Washington University emergency department
22  with respect to sexual assault -- patients that

Page 197

1  present with the complaint of sexual assault?
2       MR. GOODSON:  Objection.  Form and
3  foundation.
4       THE WITNESS:  Again, I haven't had a
5  situation to be able to address this specific
6  question.
7       MR. GOODSON:  May I make a suggestion?
8  He's given the same answer to every question
9  you've asked for the last 20 minutes.  Why don't
10  you just ask him all inclusive, everything from 13
11  through the remaining of the document?  It might
12  move this along a little quicker.
13       MR. JEFFERSON:  I endorse that.
14       MS. HARTNETT:  Well, I endorse it, too.
15  But I certainly -- I just -- I want him to be --
16  have a full understanding of each -- I don't want
17  to rush through the document and be accused of
18  asking him to agree to a document without having
19  read each part of it.  Let me see if I can find
20  some specific ones that I --
21  BY MS. HARTNETT:
22   Q   Actually, the first one I'd ask for --

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                          June 27, 2008
                    Washington, DC

Page 198

1   sorry. Going back to A --
2       A   Uh-huh.
3       Q   -- which I understand you've said that
4   you haven't had that experience.
5           Do you have any understanding about the
6   practice in the emergency department, aside from
7   yourself, as to whether that's a practice in the
8   emergency department with respect to patients
9   presenting with sexual assault complaint?
10          MR. GOODSON: Objection. Form and
11  foundation.
12          MR. KELLEY: Join.
13          THE WITNESS: I can't comment on that.
14  BY MS. HARTNETT:
15      Q   And would your answer be the same both
16  respect to your own practice and your
17  understanding or lack thereof of the general
18  practice with respect to B, Serum test for
19  syphilis?
20      A   Yes.
21      Q   Do you know what VDRL is?
22      A   It's a testing mechanism for syphilis.

Page 199

1       Q   Okay. Just give me one moment, please.
2           MR. GOODSON: Off the record.
3              (Discussion off the record)
4   BY MS. HARTNETT:
5       Q   If you could review what's in 11-A
6   through D and --
7       A   Okay.
8       Q   -- tell me if -- whether that
9   explanation about, At the conclusion of the
10  examination, the doctor will -- and those four
11  subparts, are they consistent with your
12  understanding of the practice at the GW University
13  Hospital emergency department for patients
14  complaining of sexual assault?
15          MR. JEFFERSON: Object to form and
16  foundation, for reasons stated before with respect
17  to the PD-124 form.
18          MR. GOODSON: Same objection.
19          THE WITNESS: I haven't had experience
20  outside of what I've discussed, so I can't comment
21  on it.
22  BY MS. HARTNETT:

Page 200

1       Q   Okay. With respect to 12, it states --
2   and we're still under -- again, we're still under,
3   The following should be accomplished by the doctor
4   with the assistance of the nurse, earlier.
5           Number 12 says, In addition, the
6   following procedures may be completed. A,
7   Administration of prophylactic antibiotics for
8   sexually transmitted diseases. This may include
9   one of the following regimens -- and lists Cipro
10  and azithromycin.
11          Is this consistent with your
12  understanding of the practice with respect to the
13  patients at the emergency department at GW
14  Hospital that present with complaint of sexual
15  assault?
16          MR. GOODSON: Objection. Form and
17  foundation.
18          THE WITNESS: Again, since I haven't --
19  outside of those two cases, I don't have specific
20  knowledge or experience with any other individuals
21  to know or to comment on that.
22  BY MS. HARTNETT:

Page 201

1       Q   Is the same the case for B?
2       A   Yes.
3       Q   And 12-C, as well?
4       A   That's correct.
5       Q   Okay. If you could review 13 and also
6   let me know if that is -- your same answers with
7   respect to 12 would apply to 13-A through G?
8       A   (Witness examined document). That's
9   correct.
10      Q   If you could review 14 to 19, and let me
11  know if your answer is the same.
12      A   (Witness examined document).
13          MR. JEFFERSON: And I will note an
14  objection similar to the earlier one with respect
15  to 15, 16, and 19 make reference to PD-124 --
16  [inaudible] --
17          THE REPORTER: PD-124, what was the end
18  of that?
19          MR. JEFFERSON: Or the Metropolitan
20  Police Department's involvement, given this
21  witness's lack of knowledge and experience as he
22  so testified to these type examinations.

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
                    Washington, DC

| Page 202 | Page 204 |
|---|---|
| 1    MR. GOODSON: Same objection. | 1  had the same question for these types of questions |
| 2    THE WITNESS: And I've reviewed. And my | 2  also. Is it the same one, or is it a different |
| 3  answer will be the same. | 3  question? |
| 4  BY MS. HARTNETT: | 4    Q  Yeah, it's the same, the same -- well, |
| 5    Q  Okay. With respect to number 20, The | 5  let me just ask it -- |
| 6  patient will be offered a handbook that discusses | 6    A  Okay. |
| 7  many of the possible reactions to sexual assault | 7    Q  -- if you don't mind. I'm -- |
| 8  that she may be expected to have, are you aware of | 8    A  Sure. |
| 9  any handbook that the emergency department -- | 9    Q  -- sorry to belabor the point, but -- |
| 10  covering that topic? | 10    A  No. |
| 11    A  No. | 11    Q  -- is it consistent with your experience |
| 12    Q  Under note -- there's a note; and then | 12  in the emergency department that for patients that |
| 13  it says non-consenting patient? | 13  do not give permission to notification of police |
| 14    A  Uh-huh. | 14  department, that these -- that these denoted |
| 15    Q  The patient who does not give permission | 15  protocols are performed at the emergency |
| 16  for notification of the police department should | 16  department at The George Washington University |
| 17  have the following protocols completed -- and then | 17  Hospital? |
| 18  it references 9 b and d, 10 a and b, 10 a and b. | 18    MR. JEFFERSON: Same objection. |
| 19    Please take a moment to review which | 19    MR. KELLEY: Object to form and |
| 20  ones those are. | 20  foundation. This is Adam. |
| 21    But my question is whether the | 21    MR. GOODSON: Same objection. |
| 22  completion of those protocols at the emergency | 22    THE WITNESS: I have no knowledge of |

| Page 203 | Page 205 |
|---|---|
| 1  department at The George Washington University | 1  these. |
| 2  Hospital for a patient complaining of sexual | 2  BY MS. HARTNETT: |
| 3  assault, whether it's consistent with your | 3    Q  I understand it's no knowledge with |
| 4  experience that this in fact occurs or not. | 4  respect to your experiences. |
| 5    MR. KELLEY: Object to form and | 5    Do you have knowledge with respect to |
| 6  foundation. | 6  any other -- the practice of any other physicians |
| 7    MR. GOODSON: Same objection. | 7  at the hospital? |
| 8    MR. JEFFERSON: I'm going to renew my | 8    A  No. |
| 9  objection earlier stated, and generally make it | 9    Q  Okay. Under sexual assault there's a |
| 10  with reference to any discussion of the | 10  few bullets. And, again, please read what you |
| 11  Metropolitan Police Department or PD-124 or any | 11  need to, to answer the question. |
| 12  other language that could be attributed to law | 12    The third one says, The sexual assault |
| 13  enforcement. | 13  kit will be opened in the room of the patient |
| 14    THE WITNESS: My answer will be the | 14  only. The sexual assault kit will be sealed per |
| 15  same. | 15  chain of custody rules. |
| 16  BY MS. HARTNETT: | 16    Are you aware of any chain of custody |
| 17    Q  And your -- sorry. To be clear, based | 17  rules in this context at The George Washington |
| 18  on your personal experience, you can't answer that | 18  University Hospital? |
| 19  question; is that -- is that -- sorry. | 19    A  No. |
| 20    Can you establish, just because I think | 20    MR. GOODSON: Objection. |
| 21  we're getting a little -- | 21  BY MS. HARTNETT: |
| 22    A  I -- I was under the assumption that you | 22    Q  And then on the final page, the next to |

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                    Washington, DC

| Page 206 | Page 208 |

**Page 206**

1  last bullet, it states, Never utilized Q-Tip swabs
2  or wooden sticks from pelvic tray setup.
3       Do you -- it goes on to state, Always
4  use sterile Q-Tip swab stick provided in physical
5  evidence recovery kit.
6       Do you have an understanding of what is
7  meant by Q-Tip swabs or wooden sticks from pelvic
8  tray setup?
9    A  I understand what they are.  I believe,
10  since I've been in the emergency department
11  starting with my residency, that everything is
12  sealed now.  So this -- this must have been when
13  they didn't package things, and just had bulk, and
14  would leave them out.  So I'm -- I'm assuming that
15  that's why they were commenting on that.
16    Q  So your experience from December --
17  including December of 2006 to the present is the
18  pelvic tray setup, the swabs or wooden sticks
19  would be sealed and sterile on that setup?
20    A  They're -- they're single use, single
21  package.
22    Q  Okay.  Great.  I think we're done with

**Page 207**

1  that one.
2       MS. HARTNETT:  Can we go off the record
3  for one second.
4       VIDEOGRAPHER:  Off the record at 1:00
5  o'clock and 8 seconds.
6            (Whereupon, at 1:00 p.m., a
7            luncheon recess was taken.)
8    A F T E R N O O N  S E S S I O N
9                 (1:25 p.m.)
10       (Lang Deposition Exhibit
11       No. 3 was marked for
12       identification.)
13       VIDEOGRAPHER:  On the record at 1:25:39.
14  Whereupon,
15       CHRISTOPHER R. LANG, M.D.,
16  was recalled as the witness and, having been
17  previously sworn, was examined and testified
18  further as follows:
19       EXAMINATION BY COUNSEL FOR PLAINTIFF
20       CONTINUED
21  BY MS. HARTNETT:
22    Q  Dr. Lang, we hand you what's marked --

**Page 208**

1  I've handed you what's marked as Lang 3, a page
2  from The George Washington University police
3  department website.
4       Can you review this document and let me
5  know if you've seen it before?
6       MR. GLEASON:  Excuse me.  What was the
7  number, Kathleen?
8       MS. HARTNETT:  It's Lang 3.
9       MR. GLEASON:  Lang 3.  Thanks.
10       THE WITNESS:  (Witness examined
11  document).  I've never seen this document before.
12  BY MS. HARTNETT:
13    Q  And in your experience at the emergency
14  department at George Washington University
15  Hospital, are you aware of The George Washington
16  University Hospital police involvement in any case
17  of a patient presenting for treatment --
18  presenting with a complaint of sexual assault; and
19  I know not -- not just in your practice, but just
20  in general?
21    A  No.
22    Q  Okay.  And other -- other than the

**Page 209**

1  Metropolitan Police Department, are you aware of
2  any other law enforcement entity that would be
3  involved in the -- or contacted regarding a sexual
4  assault patient presenting at The George
5  Washington University Hospital?
6    A  Yeah.  I mean D.C., you know, has a lot
7  of different jurisdictions with police
8  departments.  Give you an example Capital Hill
9  Police has their own department.  And that would
10  be another police department.  And I'm not sure --
11  the Secret Service has their own police
12  department.  And then there's the different
13  organizations.  The Department of Agriculture may
14  even have their own.  So I -- I can't comment on
15  how many different types of departments can
16  actually report into ours, but --
17    Q  Okay.  And --
18    A  It's more than the Metropolitan Police
19  Department in the --
20       MR. GLEASON:  Excuse me.  This is Jim
21  Gleason.  Dr. Lang, could you be -- before the
22  break your voice was very clear and audible.  I

                                53 (Pages 206 to 209)

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                        Washington, DC

| Page 210 | Page 212 |
|---|---|

**Page 210**

1  don't know if you're sitting a little further away
2  from the mike. But if you could just move closer,
3  that'd be great.
4      MR. GOODSON: We intentionally moved it
5  away so you could hear less about this testimony,
6  but we'll move it back.
7      MR. GLEASON: Thank you, Mr. Goodson.
8      THE WITNESS: All right. Is that
9  better?
10     MR. GLEASON: That's better.
11     THE WITNESS: I'll speak louder, too.
12  BY MS. HARTNETT:
13    Q   Just turning to page 3 of this document.
14     MS. HARTNETT: Which is for the folks on
15  the phone it's the immediate emergency services
16  portion.
17     MR. GOODSON: My comment was off the
18  record.
19  BY MS. HARTNETT:
20    Q   And under immediate emergency services,
21  there's the -- in the first paragraph you see
22  several sentences. If you could read this. I

**Page 211**

1  want to go to the third sentence. But please feel
2  free to read the entire paragraph so that -- when
3  you answer.
4      But after the evidence is collected, it
5  is -- sorry. I'll just start from the top.
6      A special exam should be conducted as
7  soon as possible following an assault to ensure of
8  your physical well-being and to collect evidence
9  that may be useful in criminal proceedings.
10     And it goes on to say, after a -- after
11  another sentence, After the evidence is collected,
12  it can be stored in case you wish to present --
13  press criminal changes.
14     Do you have any understanding of whether
15  any such evidence can be store at The George
16  Washington University Hospital?
17    A   No.
18    Q   If you wanted to find an answer to that
19  question, who -- who would you ask at The George
20  Washington University Hospital, whether such
21  evidence could be stored there?
22    A   I would probably ask the clinical

**Page 212**

1  supervisor of the emergency department.
2    Q   And who is that?
3    A   Nina Salizar.
4    Q   And the next sentence states, The exam
5  is performed by an emergency department physician
6  or gynecologist.
7      I just want to kind of somewhat similar
8  to the question I was asking you prior to our
9  break.
10     The sentence, The exam is performed by
11  an emergency department physician or gynecologist,
12  is that consistent with your understanding of what
13  the practice is at The George Washington
14  University Hospital with respect to patients
15  presenting with a complaint of sexual assault?
16     MR. GOODSON: Objection. Form and
17  foundation.
18     MR. JEFFERSON: I join.
19     MR. KELLEY: This Adam. Same objection.
20     MR. JEFFERSON: I join the objection,
21  particularly to the extent that this document
22  appears to be addressing GW students with

**Page 213**

1  reference to "your" throughout it. And clearly
2  this Plaintiff in this case is not a GW student.
3  So I question the relevance of this entire line of
4  questioning.
5      MR. GLEASON: This is Mr. Gleason. I
6  would join in the objection.
7  BY MS. HARTNETT:
8    Q   The sentence with, The exam is performed
9  by the emergency department physician or
10  gynecologist, is that consistent with your
11  understanding of practice at The George Washington
12  University Hospital with respect to patients
13  presenting with a complaint of sexual assault?
14     MR. GOODSON: Objection. Form and
15  foundation.
16     You can answer.
17     MS. HARTNETT: And so understanding for
18  the record that those previous objections all
19  pertain to my question. I was just repeating it
20  for the witness.
21     THE WITNESS: No, I don't know of any --
22  any practice or policy that is consistent with

                                        54 (Pages 210 to 213)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                June 27, 2008
                        Washington, DC

Page 214

1  that statement.
2  BY MS. HARTNETT:
3      Q   Okay.  And is the same true for the next
4  sentence, A nurse is present throughout the
5  procedure, and a support person of your choice can
6  also be present?
7      A   That's correct.
8      Q   Moving on to the next paragraph, which
9  states, GW students can receive the exam for a fee
10 at The George Washington University Hospital
11 emergency unit.
12     Is that statement consistent -- do you
13 have any understanding of whether that statement
14 is true or not?
15     A   No.
16     Q   Do you know whether -- do you know
17 whether George Washington students can receive the
18 exam or a fee at The George Washington University
19 Hospital emergency unit?
20     A   I don't know.
21     Q   It goes on to state, Students can
22 receive the exam for free by going to the Howard

Page 215

1  University emergency unit.
2      Do you know if that sentence is
3  accurate?
4      A   I don't know.
5      Q   And then it goes on to state, The
6  hospital's emergency unit follows the national
7  standard for victim care, rape exams, and evidence
8  collection procedures.
9      Do you know if that's a true statement
10 with respect to The George Washington University
11 Hospital?
12     MR. GOODSON:  Objection.  Form and
13 foundation.
14     MR. KELLEY:  Same objection.
15     MR. GLEASON:  This is Gleason.  I join
16 it.
17     THE WITNESS:  I don't know what the
18 national standard for rape -- for victim rape is,
19 for rape exam and evidence collection procedures.
20 I don't know what they're referring to or what the
21 national standard is.
22 BY MS. HARTNETT:

Page 216

1      Q   That's with respect to three items
2  listed in that last sentence:  Victim care, rape
3  exams, and evidence collection procedures?
4      A   Anything to do with national standard
5  for victim care, rape exams, and evidence
6  collection procedures.
7      Q   Okay.  And it states at the -- the next
8  paragraph has a note.  And please feel free to
9  read the entire note.
10     My question's about the final sentence,
11 where it states, In addition, it is recommended
12 that a survivor use a hospital in the county/state
13 where the incident occurred.
14     Do you have any understanding if that is
15 a accurate statement?
16     MR. GOODSON:  Is an accurate opinion, as
17 far as recommendation, or a statement?
18 BY MS. HARTNETT:
19     Q   Are you aware of whether it's
20 recommended or not by anyone at George Washington
21 University that a survivor use a hospital in the
22 county/state where the incident occurred?

Page 217

1      A   I don't know what the jurisdictional
2  restrictions are per state or county.
3      Q   Okay.  I'm going to turn to page 9 of
4  this document.  And please feel free to look at
5  the other categories that we're passing by.
6      A   (Witness examined document).
7      MS. HARTNETT:  For the people on the
8  phone, this is the substance related sexual
9  assault portion of the -- this web page.
10 BY MS. HARTNETT:
11     Q   Sorry.  One moment.  I'm on page 10.
12     A   Oh, page 10.
13     (Witness examined document).
14     Q   So at the bottom of page 10 --
15     A   What --
16     Q   -- under how do -- How can I reduce my
17 risk of substance-related rape?  And there's
18 several bullet points.  And then there's a
19 statement.
20     Anyone who believes that they have
21 consumed a sedative-like substance should be
22 driven to a hospital emergency room or should call

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                      June 27, 2008
            Washington, DC

Page 254

1  [inaudible] -- meaning when --
2       THE REPORTER:  We have a what?
3       THE WITNESS:  A capped balloon time.
4  When a person comes in with an acute MI, or
5  myocardial infarction, that patient has a time
6  frame of 90 minutes to get to the cath lab.  So
7  that -- those times are -- are time indicators
8  that we're held to standards and actually rated
9  for.  Outside of those two, it doesn't weigh that
10 much significance to me.
11 BY MS. HARTNETT:
12      Q   Under the vital signs, if you could
13 just -- and this is still in the triage data.
14      In the pain -- focusing on the pain of
15 five --
16      A   Uh-huh.
17      Q   -- do you have an understanding of what
18 that means?
19      A   That is a subjective numbering scale
20 that the triage nurse, nurse, or tech places in
21 the chart if they complain about pain somewhere.
22 And they ask how -- on the scale of zero to ten,

Page 255

1  and what -- what pain level are you at.
2       Q   And --
3       A   And there's no real descriptors of this
4  is what one means, this is what two means, this is
5  what three means, so on, so on.  They just say
6  zero to ten.  And they -- you know, people say
7  five, or two, or ten.  But there's no
8  clarification of this is what a five means, this
9  is what a three means, this is what a one means.
10      Q   And in your practice is it -- is -- do
11 you review the pain information in the course of
12 treating a -- a patient under your care?
13      A   I guess part of the whole process, the
14 most important thing is what the patient tells me.
15      MS. HARTNETT:  Off the record.
16      VIDEOGRAPHER:  This concludes tape three
17 in the deposition of Dr. Christopher Lane.  Off
18 the record at 2:09:45.
19           (Recess)
20           (Lang Deposition Exhibit
21           No. 5 was marked for
22           identification.)

Page 256

1       VIDEOGRAPHER:  This begins tape four in
2  the deposition of Dr. Christopher Lane.  On the
3  record at 2:15:39.
4  BY MS. HARTNETT:
5       Q   Dr. Lang, we're still on page 11 of 18
6  of that document, Lang 4.  Under diagnosis --
7       A   Uh-huh.
8       Q   -- so moving to the bolded categories,
9  it says, Final:  Primary:  Vaginitis, any cause.
10      Can you explain what that diagnosis
11 section of the medical record is for, generally?
12      A   To try to match up what the patient
13 presented with, with a diagnosis code.
14      Q   And can there be more than one diagnosis
15 code per patient?
16      A   Yes.
17      Q   Is there a list of the possible
18 diagnoses, and you pick one; or do you actually --
19 does one type in the diagnosis?
20      A   Yeah, the problem we have in our
21 department is we actually have preset ICD-9 code
22 diagnoses.  So if we can't find something, we have

Page 257

1  to try to match something that's maybe close to
2  but not exactly what the patient came for.  So we,
3  unfortunately, can't have exact matches for all
4  clinical presentations.
5       Q   And what does ICD-9 mean?
6       A   It's a coding system that we use for
7  diagnoses.
8       Q   Is there a list of all the possible
9  codes?
10      A   Yeah, you can get that on-line, like --
11 it's accessible.
12      Q   Okay.  And --
13      A   But, again, we have a preformatted one
14 that we only can use in our emergency room.  We
15 can't use ones outside of what the -- what -- what
16 is in our computer system.
17      Q   And do you have an understanding of
18 whether the ones in your system are some subset of
19 the ICD-9 codes, or whether they're all -- the
20 ICD-9 codes and ones in your system are the same
21 thing?
22      A   They're universal.  So I don't --

65 (Pages 254 to 257)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                    Washington, DC

---

Page 258

1    Q    Sorry.  I guess I'm -- what I'm trying
2  to -- from your last answer --
3    A    Sure.
4    Q    -- I'm just trying to understand whether
5  they're -- the ICD-9 codes are -- are equivalent
6  to the ones in your system, or whether the ICD --
7  ICD-9 codes are -- are universal and there's some
8  subset in the system at the emergency department.
9    A    Yeah, the emergency department only has
10 a -- a small subsection of the ICD-9 codes.
11   Q    Okay.
12   A    I mean I -- there's thousands of them.
13   Q    I see.
14       And is there somewhere where there's a
15 list of the -- the ones that are available in the
16 emergency department?
17   A    Yeah, when we -- when we go to diagnose
18 the -- put in a diagnosis, there's a pick list.
19 And that's what you pick from.
20   Q    Can you estimate the number of choices
21 on the pick list?
22   A    It -- you know, it -- it builds.  So

---

Page 259

1  it's -- it's really hard to say in one period of
2  time how much they -- how much are in there.
3    Q    I'm just trying to get a sense of like
4  at -- just at present, I understand that --
5    A    Yeah, which -- I apologize.  I -- I -- I
6  would be speculating --
7    Q    Then don't --
8    A    -- so --
9    Q    -- do it.  Okay.
10       What is vaginitis?
11   A    Vaginitis is just a general description
12 of -- of any sort of inflammation potentially
13 in -- in or around the vaginal area.
14   Q    Is that term used to refer to
15 inflammation in and around the anal or rectal
16 area, as well?
17   A    No.
18   Q    What would the term be for that, if
19 anything?
20   A    I have never used that diagnosis, so I
21 don't know.
22   Q    Is there an "itis" I guess associated

---

Page 260

1  with the anal or rectal area?
2    A    I mean there's specific things like
3  hemorrhoids that are on the anal or rectal area.
4  But a generic term for anal/rectal irritation, not
5  to my knowledge.
6    Q    When it says, Final:  Primary, can you
7  explain what those words -- in the context of the
8  diagnosis, what those words mean?
9    A    Final means final diagnosis.  And
10 primary means the reason why the -- the diagnosis
11 code that was associated with her.  So that was
12 it.
13   Q    And with -- who made the determination
14 of the diagnosis in -- in this case?
15   A    That -- the diagnosis of vaginitis?
16   Q    That's correct.
17   A    They would be the person who entered.
18   Q    And that's, I take it, Dr. Khozeimeh?
19   A    Uh-huh.
20   Q    And did you consult with Dr. Khozeimeh
21 before she rendered -- regarding the diagnosis to
22 be rendered in this matter before she rendered the

---

Page 261

1  diagnosis of vaginitis?
2    A    I'm sure we discussed.  You know,
3  there -- there's unfortunately no code for want --
4  desiring a medical screening exam.  There's none
5  that exists.  We don't have it.  So I'm sure we
6  had a discussion -- I can't recollect -- about is
7  there anything that we can put.  It's like that
8  these matches may be with a screening exam and its
9  focus.  But, unfortunately, there's the -- the
10 specific descriptor of what we wanted is not part
11 of at least an ICD-9 code that we can pick from in
12 our emergency department.  And I don't even know
13 if it exists.
14   Q    And just to be clear on what the -- what
15 you were searching for was some sort of a medical
16 screening exam just generally, or in a specific
17 sense?
18   A    I don't know if there's any other
19 options besides the medical screening exam.
20   Q    Okay.  And when you and the resident are
21 both caring for a patient, do you have a practice
22 as to which of you inputs the diagnosis -- or

---

66  (Pages 258 to 261)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
                Washington, DC

Page 262

1  makes the diagnosis and inputs that into the
2  electronic medical record?
3      A   I mean a majority of the time it's the
4  resident that puts it in.
5      Q   Are there any particular situations
6  where you would put it in, or does it just depend
7  on how things are going; there's not a -- there's
8  not a particular set of cases where you do it
9  versus the resident doing it?
10     A   That's correct.
11     Q   And is there any diagnosis available
12 in -- to your knowledge, in the -- in the
13 emergency department system related to a alleged
14 sexual assault?
15     A   Not to my knowledge.
16     Q   How about for like pain in the leg?
17     A   I'm not sure.
18     Q   How about for exposure to -- well, this
19 is a general matter, actually, not -- not saying
20 about this case in particular, but exposure to
21 date rape drugs?  Is there any diagnosis that
22 would correspond to that?

Page 263

1      A   Not that I'm aware of.
2      Q   Okay.  And can you tell from this, not
3  just this first page, but from, you know, any of
4  the pages in this medical record, when was the
5  first time that you saw the patient?
6          And please feel free to take your time.
7      A   The exact time of when I saw that
8  patient?  I -- I -- I can't tell you the exact
9  time when I saw that patient.
10     Q   Just turning to the -- the page 14 of
11 18 --
12     A   Uh-huh.
13     Q   -- the -- the last page.
14     A   Okay.
15         (Witness examined document).
16     Q   It's one of the entries.  This is in the
17 admin area.  And on -- one of the entries I notice
18 was Sunday, December 10th, 2006, 1:16 LAC,
19 attending changed from none to Christopher Lane.
20         What, if anything, does that entry tell
21 you?
22     A   All that tells me is when there's an

Page 264

1  initial patient in the queue, no one's clicked --
2  clicks on them.  And at some point during their
3  evolution in the emergency room, you click on the
4  patient.  And that just happened to be the time I
5  did that.
6      Q   So from this entry, you can't tell
7  whether you saw the patient before that or after
8  that?
9      A   Yeah.  There's no correlation.
10     Q   Sorry to jump around, but if we go back
11 to page 11 of 18.  I have a couple more questions.
12     A   (Witness examined document).
13     Q   And under the instruction section, can
14 you explain what the purpose of that section is in
15 the record?
16     A   To give some sort of information to the
17 patient on what they were seen -- or what was
18 performed for them, to give them guidance.
19     Q   And what role, if any, do you have
20 generally -- generally with the discharge of a
21 patient?
22     A   That's -- that's more of a resident

Page 265

1  responsibility.
2      Q   And how does that -- how does that
3  process typically work --
4      A   We complete --
5      Q   -- in your experience?
6      A   -- the care, where we agree on what
7  we're supposed to do.  And from there, we say,
8  okay, when can you discharge the patient?  So look
9  it up the -- put in the diagnosis, put in the
10 discharge instructions, and then close the loop
11 with the patient.  And then the nurse usually will
12 come in with the instructions.  Sometimes the
13 resident does it themselves.  But sometimes the
14 nurse will come in after, and then put -- make
15 sure the patient's discharged, take them out of
16 the system.
17     Q   And is there -- in your practice, is
18 there a situation where you, Dr. Lang, would be
19 the one presenting the discharge instructions to
20 the patient?
21     A   On the Fast Track side sometimes, unless
22 they don't need provider.  Most -- most of the

67 (Pages 262 to 265)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                              June 27, 2008
                    Washington, DC

Page 266

1  times the nurse does all that for us.
2     Q    And are you -- do you have an
3  understanding of what the -- under -- like with
4  the dispo -- I'm sorry -- with the diagnosis,
5  there is a click-down menu.
6        Is there some similar system in place
7  with regard to what discharge instructions are
8  provided?
9     A    There is -- you free -- you type. And
10 it will populate what you can put in. And if it's
11 there, it's there. If it's not -- so if you --
12 you know, like our example with your urinary tract
13 infection --
14    Q    Thank you.
15    A    -- if I put it in, I put in "UTI." And
16 it may come up as UTI, or I might have to put in
17 "urinary," or -- and then it either populates it,
18 or it doesn't. If it doesn't, it means there's no
19 instructions for it.
20    Q    And so have you actually done that
21 yourself before, attempted to pull up a -- a
22 discharge instruction on the system?

Page 267

1     A    Yes.
2     Q    And so if the one you're going to put in
3  is not -- for some reason not populating, do you
4  just try for a different one, to try to come up
5  with the -- some discharge instruction to provide
6  the patient that's most relevant?
7     A    Yeah, I mean you try to match up what
8  you can.
9     Q    Are there ever instances where you
10 actually prepare discharge instructions that are
11 separate from the preformatted ones that pop up
12 and you populate the field in one way or the
13 other?
14    A    There's additional comments you can put
15 on.
16    Q    In your practice, is it always the case
17 that at least one discharge instruction is
18 provided to the patient, or are there some cases
19 where there's nothing that populates the field and
20 thus no instruction that's relevant?
21    A    I mean you try to match up the
22 instructions. And then -- and if you come -- if

Page 268

1  you strike out with everything it's -- it's almost
2  the same as this, these diagnosis. Except
3  diagnosis you're stuck. You have to pick
4  something for the discharge. You hopefully will
5  find something that's close to it. If you can't,
6  then you would try to type in something.
7        But, you know, it's not as -- like
8  they're not standard instructions with help. You
9  know, it's -- it's a lot of fat-fingering. And
10 you're not sure if you're going to incorporate
11 everything that you need to.
12    Q    And with regard to the "special" part of
13 the -- this -- this entry in the medical record,
14 the special, what does that mean, if you know?
15    A    I think that might -- I think that might
16 have been the free text.
17    Q    And do you recall who selected these
18 discharge instructions for the -- for
19 Ms. McGaughey?
20    A    It would be who is annotated under
21 instruction.
22    Q    Is it Dr. Khozeimeh?

Page 269

1     A    Uh-huh.
2     Q    And do you recall conferring with
3  Dr. Khozeimeh regarding either the HIV testing or
4  the alleged sexual discharge instructions?
5     A    I don't remember specifically. I know
6  that, you know, our residents make every attempt
7  to again match what we feel is similar to that,
8  so -- I know that she was doing her best to match
9  what she could as close as she could to what the
10 presentation was.
11    Q    And do you recall whether you saw
12 Ms. McGaughey after you and Dr. Khozeimeh -- or
13 after Dr. Khozeimeh said a lot of disposition with
14 any input from you that may have occurred.
15        But do you recall whether you saw her
16 again from that point forward, once you -- once
17 the deposition was established?
18    A    Yeah, I'm -- I'm not sure of the -- the
19 time frame of all of that. So, no, I can't
20 comment.
21    Q    Okay. And with regard to the "special"
22 part of the instruction area --

68 (Pages 266 to 269)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                     June 27, 2008
                    Washington, DC

Page 270

```
 1    A   Uh-huh.
 2    Q   -- follow-up with your primary care
 3  doctor for HIV testing and further medication and
 4  treatment, take HIV prophylactic meds as
 5  instructed.  Follow-up with your private physician
 6  if needed.  Return to ED if worse.
 7        I take it that was entered by
 8  Dr. Khozeimeh, those -- what I read?
 9    A   That's speculation.
10    Q   And I was just asking that because her
11  initials are on the instruction part.
12        But is there some -- who else could it
13  be?
14    A   Probably no one else, but I just can't
15  say for sure that it was her.
16    Q   Okay.  Did you enter that?
17    A   No, I didn't enter it.
18    Q   And do you recall discussing any of
19  those matters that were covered in that "special"
20  area with Dr. Khozeimeh?
21    A   I remember discussing the -- trying to
22  get the most of appropriate discharge information.
```

Page 271

```
 1  And so she tried to get through that, and then
 2  discharged the patient.
 3    Q   And you recall that with respect to this
 4  case in particular?
 5    A   No.  That's my standard practice.
 6    Q   Okay.  Under the orders section, where
 7  it says GC/Chlamydia PCR by KN for LAC --
 8    A   Uh-huh.
 9    Q   -- on Sunday at 2:04.
10        Can you explain what -- does this tell
11  you what role, if any, you had in regarding these
12  orders?
13    A   No.  It just -- it just says that the
14  resident KN had ordered that specific test.  And
15  any time the -- the -- a resident does it, it
16  automatically populates the attending physician
17  that covers that.  So it's always for the
18  attending.  So it's the resident for the
19  attending, or the PA for attending.
20    Q   And do you recall conferring with
21  Dr. Khozeimeh regarding this order for the
22  GC/Chlamydia PCR?
```

Page 272

```
 1    A   I don't remember specifically.  But,
 2  again, my standard practice is we confer.  And it
 3  seems to be appropriate.
 4    Q   Is this a test that she could have
 5  ordered without your express approval?
 6    A   Sure.  Anyone can order the test.
 7    Q   I understand your general practice,
 8  however, is how -- how you described it.
 9        What is O2 SAT interpretation?
10    A   That is oxygen saturation in your blood.
11    Q   And what did --
12    A   It's part of the vit -- it's a -- it's a
13  vital sign.
14    Q   And is there a reason why Dr. Khozeimeh
15  performed this as opposed to a -- a nurse or
16  somebody else?
17    A   She interpreted what the nurse put in
18  the vital signs.  So it just checks off the I
19  looked at the O2 saturation that the nurse or
20  whoever triaged that patient at -- she didn't
21  actually -- it doesn't necessarily mean she per --
22  performed the procedure herself.
```

Page 273

```
 1  BY MS. HARTNETT:
 2    Q   HPI sexual assault?
 3    A   Uh-huh.
 4    Q   What does that heading mean?
 5    A   History of present illness.  And so,
 6  again, we only -- we only have set amount of pick
 7  lists that you can pick from when you do a
 8  complaint.  I'm trying to think of another example
 9  I can give you.  But there's -- but people don't
10  necessarily fit.  You know, we have chest pain, or
11  knee.  It just says knee.  Or we have extremity,
12  but we don't have an ankle.  So then we go under
13  the knee one for that.
14        And so there's -- there's topic headings
15  that start the process off.  But, again, it
16  doesn't necessarily mean that's what the category
17  is.
18    Q   Do you know if there's -- I guess with
19  HPI extremity or HPI whatever, is that -- is that
20  how it would appear on the -- depending on which
21  drop-down --
22    A   Right.  HPI chest pain, HPI trauma.
```

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                    June 27, 2008
Washington, DC

Page 274

1    Q    Is there any HPI for unprotected sex?
2    A    Not to my knowledge.
3    Q    And is there -- can you estimate how
4    many HPI's there are at the present time?
5    A    Maybe forty.
6    Q    What is the purpose of the chief
7    complaint portion of the HPI section of this
8    record?
9    A    It's what the -- the -- again, I didn't
10   enter this.  But the chief complaint is what --
11   what is the complaint of the individual presenting
12   to the emergency room.
13   Q    And in your practice, is it ever your
14   role as attending to enter this information in
15   regarding a patient, the HPI?
16   A    No.  Again, it's part of the resident
17   duties.
18   Q    And just reviewing this, this particular
19   HPI in this case, which appears to be input by
20   Dr. Khozeimeh at 2:22 and 2:27 a.m. on Sunday the
21   10th.
22        Do you know -- do you recall whether you

Page 275

1    reviewed this -- these entries during the time
2    that you were treating Ms. McGaughey?
3    A    I don't recall specially looking at
4    every single entry she made.  I -- I can't tell
5    you which ones I did and which ones I didn't.
6    Q    And then under assault there's a
7    category for that.
8        Again, my -- I guess my question is the
9    chief complaint, history, and assault, those
10   categories, are they a standard category that come
11   up depending on which HPI you pick?
12   A    Yeah, again, I haven't -- I don't know
13   this one, because I haven't entered in this one --
14   Q    Uh-huh.
15   A    -- to actually know.  But usually that
16   sets off questions you have to answer.  And it
17   forces you to put something in those categories.
18   So you're -- you're kind of -- once you pick that,
19   you're actually now setting yourself in a path of
20   answering questions that may or may not pertain to
21   the complaint.
22   Q    And under assault, the -- there's an

Page 276

1    entry here.
2        It says, Assault occurred 0200 12/9,
3    LOC:  Unknown, police notified.
4        During your -- the time that you were
5    treating Ms. McGaughey, were you aware of the --
6    any information that the assault occurred at 0200,
7    12/9?
8    A    I was unaware of the exact timing of the
9    incident.
10   Q    And were you -- was it your
11   understanding -- or did you have an understanding
12   of where the incident had occurred?
13   A    Like specific location?
14   Q    If you had one.
15   A    No.
16   Q    Did you have a general understanding of
17   where it occurred?
18   A    No.
19   Q    Okay.  Just under the notes section, I'm
20   just going to ask.  I understand that
21   Dr. Khozeimeh input this.  But I -- I just would
22   like to know if you have independent knowledge of

Page 277

1    this at the time that you were treating
2    Ms. McGaughey.
3        19-year-old female allegedly assaulted
4    Saturday at 2:00 a.m., just describe that.
5        It says, Plus ETOH use.
6        What does that mean?
7    A    That means she admitted to using
8    alcohol.
9    Q    And is that a question that would be
10   asked of her, or is this a -- I guess when you say
11   admitted, how --
12   A    Again, I didn't -- I didn't write this
13   note.
14   Q    Right.
15   A    So then I'm -- I am then speculating as
16   to why this was put in.
17   Q    But when you read the plus ETOH use,
18   that, to you, means that she's said that she's
19   used the al -- she's admitted using alcohol?
20   A    That's correct.
21   Q    Okay.  It says goes on to say, Patient
22   passed out, raped by acquaintance.

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                                    June 27, 2008
                        Washington, DC

| Page 342 |
| --- |

1    A   No.
2    Q   Are you -- do you ever -- in your
3   experience is this -- is this consistent with
4   what -- the appearance of discharge instructions
5   from The George Washington University Hospital?
6    A   The general layout, yes.
7    Q   Okay.  And where it says at the bottom
8   prepared it and it has Dr. Khozeimeh's name, do you
9   know what that means, what that indicates?
10    A   That indicates that she's the one that
11   composed the discharge instructions.
12    Q   Okay.  And just turning to the second
13   page, which marked MCG 32, the -- there's a --
14   what appears to be a discharge instruction:
15   Alleged sexual assault, adult.
16        Have you ever -- other than in this
17   case, are -- have you been involved in any case
18   with a discharge instruction of alleged sexual
19   assault, adult?
20    A   Not to my knowledge.
21    Q   And do you have any understanding of
22   when this discharge instruction is to -- is to be

| Page 343 |
| --- |

1   used at The George Washington University emergency
2   department?
3    A   Not to my knowledge.
4    Q   And did you -- have you reviewed this
5   discharge instruction?
6    A   No.
7    Q   Is this the first time that you've seen
8   this discharge instruction, sort of in the --
9   spelled out with all the -- all the information in
10   it?
11    A   Yes.
12    Q   Okay.  Turning to the final three pages
13   of this document 33 through 35, which are --
14   appear to be prescriptions given to the Plaintiff.
15        Is that your signature on these
16   documents, or is the physician signature, or do
17   you --
18        MR. GOODSON:  Can you just refer as to
19   which page?
20   BY MS. HARTNETT:
21    Q   Sorry.  33, is that your signature on
22   that document?

| Page 344 |
| --- |

1    A   No.
2    Q   Do you know whose signature it is?
3    A   No.
4    Q   Can Dr. Khozeimeh, as a resident at that
5   time, in December '06, would she be authorized to
6   sign this prescription?
7    A   Yes.
8    Q   Okay.  Flipping back to -- sorry.  Can I
9   just take it back?
10        Remember question on number four, line
11   four of the medical -- which includes the medical
12   record.  If you would just turn to page 17 of 18.
13   I'm sorry, page 16 of 18.
14    A   (Witness examined document).
15    Q   I believe you said -- stated this is not
16   part of the medical record.
17        Do you know what this form is?
18    A   No.
19    Q   And this is a form that you do not see
20   in the course of your treatment of a patient?
21    A   No.
22    Q   Have you seen this form for this

| Page 345 |
| --- |

1   Plaintiff before right now?
2    A   No.
3    Q   Do you have an understanding of whether
4   sexual assault examination kits are kept at The
5   George Washington University Hospital?
6    A   Not to my knowledge.
7    Q   If I wanted to find out whether that
8   they are in fact kept at The George Washington
9   University Hospital or not, who would -- who would
10   you ask?
11    A   The Metropolitan Police Department.
12    Q   Is there anyone in the emergency
13   department that you would ask that would --
14    A   I could, but that's not who I'd -- who
15   I'd ask.
16    Q   You -- you -- you would first contact
17   the Metropolitan Police Department and ask them?
18    A   My standard protocol is to contact the
19   Metropolitan Police Department for any sort of
20   complaint of sexual assault.
21    Q   I guess just the more -- the -- not --
22   separate from any patient, just the question of

Alderson Reporting Company
1-800-FOR-DEPO

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

Christopher R. Lang, M.D.                              June 27, 2008
                    Washington, DC

|  | Page 346 |  | Page 348 |

**Page 346**

1  whether there's actually a sexual assault kit that
2  is kept at the hospital for use if necessary, is
3  that a question that you similarly you would ask
4  the Metropolitan Police Department before you
5  would ask someone at the hospital?
6      A   I'd have to think about, but probably.
7      Q   And if there -- instead I asked you
8  that -- what -- what person would you ask at the
9  hospital if you had asked someone at the hospital
10  as opposed to outside, who would you ask?
11     A   Probably the highest ranking emergency
12  room like the -- the director or assistant
13  director, whoever is the -- you know, depends on
14  the time of day.
15     Q   Can you -- would -- can you name any --
16  a name of someone that you would ask to -- if I
17  asked you to --
18     A   Depends what time of day you -- you
19  asked, talk about.
20     Q   It just depends on who is in the -- in
21  the facility?
22     A   Well, again, there's eight to five jobs

**Page 347**

1  which are the main people.  And then there's after
2  the -- after the five and before the eight.
3      Q   Just normal business hours?
4      A   Normal business hours, it would be the
5  director of the -- [inaudible] --
6      Q   Okay.
7      THE REPORTER:  I didn't hear that
8  clearly.
9      THE WITNESS:  Director of the emergency
10  department.
11     MS. HARTNETT:  Thank you.  I'm done.
12     Anyone else?
13     MS. TURNER:  No questions.
14     MR. GOODSON:  Mr. Gleason?
15     MR. GLEASON:  No, sir, I have no
16  questions.
17     MR. GOODSON:  Adam, do you have any?
18     MR. KELLEY:  No, I don't have any
19  questions.
20     Kathleen, I do -- I am confused about
21  whether the depos of the detectives are going
22  forward on Tuesday --

**Page 348**

1      MS. HARTNETT:  Can we go -- let's go off
2  the record.
3      MR. KELLEY:  Yeah, are we off?  We're
4  not?
5      MS. HARTNETT:  One second.
6      VIDEOGRAPHER:  This concludes the
7  videotaped deposition of Dr. Christopher Lane.  It
8  consists of five videotapes.  We're off the record
9  at 3:49:01.
10
11
12
13          (Whereupon at 3:49 p.m., the
14          deposition of CHRISTOPHER R.
15          LANG, M.D., was adjourned.)
16
17
18
19
20
21
22

**Page 349**

1  A C K N O W L E D G E M E N T  O F  D E P O N E N T
2
3
4      I, CHRISTOPHER R. LANG, M.D., do hereby
5  acknowledge I have read and examined the foregoing
6  pages of testimony, and the same is a true, correct
7  and complete transcription of the testimony given
8  by me, and any changes or corrections, if any,
9  appear in the attached errata sheet signed by me.
10
11
12
13
14
15  _____        _____
16  Date               CHRISTOPHER R. LANG, M.D.
17
18
19                     _____
20                     NOTARY PUBLIC
21
22

88 (Pages 346 to 349)

fa7ee533-aa41-48e9-a3d7-49cd1cd95fcf

# Exhibit B

**To Plaintiff's Reply to Defendant Lang's Opposition to Plaintiff's Motion to Modify
Scheduling Order and Increase Number of Depositions Plaintiff May Take**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

# GOODELL, DeVRIES, LEECH & DANN, LLP

ATTORNEYS AT LAW
ONE SOUTH STREET, 20TH FLOOR
BALTIMORE, MARYLAND 21202
http://www.gdldlaw.com

TELEPHONE (410) 783-4000

FACSIMILE (410) 783-4040

ADAM KELLEY
AXK@GDLDLAW.COM
WRITER'S DIRECT NUMBER
410-783-4044

June 5, 2008

***VIA E-MAIL AND REGULAR MAIL***
Kathleen R. Hartnett
Spiva & Hartnett LLP
1776 Massachusetts Avenue, N.W.
Suite 600
Washington, D.C. 20036

Re:    **McGaughey v. District Hospital Partners, L.P., et al.**

Dear Kathleen:

Enclosed with this letter is the GWUH protocol on Sexual Assault. This is the protocol that was discussed during Victoria Autry's recent deposition. I have confirmed that this version of the protocol was still in effect as of December 2006. Please consider the production of this protocol as a supplemental response to Request for Production Nos. 21, 24, 25, 26, 28, 29, 30, 31, 32, 33 and 44 propounded to District Hospital Partners, L.P. by Plaintiff in this matter.

In further supplemental response, please be advised that we have searched for, but have not found, any GWUH protocols responsive to Request for Production Nos. 20, 22, 27, 36, and 40.

If you have any questions, please feel free to give me a call. Best regards.

Sincerely,

Adam Kelley

AK/dl
Enclosure
cc:    All counsel of record (via e-mail and regular mail, w/ encl.)
4832-5955-5586

## THE GEORGE WASHINGTON UNIVERSITY HOSPITAL
## EMERGENCY DEPARTMENT
## PRACTICE MANUAL

**REVISED DATE:**          MARCH 2003

**EFFECTIVE DATE:**        NOVEMBER 1984

**TITLE:**                 SEXUAL ASSAULT

**PURPOSE:**               TO ESTABLISH GUIDELINES FOR THE MANAGEMENT OF
                           SEXUAL ASSAULT VICTIMS IN THE EMERGENCY
                           DEPARTMENT

**SCOPE:**                 EMERGENCY DEPARTMENT ATTENDING PHYSICIANS,
                           EMERGENCY DEPARTMENT REGISTERED NURSES


The treatment of a sexual assault victim requires a rapid multidisciplinary approach that addresses the patient's physical and emotional needs and fully documents the process for use in eventual litigation.

If a patient comes to the Emergency Department with a history of alleged sexual assault, the following should be accomplished by the <u>nurse</u>:

1. Rapid triage to an examining area.

2. Designation of one nurse to follow the care of the patient throughout the stay in the Emergency Department.

3. Notification oof the Metropolitan Police Department, after permission is granted by the patient.

4. <u>Mandatory</u> notification of the Metropolitan Police Department if the patient's age is 16 or under, and/or for the possibility of child neglect or abuse.

5. <u>Mandatory</u> notification of the Homicide Division of the Metropolitan Police Department if the patient sustained life-threatening injuries.

6. Notify the attending physician in the Emergency Department, or an emergency medicine resident licensed in the District of Columbia to perform the necessary gynecologic examination and laboratory procedures. At the request of the patient, a private licensed gynecologist on staff at The George Washington University Hospital may perform the examination.

7. The Metropolitan Police Department requests that they interview the patient and collect the necessary specimens, required of them, before the physicians in the Emergency Department perform the pelvic examination of the patient, if he/she is medically stable.

The following should be accomplished by the <u>doctor</u> with the assistance of the nurse:

1. A general explanation of what will transpire in the department.

2. Assessment of the patient's support systems. The patient may be allowed to have a relative or companion with them during the examination as long as he/she does not interfere with medical procedures.

3. Notification of the arrival of the sexual assault victim to a representative of the Case Management Department for their assistance, evaluation and recommendations.

4 An explanation of the PD-124 form, and the implications of signing this form.

5. Inform the patient not to bathe/shower, change clothes, douche, smoke or drink in the Emergency Department before the examination is performed, otherwise vital evidence may be destroyed.

6. Inform the patient that the clothing the patient is wearing may be collected as evidence, (place in a paper bag and label as evidence).

7. A history of present illness should be collected to include:

a. Did the victim change clothes before presentation?

b. Did the victim bathe/shower before presentation?

c. Did the assailant's genitalia penetrate the victim?

d. Was there ejaculation?

e. Did fellatio or sodomy occur?

f. Did the victim inflict any injuries on the assailant?    if so, how?  Where?

g.    g.    Victim's LMP, gravida, parity number, and history of contraceptive use.
h.    h.    When was the alleged victim's last intercourse prior to the assault?
i.    i.    Was there any digital penetration by the assailant?

8. A careful medical history and assessment of physical injuries not related to the sexual assault should be collected and documented by the doctor.

9. A complete physical examination, including pelvic, should be performed.  Specimens will be taken according to the policies in the relevant jurisdiction for collection of evidence.  Note: All specimens are to be collected following evidence collection guidelines.

a. Do not use lubricants.  A water moistened speculum should be used.

b. A cotton applicator to be used to swab the vaginal vault and placed on one slide with one drop of saline solution and a cover slip for the examining physician's use for determination of the presence of motile sperm.

c. A dry culturette to be used to swab the vaginal vault for the determination of acid phosphatase.  The urethra and rectum may also be swabbed separately if indicated.

d. A wet culturette swab to be used to swab the cervix for the determination of GC, and Chlamydia (in place of the TM plate).  The oral pharynx and rectum may also be cultured separately if indicated.

e. Identify four slides by taping on stickers marked vaginal, urethral, rectal and oral, (if indicated).  Each area will be swabbed with a cotton applicator and then placed on the appropriate slide.  Each slide will then be sprayed with Fixative and allowed to air dry These slides are used by the laboratory department for the Papanicolaou staining for sperm.

10. After completion of the pelvic examination the following specimens can be collected.

    a.    Urine for the determination of pregnancy.

    b.    Serum test for syphilis, (VDRL), to establish a baseline for reference.

11.    At the conclusion of the examination, the <u>doctor</u> will:

    a.    Immediately examine the saline prep for the presence of sperm motility.

    b.    Document all information and procedures on the Emergency Department chart.

    c.    Complete the PD-124 form, (if applicable).

    d.    Call consultants if necessary.

12.    In addition, the following procedures may be completed.

    a.    Administration of prophylactic antibiotics for Sexually Transmitted Diseases.  This may include one of the following regimens:

        -    -    Cipro 500mg PO x 1
        -    -    Azithromycine 1g PO x 1

    b.    Optional administration of Tetracycline 250 QID x 7-10 days or Doxycline 100 BID x 7-10 days for treatment of chlamydia.

    c.    Administration of Tetanus Toxoid as indicated.

13.    The option to use a "morning after pill" will be decided on by the examining physician with complete approval and understanding by the patient.  The following factors should be taken into consideration by the physician and the patient:

    a.    A negative urine pregnancy test

    b.    Date of last menstrual period

    c.    Was there ejaculation?

    d.    Side effects that have been documented to this drug i.e. nausea and vomiting.

    e.    No absolute guarantee of the effectiveness of the treatment

    f.    Side effects to the fetus - congenital anomaly

    g.    Signed permit

The drug offered to the patient will be birth control pill such as Ovral.  The dosage will be Ovral 2 pills in the ED then 2 pills 24 hours later.  Also offered to the patient, a phenergan suppository, or phenergan, PO for nausea.

14.    The patient may be offered a cleansing douche, using Betadine or Aqueous Zephirin, if agreed to by the examining physician.

15.    After the completion of the exam, the doctor will explain to the patient their option to sign the PD-124 form which will then be completed by the physician, and will constitute permission to release the results of the samples obtained to the police.  The patient is under no obligation to sign this

form.

16. If the PD-124 form is completed, it should be dispositioned as follows:

    a.    Original copy to the Metropolitan Police Department's representative

    b.    Copy 1 to the Prosecutor, (MPD representative will accept for this department)

    c.    Copy 2 for the patient's chart to medical records

    d.    Copy 3 to the Public Health Nurse, DHS, (MPD representative will accept for this department)

17. Patients upon discharge should be given the name of one of the following clinics for their follow-up examination:

    a.    A private GYN doctor of their preference

    b.    GYN group in the MFA.

18. Transportation of the patient after examination can be provided by the Metropolitan Police Department if no family or friend is available.

19. The ED nursing office will be responsible for compiling all returned lab data and notifying the patient and the Metropolitan Police Department if appropriate to do so. A xeroxed copy of the chart and the PD-124 form must be sent to this office.

20. The patient will be offered a handbook that discusses many of the possible reactions to sexual assault that she might be expected to have.

Note: Male victims of sexual assaults should be treated in the same manner as female victims. Particular attention should be directed toward sampling areas traumatized in the assault.


Non-Consenting Patient:

The patient who does not give permission for notification of the Police Department should have the following protocols completed:

    9.    b and d

    10.    a and b

    12.    a and b

## SEXUAL ASSAULT

- Set up equipment before taking cart into room, (see reference pictures.

- Pre-label all specimen containers with name and source.

- The sexual assault kit will be opened in the room of the patient only. The sexual assault kit will be sealed per chain of custody rules.

- Send urine or serum beta ASAP to ascertain pregnancy status to avoid discharge delay while awaiting results.

- Remember to notify Case Management ASAP.

- If family/friends are called, ask them to bring clean clothes.

- If necessary, be prepared to assist with sexual assault examinations in the critical care units or other nursing units if patient's condition precludes the examination in the Emergency Department.

- Never utilize Q-tips swabs or wooden sticks from pelvic tray set-up.  Always use sterile Q-tip swab stick provided in Physical Evidence Recovery Kit.

- Never open "Control Swab" package in the Sex Offense Kit.

The patient who does not give permission for notification to the Police Department should have the following protocols as outlined in Sections:

 9. b and d

10. a and b

12. a and b

obtained for their own protection.