**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALEXANDRIA McGAUGHEY<br>10031 S. Morgan Street<br>Chicago, IL 60643,<br><br>        Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004;<br><br>HOWARD UNIVERSITY HOSPITAL<br>2041 Georgia Avenue, N.W.<br>Washington, D.C. 20060;<br><br>HOWARD UNIVERSITY<br>2400 Sixth Street, N.W.<br>Washington, D.C. 20059;<br><br>WENDIE WILLIAMS, M.D.<br>2041 Georgia Avenue, N.W., Suite 1-400<br>Washington, D.C. 20060;<br><br>DAWIT YOHANNES, M.D.<br>2041 Georgia Avenue, N.W.<br>Washington D.C. 20060;<br><br>DISTRICT HOSPITAL PARTNERS, L.P.,<br>d/b/a/ GEORGE WASHINGTON<br>UNIVERSITY HOSPITAL<br>900 23rd Street, N.W.<br>Washington, D.C. 20037;<br><br>GEORGE WASHINGTON UNIVERSITY<br>2121 Eye Street, N.W.<br>Washington, D.C. 20052; and<br><br>CHRISTOPHER LANG, M.D.<br>900 23rd Street, N.W.<br>Washington, D.C. 20037,<br><br>        Defendants. | FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>Case No. 1:07-cv-01498 (RJL) |

## INTRODUCTION

1.  In the early morning hours of Saturday, December 9, 2006, Plaintiff Alexandria McGaughey, a nineteen year-old sophomore at Howard University, was sexually assaulted at an off-campus party in the District of Columbia.  Ms. McGaughey likely was anally penetrated after having been given a date rape drug that rendered her semiconscious or incoherent for hours, including during the assault and during her visit to Defendant Howard University Hospital ("HUH") immediately thereafter.

2.  Immediately after the assault, Ms. McGaughey – accompanied by several witnesses – sought desperately needed medical care at HUH, which holds itself out to be the premiere hospital in the area for assisting sexual assault victims.  Nonetheless, due to gross negligence by HUH and the District of Columbia Washington, D.C. Metropolitan Police Department ("MPD"), Ms. McGaughey did not receive the basic medical treatment appropriate for a victim of sexual assault.  Proper treatment not only would have alleviated Ms. McGaughey's physical harm and emotional suffering, but it would have provided the most definitive proof of the perpetrator of the sexual assault and the nature of that assault, including whether and how she was drugged.  Compounding these failures, the police continue to refuse to investigate the crime.  Rather than classifying and investigating Ms. McGaughey's reported assault as an alleged sexual assault, the police misclassified it as a "miscellaneous" incident.

3.  Unfortunately, Ms. McGaughey's experience was entirely preventable.  Indeed, some of the failures of the MPD and HUH in this case are incredibly similar to their failures in the case of a *New York Times* reporter who died in January 2006 after being mugged and beaten and then receiving delayed and insufficient medical care by MPD and HUH personnel.  As in this case, a disastrous "chain of failures" was precipitated by, among other things, the erroneous and

unreasonable assumption by MPD and HUH personnel that the crime victim was simply an intoxicated individual undeserving of treatment.  The failings in this case are all the worse because both MPD and HUH hold themselves out as having policies expressly designed to respect and properly treat sexual assault victims, including those victimized by date rape drugs.

4.  Ms. McGaughey has been violated twice:  first, by an assailant who likely drugged and sexually assaulted her, and then, by Defendants, including HUH and the District of Columbia (through the MPD), which refused to take her complaint seriously and which failed to provide her the reasonable care she was owed.  Defendants' misconduct and failures to act may very well have deprived Ms. McGaughey of the chance of ever seeing her assailant brought to justice.  Accordingly, Ms. McGaughey brings this suit for compensatory and punitive damages, as well as appropriate declaratory and injunctive relief.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1367(a), and 42 U.S.C. § 1395dd(e)(1).  The matter in controversy exceeds $75,000 and is between citizens of different states.

6.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).  Defendants reside in this judicial district and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

7.  Plaintiff Alexandria McGaughey is a student at Howard University in the District of Columbia.  She is, and has been at all times relevant herein, an Illinois resident.

8.  Defendant District of Columbia is a city which controls and manages the District of Columbia Metropolitan Police Department ("MPD"), an agency of the City.  The District of

Columbia was given notice of the underlying facts and circumstances of this lawsuit pursuant to D.C. Code § 12-309.

9. Upon information and belief, Defendant Howard University Hospital ("HUH"), at all times relevant herein, was a medical facility located in the District of Columbia and operating and licensed to practice medicine in the District of Columbia, and provided medical care and treatment to Plaintiff.

10. Upon information and belief, Defendant Howard University ("HU"), at all times relevant herein, was located in the District of Columbia and was involved in the ownership and management of HUH.

11. Upon information and belief, Defendant Wendie Williams, M.D. ("Dr. Williams") was at all relevant times a physician duly licensed to practice medicine in the District of Columbia. Upon further information and belief, Defendant Williams was acting as an agent, servant and/or employee of Defendant Howard University Hospital at all times when she rendered medical care and treatment to Plaintiff.

12. Upon information and belief, Defendant Dawit Yohannes, M.D. ("Dr. Yohannes") was at all relevant times a physician duly licensed to practice medicine in the District of Columbia. Upon further information and belief, Defendant Yohannes was acting as an agent, servant and/or employee of Defendant Howard University Hospital at all times when he rendered medical care and treatment to Plaintiff.

13. Upon information and belief, Defendant District Hospital Partners, L.P., d/b/a George Washington University Hospital ("GWUH"), at all times relevant herein, was a medical facility located in the District of Columbia and operating and licensed to practice medicine in the District of Columbia, and provided medical care and treatment to Plaintiff.

14.    Upon information and belief, Defendant George Washington University ("GWU"), at all times relevant herein, was located in the District of Columbia, was involved in the ownership and management of GWUH, and employed resident physicians at GWUH, including Dr. Nini Khozeimeh.

15.    Upon information and belief, Defendant Christopher Lang, M.D. ("Dr. Lang") was at all relevant times a physician duly licensed to practice medicine in the District of Columbia. Upon further information and belief, Defendant Lang was acting as an agent, servant and/or employee of Defendant GWUH and GWU at all times when he rendered medical care and treatment to Plaintiff.

## FACTUAL BACKGROUND

### The Sexual Assault

16.    In the evening of Friday, December 8, 2006, Ms. McGaughey went to a birthday celebration for a friend with two of her Howard University classmates, Kerston Reid and Sade Diké.  The party took place at 21 Bryant Street, N.W., an off-campus house in Washington, D.C. in a neighborhood near Howard University.  Four male Howard university students live in the house, including Bilal Curtis and Brandon Thrasher, the only two residents of the house at the party.  The three women arrived at the house around midnight.  Amanda Lockett, another college friend, arrived at the party after them.

17.    Ms. Diké and Ms. McGaughey danced next to each other at the party with two young men – Ms. Diké with Mr. Curtis and Ms. McGaughey with a man named Kevin.  Mr. Curtis began behaving in a sexually aggressive manner toward Ms. Diké, who became uncomfortable and left the dance floor.

18. Mr. Curtis then began dancing with Ms. McGaughey. This is the last thing that Ms. McGaughey remembers about the evening before waking up mid-morning on Saturday, December 9, 2006 in her dormitory room with severe pain in her anus, rectum, and one of her legs. Ms. Reid had stayed with Ms. McGaughey that evening and, along with other friends at the party that night, related to Ms. McGaughey what had happened next.

19. Around 3 a.m., the party rapidly began to die down, with most of the guests departing at once. At that time, Mr. Curtis was dancing with Ms. McGaughey in a sexually aggressive manner. Ms. McGaughey appeared disoriented and Ms. Lockett grew concerned for her safety. Ms. Lockett attempted to pull Ms. McGaughey away to leave the party, but Mr. Curtis pulled Ms. McGaughey back toward him. Ms. Lockett went to the next room to get their coats so that they could leave with their friends. Although Ms. Lockett was gone only long enough to retrieve the coats, when she returned to the room where Mr. Curtis had been dancing with Ms. McGaughey, neither of them was there.

20. Ms. Lockett suspected that Mr. Curtis had taken Ms. McGaughey upstairs. The stairs had been blocked off with furniture most of the night so that guests at the party would not go upstairs. After Ms. McGaughey disappeared, Ms. Lockett saw two young men (including Robert Lowery (a/k/a "Tito"), who was supposedly providing "security" for the party), moving the furniture to re-block the stairs, as if someone had just gone upstairs.

21. Ms. McGaughey's friends looked for her, but did not see her anywhere on the first floor of the house. Nor did they see Mr. Curtis. They attempted to go upstairs, but Mr. Lowery, a large man, blocked their way and physically pulled Ms. Diké back down the stairs. The women began arguing with Mr. Lowery and demanding that he bring Ms. McGaughey back downstairs. They suspected that Ms. McGaughey had not gone upstairs alone and asked Mr.

6

Lowery who was with her, but he refused to tell them.  He did not deny that Ms. McGaughey was upstairs or that there was someone else with her.  Rather, he repeatedly said that Ms. McGaughey would "be down in a minute."

22.  A resident of the house who was present at the party, Brandon Thrasher, came downstairs shouting at the women.  He cursed at them and told them they could get the "f--- out" if they were going to disrespect him in his house.  The women viewed his behavior as bizarre given that they had no previous interaction with him that night.  Indeed, the odd behavior of both Mr. Thrasher and Mr. Lowery fueled the women's suspicions that Ms. McGaughey was not alone upstairs and that Mr. Lowery and Mr. Thrasher were trying to divert them from finding her.  They were quite concerned for her safety.

23.  Mr. Lowery eventually agreed to go upstairs and "check on" Ms. McGaughey.  He was gone for several minutes – during which time the women wondered aloud how it could take so long to find Ms. McGaughey – and came back downstairs without her.  He claimed that she was in the bathroom and would be downstairs in a minute.  The friends continued to demand that they be allowed upstairs to see Ms. McGaughey.

24.  Ms. McGaughey finally walked down the stairs alone.  She had difficulty walking and appeared to be in a daze.  Walking with her outside of the house, her friends observed that Ms. McGaughey appeared teary-eyed and quite disoriented.  When Ms. McGaughey was asked whether someone had "touched her," she responded in the affirmative.  The women asked additional questions about what had happened, but Ms. McGaughey's responses were largely incoherent.  Although Ms. McGaughey had not consumed an excessive amount of alcohol – approximately the same amount as the other women – she seemed extremely intoxicated.  Her

manner and responses led her friends to suspect that Ms. McGaughey had been sexually

assaulted and possibly given a so-called "date rape" drug.

25.  Based on their concerns, Ms. Reid and Ms. Lockett went back to the house of the

party to find out who had been with Ms. McGaughey upstairs and what had happened.  Ms. Diké

remained with Ms. McGaughey.  When Ms. Reid and Ms. Lockett arrived at the house, the men

who resided there came to the door but denied them entry and yelled at them to leave.  The men

appeared nervous.  Mr. Curtis ultimately offered the name of another Howard student as having

been in the bathroom with Ms. McGaughey, but based on Mr. Curtis' manner and the context,

Ms. Lockett and Ms. Reid suspected that Mr. Curtis had provided that name simply to get rid of

them and to deflect attention away from themselves.

**The Initial Visit To HUH**

26.  Meanwhile, Ms. McGaughey, who was waiting outside with Ms. Diké, began

throwing up profusely.  Her condition greatly concerned her friends, who called the Howard

University campus escort service to take her to the hospital.  Ms. Reid and Ms. Diké

accompanied Ms. McGaughey to HUH, a short distance from the location of the party.  They

arrived at HUH at approximately 4 a.m. on December 9, 2007.

27.  During this visit to the HUH emergency room, Ms. McGaughey's friends told HUH

personnel that they thought Ms. McGaughey had been sexually assaulted and given a date rape

drug.  Ms. McGaughey's outward symptoms – including her vomiting and disorientation –

corroborated the friends' suspicions.  Yet, remarkably, no hospital personnel called the police.

In violation of  HUH's own policies, no hospital personnel called the DC Rape Crisis Center to

ask that a counselor come to the hospital to assist Ms. McGaughey.  And no hospital personnel

contacted the Sexual Assault Nurse Examiner ("SANE") nurse, who is supposed to be on-call 24

hours a day to examine sexual assault victims.  Further deviating from the ordinary standard of
care, no HUH medical personnel examined Ms. McGaughey that morning for evidence of sexual
assault.  Indeed, over the strong objections of her friends, the attending doctor and nurses refused
to administer a sexual assault medical-forensic examination, including a so-called "rape kit," to
medically treat Ms. McGaughey and preserve forensic evidence of sexual assault.  Moreover,
despite her friends' repeated and informed warnings that Ms. McGaughey likely had been given
a date rape drug, the attending doctor, Dr. Wendie Williams, and other HUH personnel dismissed
these concerns and failed to administer any test to determine the presence of such a drug in Ms.
McGaughey's body.

28.  More specifically, after arriving at HUH, Ms. McGaughey was taken to the triage
area with Ms. Diké and Ms. Reid.  The nurse then told Ms. Diké to go back to the admissions
desk to fill out the standard emergency room admissions forms for Ms. McGaughey.  Ms. Diké
did so, providing Ms. McGaughey's name, the date, and other basic information.  Ms Diké
specifically wrote that Ms. McGaughey possibly had been raped.

29.  Ms. Reid remained with Ms. McGaughey.  As the triage nurse took Ms.
McGaughey's vital signs, Ms. McGaughey resumed vomiting.  Neither the nurse nor any other
HUH personnel tested the vomit or retained any of it for testing.  Ms. Reid told the nurse that she
thought that Ms. McGaughey may have been raped after receiving a date rape drug and that Ms.
McGaughey should be given a rape kit.  The nurse responded that Ms. Reid should talk to the
doctor about that.  The nurse moved Ms. McGaughey onto a gurney and rolled her into the
hallway.

30.  Ms. McGaughey was next seen by Dr. Wendie Williams, one of the attending
physicians at HUH that night.  Ms. Diké and Ms. Reid explained to Dr. Williams that, based on

the circumstances of the party and Ms. McGaughey's condition, they suspected Ms. McGaughey had been given a date rape drug and raped. While in the presence of Dr. Williams, Ms. McGaughey began throwing up yet again. Neither Dr. Williams nor any HUH personnel tested the vomit or retained any of it for testing. Ms. McGaughey drifted in and out of consciousness, and at one point, HUH personnel assisting Dr. Williams attempted to wake Ms. McGaughey with some type of waking substance. Ms. McGaughey came to for a brief period, but soon fell back into a semiconscious state.

31. Ms. McGaughey's incoherence, lack of consciousness and nausea – particularly in light of the limited amount of alcohol that she had consumed – were remarkably consistent with the effects of several so-called "date rape" drugs. As explained by literature posted on the website of the U.S. Department of Health and Human Services, Office of Women's Health, "date rape drugs are sometimes used to facilitate sexual assault" by making the victim "physically helpless" and rendering them unable to remember what happened. http://www.womenshealth. gov/faq/rohypnol.pdf. They are often colorless and tasteless and can be easily added to drinks without the victim's knowledge. Common effects include "relaxation, drowsiness, dizziness, nausea, problems seeing, unconsciousness (black out)," "can't remember what happened while drugged," vomiting, and confusion. Such drugs also can cause death. Alcohol can worsen the drug's effects.

32. Ms. McGaughey exhibited several of these symptoms in the presence of Dr. Williams and other HUH medical personnel. Yet, despite these obvious symptoms and her friends' statements of credible belief that Ms. McGaughey likely had been drugged and raped, no HUH personnel, including Dr. Williams, tested Ms. McGaughey for the presence of a date rape

drug or to determine how much alcohol was in her system. These failures violated widely accepted professional standards of care.

33. Nor did any HUH personnel, including Dr. Williams, otherwise examine or treat Ms. McGaughey, examine her for physical signs of sexual assault, or use a rape kit to collect physical evidence such as DNA, hair, semen, blood, or fiber to determine the identity of Ms. McGaughey's assailant. Dr. Williams and/or other HUH medical personnel told Ms. McGaughey's friends that there was simply nothing that HUH could do for Ms. McGaughey because she was intoxicated and incoherent, and that the friends should take her home and bring her back to the hospital after she had a chance to sleep it off.

34. Ms. McGaughey's friends repeatedly implored Dr. Williams and/or other HUH medical personnel to test for a date rape drug and to otherwise examine Ms. McGaughey for sexual assault, including by administering a rape kit, but HUH personnel refused. Dr. Williams and/or other HUH medical personnel told the women that HUH needed approval from the police to administer a rape kit. On information and belief, the statement by Dr. Williams and/or other HUH medical personnel that HUH needed police approval to administer sexual assault medical forensic examination, including a rape kit, was false and/or misleading. Moreover, neither Dr. Williams nor any other HUH personnel even contacted the police (or directed anyone at HUH to contact the police) to attempt to obtain such approval.

35. Dr. Williams and/or other HUH medical personnel told Ms. Reid and Ms. Diké to take Ms. McGaughey home and bring her back in the afternoon. Dr. Williams and/or other HUH medical personnel instructed the women not to let Ms. McGaughey shower, but did not provide any further instructions. In violation of widely accepted standards for preservation of evidence in potential sexual assault cases, Dr. Williams and/or other HUH medical personnel failed to tell

the friends not to let Ms. McGaughey eat or go to the bathroom before returning for a sexual assault medical forensic examination the following day.

36. The failure of Dr. Williams and other medical personnel at HUH to examine Ms. McGaughey for sexual assault, including by administering a sexual assault medical forensic examination, violated widely-accepted professional standards for treating alleged sexual assault victims and for collecting and preserving evidence in sexual assault cases. The symptoms caused by a date rape drug should have been well-known to Dr. Williams and the other medical personnel at HUH. The failure of Dr. Williams and the other medical personnel at HUH to test Ms. McGaughey for the presence of a potentially fatal date rape drug in her body also violated widely-accepted professional standards.

37. Moreover, instructing Ms. McGaughey's friends to take her home and come back the next day for testing was negligent because it resulted in a delay between the time of the alleged crime, including the possible ingestion of a date rape drug, and the time when Ms. McGaughey could be tested. Many date rape drugs metabolize quickly in the bloodstream, and it is thus paramount that a hospital test for their presence at the earliest possible opportunity. In addition, instructing a sexual assault victim to leave the hospital without a proper examination and collection of forensic evidence increases the likelihood that any evidence of sexual assault will be lost or altered by the passage of time, including through actions of the victim such as going to the bathroom, brushing of teeth and hair, eating, or other ordinary actions. The negligence in this case was compounded because HUH personnel sent Ms. McGaughey home without apprising her or her friends of precautions that should have been taken to preserve evidence as much as possible – such as refraining from eating or going to the bathroom.

38.   The failures at HUH are all the more remarkable because the HUH emergency room has been designated by the District of Columbia's Sexual Assault Response Team ("SART") as its center of operations.  According to the DC Rape Crisis Center,  SART is a multi-disciplinary collaboration between the MPD, the United States Attorney's Office, HUH and the DC Rape Crisis Center.  These agencies supposedly "work together to ensure a coordinated community response of a victim's process through the system."  http://www.dcrcc.org/sane-sart.htm (visited February 14, 2008).  Likewise, according to the MPD, "the [MPD] Sex Assault Unit is an active member of the **Sexual Assault Response Team (SART)**.  SART is partnership of public and private agencies that work to coordinate a high-quality, multidisciplinary, victim/survivor-centered response to sexual assault cases. This partnership allows for better communications among all those involved in responding to the victim.  It improves the process for reporting and prosecuting cases." http://www.mpdc.dc.gov/mpdc/cwp/view,a,1232,q,556790,mpdcNav_GID, 1523,mpdcNav,|31417|.asp (bold in original).

39.   Under the SART program, HUH is required to make available to alleged victims of sexual assault a Sexual Assault Nurse Examiner ("SANE nurse"), who is on-call 24 hours a day. In addition, DC Rape Crisis Center advocates are to be made available for all sexual assault victims who receive a sexual assault medical forensic exam.  According to SART policy, both the SANE nurse and the DC Rape Crisis Center must be contacted whenever a sexual assault victim comes to the emergency room, unless the victim declines to allow such contact. However, neither Dr. Williams nor any other HUH personnel contacted the SANE nurse or the DC Rape Crisis Center during Ms. McGaughey's initial visit to the hospital.  Indeed, Dr. Williams told Ms. McGaughey's friends that it would be pointless to call the SANE nurse because of Ms. McGaughey's disoriented and semiconscious state.  In addition, no HUH

personnel called the police to report that Ms. McGaughey was a possible sexual assault victim and recipient of a date rape drug.

40.  When it became clear to Ms. McGaughey's friends that HUH was not going to perform a rape kit or otherwise treat Ms. McGaughey as a sexual assault victim, they pleaded with Dr. Williams and/or other HUH medical personnel simply to examine the vomiting and disoriented Ms. McGaughey and stabilize her condition.  HUH personnel, including Dr. Williams, told the women that there was nothing that could be done at HUH and that Ms. McGaughey should go home to sleep.

41.  Left by the HUH staff with no option but to depart the hospital, Ms. McGaughey had to be taken out of the emergency room in a wheelchair, which she entered with the assistance of Dr. Williams, her assistant, and/or other HUH medical personnel.  At that time, Ms. McGaughey was still drifting in and out of consciousness, and she vomited again as she exited the hospital in the wheelchair.  Once again, no HUH personnel collected or tested the vomit.  Ms. McGaughey was assisted by HUH personnel from the wheelchair to the Howard University escort service van, which took her back to her dorm room with her friends.  Releasing Ms. McGaughey in this unstable condition, without any appropriate testing or diagnosis, violated clear requirements of federal law, as well as applicable ethical and professional standards.

**The Second Visit To HUH**

42.  After awakening later in the day on December 9, 2006 with severe pain in her anus, rectum, and one of her legs, and with no memory of the sexual assault or the visit to HUH hours earlier, Ms. McGaughey returned to HUH with Ms. Reid in the early afternoon.  They again informed the attendant at the emergency room admissions desk, as well as every other doctor and nurse who saw Ms. McGaughey, that she had been sexually assaulted and likely given a date

rape drug.  HUH personnel again failed to do any tests to detect the presence of a date rape drug or other intoxicating substance in Ms. McGaughey's body.  HUH personnel also continued to refuse to conduct a sexual assault medical forensic exam to collect evidence of or otherwise properly examine her for sexual assault.

43.  One of the HUH nurses who saw Ms. McGaughey on the second HUH visit stated that because Ms. McGaughey had eaten something before returning to the hospital, a forensic test would not be able to detect any evidence of rape anyhow.  On information and belief, this statement was erroneous.  Moreover, Dr. Williams had failed to tell Ms. McGaughey or her friends that she should not eat or use the bathroom before returning to the hospital the next day.

44.  A cousin of Ms. McGaughey, who is also a physician, eventually reached HUH by phone during Ms. McGaughey's second HUH visit to demand that she be treated.  After this intervention, Ms. McGaughey was seen by another HUH doctor, Dr. Dawit Yohannes, who said he would treat Ms. McGaughey for unprotected sex by performing a urine test for pregnancy and by prescribing drugs to prevent certain sexually transmitted diseases and any potential pregnancy.  HUH did not tell Ms. McGaughey about the potential need for drugs to prevent HIV/AIDS, or prescribe any such drugs, despite the existence of an HIV prophylactic drug that can be given to sexual assault victims, which was ultimately prescribed for Ms. McGaughey by another hospital.  Dr. Yohannes also refused to administer a sexual assault medical forensic exam for evidence of sexual assault or to perform tests for the presence of a date-rape drug in her body.

**The MPD's Involvement**

45.  During Ms. McGaughey's second visit to HUH, the hospital personnel finally called the police to report Ms. McGaughey's case as a sexual assault.  MPD Officer M.A. Minor

arrived at HUH and questioned Ms. McGaughey. She told him that she thought she had been raped earlier that morning and described the pain she was experiencing. Her friend Ms. Reid also spoke with Office Minor and confirmed that she too believed that Ms. McGaughey had been raped, describing in detail the events of the night before, including the suspicious behavior of the young men at the party and the pain and disorientation experienced by Ms. McGaughey. Officer Minor did not appear to take notes of Ms. Reid's statement, other than writing down a few names. Officer Minor did not ask to speak with Ms. Diké, Ms. Lockett, or any other witness from the night before.

46. Officer Minor phoned Detective Spriggs, who then spoke with Ms. McGaughey by phone. Based solely on his brief phone conversation with Ms. McGaughey, Detective Spriggs told her that "we don't have a case for a rape kit." Detective Spriggs told Ms. McGaughey that she needed to provide the name of the alleged assailant in order to have a case. From that point forward, HUH declined to perform a sexual assault medical forensic examination of Ms. McGaughey on the purported grounds that HUH personnel needed police approval to administer a rape kit and that the police had not authorized one.

47. Detective Spriggs did not come to the hospital to speak with Ms. McGaughey, and he did not speak to any other witness in the case (including Ms. Reid, Ms. Diké or Ms. Lockett) either by phone or in person. Nor did Officer Minor or any other MPD officer interview Ms. Diké or Ms. Lockett. On information and belief, neither Detective Spriggs, Officer Minor, or any other MPD officer has spoken to Mr. Curtis, Mr. Lowery, Mr. Thrasher or any other individual who attended the party. On information and belief, MPD has conducted no further investigation of Ms. McGaughey's allegations of rape and drugging. Neither Officer Minor nor Detective Spriggs completed a police report concerning Ms. McGaughey's complaint.

48. Before Ms. McGaughey's second visit to HUH, she had contacted her sister, Raegen McGaughey (hereinafter "Raegen"), who lives in the area, to inform her about the assault and subsequent events. Raegen arrived at HUH after Officer Minor had departed and after Ms. McGaughey had spoken to Detective Spriggs on the phone. After hearing from Ms. McGaughey that the police would not "authorize" a sexual assault medical forensic examination or do any further investigation, Raegen called the police to demand a proper investigation, including authorization of the examination. Raegen called MPD directly, but was told by the MPD employee who answered the phone that she should hang up and call 911 to report the crime. Raegen thus called 911 to report the crime. When the officers had not arrived after an hour and a half had passed, Raegen called 911 again. It was only after this second 911 call that two MPD officers – Officers Leveque and Green – finally showed up at the hospital.

49. Officers Leveque and Green spoke briefly with Ms. McGaughey. They were very rude and dismissive of her complaint. Contrary to MPD's own standards for helping traumatized sexual assault victims, the officers questioned Ms. McGaughey as if she were lying or had done something wrong, and they even threatened her that she could be arrested for lying. Their demeanor and questioning made her feel very uncomfortable to relate what she was able to remember about what had happened to her. The officers conveyed their skepticism of her claim to have blacked out at the party, betraying an ignorance of the effects of date rape drugs. The officers' dismissive and condescending attitude toward Ms. McGaughey is memorialized in the police report that they filed, which states that they emphasized to Ms. McGaughey the "importance of truth" and that they needed something more "concrete" to authorize a rape kit or even to conduct a further investigation. The officers even failed to recognize Ms. McGaughey's

complaint as an alleged sexual assault, instead categorizing it as a "miscellaneous" incident and placing Ms. McGaughey's private information on a publicly available police report form.

50.    The officers were also rude and unprofessional to Raegen.  They refused to give their names to Raegen, and after Raegen had been attempting to communicate with them for a brief period of time, they stated that they were "done talking to [her]."  The MPD touts its Sex Assault Unit as being "specially trained in the investigation of sexual assault," and states that its "detectives recognize and understand the sensitive, personal and invasive nature of sexual assault crimes.  Sexual assault crimes are investigated with respect for the rights of the accused and the victim."  http://mpdc.dc.gov/mpdc/cwp/view,a,1232,q,556783,mpdcNav_GID,1523,mpdcNav, %7C31417%7C.asp.  The MPD officers' treatment of Ms. McGaughey and her sister Raegen plainly fell well below the very standards to which MPD claims to adhere.

51.    Before departing HUH, Officers Leveque and Green placed a call to MPD and informed Ms. McGaughey and Raegen that they had spoken to Detective Wheeler, whose supervisor, Detective Rice, had stated that the case had been "cleared" previously without a report and that MPD Detective Wheeler would be contacting Ms. McGaughey in the next few days to explain the situation further.  Ms. McGaughey never was contacted by Detective Wheeler.  Upon information and belief, no further investigation of Ms. McGaughey's case was conducted by Officers Leveque and Green, or any other MPD officer.

52.    Officers Leveque and Green thereafter submitted a false and misleading police report in which they grossly misclassified Ms. McGaughey's complaint of rape and drugging as a "miscellaneous" incident, rather than as a sexual assault.  Their report falsely claimed that Ms. McGaughey "changed her story" and that she said she was simply "drunk" as opposed to having been drugged.  Moreover, the clear and erroneous implication of their report is that if Ms.

McGaughey were "drunk" then she could not also have been sexually assaulted, and therefore, no further investigation was warranted. This implication is borne out by all of the ways in which the officers failed to follow up on Ms. McGaughey's allegations.

53. Although Officers Leveque and Green acknowledge in their written report that Ms. McGaughey told them that her rectum hurt in a way that made her feel she had been anally penetrated the night before when she was unconscious or semiconscious, they wrote that they needed something "more concrete" in order to investigate further or authorize a rape kit. Yet, the officers failed to speak with Ms. Diké, Ms. Reid or Ms. Lockett, all of whom were with Ms. McGaughey at the party, and all of whom suspected based on what they observed that she had been drugged and raped. The officers also failed to speak with any other individuals who had been at the party, and, in particular, with the men who had behaved so suspiciously. Neither these officers nor the detective or supervisors with whom they spoke by phone would "authorize" HUH to do a sexual assault medical forensic examination. And although HUH did not need police "authorization" to do an examination, it nonetheless declined to do so.

**A "Chain of Failures"**

54. Some of the failures of MPD and HUH in this case bear a striking resemblance to their failures in the case of David E. Rosenbaum, the *New York Times* reporter who was mugged in Washington, D.C. in January 2006 and subsequently died due to delayed medical care by HUH. In an investigation of that case, the D.C. Office of Inspector General found that "***[t]he perception of alcohol intoxication precipitated a chain of failures***," including by "MPD[] and Howard [University Hospital] Emergency Department employees in providing appropriate emergency medical and other services that were required by protocols, policies, and procedures. A number of employees involved expressed a lack of concern and a negative attitude toward

patients believed to be intoxicated, and that attitude resulted in significant and unnecessary delays in identifying and treating Mr. Rosenbaum's injuries. It also hindered recognition that a crime had been committed." Testimony of Charles J. Willoughby, Inspector General, Before the D.C. Council Committee on the Judiciary, Emergency Medical Services, June 19, 2006 at 3-4, *available at* http://oig.dc.gov/news/PDF/release06/Rosenbaum061906.pdf. Thus, by at least June 2006, the MPD and HUH were on clear notice that their practices involving apparently intoxicated individuals had led to a disastrous "chain of failures." Yet, neither HUH or MPD had taken appropriate measures to prevent its personnel from precipitating a strikingly similar "chain of failures" in this case.

55. Contributing further to the systemic breakdown in this case, HUH's SANE nurse, Mary Pinn, R.N., never visited the hospital and never directly spoke with Ms. McGaughey. Nurse Pinn spoke to Raegen by phone and repeatedly told Raegen that she was waiting on the MPD's decision whether to "authorize" a sexual assault medical forensic examination before deciding whether to come to the hospital in person. Nurse Pinn stated erroneously that HUH could not do a forensic examination absent police authorization. Nurse Pinn also made the peculiar comment to Raegen that Ms. McGaughey should not give a urine specimen to HUH personnel as they were requesting, but instead should hold on to the specimen, presumably in hopes that an examination might eventually be authorized. One of the other HUH nurses who saw Ms. McGaughey that day also falsely told Raegen that "it has to go through the police" and that "we cannot do it [a forensic exam] without the police." As in the first visit, HUH never contacted the DC Rape Crisis Center, which advocates for sexual assault victims if they are dissatisfied with treatment, and which is a partner with HUH and MPD in the SART program.

56.  The falsity of HUH's claims regarding their own powerlessness to conduct the forensic examination without police authorization is shown, among other things, by reference to applicable federal standards.  In 2004, the Department of Justice ("DOJ") Office on Violence Against Women published *A National Protocol for Sexual Assault Medical Forensic Examinations*, *available at* http://www.ncjrs.gov/pdffiles1/ovw/206554.pdf.  This publication strongly recommends against conditioning reimbursement by local jurisdictions of the costs of conducting a forensic examination on a victim's reporting of a sexual assault to the police.  Moreover, recipients of federal "STOP" funds, including the District of Columbia, are encouraged and will as of 2009 be required by law to reimburse the full cost of forensic exams regardless of whether the victim reports the crime to the police.  By discouraging and/or prohibiting local jurisdictions from requiring a victim to report a sexual assault to the police in order to receive *reimbursement* for a forensic examination, federal standards and regulations are based on the assumption that such an examination may always be performed by a hospital (regardless of reimbursement) without a police report or police authorization.

57.    Moreover, apparently since the beginning of 2008, HUH has administered sexual assault medical forensic examinations to all patients complaining of sexual assault, regardless of police "authorization" of such examinations.  That HUH now performs such examinations – despite that the new federal regulations do not go into effect until early 2009 – further demonstrates that HUH was fully able to perform sexual assault medical forensic examinations in December 2006 regardless of whether police "authorized" such examinations or not.

**The Visit to GWUH**

58.  After having been at HUH during the second December 9, 2006 visit for over six hours without receiving proper treatment or examination, Ms. McGaughey left the hospital with

Raegen at approximately 7:00 p.m.  They again spoke by phone with their physician cousin in Chicago who had been calling colleagues around the country that afternoon to find options for Ms. McGaughey's treatment and examination – the type of advice and assistance that the D.C. SART program and its agencies had failed to provide.  Their cousin ultimately suggested that Ms. McGaughey attempt to receive treatment from another hospital in the District.

59.  Desperate for a proper examination and treatment, Ms. McGaughey and Raegen drove to GWUH.  They arrived there at approximately 8:00 p.m., and they told the admissions desk that Ms. McGaughey had been raped and possibly given a date rape drug.  A GWUH triage nurse did not see Ms. McGaughey until approximately 9:30 p.m.

60.  Ms. McGaughey and Raegen told the triage nurse that they had been to HUH, but that HUH had refused to perform a forensic exam or test for a date rape drug.  At approximately 10:00 p.m., the charge nurse called Ms. McGaughey back into the internal area of the emergency room, but said that Raegen could not come with her.  Ms. McGaughey went with the nurse but explained that she wanted her sister to come back with her.  Although it was Ms. McGaughey's right to have her sister with her, the GWUH nurse continued to dispute this point for some time. After this discussion, the charge nurse sent Ms. McGaughey back to the waiting room to wait further.

61.  The charge nurse did not call Ms. McGaughey back into the internal portion of the emergency room until approximately 12:30 a.m.  This time the nurse did not dispute Ms. McGaughey's right to have her sister with her, and Raegen accompanied her.  The charge nurse asked them "why are you here?," claiming not to understand why Ms. McGaughey and Raegen would seek treatment at GWUH.  Yet the charge nurse or other GWUH personnel apparently had already spoken with HUH about Ms. McGaughey's case, because the charge nurse told Ms.

McGaughey and Raegen that GWUH could not administer a rape kit because the police had ruled it out, and because HUH had refused to do it.

62. While at GWUH, Ms. McGaughey spoke to MPD Detective Fields by phone. Detective Fields told Ms. McGaughey that Detective Fields could not do anything to help Ms. McGaughey because Detective Spriggs (Detective Fields' supervisor) had already ruled out authorizing a sexual assault medical forensic examination. Detective Fields also told Ms. McGaughey that, in any event, Detective Fields could not authorize a rape kit over the phone, but would have to come see Ms. McGaughey in person to make such a determination – apparently unaware that Detective Spriggs' earlier determination not to authorize an exam had been based entirely on information he obtained from Ms. McGaughey over the telephone.

63. Ms. McGaughey and Raegen continued to plead with GWUH personnel that Ms. McGaughey be seen by a doctor. At approximately 1:00 a.m. on December 10, 2007, five hours after they had arrived at GWUH, Ms. McGaughey was finally seen by a doctor, Dr. Christopher Lang. They informed him, as they had all other medical personnel seeing Ms. McGaughey at GWUH, that Ms. McGaughey had been raped and possibly given a date rape drug. Dr. Lang, like other medical personnel at GWUH, told them that he could not administer a rape kit to Plaintiff. Neither Dr. Lang nor any other medical personnel at GWUH administered a sexual assault medical forensic examination for evidence of sexual assault or otherwise tested Ms. McGaughey's body for the presence of a date rape drug or other intoxicating substance. Unlike at HUH, Dr. Lang did inform Ms. McGaughey about the existence of an HIV prophylactic drug, and he prescribed it for her.

64. Dr. Lang did not physically examine Ms. McGaughey. Rather, he delegated Ms. McGaughey's physical examination to a first-year medical resident, Dr. Khozeimeh, who was

doing a one-month rotation in the GWUH emergency department.  Dr. Lang was not present during this physical examination and did not provide appropriate guidance to Dr. Khozeimeh with respect to Ms. McGaughey's complaint of sexual assault.  Dr. Khozeimeh's examination did not resolve several of Ms. McGaughey's specific complaints of leg and rectal pain that Ms. McGaughey had made to GWUH medical personnel.

65.  Ms. McGaughey and Raegen finally departed GWUH at approximately 3:45 a.m. on Sunday, December 10, 2007, almost eight hours after they had arrived at GWUH, and approximately twenty-four hours after the sexual assault occurred.

66.  GWUH, like HUH, used the MPD as an excuse for not conducting a forensic exam for evidence of sexual assault.  On information and belief, the statements of GWUH medical personnel that police "authorization" was required for Ms. McGaughey to receive a sexual assault medical forensic examination were false and/or misleading.

67.  Notably, a forensic exam would not necessarily have been futile by the time Ms. McGaughey arrived at GWUH or even by the time that she finally was seen by a GWUH doctor. As stated by a DC Rape Crisis Center publication that is available on the MPD's website, a sexual assault exam can be performed up to ninety-six hours after the assault.  http://www.mpdc. dc.gov/mpdc/frames.asp?doc=/mpdc/lib/mpdc/about/units/rapesurvival.pdf, at 3.  Defendants' behavior in this case cannot be reconciled with the MPD's guidance, which encourages victims of sexual assault to have a forensic exam performed even if they do not immediately go to the hospital (as Ms. McGaughey had done, in any event).

## CLAIMS

## COUNT I

**(Violation of Emergency Medical Treatment and Active Labor Act ("EMTALA"),
42 U.S.C. § 1395dd *et seq.* – Defendants Howard University Hospital; Howard University)**

68.  Plaintiff incorporates by reference paragraphs 1 through 67 above, and further alleges that Ms. McGaughey came to the HUH emergency department on December 9, 2006, and a request was made either by her and/or on her behalf for examination or treatment for a medical condition.  Ms. McGaughey presented symptoms, *e.g.*, repeated vomiting, blacking out and incoherence, strongly indicative of an emergency medical condition within the meaning of 42 U.S.C. § 1395dd(e)(1).

69.  HUH failed to provide Ms. McGaughey with an appropriate medical screening examination within the capability of the hospital's emergency department to determine the existence, nature and scope of an emergency medical condition within the meaning of 42 U.S.C. § 1395dd(e)(1).

70.  In addition, HUH, within the staff and facilities available at the hospital, failed to provide Ms. McGaughey with such further medical examination and such treatment as would have been required to stabilize the medical condition.

71.  HUH did not offer Ms. McGaughey further treatment and examination.  Nor did Ms. McGaughey or any persons acting on her behalf decline consent to any such examination or treatment.

72.  The failures of HUH and its personnel toward Ms. McGaughey were fraudulent, outrageous, and in reckless and willful disregard for Ms. McGaughey's rights and safety.

73.  Ms. McGaughey suffered personal harm as a direct result of HUH's violations of 42 U.S.C. §1395dd(a) & (b), including pain, suffering, emotional distress, and the loss of potential

evidence of a crime having committed against her, including the existence of a date rape drug in her system and forensic evidence of sexual assault.

## COUNT II

**(Medical Malpractice/Abandonment – Defendants Howard University Hospital; Howard University; Wendie Williams, M.D.)**

74.  Plaintiff incorporates by reference paragraphs 1 through 73 above, and further alleges that Ms. McGaughey came to the HUH emergency department on December 9, 2006 to be examined and treated for emergency medical conditions, including repeated vomiting, blacking out, incoherence, intoxication (likely induced by a date rape drug), and sexual assault.

75.  Ms. McGaughey was triaged by an HUH nurse upon Ms. McGaughey's arrival at the HUH emergency department.  Ms. McGaughey also was seen by Dr. Williams, an attending physician at the HUH emergency department.  Dr. Williams and other medical professionals at HUH entered into a professional relationship with Plaintiff.

76.  Despite Ms. McGaughey's unstable condition and the pleas of her friends that HUH treat and examine Ms. McGaughey, Dr. Williams and/or other HUH medical personnel sent Ms. McGaughey home without treatment in the early morning hours of December 9, 2006.

77.  Dr. Williams and/or other HUH medical personnel, terminated their professional relationship with Ms. McGaughey by sending her home and refusing to treat her.  They did so at an unreasonable time, without the consent of Ms. McGaughey or her friends, and despite Ms. McGaughey's obvious need for further care.

78.  By sending Ms. McGaughey home in the early morning hours of December 9, 2006, Dr. Williams and/or other HUH medical personnel gave Ms. McGaughey and her friends no opportunity to procure additional medical attention from a qualified source.

79.  The failures of HUH and its personnel toward Ms. McGaughey were fraudulent, outrageous, and in reckless and willful disregard for Ms. McGaughey's rights and safety.

80.  Ms. McGaughey suffered personal harm as a direct result of her abandonment by HUH medical personnel, including pain, suffering, emotional distress, and the loss of potential evidence of a crime having committed against her, including the existence of a date rape drug in her system and forensic evidence of sexual assault.

## COUNT III

**(Negligence – Defendants Howard University Hospital; Howard University; Wendie Williams, M.D.; Dawit Yohannes, M.D.; District Hospital Partners d/b/a George Washington University Hospital; George Washington University; Christopher Lang, M.D.)**

81.  Plaintiff incorporates by reference paragraphs 1 through 80 above.

82.  Plaintiff further alleges that Defendants owed her a duty to conform to the standard of care of a reasonable hospital emergency room, and, more specifically in the case of HUH, a sexual assault treatment center, and of reasonable medical personnel serving in such facilities.

83.  Defendants breached their duty of care by, *inter alia*, failing to administer a sexual assault medical forensic examination or otherwise examine Plaintiff for evidence of sexual assault, and/or failing to test for the presence of a date rape drug (including but not limited to alcohol) in Plaintiff's system.

84.  Plaintiff further alleges that the negligent care and/or treatment by the Defendants and/or their agents, servants and/or employees, included but is not limited to, failing to test for the presence of a date rape drug in her body and failing to conduct a sexual assault medical forensic examination or an otherwise adequate examination under the circumstances.

85.  In addition, the Howard University Defendants failed to stabilize Ms. McGaughey before releasing her from her first visit to HUH; failed to call the SANE nurse, the DC Rape

Crisis Center, and/or the MPD during her first visit to HUH; failed to call the DC Rape Crisis

Center upon Ms. McGaughey's second visit to HUH; and failed to require the SANE nurse to

meet with Ms. McGaughey at the hospital in person during either of her hospital visits.

86.  Defendants' breaches proximately caused Plaintiff injury in that she was denied a

reasonable opportunity to determine who sexually assaulted her and the nature of that assault, as

well as to seek prosecution of such individual or individuals because of the loss of evidence

caused by Defendants' multiple failures.  Defendants' breaches also caused Plaintiff severe

physical pain, suffering and emotional distress, as well as financial expenses.

87.  Defendants' actions toward Ms. McGaughey were fraudulent, outrageous, and in

reckless and willful disregard for Ms. McGaughey's rights and safety.

## COUNT IV

**(Medical Malpractice – Defendants Howard University Hospital; Howard University;
Wendie Williams, M.D.; Dawit Yohannes, M.D.; District Hospital Partners d/b/a George
Washington University Hospital; George Washington University; Christopher Lang, M.D.)**

88.  Plaintiff incorporates by reference paragraphs 1 through 87 above, and further

alleges that Defendants had a duty to provide Ms. McGaughey with medical care and treatment

consistent with the degree of care reasonably expected of other professionals with similar skills

acting under the same or similar circumstances.

89.  Plaintiff further alleges that Defendants violated the applicable standard of care as

practiced by reasonably competent practitioners under the same or similar circumstances, and as

a result, Ms. McGaughey suffered great physical pain and continues to suffer great emotional

pain.

90.  Plaintiff further alleges that the negligent care and/or treatment by the Defendants

and/or their agents, servants and/or employees, included but is not limited to, failing to test for

presence of a date rape drug in her body; failing to conduct a sexual assault medical forensic examination, or an otherwise adequate examination under the circumstances; and, with respect to the Howard University Defendants, failing to stabilize or treat her before releasing her from the hospital.

91.  The negligent acts and/or omissions of Defendants, their agents, servants and/or employees directly and proximately caused a permanent loss of opportunity to gather evidence concerning the identity of Ms. McGaughey's attacker and the nature and scope of that attack. Defendants' breaches also resulted in a permanent loss of opportunity to determine whether Ms. McGaughey had been drugged to facilitate her sexual assault.

92.  In addition, as a direct and proximate result of the negligent acts and/or omissions of Defendants, their agents, servants and/or employees, Ms. McGaughey has incurred severe pain, suffering, and emotional distress, as well as substantial financial expenses.

93.  Defendants' actions toward Ms. McGaughey were fraudulent, outrageous, and in reckless and willful disregard for Ms. McGaughey's rights and safety.

## <u>COUNT V</u>

**(Negligent Hiring/Training/Supervision – Defendants Howard University Hospital; Howard University; District Hospital Partners d/b/a George Washington University Hospital; George Washington University)**

94.  Plaintiff incorporates paragraphs 1 through 93 above, and further states that Defendants Howard University Hospital, Howard University, District Hospital Partners d/b/a George Washington University Hospital, and George Washington University ("Hospital Defendants") were the employers of the medical personnel who purported to provide services to Plaintiff at all relevant times herein.

95. Plaintiff further alleges that the Hospital Defendants had a duty to use reasonable care in the hiring, training, and supervision of their employees.

96. Plaintiff further alleges that the Hospital Defendants breached the duties owed as set forth in the preceding paragraph.

97. Plaintiff further alleges that the Hospital Defendants breached the duties owed by, *inter alia*: (1) failing to hire, train and supervise hospital personnel capable of the proper assessment and treatment of cases of alleged sexual assault; (2) failing to hire, train and supervise hospital personnel concerning the necessity of gathering and preserving time-sensitive evidence, including through the administration of sexual assault medical forensic exams; (3) failing to hire, train and supervise hospital personnel to understand their independent obligation to provide complete and proper treatment to sexual assault victims regardless whether the MPD or other authorities "authorize" a sexual assault medical forensic examination, including a "rape kit," and in fact, providing affirmatively false and misleading training, including that alleged sexual assault victims may not receive sexual assault medical forensic examinations absent police "authorization" or may only receive such care at HUH; (4) failing to hire, train and supervise hospital personnel to contact the relevant resources, including the SANE nurse and the DC Rape Crisis Center, upon receipt of a potential victim of sexual assault; and (5) failing to hire, train and supervise hospital personnel to treat sexual assault victims in a expedient, sensitive and respectful manner.

98. These and other failures by the Hospital Defendants properly to hire, train and supervise amounted to gross negligence, deliberate indifference or intentional misconduct, and encouraged and/or permitted the employees to engage in the conduct which proximately and directly caused harm to Ms. McGaughey. Hospital Defendants' failures were fraudulent,

outrageous, and in reckless and willful disregard for the  rights and safety of Ms. McGaughey

and other sexual assault victims.

99.  The Hospital Defendants were, or should have been, on notice of reports by the

District of Columbia that hospitals in the District had been part of a "chain of failures" in cases

of "perceived alcohol intoxication" of the victim.  The Hospital Defendants failed to take

adequate measures or corrective action to prevent such failures from occurring again.

## COUNT VI

**(D.C. Consumer Protection Procedures Act ("D.C. CPPA"), D.C. Code § 28-3901 *et seq.* –
Defendants Howard University Hospital; Howard University; Wendie Williams, M.D.;
Dawit Yohannes, M.D.; District Hospital Partners d/b/a George Washington University
Hospital; George Washington University; Christopher Lang, M.D.)**

100.  Plaintiff incorporates paragraphs 1 through 99 above, and further states that the

Defendants named in this Count ("Medical Defendants"), by performing medical services, are

"persons" engaging in a "trade practice" under the D.C. CPPA, D.C. Code §§ 28-3901(a)(1), (6).

Plaintiff and other sexual assault patients like her that present for medical care and treatment at

the Hospital Defendants' facilities, are "persons" and "consumers" under the D.C. CPPA, D.C.

Code §§ 28-3901(a)(1)-(2).

101.  In the course of interacting with Plaintiff on December 9-10, 2006, the Medical

Defendants committed unlawful trade practices under the D.C. CPPA by making false and

misleading representations and omissions.  D.C. Code §§ 28-3904(e), (f).  The Medical

Defendants misrepresented to Ms. McGaughey, her friends, and her relatives that the Medical

Defendants could not perform a sexual assault medical forensic examination, including a "rape

kit," without police approval.  In addition, the Medical Defendants misled Plaintiff and her

friends and family that only the SANE nurse could perform a sexual assault medical forensic

examination, including a "rape kit," when in actuality other medical personnel – including

emergency room physicians – are authorized and should be qualified to administer such examinations.  Furthermore, Defendants District Hospital Partners d/b/a George Washington University Hospital, The George Washington University, and Christopher Lang, M.D. have made false and/or misleading statements that HUH is the designated hospital in the District of Columbia for sexual assault victims, that sexual assault victims should seek treatment at HUH and should be transferred there if they present for treatment at GWUH, and that sexual assault medical forensic examinations are conducted only at HUH, as part of the SANE program.

102.  Upon information and belief, the Medical Defendants continued to engage in the above-described misrepresentations and omissions with respect to other sexual assault victims after December 9-10, 2006.  Some or all of the Medical Defendants continue to engage in such unlawful trade practices to this day.

103.  Although not necessary to establish a D.C. CPPA violation, Plaintiff alleges that the Medical Defendants engaged in the above-described misrepresentations and omissions, among other reasons, for pecuniary and entrepreneurial purposes.  For example, the Medical Defendants' misrepresentations and omissions about the availability of sexual assault medical forensic examinations (1) allowed them to avoid costs that they may have incurred if they performed sexual assault medical forensic examinations without police "authorization" or by personnel other than the SANE nurse, as such examinations may not have been reimbursed by the government under the SANE program in the District of Columbia in those circumstances, and (2) allowed them to avoid the costs and burdens resulting from medical personnel (in particular, attending physicians) becoming witnesses to a crime and thus being required to participate in the authorities' investigative and prosecutorial efforts.

104.  The Medical Defendants' false and misleading statements and omissions proximately caused Plaintiff injury in that she was denied a reasonable opportunity to determine who sexually assaulted her and the nature of that assault, as well as to seek prosecution of such individual or individuals because of the loss of evidence caused by Defendants' false and misleading statements and omissions.  The Medical Defendants' violations of the D.C. CPPA also caused Plaintiff severe physical pain, suffering and emotional distress, as well as financial expenses.

105.  The Medical Defendants' misrepresentations and omissions were fraudulent, outrageous, and in reckless and willful disregard for the  rights and safety of Ms. McGaughey and other sexual assault victims.

106.  As a result of the Medical Defendants' unlawful trade practices, Plaintiff seeks treble damages, reasonable attorney's fees, punitive damages, an appropriate injunction, and all other relief that is available and proper under the D.C. CPPA.  D.C. Code § 28-3905(k)(1).

## COUNT VII

**(Negligent Hiring/Training/Supervision – Defendant District of Columbia)**

107.  Plaintiff incorporates paragraphs 1 through 106 above, and further states that Defendant District of Columbia was the employer of the MPD officers, detectives and other personnel involved in this matter at all relevant times herein.

108.  Plaintiff further alleges that Defendant District of Columbia had a duty to use reasonable care in the hiring, training, and supervision of its employees.

109.  Plaintiff further alleges that Defendant District of Columbia breached the duties owed as set forth in the preceding paragraph.

110.  Plaintiff further alleges that the Defendant District of Columbia breached the duties owed by, *inter alia*:  (1) failing to hire, train and supervise MPD officers properly qualified to document, assess, and investigate criminal activity; (2) failing to hire, train and supervise MPD officers to investigate alleged sexual assault cases in a proper manner, including with respect to the gathering and preservation of time-sensitive evidence, and the facilitation of (as opposed to interference with) the administration of sexual assault medical forensic exams; and (3) failing to hire, train and supervise MPD officers to treat sexual assault victims with sensitivity and respect.

111.  These and other failures to train and supervise by the District of Columbia amounted to gross negligence, deliberate indifference or intentional misconduct, and encouraged and/or permitted the employees to engage in the conduct which proximately and directly caused harm to Ms. McGaughey.

112.  The District of Columbia was, or should have been, on notice of reports of its own officials that the MPD had been part of a "chain of failures" in cases of "perceived alcohol intoxication" of the victim.  The District of Columbia failed to take adequate measures or corrective action to prevent such failures from occurring again.

## COUNT VIII

### (Negligence – Defendant District of Columbia)

113.  Plaintiff incorporates paragraphs 1 through 112 above and further alleges that as police officials of the District of Columbia (including individuals specially designated by MPD to respond as part of the Sexual Assault Response Team) Officers Minor, Leveque and Green and Detectives Spriggs, Rice, Wheeler and Fields, and any other MPD personnel who took part in the decision not to authorize and/or who interfered with the hospitals' administration of a sexual assault medical forensic examination, including a "rape kit," owed a duty to Ms.

McGaughey to insure that evidence concerning her sexual assault was collected and was not lost or destroyed.

114.  Moreover, the District of Columbia, as a jurisdiction that receives federal funds that require it to certify that it pays for sexual assault medical forensic exams for any victim who seeks one – regardless whether the victim reports the crime to the police – owed a duty not to interfere with Ms. McGaughey's attempt to have such an examination conducted.

115.  Defendant District of Columbia, through the actions of the police officials acting within the scope of their employment, breached these duties, *inter alia*, by informing the hospitals and Ms. McGaughey that there was insufficient evidence of sexual assault to authorize a forensic examination.  Upon information and belief, Defendant District of Columbia, through the actions of its officials and employees, also falsely led hospital personnel, Ms. McGaughey, and her caretakers to believe that police approval was necessary in order for the hospitals to conduct a forensic exam.

116.  The breaches of the Defendant District of Columbia, through the actions of its officers, proximately caused substantial injury to Plaintiff.  Both HUH and GWUH personnel repeatedly asserted that the MPD's failure to authorize a rape kit was a basis for HUH and GWUH personnel not administering one.  The failure to administer a rape kit caused Ms. McGaughey physical and emotional harm, as well as pain and suffering; impeded her proper medical treatment; and resulted in the loss of physical evidence concerning the identity of Ms. McGaughey's attacker, and the nature and scope of that attack, and, consequently, the probable loss of the opportunity to see her assailant brought to justice.

## COUNT IX

### (Negligent Failure to Investigate – Defendant District of Columbia)

117.  Plaintiff incorporates paragraphs 1 through 116 and further alleges that police officials of Defendant District of Columbia, acting within the scope of their employment, including Officers Minor, Leveque and Green and Detectives Spriggs, Rice, Wheeler and Fields, failed to take reasonable steps to investigate Ms. McGaughey's sexual assault.

118.  Defendant District of Columbia, through the actions of its officers acting within the scope of their employment, misclassified Ms. McGaughey's complaint as a "miscellaneous" incident, rather than a sexual assault.  On information and belief, no police officials have interviewed any of the individuals present at the party other than Ms. McGaughey and Ms. Reid, despite that both Ms. McGaughey and Ms. Reid have identified several such individuals and have specifically identified the men who behaved suspiciously and who may have been responsible for Ms. McGaughey's sexual assault and/or who may know the identity of her assailant.  Ms. McGaughey was promised a follow-up phone call from Detective Wheeler, but she never received that call.  Since the time of the events described herein, Ms. McGaughey and individuals acting on her behalf have made repeated attempts to get additional information from the MPD and to have Ms. McGaughey's sexual assault properly investigated, all to no avail.

119.  The MPD, by participating in the SART program, by attempting to insert itself into the hospitals' treatment and collection of evidence from sexual assault victims, and by interviewing Ms. McGaughey in response to her sexual assault complaint, in connection with the SART program, had and has a special duty reasonably to investigate Ms. McGaughey's complaint.  However, Defendant District of Columbia, through the actions and omissions of its

officers in the scope of their employment, has failed to undertake any such investigation, reasonable or otherwise.

120.  This failure to investigate has proximately caused substantial injury to Plaintiff.  By failing to collect evidence or otherwise investigate Ms. McGaughey's sexual assault, the District of Columbia and its officers are responsible for the loss of evidence that could identify Ms. McGaughey's attacker and establish the scope and nature of the crime.  They are also responsible for making it nearly impossible for Ms. McGaughey's attacker to be identified and prosecuted. These failings have caused Ms. McGaughey great harm, including the probable loss of the opportunity to see her assailant brought to justice.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, on all counts, and grant the following relief:

(a)  Compensatory and punitive damages in an amount to be determined by the jury;

(b)  Treble damages, pursuant to the D.C. CPPA;

(c)  Appropriate injunctive relief, including an order that the District of Columbia properly investigate Plaintiff's sexual assault, and an order that the Hospital Defendants and the District of Columbia institute corrective action for the future handling of cases of sexual assault;

(d) Prejudgment and post-judgment interest on all damages;

(e) Costs and reasonable attorneys' fees; and

(f) Such other relief as the Court shall deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff requests a jury trial on all claims and issues so triable.

Respectfully submitted,

/s/ Bruce V. Spiva
Bruce V. Spiva (D.C. Bar No. 443754)
 bspiva@spivahartnett.com
Kathleen R. Hartnett (D.C. Bar No. 483250)
 khartnett@spivahartnett.com
SPIVA & HARTNETT LLP
1776 Massachusetts Avenue, N.W.
Suite 600
Washington, D.C. 20036
Tel:  (202) 785-0601
Fax:  (202) 785-0697

*Attorneys for Plaintiff*

Dated:  August 18, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing First Amended Complaint

was served on August 18, 2008, by e-mail and U.S. Mail, upon:

Thomas V. Monahan, Jr.
  tvm@gdldlaw.com
Adam Kelley
  axk@gdldlaw. com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, Suite 2000
Baltimore, MD 21202

Dwayne Jefferson
  dwayne.jefferson@dc.gov
OFFICE OF THE ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001

Larry D. McAfee
  lmcafee@gleason-law.com
GLEASON, FLYNN, EMIG & FOGLEMAN,
  CHARTERED
11 North Washington Street, Suite 400
Rockville, MD 20850

Robert W. Goodson
  robert.goodson@wilsonelser.com
Deidre L. Robokos
  deidre.robokos@wilsonelser.com
Christine M. Costantino
  chrissy.costantino@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN &
  DICKER, LLP
1341 G Street, NW, Suite 500
Washington, D.C. 20005-3105

Karen R. Turner
  karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814

/s/ Bruce V. Spiva