UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALEXANDRIA MCGAUGHEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:07-CV-01498 (RJL) |
| | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**THE DISTRICT OF COLUMBIA'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Defendant District of Columbia ("District"), by and through undersigned counsel,

hereby moves this Court, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiff's First

Amended Complaint as she has failed to state a claim for which she is entitled to relief

from the District. The public duty doctrine bars Plaintiff's claims against the District.

Plaintiff was never in the District's custody and had no special relationship with the

District, such that the District owed her no duty. Alternatively, the District seeks

summary judgment pursuant to Fed. R. Civ. P. 56.

In support of this motion, Defendant attaches hereto a Memorandum of Points and

Authorities, a Statement of Undisputed Facts, as well as a proposed Order. Because this

is a dispositive motion, the District is not required to seek Plaintiff's consent before

filing.

Respectfully Submitted,

PETER J. NICKLES
Acting Attorney General, District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV


___/s/ Dwayne C. Jefferson_____
DWAYNE C. JEFFERSON [980813]
Assistant Attorney General
One Judiciary Square
441 4th St., N.W., 6th Floor South
Washington, D.C. 20001
(202) 724-6649; (202) 727-6295 p | (202) 741-0554 f
dwayne.jefferson@dc.gov

**COUNSEL FOR THE
DISTRICT OF COLUMBIA**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALEXANDRIA MCGAUGHEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:07-CV-01498 (RJL) |
| | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS SUPPORTING
MOTION FOR SUMMARY JUDGMENT**

The District of Columbia ("District"), by and through undersigned counsel, herein submits and sets forth the following material facts to which there is no material dispute:

1.     Alexandria McGaughey was 19 years of age at all times relevant to this litigation. *See* Plaintiff Deposition at pp. 16:6-7 and 28:13-21 (attached as Exhibit "C").

2.     Plaintiff has no personal recollection of the alleged rape that occurred at a private house party on December 9, 2006. *See* Plaintiff Deposition at pp. 38:12-18, 45:13-18 and 56:5-8 (attached as Exhibit "C"); *see also* Plaintiff Responses to Howard University's Interrogatories at No. 1 (attached as Exhibit "A").

3.     Plaintiff visited Howard University Hospital twice on December 9, 2006.  On her first visit, Plaintiff was not transported to the hospital by the D.C. Metropolitan Police Department ("MPD") or any other District employee; instead, she was transported by Howard University's campus escort service. *See* Plaintiff Deposition at p. 54:1-4 (attached as Exhibit "C").

4.     After her first visit, Plaintiff was not transported or escorted from the hospital by

MPD, but took a shuttle back to the campus. *See* Plaintiff Deposition at p. 62:16-17 (attached as Exhibit "C").

5.    Plaintiff did not contact MPD or the D.C. Rape Crisis Center regarding her alleged sexual assault on December 9, 2006. In fact, Plaintiff's friends and/or sister did not contact MPD about the alleged assault until after Plaintiff arrived for her second visit to Howard University Hospital. *See* Plaintiff Deposition at pp. 143:14 – 144:7 (attached as Exhibit "C"); *see also* Plaintiff Responses to District Hospital Partners' Admission Requests at Nos. 16 and 31 (attached as Exhibit "B"); Sade Diké Deposition at p. 141 (attached as Exhibit "D"); Kerston Reed Deposition at p. 139 (attached as Exhibit "E").

6.    MPD arrived at Howard University Hospital during Plaintiff's second visit, and spoke with her about the sexual assault allegations. *See* Plaintiff Deposition at pp. 123:13 – 124:8 (attached as Exhibit "C").

7.    Plaintiff was not present when MPD spoke with Howard University Hospital personnel. *See* Plaintiff Deposition at p. 144:13-15 (attached as Exhibit "C").

8.    Plaintiff did not know the last name of the person who allegedly raped her. In fact, all she had was made-up name. *See* Plaintiff Deposition at p. 330:7-22 (attached as Exhibit "C").

9.    When MPD was contacted about Plaintiff's alleged sexual assault, she had already visited Howard University Hospital twice, and had already been denied a rape kit. *See* Plaintiff Deposition at p. 115:2-7 (attached as Exhibit "C").

Respectfully Submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


_____ /s/ Patricia A. Jones _____
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV


__ /s/  Dwayne C. Jefferson _____
DWAYNE C. JEFFERSON  [980813]
Assistant Attorney General
One Judiciary Square
441 4th St., N.W., 6th Floor South
Washington, D.C. 20001
(202) 724-6649; (202) 727-6295 p | (202) 741-0554 f
dwayne.jefferson@dc.gov

**COUNSEL FOR THE
DISTRICT OF COLUMBIA**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA MCGAUGHEY, :
          :
    Plaintiff,   :
          :
v.           :  Case No. 1:07-CV-01498 (RJL)
          :
DISTRICT OF COLUMBIA, *et al.*, :
          :
    Defendants.  :
_____:

### MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING THE DISTRICT OF COLUMBIA'S MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

In support of its Motion to Dismiss and alternative Motion for Summary Judgment, the District submits the following memorandum of points and authorities.

### STATEMENT OF FACTS

Plaintiff Alexandria McGaughey was 19 years of age at all times relevant to this litigation. *See* First Amended Complaint at ¶ 1; *see also* Plaintiff Deposition at pp. 16:6-7 and 28:13-21 (attached as Exhibit "C"). Plaintiff seeks to proceed against the District on several negligence theories — negligent hiring/training/supervision; negligence; and negligent failure to investigate. *See* First Amended Complaint at ¶¶ 107 through 120.

Plaintiff alleges that she went to a private house party on December 8, 2006. While still at the party on December 9, 2006, she believes she was given a date rape drug and likely sexually assaulted. *See* First Amended Complaint at ¶¶ 1, 16 and 18. She was not on government owned property or sexually assaulted by a known District government employee. *See* Amended Complaint, generally. Plaintiff was never in the actual physical

custody or control of members of the D.C. Metropolitan Police Department ("MPD") or any other District government employee. *See* Amended Complaint, generally.

Plaintiff visited Howard University Hospital twice on December 9, 2006. On her first visit, Plaintiff was not transported to the hospital by the D.C. Metropolitan Police Department ("MPD") or any other District employee; instead, she was transported by Howard University's campus escort service. *See* First Amended Complaint at ¶ 26; *see also* Plaintiff Deposition at p. 54:1-4 (attached as Exhibit "C").

During Plaintiff's first visit to Howard University Hospital, no one called MPD or the D.C. Rape Crisis Center. *See* First Amended Complaint at ¶ 27. Plaintiff was not tested for presence of a date rape drug during her first visit at Howard hospital. *See* First Amended Complaint at ¶ 32. In fact, Plaintiff's friends were told that there was nothing that could be done because Plaintiff was intoxicated and incoherent. *See* First Amended Complaint at ¶ 33. When it became clear that Howard University Hospital would not administer a rape kit, Plaintiff's friends pleaded with hospital personnel to simply examine the vomiting, and to stabilize her condition. *See* First Amended Complaint at ¶ 40.

After her first visit, Plaintiff was not transported or escorted from the hospital by MPD, but took a shuttle back to the campus. *See* Plaintiff Deposition at p. 62:16-17 (attached as Exhibit "C"). Plaintiff did not contact MPD or the D.C. Rape Crisis Center regarding her alleged sexual assault on December 9, 2006. In fact, Plaintiff's friends and/or sister did not contact MPD about the alleged assault until after Plaintiff arrived for her second visit to Howard University Hospital. *See* Plaintiff Deposition at pp. 143:14 – 144:7 (attached as Exhibit "C"); *see also* Plaintiff Responses to District Hospital

Partners' Admission Requests at Nos. 16 and 31 (attached as Exhibit "B"); Sade Diké Deposition at p. 141 (attached as Exhibit "D"); Kerston Reed Deposition at p. 139 (attached as Exhibit "E"). MPD arrived at Howard University Hospital during Plaintiff's second visit, and spoke with her about the sexual assault allegations. *See* Plaintiff Deposition at pp. 123:13 – 124:8 (attached as Exhibit "C").

Plaintiff avers that MPD refused to authorize a sexual assault medical forensic examination, or do any further investigation, and was rude and dismissive of her compliant. *See* First Amended Complaint at ¶¶ 48-49. Plaintiff avers that MPD officers inappropriately classified her sexual assault as a "miscellaneous incident." *See* First Amended Complaint at ¶ 52. Plaintiff concedes that Howard University Hospital was not required to obtain police authorization to conduct a forensic examination. *See* First Amended Complaint at ¶¶ 56-57.

### PROCEDURAL POSTURE

Plaintiff filed this action on August 21, 2007. [Docket # 1]. During the course of discovery, plaintiff was granted leave to take 20 depositions, and did so. *See* Minute Order (dated 04/16/08). On June 16, 2008, the District filed its Motion for Judgment on the Pleadings. [Docket # 41]. On July 14, 2008, Plaintiff moved to enlarge discovery and for leave to take approximately 15 more depositions. [Docket # 47]. The District as well as the Howard Defendants opposed Plaintiff's motion. [Docket # 48, # 51 and # 52]. There is no need for additional discovery in this case as it relates to the District because no amount of discovery will establish the existence of a duty owed to Plaintiff by the District. Discovery in this case closed on July 16, 2008. *See* Minute Order (dated 04/16/08).

On August 18, 2008, Plaintiff filed her First Amended Complaint against the named defendants.  Plaintiff has included additional facts in the First Amended Complaint, but her theories of liability against the District have not changed.  [Docket # 1 and # 58].  As will be shown below, no special circumstances exist to create a duty owed Plaintiff by the District in this case.  Thus, as a matter of law, this Court must dismiss Plaintiff's First Amended Complaint against the District, or enter summary judgment in the District's favor.

STANDARDS OF REVIEW

## I.    DISMISSAL PURSUANT TO FED. R. CIV. P. 12(b)(6).

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate when a moving party has failed to set forth a claim for which he/she is entitled to relief.  The determination of whether a dismissal is proper must be made on the face of the pleadings alone.  *See Telecommunications of Key West, Inc. v. United States,* 757 F.2d 1330, 1335 (D.C. Cir. 1985); *Celotex Corp. v. Catrett,* 106 S. Ct. 2548 (1986).  A plaintiff is required to plead enough facts to state a claim for relief that is plausible on its face.  *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007).

In order to survive a motion to dismiss, a plaintiff's complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp.,* 127 S.Ct. at 1964-65.  "When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 1966.

## II.    SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c).  Only disputes over material facts, or facts that might significantly affect the outcome of a suit under the governing law, preclude entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986).  Under the summary judgment standard, a "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Summary judgment is not "a disfavored procedural shortcut," *Celotex,* 477 U.S. at 327, rather it is an "integral part" of the endeavor of civil rules as a whole "to secure the just, speedy, and inexpensive determination of every action."  *Id., quoting* Fed. R. Civ. P. 1.  Rule 56 must be construed with "due regard . . . for the rights of persons opposing claims or defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  *Id.*

To obtain judgment under Rule 56, the District need only "identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [it] believes demonstrate the absence of a genuine issue of material fact," and show its entitlement to judgment as a matter of law. The District need not negate an element of the plaintiff's case.  *Celotex,* 477 U.S. at 323.

The non-movant must produce "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. These facts must have "significant probative" force "tending to support the complaint." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

**ARGUMENT**

**III.    PLAINTIFF HAS NOT SUFFICIENTLY PLED ANY FACTS UPON WHICH THE DISTRICT COULD BE NEGLIGENTLY LIABLE.**

In any negligence action, a plaintiff bears the burden of proof on the following three issues in order to prevail:

1. the applicable standard of care;
2. a deviation from that standard by the defendant; and
3. a causal relationship between the deviation and the plaintiff's injury.

*Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984); *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C. 1978). The existence of a legal duty under negligence is ordinarily a question of law for the court. *See Zhou v. Jennifer Mall Restaurant,* 534 A.2d 1268, 1274 (D.C. 1987); *In re Sealed Case,* 67 F.3d 956, 968 (D.C. Cir. 1995). Plaintiff avers that the District owed her a duty to ensure that evidence concerning her sexual assault was collected and was not lost or destroyed. *See* First Amended Complaint at ¶ 113. According to Plaintiff, because the District receives federal funds that require it to certify that it pays for sexual assault forensic exams for any victim who seeks one (regardless whether the victim reports the crime to police) the District owed her a duty not to interfere with her attempt to have such an examination conducted. *See* First Amended Complaint at ¶ 113.

None of the allegations advanced in Plaintiff's First Amended Complaint show any affirmative duty owed her by the District. *See* First Amended Complaint, generally.

As will be shown below, Plaintiff's lawsuit must be dismissed because the public duty doctrine bars her court action. Plaintiff was neither in the District's care or custody, and did not otherwise have any special relationship with the District to create any duty. Absent a duty of care, the District cannot be held answerable in negligence.

## IV.    THE PUBLIC DUTY DOCTRINE BARS PLAINTIFF'S CLAIMS

Courts have routinely explained that the District "`and its agents are under no general duty to provide public services . . . to any particular individual citizen,' and cannot, therefore, ordinarily be held liable for negligently failing to provide such services." *Platt v. District of Columbia,* 467 A.2d 149, 151 (D.C. 1983), *quoting Warren v. District of Columbia,* 444 A.2d 1, 4 (D.C. 1981) *(en banc); see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 561 (D.C. Cir. 1993) (holding that the District is generally immune from tort liability for actions taken by its officers in the course of providing public services). Courts have recognized an exception to the general rule of no liability in instances where there exists a "special relationship" between the District and a member of the public.

A special relationship may arise when two conditions are met: "(1) a direct contact or continuing contact between the victim and the governmental agency or official; **and** (2) a justifiable reliance on the part of the victim." *Platt,* 467 A.2d at 151. In applying these factors, Courts have recognized exceptions to the public duty doctrine in special circumstances, such as when police actively use a private citizen in the investigation, arrest, or prosecution of a criminal. *See, e.g., Hines v. District of Columbia,* 580 A.2d 133, 138 (D.C. 1990).

In the present case, Plaintiff has failed to plead any facts to establish the existence

of a special relationship between herself and the District of Columbia. *See* First

Amended Complaint, generally. Plaintiff was of legal age at the time of the events that

gave rise to this lawsuit. *See* First Amended Complaint at ¶ 1; *see also* Plaintiff

Deposition at pp. 16:6-7 and 28:13-21 (attached as Exhibit "C"). She was never in police

custody or otherwise in the custody of any District employee. *See* First Amended

Complaint, generally. The incident giving rise to Plaintiff's allegations did not occur on

public property. The alleged sexual assault occurred at a private house, and Plaintiff was

allegedly denied a forensic examination while at Howard University Hospital — a non-

District facility. *See* First Amended Complaint, generally. Plaintiff never contacted

MPD. Police did not promise to provide her special services, nor does she allege any

justifiable reliance on police officers based on her interaction with them. *See* Amended

Complaint, generally. While Plaintiff's sister, Plaintiff's friends and/or hospital

personnel contacted MPD during Plaintiff's second visit to the hospital, and MPD

officers spoke with Plaintiff when they arrived at the hospital, there are no allegations in

the First Amended Complaint to support the proposition that Plaintiff reasonably relied

on any promises made to her by MPD officers. *See* First Amended Complaint, generally.

### A.     TWO CONTACTS BETWEEN PLAINTIFF AND MPD IS NOT ENOUGH TO ESTABLISH A SPECIAL RELATIONSHIP

The first prong of the special relationship test requires that there be some form of

privity between the District and Alexandria McGaughey that sets her apart from the

general public. That is, any direct contact between plaintiff and the District must be

"different from the type of contact that the District has with the general public" *See*

*Nealon,* 669 A2d at 693, citing *Powell v. District of Columbia,* 602 A.2d 1123, 1130

(D.C.1992). MPD's two visits to Howard University Hospital do not create privity

between plaintiff and MPD.  If this were the case, any citizen from the general populace

would repeatedly contact MPD to report their complaint simply to manufacture privity.

This is not the law in this jurisdiction or elsewhere.

In *Wanzer v. District of Columbia*, 580 A.2d 127 (D.C. 1990), the Court upheld

the dismissal of a negligence claim brought by the estate of a decedent, Mr. Lee, who

called 911 complaining of a terrible headache and requested an ambulance.  Mr. Lee was

advised by the dispatcher to take an aspirin, and no ambulance was dispatched — Mr.

Lee died two days later of a stroke.  Having concluded that the public duty doctrine was

applicable to the District's public ambulance service (911), the Court found that:

> [t]o give rise to a special relationship, the agency's response to the
> private party must in some demonstrable way exceed the response
> generally made to other members of the public.  *Even a series of
> contacts over a period of time between a public agency and an
> injured or endangered person is not enough to establish a special
> relationship*, absent some showing that the agency assumed a
> greater duty to that person than the duty owed to the public at
> large.

*Id*. at 132 (emphasis added) (citations omitted).

In *Hines v. District of Columbia*, the Court noted:

> Our case law makes it clear that the mere fact that an individual
> has emerged from the general public and become an object of the
> special attention of public employees does not create a relationship
> which  imposes a special legal duty.

580 A.2d 133, 138 (D.C. 1990).  A special relationship does not arise simply because an

individual requests, and a District employee agrees to render, public assistance.  *See

Morgan v. District of Columbia,* 468 A.2d 1306, 1313 (D.C. 1983) (*en banc*); *Warren,*

444 A.2d 1, 2 & 6 (D.C. 1981) (*en banc*).  Furthermore, even when the District renders

some assistance, no actionable duty arises even if that assistance is negligent unless the

nature of the assistance rendered creates a special relationship. *Morgan,* 468 A.2d at 1317; *Warren,* 444 A.2d at 2. MPD cannot be held liable simply because of its visit to Howard University Hospital regarding Plaintiff's claim of sexual assault.

While summoning police may be considered in determining whether there was "direct contact" between plaintiff and the District, it cannot by itself create the requisite special relationship. "Even a series of contacts over a period of time between a public agency and an injured or endangered person is not enough to establish a special relationship, absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large." *Wanzer,* 580 A.2d at 132. Thus, the mere fact that MPD officers responded to Howard University Hospital and spoke with plaintiff on two occasions, in itself, does not create a special relationship, and dismissal of this lawsuit and/or judgment as a matter of law must be granted to the District.

### B.    PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE JUSTIFIABLY RELIED ON MPD.

Not only are plaintiff's "direct contact" allegations deficient, the First Amended Complaint fails to recite any express MPD assurances on which plaintiff justifiably relied to her detriment. In fact, Plaintiff concedes throughout the First Amended Complaint that there were no police promises or guarantees made to her during her interaction with them. *See* First Amended Complaint, generally.

Courts adhere to a strict interpretation of the justifiable reliance prong of the special relationship test. *Taylor v. District of Columbia*, 776 A.2d 1208, 1218 (D.C. 2001). Justifiable reliance means particular or special reliance. *Morgan,* 468 A.2d at 1315; *see also Platt v. District of Columbia,* 467 A.2d 149, 151 (D.C.1983). More than general reliance is needed, and plaintiff must either act or fail to act in such a way as to

show particular reliance upon the actions of MPD officers. "Liability is established [if the agency has] specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking." *Id.*

In *Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006), the plaintiff lodged wrongful death and survival action claims against the District of Columbia for the death of her son, Benjamin Varner, a Gallaudet University freshman. Just prior to Varner's death, another student, Eric Plunkett, was murdered. The D.C. Metropolitan Police Department arrested Thomas Minch for the Plunkett murder, though it allegedly had evidence that Joseph Mesa had stolen Plunkett's credit card and had used it to make purchases. Varner claimed that if MPD had exercised reasonable care in investigating the Plunkett murder, then Mesa would have been swiftly apprehended, and would not have had an opportunity to kill Varner. Further, in an effort to establish the existence of a special relationship with the District, Plaintiff highlighted the fact that — between the Plunkett and Varner homicides — Metropolitan Police attended an on-campus meeting during which Gallaudet University students, including Benjamin Varner, were assured that they would receive special protection, that their security would be accorded highest priority, and that it was safe for them to remain in school. The District Court found that no special relationship existed between Varner and the District of Columbia. Varner appealed, and the D.C. Court of Appeals found that:

> [U]nder the public duty doctrine, public officials such as police officers cannot be held liable for harm caused by criminals unless there was a "special relationship" between the victim and the official. *See, e.g., Platt v. District of Columbia,* 467 A.2d 149 (D.C.1983). In order to find that a "special relationship" had been created, a two-prong test applies: there must be either [sic] a direct or continuing contact between the victim and the police department, and there must be a justifiable reliance on that contact

by the victim. *See id.*

> In the present [Varner] case, neither prong of the test is met.
> Plaintiff argues that a special relationship had been created by the
> prior murder of a Gallaudet student, and because the MPD had a
> presence on the Gallaudet campus. [Citation to record omitted.]
> Plaintiff presents no argument or evidence, however, to show that
> Benjamin Varner himself had any direct or continuing contact with
> the MPD. Merely because the police are present in an area does not
> create a special relationship with the people in that area. To the
> contrary, finding that a special relationship exists in such a
> situation would obviate the public duty doctrine, as a special
> relationship would be created between the police and the people in
> any area in which the police are doing their job. Thus, absent any
> information or argument by plaintiff that a special relationship had
> been created between Detective Cimiotti and Benjamin Varner
> himself, as opposed to the entire Gallaudet student body, the public
> duty doctrine applies to this case.

891 A.2d 260, 275.

Courts have found justifiable reliance when it is determined that the victim has

been lulled into a false sense of security by the municipality's voluntary undertaking,

which has thereby induced the victim to either relax their own vigilance, or to forego

other available avenues of protection.  In the present case, Plaintiff suggested to police

that a likely sexual assault had already occurred; thus, none of her post-assault

conversations with MPD could not have induced Plaintiff to relax her own vigilance or

forego other available avenues of protection — i.e., vigilance in avoiding the underlying

sexual assault, or vigilance in seeking the administration of a rape kit.  There is no

evidence that any MPD officer, through promises or actions, assumed any affirmative

duty to protect or provide services to Plaintiff, either before or after the alleged assault.

Justifiable reliance cannot be said to exist in the circumstance.

In *Nichol v. District Metropolitan Police Department*, 444 A2d 1 (D.C. 1981) (en

banc), a case quite similar to the instant case, a man was assaulted in his car and the

police came to his assistance...  At the behest of the police officer, the victim ceased

efforts to obtain the identity of his attackers.  Because the officer failed to obtain the

information, the victim was unable to perfect a lawsuit against his assailants.  Plaintiff's

subsequent lawsuit against the District of Columbia for failure to file a crime report was

dismissed by the trial court for failure to state a claim upon which relief could be granted.

In affirming the trial court's ruling, the Court of Appeals held that the police officer's

failure to prepare an accident report does not constitute the degree of "affirmative

negligence" necessary to create either a "special relationship" with the crime victim or

detrimental "reliance". *Id; see also Auto World Inc. v. District of Columbia*, 627 A.2d 11

(D.C. 1993) (no duty to provide motor vehicle registration information); *Hines v. District

of Columbia,* 580 A.2d 133, 136 (D.C. 1990) (the District has no duty to provide public

services to any particular person).  Under the public duty doctrine, MPD had no special

duty to prepare or provide an incident report to an injured party — much less any duty for

which it can be held liable for its alleged failure to prepare or provide the "sexual assault"

incident report demanded herein by plaintiff.  Accordingly, dismissal of Plaintiff's First

Amended Complaint against the District is required.

## V.    MPD General Orders Create No Special Relationship And No Duty

Plaintiff contends that MPD holds itself out as, "having policies expressly

designed to respect and properly treat sexual assault victims, including those victimized

by date rape drugs." *See* First Amended Complaint at ¶ 3.  These allegations are

insufficient to establish any special relationship between Plaintiff and the District.  The

District's MPD officers' alleged failure to comply with sexual assault response

procedures does not support a claim against the District because no special relationship

was created by the mere fact that Plaintiff requested a rape kit from Howard University

Hospital, it was refused, and MPD officers would not thereafter "authorize" MPD to

provide Plaintiff with a rape kit.

MPD officers exercise discretionary authority when deciding whether to escalate

or terminate an investigation of purported criminal wrongdoing.  Plaintiff avers that

MPD's investigation of her sexual assault charge was negligent, and that the District

negligently hired, trained and/or supervised these officers.  *See* First Amended Complaint

at ¶¶ 107-112.  When MPD officers investigated Plaintiff's sexual assault allegations,

each one of their acts (and the decisions upon which these acts were based) were

discretionary, and did not create a legal duty to Plaintiff.  Even assuming *arguendo* that

certain aspects of the officers' investigation were somehow misaligned with the District's

sexual assault procedures (which is expressly denied), the District cannot be made

answerable in tort liability since the District had no specific duty to Plaintiff.  Moreover,

courts have repeatedly made it clear that internal agency guidelines do not create a

special class of persons to whom an actionable duty is owed.  *See, e.g., Hines,* 580 A.2d

at 138 (no special relationship between the District and persons needing emergency

medical services even though a statute imposed a fee for ambulance service for those able

to pay for it; a Mayor's Order provided that the Fire Department "will provide emergency

ambulance treatment and transportation on demand" and a regulation established

standards for providing emergency medical service); *Morgan,* 68 A.2d at 1310 (no

special relationship between the District and the wife of police officer who shot her

despite the District's failure to investigate wife's complaint that husband had threatened

her with his service revolver in violation of general police order requiring investigation

of, and written report about, any complaint that a police officer had improperly used

service revolver); *Warren,* 444 A.2d at 3 (no special relationship was created between

MPD officers and crime victims when police, in investigating 911 calls for police

assistance, failed "to follow standard police investigative procedures" with the result that

three women were brutally raped and beaten).

The fundamental police function to enforce criminal laws would be unduly

hampered if law enforcement decisions were, as a general rule, subject to after-the-fact

judicial review through private tort litigation.  Such a rule would also place police

officials in the untenable position of ensuring/guaranteeing the personal safety of every

member of the public or, otherwise, be subject to civil damages.  Governmental entities

must be protected against the excessive fiscal impact that would necessarily ensue if

every police investigatory decision was generally subject to tort liability.  The public is

instead protected by mechanisms (other than civil negligence actions) that hold individual

officials accountable for dereliction of duty — these include internal disciplinary

proceedings or formal criminal prosecutions.  Plaintiff's failure to plead sufficient facts to

support a negligence cause of action against the District bars her claim, and dismissal is

appropriate.

WHEREFORE, for the foregoing reasons, the District of Columbia moves this

Honorable Court to grant it dismissal of Plaintiff's First Amended Complaint and/or

summary judgment.

Respectfully Submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation Sec. IV


___/s/  Dwayne C. Jefferson_____
DWAYNE C. JEFFERSON  [980813]
Assistant Attorney General
One Judiciary Square
441 4th St., N.W., 6th Floor South
Washington, D.C. 20001
(202) 724-6649; (202) 727-6295 p | (202) 741-0554 f
dwayne.jefferson@dc.gov

COUNSEL FOR THE
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA MCGAUGHEY,        :
                                             :
        Plaintiff,            :
                                             :
v.                                       :     Case No. 1:07-CV-01498 (RJL)
                                           :
DISTRICT OF COLUMBIA, *et al.*     :
                                           :
        Defendants.       :
_____

## ORDER

UPON CONSIDERATION of the District of Columbia's Motion to Dismiss, any opposition thereto, and the entire record in this matter, it is this ___ day of _____, 2008, hereby:

ORDERED that the Motion to Dismiss is **GRANTED** for the reasons set forth in the motion; and it is,

FURTHER ORDERED: that Plaintiff's case is **DISMISSED WITH PREJUDICE** as to Defendant District of Columbia.

_____
**HON. RICHARD J. LEON**
**United States District Court for the District of Columbia**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA MCGAUGHEY,                        :
                                             :
            Plaintiff,                       :
                                             :
v.                                           :         Case No. 1:07-CV-01498 (RJL)
                                             :
DISTRICT OF COLUMBIA, et al.                 :
                                             :
            Defendants.                      :
_____

### ORDER

UPON CONSIDERATION of the District of Columbia's Motion for Summary

Judgment, any opposition thereto, and the entire record in this matter, it is this ___ day of

_____, 2008, hereby:

ORDERED that the Motion for Summary Judgment is **GRANTED** for the

reasons set forth in the motion; and it is,

FURTHER ORDERED:  that Plaintiff's case is **DISMISSED WITH**

**PREJUDICE** as to Defendant District of Columbia.


                              _____
                              **HON. RICHARD J. LEON**
                              **United States District Court for the District of Columbia**

Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA McGAUGHEY,  )
                                 )
           Plaintiff,        )
                                 )     Case No. 1:07-cv-01498 (RJL)
v.                        )
                                 )
DISTRICT OF COLUMBIA, *et al.*,   )
                                 )
           Defendants.      )
_____)

### PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT HOWARD UNIVERSITY D/B/A HOWARD UNIVERSITY HOSPITAL'S INTERROGATORIES TO PLAINTIFF

Plaintiff, by and through undersigned counsel, submits these responses and objections to Defendant Howard University d/b/a Howard University Hospital's ("HUH's") Interrogatories to Plaintiff.

### GENERAL OBJECTIONS

1.     Plaintiff objects to HUH's Interrogatories to the extent that they seek information beyond the scope of discovery under the Federal Rules of Civil Procedure.

2.     Plaintiff objects to HUH's Interrogatories as overbroad to the extent they seek information that is outside Plaintiff's possession, custody or control.

3.     Plaintiff objects to HUH's Interrogatories to the extent that they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to HUH's Interrogatories to the extent that they are ambiguous, vague, overbroad, or unduly burdensome.

5.     Plaintiff objects to HUH's Interrogatories to the extent that they are overlapping, duplicative, and cumulative, both internally and with respect to the Interrogatories propounded

1

separately by the Howard Defendants, including the joint interrogatories in which HUH joined, as well as the separate interrogatories of Howard University, Dr. Wendie Williams, and Dr. Dawit Yohannes.

6.    Plaintiff objects to HUH's Interrogatories to the extent that they call for information that is publically available or equally, if not more easily, accessible by the Howard Defendants.

7.    Plaintiff objects to HUH's Interrogatories to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or doctrine available under federal or state law. Inadvertent disclosure by Plaintiff of privileged information shall not be deemed a waiver of any applicable privilege.

8.    Plaintiff objects to HUH's Interrogatories to the extent that they are harassing and/or an invasion of privacy. Plaintiff further objects to HUH's Interrogatories to the extent that they seek medical information and other sensitive private data, such as social security numbers, phone numbers, and addresses. All information provided by Plaintiff is produced for this litigation only, and without waiving any statutory or common law privilege or confidentiality protection for medical records and other private data. Plaintiff will seek a protective order to cover the medical and other private information produced in this litigation, and Plaintiff responds to HUH's Interrogatories subject to that protective order. This document may not be filed on the public record or disclosed publicly without the express consent of Plaintiff, and/or redaction of all private data as defined above.

9.    Plaintiff objects to HUH's Interrogatories to the extent that they are not limited to a specified period of time, or to the extent that they are purportedly limited to a time period that is otherwise objectionable as described herein.

10.    In responding to HUH's Interrogatories, Plaintiff does not concede any characterizations, factual assumptions, legal assumptions, definitions or terms explicitly or implicitly contained in the Interrogatories.

11.    In responding to HUH's Interrogatories, Plaintiff expressly reserves all objections as to the relevance, authenticity, or admissibility of any of the interrogatories, responses, and subject matter, as well as all other objections.

12.    In responding to HUH's Interrogatories, Plaintiff expressly reserves all rights to change, modify or supplement its responses.

13.    Plaintiff objects to the HUH's Interrogatories' use of the terms "any" and "all," to the extent that those require Plaintiff to provide more than the information located after a reasonable and diligent investigation. By answering, Plaintiff does not certify that "any" or "all" responsive information has been obtained.

14.    In agreeing to search for or produce any documents or information in response to HUH's Interrogatories, Plaintiff makes no representation that such documents exist, or, that if they once existed, that they currently exist.

15.    Plaintiff objects to HUH's Interrogatories, in combination with the joint interrogatories joined by HUH and the two other sets of interrogatories separately propounded by each of the two HUH Physician Defendants, as exceeding the number of interrogatories authorized by Federal Rule of Civil Procedure 33(a)(1). Together, these three Defendants are entitled to, at most, a total of 75 interrogatories. Although all four sets of interrogatories propounded by HUH and/or the two HUH Physician Defendants use subsections and thus purport to number in sum under 75, these three Defendants actually have propounded more than 75 interrogatories – conservatively, they have served 107 interrogatories – including discrete

3

subparts. Plaintiff responds to the first 75 interrogatories propounded by these Defendants –

starting with the joint HUH and HUH Physicians' Interrogatories, and proceeding to the

individually propounded interrogatories (first, HUH, then Dr. Williams, and then Dr. Yohannes).

For those interrogatories numbering over 75 discrete subparts, Plaintiff provides objections but

will not respond.

### RESPONSES AND SPECIFIC OBJECTIONS

**Interrogatory Number 1:**

Please set forth the basis for your contention that you were raped or sexually assaulted on

or about December 9, 2006.

**Response to Interrogatory Number 1:**

Plaintiff objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ.

P. 33(a)(2). Plaintiff bases the following response on information she knows first-hand and

information she has learned from others. Subject to and without waiving this objection or the

General Objections, Plaintiff responds that, at present, the Complaint and documents produced

by Plaintiff in conjunction with Plaintiff's Rule 26(a)(1) Disclosures provide information

responsive to this Interrogatory. As detailed in the Complaint, Plaintiff experienced severe rectal

pain when she woke up on December 9, 2006 after having attended a party that ended earlier that

morning. Plaintiff believes there is no other conceivable cause of the pain she experienced other

than having been involuntarily anally penetrated. Plaintiff has had to rely upon what her friends

told her about what happened that evening after she began dancing with a young man at the party

because she experienced what she has described as a blackout period between the time she was

dancing with the man and the time she woke up in her dorm room the next morning. She does

not remember anything about the evening after having danced with a man who was behaving

aggressively toward her; she does not recall how she had gotten from the party to her room; she

does not recall having been taken to the hospital after the hospital or having been taken from

there to her room; she woke up feeling as if she had been drugged; she does not recall having had

more than one or two servings of alcohol the evening before and none of her friends observed

her drinking more than that. Plaintiff's friends told her that she had been upstairs at the party

where no one else had been permitted to go that night; the friends related that they had lost sight

of her and that when they tried to go upstairs to look for her that the person who was supposed to

be providing "security" that night, Robert Lowery, physically blocked their way. In addition,

during this exchange, one of the residents of the house had come downstairs lewdly yelling at the

friends that they could get the "f- - k" out of his house if they were going to disrespect him, a

bizarre statement given that the women had not previously interacted with him. Mr. Lowery

went upstairs purporting to check on Plaintiff and spent several minutes upstairs. He then came

back down and said to Plaintiffs' friends that Plaintiff was in the bathroom and that she would be

down in a minute. When Plaintiff came downstairs she looked disheveled and appeared

disoriented. When she got outside with her friends, they asked her what happened and she said

that someone had touched her. When they asked who, she said she couldn't say. Plaintiff's

speech and manner were very unusual to her friends. Two of the friends went back to the house

to ask what had happened to Plaintiff, and they were met and blocked at the door by two of the

young men from the party who were acting bizarrely. The two young men stated that a man had

been upstairs with Plaintiff at the party, despite the fact that they had earlier denied that anyone

was with her. Plaintiff began vomiting outside in the street. She vomited several more times at

the hospital and to and from the escort van that took her to HUH and back to her dorm, leading

the friends to believe that she may have been drugged at the party. Plaintiff was wearing a panty

liner the night of the party and that panty liner was missing when she awoke. Plaintiff's sister

Raegen had a conversation some months after December 9, 2006 with the Mr. Lowery, the

supposed security guard at the party and one of the young men, Bilal Curtis, who had been

behaving so suspiciously. When Raegen asked the men about what had happened to her sister,

the answers they gave her were inconsistent with the version of events she had learned from Ms.

Diké, Ms. Reid, Ms. Lockett and Plaintiff, and on that basis, Raegen concluded that the men

were lying and trying to cover-up their own involvement in wrongdoing. Specifically, at the

beginning of the conversation, Mr. Lowery immediately said without any questioning about rape

from Raegen that charges of rape were a serious matter. It is unclear how he would have known

that there was any suspicion of a rape having occurred at the party at that point, because the

conversation occurred many months before this lawsuit was filed, and neither Raegen, Plaintiff

or her friends had previously questioned him or any of the young men about the issue. In

addition, Mr. Lowery claimed that his attention had been diverted from blocking the stairway

because a fight broke out that he had to deal with outside the house, and claimed that he had not

seen Plaintiff go upstairs. His version differs from that of Plaintiffs' friends, who recall no fight

having broken out at the party. Plaintiffs' friends also recall a big argument they had with Mr.

Lowery on the night of the party, in which he acknowledged that Plaintiff was in the upstairs of

the house and even went upstairs for several minutes at one point purporting to check on

Plaintiff, but refused to let them go upstairs to check on her. Mr. Lowery said nothing about this

in his conversation with Raegen. Mr. Curtis claimed to Raegen that he had been taking care of

the music for the party all night and did not recall interacting with Plaintiff at all except for a

very brief exchange. This differs significantly from the account of Plaintiff and her friends, who

recall Mr. Curtis as having danced with both Plaintiff and one of her friends, and as having been

one of the men who argued with Plaintiffs' friends at the door of the house when they returned to

the house to find out what happened to Plaintiff.

**Interrogatory Number 2:**

Please set forth the identity of the person or person who you claim raped or sexually

assaulted you on or about December 9, 2006.

**Response to Interrogatory Number 2:**

Plaintiff objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ.

P. 33(a)(2). Subject to and without waiving this objection or the General Objections, Plaintiff

responds that, at present, the Complaint and documents produced by Plaintiff in conjunction with

Plaintiff's Rule 26(a)(1) Disclosures provide information potentially responsive to this

Interrogatory. Plaintiff further responds that Defendants' acts and omissions have made it

impossible for her to identify her attacker.

**Interrogatory Number 3:**

When was your last sexual encounter prior to December 9, 2006 and with whom?

**Response to Interrogatory Number 3:**

Plaintiff objects to this interrogatory on the grounds that it is harassing, an invasion of

privacy, and calls for information neither relevant nor reasonably calculated to lead to the

discovery of admissible evidence.

**Interrogatory Number 4:**

Please state the type and amount of all alcohol beverages, drugs (legal or illicit), or other

intoxicating substances you consumed on December 8, 2006 and December 9, 2006.

**Response to Interrogatory Number 4:**

Plaintiff objects to this Interrogatory to the extent it seeks information that is privileged

from discovery under the Fifth Amendment to the United States Constitution. Subject to this

objection and without waiving the General Objections, Plaintiff responds that she did not

knowingly consume any drugs whatsoever at the December 8-9, 2006 party; that she likely had

no more than one alcoholic beverage before arriving at the party; and that she does not recall or

believe that she consumed more than one cup of the "punch" being served at the party before

blacking out.

**Interrogatory Number 5:**

Please set forth in detail the facts upon which you intend to rely to support your

allegation that hospital personnel, pursuant to HUH's own policies were required to call the DC

Rape Crisis Center in response to Ms. McGaughey's presentation to the emergency room as

alleged in Paragraphs 28, 40 and 75 of your Complaint.

**Response to Interrogatory Number 5:**

Plaintiff objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ.

P. 33(a)(2). Subject to and without waiving this objection or the General Objections, Plaintiff

responds that, at present, the Complaint, sources cited therein, and documents produced by the

Howard Defendants provide information responsive to this Interrogatory.

**Interrogatory Number 6:**

Please set forth in detail the facts upon which you intend to rely to support your

allegation that hospital personnel was required to contact the Sexual Assault Nurse Examiner

("SANE") nurse in response to Ms. McGaughey's presentation to the emergency room as alleged

in your Complaint.

**Response to Interrogatory Number 6:**

Plaintiff objects to this Interrogatory as vague with respect to which "hospital personnel"

8

and "emergency room" is at issue.  Plaintiff interprets these phrases to refer to HUH personnel

and the HUH emergency room.  Plaintiff further objects to this Interrogatory on the grounds that

it is premature.  *See* Fed. R. Civ. P. 33(a)(2).  Subject to and without waiving these objections or

the General Objections, Plaintiff responds that, at present, the Complaint, sources cited therein,

and documents produced by the Howard Defendants provide information responsive to this

Interrogatory.

**Interrogatory Number 7:**

Please set forth in detail the facts upon which you intend to rely to support your

allegation that HUH emergency department personnel were required to examine Ms.

McGaughey for evidence of rape based upon her presentation to the emergency room as alleged

in your Complaint.

**Response to Interrogatory Number 7:**

Plaintiff objects to this Interrogatory on the grounds that it is premature.  *See* Fed. R. Civ.

P. 33(a)(2).  Subject to and without waiving this objection or the General Objections, Plaintiff

responds that, at present, the Complaint, sources cited therein, and documents produced by the

Howard Defendants provide information responsive to this Interrogatory.

**Interrogatory Number 8:**

Please set forth in detail the facts upon which you intend to rely to support your

allegation that HUH emergency department personnel failed to stabilize Ms. McGaughey as

alleged in your Complaint.

**Response to Interrogatory Number 8:**

Plaintiff objects to this Interrogatory on the grounds that it is premature.  *See* Fed. R. Civ.

P. 33(a)(2).  Subject to and without waiving this objection or the General Objections, Plaintiff

responds that, at present, the Complaint and documents produced by the Howard Defendants provide information responsive to this Interrogatory.

**Interrogatory Number 9:**

Please set forth in detail the facts upon which you intend to rely to support your allegation that Mary Pinn, R.N. could perform a forensic examination of Ms. McGaughey absent police authorization based on Ms. McGaughey's presentation to the emergency room as alleged in Paragraph 56 of your Complaint.

**Response to Interrogatory Number 9:**

Plaintiff objects to this Interrogatory as vague with respect to the phrase "emergency room." Plaintiff interprets this phrase as referring to the HUH emergency room. Plaintiff further objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ. P. 33(a)(2). Subject to and without waiving this objection or the General Objections, Plaintiff responds that, at present, the Complaint, sources cited therein, and documents produced by the Howard Defendants provide information responsive to this Interrogatory.

**Interrogatory Number 10:**

Identify the emergency medical condition within the meaning of 42 U.S.C. §1395dd(e)(1) you claim to have had as alleged in Paragraph 66 of your Complaint.

**Response to Interrogatory Number 10:**

Plaintiff objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ. P. 33(a)(2). Subject to and without waiving this objection or the General Objections, Plaintiff responds that the statutory provision cited in this Interrogatory defines "emergency medical condition" and speaks for itself. Plaintiff further responds that, at present, the Complaint and Plaintiff's medical records provide information responsive to this interrogatory.

10

**Interrogatory Number 11:**

Please describe in detail all of your activities following your departure from HUH after your first visit on or about December 9, 2006, until you returned to HUH later that same day.

**Response to Interrogatory Number 11:**

Plaintiff objects to this Interrogatory as unduly burdensome and overbroad. Plaintiff further objects as misleading the characterization that Plaintiff "depart[ed]" HUH after her first visit on December 9, 2006, as she did not leave of her own accord but departed only because she was discharged. Subject to and without waiving these objections and the General Objections, Plaintiff responds that the Complaint provides information responsive to this Interrogatory. Plaintiff further responds that after being discharged from HUH in the early morning hours of December 9, 2006, she returned to her dorm room accompanied by her friend, Kerston Reid, where she slept. Thereafter, she awoke and returned to the HUH emergency room in the late morning or early afternoon with Ms. Reid. Because the medical personnel who saw and discharged Plaintiff during her first visit to the hospital failed to instruct either Plaintiff or her friends who accompanied her not to eat before she returned to the hospital, and because the hospital discharged her before she was stabilized and a forensic exam could be performed, Plaintiff stopped by a sandwich shop where she ordered a sandwich on her way back to the hospital. She ate about half of the sandwich at the hospital before being told by a nurse that eating prior to receiving a rape kit would render the kit unreliable.

**Interrogatory Number 12:**

Please describe in detail all of your activities following your departure from Howard University Hospital after your second visit on or about December 9, 2006 until you presented to

George Washington University Hospital.

**Response to Interrogatory Number 12:**

Plaintiff objects to this Interrogatory as unduly burdensome and overbroad. Subject to and without waiving this objections and the General Objections, Plaintiff responds that the Complaint provides information responsive to this Interrogatory. Plaintiff further responds that after being discharged from HUH in the evening of December 9, 2006, she and her sister drove to Holy Cross Hospital in Maryland to seek proper treatment for Plaintiff's sexual assault, but before entering that hospital, and at the advice of Dr. Gerald Cook (the husband of Plaintiff's cousin, who lives in Chicago), Plaintiff and her sister drove to George Washington University Hospital to seek proper treatment for Plaintiff's sexual assault.

**Interrogatory Number 13:**

Identify the harm you contend you sustained as a result of the alleged violation of 42 U.S.C. §1395dd(e)(1) as alleged in your Complaint?

**Response to Interrogatory Number 13:**

Plaintiff objects to this Interrogatory on the grounds that it misstates the statutory basis for Plaintiff's EMTALA claim, as Plaintiff seeks relief under provisions of EMTALA including 42 U.S.C. §§ 1395dd(a), (b), and (d)(2)(a). Plaintiff further objects that this Interrogatory is premature. *See* Fed. R. Civ. P. 33(a)(2). Subject to and without waiving these objections and the General Objections, Plaintiff responds that, at present, the Complaint and Plaintiff's Rule 26(a)(1) Disclosures provide information responsive to this Interrogatory.

**Interrogatory Number 14:**

Describe the evidence you claim was lost as a result of a forensic rape kit or other screening or test having not been performed on you at Howard University Hospital.

**Response to Interrogatory Number 14:**

Plaintiff objects to this Interrogatory on the grounds that it is premature. *See* Fed. R. Civ. P. 33(a)(2). Subject to and without waiving this objection or the General Objections, Plaintiff responds that, at present, the Complaint and Plaintiff's Rule 26(a)(1) Disclosures provide information responsive to this Interrogatory. Plaintiff further responds that any forensic evidence on her body that could have identified her assailant was lost, as well as evidence of any date-rape drug that she consumed in her system, because Defendants failed to administer a rape kit or test for the presence of drugs, because Defendants discharged her from the hospital without appropriate testing on her first visit to HUH, and because Defendants failed to fully inform her or the friends that accompanied her that Plaintiff should not eat prior to returning to the hospital.

**Interrogatory Number 15:**

If you have given any statements relevant to the alleged facts or claims raised in this case, please identify each such statement you have given including the date, name of person to whom the statement what given, purpose for giving the statement, and substance of your statement.

**Response to Interrogatory Number 15:**

Plaintiff objects to this Interrogatory as vague, overbroad and unduly burdensome. Plaintiff further objects that this Interrogatory seeks information that is protected by the attorney-client privilege and the work product doctrine. Subject to and without waiving these objections or the General Objections, and construing "statements" to mean written or transcribed oral statements, Plaintiff responds that she is not aware any such statement.

**Interrogatory Number 16:**

Identify all persons at Howard University or HUH that you or anyone acting on your

behalf contacted, spoke with, or met after you left the hospital on either occasion on December 9, 2006, with regard to any of the issues giving rise to this lawsuit, setting forth the names of the parties involved in the contact, the date, time and location of the contact, and the substance of any information exchanged during the contact.

**Response to Interrogatory Number 16:**

Plaintiff objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects that this Interrogatory seeks information that is equally if not more easily available to the Howard Defendants. Plaintiff also objects that this Interrogatory is premature. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound and has at least two discrete subparts – (1) identification of date/time/location of all contact with Howard/HUH personnel and (2) a description of the substance of each such contact. Accordingly, Plaintiff counts this Interrogatory as <u>two</u> interrogatories. Subject to and without waiving these objections or the General Objections, Plaintiff responds that she, her mother, and/or her sister spoke with at least the following individuals at Howard and/or HUH concerning Plaintiff's treatment at HUH on December 9, 2006, as described in the Complaint: Ms. Chaquina Lee (several occasions in December 2006 through March 2007), Dr. Evelyn Treakle Moore (March 16, 2007), Ms. Brenda Douglas (March 16, 2007), and Mr. Gavin Latney (January 5, 2007, March 16, 2007, and perhaps other occasions in early 2007).

14

Dated: April 7, 2008                          Respectfully submitted,


                                              _____
                                              Bruce V. Spiva, D.C. Bar. No. 443754
                                                bspiva@spivahartnett.com
                                              Kathleen R. Hartnett, D.C. Bar. No. 483250
                                                khartnett@spivahartnett.com
                                              SPIVA & HARTNETT LLP
                                              1776 Massachusetts Avenue, N.W.
                                              Suite 600
                                              Washington, D.C. 20036
                                              Telephone: (202) 785-0601
                                              Facsimile: (202) 785-0697

                                              *Attorneys for Plaintiff*


## VERIFICATION

I, Alexandria McGaughey, declare under penalty of perjury that the foregoing responses

are true and correct.


Dated: April 7, 2008                          _____
                                              Alexandria McGaughey


15

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2008, a true and correct copy of the foregoing Defendant

Howard University d/b/a Howard University Hospital's Interrogatories to Plaintiff was served

via email and first-class U.S. Mail, postage prepaid, on:

Thomas V. Monahan, Jr.
  tvm@gdldlaw.com
Adam Kelley
  axk@gdldlaw. com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, Suite 2000
Baltimore, MD 21202

Darrell Chambers
  darrell.chambers@dc.gov
OFFICE OF THE ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001

Larry D. McAfee
  lmcafee@gleason-law.com
GLEASON, FLYNN, EMIG & FOGLEMAN,
  CHARTERED
11 North Washington Street, Suite 400
Rockville, MD 20850

Robert W. Goodson
  robert.goodson@wilsonelser.com
Deidre L. Robokos
  deidre.robokos@wilsonelser.com
Christine M. Costantino
  chrissy.costantino@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN &
  DICKER, LLP
1341 G Street, NW, Suite 500
Washington, D.C. 20005-3105

Karen R. Turner
  karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814

_____
Bruce V. Spiva

Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALEXANDRIA McGAUGHEY,     )
                                 )
           Plaintiff,     )
                                 )     Case No. 1:07-cv-01498 (RJL)
v.                       )
                                 )
DISTRICT OF COLUMBIA, *et al.*,     )
                                 )
           Defendants.     )
_____)

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO
DEFENDANT DISTRICT HOSPITAL PARTNERS, L.P.'S
REQUEST FOR ADMISSION OF FACTS TO PLAINTIFF**

      Plaintiff, by and through undersigned counsel, submits these responses and objections to

Defendant District Hospital Partners, L.P. d/b/a George Washington University Hospital's

("GWUH's") Request for Admission of Facts to Plaintiff ("Requests").

**GENERAL OBJECTIONS**

      1.     Plaintiff objects to GWUH's Requests to the extent that they seek information

beyond the scope of discovery under the Federal Rules of Civil Procedure.

      2.     Plaintiff objects to GWUH's Requests as overbroad to the extent they seek

information that is outside Plaintiff's possession, custody or control.

      3.     Plaintiff objects to GWUH's Requests to the extent that they seek information that

is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

      4.     Plaintiff objects to GWUH's Requests to the extent that they are ambiguous,

vague, overbroad, or unduly burdensome.

      5.     Plaintiff objects to GWUH's Requests to the extent that they are overlapping,

duplicative, and cumulative.

6.      Plaintiff objects to GWUH's Requests to the extent that they seek information that is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or doctrine available under federal or state law. Inadvertent disclosure by Plaintiff of privileged information shall not be deemed a waiver of any applicable privilege.

7.      Plaintiff objects to GWUH's Requests to the extent that they are harassing and/or an invasion of privacy. Plaintiff further objects to GWUH's Interrogatories to the extent that they seek medical information and other sensitive private data. All information provided by Plaintiff is produced for this litigation only, and without waiving any statutory or common law privilege or confidentiality protection for medical records and other private data. Plaintiff will seek a protective order to cover the medical and other private information produced in this litigation, and Plaintiff responds to GWUH's Requests subject to that protective order. This document may not be filed on the public record or disclosed publicly without the express consent of Plaintiff, and/or redaction of all private data as defined above.

8.      In responding to GWUH's Requests, Plaintiff does not concede any characterizations, factual assumptions, legal assumptions, definitions or terms explicitly or implicitly contained in the Interrogatories.

9.      In responding to GWUH's Requests, Plaintiff expressly reserves all objections as to the relevance, authenticity, or admissibility of any of the requests, responses, and subject matter, as well as all other objections.

10.      In responding to GWUH's Requests, Plaintiff expressly reserves all rights to change, modify or supplement its responses.

Subject to and without waiving the foregoing General Objections, each of which is hereby incorporated into each of Plaintiff's responses and specific objections to each Request,

2

Plaintiff responds as set forth below.

## RESPONSES AND SPECIFIC OBJECTIONS

**Request Number 1:**

Plaintiff has no actual recollection of being sexually assaulted or raped at a house party (hereinafter, the "Party") on December 9, 2006.

**Response to Request Number 1:**

Admitted.

**Request Number 2:**

Plaintiff has no actual recollection of being anally penetrated at the Party on December 9, 2006.

**Response to Request Number 2:**

Admitted.

**Request Number 3:**

Plaintiff has no actual recollection of being vaginally penetrated at the Party on December 9, 2006.

**Response to Request Number 3:**

Admitted.

**Request Number 4:**

Plaintiff consumed alcoholic beverages at the Party on December 8, 2006.

**Response to Request Number 4:**

Plaintiff admits that she recalls consuming less than one cup of alcoholic "punch" at the Party on December 8 or 9, 2006.  In all other respects, Plaintiff lacks sufficient knowledge or information to admit or deny this Request.

3

**Request Number 5:**

Plaintiff was under the age of 21 when she consumed alcoholic beverages at the Party on December 8, 2006.

**Response to Request Number 5:**

Objection. This Request is harassing, irrelevant and unlikely to lead to the discovery of admissible evidence, and seeks information that is privileged from discovery under the Fifth Amendment to the United States Constitution.

**Request Number 6:**

Plaintiff consumed alcoholic beverages at the Party on December 9, 2006.

**Response to Request Number 6:**

Plaintiff admits that she recalls consuming less than one cup of alcoholic "punch" at the Party on December 8 or 9, 2006. In all other respects, Plaintiff lacks sufficient knowledge or information to admit or deny this Request.

**Request Number 7:**

Plaintiff was under the age of 21 when she consumed alcoholic beverages at the Party on December 9, 2006.

**Response to Request Number 7:**

Objection. This Request is harassing, irrelevant and unlikely to lead to the discovery of admissible evidence, and seeks information that is privileged from discovery under the Fifth Amendment to the United States Constitution.

**Request Number 8:**

Plaintiff has no recollection of how much alcohol she consumed at the Party on December 8-9, 2005.

4

**Response to Request Number 8:**

Denied.

**Request Number 9:**

Plaintiff observed Sade Dike dancing with Bilal Curtis at the Party on December 9, 2006.

**Response to Request Number 9:**

Denied.

**Request Number 10:**

Plaintiff observed Mr. Curtis behaving in a sexually aggressive manner with Ms. Dike.

**Response to Request Number 10:**

Denied.

**Request Number 11:**

After witnessing Mr. Curtis behaving in a sexually aggressive manner toward Ms. Dike, Plaintiff started dancing with Mr. Curtis herself.

**Response to Request Number 11:**

Denied.

**Request Number 12:**

Plaintiff has no actual recollection of anything that happened at the Party after she started dancing with Mr. Curtis.

**Response to Request Number 12:**

Denied.

**Request Number 13:**

Following the alleged sexual assault at the Party on December 9, 2006, Plaintiff did not raise charges against Mr. Bilal (sic) or anyone else with any Howard University disciplinary

5

board.

**Response to Request Number 13:**

   Admitted.

**Request Number 14:**

   Following the alleged sexual assault at the Party on December 9, 2006, Plaintiff did not

press charges against Mr. Bilal (sic) or anyone else with any state or federal police department.

**Response to Request Number 14:**

   Denied.

**Request Number 15:**

   Following the alleged sexual assault at the Party on December 9, 2006, Plaintiff did not

complain of the alleged rape to any campus security personnel at Howard University.

**Response to Request Number 15:**

   Admitted.

**Request Number 16:**

   Plaintiff did not call any rape crisis center or rape crisis hotline on December 9, 2006.

**Response to Request Number 16:**

   Objection.  The phrase "any rape crisis center or rape crisis hotline" is vague.  Admitted,

construing this phrase to mean an organization formally named a "rape crisis center" or "rape

crisis hotline."

**Request Number 17:**

   A period of at least 18 hours had passed between the time of the alleged rape and the time

of Plaintiff's arrival at George Washington University Hospital on the evening of December 9,

2006.

**Response to Request Number 17:**

Plaintiff lacks sufficient knowledge or information to admit or deny this Request.

**Request Number 18:**

Plaintiff did not incur any physical injuries during the alleged rape.

**Response to Request Number 18:**

Denied.

**Request Number 19:**

Plaintiff's clothing was not torn or stained during the alleged rape.

**Response to Request Number 19:**

Plaintiff lacks sufficient knowledge or information to admit or deny this Request.

**Request Number 20:**

Plaintiff went to George Washington University Hospital on the evening of December 9, 2006 to get a rape kit done.

**Response to Request Number 20:**

Plaintiff admits that she attempted to receive a sexual assault medical forensic examination at GWUH on December 9, 2006, but denies this Request to the extent it implies that a sexual assault medical forensic examination was the only treatment that she sought at GWUH on that day.

**Request Number 21:**

Between the time of the alleged rape and the time she presented to George Washington University Hospital, Plaintiff vomited at least once.

**Response to Request Number 21:**

Admitted.

7

**Request Number 22:**

Between the time of the alleged rape and the time she presented to George Washington University Hospital, Plaintiff brushed her teeth at least once.

**Response to Request Number 22:**

Denied.

**Request Number 23:**

Between the time of the alleged rape and the time she presented to George Washington University Hospital, Plaintiff urinated at least once.

**Response to Request Number 23:**

Admitted.

**Request Number 24:**

Between the time of the alleged rape and the time she presented to George Washington University Hospital, Plaintiff defecated at least once.

**Response to Request Number 24:**

Denied.

**Request Number 25:**

Between the time of the alleged rape and the time she presented to George Washington University Hospital, Plaintiff changed her clothing.

**Response to Request Number 25:**

Plaintiff admits that she changed her clothing between the time of the alleged rape and the time she arrived at GWUH, but denies that the clothing that she had been wearing at the Party on December 9, 2006 was unavailable to GWUH; as of December 9, 2006, Plaintiff had preserved the clothing that she had been wearing at the time of the alleged sexual assault.

8

**Request Number 26:**

Since December 9, 2006, Plaintiff has laundered the clothing that she was wearing at the time of the alleged rape at the Party on December 9, 2006.

**Response to Request Number 26:**

Plaintiff admits that she has laundered some of that clothing, but denies that she has laundered the shirt and underwear that she was wearing at the time of the alleged sexual assault.

**Request Number 27:**

Plaintiff did not notice any rectal or vaginal bleeding on December 9, 2006.

**Response to Request Number 27:**

Admitted.

**Request Number 28:**

Plaintiff did not notice any rectal or vaginal leaking or discharge on December 9, 2006.

**Response to Request Number 28:**

Objection. The term "rectal or vaginal leaking or discharge" is vague.

**Request Number 29:**

Plaintiff does not recall specifically where she was at the time of the alleged rape.

**Response to Request Number 29:**

Objection. The terms and phrases "specifically where she was" and "at the time of" are vague. Plaintiff further objects to the term "recall" because it implies without foundation that Plaintiff once knew but has forgotten where her sexual assault took place. Plaintiff admits that she does not know where the alleged sexual assault took place.

**Request Number 30:**

Plaintiff does not recall who she was with, if anyone, at the time of the alleged rape.

9

**Response to Request Number 30:**

Objection. The terms and phrases "who she was with," "if anyone," and "at the time of" are ambiguous and confusing. Plaintiff further objects to the term "recall" because it implies without foundation that Plaintiff once knew but has forgotten who sexually assaulted her and who was in the same room at the time. Plaintiff admits that she does not know who sexually assaulted her or who was present in the same room while she was being assaulted.

**Request Number 31:**

Plaintiff did not contact the police herself on December 9, 2006.

**Response to Request Number 31:**

Plaintiff admits that she did not personally call the police on December 9, 2006, but denies that she did not contact the police on December 9, 2006, as her friends and family repeatedly contacted the police on her behalf. Plaintiff also spoke with several police officers and detectives on December 9, 2006.

**Request Number 32:**

Upon arriving at George Washington University Hospital, Plaintiff read and signed a Consent to Treatment form.

**Response to Request Number 32:**

Plaintiff admits that she signed a form at GWUH that included a "consent to treatment" provision, but lacks sufficient knowledge or information to admit or deny whether she signed that form "upon arriving" at GWUH, or whether the form she signed is the same form referred to in this Request for Admission.

**Request Number 33:**

At George Washington University Hospital, Plaintiff was treated by at least two

10

physicians.

**Response to Request Number 33:**

Plaintiff admits that she was treated by at least one physician at GWUH, but does not recall being informed at GWUH that any additional physicians were treating her.

**Request Number 34:**

At George Washington University Hospital, a nurse put Plaintiff on the phone with Officer Fields to discuss Plaintiff's allegation of rape.

**Response to Request Number 34:**

Plaintiff is without sufficient knowledge to admit or deny who physically handed her the phone before she spoke with Detective Fields or the purpose of the person who handed her the phone. Plaintiff admits that she spoke with Detective Fields on the phone while she was at GWUH.

**Request Number 35:**

During her conversation with Officer Fields, Officer Fields explained the reasons why the police were unable to authorize a rape kit for Plaintiff.

**Response to Request Number 35:**

Denied.

**Request Number 36:**

At George Washington University Hospital, Plaintiff told Dr. Christopher Lang that she did not wish to pursue her rape allegation any further.

**Response to Request Number 36:**

Denied.

11

**Request Number 37:**

On December 9, 2006, Plaintiff gave a statement to Detective Wheeler of the

Metropolitan Police Department.

**Response to Request Number 37:**

Denied.

**Request Number 38:**

During her conversation with Detective Wheeler on December 9, 2006, Plaintiff stated

that she was uncertain whether she had been raped at the Party.

**Response to Request Number 38:**

Denied.

**Request Number 39:**

To this day, Plaintiff has no actual knowledge that she was raped at the Party on

December 9, 2006.

**Response to Request Number 39:**

Denied.

**Request Number 40:**

During her conversation with Detective Wheeler on December 9, 2006, Plaintiff stated

that she had been drunk at the Party.

**Response to Request Number 40:**

Denied.

**Request Number 41:**

Plaintiff did not attempt to have a rape kit performed at any other facility after she left

George Washington University Hospital on December 10, 2006.

12

**Response to Request Number 41:**

     Denied.

**Request Number 42:**

     Plaintiff has no knowledge of any witnesses to the alleged sexual assault.

**Response to Request Number 42:**

     Denied.  Plaintiff does not know if anyone was physically present during her sexual assault, but is aware of, and told the police of, the names of individuals who may have been witnesses to her sexual assault.

**Request Number 43:**

     Plaintiff cannot identify all of the men who were present at the Party on December 8-9, 2006.

**Response to Request Number 43:**

     Admitted.

**Request Number 44:**

     Plaintiff is unaware of any persons who saw, or claim to have seen, Plaintiff's drink being "spiked" with a date rape drug at the Party on December 9, 2006.

**Response to Request Number 44:**

     Admitted.

13

Dated:  April 23, 2008

Respectfully submitted,


Bruce V. Spiva, D.C. Bar. No. 443754
  bspiva@spivahartnett.com
Kathleen R. Hartnett, D.C. Bar. No. 483250
  khartnett@spivahartnett.com
SPIVA & HARTNETT LLP
1776 Massachusetts Avenue, N.W.
Suite 600
Washington, D.C. 20036
Telephone:  (202) 785-0601
Facsimile:  (202) 785-0697

*Attorneys for Plaintiff*

14

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2008, a true and correct copy of the foregoing Plaintiff's Responses and Objections to Defendant District Hospital Partners, L.P.'s Request for Admission of Facts to Plaintiff was served via email and first-class U.S. Mail, postage prepaid, upon:

Thomas V. Monahan, Jr.
 tvm@gdldlaw.com
Adam Kelley
 axk@gdldlaw.com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, Suite 2000
Baltimore, MD 21202

Dwayne Jefferson
 dwayne.jefferson@dc.gov
OFFICE OF THE ATTORNEY GENERAL
 FOR THE DISTRICT OF COLUMBIA
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001

Larry D. McAfee
 lmcafee@gleason-law.com
GLEASON, FLYNN, EMIG & FOGLEMAN,
 CHARTERED
11 North Washington Street, Suite 400
Rockville, MD 20850

Robert W. Goodson
 robert.goodson@wilsonelser.com
Deidre L. Robokos
 deidre.robokos@wilsonelser.com
Christine M. Costantino
 chrissy.costantino@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN &
 DICKER, LLP
1341 G Street, NW, Suite 500
Washington, D.C. 20005-3105

Karen R. Turner
 karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814

Bruce V. Spiva

Exhibit C

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

1 (Pages 1 to 4)

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3
4   ALEXANDRIA McGAUGHEY,      :
5        Plaintiff,    :  CASE NO.
6        v.           :  1:07-cv-01498 (RJL)
7   HOWARD UNIVERSITY, et al.,  :
8        Defendants.     :
9
10              --------------
11
12     Videotaped Deposition of ALEXANDRIA McGAUGHEY
13            Washington, D.C.
14          Tuesday, April 1, 2008
15               9:54 a.m.
16
17
18
19   Job No: 1-125031
20   Pages 1 - 361
21   Reported by:  Susan Ingram, RPR
22
```

**Page 2**

```
1      Videotaped Deposition of ALEXANDRIA McGAUGHEY,
2   held at the offices of:
3        Spiva & Hartnett LLP
4        Suite 600
5        1776 Massachusetts Avenue, Northwest
6        Washington, D.C.  20036
7
8
9
10
11
12
13
14
15
16
17
18
19        Pursuant to notice before Susan Ingram,
20   Registered Professional Reporter and Notary Public in
21   and for the District of Columbia.
22
```

**Page 3**

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4        BRUCE V. SPIVA, ESQUIRE
5        Spiva & Hartnett LLP
6        Suite 600
7        1776 Massachusetts Avenue, Northwest
8        Washington, D.C.  20036
9        Telephone: (202) 785-0601
10
11
12   ON BEHALF OF THE DEFENDANT DISTRICT HOSPITAL
13        PARTNERS, LLP:
14        THOMAS V. MONAHAN, JR., ESQUIRE
15        Goodell, DeVries, Leech & Dann, LLP
16        20th Floor
17        One South Street
18        Baltimore, Maryland  21202
19        Telephone:  (410) 783-4044
20
21
22
```

**Page 4**

```
1      A P P E A R A N C E S  (Continued)
2
3   ON BEHALF OF THE DEFENDANTS HOWARD UNIVERSITY,
4        WENDIE WILLIAMS, M.D., and DAWIT YOHANNES, M.D.:
5        KAREN TURNER, ESQUIRE
6        Hamilton Altman Canale & Dillon, LLC
7        Suite 201
8        4600 East-West Highway
9        Bethesda, Maryland  20814
10        Telephone:  (301) 652-7332
11
12
13   ON BEHALF OF THE DEFENDANT GEORGE WASHINGTON
14        UNIVERSITY:
15        JAMES P. GLEASON JR., ESQUIRE
16        LARRY D. McAFEE, ESQUIRE
17        CHRISTOPHER R. SMITH, ESQUIRE
18        Gleason, Flynn, Emig & Fogleman, Chartered
19        Suite 400
20        11 North Washington Street
21        Rockville, Maryland  20850
22        Telephone: (301) 294-2110
```

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

2 (Pages 5 to 8)

5

1    A P P E A R A N C E S  (Continued)

2

3    ON BEHALF OF THE DEFENDANT CHRISTOPHER LANG, M.D.:

4        DEIDRE L. ROBOKOS, ESQUIRE

5        Wilson Elser Moskowitz Edelman & Dicker LLP

6        Fifth Floor

7        1341 G Street, Northwest

8        Washington, D.C.  20005-3105

9        Telephone: (202) 626-7660

10

11

12    ON BEHALF OF THE DEFENDANT DISTRICT OF COLUMBIA:

13        DARRELL CHAMBERS, ESQUIRE

14        Assistant Attorney General

15        Office of the Attorney General

16        Suite 600 South

17        441 Fourth Street

18        Washington, D.C.  20001

19        Telephone: (202) 727-6295

20

21

22

6

1    A P P E A R A N C E S  (continued)

2

3    ALSO PRESENT: CHRISTOPHER LANG, M.D.; WENDIE

4    WILLIAMS, M.D.; RACHEL DELOUCH; and

5    DAVID BAYLES, VIDEOGRAPHER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

7

## C O N T E N T S

1

2    EXAMINATION OF ALEXANDRIA McGAUGHEY         PAGE

3        By Ms. Turner           11

4        By Ms. Robokos          211

5        By Mr. McAfee           243

6        By Mr. Monahan          279

7        By Mr. Chambers         316

8        By Ms. Robokos          355

9        By Ms. Turner           356

10

11

12

13        E X H I B I T S

14        (Attached to the transcript)

15    ALEXANDRIA McGAUGHEY EXHIBIT NO.           PAGE

16    1  Facsimile Transmittal Cover Sheet,      357

17        Application For Health Services

18    2  Meeting with Evelyn Treakle Moore at     357

19        Howard University Hospital ER, 12-9-06

20    3  Shopping list, December 9, handwritten notes  357

21    4  Shopping list, handwritten notes         357

22

8

1    5  George Washington University Hospital    357

2        Patient Authorization Form, 12-9-06

3    6  Howard University Hospital prescription   357

4        for Plan B and Flagyl

5    7  Incident-Based Event Report              333

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

4 (Pages 13 to 16)

**13**

1  of Howard University?
2  **A    It's part of Howard University, but it's also**
3  **a private residence.  Privately owned.**
4  Q    Is that a dorm?
5  **A    It is a dorm.**
6  Q    What's the name of the dorm?
7  **A    The Howard Plaza Towers.**
8  Q    How long have you been at that location?
9  **A    Um, since the beginning of the semester.  The**
10  **first semester, I'm sorry.  August.**
11  Q    Of '07?
12  **A    Of '07.**
13  Q    Can you just keep your voice up a little
14  bit, please?
15  **A    Sure.**
16  Q    Where did you live locally prior to that
17  location?
18  **A    I lived in the annex.  I forget the address.**
19  Q    Do you know what street that's on?
20  **A    4th Street.**
21  Q    How long did you live there?
22  **A    For about three to four months.**

**14**

1  Q    Where were you prior to that?
2  **A    I was in the Meridian, Meridian Hill Hall.**
3  Q    Where's that?
4  **A    That's on 16th Street.**
5  Q    And how long did you live there?
6  **A    For about ten months.**
7  Q    Which address did you live at in December
8  2006?
9  **A    December 2006, at Meridian Hill Hall.**
10  Q    Where is your permanent address?
11  **A    Uh, it's in Chicago, Illinois.**
12  Q    What is that address?
13  **A    10031 South Morgan Street.**
14  Q    And is that your family home?
15  **A    Uh, yes.**
16  Q    Do you currently have any roommates?
17  **A    I have one.**
18  Q    What's your roommate's name?
19  **A    Channin Griffin.**
20  Q    Shannon or Janet?
21  **A    Channin.**
22  Q    Channin.  How do you spell that?

**15**

1  **A    C-h-a-n-n-i-n, I believe.**
2  Q    Okay.  How long has she been your roommate --
3  she; right?
4  **A    Uh-huh.**
5  Q    Okay.  How long has she been your roommate?
6  **A    Uh, since August.**
7  Q    Did you have any roommates in December 2006
8  when you lived at Meridian?
9  **A    I had a suite mate.**
10  Q    Who was your suite mate?
11  **A    I have no idea.**
12  Q    You don't remember that person's name?
13  **A    We didn't talk.**
14  Q    Was that person your suite mate the entire
15  time you were in that dorm?
16  **A    No.**
17  Q    How long were they your mate -- suite mate?
18  **A    Let's see, she got there in the middle of the**
19  **semester.  I really don't remember.  She was an**
20  **upperclassman so ...**
21  Q    Did she arrive prior to December 2006?
22  **A    I don't remember.**

**16**

1  Q    Was it first semester or second semester that
2  she arrived?
3  **A    I don't remember.**
4  Q    Do you have any contact with her now?
5  **A    No.**
6  Q    What's your date of birth?
7  **A    March 28th, 1987.**
8  Q    And when did you become -- first become a
9  student at Howard University?
10  **A    In August of '05.**
11  Q    Where did you graduate high school?
12  **A    Walter Payton College Prep.**
13  Q    What city and state is that in?
14  **A    Chicago, Illinois.**
15  Q    Have you declared a major at Howard yet?
16  **A    Public relations.**
17  Q    What year are you in currently?
18  **A    I'm a junior.**
19  Q    What's your expected graduation date?
20  **A    May 2009.**
21  Q    Do you know what your current GPA is?
22  **A    Overall, it should be a 3.1, I believe.**

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

7 (Pages 25 to 28)

**25**

1    freshman year?
2        A    The Quad.  The Quadrant.
3        Q    And was she your roommate for that whole
4    year?
5        A    Yes, she was.
6        Q    What about Sade?
7        A    She stayed in the same hall as me.
8        Q    Have you ever been roommates?
9        A    No.
10       Q    Or suite mates?
11       A    No.
12       Q    Do you and these young ladies socialize when
13   you're not on campus?  Sort of like if over the summer,
14   if you go home, do you keep in touch?
15       A    Uh-huh, yes.
16       Q    Would you describe these as your best
17   friends?
18       A    Yes.
19       Q    Are there other friends who you identify as
20   being as close of friends to you as Ms. Dike and
21   Ms. Reid?
22       A    Yes.

**26**

1        Q    Who would they be?
2        A    Um, well, I just have other friends at school
3    and outside of school so ...
4        Q    Well, I'm trying to focus on who would you
5    consider to be as close or, you know, as good a friends
6    as those two.
7        A    Well, nobody that really has to deal with
8    this, what was going on right now.
9        Q    Okay.  Anybody locally?
10       A    Locally who live -- who come from D.C. or
11   Maryland?
12       Q    No, any close friends that you have here
13   besides the two, Ms. Reid and Ms. Dike.
14       A    Yes.
15       Q    And who else would that be?
16           MR. SPIVA:  You can answer.
17       A    Um, okay.  Well, I have a friend named
18   Brittney, I have a friend named Laisha --
19       Q    First and last names, please.
20       A    I have a friend named Brittney Autry.  I have
21   a friend named Laisha Owens, I have a friend named Ceily
22   Moore.  Um, I have a friend named Stacia Thompson.  I

**27**

1    mean, that's all that ...
2        Q    Okay.  How do you know Amanda Lockett?
3        A    How do I know Amanda Lockett?
4        Q    Uh-huh.
5        A    Just through friends, through friends, and we
6    became cool through friends so ...
7        Q    Had you gone out socially to parties or clubs
8    with Ms. Dike and Ms. Reid prior to December 2006?
9        A    Uh, I didn't really go to clubs and parties
10   like that.  I wasn't big on that, so no.  I mean, we
11   would hang out, go to the movies perhaps, or something
12   like that but ...
13       Q    How often in that semester, that first
14   semester of your sophomore year, did you go to a party,
15   either on campus or off campus?
16           MR. SPIVA:  Did you say first year or
17   sophomore year?
18           MS. TURNER:  First semester sophomore year.
19       A    First semester sophomore year.  I didn't
20   really attend any.  Only the one where the incident
21   occurred, that's the one I remember.
22           I don't really go to parties or clubs like

**28**

1    that so ...  And it didn't make any difference.
2        Q    Okay.  What about over the summer --
3        A    Over the summer?
4        Q    -- prior to your sophomore year?
5        A    No, because basically I was too young,
6    definitely.  I was just become of age to go to clubs.
7    So over the summer I was at home, so no, not at all.
8    Actually, not at all.
9        Q    Okay.  And freshman year, how often did you
10   go to parties?
11       A    I can't give you exact number.  Maybe two to
12   three a semester.
13       Q    Did you ever attend a party or even visit the
14   home that's located at 21 Bryant Street before December
15   9 --
16       A    Never.
17       Q    -- 2006?
18       A    Never.
19       Q    Did you know anyone who lived at that address
20   prior to going there on December 9th?
21       A    No.
22       Q    How did you find out about that particular

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

10 (Pages 37 to 40)

---

**37**

1      Were they serving food at the party?
2    A    No.
3    Q    Did you meet up with any friends once you got
4  to the party?
5    A    Uh, we saw friends at the party, yes.
6    Q    And did you all sort of hang together while
7  you were at the party?
8    A    Yes.
9    Q    Who was -- who else besides Ms. Dike was in
10  your group --
11    A    Kerston.
12    Q    -- while you were at the party?
13    A    Kerston and Amanda.
14    Q    Do you know whether any of those three young
15  ladies had had any alcohol prior to coming to the party?
16    A    No, I don't know.
17    Q    Do you know if they had anything to drink at
18  the party?
19    A    Um, they weren't heavily under my watch but
20  they probably did, but I don't want to say for sure, you
21  know, I wasn't -- you know, I wasn't in their shoes.
22    Q    Do you know if they were -- they had used any

---

**38**

1  type of elicit drugs prior to or at the party?
2    A    Do I know if they used any?
3    Q    Yes.
4    A    No, they don't do that.
5    Q    Once you were at the -- strike that.
6      Were they serving any type of alcohol other
7  than whatever was in the Gatorade pitcher, like beer
8  or --
9    A    I don't remember.
10    Q    -- liquor?
11    A    I don't remember.
12    Q    After you drank the beverage that you were
13  provided, did you notice any change in how you were
14  feeling?
15    A    Uh, not really.  I was doing fine.  I was
16  talking to my friends, danced.  And the next thing you
17  know, I just don't remember anything after that.  I was
18  basically like a blackout period.
19    Q    How long had you been at the party before you
20  blacked out?
21    A    Maybe an hour.
22    Q    Did you sort of drink the beverage quickly,

---

**39**

1  or did you sort of sip on it over a period of time?
2    A    I sipped on it a period of time because --
3  yeah, I sipped on it for a period of time.
4    Q    How much did you eventually drink of that?
5      MR. SPIVA:  You mean --
6    Q    Whatever the beverage was.
7    A    The beverage in the cup, maybe half.
8    Q    And was it -- can you estimate what size cup
9  it was?  There are different sized cups, you know, some
10  are 16 ounces, some are eight ounces.
11    A    Exactly.  Probably about the size of this cup
12  here.
13    Q    Okay.  Well, why don't you hold that up for
14  the video so we can get a visual of it.  I don't know
15  how many ounces that is.  Does it say?
16      MR. SPIVA:  Doesn't say, actually.
17    Q    Okay.  So you drank half of what would fill
18  that cup?
19    A    Uh-huh.
20    Q    You have to say "yes" or "no."
21    A    Yes.
22    Q    Did you have anything else to drink while you

---

**40**

1  were at the party?  Water, soda, anything at all?
2    A    No.
3    Q    Were you dancing with anyone that you knew
4  whose name you were able to identify at any point during
5  the party?
6    A    Uh, yes.
7    Q    Who do you recall dancing with?
8    A    Um, Bilal.
9    Q    Who is Bilal?
10    A    Bilal Curtis.  I believe he was the owner of
11  the house.
12    Q    Did you know him before you went to the
13  party?
14    A    No.
15    Q    How do you -- how did you know that he was
16  the owner of the house?
17    A    Uh, somebody had told me.
18    Q    While you were there or at some other time?
19    A    Um, I don't remember.  It was either there or
20  after.
21    Q    But when you were dancing with him, did you
22  know his name?

---

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

12 (Pages 45 to 48)

**45**

1     A     Um, I went outside, but I don't think I went
2  to the washroom.
3     Q     Okay. All right. Was -- can you estimate
4  how many people were at the party during the time that
5  you were there?
6     A     Um, it wasn't like a big house, so a small
7  amount of people couldn't make it. Seemed like there
8  was a lot of people there, so maybe 30.
9     Q     Did it seem crowded to you?
10    A     Um, yeah.
11    Q     Do you recall there being any fighting?
12    A     No fighting.
13    Q     Just before you blacked out, what do you
14  remember?
15    A     Uh, I remember sitting on the couch talking
16  to my friends. I remember getting up and dancing. And
17  that was the end of what I remember. I remember
18  dancing.
19    Q     And was that when you were dancing with
20  Mr. Curtis?
21    A     Yes.
22    Q     Was he dancing with you in any kind of sexual

**46**

1  or offensive way?
2     A     He was getting a little rough, and I remember
3  trying to kind of just get away from him or like notify
4  Sade or -- but I don't know if she was -- I don't even
5  think she was close to me at that point, so -- but right
6  before that, I remember I tried to stop dancing with
7  him.
8     Q     What do you mean he was getting rough?
9     A     Um, just not what I liked to do when I
10  danced. You know, a little too much of sexual
11  suggestion or just touching me where I don't feel it's
12  appropriate.
13    Q     How was he touching you?
14    A     Um, just touching me too much. You don't
15  need to -- when I dance, I mean, I guess -- I think it
16  was on my arms, but I don't remember exactly how.
17    Q     Was he dancing close to you as well?
18    A     Yes.
19    Q     Were -- when you said you were sitting on the
20  couch with your friends, which of your friends were you
21  talking to while you were sitting on the couch?
22    A     Amanda. I do remember Amanda.

**47**

1     Q     And when you were dancing with Mr. Curtis,
2  were any of your friends around?
3     A     I don't remember.
4     Q     Were you able to -- strike that.
5         How long had you danced with Mr. Curtis
6  before you were trying to stop dancing with him?
7     A     I don't know.
8     Q     One song, two songs? Can you estimate in
9  that way?
10    A     I don't know. I'm not sure.
11    Q     How did he respond to your efforts to have
12  him move away from you or stop dancing?
13    A     Um, I don't necessarily remember exactly how,
14  but he wasn't allowing me, you know, just freely or, you
15  know, easily, so ...
16    Q     Did you at some point get away from him?
17    A     I don't remember.
18    Q     So, the very last thing you remember is what?
19    A     Being with Bilal, or trying to get away or
20  trying to, you know, move to the next room.
21    Q     Which room were you in at that point?
22    A     The first living area closest to the exit

**48**

1  door.
2     Q     Um, do you recall anything he said to you
3  while you were dancing?
4     A     No.
5     Q     Did he say anything to you while you were
6  dancing?
7     A     I don't remember.
8     Q     Do you recall words that you said to him
9  while you were dancing?
10    A     No.
11    Q     Did anyone around you say anything to either
12  of you during the time that you were trying to get him
13  to stop dancing?
14    A     Uh, no.
15    Q     You said that you were looking for Ms. Dike,
16  but she wasn't in your general vicinity while you were
17  dancing with Mr. Curtis?
18    A     I don't remember.
19    Q     Was there a point at -- during when you were
20  dancing with Mr. Curtis that you were trying to get her
21  attention?
22    A     I don't remember.

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

14 (Pages 53 to 56)

53

1   to leave, basically, I guess, just pushed out of the
2   house, but then they knocked on the door again and, you
3   know, asked to get me or, you know, they just wouldn't
4   leave without me, and so they told them it would be a
5   minute. And so I finally came down.
6       Um, we left, um, we were walking. They asked
7   me what happened or why did I go up there, and they said
8   there's something wrong, and I shook my head, yes, I
9   said yes. And they said what happened, and I said
10  somebody touched me, and they said, somebody touched
11  you?
12      They went back to the house. They knocked on
13  the door, and they pretty much demanded to know who was
14  up there with me or, you know, whatever was going on.
15      I don't know who came to the door. They came
16  to the door and told them some name just to, you know,
17  get them off their backs so there wouldn't be any
18  further, I guess, altercation.
19      They saw that they weren't going to budge or
20  clearly that they were lying, so we left. They said I
21  got to the corner again and just began throwing up, but,
22  like, compulsively.

54

1       So they called a — like a super shuttle we
2   have, not a shuttle, but like an escort service we have.
3   It takes us places after hours on the campus. Took me
4   to the Howard University Hospital. We went there.
5       They tried to, well, admit me or, you know,
6   to say that I had possibly been raped, which is — my
7   friend Kerston said, that I possibly — to admit me,
8   because I had possibly been raped and to receive a rape
9   kit.
10      They told me — we went to the back room.
11  The triage nurse saw me, and we went to the back room.
12  They put me on a bed. I began throwing up more
13  compulsively.
14      I was notified that the doctor came to see
15  us. Basically — and they told us that — my friend
16  Kerston, her mother is a nurse, and basically like if
17  someone touched you, you need to know what happened, and
18  in order to know what happened, you need a rape kit.
19      Um, we asked for that. Basically, it was
20  denied because I was supposedly drunk or too drunk to
21  say anything for myself or to speak for myself, so I was
22  basically really unconscious during this time. I wasn't

55

1   even able to walk on my own.
2       And, um, I was told to come back in the
3   morning, when I could remember something. And I was
4   discharged. And we went back to my room and fell asleep
5   until the morning.
6   Q   What time did you wake up?
7   A   Uh, I don't remember. But the morning.
8   Q   You know it was morning --
9   A   Early morning.
10  Q   -- as opposed to afternoon?
11  A   Exactly, early morning.
12  Q   What was it -- what was going on that makes
13  you sure it was early morning?
14  A   Um, well, the sun was up. It was early
15  morning. I know it was before 12:00. I just know it
16  was before 12. I know it was before 12 because we got
17  to the hospital pretty early before 12 or ...
18  Q   And you were in your room, you said?
19  A   I was in my room.
20  Q   Were you in your own bed?
21  A   I was in my own bed.
22  Q   Were you clothed?

56

1   A   I was clothed.
2   Q   Was anybody else in the room besides Ms.
3   Reid?
4   A   No.
5   Q   The information that you just provided of
6   what Ms. Reid and Ms. Dike told you, do you have any
7   recollection of any of those events of your own?
8   A   None whatsoever.
9   Q   Did you or any of your friends have cell
10  phones back then?
11  A   Yes.
12  Q   Did you have them with you at the party?
13  A   Um, I don't remember if I had mine; I know my
14  friend Sade did and Kerston did.
15  Q   Did they indicate to you first who pushed
16  them -- threw them down the steps or pushed them down
17  the stairs?
18  A   They, um, a guy by the name of Tito.
19  Q   Do you know Tito?
20  A   Um, not directly. I just knew him -- no, not
21  directly.
22  Q   Do you know his full name?

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

16 (Pages 61 to 64)

**61**

1   about what was happening with me.
2   Q   Did you have any dizziness?
3   A   Um, not that I can recall.
4   Q   Were you nauseous at all?
5   A   No.
6   Q   Did you vomit once you woke up?
7   A   No.
8   Q   Do you know whether or not during the period
9   that you were blacked out that -- if your friends tried
10  to get you to eat anything?
11  A   Um --
12  Q   Did they offer you food?
13  A   I don't remember.
14  Q   Coffee or anything?
15  A   No.
16  Q   Did they tell you whether or not they did
17  anything to try to wake you up or stimulate you?
18  A   They told me when I was at the hospital they
19  put smelling salts, I don't know what you call the
20  medical term, but smelling salts under my nose to wake
21  me up or to bring me to consciousness.
22  Q   Did they say how you responded to that?

**62**

1   A   They said I opened my eyes for a bit.
2   Q   Did Ms. Dike or Ms. Reid say that they did
3   anything separate from that to try to wake you up or
4   keep you up?
5   A   I don't remember.
6   Q   Um, do you recall, once you woke up, whether
7   or not you ate or drank anything?
8   A   Not when I first woke up, but when we went to
9   campus, I ate Subway.
10  Q   When did you go to campus?
11  A   I'm not sure. Maybe 10 to 11.
12  Q   10 or 11:00 a.m?
13  A   Yes.
14  Q   And when you say "went to campus," what do
15  you mean?
16  A   We took a shuttle to the campus, so it
17  dropped us off at the Towers.
18  Q   See, I'm a little confused because you lived
19  on campus.
20  A   Yes, but -- no, Meridian Hill Hall is on 16th
21  Street.
22  Q   Okay.

**63**

1   A   The campus is located on 4th Street.
2   Q   The main campus.
3   A   Or 6th Street.  Right.
4   Q   I gotcha, okay.
5       So the Subway sandwich shop that you went to
6   was located where?
7   A   On Georgia Avenue.
8   Q   And what did you eat there?
9   A   A sub and a drink and chips.
10  Q   What, a six-inch sub?
11  A   Yes.  I don't really get -- I don't get
12  12-inch.
13  Q   Okay.  Did you eat the whole thing?
14  A   No, I couldn't, no.
15  Q   How much of it did you eat?
16  A   Uh, I'm not sure.  Half.
17  Q   Why couldn't you eat more?
18  A   I mean, my stomach was hurting.
19  Q   Did your stomach hurt before you started
20  eating?
21  A   Yes.
22  Q   When did you first notice your stomach

**64**

1   hurting?
2   A   Um, I'm not sure.  Maybe in the morning.
3   Q   Did you shower?
4   A   No.
5   Q   Did you change your clothes?
6   A   Yes.
7   Q   And what did you -- why didn't you shower?
8   A   Um, I was told not to shower, but I wasn't
9   informed not to eat.  I was just told not to shower.
10  Q   Who told you not to shower?
11  A   Uh, well, I guess a nurse told Kerston to
12  tell me not to shower until we came back in the morning.
13  Q   Did you use a bathroom at all?
14  A   I did.
15  Q   And did you urinate, have a bowel movement,
16  what?
17  A   Uh, urinate.
18  Q   How many times before you went back to
19  Howard?
20  A   Hmm, once.
21  Q   Do you know whether or not while you were
22  blacked out if you went to the bathroom, if they took

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

29 (Pages 113 to 116)

113

1    A    I mainly just remember the soreness on my
2    leg.
3    Q    Have you come to some understanding as to who
4    it was that you believed raped you or sexually assaulted
5    you?
6    A    One more time?
7    Q    Have you come to some understanding, since
8    you were blacked out, based on what you were told by
9    other people, have you come to some understanding of who
10   it was that allegedly raped you or sexually assaulted
11   you on December 9th?
12   A    I can't come to any understanding.  I mean, I
13   can only assume, but I can only stay clear of who might
14   have and just keep my distance.
15   Q    Who do you believe it might have been?
16   A    Perhaps Bilal or any one of the owners of the
17   house.  Then again, I don't know.
18   Q    Do you know the names of any other owners?
19   A    No.
20   Q    I take it you have not been back to that
21   house since?
22   A    No.

114

1    Q    Do you know if Ms. Dike, Ms. Reid or
2    Ms. Lockett have been?
3    A    No.
4    Q    What about your sister or other family
5    members?
6    A    Have they been to the house?
7    Q    Yes --
8    A    No, never.
9    Q    -- since December 9, 2006, have they gone to
10   the house?
11   A    Kerston and Sade have not been back to the
12   house.  My sister nor family have ever been to the
13   house.
14   Q    Okay.  Once you got to Howard --
15   A    Uh-huh.
16   Q    -- now the first time, um, did Ms. Dike or
17   Ms. Reid identify by name any of the health-care
18   providers that either they spoke with or that evaluated
19   you?
20   A    The first time we went to Howard University
21   Hospital, they told me we saw Dr. Wendie Williams.  And
22   that was the lady who discharged me and gave me the

115

1    instructions.
2    Q    What did they say Dr. Williams did?
3    A    Um, perhaps gave me the smelling salts to
4    wake me back up, told me to go home.  Told me that I was
5    -- I could not answer for myself or say anything for
6    myself; therefore, I could not receive a rape kit, and
7    to go home and not shower.
8    Q    Did they --
9    A    Come back in the morning when I could talk
10   for myself.
11   Q    Did your friends tell you anything about any
12   information they received regarding the SANE, S-A-N-E,
13   nurse or the SANE evaluation?
14   A    One more time?
15   Q    Did Ms. Dike or Ms. Reid tell you anything
16   about information that they had been provided about the
17   SANE nurse or a SANE evaluation?
18        MR. SPIVA:  Objection.  Time frame.
19   Q    During that -- did they tell you at any time
20   about information that they received during that first
21   visit?
22   A    During the first visit, I don't remember.

116

1    Q    I know you don't remember, but I'm asking
2    you --
3    A    I don't remember what they told me exactly.
4    Q    Okay.  My question is, did they tell you
5    anything about --
6    A    The SANE -- I mean, I don't remember anything
7    coming from Kerston or Sade's mouth of -- involving a
8    SANE nurse.
9    Q    Okay.
10   A    Just the sex kit --
11   Q    Okay.
12   A    -- and that I was refused.
13   Q    And what did they say about the reason you
14   were discharged, if they said anything?
15   A    Hmm, that, basically, I was thought to be
16   drunk or intoxicated.  Um, even if they -- they said to
17   the doctor, even if I could not receive a sex kit, to
18   treat me for some type of drug that I would be drugged,
19   or to at least keep me in the hospital so I could be,
20   you know, restored or to keep me in the hospital so --
21   'cause they wouldn't know what would happen during the
22   night, just to keep me there until I could say something

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

31 (Pages 121 to 124)

121

1    A    No.  I don't know whether or not.
2    Q    Okay.  Do you know whether or not either of
3  them contacted your RA that night?
4    A    No.
5    Q    Do you know if they subsequently contacted
6  your RA?
7    A    No, they didn't.
8    Q    Did you?
9    A    No.
10    Q    Was there any particular reason why you
11  didn't notify your RA?
12    A    I didn't want any other parties that weren't
13  necessary to get involved to get involved.
14    Q    Once you woke up, did you discuss calling the
15  police?
16    A    Um, we did.
17    Q    What was that discussion?
18    A    Um, as soon as I woke up, when we got to the
19  hospital, we thought it was best to call the police.
20    Q    Well, before you got to the hospital, was
21  there any discussion about calling the police?
22    A    I'm not sure.

122

1    Q    And to your knowledge -- well, strike that.
2        Did either of your friends tell you whether
3  or not the police had been contacted during your first
4  hospital visit?
5    A    I don't remember.
6    Q    Did they tell you how long you were at Howard
7  the first time total?
8    A    Um, they did, but at this point, I mean,
9  probably -- I'm not sure, so I don't want to say, but
10  they gave me a time frame, so ...
11    Q    What time frame did they give you?
12    A    Then again, I don't know the specifics as of
13  now.  We left probably maybe what, 3, 3 in the morning.
14    Q    Left where?
15    A    Howard University Hospital.
16    Q    Okay.  Did they say whether or not you
17  were -- once you got to the hospital, if you had to sit
18  in the waiting room for any period of time the first
19  time?
20    A    The first time?  I don't remember what they
21  told me exactly, so ...
22    Q    Did either of your friends say who they

123

1  thought might have been the person to commit this act?
2    A    Um, they believed that it could possibly be
3  who they were -- the person at the door when they tried
4  to get admitted the second time.  The name that they
5  told us.  But that was the only name we were given, and
6  we don't even know if it was a real name or not, so ...
7    Q    About what time was it when you got to the
8  hospital, back to Howard the second time?
9    A    11ish, I'm not sure.
10    Q    And I think Ms. Reid was the one who went
11  with you; correct?
12    A    Yes.
13    Q    Tell me, please, what happened once you
14  arrived on that second visit.
15    A    We came to the hospital.  I told them what
16  happened.
17    Q    To the emergency room?
18    A    To the emergency room.
19        I told them that I had been raped, and that I
20  needed to receive a sex kit.  I filled out some papers,
21  called the police.  Waited for God knows how long.
22        The police arrived -- or a detective arrived.

124

1  Um, the detective arrived, told them the story.  He
2  contacts another detective over the phone, tells him
3  what happened.
4        Um, the detective over the phone tells me
5  that I would not be able to receive a sex kit because I
6  do not know the person or whoever it was last name.  I
7  didn't know the last name.  So I could not receive the
8  sex kit.
9        So after that I guess the deal was done, went
10  back to see a triage nurse.  Waited some more.  Then
11  went back to see another nurse.
12        She saw the food in my hand and asked me why
13  I ate, because even if I was to get a sex kit, you were
14  not supposed to eat, but I was not instructed to do so.
15        Basically, she said you have a lost cause
16  'cause you ate, and sent me out so I could -- sent me
17  out to the waiting room so I could see a doctor.
18        My sister came about an hour or two later,
19  then saw another doctor, and then another set of police
20  came.
21    Q    Did you get the name of the nurse who asked
22  you about -- asked you why you ate?

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

36 (Pages 141 to 144)

141

1  triage?
2      A  I'm not sure the point where I came in
3  contact with the detective.  I have that all mixed up,
4  so, you know, I'm not sure if that was -- if I talked to
5  the detective before I went to triage or after I went to
6  triage, I'm not sure.
7      Q    Where were you when you talked to the
8  detective?
9      A  In the waiting room.
10     Q    Um, after you left the waiting room, you went
11 to the back area.
12     A  After I left the waiting room after the hours
13 that I sat there, yes, I was taken into the back.
14     Q    Okay.  And so wherever you were taken into
15 the back, is that where you remained until you left the
16 hospital?
17     A  Yes.
18     Q    In the back did you -- were you evaluated by
19 any nurses or doctors?
20     A  Not physically.  He just -- not physically.
21 I didn't take off any clothes, I didn't -- he just gave
22 me a couple of prophylactics.

142

1      Q    Did you speak with a doctor?
2      A  Yes.
3      Q    And what do you recall your conversation
4  being with that doctor?
5      A  Um, I was raped.  I believe I need a sex kit
6  or I would like to receive one.  Is there anything you
7  can do.
8          He said he could not 'cause he was directed
9  not to.  Um, he told me to -- so he gave me
10 prophylactics or, you know, for syphilis or other STDs.
11     Q    Was anyone present, either family member,
12 friend, nurses, anyone else present in the room
13 during --
14     A  In the room with me?  No.
15     Q    -- this conversation?
16         When the doctor was talking to you.
17     A  When the doc -- no.
18     Q    Do you recall the doctor offering to do a
19 pelvic exam?
20     A  No.
21     Q    Do you recall at any point your refusing a
22 pelvic exam?

143

1      A  Not at all.
2      Q    Do you recall specifically coming to the
3  hospital, asking for treatment for possible STDs due to
4  unprotected sex?
5      A  No, I didn't -- rephrase the question?
6      Q    Did you -- do you recall specifically saying,
7  "I want to be treated for possible STDs because I had
8  unprotected sex"?
9      A  No, I said I was raped and I would like to
10 receive a sex kit.
11     Q    Did your friends tell you whether or not
12 police had been contacted during your first visit?
13     A  I don't remember.
14     Q    Do you know how the police were contacted
15 during your -- during the second visit at Howard?
16     A  I contacted them either -- if it wasn't me,
17 it was probably Kerston or -- it wasn't me, but it was
18 Kerston or someone.
19     Q    And how did you contact them?
20     A  Over the phone.
21     Q    You dialed 911 or non-emergency number?
22     A  I'm not sure.

144

1      Q    Were -- was a call made to the police more
2  than once during that second visit, that you know of?
3      A  Yes.
4      Q    And when was the second time a call was made?
5      A  Around maybe 4 or 5.
6      Q    Who made that call?
7      A  My sister.
8      Q    Were any Howard University health-care
9  providers involved in making those calls or assisting in
10 making those calls to the police?
11     A  The first one I don't remember, but the
12 second one, no, not at all.
13     Q    Do you remember being present when and if
14 anybody from Howard spoke to any police officer?
15     A  No.
16     Q    What happened -- when the time came for you
17 to be discharged from Howard, what were you told, what
18 information were you given?
19     A  The second time?
20     Q    Yes.
21     A  Um, I don't -- if I was discharged -- well,
22 we were discharged, I guess, I don't know if we were

VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

83 (Pages 329 to 332)

329

1    Q    And that's sort of the open space where all
2    the patients are waiting?
3    A    Yes.
4    Q    Did you have a conversation with him at that
5    time?
6    A    Sure did.
7    Q    And he spoke with you out there in the open?
8    A    Yes. Um, we sat two seats next to each
9    other. We didn't speak very loudly, but yes, we were.
10   Q    Okay. And what was the substance of the
11   conversation you had with that officer?
12   A    Basically, to run through what had happened
13   and to tell him what I believe had happened to my
14   knowledge, and to have him decipher from there.
15   Q    Um, and what did you tell him you believed
16   happened?
17   A    That I was raped.
18   Q    Can you describe that officer?
19   A    Black, taller than me, middle age. Had on a
20   police uniform.
21   Q    Um, when was the next time you spoke to a
22   police officer after that, after speaking with that

330

1    first officer?
2    A    I spoke to a detective about 15 minutes later
3    over the phone.
4    Q    Okay. And do you know that officer's name?
5    A    Not right now, but I could tell you. I mean,
6    not now.
7    Q    Okay. And what was the conversation with
8    that officer?
9    A    The conversation basically asking me
10   questions about what happened that night, um, who did I
11   believe the person was, did I know the person's last
12   name. No, I don't know the person's last name. You
13   can't get a rape kit.
14   Q    Didn't your friends have a first and last
15   name of the person?
16   A    Not during that time, no.
17   Q    Didn't someone at the house, when they went
18   back to inquire as to what happened, give them a name,
19   Adams or Joseph?
20   A    No, it was clearly a made-up name. It was a
21   made-up name. It was something they told us just to get
22   them off -- get us off of their backs.

331

1    Q    Do you know for a fact that that's a made-up
2    name?
3    A    From the little bit of research or -- I've
4    tried the -- I have not come across an Adam Joseph.
5        Plus, I didn't want to say somebody it was
6    when I didn't know it was because I had been drugged and
7    been out of it and didn't know exactly who it was.
8    Hence, the point of the rape kit.
9    Q    So, you didn't give a name.
10       MR. SPIVA: Objection, to the extent you're
11   implying that she knew of a name at that time.
12       MR. CHAMBERS: She knew of the name Adam
13   Joseph.
14       MR. SPIVA: Objection, lack of foundation,
15   mischaracterizes the testimony. That she knew of.
16   Q    Now, you said when you were dancing before
17   you passed out you remember the last person you remember
18   dancing with was Bilal Curtis.
19   A    I didn't know his last name at that point.
20   Q    But you knew Bilal.
21   A    I didn't even really know him. I didn't know
22   him. I wasn't formally introduced to him.

332

1    Q    Meaning, you knew his first name is my
2    question.
3    A    Yes, which means I still don't know a last
4    name, by the time I talked to the detective.
5    Q    So is that all the detective said to you,
6    there's no last name, so we're not filing a report?
7    A    Pretty much.
8    Q    When you say "pretty much," is that all he
9    said, or did he say more?
10   A    Not that I recall, nothing that was too much
11   more important.
12   Q    Do you recall him saying anything more?
13   A    Clearly, there was more said. I mean, it was
14   nothing more that went in the depth of why I can't get
15   it, he just said I cannot -- you cannot receive a rape
16   kit.
17   Q    Okay. So that officer -- that detective you
18   talked to on the telephone told you you can't receive a
19   rape kit?
20   A    Exactly.
21   Q    Is that what you asked for, a rape kit, when
22   you walked into the hospital?

Exhibit D

VIDEOTAPED DEPOSITION OF SADE JULIANNA DIKE
CONDUCTED ON THURSDAY, MAY 1, 2008

1 (Pages 1 to 4)

**Page 1**

```
1       IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
3    - - - - - - - - - - - - - +
                               |
4    ALEXANDRIA McGAUGHEY,     |
                               |
5         Plaintiff,   | Case No.:
                               |
6    vs.              | 1:07-cv-01498 (RJL)
                               |
7    HOWARD UNIVERSITY, et al, |
                               |
8         Defendants.   |
                               |
9    - - - - - - - - - - - - - +
10
11       Videotaped Deposition of Sade Julianna Dike
12             Washington, D.C.
13             Thursday, May 1, 2008
14                 9:37 a.m.
15
16
17
18
19
20   Job No. 1-127251
21   Pages 1 - 326
22   Reported by:  Laurie Bangart-Smith, RPR, CRR
```

**Page 2**

```
1            Videotaped Deposition of
2              SADE JULIANNA DIKE
3
4    Held at the offices of:
5        WILSON, ELSER, MOSKOWITZ,
6        EDELMAN & DICKER, LLP
7        1341 G Street, Northwest, Suite 500
8        Washington, D.C. 20005
9        (202)626-7660
10
11
12
13
14
15
16       Taken pursuant to notice, before Laurie
17   Bangart-Smith, Registered Professional
18   Reporter, Certified Realtime Reporter, and
19   Notary public in and for the District of
20   Columbia.
21
22
```

**Page 3**

```
1                A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF AND WITNESS, SADE DIKE:
3        BRUCE V. SPIVA, ESQUIRE
4        KATHLEEN R. HARTNETT, ESQUIRE
5        Spiva & Hartnett, LLP
6        1776 Massachusetts Ave., N.W., Suite 600
7        Washington, D.C. 20036
8        (202)785-0601
9    ON BEHALF OF DEFENDANT DISTRICT OF COLUMBIA:
10       DWAYNE C. JEFFERSON, ESQUIRE
11       Office of the Attorney General
12       One Judiciary Square
13       441 Fourth Street, Northwest
14       Washington, D.C. 20001
15       (202)727-6295
16   ON BEHALF OF DEFENDANT DISTRICT HOSPITAL PARTNERS,
17   LP:
18       ADAM KELLEY, ESQUIRE
19       Goodell, DeVries, Leech & Dann, LLP
20       One South Street, 20th Floor
21       Baltimore, Maryland 21202
22       (410)783-4000
```

**Page 4**

```
1    (Appearances continued)
2    ON BEHALF OF THE DEFENDANT GEORGE WASHINGTON
3    UNIVERSITY:
4        JAMES P. GLEASON, JR., ESQUIRE
5        Gleason, Flynn, Emig & Fogleman, Chartered
6        11 North Washington Street, Suite 400
7        Rockville, Maryland 20850
8        (301)294-2110
9    ON BEHALF OF THE DEFENDANT DR. CHRISTOPHER LANG:
10       CHRISTINE COSTANTINO, ESQUIRE
11       Wilson, Elser, Moskowitz,
12       Edelman & Dicker, LLP
13       1341 G Street, N.W., Suite 500
14       Washington, D.C. 20005
15       (202)626-7660
16   ON BEHALF OF DEFENDANT HOWARD UNIVERSITY:
17       KAREN R. TURNER, ESQUIRE
18       Hamilton, Altman, Canale & Dillon, LLC
19       4600 East West Highway, Suite 201
20       Bethesda, Maryland 20814
21       (301)652-7332
22
```

VIDEOTAPED DEPOSITION OF SADE JULIANNA DIKE
CONDUCTED ON THURSDAY, MAY 1, 2008

2 (Pages 5 to 8)

**Page 5**

1  (Appearances continued)
2  ALSO PRESENT:
3      Will Freburger, Videographer

**Page 7**

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins Videotape
3  Number 1 in the deposition of Sade Dike, in
4  the matter of Alexandria McGaughey versus the
5  District of Columbia, et al, pending in the
6  U.S. District Court for the District of
7  Columbia, case number 1:07-cv-01498.
8          Today's date is May 1st, 2008.  The time
9  on the video monitor is 9:37 a.m.  The video
10  operator today is Will Freburger.  This video
11  deposition is taking place at 1341 G Street,
12  Northwest, Washington, D.C.
13          Counsel, please voice-identify
14  yourselves and state whom you represent.
15          MR. SPIVA:  Bruce Spiva for the witness,
16  Sade Dike, and for the plaintiff.
17          MS. HARTNETT:  Kathleen Hartnett also
18  for the witness and the plaintiff.
19          MR. GLEASON:  James Gleason on behalf of
20  defendant George Washington University.
21          MS. COSTANTINO:  Christine Costantino on
22  behalf of defendant, Dr. Christopher Lang.

**Page 6**

1          EXAMINATION INDEX
2                  PAGE
3  EXAMINATION BY MS. TURNER . . . . . . . . . .  8
4  EXAMINATION BY MR. GLEASON  . . . . . . . . .  172
5  EXAMINATION BY MR. JEFFERSON  . . . . . . . .  191
6  EXAMINATION BY MS. COSTANTINO . . . . . . . .  283
7  EXAMINATION BY MR. KELLEY . . . . . . . . . .  290
8
9          E X H I B I T S
10      (Attached to the Transcript)
11  DEPOSITION EXHIBIT                    PAGE
12  Exhibit 1  Hand-drawn diagram        197
13  Exhibit 2  Handwritten shopping list  297

**Page 8**

1          MR. JEFFERSON:  Dwayne Jefferson,
2  District of Columbia.
3          MR. KELLEY:  Adam Kelley for defendant
4  District Hospital Partners, LP.
5          MS. TURNER:  Karen Turner for Howard
6  University Hospital, Dr. Williams and
7  Dr. Yohannes.
8          THE VIDEOGRAPHER:  The court reporter
9  today is Laurie Bangart-Smith of L.A.D.
10  Reporting.  Would the reporter please swear
11  in the witness.
12          SADE JULIANNA DIKE,
13  having been first duly sworn, testified upon her
14  oath as follows:
15  EXAMINATION BY COUNSEL FOR HOWARD UNIVERSITY
16  BY MS. TURNER:
17  Q   Please state your name for the record.
18  A   Sade Julianna Dike.
19  Q   Ms. Dike, my name is Karen Turner, and
20  I'm one of the attorneys representing the
21  defendants in this case.  We've asked you to come
22  here today to answer some questions about the

VIDEOTAPED DEPOSITION OF SADE JULIANNA DIKE
CONDUCTED ON THURSDAY, MAY 1, 2008

36 (Pages 141 to 144)

141

1  in that general room?
2      A  I don't remember.
3      Q  Was the area where you were a
4  curtained-off area?
5      A  No, ma'am.
6      Q  Did you speak with any metropolitan
7  police officers while you were in the emergency
8  room, in any part of the emergency room?
9      A  No.
10     Q  Did you ever speak with the SANE nurse?
11     A  She never came.
12     Q  Did you ever speak with her by phone?
13     A  No.
14     Q  Did you get the name of the nurse who
15 you could talk to -- you had spoken with earlier
16 who you said was helpful?
17     A  No, ma'am.
18     Q  Can you describe what she looked like?
19     A  Maybe your complexion, heavy-set, short
20 hair, between the age of maybe 40 to 50.
21     Q  Was that the --
22     A  I'm going to say 30 to 50.

142

1      Q  Okay.
2      A  Big gap, I know, but . . .
3      Q  And was there only one nurse that you
4  had contact with the entire time while you were at
5  the emergency department?
6      A  Yeah, she was the only nurse I spoke
7  with.
8      Q  Was that the same nurse that took
9  Ms. McGaughey's blood pressure at the beginning?
10     A  Yes, ma'am.
11     Q  Do you -- you don't know her name?
12     A  No, ma'am.
13     Q  At the point before you left the
14 hospital, did you think about calling any family
15 members, either your family members or
16 Ms. McGaughey's family members, to get some
17 assistance?
18     A  Thought about it, yes.
19     Q  But why didn't you?
20     A  Because it was her choice, and at that
21 point she couldn't make a choice, and whether I
22 had called a family member or not, it wouldn't

143

1  have changed anything at the time.
2      Q  Did you try to get help from anybody
3  else in the emergency department since
4  Dr. Williams wasn't able to help you?
5      A  No.
6      Q  You say you don't know how the taxi got
7  there, the Howard taxi got there?
8      A  I don't remember.
9      Q  Okay, so when you got in, was it the
10 same driver?
11     A  Yes.
12     Q  Did -- was Ms. Reid still with you?
13     A  Yes.
14     Q  Did they have any conversation that you
15 overheard?
16     A  None that I remember.
17     Q  What happened once you got in the taxi?
18     A  When we got into the taxi, the guy who
19 might have been a nurse helped her in, and we put
20 her in there, um, and we took her to Meridian. I
21 mean there wasn't much dialogue other than the
22 fact that me and Kierston talked, but it was just

144

1  because we were mad, you know, voicing opinions
2  and stuff.
3      Q  Did you get any paperwork when you left
4  the hospital?
5      A  Nothing.
6      Q  Were you given any other instructions
7  about what to do or not do upon leaving?
8      A  Only thing she said was just make sure
9  she doesn't take a shower and bring her back
10 tomorrow.
11     Q  Did she say by a specific time?
12     A  No, ma'am.
13     Q  Where did the taxi take you?
14     A  Well, first we went to Meridian and we
15 told him to wait, and then we, Kierston and I,
16 took Sunny to her room.
17     Q  Was she able to walk on her own?
18     A  It was the same walking that it was when
19 we left the party, us holding her, and . . .
20     Q  By this point were her eyes open,
21 closed?
22     A  Um, same way it was when we left the

Exhibit E

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

1 (Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA MCGAUGHEY,      :

     Plaintiff,    : Civil Case No.

     vs.      : 1:07-CV-01498(RJL)

HOWARD UNIVERSITY, et al,   :

     Defendants.   :

     - - - - - - -

VIDEOTAPED DEPOSITION OF KERSTON REID

Bethesda, Maryland

Wednesday, May 21, 2008

9:55 A.M.

Job No: 1-129913

Pages 1 - 350

Reported by: Barbara A. Conner, R.P.R.

**Page 2**

Videotaped Deposition of KERSTON REID, held at the offices of:

HAMILTON, ALTMAN, CANALE & DILLON, LLC

4600 East-West Highway

Suite 201

Bethesda, Maryland 20814

(301) 652-7332

Pursuant to Notice, before Barbara A. Conner, Registered Professional Reporter and Notary Public of the State of Maryland.

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

     KATHLEEN R. HARTNETT, ESQUIRE

     SPIVA & HARTNETT, LLP

     1776 Massachusetts Avenue, Northwest

     Suite 600

     Washington, D.C. 20036

     (202) 785-0601

ON BEHALF OF THE DEFENDANTS HOWARD UNIVERSITY, DAWIT YOHANNES, M.D., AND WENDIE WILLIAMS, M.D.:

     CHAMILLE DENNIS-KITTLES, ESQUIRE

     HAMILTON, ALTMAN, CANALE & DILLON, LLC

     4600 East-West Highway

     Suite 201

     Bethesda, Maryland 20814

     (301) 652-7332

**Page 4**

ON BEHALF OF THE DEFENDANT GEORGE WASHINGTON UNIVERSITY:

     CHRISTOPHER R. SMITH, ESQUIRE

     GLEASON, FLYNN, EMIG & FOGLEMAN, CHARTERED

     11 North Washington Street

     Suite 400

     Rockville, Maryland 20850

     (301) 294-2110

ON BEHALF OF THE DEFENDANT DISTRICT OF COLUMBIA:

     DWAYNE JEFFERSON, ESQUIRE

     OFFICE OF THE ATTORNEY GENERAL

     FOR THE DISTRICT OF COLUMBIA

     Civil Litigation Division

     441 Fourth Street, Northwest

     6th Floor

     Washington, D.C. 20001

     (202) 724-6649

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

2 (Pages 5 to 8)

---

**5**

1 ON BEHALF OF THE DEFENDANT DISTRICT HOSPITAL PARTNERS,

2 L.L.P.:

3     ADAM KELLEY, ESQUIRE

4     GOODELL, DEVRIES, LEECH & DANN, LLP

5     One South Street

6     20th Floor

7     Baltimore, Maryland 21202

8     (410) 783-4000

9

10

11

12 ON BEHALF OF THE DEFENDANT CHRISTOPHER LANG, M.D.:

13     CHRISTINE M. COSTANTINO, ESQUIRE

14     WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER,

15     LLP

16     1341 G Street, Northwest

17     Suite 500

18     Washington, D.C. 20005

19     (202) 626-7660

20

21 ALSO PRESENT:

22     Cali Day, Videographer

---

**6**

1         P R O C E E D I N G S

2     THE VIDEOGRAPHER: Here begins tape number

3 one in the deposition of Kerston Reid, in the matter of

4 Alexandria McGaughey versus Howard University, et al, in

5 the United States District Court for the District of

6 Columbia, case number 1:07-CV-01498. Today's date is

7 May 21, 2008. The time is 9:55 AM. The video operator

8 today is Cali Day. This deposition is taking place at

9 Hamilton Altman, 4600 East-West Highway, Bethesda,

10 Maryland.

11     Would counsel please identify themselves and

12 state whom they represent.

13     MS. HARTNETT: Kathleen Hartnett, from Spiva

14 & Hartnett. I represent the witness and the plaintiff.

15     MS. COSTANTINO: Christine Costantino, for

16 Christopher Lang.

17     MR. SMITH: Chris Smith, for GW University.

18     MR. KELLEY: Adam Kelley, for District

19 Hospital Partners, LT.

20     MR. JEFFERSON: Dwayne Jefferson, District of

21 Columbia.

22     MS. DENNIS-KITTLES: Chamille Dennis-Kittles,

---

**7**

1 Howard University Hospital.

2     THE VIDEOGRAPHER: The court reporter today

3 is Barbara Conner of LAD Reporting.

4     Would the reporter please swear in the

5 witness.

6         KERSTON REID,

7   having been duly sworn, testified as follows:

8     THE VIDEOGRAPHER: You may begin.

9     EXAMINATION BY COUNSEL FOR DEFENDANTS

10     HOWARD UNIVERSITY HOSPITAL, ET AL

11 BY MR. DENNIS-KITTLES:

12   Q   Would you please state your full name.

13     MS. HARTNETT: I'm sorry, wait. Just for the

14 record, before we start, I just want to say that the

15 witness has been here and ready since 9:30.

16     Thank you.

17     MR. DENNIS-KITTLES: Okay.

18     MS. HARTNETT: Sorry to interrupt.

19     MR. DENNIS-KITTLES: We were waiting for

20 counsel to appear, so now we're going to start the

21 deposition. Okay?

22     MS. HARTNETT: That's fine. For the record,

---

**8**

1 she came from south of Richmond, where she's staying

2 with her parents, and we had to reschedule the

3 deposition due to the earlier issue. I just want to

4 make --

5     MR. DENNIS-KITTLES: That's fine. We all

6 know how the traffic is around here, that's fine.

7   Q   Can you please state your name for the

8 record.

9   A   **Kerston Reid.**

10   Q   Reid, have you ever had your deposition taken

11 before?

12   A   **No.**

13   Q   As you can see, there's a court reporter

14 sitting to my left and she's taking down everything

15 that's being said during the deposition. So, and she's

16 going to just transcribe it. It's going to be in

17 written format at the end of the deposition, in a couple

18 weeks or a couple days, and so we have to have verbal

19 communications between whoever is asking you a question

20 and your answers, meaning you can't say a-huh, un-huh

21 and nod your head. You have to yes or no in response to

22 any questions. Okay?

---

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

35 (Pages 137 to 140)

137

1  we were like, "No, you can't be serious," Sunny threw up
2  again and she was like, "Yeah, we can't do anything."
3  She said, "Yeah, we can't do anything with her like
4  this. The best thing for you to do is," she looked us
5  in the eye, she said, "The best thing for you to do is
6  to take her home and bring her back in the morning and
7  let her sober up," that's what she said, "let her sober
8  up and bring her back here in the morning."
9      Q    And she you gave the instructions not --
10     A    Not to shower. Not to let her shower.
11     Q    Did she give you any other instructions?
12     A    No.
13     Q    What, did you guys leave the hospital at that
14  point in time?
15     A    I believe that the doctors helped her down
16  from off the bed and they put her in a wheelchair and
17  she was still like leaned over to the side, with her
18  little vomit bag, and they rolled her outside and the
19  shuttle -- the shuttle came and right before we put her
20  in the shuttle, she threw up again and we put her in the
21  shuttle.
22     Q    While you were in the hospital, did you speak

138

1  with any other hospital personnel besides the triage
2  nurse and Dr. Williams?
3      A    No, I did not.
4      Q    Did Ms. Dike speak with anyone else besides
5  the triage nurse and Dr. Williams when you were in her
6  presence?
7      A    I believe she did because -- no, not while
8  she was in my presence, because I didn't see her when
9  she went to get the form and fill it out. So, she had
10  to have spoken to someone else, but it wasn't in my
11  presence.
12     Q    Did Ms. Dike tell you about any conversations
13  that she had with any other hospital personnel?
14     A    No.
15     Q    Did you ever speak with the same nurse during
16  that visit?
17     A    No.
18     Q    Did Ms. Dike ever speak with the same nurse?
19     A    No.
20     Q    Do you know if Ms. McGaughey spoke with any
21  other hospital personnel when you were in her presence,
22  besides the triage nurse and Dr. Williams?

139

1      A    Ms. McGaughey didn't talk to anyone.
2      Q    Okay. That's what I'm trying to understand
3  because you said you weren't sure she ever provided any
4  information. Did she ever provide any hospital
5  personnel any information?
6      A    No, other than to the doctor, when she would
7  say "Huh?" tell "Yes" to her name, she didn't say
8  anything.
9      Q    Was she ever alone with the doctors?
10     A    No.
11     Q    Did you ever speak with any police officers,
12  either campus police or Metropolitan Police Department,
13  while you were in the hospital during that visit?
14     A    I did not.
15     Q    Did Ms. Dike, to your knowledge?
16     A    I don't know.
17     Q    Do you know if Ms. McGaughey did?
18     A    She did not.
19     Q    Did you specifically ask Dr. Williams to do a
20  rape kit or did you say, "Check her out"?
21     A    I can't remember if I said rape kit or if I
22  said check her for rape. I know that I -- the name, the

140

1  word rape, came out of our mouth and that's how the SANE
2  same nurse came about. I had no idea what the procedure
3  was and so she told us that you have to call the SANE
4  nurse to come out and that's what she said. She said,
5  The SANE nurse is not going to come out here with her
6  like this. She said, "So, take her home, let her sober
7  up, bring her back in the morning."
8      Q    Do you know what a SANE nurse is?
9      A    I believe it's the person that you talk to --
10  I don't -- I don't know. She didn't explain who the
11  SANE nurse, like in detail, who she was. She just kept
12  saying the SANE nurse will have to come and she said it
13  was late and it makes no sense to call her out here at
14  this time and with her like this, that's what she said,
15  "We can't do anything with her like this."
16     Q    Did you ever say anything to Dr. Williams
17  about a date rape drug?
18     A    I said it was a possibility that she could
19  have been given a date rape drug.
20     Q    Okay. Anything else?
21     A    Because she was out of it. I didn't know
22  what else could have done that to her or, you know, in