IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALEXANDRIA McGAUGHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-01498 |
| v. | ) | |
| | ) | Judge Richard J. Leon |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO THE DISTRICT OF COLUMBIA'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT
AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Plaintiff Alexandria McGaughey respectfully submits this Opposition to Defendant the

District of Columbia's ("the District's") Motion to Dismiss First Amended Complaint and

Alternative Motion for Summary Judgment ("Dist. Mot.").

Already pending before the Court is the District's Motion for Judgment on the Pleadings,

in which the District made exactly the same argument that it makes here – that the "public duty

doctrine" bars Plaintiff's claims against the District. Now that Plaintiff has filed a First

Amended Complaint, as the Court's scheduling order contemplated, the District has re-raised its

"public duty" arguments and has requested both dismissal and summary judgment. For the

reasons below, as well as all of the reasons stated in Plaintiff's earlier briefing on this issue,[1] the

District's Motion should be denied.

---

[1] *See, e.g.*, Doc. 43, Plaintiff's Opposition to Defendant the District of Columbia's Motion for
Judgment on the Pleadings (filed June 30, 2008); Doc. 24-2, Plaintiff's Surreply in Opposition to
Defendant District of Columbia's Motion to Dismiss, or in the Alternative, for Summary
Judgment (filed Jan. 28, 2008).

## STATEMENT OF FACTS[2]

**A.    PLAINTIFF'S ALLEGATIONS AGAINST THE DISTRICT.**

### 1.    Several Of The District's Factual Assertions Are Irrelevant And Erroneous.

In the early morning hours of Saturday, December 9, 2006, Plaintiff Alexandria McGaughey, a nineteen year-old sophomore at Howard University, was sexually assaulted at an off-campus party in the District of Columbia. Amended Complaint ¶ 1. Ms. McGaughey likely was anally penetrated after having been given a date rape drug that rendered her semiconscious or incoherent for hours, including during the assault and during her visit to Defendant Howard University Hospital ("HUH") immediately thereafter. *Id.*

Immediately after the assault, Ms. McGaughey – accompanied by several witnesses – sought desperately needed medical care in the middle of the night at HUH, which holds itself out to be the premiere hospital in the area for assisting sexual assault victims. *Id.* ¶ 2. After being sent home by HUH without adequate care or treatment, *see id.* ¶¶ 26-41, Plaintiff awoke the next day with no memory of the sexual assault or the visit to HUH, but with severe pain in her anus, rectum, and one of her legs. *Id.* ¶ 42. She then again sought care again at HUH, as well as at the George Washington University Hospital ("GWUH"). *Id.* ¶¶ 42-44, 58-67. Nonetheless, due to the negligence of the District's Metropolitan Police Department ("MPD"), HUH, and GWUH, Ms. McGaughey did not receive the basic treatment appropriate for a victim of sexual assault. *E.g.*, *id.* ¶¶ 2, 4. Proper treatment not only would have alleviated Ms. McGaughey's physical harm and emotional suffering, but it would have provided the most definitive proof of the perpetrator of the sexual assault and the nature of that assault, including whether and how she

---

[2] Both Plaintiff's Statement of Facts and her argument below are drawn substantially from Plaintiff's prior briefing on these issues, *see supra* n.1, but are repeated by Plaintiff for the Court's ease of reference and in order to respond fully to the District's present Motion.

was drugged.  *See id.*  Compounding these failures, the MPD continues to refuse to investigate the crime.  *Id.* ¶ 2.

The facts set forth by the District in the Statement of Facts in the District's Memorandum ("Dist. Mem.") and accompanying proposed Statement of Undisputed Material Facts ("Dist. SOF") are largely irrelevant to whether the "public duty" doctrine precludes any of Plaintiff's claims against the District.  For example, it is simply irrelevant to the District's Motion (and to Plaintiff's claims in this matter) whether Plaintiff was in the District's custody, whether she was on government-owned property, or whether she was assaulted by a District employee.  *See* Dist. Mem. at 6-7; Dist. SOF ¶¶ 3-4.  As Plaintiff's Amended Complaint and previous briefing on the "public duty doctrine" makes clear, none of those factors are the basis for Plaintiff's arguments that the public duty doctrine does not bar Plaintiff's claims against the District.  Similarly irrelevant here are the District's factual contentions that Plaintiff never was transported in an MPD vehicle and that the MPD did not come to HUH during Plaintiff's first visit to the hospital. *See* Dist. Mem. at 7; Dist. SOF ¶¶ 3-4.  Again, those factors are not the bases for Plaintiff's claims against the District or for the inapplicability of the public duty doctrine here.  Finally, it is simply irrelevant to the District's public duty argument that Plaintiff blacked out during the attack and thus cannot remember the sexual assault, that as of December 9, 2006, Plaintiff could not provide the last name of her likely attacker, and whether Plaintiff observed interactions between MPD and HUH personnel.  *See* Dist. Mem. at 7; Dist. SOF ¶¶ 2, 7-8.[3]  Although these

---

[3] Although irrelevant to the District's Motion, the District also states as a supposed undisputed fact that "all she had was [a] made-up name," falsely suggesting that on December 9, 2006, Plaintiff and her friend did not provide information about Plaintiff's likely attacker but instead "made up" a name.  Dist. SOF ¶ 8.  As the record makes clear, Plaintiff and the one witness to whom MPD spoke on December 9, 2006 provided all of the information they had concerning the alleged assault, including both the likely assailant's first name and address and the fact that the likely assailant's friends had provided what seemed  to be a "made-up name," in order to prevent

factors are certainly relevant to the District's negligence in this matter – as the MPD utterly failed to recognize the symptoms of Plaintiff's likely drug-facilitated assault or to otherwise handle her case with professionalism and reasonable care – those factors have no bearing on whether the public duty doctrine shields the District from liability.

Although the District's factual presentation largely focuses on immaterial facts, the District also makes several key misstatements of material fact. These misstatements are contrary not only to the allegations in Plaintiff's Amended Complaint, but also to the undisputed evidence developed in discovery to date. For example:

- The District states that "Plaintiff did not contact MPD or the D.C. Rape Crisis Center regarding her alleged sexual assault on December 9, 2006." Dist. Mem. at 7; Dist. SOF ¶ 5.[4] This statement is false and misleading. The evidence overwhelmingly indicates that Plaintiff, her sister, and her friends had multiple contacts with MPD personnel on December 9, 2008 – including directly with, at a minimum, Officers Minor, Green and Leveque, and Detectives Spriggs and Fields, and indirectly with, at a minimum, Detectives Wheeler and Rice and Sergeant Maradiaga. *See* Plaintiff's Statement of

_____

Plaintiff and her friends from identifying the likely assailant. *See* Plaintiff's Statement of Controverted Facts ("Plaintiff SOF") ¶ 8. If anything, the fact that the likely assailant's friends appeared to be covering up evidence of the sexual assault – including the likely assailant's name – should have aroused further concern and suspicion from MPD. Moreover, Plaintiff and her friends later learned the likely assailant's full name. *See id.* However, because MPD refused to treat Plaintiff's case as a sexual assault, refused to investigate her complaint and failed to contact Plaintiff after December 9, 2006, MPD never pursued that information further. *See id.* MPD had and ignored every opportunity to do so: for example, Plaintiff and her mother filed an internal police complaint against the officers involved in the weeks after her assault and, months prior to filing the present suit, Plaintiff provided formal and detailed notice of her complaint to the District pursuant to D.C. Code § 12-309. Amended Complaint ¶ 8.

[4] The District's Memorandum is not separately paginated, so Plaintiff's citations to "Dist. Mem." are to the page numbers on Document 59 as listed in the Court's ECF system for this case.

Controverted Facts ("Plaintiff SOF") ¶¶ 5, 9.  Not only did Plaintiff repeatedly interact with MPD personnel on December 9, 2006, but Plaintiff's friend and sister affirmatively contacted MPD that day (on behalf of Plaintiff) when it became clear that Plaintiff's case was not being handled properly.  *See id*.  In addition, on December 9, 2006, Plaintiff and her sister did seek out and briefly confer by phone with the SANE nurse, Mary Pinn, who is a contractor of the D.C. Rape Crisis Center.  *See id*.  Although this contact with Ms. Pinn was not the type of contact with the D.C. Rape Crisis Center that Defendants were obligated to provide, the District's factual statement is inaccurate to the extent it implies that Plaintiff had an obligation to contact the D.C. Rape Crisis Center or Nurse Pinn, or that Plaintiff did not in fact contact Nurse Pinn.  *See id*.[5]

- The District incorrectly claims as a supposed undisputed fact that "Plaintiff concedes that Howard University was not required to obtain police authorization to conduct a forensic examination."  Dist. Mem. at 8.  Although Plaintiff does claim in this lawsuit that the hospitals were not required to obtain police "authorization" in order to administer a sexual assault medical forensic examination or "rape kit" to Plaintiff, she has made no "concession" – as the District's factual statement incorrectly suggests – with respect to the MPD's obstruction of her medical care and treatment by repeatedly and falsely stating to the hospitals that MPD "denied" or "refused to authorize" a "rape kit" for Plaintiff. *See* Plaintiff SOF ¶ 9.  Indeed, the evidence to date makes clear that MPD personnel told the hospitals that "there would be no sexual kit done" for Plaintiff based on MPD's supposed determination.  Green Dep. at 115-17 (cited in Plaintiff SOF ¶¶ 9, 14).

---

[5] Plaintiff identifies other erroneous proposed facts in her Statement of Controverted Facts. Because many of the District's proposed facts are not material (and are not relied on by the District in its argument), Plaintiff does not elaborate on all such factual disputes here.

- The District erroneously claims that Plaintiff has taken all 20 depositions that the Court has authorized her to take. *See* Dist. Mem. at 8. Plaintiff still has 4 of the 20 depositions remaining, and she also needs to complete the deposition of MPD Sergeant Reid, one of the leaders of MPD's Sex Assault Unit. Plaintiff intends to complete these depositions as well as other discovery by the new discovery cut-off of October 14, 2008. As Plaintiff's briefing on her Motion to Modify the Scheduling Order made clear, the additional discovery of MPD that she intends to pursue will further show that the public duty doctrine does not bar her claims against the District in this case.

2.     **Plaintiff's Specific And Detailed Allegations Against The District.**

The Amended Complaint contains detailed allegations concerning the basis for Plaintiff's three claims of negligence against the District in this matter: negligent hiring, training and supervision (Count VII); negligent interference with Plaintiff's medical care and treatment, including obstruction of the collection of forensic evidence (Count VIII); and negligent failure to investigate (Count IX). The District's presentation largely ignores these allegations, which plainly support all three of Plaintiff's theories of negligence and which have been borne out by the evidence to date.

Plaintiff alleges that during Plaintiff's second visit to HUH – still only hours after the sexual assault and likely drugging – the hospital personnel finally called the MPD to report Plaintiff's case as a sexual assault. Amended Complaint ¶ 45. As the District's own admissions make clear, Plaintiff acted correctly by "[g]o[ing] to a hospital emergency room or your own doctor for medical care immediately" after a sexual assault, because hospitals in the District contact MPD on behalf of sexual assault victims. Plaintiff SOF ¶ 5. In particular with respect to HUH, "[t]he Metropolitan Police Department, in conjunction with Howard University Hospital

and the DC Rape Crisis Center, has developed the Sexual Assault Nurse Examiner (SANE) program. In this program, a victim of a sexual assault (over the age of 17) will be in a private examination room while waiting to be seen, the wait will not be more than one hour, and the victim will be examined by someone specially trained in this area." *Id.*

Thus, on December 9, 2006, Officer M.A. Minor arrived at HUH and questioned Plaintiff. Amended Complaint ¶ 45. She told him that she thought she had been raped earlier that morning and described the pain she was experiencing. *Id.* Plaintiff's friend Ms. Reid also spoke with Officer Minor and confirmed that she too believed that Plaintiff had been raped, describing in detail the events of the night before, including the suspicious behavior of the young men at the party and the pain and disorientation experienced by Plaintiff. *Id.* Officer Minor did not appear to take notes of Ms. Reid's statement, other than writing down a few names. *Id.* Officer Minor did not ask to speak with Ms. Diké, Ms. Lockett, or any other witness from the night before. *Id.*

Officer Minor phoned Detective Spriggs, who then spoke with Plaintiff by phone. Amended Complaint ¶ 46. Without coming to the hospital to interview Plaintiff and based solely on his brief phone conversation with her, Detective Spriggs told her that "we don't have a case for a rape kit." *Id.* Detective Spriggs told Plaintiff that she needed to provide the name of the alleged assailant in order to have a case. *Id.* From that point forward, HUH declined to perform a sexual assault medical forensic examination of Plaintiff on the purported grounds that HUH personnel needed police approval to administer such an examination and that the police had not authorized one. *Id.*

Detective Spriggs did not come to the hospital to speak with Plaintiff, and he did not speak to any other witness in the case (including Ms. Reid, Ms. Diké or Ms. Lockett) either by

phone or in person. Amended Complaint ¶ 47. Nor did Officer Minor or any other MPD officer

interview Ms. Diké or Ms. Lockett. *Id.* On information and belief, neither Detective Spriggs,

Officer Minor, or any other MPD officer has spoken to Mr. Curtis, Mr. Lowery, Mr. Thrasher or

any other individual who attended the party. *Id.* On information and belief, MPD has conducted

no further investigation of Plaintiff's allegations of rape and drugging. *Id.* Neither Officer

Minor nor Detective Spriggs completed a police report concerning Plaintiff's complaint. *Id.*

Before Plaintiff's second visit to HUH, she had contacted her sister, Raegen McGaughey

(hereinafter "Raegen"), who lives in the area, to inform her about the assault and subsequent

events. Amended Complaint ¶ 48. Raegen arrived at HUH after Officer Minor had departed and

after Plaintiff had spoken to Detective Spriggs on the phone. *Id.* After hearing from Plaintiff

that the police would not "authorize" a sexual assault medical forensic examination or do any

further investigation, Raegen called the police to demand a proper investigation, including

authorization of a sexual assault medical forensic examination. *Id.* After hours of waiting and

multiple phone calls, two MPD officers – Officers Leveque and Green – finally showed up at the

hospital. *Id.*[6]

Officers Leveque and Green spoke briefly with Plaintiff. Amended Complaint ¶¶ 49.

They were very rude and dismissive of her complaint. *Id.* Contrary to MPD's own standards for

helping traumatized sexual assault victims, the officers questioned Plaintiff as if she were lying

---

[6] That Raegen called the MPD on Plaintiff's behalf belies the District's erroneous and
unsupported assertion that Plaintiff "did not contact MPD . . . regarding her alleged sexual
assault on December 9, 2006." Dist. Mem. at 7. The District's insinuation in its briefing that
Plaintiff somehow should have done more to contact police is equally incorrect and misleading
because, as the MPD's guidance to the public makes clear, a victim of sexual assault should
"[g]o to a hospital emergency room or your own doctor for medical care immediately." Plaintiff
SOF ¶ 5. The hospitals eventually contacted the police on Plaintiff's behalf, and, as the
Amended Complaint and discovery to date makes clear, the police had extensive and continuing
contact with Plaintiff and the hospitals throughout Plaintiff's ordeal. *See, e.g.*, Amended
Complaint ¶¶ 45-53, 61-62, 66, 107-120; Plaintiff SOF ¶¶ 5, 9.

or had done something wrong, and they even threatened her that she could be arrested for lying. *Id.* Their demeanor and questioning made her feel very uncomfortable to relate what she was able to remember about what had happened to her. *Id.* The officers conveyed their skepticism of her claim to have blacked out at the party, betraying an ignorance of the effects of date rape drugs. *Id.* The officers' dismissive and condescending attitude toward Plaintiff is memorialized in the police report that they filed, which states that they emphasized to Plaintiff the "importants (sic) of truth" and that they needed something more "concrete" to authorize a rape kit or even to conduct a further investigation. *Id.* The officers even failed to recognize Plaintiff's complaint as an alleged sexual assault, instead categorizing it as a "miscellaneous" incident. *Id.*

The officers were also rude and unprofessional to Raegen. Amended Complaint ¶ 50. They refused to give their names to Raegen, and after Raegen had been attempting to communicate with them for a brief period of time, they stated that they were "done talking to [her]." *Id.* The MPD touts its Sex Assault Unit as being "specially trained in the investigation of sexual assault," and states that its "detectives recognize and understand the sensitive, personal and invasive nature of sexual assault crimes. Sexual assault crimes are investigated with respect for the rights of the accused and the victim." *Id.*; *see* http://mpdc.dc.gov/mpdc/cwp/view,a, 1232,q,556783,mpdcNav_GID, 523,mpdcNav,|31417|.asp. The MPD officers' treatment of Plaintiff and her sister Raegen plainly fell well below the very standards to which MPD claims to adhere. Amended Complaint ¶ 50.

Before departing HUH, Officers Leveque and Green placed a call to MPD and informed Plaintiff and Raegen that they had spoken to Detective Wheeler, whose supervisor, Detective Rice, had stated that the case had been "cleared" previously without a report and that Detective Wheeler would be contacting Plaintiff in the next few days to explain the situation further.

Amended Complaint ¶ 51.  Plaintiff never received a call from Detective Wheeler.  *Id.*  Upon information and belief, no further investigation of Plaintiff's case was conducted by Officers Leveque and Green, or any other MPD officer or detective.  *Id.*

Officers Leveque and Green thereafter submitted a false and misleading police report in which they grossly misclassified Plaintiff's complaint of rape and drugging as a "miscellaneous" incident, rather than as a sexual assault.  Amended Complaint ¶ 52.  Their report falsely claimed that Plaintiff "changed her story" and that she said she was simply "drunk" as opposed to having been drugged.  *Id.*  Moreover, the clear and erroneous implication of their report is that if Plaintiff were "drunk" then she could not also have been sexually assaulted, and therefore, no further investigation was warranted.  *Id.*  This implication is borne out by all of the ways in which the officers failed to follow up on Plaintiff's allegations.  *Id.*

Although Officers Leveque and Green acknowledge in their written report that Plaintiff told them that her rectum hurt in a way that made her feel she had been anally penetrated the night before when she was unconscious or semiconscious, they wrote that they needed something "more concrete" in order to investigate further or authorize a sexual assault medical forensic examination.  Amended Complaint ¶ 53.  Yet, the MPD officers as well as the detectives from the MPD's sexual assault unit failed to speak with Ms. Diké, Ms. Reid or Ms. Lockett, all of whom were with Plaintiff at the party, and all of whom suspected based on what they observed that she had been drugged and raped.  *Id.*  The officers and detectives also failed to speak with any other individuals who had been at the party, and, in particular, with the men who had behaved so suspiciously.  *Id.*  Neither these officers nor the detective or supervisors to whom they spoke with by phone would "authorize" HUH or GWUH to do a forensic rape examination. *Id.* ¶¶ 53, 62.  And although the hospitals did not need police "authorization" to do an

examination, the police led HUH and GWUH to believe that they did.  *Id.* ¶¶ 53, 62.[7]

**B.    ADDITIONAL EVIDENCE DEVELOPED IN DISCOVERY TO DATE.**

As demonstrated above and explained further below, Plaintiff's detailed Amended

Complaint more than sufficiently alleges her three counts of negligence against the District and

explains why the "public duty doctrine" does not bar Plaintiff's claims.  Moreover, the discovery

conducted to date has uncovered significant evidence of the following points supporting

Plaintiff's allegations against the District, elaborated in more detail below:

- the District's interference with Plaintiff's medical treatment;

- the District's interference with the collection of medical forensic evidence from Plaintiff;

- the District's practice of interfering with sexual assault victims' (including Plaintiff's) medical testing and treatment by "unfounding" sexual assault complaints where, based on a superficial review by untrained officers and improperly trained sexual assault detectives, either the Plaintiff cannot identify her attacker (often due to drug facilitation of the assault) or the detectives view the case as difficult to investigate or prove;

- the District's failure to document at all or to properly document sexual assault victims' (including Plaintiff's) complaints of sexual assault; and

- the District's failure properly to train its officers and detectives to handle sexual assault cases, including with respect to the collection and preservation of medical forensic evidence.

**<u>The District's Failure To Train MPD Personnel Regarding The Proper Handling Of Sexual Assault Complaints.</u>**

As discovery to date has revealed, the MPD's failures in Plaintiff's case were entirely

_____

[7] As the Amended Complaint explains, the MPD's interference with Plaintiff's medical treatment and the other negligent actions of MPD personnel do not excuse the medical Defendants' failure to provide Plaintiff with adequate care and treatment as required by federal and state law.

predictable given the District's practice of sending untrained officers to conduct the initial interview of sexual assault victims such as Plaintiff.[8]  The patrol officers who responded to HUH to interview Plaintiff have uniformly testified that they are not members of the MPD's Sexual Assault Unit, have never received any significant training in the investigation of sexual assaults, have never received any training on the subject of date rape drugs, and are unaware of critical aspects of the District's supposed response system for sexual assault victims, such as the Sexual Assault Response Team ("SART") or the D.C. Rape Crisis Center.  *See* Plaintiff SOF ¶ 17.

As deposition testimony of MPD personnel (among others) has confirmed, in Plaintiff's case, the MPD interfered with her medical treatment and the collection of medical forensic evidence based solely on in-person interviews by untrained patrol officers and <u>phone</u> interviews by sexual assault detectives – rather than based upon the sexual assault detectives' in-person interviews and investigation, as MPD policy requires.  *See* Plaintiff SOF ¶ 18.  Indeed, Officer Leveque confirmed in her deposition that, despite MPD policy requiring the sexual assault unit detectives to "respond to the location," Plaintiff's experience was not atypical.  *Id.*

### The MPD's Improper Practice of "Unfounding" Complaints of Sexual Assault.

Discovery to date also has shown that the MPD has attempted to shield itself from review of its handling of sexual assault cases such as Plaintiff's through a practice of <u>not</u> taking a report in cases where the sexual assault detectives determine not to investigate further; MPD personnel

---

[8] In light of the Court's recent ruling permitting extending fact discovery and the other remaining deadlines in the case by 90 days, Plaintiff will continue to pursue discovery against the District, including completing the deposition of Sergeant Ronald Reid and noticing additional depositions of other MPD personnel, as necessary, including those who were involved in the handling of Plaintiff's case and/or of Rule 30(b)(6) designees.  Plaintiff also will attempt to resolve her outstanding disputes with the District regarding its incomplete search for and production of documents, without Court involvement if possible.  Although the District refused to meet and confer with Plaintiff regarding these disputes since July 16, 2008, the District recently indicated that it will meet and confer with Plaintiff on September 4 or 5, 2008.

have referred to such cases as "unfounded." *See* Plaintiff SOF ¶ 19. This apparently widespread practice of "unfounding" without a report is directly contrary to MPD policy, which requires "that members shall file a report for all reported crimes and incidents brought to his/her attention." *Id.* Yet none of the MPD officers who responded to HUH to interview Plaintiff either recalled or were aware of this MPD policy, and indeed, believed that their practice of <u>not</u> taking a report was consistent with MPD policy. *Id.*

Remarkably, Officer Leveque testified that of the approximately five sexual assault complaints to which she has responded in her police career, only <u>one</u> had been determined to be "founded." Plaintiff SOF ¶ 20. According to Officer Leveque, the cases determined to be "unfounded" – like Plaintiff's – often involved drug or alcohol facilitation where the victim did not know for certain who had assaulted her or precisely what had happened. *See id.* Officer Green similarly testified that about <u>half</u> of the sexual assault complaints to which she has responded were deemed "unfounded." *See id.* And, as with Officer Leveque, many of Officer Green's so-called "unfounded" cases involved victims who could not identify their attackers, potentially due to drug-facilitation of the assaults. *See id.* Likewise, Officer Minor testified that of the approximately twelve sexual assault complaints to which he has responded, almost <u>half</u> had been deemed "unfounded," and therefore, he took no report of the complaint. *See id.*

**<u>The MPD's Interference With Plaintiff's Medical Treatment and the Collection of Medical Forensic Evidence.</u>**

As noted above, the evidence to date also clearly supports Plaintiff's allegations that MPD personnel inserted themselves into the decision-making over Plaintiff's medical treatment and interfered with Plaintiff's attempt to have medical forensic evidence collected by the hospitals. *Compare, e.g.*, Amended Complaint ¶¶ 45-53, 61-62, 66, 107-120, *with, e.g.*, Plaintiff SOF ¶¶ 5, 9, 11-14. Officer Green's testimony on this point is particularly illuminating:

Q    Okay.  And did you speak with any of the  hospital personnel?

A    On the – on the time of the interview, or afterwards, or what?

Q    At the – at the time – well, any time on that day concerning, you know, this matter.

A    No.

Q    Okay.  Did any of them seek to ask you any questions?

A    No.

Q    I'm sorry.  When I say "them," I'm talking about any hospital personnel?

A    No.  Just a disposition.

Q    When – and when you say "disposition," what do you mean?

A    What did the – what the Sexual Assault Unit detective said in reference to a sexual kit.

Q    Okay.  And who asked you about that?

A    It was one of the nurse.

Q    Uh-huh.  And what did you tell her?

A    *Told her that Detective Wheeler said no.*

Q    *Said no – and when you said – you said no, what did – what did you mean?*

A    *In reference to having a sexual kit performed.*

Q    *That – that – that Detective Wheeler said that no sexual assault kit should be performed?*

A    *That no – there would be no sexual kit done.*

Q    *Okay.  You told the nurse that Detective Wheeler said that no sexual assault kit would be done?*

MR. BANKS:  Objection.  Asked and answered.

MR. JEFFERSON:  Objection.  Asked and answered.

MS. COSTANTINO:  Just joining in the objection.

BY MR. SPIVA:

Q    *Is that correct?*

A    *That's correct.*

Q    *And – and why did you tell her that?*

A    *Because they wanted to know whether or not they needed to do a kit.*

Plaintiff SOF ¶ 14 (quoting Green Dep. at 115-17 (emphasis added)).

<u>**ARGUMENT**</u>

**THE DISTRICT IS NOT ENTITLED TO DISMISSAL OR SUMMARY JUDGMENT BASED ON THE "PUBLIC DUTY DOCTRINE."**

    **A.    Standards Governing The District's Motion.**

       The District correctly observes that its Motion to Dismiss may not be granted "unless the complaint does not contain 'enough facts to state a claim to relief that is plausible on its face.'" *Evergreen Equity Trust v. Fannie Mae (In re Fannie Mae Sec.)*, 503 F. Supp. 2d 25, 31 (D.D.C. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). However, although not mentioned by the District, the Court also "must view the factual allegations in the light most favorable to the plaintiff." *Evergreen Equity Trust*, 503 F. Supp. 2d at 31 (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 2007)). As the above factual discussion and the Amended Complaint demonstrate, this case does not involve – as the District incorrectly suggests – a Complaint containing mere "labels and conclusions" or a "formulaic recitation of a cause of action." *See* Dist. Mem. at 9 (quoting *Twombly*).

       With respect to its Motion for Summary Judgment, it is first the District's burden to "demonstrat[e] the absence of a genuine dispute of material fact." *Siegel v. Ridgewells, Inc.*, 511 F. Supp. 2d 188, 192 (D.D.C. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). As with the District's Motion to Dismiss, the "Court draws all reasonable inferences regarding the assertions made in a light favorable to the [Plaintiff]." *Siegel*, 511 F. Supp. 2d at 192. Moreover, it is the District's burden to show that Plaintiff "fail[ed] to make a showing sufficient to establish the existence of an element essential to [Plaintiff's] case, and on which [Plaintiff] will bear the burden of proof at trial." *Id.* at 192 (quoting *Celotex*, 477 U.S. at 322). In assessing the evidence cited by the parties, the "Court must view the facts in the light most favorable to the nonmovant, giving the nonmovant the benefit of all justifiable inferences derived from the

evidence in the record." *Siegel*, 511 F. Supp. 2d at 192-93 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Finally, "a Court ruling on summary judgment motions must not determine the credibility of witnesses or weigh material facts legitimately in dispute." *Siegel*, 511 F. Supp. 2d at 193 (citing, inter alia, *Anderson*, 477 U.S. at 255).

Contrary to the District's claims, whether the "public duty doctrine" bars Plaintiff's claims against the District is not wholly a question of law for the Court's decision.  *Cf.* Dist. Mem. at 11.  As Plaintiff explains below, the public duty doctrine does not apply to this case as a matter of law because Plaintiff is not alleging that the District failed to protect her from harm by a third party.  However, the District's claim that the "special relationship" exception to the public duty doctrine does not apply to this case presents, at the least, disputed factual questions that must be resolved by the jury at trial.  *See, e.g.*, *Johnson v. District of Columbia*, 580 A.2d 140, 143-44 (D.C. 1990).[9]  As in *Johnson*, the District sought to forestall further discovery against it by claiming that the public duty doctrine was dispositive.  *See id.* The D.C. Court of Appeals rejected this argument, reversing an order of summary judgment for the District because of factual disputes related to whether the special relationship exception applies.  *See id.*  Thus, as *Johnson* recognizes, summary judgment is inappropriate where, as here, there are factual disputes concerning the special relationship exception – particularly where, as here, discovery has yet to be completed.  *See id.*

**B.     The "Public Duty Doctrine" Does Not Bar Plaintiff's Claims Against The District.**

The public duty doctrine does not bar Plaintiff's three negligence claims against the District, for at least two reasons, as detailed below.  First, the public duty doctrine is largely, if

---

[9] Pursuant to the Court's scheduling order, Plaintiff may later move for an affirmative order of summary judgment on this point, to the extent that the undisputed material facts demonstrate, as a matter of law, that the special relationship exception applies to this case.

not completely, inapposite in this case.  As courts, including this Court, have recognized, the public duty doctrine does not apply where, as here, a plaintiff is alleging that public officials have affirmatively caused her harm, rather than – as in *Varner v. District Columbia*, 891 A.2d 260 (D.C. 2006) and other typical public duty cases – that the public officials have failed to protect the plaintiff from crime or have failed to properly address an emergency situation. Plaintiff is not claiming that the District failed to protect her from sexual assault or that the District is responsible for those injuries, but is claiming, among other things, that the District harmed her by affirmatively interfering with her medical treatment and her ability to have evidence collected to determine who sexually assaulted her and whether (as likely) she was subjected to date rape drugs.  *See* Amended Complaint ¶¶ 107-120.

Second, as even the District recognizes, there is an exception to the public duty doctrine for individuals with a "special relationship" to the District.  *See* Dist. Mem. at 12.  Even assuming that the public duty doctrine applies to some or all of Plaintiff's claims in this case – and it does not – the "special relationship" exception permits Plaintiff's claims.  As the Amended Complaint sets forth in detail, and as discovery has confirmed, Plaintiff was no stranger to District officials, but rather had extensive and continuing contact with the District throughout her ordeal.  *See, e.g.*, Amended Complaint ¶¶ 45-53, 61-62, 66, 107-120; Plaintiff SOF ¶¶ 5, 9, 12-20.  She relied on District agents to handle their contacts with her properly and non-negligently, but they did not.  *See id.*  Rather, in gross violation of the ordinary standard of care, District officials interfered with Plaintiff's medical treatment and ability to have evidence collected and preserved concerning her sexual assault, and they affirmatively worsened her condition.  *See id.* In circumstances such as these, a "special relationship" exists and the public duty doctrine does not bar Plaintiff's claims.

1.    **Plaintiff's Allegations Against The District And Supporting Evidence.**

Although purporting to recognize that Plaintiff has alleged three separate theories of negligence against the District, *see* Dist. Mem. at 6, the District thereafter mischaracterizes and minimizes Plaintiff's allegations against the District, ignoring that her complaint is not the police failed adequately to protect her from harm by third parties. *See, e.g.*, *id.* at 20 (claiming, incorrectly, that Plaintiff's position "would also place police officials in the untenable position of ensuring/guaranteeing the personal safety of every member of the public"). Plaintiff's claim is not that the District failed to protect her, or even that the District simply failed to investigate her case. Rather, as Plaintiff has alleged in detail, she claims that the District affirmatively interfered with her medical treatment and the collection and preservation of evidence by directly interfering with medical personnel at two hospitals. As set forth in the Complaint, Plaintiff has alleged three separate claims of negligence against the District. *See* Amended Complaint ¶¶ 45-53, 107-120.

Count VII alleges that the District is liable for negligence as a result of its failure to properly hire, train and supervise MPD employees, including with respect to the proper assessment and treatment of sexual assault victims, investigation of sexual assault cases, and collection and retention of medical forensic evidence of sexual assault. Amended Complaint ¶¶ 107-112. This negligence claim hinges on the District's inadequate policies, practices, and training regarding the handling of sexual assault victims, which, according to Plaintiff's allegations, led the District to interfere with Plaintiff's medical treatment, to exacerbate her physical and emotional harm and pain and suffering, and to prevent the collection and preservation of evidence relevant to her sexual assault and likely drugging. *See id.* Discovery to date has confirmed the inadequacy of MPD's hiring, training and supervision, *see* Plaintiff SOF ¶¶ 5, 9, 11-20, and now that the District has agreed to meet and confer with Plaintiff regarding

the District's inadequate document production, Plaintiff expects to develop additional evidence concerning the District's negligence as alleged in Count VII.

Count VIII alleges that the District is liable for negligence based upon its employees' interference with Plaintiff's care and treatment by the hospitals, including District employees' obstruction of the hospitals' collection of medical forensic evidence and performance of a medical forensic examination of Plaintiff. Amended Complaint ¶¶ 113-116. Among other things, this claim is based on MPD employees stating without basis that Plaintiff's complaint of sexual assault did not justify treating her as a sexual assault victim or performing relevant tests and procedures. *See id.* Discovery to date strongly supports these allegations. *See* Plaintiff SOF ¶¶ 5, 9, 11-20. Plaintiff alleges that these actions by District employees affirmatively worsened her condition by exacerbating her physical and emotional harm and pain and suffering, and by preventing the collection and preservation of evidence relevant to her sexual assault. *See* Amended Complaint ¶¶ 113-116.

Count IX alleges that the District is liable for negligence based on its officers' failure to investigate Plaintiff's sexual assault, including their preparation of a false and misleading police report and their refusal to treat Plaintiff's complaint as an alleged sexual assault. Amended Complaint ¶¶ 117-120. Plaintiff brings this claim in light of the District's special duty to sexual assault victims created by the District's relationship with area hospitals and by the District's insertion of itself into hospitals' treatment of sexual assault victims, as in Plaintiff's case. *See id.* Discovery to date confirms that the MPD inserts itself into patients' medical care and treatment (including Plaintiff's) by claiming that MPD must "authorize" a sexual assault medical forensic examination for such examinations to proceed at local hospitals, and that MPD personnel repeatedly purported to refuse to "authorize" a sexual assault medical forensic examination for

Plaintiff on December 9-10, 2006; refused to treat Plaintiff's complaint as one of sexual assault; and repeatedly interfered with Plaintiff's care and treatment at the hospitals by purporting to direct hospital personnel not to perform a so-called "rape kit" or sexual assault medical forensic examination. *See* Plaintiff SOF ¶¶ 5, 9, 11-20. Plaintiff alleges that the District's negligence caused substantial injury to Plaintiff, including the loss of evidence to identify and hold responsible her assailant. *See id.*

### 2.  The Public Duty Doctrine Does Not Apply To This Case.

Although the parties have briefed the District's "public duty" arguments twice before, the District refuses to respond to Plaintiff's central dispositive argument: that the public duty doctrine does not apply as a matter of law where, as here, Plaintiff is not alleging that the District failed to protect her from harm by third parties. As the case law makes clear, the public duty doctrine exempts the District from liability in "cases where individuals seek to hold the District liable for negligence or wrongful death because of a <u>failure to protect</u> a person." *Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001) (emphasis added). As courts have explained, the public duty doctrine "is wholly inapposite in a case such as this, where the alleged harm was brought about directly by the officers themselves, and where there is no allegation of a failure to protect." *Liser v. Smith*, 254 F. Supp. 2d 89, 102 (D.D.C. 2003) (citing *District of Columbia v. Evans*, 644 A.2d 1008, 1017 n.8 (D.C. 1994) ("In this case, the harm to Virtus Evans was caused directly by the officers at the scene. There is no allegation of failure to protect. The public duty doctrine, therefore, has no relevance to this case.")); *see, e.g.*, *Briggs v. Washington Metro. Area Transit Auth.*, 293 F. Supp. 2d 8, 12 (D.D.C. 2003) (explaining that for the District "to have immunity under the public duty doctrine, the plaintiff must allege that one of the city's public services failed to protect the decedent"); *Johnson v. District of Columbia*, 580

A.2d at 142-43 (D.C. 1990) (the public duty doctrine does not apply where "affirmative acts" of public officials "worsened" the plaintiff's condition).[10]

   *Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) – one of the primary cases relied upon by the District for its public duty argument – exemplifies why the public duty doctrine does not apply in this case. *Varner* was a wrongful death and survival action brought on behalf of a murdered Gallaudet student, Varner. *Id.* at 263. The murderer had previously killed another Gallaudet student, but had not been apprehended by the authorities at the time he killed Varner. *Id.* at 264. The plaintiffs alleged that the District was "negligent in their investigation of the [first] murder," and that "if the police had exercised reasonable care in investigating that murder, [the perpetrator] would have been swiftly apprehended, and he would therefore have had no opportunity to kill Benjamin Varner." *Id.* at 273-74. The D.C. Court of Appeals affirmed a grant of summary judgment in favor of the District based on the public duty doctrine. *Id.* at 273-77. The Court of Appeals explained that "'under the public duty doctrine, public officials such as police officers cannot be held liable for harm caused by criminals unless there was a "special relationship" between the victim and the official.'" *Id.* at 275 (quoting trial court). The Court concluded that the "special relationship" exception did not apply because plaintiffs "'present no argument or evidence, however, to show that Benjamin Varner himself had any direct or continuing contact with the MPD,'" *id.* (quoting trial court), even assuming that the police had made general assurances to the 2000-person Gallaudet campus that District officials were doing

---

[10] A caveat to *Johnson* is that public officials are not ordinarily susceptible to suit for "affirmatively worsening" a plaintiff's condition in the exigency of a rescue operation. *See, e.g.*, *Miller v. District of Columbia*, 841 A.2d 1244, 1248 (D.C. 2004) (in a case involving a fire rescue operation, explaining that "the actions of the police during a rescue operation are protected by the public duty doctrine and are not subject to retrospective dissection at trial"). Because Plaintiff's claims against the District do not pertain to an alleged duty to protect, never mind in the context of a rescue operation, the public duty doctrine is inapposite here.

all they could to protect everyone on campus, *id.* at 275-76.

As the Amended Complaint makes clear, Plaintiff is not alleging that the District failed to protect her from criminal acts or other harm caused by a third party. Rather, Plaintiff's allegations are that the District's policies and the actions of its employees directly harmed her by affirmatively interfering with her medical treatment and preventing the collection and preservation of evidence about her sexual assault, adding to and exacerbating her physical and emotional harm, and pain and suffering, and preventing her from obtaining evidence relevant to her sexual assault and likely drugging. Amended Complaint ¶¶ 45-53, 107-120. Such evidence was relevant not only to a potential criminal prosecution by the District, but also to her proper medical treatment and to any effort to hold her assailant civilly liable or otherwise responsible for his actions. Thus, Plaintiff's allegation is not that the police failed to prevent her sexual assault, or that they failed to respond to the scene of an emergency, but rather that they improperly inserted themselves into Plaintiff's treatment and the collection of evidence at the hospital, causing her injury. In this context, the public duty doctrine is inapposite.

The District's public duty argument does not differentiate among Plaintiff's three separate negligence claims against the District. One might argue, however, that even if Counts VII and VIII – both of which allege direct harm to Plaintiff through the affirmative acts of the police – are not barred by the public duty doctrine, that doctrine bars Count IX, which is Plaintiff's "failure to investigate" claim. Importantly, Plaintiff's failure to investigate claim is unlike the "failure to investigate" claim barred in *Varner* and similar cases, in which plaintiffs sought to hold the District liable for the criminal actions of third parties based on the District's failure to investigate or respond to criminal activity. That is <u>not</u> Plaintiff's claim in Count IX. Plaintiff's claim is that the District's investigation of her sexual assault claim fell woefully short

of the standard of care and prevented her from being able to identify her assailant and bring him to justice, thereby affirmatively harming her and worsening her condition.  This is not the sort of "failure to investigate" claim precluded by the public duty doctrine, which, as explained above, insulates government officials from liability for failing to protect individuals from harm by others – not for directly causing individuals harm.[11]

> **3.    Even Were The Public Duty Doctrine Applicable, The "Special Relationship" Exception Permits Plaintiff's Claims.**

Even assuming the applicability of the public duty doctrine to all or some of Plaintiff's claims against the District, the District is not entitled to dismissal or summary judgment because Plaintiff has pleaded and presented evidence of a "special relationship" with the District – a well-

---

[11] For the same reasons, the other cases cited by the District in support of its Motion are entirely inapposite, because those cases involved allegations that the police or other emergency personnel had negligently failed to protect the plaintiff from harm caused by a third party, or failed to rescue the plaintiff in a timely and effective manner.  *See Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990) (holding, in a case where the decedent's estate alleged that District personnel negligently failed to rescue decedent from a stroke, that a single phone call could not create a special relationship); *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990) (granting summary judgment, after full discovery, against the plaintiff's claim that failure to provide adequate emergency services caused plaintiff's death); *Platt v. District of Columbia*, 467 A.2d 149, 150 (D.C. 1983) (holding that the public duty doctrine barred a claim alleging that the District, by negligently enforcing the fire and occupancy code, failed to prevent a fire that killed the plaintiffs); *Morgan v. District of Columbia*, 468 A.2d 1306, 1308 (D.C. 1983) (upholding the trial court's judgment notwithstanding the verdict on the grounds that the public duty doctrine barred a claim against the District for a "failure to protect" an individual citizen from crime, and that the report a wife made to the police supervisor of her police officer husband did not create a special duty); *Warren/Nichol v. District of Columbia*, 444 A.2d 1, 2 (D.C. 1981) (holding that the public duty doctrine barred a failure to protect claim alleging that the police negligently responded to a crime in progress and thus failed to prevent injury to the plaintiffs caused by criminal third-parties).  In contrast, the public duty doctrine is inapplicable in this case without even considering the "special relationship" exception, because Plaintiff does not allege that the police failed to protect her from the initial drugging and sexual assault.  *Cf.* Dist. Mem. at 17 (suggesting that Plaintiff's claim pertains to "avenues of protection" from the police, such as "vigilance in avoiding the underlying sexual assault").  Plaintiff's allegation is that District personnel injured her through affirmative acts of negligence that affirmatively harmed her and worsened her condition, including interference with her treatment by medical personnel and the collection of medical forensic evidence by those personnel.

established exception to the public duty doctrine, and one acknowledged by the District. The "special relationship" exception distinguishes individuals in the general public – to whom public officials owe no specific duty – from individuals who have established contact with public officials and to whom a duty is owed. To establish a "special relationship," there must be: (1) "'a direct and continuing contact between the victim and the police department'" and (2) "'justifiable reliance on that contact by the victim.'" *Varner*, 891 A.2d at 275; *accord, e.g.*, Dist. Mem. at 12.[12] A special relationship exists, among other situations, where District personnel affirmatively worsen a plaintiff's condition. *See, e.g.*, *Johnson*, 580 A.2d at 142-43.

Plaintiff has pleaded and produced abundant evidence to support her allegation of a special relationship under these standards. *See* Amended Complaint ¶¶ 45-53, 107-120; Plaintiff SOF ¶¶ 5, 9, 11-20. As Plaintiff alleges and as the evidence to date demonstrates, based on Plaintiff's direct and repeated interactions with District employees in the MPD's touted "Sex Assault Unit," Plaintiff relied on the District to take reasonable efforts to assist her as a sexual assault victim and to investigate her case, including to follow up with her after the traumatic odyssey at the hospitals. *See id.* And, as Plaintiff alleges and as the evidence to date shows, the District wholly failed in these regards and in fact affirmatively worsened her condition by interfering with her care and treatment at the hospitals. *See id.* Because Plaintiff has pleaded facts (and produced evidence) to support both a direct and continuing contact with District officials and justifiable reliance on those contacts, she has pleaded a "special relationship" and the District is not entitled to dismissal or summary judgment.

The District has pointed to no undisputed facts that entitle it to dismissal or summary

---

[12] The District uses the term "privity" to characterize the first prong of this analysis, *see, e.g.*, Dist. Mem. at 13, but that is not the term used by the cases. To the extent the District's terminology suggests a higher requirement than the cases set forth, it should be rejected.

judgment based on the alleged lack of a special relationship. *See, e.g.*, *Siegel*, 511 F. Supp. 2d at 192 (explaining that it is the District's burden to "demonstrat[e] the absence of a genuine dispute of material fact"). Indeed, nearly all of the facts that the District has cited are immaterial and irrelevant to whether the special relationship exception applies to this case. For example, the District repeatedly emphasizes that Plaintiff was not in MPD custody, was not transported by MPD officers, was not assaulted on District property and was not assaulted by a District employee. *See* Dist. Mem. 6-7, 13. But those are not the only reasons recognized by the case law for application of the special relationship exception, and those are not the reasons that the special relationship exception applies here. As stated above, the special relationship exception applies based on Plaintiff's repeated contacts with the MPD, her reliance on those contacts, the MPD's affirmative worsening of her condition, and the MPD's insertion of itself into the care and treatment of sexual assault patients such as Plaintiff. *See* Amended Complaint ¶¶ 45-53, 107-120; Plaintiff SOF ¶¶ 5, 9, 11-20.

With respect to factual issues that are actually material to the special relationship inquiry, the District misstates Plaintiff's allegations, the factual record, or both. To begin with, the District incredibly claims as undisputed fact that "Plaintiff never contacted MPD." Dist Mem. at 13. As has been shown repeatedly in previous briefings, that is simply false. The evidence overwhelmingly indicates that Plaintiff, her sister, and her friends had multiple contacts with MPD personnel on December 9, 2008 – including directly with, at a minimum, Officers Minor, Green and Leveque, and Detectives Spriggs and Fields, and indirectly with, at a minimum, Detectives Wheeler and Rice and Sergeant Maradiaga. *See* Amended Complaint ¶¶ 45-53, 107-120; Plaintiff SOF ¶¶ 5, 9, 11-20. Not only did Plaintiff repeatedly interact with MPD personnel on December 9, 2006, but Plaintiff's friend and sister affirmatively contacted MPD that day (on

behalf of Plaintiff) when it became clear that Plaintiff's case was not being handled properly. *See id.* The District goes on to make the inconsistent but still incorrect claim that Plaintiff's "special relationship" argument is based on a mere "two contacts between Plaintiff and MPD" or "simply because of [MPD's] visit to Howard University Hospital." Dist. Mem. at 13, 15. As just noted, Plaintiff's claims against the District are based on numerous, repeated contacts with MPD and explicit and implicit assurances that they were handling her complaint properly – not "two contacts" or two visits to HUH. Of course, the nature of Plaintiff's contacts with MPD demonstrate that Plaintiff's case is wholly unlike the hypothetical Plaintiff imagined by the District, who "repeatedly contact[s] MPD . . . simply to manufacture privity." Dist. Mem. at 14. Here, Plaintiff's repeated contacts with MPD were largely due to MPD's insistence on inserting itself into her medical care and treatment so as to affirmatively worsen her condition, but, in any event, are far from the "manufactured" contacts posited by the District.

  The District also incorrectly states that "there are no allegations in the First Amended Complaint to support the proposition that Plaintiff reasonably relied on any promises to her by MPD officers." Dist. Mem. at 13. As the case law recognizes, there is a "clear and justifiable reliance" on the part of individuals like Plaintiff that "the District police owe individuals a duty to use reasonable care to protect them from an excessive risk of harm." *Griggs v. WMATA*, 66 F. Supp. 2d 23, 29 (D.D.C. 1999). Thus, Plaintiff need not "recite any express MPD assurances," Dist. Mem. at 15, in order to demonstrate justifiable reliance or a special relationship. In any event, as Plaintiff has alleged and as the evidence to date shows, Plaintiff relied upon the MPD's involvement in her case in numerous respects: she reasonably expected MPD to receive her complaint of sexual assault and take it seriously, she reasonably expected MPD to perform at least a minimal investigation before "unfounding" her case, she reasonably expected MPD

personnel to recognize and respond to obvious signs of drug-facilitated sexual assault, she reasonably excepted MPD personnel to follow up with her as they promised they would, she reasonably expected MPD's assistance in preserving forensic evidence from her body related to the sexual assault, and she reasonably expected MPD not to repeatedly affirmatively interfere with her medical care and treatment and affirmatively worsen her condition. *See* Amended Complaint ¶¶ 45-53, 107-120; Plaintiff SOF ¶¶ 5, 9, 11-20. The District fundamentally mischaracterizes Plaintiff's claim in arguing that she cannot show reliance because she cannot show that MPD "induced Plaintiff to relax her own vigilance or forego other available avenues of protection." Dist. Mem. at 17. If anything, this argument shows that the "public duty doctrine" does not apply to this case because Plaintiff is <u>not</u> arguing that MPD failed to protect her from sexual assault. In any event, Plaintiff has alleged and the evidence shows that, based on the MPD's own actions and statements, Plaintiff relied on the MPD to handle her case properly and to assist her – not obstruct her – from being cared for and treated by the hospitals for sexual assault. Because, at the least, a material question of fact exists with respect to reliance, the District's request for dismissal or summary judgment should be denied.

The cases cited by the District illustrate, by way of contrast, why a "special relationship" has been properly pleaded (and evidenced) in this case. For example, in *Varner*, *see* Dist. Mem. at 16-17, the Court of Appeals rejected the "special relationship" exception on summary judgment because the plaintiff could not establish any direct contact between the police and plaintiff's murdered son, but rather attempted to rely on generalized assurances made by the police to the entire 2000-person Gallaudet student body. *Varner*, 891 A.2d at 276. In stark contrast, the police were continually and directly involved with Plaintiff, including through repeated interference with Plaintiff's medical care and treatment, and the collection of evidence

27

that would have enabled her to identify her attacker.  Likewise, *Warren/Nichol* is not "quite similar to the instant case," Dist. Mem. at 17, but involved an exigency situation not present here.  Moreover, that case pertained to a situation in which the plaintiff had limited contact with the MPD and in which there was no allegation that the MPD repeatedly and affirmatively worsened the Plaintiff's condition.  *Cf.* Dist. Mem. at 18.[13]

**C.      At The Very Least, Decision On The Public Duty Issue Must Await Full Discovery.**

For the reasons stated above, the Court should rule, as a matter of law, that the public duty doctrine does not bar Plaintiff's claims against the District.  At the very least, however, the Court should not resolve the public duty issue in the District's favor prior to full discovery.

As elaborated above, Plaintiff has adequately pleaded that the public duty doctrine does not apply in this case, among other reasons, because the District established a "special relationship" with the Plaintiff, *e.g.*, Amended Complaint ¶¶ 113-14, 119.  Plaintiff's Complaint is thus adequate to withstand the District's motion to dismiss.

Similarly, although the District's Motion for Summary Judgment should be denied outright, in no case should the "public duty" issue be resolved against Plaintiff prior to her having the opportunity to continue to develop facts in discovery to further support her claim that the public duty doctrine does not apply in this case.  *See* Fed. R. Civ. P. 56(f); *Johnson*, 580 A.2d

---

[13] The District also argues that MPD policies and other documents "create no special relationship and no duty."  Dist. Mem. at 18-20.  As explained above and in Plaintiff's prior briefing, Plaintiff does not rely on "MPD General Orders," *id.* at 18, for her argument that the public duty doctrine does not apply and that, in any event, a special relationship exists.  Plaintiff's "special relationship" argument is based on the two-prong test set forth in the case law, and, as shown above, her allegations and evidence satisfy both prongs.  However, the MPD policies produced to date, as well as other representations by MPD, underscore that Plaintiff reasonably expected the MPD's assistance with her sexual assault complaint and was justified in her reliance on MPD.  Moreover, MPD's policies and other representations are highly relevant to the merits of Plaintiff's claims against the District on all three theories of negligence.

at 143-44 (reversing grant of summary judgment for the District on the "public duty" issue, where factual questions existed concerning the applicability of the doctrine and where – as here – the plaintiff sought "discovery to demonstrate the 'special relationship' needed to remove the case from the application of the public duty doctrine").

As described above, the discovery that Plaintiff has developed to date indicates extremely strong support not only for her ultimate claims against the District, but also for the inapplicability of the public duty doctrine, based both on the evidence of widespread policy failures and on the evidence that the District established a special relationship through its contacts with Plaintiff. *See, e.g.*, Plaintiff SOF ¶¶ 5, 9, 11-20.  Moreover, the Court has recently ordered that discovery may proceed for an additional 90 days beyond the discovery cut-off of July 16, 2008, and thus Plaintiff intends to pursue additional discovery against the District – including depositions of MPD personnel concerning the MPD's "special relationship" to Plaintiff and other sexual assault victims, as well as depositions and document discovery regarding MPD's hiring, training and supervision of its personnel related to cases involving sexual assault.[14]  Thus, as in numerous other cases resolving the public duty issue – both at trial and on summary judgment – Plaintiff should be permitted to complete discovery concerning the applicability of the public duty doctrine, including with respect to whether a "special relationship" was formed.  Although Plaintiff expects that the evidence may demonstrate that she is entitled to summary judgment at the conclusion of discovery –with respect to both the "public duty" issue and the District's underlying negligence – at the very least, both of these issues will need to be resolved at trial.

---

[14] As noted above, Plaintiff already has propounded document requests to the District.  Since July 16, 2008, the District has refused to meet and confer with Plaintiff concerning her contention that the District failed adequately to search for and produce documents.  The District is now willing to meet regarding the parties' discovery disputes, which Plaintiff will seek to resolve without Court intervention, if possible.

*See, e.g.*, *Johnson*, 580 A.2d at 143 (refusing to grant the District summary judgment on the "public duty doctrine" because triable issues of fact existed concerning whether that doctrine applied).

## CONCLUSION

For the foregoing reasons, and all others apparent to the Court, the District's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment should be denied.

Dated:  September 2, 2008                          Respectfully submitted,

                                            _____/s/_____

                                            Bruce V. Spiva, D.C. Bar. No. 443754
         bspiva@spivahartnett.com
Kathleen R. Hartnett, D.C. Bar. No. 483250
         khartnett@spivahartnett.com
SPIVA & HARTNETT LLP
1776 Massachusetts Avenue, N.W.
Suite 600
Washington, D.C. 20036
Telephone:  (202) 785-0601
Facsimile:  (202) 785-0697

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA McGAUGHEY,            )
                                 )
            Plaintiff,            )
                                 )        Case No. 1:07-cv-01498 (RJL)
v.                               )
                                 )
DISTRICT OF COLUMBIA, *et al.*,   )
                                 )
                                 )
            Defendants.           )
_____ )

**STATEMENT OF CONTROVERTED FACTS AS TO WHICH THERE IS
A GENUINE DISPUTE IN OPPOSITION TO THE DISTRICT OF COLUMBIA'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT AND ALTERNATIVE
MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED
MATERIAL FACTS SUPPORTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff respectfully submits the following Statement of Controverted Facts as to Which

There is a Genuine Dispute in Opposition to Defendant the District of Columbia's ("the

District's") Motion to Dismiss First Amended Complaint and Alternative Motion for Summary

Judgment ("Dist. Mot.") and the District's Statement of Undisputed Material Facts Supporting

Motion for Summary Judgment ("Dist. SOF").

**RESPONSES TO DISTRICT'S PROPOSED FACTS**

1.      Alexandria McGaughey was 19 years of age at all times relevant to this litigation.

*See* Plaintiff Deposition at pp. 16:6-7 and 28:13-21 (attached as Exhibit "C").[15]

_____

[15] The District's proposed facts are reproduced verbatim, and the Exhibit references in the
District's reprinted proposed facts thus refer to Exhibits attached to the District's Motion and
Statement of Proposed Facts.  In both her Responses to the District's Proposed Facts and
consecutively numbered Statement of Material Facts Precluding Summary Judgment herein

**Response:  Controverted.**  Plaintiff was born on March 28, 1987, and thus was 19 years old as of December 9-10, 2006.  However, that is not the only time period "relevant to this litigation."  Plaintiff suffered damages attributable to Defendants after December 9-10, 2006, and the evidence indicates that many of Defendants' negligent practices continue to this day.  In addition, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

2.      Plaintiff has no personal recollection of the alleged rape that occurred at a private house party on December 9, 2006.  *See* Plaintiff Deposition at pp. 38:12-18, 45:13-18 and 56:5-8 (attached as Exhibit "C"); *see also* Plaintiff Responses to Howard University's Interrogatories at No. 1 (attached as Exhibit "A").

**Response:  Partially controverted as incomplete and misleading.**  While Plaintiff does not recall experiencing the rape or the identity of her attacker, she experienced severe pain as well as symptoms of having been drugged after awakening from what she has described as a period of blacking out, as well as other factors such as a missing panty liner after she awoke, that led her to believe she had in fact been raped.  *See, e.g.*, Plaintiff Responses to Howard University's Interrogatories at No. 1 (attached as Ex. A to District's Motion and Statement of Proposed Facts).  In any event, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

3.      Plaintiff visited Howard University Hospital twice on December 9, 2006.  On her first visit, Plaintiff was not transported to the hospital by the D.C. Metropolitan Police Department ("MPD") or any other District employee; instead, she was transported by Howard

---

("Plaintiff SOF"), Plaintiff also refers to Exhibits that Plaintiff has attached to this submission. With respect to Exhibits of deposition testimony attached hereto, Plaintiff has collated all referenced deposition pages for each witness in one Exhibit and provides the Exhibit citation the first time that a given witness's deposition testimony is cited.

University's campus escort service. *See* Plaintiff Deposition at p. 54:1-4 (attached as Exhibit "C").

**Response:  Uncontroverted.**  However, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

4.      After her first visit, Plaintiff was not transported or escorted from the hospital by MPD, but took a shuttle back to the campus.  *See* Plaintiff Deposition at p. 62:16-17 (attached as Exhibit "C").

**Response:  Controverted.**  The cited testimony does not support the proposed fact, but pertains to Plaintiff's return to campus on December 9, 2006 for her second visit to Howard University Hospital ("HUH").  The evidence, including Plaintiff's testimony, is that after the first visit to HUH on December 9, 2006, she was taken by a friend to Plaintiff's room in Meridian Hill Hall, which is not on the Howard campus.  *See* A. McGaughey Dep. at 54-55, 62-63 (attached hereto as Exhibit A).  In any event, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

5.      Plaintiff did not contact MPD or the D.C. Rape Crisis Center regarding her alleged sexual assault on December 9, 2006.  In fact, Plaintiff's friends and/or sister did not contact MPD about the alleged assault until after Plaintiff arrived for her second visit to Howard University Hospital.  *See* Plaintiff Deposition at pp. 143:14 – 144:7 (attached as Exhibit "C"); *see also* Plaintiff Responses to District Hospital Partners' Admission Requests at Nos. 16 and 31 (attached as Exhibit "B"); Sade Diké Deposition at p. 141 (attached as Exhibit "D"); Kerston Reed Deposition at p. 139 (attached as Exhibit "E").

**Response:  Controverted.**  The record evidence overwhelmingly indicates that Plaintiff, her sister, and her friends had multiple contacts with MPD personnel on December 9, 2008 –

including directly with, at a minimum, Officers Minor, Green and Leveque, and Detectives Spriggs and Fields, and indirectly with, at a minimum, Detectives Wheeler and Rice and Sergeant Maradiaga. *See, e.g.*, A. McGaughey Dep. at 123-24, 143-44, 219-24, 328-45; R. McGaughey Dep. at 133-50, 177-80 (attached hereto as Exhibit B); K. Reid Dep. at 163-65, 180 (attached hereto as Exhibit C); *see also, e.g.*, Minor Dep. at 60-61, 70-76 (attached hereto as Exhibit D); Green Dep. at 84-127 (attached hereto as Exhibit E); Leveque Dep. at 86-118 (attached hereto as Exhibit F); Maradiaga Dep. at 165-176 (attached hereto as Exhibit G). Thus, the District's claim that "Plaintiff did not contact MPD . . . on December 9, 2006" is false and misleading, because not only did she repeatedly interact with MPD on December 9, 2006, but Plaintiff's friend and sister affirmatively contacted MPD that day (on behalf of Plaintiff) when it became clear that Plaintiff's case was not being handled properly.

In addition, both that claim, as well as the District's claim that Plaintiff's friends and/or sister did not contact MPD "until after Plaintiff arrived for her second visit to [HUH]" are misleading and immaterial to the District's "public duty" argument, as those assertions incorrectly suggest that Plaintiff, her sister or her friends had an obligation to contact MPD or that Defendants' negligence with respect to Plaintiff's first visit to HUH is somehow attributable to the actions of Plaintiff, her sister and her friends. As the MPD's guidance to the public makes clear, a victim of sexual assault should "[g]o to a hospital emergency room or your own doctor for medical care immediately," http://mpdc.dc.gov/mpdc/cwp/view,a,1237,q,547802,mpdc Nav_GID,1551.asp" (attached hereto as Exhibit H). That is exactly what Plaintiff (assisted by her friends and sister) did, the hospitals eventually contacted the MPD on Plaintiff's behalf, and thereafter MPD personnel had extensive and continuing contact with Plaintiff and the hospitals throughout Plaintiff's ordeal. In particular with respect to HUH, "[t]he Metropolitan Police

Department, in conjunction with Howard University Hospital and the DC Rape Crisis Center, has developed the Sexual Assault Nurse Examiner (SANE) program. In this program, a victim of a sexual assault (over the age of 17) will be in a private examination room while waiting to be seen, the wait will not be more than one hour, and the victim will be examined by someone specially trained in this area." *Id.*

Furthermore, although all Defendants failed to contact the D.C. Rape Crisis Center on behalf of Plaintiff on December 9, 2006 – as was their obligation to do – Plaintiff and her sister did seek out and briefly confer by phone with the SANE nurse, Mary Pinn, who is a contractor of the D.C. Rape Crisis Center. *See* A. McGaughey Dep. at 127-28; R. McGaughey Dep. at 148-50; Pinn Dep. at 22-23, 212-13 (attached hereto as Exhibit I). Although this contact with Ms. Pinn was not the type of contact with the D.C. Rape Crisis Center that Defendants were obligated to provide, the District's proposed fact is inaccurate to the extent it implies that Plaintiff had an obligation to contact the D.C. Rape Crisis Center or Nurse Pinn, or that Plaintiff did not in fact contact Nurse Pinn. In any event, whether Plaintiff or her representative contacted the D.C. Crisis Center is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

6.    MPD arrived at Howard University Hospital during Plaintiff's second visit, and spoke with her about the sexual assault allegations. *See* Plaintiff Deposition at pp. 123:13 – 124:8 (attached as Exhibit "C").

**Response: Uncontroverted.** However, this proposed fact is incomplete, as neither it nor the citation reflects the multiple contacts that Plaintiff and her representatives had with MPD on December 9, 2006.

7.    Plaintiff was not present when MPD spoke with Howard University Hospital

5

personnel.  *See* Plaintiff Deposition at p. 144:13-15 (attached as Exhibit "C").

  **Response:  Controverted.**  The cited testimony does not support the proposed fact,

because Plaintiff's testimony was that she does not remember whether she was present when

MPD spoke with HUH personnel.  Another witness, HUH Nurse Postell, has testified that she

and Dr. Yohannes witnessed MPD interacting with Plaintiff and her sister and that Nurse Postell

and Dr. Yohannes immediately thereafter spoke with MPD personnel, indicating that Plaintiff

may have been present when MPD personnel interacted with HUH personnel.  Postell Dep. at

291-93, 307-08 (attached hereto as Exhibit J).  In any event, this proposed fact is immaterial to

whether the "public duty" doctrine bars Plaintiff's claims against the District.

  8. Plaintiff did not know the last name of the person who allegedly raped her.  In

fact, all she had was made-up name.  *See* Plaintiff Deposition at p. 330:7-22 (attached as Exhibit

"C").

  **Response:  Controverted.**  This proposed fact is incorrect and misleading, because

Plaintiff and her friends at some point did come to know the last name of the person (Bilal

Curtis) who may have assaulted her.  *See, e.g.*, A. McGaughey Dep. at 331-32.  As of December

9, 2006, however, Plaintiff and her friends did not know Mr. Curtis's last name (and, of course,

did not know whether he was in fact the person who had assaulted Plaintiff), so at that time,

Plaintiff and her friends provided all of the information that they had about the sexual assault to

the police, such as Mr. Curtis's first name, *see, e.g.*, A. McGaughey Dep. at 330-32; K. Reid

Dep. at 163-65, 180.  However, because MPD refused to treat her case as a sexual assault or

conduct any follow-up investigation, MPD never received additional information from Plaintiff

and her friends concerning potential suspects.  Moreover, the proposed fact is misleading

because it implies that Plaintiff "made up" a name regarding her alleged assailant. As the cited

deposition testimony (and other witnesses' testimony) makes clear, the potential suspect's friends provided what Plaintiff and her friends believed to be "clearly a made-up name [Adam Joseph]. . . . It was something they told us just to get . . . us off their backs." A. McGaughey Dep. at 330. As Plaintiff testified, although she and her friends had suspicions as to which man may have assaulted Plaintiff, Plaintiff and her friends "didn't want to say somebody it was when I didn't know it was because I had been drugged and been out of it and didn't know exactly who it was." *Id.* at 331. Thus, they informed police both of the name "Adam Joseph" and the first name of Mr. Curtis as well as the address of the house party where Mr. Curtis lived at the time, but were unable to say with certainty if any such person was the individual who in fact sexually assaulted Plaintiff.

In any event, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

9.     When MPD was contacted about Plaintiff's alleged sexual assault, she had already visited Howard University Hospital twice, and had already been denied a rape kit. See Plaintiff Deposition at p. 115:2-7 (attached as Exhibit "C").

**Response:** **Controverted.** Although MPD was not contacted during Plaintiff's first visit to HUH due to the negligence of HUH personnel, as noted above, MPD was contacted on Plaintiff's second visit to HUH multiple times, both by HUH and Plaintiff's representatives. *See* Plaintiff SOF ¶ 5. Thus, Plaintiff had not "visited [HUH] twice" prior to MPD being contacted, as the District claims.

This proposed fact is further incorrect and misleading by stating that Plaintiff "had already been denied a rape kit" by the time that MPD became involved, thus suggesting that it was not MPD who also "den[ied]" Plaintiff a so-called rape kit. Although it is true that HUH

7

failed to administer a sexual assault medical forensic examination to Plaintiff (or to otherwise treat her) on her first visit to HUH, during Plaintiff's second visit to HUH, MPD personnel repeatedly interfered with Plaintiff's attempt to have medical forensic evidence collected by repeatedly purporting to "deny" or "fail to authorize" a rape kit or sexual assault medical forensic examination. *See, e.g.*, A. McGaughey Dep. at 123-24, 328-30, 332-33, 343-44; R. McGaughey Dep. at 133-35, 143-48; K. Reid Dep. at 19, 159-60. As the District earlier conceded in its Memorandum in Support of its Motion for Judgment on the Pleadings, "MPD did not provide Plaintiff with a rape kit." Dist. Mot. for Judgment on Pleadings Mem. at 2. Likewise, Officer Green testified that she told HUH personnel "[t]hat no – there would be no sexual kit done" for Plaintiff based on MPD's supposed determination. *See* Green Dep. at 115-17; Maradiaga Dep. at 167-68.[16]

Finally, this proposed fact is immaterial to whether the "public duty" doctrine bars Plaintiff's claims against the District.

## MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT FOR THE DISTRICT BASED ON ITS "PUBLIC DUTY" ARGUMENT

The following material facts, among others, preclude the District's request for summary judgment based on the public duty doctrine. Plaintiff respectfully submits that these facts are undisputed in favor of Plaintiff and may eventually call for summary judgment for Plaintiff, but at the least preclude summary judgment for the District.

---

[16] Plaintiff has not yet deposed the MPD detectives who, like the MPD officers, also interfered with her care and treatment at the hospitals and purported to "deny" her a sexual assault medical forensic examination. However, based on the MPD officers' testimony that the MPD detectives make the supposed determinations of whether to "authorize" sexual assault medical forensic examinations, the testimony of the MPD detectives is likely to further support Plaintiff's evidence that MPD personnel repeatedly purported to "deny" or "fail to authorize" a sexual assault medical forensic examination for Plaintiff.

10.    Plaintiff is not alleging that the District negligently failed to protect her from harm by a third party.  Plaintiff alleges that the District's policies and the actions of its employees directly harmed her by affirmatively interfering with her medical treatment and preventing the collection and preservation of evidence concerning her sexual assault, adding to and exacerbating her physical and emotional harm, and pain and suffering, and preventing her from obtaining evidence relevant to her sexual assault and likely drugging.  Amended Complaint ¶¶ 45-67, 107-20.

11.    The MPD inserts itself into patients' medical care and treatment by claiming that MPD must "authorize" a sexual assault medical forensic examination for such examinations to proceed at local hospitals.  *See* Plaintiff SOF ¶¶ 5, 9.  In addition, Officer Minor testified that the MPD "sex squad unit" plays "a great role in" the determination of "whether the hospital actually does a sexual assault examination."  Minor Dep. at 84.

12.    Plaintiff had a direct and continuing contact with MPD personnel throughout her ordeal on December 9-10, 2006.  *See* Plaintiff SOF ¶¶ 5, 9.

13.    MPD personnel repeatedly purported to refuse to "authorize" a sexual assault medical forensic examination for Plaintiff on December 9-10, 2006; refused to treat Plaintiff's complaint as one of sexual assault; and repeatedly interfered with Plaintiff's care and treatment at the hospitals by purporting to direct hospital personnel not to perform a so-called "rape kit" or sexual assault medical forensic examination.  *See* Plaintiff SOF ¶¶ 5, 9.

14.    Officer Green testified that Plaintiff told Officer Green that "nurse told her that the only way she could get [a sexual assault medical forensic exam] done was to get the police to say to do one."  Green Dep. at 85, 103.  Officer Green also testified:

Q    Okay.  And did you speak with any of the  hospital personnel?

A    On the – on the time of the interview, or afterwards, or what?

9

Q    At the – at the time – well, any time on that day concerning, you know, this matter.

 A    No.

Q    Okay.  Did any of them seek to ask you any questions?

A    No.

Q    I'm sorry.  When I say "them," I'm talking about any hospital personnel?

A    No.  Just a disposition.

Q    When – and when you say "disposition," what do you mean?

A    What did the – what the Sexual Assault Unit detective said in reference to a sexual kit.

Q    Okay.  And who asked you about that?

A    It was one of the nurse.

Q    Uh-huh.  And what did you tell her?

A    *Told her that Detective Wheeler said no.*

Q    *Said no – and when you said – you said no, what did – what did you mean?*

A    *In reference to having a sexual kit performed.*

Q    *That – that – that Detective Wheeler said that no sexual assault kit should be performed?*

A    *That no – there would be no sexual kit done.*

Q    *Okay.  You told the nurse that Detective Wheeler said that no sexual assault kit would be done?*

MR. BANKS:  Objection.  Asked and answered.

MR. JEFFERSON:  Objection.  Asked and answered.

MS. COSTANTINO:  Just joining in the objection.

BY MR. SPIVA:

Q    *Is that correct?*

A    *That's correct.*

Q    *And – and why did you tell her that?*

A    *Because they wanted to know whether or not they needed to do a kit.*

Green Dep. at 115-17 (emphasis added).

15.    Plaintiff justifiably relied on MPD personnel to assist her properly in obtaining a

10

sexual assault medical forensic examination and to otherwise be treated as a victim of sexual assault. *See* Plaintiff SOF ¶¶ 5, 9.

16.     The actions of MPD personnel affirmatively worsened Plaintiff's condition by, among other things, delaying, interfering with and obstructing Plaintiff's care and treatment by the hospitals. *See* Plaintiff SOF ¶¶ 5, 9.

17.     The patrol officers who responded to HUH to interview Plaintiff have uniformly testified that they are not members of the MPD's Sexual Assault Unit, have never received any significant training in the investigation of sexual assaults, have never received any training on the subject of date rape drugs, and are unaware of critical aspects of the District's supposed response system for sexual assault victims, such as the Sexual Assault Response Team ("SART") or the D.C. Rape Crisis Center. *See* Leveque Dep. at 38, 57, 60-63, 67-68, 119-21; Green Dep. at 28-30, 46-47, 49, 178-79; Minor Dep. at 12, 17, 20-23, 26-29.

18.     In Plaintiff's case, the MPD interfered with her medical treatment and the collection of medical forensic evidence based solely on in-person interviews by untrained patrol officers and _phone_ interviews by sexual assault detectives – rather than based upon the sexual assault detectives' in-person interviews and investigation, as MPD policy requires. *See* Leveque Dep. at 38-40, 44-45. Indeed, Officer Leveque confirmed in her deposition that, despite MPD policy requiring the sexual assault unit detectives to "respond to the location," Plaintiff's experience was not atypical. *Id.* at 40, 44-45.

19.     The MPD has attempted to shield itself from review of its handling of sexual assault cases such as Plaintiff's through a practice of _not_ taking a report in cases where the sexual assault detectives determine not to investigate further; MPD personnel have referred to such cases as "unfounded." *See* Leveque Dep. at 48-49, 72-74, 157-58, 205-10; Green Dep. at

62-64, 68-69, 103; Minor Dep. at 35-36, 40-41.  This apparently widespread practice of "unfounding" without a report is directly contrary to MPD policy, which requires "that members shall file a report for all reported crimes and incidents brought to his/her attention."  MPD Field Reporting System, GO-SPT-401.01, March 4, 2004, Ex. 4 to Green Dep. (attached hereto as Exhibit K).  Yet none of the MPD officers who responded to HUH to interview Plaintiff either recalled or were aware of this MPD policy, and indeed, believed that their practice of <u>not</u> taking a report was consistent with MPD policy.  *See* Leveque Dep. at 50-51, 55-57; Green Dep. at 200-02; Minor Dep. at 46-47.

   20. Officer Leveque testified that of the approximately five sexual assault complaints to which she has responded in her police career, only <u>one</u> had been determined to be "founded." Leveque Dep. at 67-68, 71-73.  According to Officer Leveque, the cases determined to be "unfounded" – like Plaintiff's  – often involved drug or alcohol facilitation where the victim did not know for certain who had assaulted her or precisely what had happened.  *See id.* at 221-22, 236, 245, 256.  Officer Green similarly testified that about <u>half</u> of the sexual assault complaints to which she has responded were deemed "unfounded."  Green Dep. at 64.  And, as with Officer Leveque, many of Officer Green's so-called "unfounded" cases involved victims who could not identify their attackers, potentially due to drug-facilitation of the assaults.  *Id.* at 70-73. Likewise, Officer Minor testified that of the approximately twelve sexual assault complaints to which he has responded, almost <u>half</u> had been deemed "unfounded," and therefore, he took no report of the complaint.  Minor Dep. at 46-49.

Dated:  September 2, 2008                    Respectfully submitted,

                                              /s/ Bruce V. Spiva
                                              Bruce V. Spiva, D.C. Bar. No. 443754
                                                  bspiva@spivahartnett.com
                                              Kathleen R. Hartnett, D.C. Bar. No. 483250
                                                  khartnett@spivahartnett.com
                                              SPIVA & HARTNETT LLP
                                              1776 Massachusetts Avenue, N.W.
                                              Suite 600
                                              Washington, D.C. 20036
                                              Telephone:  (202) 785-0601
                                              Facsimile:  (202) 785-0697

                                              *Counsel for Plaintiff*

13

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment, and Plaintiff's Statement of Controverted Facts as to Which There is a Genuine Dispute in Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment and Statement of Undisputed Material Facts Supporting Motion for Summary Judgment was served on September 2, 2008, by electronic filing with the Court's ECF system, upon:

Thomas V. Monahan, Jr.
  tvm@gdldlaw.com
Adam Kelley
  axk@gdldlaw. com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, Suite 2000
Baltimore, MD 21202

Dwayne Jefferson
  dwayne.jefferson@dc.gov
OFFICE OF THE ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001

Larry D. McAfee
  lmcafee@gleason-law.com
GLEASON, FLYNN, EMIG & FOGLEMAN,
  CHARTERED
11 North Washington Street, Suite 400
Rockville, MD 20850

Robert W. Goodson
  robert.goodson@wilsonelser.com
Deidre L. Robokos
  deidre.robokos@wilsonelser.com
Christine M. Costantino
  chrissy.costantino@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN &
  DICKER, LLP
1341 G Street, NW, Suite 500
Washington, D.C. 20005-3105

Karen R. Turner
  karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814


                                        /s/ Bruce V. Spiva
                                        Bruce V. Spiva

# Exhibit A

**(Excerpts of A. McGaughey Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

1 (Pages 1 to 4)

1

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3
4   ALEXANDRIA McGAUGHEY,       :
5        Plaintiff,      :  CASE NO.
6        v.          :  1:07-cv-01498 (RJL)
7   HOWARD UNIVERSITY, et al., :
8        Defendants.      :
9
10              --------------
11
12     Videotaped Deposition of ALEXANDRIA McGAUGHEY
13            Washington, D.C.
14          Tuesday, April 1, 2008
15             9:54 a.m.
16
17
18
19   Job No: 1-125031
20   Pages 1 - 361
21   Reported by: Susan Ingram, RPR
22
```

2

```
1       Videotaped Deposition of ALEXANDRIA McGAUGHEY,
2   held at the offices of:
3        Spiva & Hartnett LLP
4        Suite 600
5        1776 Massachusetts Avenue, Northwest
6        Washington, D.C.  20036
7
8
9
10
11
12
13
14
15
16
17
18
19        Pursuant to notice before Susan Ingram,
20   Registered Professional Reporter and Notary Public in
21   and for the District of Columbia.
22
```

3

```
1              A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        BRUCE V. SPIVA, ESQUIRE
5        Spiva & Hartnett LLP
6        Suite 600
7        1776 Massachusetts Avenue, Northwest
8        Washington, D.C.  20036
9        Telephone: (202) 785-0601
10
11
12   ON BEHALF OF THE DEFENDANT DISTRICT HOSPITAL
13        PARTNERS, LLP:
14        THOMAS V. MONAHAN, JR., ESQUIRE
15        Goodell, DeVries, Leech & Dann, LLP
16        20th Floor
17        One South Street
18        Baltimore, Maryland  21202
19        Telephone:  (410) 783-4044
20
21
22
```

4

```
1      A P P E A R A N C E S (Continued)
2
3    ON BEHALF OF THE DEFENDANTS HOWARD UNIVERSITY,
4        WENDIE WILLIAMS, M.D., and DAWIT YOHANNES, M.D.:
5        KAREN TURNER, ESQUIRE
6        Hamilton Altman Canale & Dillon, LLC
7        Suite 201
8        4600 East-West Highway
9        Bethesda, Maryland  20814
10        Telephone:  (301) 652-7332
11
12
13   ON BEHALF OF THE DEFENDANT GEORGE WASHINGTON
14        UNIVERSITY:
15        JAMES P. GLEASON JR., ESQUIRE
16        LARRY D. McAFEE, ESQUIRE
17        CHRISTOPHER R. SMITH, ESQUIRE
18        Gleason, Flynn, Emig & Fogleman, Chartered
19        Suite 400
20        11 North Washington Street
21        Rockville, Maryland  20850
22        Telephone: (301) 294-2110
```

Case 1:07-cv-01498-RJL   Document 64-2   Filed 09/02/2008   Page 3 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRIA MOUGHRABI
CONDUCTED ON TUESDAY, APRIL 1, 2008

14 (Pages 53 to 56)

53

1 to leave, basically, I guess, just pushed out of the
2 house, but then they knocked on the door again and, you
3 know, asked to get me or, you know, they just wouldn't
4 leave without me, and so they told them it would be a
5 minute. And so I finally came down.
6     Um, we left, um, we were walking. They asked
7 me what happened or why did I go up there, and they said
8 there's something wrong, and I shook my head, yes, I
9 said yes. And they said what happened, and I said
10 somebody touched me, and they said, somebody touched
11 you?
12     They went back to the house. They knocked on
13 the door, and they pretty much demanded to know who was
14 up there with me or, you know, whatever was going on.
15     I don't know who came to the door. They came
16 to the door and told them some name just to, you know,
17 get them off their backs so there wouldn't be any
18 further, I guess, altercation.
19     They saw that they weren't going to budge or
20 clearly that they were lying, so we left. They said I
21 got to the corner again and just began throwing up, but,
22 like, compulsively.

54

1     So they called a -- like a super shuttle we
2 have, not a shuttle, but like an escort service we have.
3 It takes us places after hours on the campus. Took me
4 to the Howard University Hospital. We went there.
5     They tried to, well, admit me or, you know,
6 to say that I had possibly been raped, which is -- my
7 friend Kerston said, that I possibly -- to admit me,
8 because I had possibly been raped and to receive a rape
9 kit.
10     They told me -- we went to the back room.
11 The triage nurse saw me, and we went to the back room.
12 They put me on a bed. I began throwing up more
13 compulsively.
14     I was notified that the doctor came to see
15 us. Basically -- and they told us that -- my friend
16 Kerston, her mother is a nurse, and basically like if
17 someone touched you, you need to know what happened, and
18 in order to know what happened, you need a rape kit.
19     Um, we asked for that. Basically, it was
20 denied because I was supposedly drunk or too drunk to
21 say anything for myself or to speak for myself, so I was
22 basically really unconscious during this time. I wasn't

55

1 even able to walk on my own.
2     And, um, I was told to come back in the
3 morning, when I could remember something. And I was
4 discharged. And we went back to my room and fell asleep
5 until the morning.
6   Q   What time did you wake up?
7   A   Uh, I don't remember. But the morning.
8   Q   You know it was morning --
9   A   Early morning.
10   Q   -- as opposed to afternoon?
11   A   Exactly, early morning.
12   Q   What was it -- what was going on that makes
13 you sure it was early morning?
14   A   Um, well, the sun was up. It was early
15 morning. I know it was before 12:00. I just know it
16 was before 12. I know it was before 12 because we got
17 to the hospital pretty early before 12 or ...
18   Q   And you were in your room, you said?
19   A   I was in my room.
20   Q   Were you in your own bed?
21   A   I was in my own bed.
22   Q   Were you clothed?

56

1   A   I was clothed.
2   Q   Was anybody else in the room besides Ms.
3 Reid?
4   A   No.
5   Q   The information that you just provided of
6 what Ms. Reid and Ms. Dike told you, do you have any
7 recollection of any of those events of your own?
8   A   None whatsoever.
9   Q   Did you or any of your friends have cell
10 phones back then?
11   A   Yes.
12   Q   Did you have them with you at the party?
13   A   Um, I don't remember if I had mine; I know my
14 friend Sade did and Kerston did.
15   Q   Did they indicate to you first who pushed
16 them -- threw them down the steps or pushed them down
17 the stairs?
18   A   They, um, a guy by the name of Tito.
19   Q   Do you know Tito?
20   A   Um, not directly. I just knew him -- no, not
21 directly.
22   Q   Do you know his full name?

Case 1:07-cv-01498-RJL Document 64-2 Filed 09/02/2008 Page 4 of 15
VIDEOTAPED DEPOSITION OF AFRICANSKA MOUGINE
CONDUCTED ON TUESDAY, APRIL 1, 2008

16 (Pages 61 to 64)

**61**

1 about what was happening with me.
2 Q Did you have any dizziness?
3 A Um, not that I can recall.
4 Q Were you nauseous at all?
5 A No.
6 Q Did you vomit once you woke up?
7 A No.
8 Q Do you know whether or not during the period
9 that you were blacked out that -- if your friends tried
10 to get you to eat anything?
11 A Um --
12 Q Did they offer you food?
13 A I don't remember.
14 Q Coffee or anything?
15 A No.
16 Q Did they tell you whether or not they did
17 anything to try to wake you up or stimulate you?
18 A They told me when I was at the hospital they
19 put smelling salts, I don't know what you call the
20 medical term, but smelling salts under my nose to wake
21 me up or to bring me to consciousness.
22 Q Did they say how you responded to that?

**62**

1 A They said I opened my eyes for a bit.
2 Q Did Ms. Dike or Ms. Reid say that they did
3 anything separate from that to try to wake you up or
4 keep you up?
5 A I don't remember.
6 Q Um, do you recall, once you woke up, whether
7 or not you ate or drank anything?
8 A Not when I first woke up, but when we went to
9 campus, I ate Subway.
10 Q When did you go to campus?
11 A I'm not sure. Maybe 10 to 11.
12 Q 10 or 11:00 a.m?
13 A Yes.
14 Q And when you say "went to campus," what do
15 you mean?
16 A We took a shuttle to the campus, so it
17 dropped us off at the Towers.
18 Q See, I'm a little confused because you lived
19 on campus.
20 A Yes, but -- no, Meridian Hill Hall is on 16th
21 Street.
22 Q Okay.

**63**

1 A The campus is located on 4th Street.
2 Q The main campus.
3 A Or 6th Street. Right.
4 Q I gotcha, okay.
5 So the Subway sandwich shop that you went to
6 was located where?
7 A On Georgia Avenue.
8 Q And what did you eat there?
9 A A sub and a drink and chips.
10 Q What, a six-inch sub?
11 A Yes. I don't really get -- I don't get
12 12-inch.
13 Q Okay. Did you eat the whole thing?
14 A No, I couldn't, no.
15 Q How much of it did you eat?
16 A Uh, I'm not sure. Half.
17 Q Why couldn't you eat more?
18 A I mean, my stomach was hurting.
19 Q Did your stomach hurt before you started
20 eating?
21 A Yes.
22 Q When did you first notice your stomach

**64**

1 hurting?
2 A Um, I'm not sure. Maybe in the morning.
3 Q Did you shower?
4 A No.
5 Q Did you change your clothes?
6 A Yes.
7 Q And what did you -- why didn't you shower?
8 A Um, I was told not to shower, but I wasn't
9 informed not to eat. I was just told not to shower.
10 Q Who told you not to shower?
11 A Uh, well, I guess a nurse told Kerston to
12 tell me not to shower until we came back in the morning.
13 Q Did you use a bathroom at all?
14 A I did.
15 Q And did you urinate, have a bowel movement,
16 what?
17 A Uh, urinate.
18 Q How many times before you went back to
19 Howard?
20 A Hmm, once.
21 Q Do you know whether or not while you were
22 blacked out if you went to the bathroom, if they took

Case 1:07-cv-01498-RJL   Document 64-2   Filed 09/02/2008   Page 5 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA MOUGHRABI
CONDUCTED ON TUESDAY, APRIL 1, 2008

31 (Pages 121 to 124)

121

1    A    No. I don't know whether or not.
2    Q    Okay. Do you know whether or not either of
3  them contacted your RA that night?
4    A    No.
5    Q    Do you know if they subsequently contacted
6  your RA?
7    A    No, they didn't.
8    Q    Did you?
9    A    No.
10    Q    Was there any particular reason why you
11  didn't notify your RA?
12    A    I didn't want any other parties that weren't
13  necessary to get involved to get involved.
14    Q    Once you woke up, did you discuss calling the
15  police?
16    A    Um, we did.
17    Q    What was that discussion?
18    A    Um, as soon as I woke up, when we got to the
19  hospital, we thought it was best to call the police.
20    Q    Well, before you got to the hospital, was
21  there any discussion about calling the police?
22    A    I'm not sure.

122

1    Q    And to your knowledge -- well, strike that.
2       Did either of your friends tell you whether
3  or not the police had been contacted during your first
4  hospital visit?
5    A    I don't remember.
6    Q    Did they tell you how long you were at Howard
7  the first time total?
8    A    Um, they did, but at this point, I mean,
9  probably -- I'm not sure, so I don't want to say, but
10  they gave me a time frame, so ...
11    Q    What time frame did they give you?
12    A    Then again, I don't know the specifics as of
13  now. We left probably maybe what, 3, 3 in the morning.
14    Q    Left where?
15    A    Howard University Hospital.
16    Q    Okay. Did they say whether or not you
17  were -- once you got to the hospital, if you had to sit
18  in the waiting room for any period of time the first
19  time?
20    A    The first time? I don't remember what they
21  told me exactly, so ...
22    Q    Did either of your friends say who they

123

1  thought might have been the person to commit this act?
2    A    Um, they believed that it could possibly be
3  who they were -- the person at the door when they tried
4  to get admitted the second time. The name that they
5  told us. But that was the only name we were given, and
6  we don't even know if it was a real name or not, so ...
7    Q    About what time was it when you got to the
8  hospital, back to Howard the second time?
9    A    11ish, I'm not sure.
10    Q    And I think Ms. Reid was the one who went
11  with you; correct?
12    A    Yes.
13    Q    Tell me, please, what happened once you
14  arrived on that second visit.
15    A    We came to the hospital. I told them what
16  happened.
17    Q    To the emergency room?
18    A    To the emergency room.
19       I told them that I had been raped, and that I
20  needed to receive a sex kit. I filled out some papers,
21  called the police. Waited for God knows how long.
22       The police arrived -- or a detective arrived.

124

1  Um, the detective arrived, told them the story. He
2  contacts another detective over the phone, tells him
3  what happened.
4       Um, the detective over the phone tells me
5  that I would not be able to receive a sex kit because I
6  do not know the person or whoever it was last name. I
7  didn't know the last name. So I could not receive the
8  sex kit.
9       So after that I guess the deal was done, went
10  back to see a triage nurse. Waited some more. Then
11  went back to see another nurse.
12       She saw the food in my hand and asked me why
13  I ate, because even if I was to get a sex kit, you were
14  not supposed to eat, but I was not instructed to do so.
15       Basically, she said you have a lost cause
16  'cause you ate, and sent me out so I could -- sent me
17  out to the waiting room so I could see a doctor.
18       My sister came about an hour or two later,
19  then saw another doctor, and then another set of police
20  came.
21    Q    Did you get the name of the nurse who asked
22  you about -- asked you why you ate?

Case 1:07-cv-01498-RJL Document 64-2 Filed 09/02/2008 Page 6 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA MOORE
CONDUCTED ON TUESDAY, APRIL 1, 2008

32 (Pages 125 to 128)

125

1    A    Um, I don't remember her name now.
2    Q    Can you describe what she looked like?
3    A    She was not -- she was, let's see, of a
4    bigger stature, not incredibly overweight but, you know,
5    just a bigger woman. Darker complexion, about a
6    chocolate complexion. I believe she had twisties in her
7    hair. I know it was pulled back. She had -- and she
8    had on some colorful scrubs.
9    Q    Was she a nurse who was involved in later
10   aspects of your care?
11   A    Not to my knowledge.
12   Q    How long was your entire visit that second
13   time at the hospital?
14   A    Um, I know I left around maybe 6:00, around
15   that time.
16   Q    So six to seven hours? Does that sound like
17   a good estimate?
18   A    Yes.
19   Q    When you arrived at the hospital, do you
20   recall actually saying that you were raped as opposed to
21   "I think I might have been raped"?
22   A    No, I said I was raped.

126

1    Q    Did you say that to more than one person
2    while you were at the hospital? -- health-care
3    providers?
4    A    I don't remember either. If I didn't tell
5    them, it was probably told to them before they talked to
6    me, so they were informed of my situation.
7    Q    Well, I'm just speaking of what you --
8    what --
9    A    No.
10   Q    -- words you used.
11   A    No.
12   Q    Okay. So as far as you recall, you told --
13   A    Just the first nurse that you see to be
14   admitted into emergency care.
15   Q    Did that nurse do any type of evaluation,
16   like temperature, blood pressure?
17   A    Not that specific nurse. She was behind a
18   glass window, so I guess she was just an entry nurse or
19   whatever.
20   Q    So after you gave the information to that
21   first person, then you saw somebody else who took --
22   A    Took blood pressure.

127

1    Q    -- blood pressure.
2        By the time you arrived at the hospital for
3    this second visit, how would you describe your level of
4    coherence?
5    A    I was com -- the second time?
6    Q    The second time.
7    A    I was completely coherent.
8    Q    Did you feel like you were drugged or under
9    the influence of any substance?
10   A    Not under the influence -- I mean, I felt
11   like my body definitely wasn't in its normal state.
12   Q    You did not -- you said you did not eat your
13   entire sandwich, but of what you did eat, did it make
14   you nauseous or felt like you needed to throw up?
15   A    The second day, I don't know. I don't think
16   I felt like I had to throw up, but my stomach did hurt.
17   My stomach definitely did hurt.
18   Q    While you were at the hospital the second
19   time, did you speak with any health-care providers by
20   telephone who were in any way affiliated with Howard, to
21   your understanding?
22   A    While I was at the hospital the second time,

128

1    I believe I talked to the SANE nurse. I did talk to a
2    nurse over the phone, yes.
3    Q    Do you remember her name?
4    A    No.
5    Q    Did anyone else speak to that person over the
6    phone that you know of? -- like your family --
7    A    My sister, perhaps.
8    Q    Were you present when your sister spoke to
9    her?
10   A    I don't remember.
11   Q    What do you recall about your conversation
12   with that person?
13   A    It was something pertaining to the sex kit,
14   and it may be somewhere else I can receive one or --
15   it's really cloudy now. I'm not sure, but it was
16   pertaining to the sex kit, definitely.
17   Q    Did you pose any -- strike that.
18       What was the reason you were speaking to this
19   person on the telephone?
20   A    Um, you know, I'm not sure of the exact
21   reasons why. I mean, at that point I was wanting to
22   talk to anyone to get done what needed to be done.

Case 1:07-cv-01498-RJL Document 64-2 Filed 09/02/2008 Page 7 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA MOSUGU
CONDUCTED ON TUESDAY, APRIL 1, 2008

36 (Pages 141 to 144)

141

1  triage?
2      A   I'm not sure the point where I came in
3  contact with the detective. I have that all mixed up,
4  so, you know, I'm not sure if that was -- if I talked to
5  the detective before I went to triage or after I went to
6  triage, I'm not sure.
7      Q   Where were you when you talked to the
8  detective?
9      A   In the waiting room.
10     Q   Um, after you left the waiting room, you went
11  to the back area.
12     A   After I left the waiting room after the hours
13  that I sat there, yes, I was taken into the back.
14     Q   Okay. And so wherever you were taken into
15  the back, is that where you remained until you left the
16  hospital?
17     A   Yes.
18     Q   In the back did you -- were you evaluated by
19  any nurses or doctors?
20     A   Not physically. He just -- not physically.
21  I didn't take off any clothes, I didn't -- he just gave
22  me a couple of prophylactics.

142

1      Q   Did you speak with a doctor?
2      A   Yes.
3      Q   And what do you recall your conversation
4  being with that doctor?
5      A   Um, I was raped. I believe I need a sex kit
6  or I would like to receive one. Is there anything you
7  can do.
8          He said he could not 'cause he was directed
9  not to. Um, he told me to -- so he gave me
10  prophylactics or, you know, for syphilis or other STDs.
11     Q   Was anyone present, either family member,
12  friend, nurses, anyone else present in the room
13  during --
14     A   In the room with me? No.
15     Q   -- this conversation?
16         When the doctor was talking to you.
17     A   When the doc -- no.
18     Q   Do you recall the doctor offering to do a
19  pelvic exam?
20     A   No.
21     Q   Do you recall at any point your refusing a
22  pelvic exam?

143

1      A   Not at all.
2      Q   Do you recall specifically coming to the
3  hospital, asking for treatment for possible STDs due to
4  unprotected sex?
5      A   No, I didn't -- rephrase the question?
6      Q   Did you -- do you recall specifically saying,
7  "I want to be treated for possible STDs because I had
8  unprotected sex"?
9      A   No, I said I was raped and I would like to
10  receive a sex kit.
11     Q   Did your friends tell you whether or not
12  police had been contacted during your first visit?
13     A   I don't remember.
14     Q   Do you know how the police were contacted
15  during your -- during the second visit at Howard?
16     A   I contacted them either -- if it wasn't me,
17  it was probably Kerston or -- it wasn't me, but it was
18  Kerston or someone.
19     Q   And how did you contact them?
20     A   Over the phone.
21     Q   You dialed 911 or non-emergency number?
22     A   I'm not sure.

144

1      Q   Were -- was a call made to the police more
2  than once during that second visit, that you know of?
3      A   Yes.
4      Q   And when was the second time a call was made?
5      A   Around maybe 4 or 5.
6      Q   Who made that call?
7      A   My sister.
8      Q   Were any Howard University health-care
9  providers involved in making those calls or assisting in
10  making those calls to the police?
11     A   The first one I don't remember, but the
12  second one, no, not at all.
13     Q   Do you remember being present when and if
14  anybody from Howard spoke to any police officer?
15     A   No.
16     Q   What happened -- when the time came for you
17  to be discharged from Howard, what were you told, what
18  information were you given?
19     A   The second time?
20     Q   Yes.
21     A   Um, I don't -- if I was discharged -- well,
22  we were discharged, I guess, I don't know if we were

Case 1:07-cv-01498-RJL Document 64-2 Filed 09/02/2008 Page 8 of 15
VIDEOTAPED DEPOSITION OF ALLISON KRAUGH
CONDUCTED ON TUESDAY, APRIL 1, 2008

55 (Pages 217 to 220)

217

1    A    I don't remember.
2    Q    And I know you probably don't remember the
3 exact conversation, but do you remember the sum and
4 substance of what your understanding was as to why she
5 was saying you couldn't get the rape kit?
6    A    Um, that it was given -- Howard is the main
7 site where you get a SANE kit or a SANE nurse is, and
8 that is basically the holding place for D.C. area
9 hospitals.
10        And if the case was dismissed at that
11 hospital or if you could not receive it at that
12 hospital, then, you know, we can't do it here.
13    Q    And who told her -- well, what's your
14 understanding of how she knew that you had been to
15 Howard Hospital?
16    A    Honestly, I don't know.
17    Q    Did you tell anyone up to that point that you
18 had previously been to Howard University Hospital?
19    A    Not myself specifically.  Maybe my -- not me.
20    Q    And after you spoke with the charge nurse,
21 did you then go back out into the waiting room?
22    A    Waiting room.

218

1    Q    And were you eventually called back into the
2 emergency department?
3    A    Eventually, yes.
4    Q    And who called you back into the emergency
5 department?
6    A    A nurse.
7    Q    And let me just go back for a second and ask
8 you throughout everything that you've testified thus far
9 with regard to George Washington University Hospital,
10 was your sister Raegen present for all of these
11 conversations?
12    A    Not the conversation with the triage nurse or
13 the charge nurse.
14    Q    And is there a reason for that?
15    A    Uh, basically, I had to handle it on my own.
16 She couldn't come into it.  She hadn't been the one that
17 had been raped or -- you know.
18    Q    Were you given the option to have her present
19 or not have her present?
20    A    No.  Um, I think with the charge nurse I
21 think she wanted to be, but the charge nurse told her
22 she couldn't.

219

1    Q    Based on your decision that you wanted to
2 handle it on your own?
3    A    No.
4        MR. SPIVA:  Objection.
5        You can answer.
6    A    No, not on my decision.
7    Q    And when you were called back by -- going
8 back to when you were called back into the emergency
9 department by the nurse, did your sister Raegen
10 accompany you to go back into the emergency department?
11    A    Yes.
12    Q    And when you first went back who, if anyone,
13 did you speak with?
14    A    We first went back, the charge nurse was
15 still there.  We were waiting.  We were standing,
16 actually, for a minute.  We weren't even put into a
17 room, so we just put back there.  So we were standing.
18        The charge nurse came, told us that the
19 detective was on the phone.  Detective Marshall was on
20 the phone to conclude my case or the case, if I should
21 get a rape kit, excuse me, talk to Detective Marshall
22 over the phone.  She told me --

220

1        MR. MONAHAN, JR.:  I'm sorry, who did?
2        THE WITNESS:  I did.  I did.
3        MR. MONAHAN, JR.:  Thank you.
4    A    She basically told me that my case had been
5 brought up before, and it was closed, and that it could
6 not be opened again.  Once the decision had been made,
7 that was it.  And that basically I couldn't receive a
8 rape kit.
9        And then that was the end of my conversation
10 on the phone with her.  So we had -- after that phone
11 conversation, we were put into a room.
12        I remember seeing Nurse Autry, one other
13 nurse to do an exam, a bodily exam, a physical exam, and
14 Dr. Lang.
15    Q    Okay.  We'll get to the examination and who
16 you saw in a minute, I just want to go back to what you
17 said about the telephone call.
18        You were -- from what I understand, you were
19 standing in the emergency department and had not yet
20 been placed in a room, and the charge nurse came up to
21 you and said that there was a detective on the
22 telephone?

Case 1:07-cv-01498-RJL   Document 64-2   Filed 09/02/2008   Page 9 of 15
VIDEOTAPED DEPOSITION OF AFENI SAKUBAYOGUL??
CONDUCTED ON TUESDAY, APRIL 1, 2008

56 (Pages 221 to 224)

221

1    A    Uh-huh.
2    Q    So was it your understanding that the charge
3  nurse or somebody at the hospital --
4    A    Had been --
5    Q    -- had gotten in touch with the detective?
6    A    Possibly.  I mean, it wasn't through me, it
7  wasn't -- I don't -- I'm not sure if it was through
8  my -- if I started it or if I wanted them to call, I'm
9  not sure exactly, but I remember the phone call had to
10  go through, you know.
11    Q    Did anyone at The George Washington
12  University Hospital tell you that they called Howard
13  University Hospital to discuss your case?
14    A    I don't remember.
15    Q    Did anyone tell you that they called the
16  police to discuss your case?
17    A    I don't remember.  I remember the police just
18  -- they were involved.
19    Q    And did anybody ever tell you or did you ever
20  find out that somebody at George Washington University
21  Hospital ever spoke to the SANE nurse over at Howard?
22    A    No, not to my recollection.

222

1    Q    I understand your testimony about the
2  telephone call with, you said, Detective Marshall?
3    A    Uh-huh.
4    Q    Do you know the first name of that detective?
5    A    No.
6    Q    Was it your understanding that the rape kit
7  could not be done without the police authorization for
8  the rape kit?
9        MR. SPIVA:  Objection.
10        MS. ROBOKOS:  What's the objection?
11        MR. SPIVA:  You said is it your
12  understanding.  Are you asking did somebody tell her
13  that?  Or is that --
14        MS. ROBOKOS:  I'm wondering what her
15  understanding was based on the telephone call with
16  Detective Marshall, because she obviously doesn't
17  remember the exact words that this detective said to
18  her, and she said, you know, essentially said this.
19        Well, I want to know the sum and substance of
20  the conversation and what her understanding is after
21  talking to Detective Marshall.
22        MR. SPIVA:  Are you asking her what they told

223

1  her --
2        MS. ROBOKOS:  Yes.
3        MR. SPIVA:  -- or what her belief is?
4    Q    Well, what's your understanding of why the
5  detective was saying they can't do the rape kit?
6        MR. SPIVA:  Well, I'm going to object, that
7  calls for speculation if you're asking her why the
8  detective said something, but if you're asking her what
9  the detective said, I have no objection to that.
10    Q    I'm asking what the detective said with
11  regard to why the rape kit could not be administered at
12  G.W.  I'm just trying to delve into further detail to go
13  along with your previous answer.
14        MR. SPIVA:  I have no objection to that
15  question.
16        MS. ROBOKOS:  Okay.
17        MR. SPIVA:  But you may need it -- she may
18  need it back.
19    A    What was the question?
20    Q    The question is, based on your discussion
21  with Detective Marshall, what was the reason being told
22  to you as to why a rape kit could not be done at The

224

1  George Washington University Hospital?  Anything
2  specific beyond what you've already testified to?
3        MR. SPIVA:  I'm going to object, but you can
4  answer.
5    A    Not beyond what I said, that she had spoke
6  with the person above her.  He had closed the case
7  already.  She had looked -- 'cause I guess they called
8  just to see if, you know, we could do it.  The case was
9  closed.  She couldn't do it.  She told me I couldn't get
10  a sex kit.
11    Q    And why -- if you know, why did the charge
12  nurse have you talk directly to the officer -- the
13  detective on the telephone?
14    A    I don't know.
15    Q    And after you spoke -- is that the extent of
16  the conversation as far as you remember with Detective
17  Marshall?
18    A    Yes.
19    Q    After you completed that telephone call, who
20  did you then speak to or have contact with as far as
21  health-care providers at The George Washington
22  University Hospital?

Case 1:07-cv-01498-RJL    Document 64-2    Filed 09/02/2008    Page 10 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRIA MCGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

82 (Pages 325 to 328)

325

1    MR. CHAMBERS: I wrote it down; I wasn't on
2  my BlackBerry.
3    MR. SPIVA: Did you not ask this question,
4  and did you hear anything about the campus police?
5    MS. TURNER: Yes, I did, actually.
6    MR. CHAMBERS: Yes, thank you.
7    MR. SPIVA: All right.
8    MS. TURNER: And so laying that foundation --
9    **A    So my answer was to your question, the campus**
10 **police took me to the hospital, they took me from Subway**
11 **to Howard University Hospital, which is approximately**
12 **two blocks.**
13   Q    Okay. So I didn't mishear; you did say
14 campus police took you from Subway to the hospital;
15 correct?
16   **A    Not from my dorm to the hospital. From**
17 **Subway to the hospital.**
18   Q    Okay. Because that was my question, from
19 Subway to the hospital.
20   **A    You asked me if campus police took me to the**
21 **hospital.**
22   Q    What did you tell the campus police had

326

1  happened to you?
2    **A    I told them that I was sick and I need to go**
3  **to the hospital and I couldn't walk any further.**
4    Q    Okay. Did you tell them that you had been
5  raped?
6    **A    No.**
7    Q    Did you tell them that you had been touched?
8    **A    No.**
9    Q    Assaulted?
10   **A    No.**
11   Q    Um, what's the name of the campus police
12 officer that took you to the hospital?
13   **A    I don't know.**
14   Q    Do you have a description of him or her?
15   **A    I don't know.**
16   Q    Was it a male or female?
17   **A    It was a male.**
18   Q    Black or White?
19   **A    Black.**
20   Q    Tall or short?
21   **A    Tall.**
22   Q    Fat or skinny?

327

1    **A    Skinny.**
2    Q    Had you seen him around campus before?
3    **A    Um, see, I don't recall. I was in the car**
4  **with him about five minutes so I wouldn't know, and I**
5  **was too sick to really try to pay attention to his**
6  **facial features so ...**
7    Q    Do you know what kind of car he was driving?
8    **A    A police car, campus police car.**
9    Q    Okay. Was it a car or a truck?
10   **A    Car.**
11   Q    Okay. At the second visit to Howard, when
12 the campus police took you from Subway, physically how
13 did you feel?
14   **A    I felt sick. I couldn't really walk. I was**
15 **nauseated. I was generally sick.**
16   Q    Um, mentally sort of how did you feel?
17   **A    Mentally, um, scared.**
18   Q    Were you still sort of out of it, hung over,
19 or were you -- did you feel like you were cognizant,
20 understood what was sort of going on?
21   **A    Hung over would imply that I was drunk, so --**
22 **I was not, so I did not have a hangover. I was sick to**

328

1  **my knowledge. So I was sick, and I couldn't walk, so I**
2  **was scared. That was how I was feeling mentally.**
3  **Physically, I was sick.**
4    Q    And by "hung over," I didn't mean to imply
5  hung over just from alcohol, I meant hung over because
6  you had been drugged as well.
7    Did you feel sort of in a fog, or were you
8  thinking clearly is really my question.
9    **A    I was thinking clearly enough to make my own**
10 **decisions, I mean, but I could think clearly.**
11   Q    How long were you in the hospital before the
12 police arrived?
13   **A    Thirty minutes to an hour.**
14   Q    How many police arrived?
15   **A    One.**
16   Q    You know the officer's name?
17   **A    I do, but I can't recall the name at this**
18 **time.**
19   Q    It was a male officer that came?
20   **A    A male officer.**
21   Q    Um, and where were you when he came?
22   **A    In the ER waiting room.**

Case 1:07-cv-01498-RJL  Document 64-2  Filed 09/02/2008  Page 11 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA ROBINAUGHES
CONDUCTED ON TUESDAY, APRIL 1, 2008

83 (Pages 329 to 332)

329

1    Q    And that's sort of the open space where all
2    the patients are waiting?
3    A    Yes.
4    Q    Did you have a conversation with him at that
5    time?
6    A    Sure did.
7    Q    And he spoke with you out there in the open?
8    A    Yes.  Um, we sat two seats next to each
9    other.  We didn't speak very loudly, but yes, we were.
10    Q    Okay.  And what was the substance of the
11    conversation you had with that officer?
12    A    Basically, to run through what had happened
13    and to tell him what I believe had happened to my
14    knowledge, and to have him decipher from there.
15    Q    Um, and what did you tell him you believed
16    happened?
17    A    That I was raped.
18    Q    Can you describe that officer?
19    A    Black, taller than me, middle age.  Had on a
20    police uniform.
21    Q    Um, when was the next time you spoke to a
22    police officer after that, after speaking with that

330

1    first officer?
2    A    I spoke to a detective about 15 minutes later
3    over the phone.
4    Q    Okay.  And do you know that officer's name?
5    A    Not right now, but I could tell you.  I mean,
6    not now.
7    Q    Okay.  And what was the conversation with
8    that officer?
9    A    The conversation basically asking me
10    questions about what happened that night, um, who did I
11    believe the person was, did I know the person's last
12    name.  No, I don't know the person's last name.  You
13    can't get a rape kit.
14    Q    Didn't your friends have a first and last
15    name of the person?
16    A    Not during that time, no.
17    Q    Didn't someone at the house, when they went
18    back to inquire as to what happened, give them a name,
19    Adams or Joseph?
20    A    No, it was clearly a made-up name.  It was a
21    made-up name.  It was something they told us just to get
22    them off -- get us off of their backs.

331

1    Q    Do you know for a fact that that's a made-up
2    name?
3    A    From the little bit of research or -- I've
4    tried the -- I have not come across an Adam Joseph.
5    Plus, I didn't want to say somebody it was
6    when I didn't know it was because I had been drugged and
7    been out of it and didn't know exactly who it was.
8    Hence, the point of the rape kit.
9    Q    So, you didn't give a name.
10    MR. SPIVA:  Objection, to the extent you're
11    implying that she knew of a name at that time.
12    MR. CHAMBERS:  She knew of the name Adam
13    Joseph.
14    MR. SPIVA:  Objection, lack of foundation,
15    mischaracterizes the testimony.  That she knew of.
16    Q    Now, you said when you were dancing before
17    you passed out you remember the last person you remember
18    dancing with was Bilal Curtis.
19    A    I didn't know his last name at that point.
20    Q    But you knew Bilal.
21    A    I didn't even really know him.  I didn't know
22    him.  I wasn't formally introduced to him.

332

1    Q    Meaning, you knew his first name is my
2    question.
3    A    Yes, which means I still don't know a last
4    name, by the time I talked to the detective.
5    Q    So is that all the detective said to you,
6    there's no last name, so we're not filing a report?
7    A    Pretty much.
8    Q    When you say "pretty much," is that all he
9    said, or did he say more?
10    A    Not that I recall, nothing that was too much
11    more important.
12    Q    Do you recall him saying anything more?
13    A    Clearly, there was more said.  I mean, it was
14    nothing more that went in the depth of why I can't get
15    it, he just said I cannot -- you cannot receive a rape
16    kit.
17    Q    Okay.  So that officer -- that detective you
18    talked to on the telephone told you you can't receive a
19    rape kit?
20    A    Exactly.
21    Q    Is that what you asked for, a rape kit, when
22    you walked into the hospital?

Case 1:07-cv-01498-RJL   Document 64-2   Filed 09/02/2008   Page 12 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA MCLAUGHLIN
CONDUCTED ON TUESDAY, APRIL 1, 2008

84 (Pages 333 to 336)

333
1    A   Um, I told them I had been raped, and that I
2 would -- I dearly like to receive a rape kit to know
3 what happened -- to know who it was, and from there call
4 the police.
5    Q   Hasn't it been your testimony today that you
6 wanted to get this rape kit to find out what happened?
7        MR. SPIVA:  Objection, mischaracterizes the
8 testimony and argumentative.
9    A   No, I had just wanted to find out who it was.
10   Q   All right.
11       MR. CHAMBERS:  Let me mark this.
12       (Exhibit No. 7 marked for identification and
13 attached to the deposition transcript.)
14   Q   Have you seen that document before?
15   A   Um, once before.
16   Q   Do you know what that is?
17   A   Um, like a police report.
18   Q   Do you know who wrote that police report?
19   A   No, I don't.
20   Q   Have you read through that police report
21 before?
22       MR. SPIVA:  Objection, asked and answered.

334
1    Q   Have you read through that police report
2 before?
3        MR. CHAMBERS:  I'll give you a hundred
4 dollars if I've asked that question.  I'll give you a
5 hundred dollars right now.
6    Q   Have you read that document before?
7    A   I've read it, but I don't remember what was
8 in it.  I've read it.
9    Q   Can you take a minute to read it now, please?
10   A   (The witness complies.)
11       Okay.
12   Q   Now, you have already stated that you blacked
13 out and you don't remember having sexual intercourse
14 that night.
15   A   Exactly.
16   Q   Now, the report says --
17       MR. SPIVA:  I object to the characterization
18 of "sexual intercourse," but go ahead.  It's been
19 answered.
20   Q   Okay.  The report indicates that you went to
21 the hospital to get a sex kit done.  Is that true?
22   A   True.

335
1    Q   The report indicates that you had attended a
2 house party, and you blacked out and you thought
3 something happened.  Is that true?
4    A   I was told that something happened to me, or
5 I was told that I knew that something happened to me
6 that night.
7    Q   Again, the report indicates that you had gone
8 into the bathroom and someone had followed you in.  Is
9 that true?
10   A   At that present day, which was the day after,
11 I probably could remember going in and out of
12 consciousness, but a year or two later, I don't remember
13 what happened.
14       I try my best to block those incidents out of
15 my mind, but more than likely, 99 percent, I could have
16 remembered if that happened to me, and I wouldn't just
17 say it.
18   Q   Again, the report indicates that you thought
19 someone touched you, your breasts and your private
20 parts.
21   A   Not thought.  There was never a thought in
22 the situation.

336
1    Q   Well, the report indicates that someone
2 followed you and touched you on your breasts --
3    A   And I must say it was a report written by
4 someone else, not me.  My words could have been skewed.
5    Q   Okay.  I'm just asking you whether the
6 statements here are true or not.  If they're not true,
7 let me know.
8    A   Okay.
9    Q   The report indicates that you were touched on
10 your breasts and your private parts.  Is that true?
11   A   Could have been true at that time.  I could
12 have remembered it, yes.
13   Q   The report indicates that you at some point
14 told the police that you were drunk, changed your story
15 and said, "I was drunk" --
16   A   Not at all, never.
17   Q   I have to finish my question.
18       The report indicates that you changed your
19 story and stated, "I was drunk."
20       Is that true or is that not true?
21   A   That is not true.
22       MR. SPIVA:  Object, in that you're reading

Case 1:07-cv-01498-RJL    Document 64-2    Filed 09/02/2008    Page 13 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRA MCLAUGHLIN
CONDUCTED ON TUESDAY, APRIL 1, 2008

85 (Pages 337 to 340)

337

1  things -- you're paraphrasing and you're reading things
2  without reading everything.  You're skipping things.
3        But go ahead, you can ask your question.
4        MR. CHAMBERS:  She answered it.
5    Q    The report indicates that the police told you
6  that in order to file a report they need to have
7  something concrete.
8        Did the police tell you that?
9    A    Yes.
10   Q    Okay.  You've already testified that you were
11 thinking clearly on this day when you went to the
12 hospital the second time.
13   A    Yes.
14   Q    And when they told you they needed something
15 concrete, what did you say to them?
16       MR. SPIVA:  Hold on a second.
17       If you're going to quote from the document,
18 can you at least quote the entire sentence that you're
19 quoting from and not just select a couple of words out
20 of context?
21   Q    When the police officer said, "I have to have
22 something concrete and not have any guesses," what did

338

1  you say?
2    A    I said -- well, I don't know exactly what I
3  said, I'm paraphrasing clearly.
4        What's more concrete than me saying that I
5  need a rape kit and I believe and I know that something
6  has happened to me.
7    Q    Um, you remember what officer you were
8  talking to?
9    A    I was talking to Green and Leveque.
10   Q    Okay.  What officer specifically was doing
11 the questioning?
12   A    Both of them.
13   Q    The report indicates that, "Complainant" --
14 C1 -- "then stated she only wanted to have a sex kit
15 done to see if anything happened, and she just needs for
16 us to say something happened."
17       Is that true or is that not true?
18   A    Not true.
19   Q    Did you tell the police that you had had
20 something to drink at the party?
21   A    Yes, I did.
22   Q    The report states a little bit lower down

339

1  from where we were talking, "C1, complainant, then
2  stated, 'okay, I'll just say I was rape'" -- which is
3  misspelled -- "'rape to get the kit done.'"
4        Is that true?
5    A    No.
6    Q    The report states, just above the sentence
7  before that, "Complainant then asked if we had sisters
8  or kids and would we want them to be tested."
9        Did you say that to the police?
10   A    Yes, I did.
11   Q    And the next sentence, "Complainant was
12 informed again that we were not going to lie."
13       Did the police say that to you?
14   A    I don't remember; they were barking at me.  I
15 mean, I don't know.  It was something rude.
16       MR. McAFEE:  I'm sorry, something what?
17       THE WITNESS:  Something rude.
18   Q    Do you consider it rude that a police officer
19 tells you that they don't want to lie?
20   A    No, they didn't say we're not going to lie.
21 They said something -- they didn't say that.  They
22 definitely didn't say that.  I know for a fact.

340

1    Q    All right, because that was my question, is
2  that true, the police officer said, "We are not going to
3  lie."
4        So you're saying that that's not true?
5    A    That's not true.
6    Q    Did the police officers, Leveque and Green,
7  finally tell you that they didn't have enough to file a
8  sexual assault report?
9    A    Um --
10       MR. SPIVA:  Objection.
11       MR. CHAMBERS:  Why?  Am I reading --
12       MR. SPIVA:  No, I know.
13       MR. CHAMBERS:  I just asked her a question
14 whether they told her that.
15       MR. SPIVA:  That they didn't have enough to
16 file a report?
17       MR. CHAMBERS:  Didn't have enough -- yeah, a
18 police report.
19       MR. SPIVA:  I mean, lack of foundation.
20   Q    Okay, you can answer.  We have to get out of
21 here.
22       MR. SPIVA:  I mean, you can answer if you

Case 1:07-cv-01498-RJL   Document 64-2   Filed 09/02/2008   Page 14 of 15
VIDEOTAPED DEPOSITION OF ALLISON ANNE MCLAUGHLIN
CONDUCTED ON TUESDAY, APRIL 1, 2008

86 (Pages 341 to 344)

341

1  want.
2      A    So, they -- what was your question?
3          MR. CHAMBERS:  Will you please read the
4  question back?
5          (The requested portion of the record was read
6  back.)
7          MR. SPIVA:  Oh, did you say sexual assault
8  report?  I apologize, I withdraw my objection.
9      A    I don't remember exactly what they said at
10 the end of the conversation.
11     Q    How long was the conversation with them?
12     A    Maybe 15 minutes.
13     Q    Where did that conversation take place?
14     A    In the hospital room.
15     Q    Who was present during that conversation?
16     A    Me, Leveque and Green.
17     Q    Where was your sister?
18     A    She was outside.  I mean, she was inside the
19 ER room.
20     Q    Why wasn't she in the room?
21     A    Um, I really don't know.  I figured it was
22 best for me to go in there, so they figured she wouldn't

342

1  be an outside party trying to influence me.
2          It's my story so I needed to tell it.
3      Q    So basically it was at your request that she
4  not be present during the interview?
5      A    Not at my request; I just told her she
6  doesn't have to come with me.
7      Q    Um, whose idea was it to go into the hospital
8  room to do the interview?
9      A    I don't remember.
10     Q    When you first saw Leveque and Green, were
11 they together, first of all?
12     A    They were.
13     Q    They arrived together?
14     A    Yes.
15     Q    How long were you at the hospital before you
16 first saw them?
17     A    Hours.
18     Q    And where were you when they first arrived?
19     A    Um, in the waiting room -- well, no.  No, I
20 was in the waiting room about to go back into the
21 emergency room.
22     Q    Okay.  Were there any doctors or nurses

343

1  present during that conversation?
2      A    No.
3      Q    Had you begun to get treatment?
4      A    No.
5      Q    So that conversation ended, and they
6  basically said that they were not filing a report; is
7  that sort of how it ended?
8      A    Yes.
9      Q    All right.  So when is the next time you
10 spoke with a Metropolitan Police Department officer?
11     A    The next time I did?
12     Q    Yes.
13     A    I didn't -- no, not after that.
14     Q    Not at Howard, just --
15     A    Yeah, in general, no.
16     Q    Because you spoke with one at G.W.
17     A    A detective over the phone, but ...
18     Q    So, that would be the next time you spoke
19 with one.
20     A    Okay.
21     Q    Was that the same night?
22     A    The same night.

344

1      Q    And what was the substance of that
2  conversation?
3      A    That she had spoke to her supervisor, and
4  that the case was closed, and that I could not receive a
5  rape kit, and the decision had been made on my case.
6      Q    Um, how long did that conversation last?
7      A    Ten minutes.
8      Q    Were there -- were there two conversations
9  with her?
10     A    With her?  No.
11     Q    She had already spoken to her supervisor
12 before she spoke to you?
13     A    Yes.
14     Q    Someone spoke with her before she spoke to
15 you as well?
16     A    Either she spoke to him, he spoke to her,
17 they spoke to each other.
18     Q    I'm sorry, my question was not clear.
19          I really meant, did someone from the hospital
20 speak with her before she spoke with you?
21     A    I'm not sure.
22     Q    Did she call your room directly?

Case 1:07-cv-01498-RJL    Document 64-2    Filed 09/02/2008    Page 15 of 15
VIDEOTAPED DEPOSITION OF ALEXANDRIA McGAUGHEY
CONDUCTED ON TUESDAY, APRIL 1, 2008

87 (Pages 345 to 348)

345

1    A    It wasn't the room; it was the main desk in
2  the ER room.
3    Q    Did a hospital employee call you up and say
4  you have a phone call?
5    A    I cannot specifically remember, but I believe
6  so.
7        MR. CHAMBERS:  Three minutes on the tape; I
8  only have like five minutes left.
9        THE VIDEOGRAPHER:  This ends tape number
10  three in the deposition of Ms. McGaughey.  Going off the
11  record.  The time is 5:41 p.m.
12        (A brief recess was taken.)
13        THE VIDEOGRAPHER:  Back on the record.  Here
14  begins tape number four in the deposition of
15  Ms. McGaughey.  The time is 5:47 p.m.
16  BY MR. CHAMBERS:
17    Q    Okay.  We were just talking about you
18  speaking to a police officer at G.W. Hospital.
19        Do you know the name of that police officer?
20    A    The detective's name was Detective Fields.
21    Q    Okay.  Um, is it your contention that the
22  District of Columbia and/or the Metropolitan Police

346

1  Department was negligent in this case?
2        MR. SPIVA:  Object, to the extent you're
3  asking her for a legal conclusion.
4    A    As a whole or -- yes.
5    Q    Okay.
6    A    Yes.
7    Q    What do you contend that they did that was
8  negligent?
9    A    Number one, the rude and just -- I don't have
10  a word to really explain their behavior or just -- I
11  don't believe they followed protocol, I don't believe
12  that they served their purpose.
13        I don't -- they did nothing of their nature
14  to help me or to even try to make me feel like they
15  would help me, and I'm speaking specifically on Leveque
16  and Green.
17        They just did not do their job, and they were
18  rude and not being police officers to me.  Not -- not
19  serving me.
20        Um, after dealing with them and after dealing
21  with detectives over the phone, which I don't even think
22  is the way that's supposed to happen, the way it was

347

1  dealt with just wasn't the proper way it was supposed to
2  happen.
3        And the way my case was just dismissed, the
4  way I was dismissed, the way my story was not heard all
5  the way through, was wrong, negligent, as you might say.
6    Q    Um, as a result of that, do you contend that
7  you were physically harmed by any actions of the
8  Metropolitan Police Department or the District of
9  Columbia?
10    A    Physically harmed, not specifically, but if I
11  were to ever be physically harmed, I would not trust a
12  D.C. police officer to ever do anything for me.
13        I would not even think to call a D.C. police
14  officer to try to help me because it would not happen.
15    Q    Okay.  So you're not alleging that any police
16  officer physically harmed you?
17    A    No.
18    Q    Are you alleging that any negligence of a
19  police officer caused you physical harm?
20    A    Physical in the end, yes.
21    Q    Please explain.
22    A    Um, the fact that I wasn't able to get a rape

348

1  kit, the fact that I wasn't able to get just the rape
2  kit, just the fact that -- that's physical harm.
3        I was raped.  I was physically harmed, and
4  you did nothing about it.  They did nothing about it.
5    Q    Okay.  When you say "I was physically
6  harmed," you mean the rape itself?
7    A    Yes.
8    Q    When you say "they did nothing about it," you
9  mean they failed to investigate it properly?
10    A    Yes.
11        MR. SPIVA:  Objection, to the extent you're
12  calling for her to make a legal conclusion.
13    Q    When you say -- I'm sorry, can you read back
14  my last question?
15        (The requested portion of the record was read
16  back.)
17    Q    Okay, I'll rephrase that.
18        When you say "they did nothing about it," do
19  you mean they failed to investigate it to your liking?
20        MR. SPIVA:  Objection to the characterization
21  and to the extent it calls for a legal conclusion.
22        You can answer to the extent you can.

# Exhibit B

**(Excerpts of R. McGaughey Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

1 (Pages 1 to 4)

1

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3
4    ALEXANDRIA McGAUGHEY,      :
5        Plaintiff,      :  CASE NO.
6        v.          :  1:07-cv-01498 (RJL)
7    HOWARD UNIVERSITY, ET AL., :
8        Defendants.      :
9
10        --------------
11
12        Videotaped Deposition of RAEGEN McGAUGHEY
13            Washington, D.C.
14            Monday, March 31, 2008
15            10:03 a.m.
16
17
18
19    Job No: 1-125030
20    Pages 1 - 351
21    Reported by: Susan Ingram, RPR
22

2

1    Videotaped Deposition of RAEGEN McGAUGHEY, held at the
2    offices of:
3        Wilson Elser Moskowitz Edelman & Dicker LLP
4        Fifth Floor
5        1341 G Street, Northwest
6        Washington, D.C. 20005-3105
7
8
9
10
11
12
13
14
15
16
17
18
19        Pursuant to notice before Susan Ingram,
20    Registered Professional Reporter and Notary Public in
21    and for the District of Columbia.
22

3

1            A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        BRUCE V. SPIVA, ESQUIRE
5        KATHLEEN R. HARTNETT, ESQUIRE
6        Spiva & Hartnett LLP
7        Suite 600
8        1776 Massachusetts Avenue, Northwest
9        Washington, D.C. 20036
10        Telephone: (202) 785-0601
11
12
13
14    ON BEHALF OF THE DEFENDANT: (District Hospital
15    Partners )
16        ADAM KELLEY, ESQUIRE
17        Goodell, DeVries, Leech & Dann, LLP
18        20th Floor
19        One South Street
20        Baltimore, Maryland 21202
21        Telephone: (410) 783-4044
22

4

1    ON BEHALF OF THE DEFENDANT (Howard University)
2        CHAMILLE C. DENNIS-KITTLES, ESQUIRE
3        Hamilton Altman Canale & Dillon, LLC
4        Suite 201
5        4600 East-West Highway
6        Bethesday, Maryland 20814
7        Telephone: (301) 652-7332
8
9
10
11    ON BEHALF OF THE DEFENDANT (George Washington
12    University)
13        LARRY D. McAFEE, ESQUIRE
14        Gleason, Flynn, Emig & Fogleman, Chartered
15        Suite 400
16        11 North Washington Street
17        Rockville, Maryland 20850
18        Telephone: (301) 294-2110
19
20
21
22

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

133

1  **A    It appeared that she had already been seen by**
2  **a triage, and she was waiting to be seen by a doctor.**
3  Q    Okay.  When you arrived at Howard University
4  Hospital, who was with her?
5  **A    Kerston.**
6  Q    Okay.  Was Sade gone by that point in time?
7  **A    Yes; this was on the second visit.**
8  Q    Correct.
9  So Kerston was there, and your sister was
10 there and you were there.  Nobody else?
11 **A    No one else.**
12 Q    Okay.  Um, did you accompany your sister back
13 into the room for treatment?
14 **A    It didn't really work like that.  There's**
15 **parts of the process missing, so you can ask me another**
16 **question and be more specific.**
17 Q    Well, once you got there, what happened?
18 **A    Once I got there, um, I found out that she**
19 **had already spoken with the police, and they said a rape**
20 **kit could not be administered.**
21 Q    Okay.  Was it your understanding that your
22 sister had personally spoken with the police by that

134

1  point in time?
2  **A    That she spoke to one police in person and**
3  **spoke to another over the phone.**
4  Q    Okay.  And where did the in-person meeting
5  with the police take place?
6  **A    Out in the public area of the hospital**
7  **waiting room.**
8  Q    But at Howard University Hospital?
9  **A    Yes.**
10 Q    Okay.  Did your sister take any notes of
11 those conversations with the policeman?
12 **A    I'm not sure.**
13 Q    Okay.  Were you present for those
14 conversations with the policeman?
15 **A    No.**
16 Q    Okay.  After you got there, your sister
17 informed you that she had spoken with police, and they
18 had told her that she could not get a rape kit.  That's
19 correct?
20 **A    Yes.**
21 Q    Okay.  Did you ask your sister what reasoning
22 the police gave her as to why she could not get a rape

135

1  kit?
2  **A    Yes.**
3  Q    What did your sister tell you?
4  **A    I believe -- I'm not 100 percent sure.  I did**
5  **ask, though.**
6  Q    Okay.  Well, what is your recollection?  You
7  don't have to give me the exact quote, but generally
8  what did she say?
9  **A    From what I recall, because she did not know**
10 **the names of the individuals, um, there was no case.**
11 Q    Did your sister tell you anything else about
12 her conversations with the police officers that you can
13 remember at this time?
14 **A    Not other than what I just stated.**
15 Q    After your sister told you about her
16 interactions with the police, was happened next?
17 **A    Um, I told her to continue to wait for**
18 **service at the hospital and I called the police, the**
19 **D.C. Police.**
20 Q    Okay.  So you called the police on your cell
21 phone?
22 **A    Yes.**

136

1  Q    Did you just call 911, or how did you get to
2  the police?
3  **A    I called the D.C. Police.**
4  Q    Okay.  And how did you know that number?  Did
5  you have to look it up?
6  **A    I'm not certain.**
7  Q    When you called the D.C. Police, what
8  happened?  Who did you speak to?
9  **A    I spoke to whomever answered the phone, and I**
10 **explained to them that my sister had been raped, and**
11 **they told me to call 911.**
12 Q    Okay.  So, did you call 911?
13 **A    Yes.**
14 Q    Okay.  And what did you say to the person
15 that answered 911?
16 **A    I told them the same situation; that my**
17 **sister had been raped and I'm calling for help.**
18 Q    What did the 911 clerk say to you?
19 **A    They would be dispatching police to the**
20 **hospital.**
21 Q    Okay.  And did there come a time when the
22 police did in fact arrive at the hospital?

Case 1:07-cv-01498-RJL    Document 64-3    Filed 09/02/2008    Page 4 of 8
VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

35 (Pages 137 to 140)

137

1    A    No.
2    Q    Okay.  So, it's your understanding that the
3    911 call that you made did not result in any police
4    coming to the hospital to respond to the call?
5    A    Yes, that's accurate.
6    Q    Okay.  While you were making these calls, was
7    your sister just sitting in the waiting room?  Where was
8    she?
9    A    She was in the waiting room while I was
10   making the first attempt to contact the police.
11   Q    Okay.  By "first attempt," you mean when you
12   called and they told you to call 911?
13   A    And then I called 911, so I would say that
14   would be the first successful attempt.
15   Q    All right.  When did you next --
16        MR. SPIVA:  I think you guys are talking past
17   each other.  I'm not trying to coach, so I'm not going
18   to -- I don't think you've got a complete record here.
19   Q    My understanding is that you called -- you
20   called the police after you arrived at the hospital;
21   correct?
22   A    After I arrived and talked to my sister, yes.

138

1    Q    Right.  And the police told you to call 911.
2    A    Yes.
3    Q    And while you were having those two
4    conversations on the phone, your sister was in the
5    waiting room; correct?
6    A    Yes.
7    Q    Okay.  Did there come a point in time when
8    your sister left the waiting room?
9    A    We left the waiting room together.
10   Q    Okay.  Before you two left the waiting room
11   together, had you had any more conversations with any
12   police officers?
13   A    It's possible.
14   Q    Okay.  Well, you said -- for that visit at
15   Howard University Hospital on the afternoon of
16   December 9th, did you ever speak with any police
17   officers beyond the initial call to the police and the
18   911 call that you just told me about?
19   A    When I called them back because they had not
20   arrived.
21   Q    Okay.  Who did you call back?
22   A    911.

139

1    Q    Okay.  And you said the cops you were
2    supposed to be sending never arrived?
3    A    Hours had passed.
4    Q    Okay.  How many hours?
5    A    Roughly, two to three.
6    Q    Okay.  And did they give you any explanation
7    for why the police had not arrived?
8    A    They said that police would be out shortly.
9    They gave me no explanation.
10   Q    Okay.  Did police in fact arrive at Howard
11   University Hospital after your second conversation with
12   911?
13   A    Early in the evening, yes.
14   Q    Okay.  By the time the police arrived, where
15   were you?
16   A    I was in a room in the back of the hospital
17   with my sister.
18   Q    So did the police come back into the hospital
19   in the room where your sister was being treated?
20   A    They came back to the area and -- because I
21   was frantically waiting, I looked for them and saw them.
22   Q    Okay.  So they came back to the area.

140

1        Did they actually go into the room where your
2    sister was being treated?
3    A    Yes.
4    Q    Okay.  Um, roughly, how long had your sister
5    been in the treatment room by the time the police
6    arrived at Howard University Hospital and made their way
7    back to the treatment room?
8    A    I'm not sure.
9    Q    Did it seem like your sister had been in the
10   treatment room information an hour or less than an hour?
11   A    Roughly an hour.
12   Q    Do you remember who was treating your sister
13   in the treatment room at Howard University Hospital?
14   A    Um, a male doctor.
15   Q    Okay.  And do you remember what that male
16   doctor was doing in terms of treating your sister?
17   A    There was no treatment provided.
18   Q    Okay.  Did he do a physical examination, to
19   your recollection?
20   A    No.
21   Q    Did he do a pelvic examination?
22   A    No.

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

36 (Pages 141 to 144)

141

1    Q    Were you with your sister in the treatment
2    room at all time, or did you ever leave the treatment
3    room?
4    **A    I had to leave the treatment room when she**
5    **was with the male doctor, and I had to leave the**
6    **treatment room when she was with the two female**
7    **officers.**
8    Q    Okay.  What was your understanding as to why
9    you had to leave the treatment room when she was with
10   the male doctor?
11   **A    Um, she's over the age of 18.**
12   Q    Okay.  Do you have any knowledge of what kind
13   of treatment or actions the male doctor took after you
14   left the room?
15   **A    The actions that were told to him by my**
16   **cousin.**
17   Q    Which were what?
18   **A    Which was to treat her.  Um, you would have**
19   **to ask him for the specific conversation.  That he**
20   **demanded treatment.**
21   Q    Did your sister ever tell you what the male
22   doctor did after you left the room?

142

1    **A    She said that he took a urine sample, and I**
2    **asked her for it.  And that he prescribed to her Plan B.**
3    Q    Okay.  Did your sister tell you whether the
4    doctor ever physically examined her?
5    **A    She said that he did not.**
6    Q    Now, at some point in time the officers
7    arrived, and my understanding is that you left the
8    treatment room to go speak with the officers in some
9    sort of area outside of the treatment room?  Is that
10   true?
11   **A    Yes.**
12   Q    Okay.  Do you recall which officers had
13   responded to the call?
14   **A    Two female officers.**
15   Q    Okay.  Do you happen to know their names?
16   **A    Leveque and Green.**
17   Q    Did you have a conversation with Officers
18   Leveque and Green?
19   **A    Yes.**
20   Q    Okay.  What do you recall discussing with
21   them?
22   **A    Um, I asked them how long the process would**

143

1    take.
2    Q    What process?
3    **A    Um, I just said, you know, how long will this**
4    **take.**
5    Q    Well, when you said how long is this going to
6    take, what were you talking about?  How long was what
7    going to take?
8    **A    They were -- they had a process, they were**
9    **filling out paperwork.**
10   Q    Okay.  Did you give them any sort of a
11   factual background of what had happened with your sister
12   over the course of the day?
13   **A    No, they knew the facts because they had**
14   **spoken to her prior to speaking to me.**
15   Q    Did you tell Officers Leveque and Green that
16   in your opinion your sister needed a rape kit?
17   **A    I asked them if she was going to receive one.**
18   Q    Okay.  What did they say?
19   **A    They said that they have to wait for a call.**
20   Q    Okay.  Did you say, who do you need to wait
21   for a call from?
22   **A    I tried to probe them as much as possible.**

144

1    They really didn't want to talk to me.
2    Q    Did they ever give you any understanding of
3    who it was that they needed to speak to before
4    authorizing the rape kit?
5    **A    No.**
6    Q    Okay.  Did there come a point in time when
7    Officers Leveque and Green went into your sister's room
8    to speak with her personally?
9    **A    Yes.**
10   Q    And were you present for any portion of that
11   conversation?
12   **A    No.**
13   Q    Okay.  Was there a reason that you were not
14   present?
15   **A    Because she was over 18.**
16   Q    So they told you that you weren't allowed to
17   be there?
18   **A    Um, no, they did not tell me that, but**
19   **because she was over 18, she has to say that she allows**
20   **me to be there.**
21   Q    Okay.  And did you ask your sister to allow
22   you to be there?

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

145

1    A    They didn't allow us to have a conversation
2  to that prior.
3    Q    To your knowledge, did your sister ever say,
4  you know, Officer Leveque and Green, I would like my
5  sister to be present in the room with me?
6    A    I'm not sure.
7    Q    Now, paragraph 51 of the complaint in this
8  case states that the police officers were rude and
9  unprofessional toward you.
10       Do you agree with that?
11    A    Definitely.
12    Q    Okay.  And tell me the basis for that.  Why
13  do you believe they were rude and acting unprofessional
14  toward you?
15    A    Well, basically I was asking them just for
16  basic information.  I wanted their names.  They told me
17  that I would have to look at their badge to obtain that
18  information versus them verbally telling me their names.
19  So I had to write down their names from their badge.
20       And, um, you know, I was asking them just
21  general information, you know, do you think she'll be
22  able to get a rape kit.  Their answers were short and

146

1  rude.
2       Um, and then I went to speak to my sister to
3  see how their conversation had went, and I came back and
4  I asked the police, you know, like what's the progress,
5  and they said that they no longer wished to speak to me.
6       It -- go ahead.
7    Q    Did you -- did you -- did your sister at any
8  point in time say wait, you know, we -- I want you to
9  talk to my sister, she -- she has more questions for
10  you?
11    A    Not to my knowledge.
12    Q    Did you ever -- did you ever expressly ask
13  Officers Leveque and Green why a rape kit could not be
14  performed on your sister at that time?
15    A    I might have.
16    Q    Okay.  Do you rec -- do you recall what their
17  answer was?
18    A    No.
19    Q    Did you have any understanding of why a rape
20  kit was not available to your sister while she was at
21  Howard University Hospital?
22    A    Because they had to wait on the call from

147

1  someone else.
2    Q    Okay.  Is it your understanding that they
3  ever got that call?
4    A    Yes.
5    Q    Okay.  And do you have any understanding as
6  to -- as to what the outcome of the call was?
7    A    Um, the outcome of the call was that she
8  could not be administered the rape kit per someone's
9  decision.
10    Q    Did you ever find out who made that decision?
11    A    I believe I did.  I can't recall the name,
12  though, at this time.
13    Q    Is that in your notes?
14    A    Probably so.
15    Q    Did you ever have any conversations with any
16  of the nurses or doctors at Howard University Hospital
17  on the afternoon of December 9, 2006, in which you asked
18  them why they couldn't do a rape kit even if the police
19  didn't want them to?
20    A    Yes.
21    Q    Okay.  And what were you told?
22    A    I was told that the police have to authorize

148

1  the rape kit.
2    Q    And did you say why do they have to authorize
3  the rape kit?
4    A    Yes.
5    Q    And what were you told?
6    A    That they cannot go forward without the rape
7  kit until the police have made the decision to authorize
8  it.
9    Q    You said that your sister gave the Howard
10  University Hospital physician a urine sample?
11    A    Yes.
12    Q    And then you kept the urine sample?
13    A    No, I was -- no.
14    Q    Okay.  So the urine sample was retained by
15  Howard University Hospital?
16    A    Yes.
17    Q    Okay.  So, when you spoke before -- I had
18  understood you to say that you kept the urine sample.
19       Have you kept any urine samples related to
20  your sister's treatment?
21    A    I was told by Ms. Pinn, the SANE nurse, to
22  retain any urine sample.

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

149

1    Q    Did you do that?
2    A    I couldn't at that point.
3    Q    At what point?
4    A    At the point that the doctor took it.
5    Q    Did you ever ask your sister to just go to
6    the bathroom again and give you another sample?
7    A    No, I had nothing to put urine in.
8    Q    Okay.  Did you ever ask anybody at Howard
9    University Hospital if they would provide to you a
10    specimen cup?
11    A    No.
12    Q    You said that you had spoken with the SANE
13    nurse while you were at Howard University Hospital?
14    A    Yes.
15    Q    Okay.  How many times did you speak with the
16    SANE nurse?
17    A    Several.
18    Q    Okay.  And were all of these conversations on
19    the phone?
20    A    Yes.
21    Q    Okay.  Um, what do you recall being the
22    substance of your conversations with the SANE nurse?

150

1    A    Me asking her for help and what I should do.
2    Q    Okay.  And what did she say to you?
3    A    Um, she said the decision had to be made by a
4    member of Metropolitan Police Department, and we had to
5    wait for that decision to be made.
6        And then she told me about the urine
7    specimens and gave instructions as to her not to shower,
8    eat, whatever, drink, so forth, use the bathroom, one or
9    two.
10    Q    Did you ever ask the SANE nurse why police
11    approval was required for the administration of a rape
12    kit?
13    A    Yes.
14    Q    And what did the SANE nurse tell you?
15    A    That that was the proper policy and
16    procedure.
17    Q    To your recollection, was any blood drawn at
18    Howard University Hospital?
19    A    I'm unsure.
20    Q    The Howard University Hospital records
21    indicate that your sister left Howard at approximately
22    7:00 p.m.

151

1        Do you have any reason to disagree with that?
2    A    No.
3    Q    To the best of your recollection, was your
4    sister discharged with prescriptions for any
5    medications?
6    A    To the best of my knowledge, yes.
7    Q    Do you recall what prescriptions she had?
8    A    Plan B.
9    Q    Okay.  Anything else?
10    A    No, not to my knowledge.
11    Q    My understanding is that you and your sister
12    then went to George Washington University Hospital.  Is
13    that correct?
14    A    No.
15    Q    Okay.  Where did you go after your sister was
16    discharged from Howard University Hospital?
17    A    We drove to Holy Cross Hospital.
18    Q    Okay.  Why did you go the Holy Cross
19    Hospital?
20    A    Per my cousin's instructions.
21    Q    Mr. Cooke -- Dr. Cooke?
22    A    Yes.

152

1    Q    And why did your doctor -- why did Dr. Cooke
2    tell you to go to Holy Cross Hospital?  What was the
3    point in going there?
4        MR. SPIVA:  Objection.
5        You can answer.
6    A    He called other doctors he knew throughout
7    the country to figure out the proper process and
8    procedure for a rape kit being administered.
9        And at the time he had believed that I would
10    -- we would receive help from a hospital in Maryland.
11    Q    Okay.
12        MR. SPIVA:  Were you done with your answer?
13    Okay.
14    Q    So my understanding is that after you left
15    Howard University Hospital on the evening of December 9,
16    2006, you drove from Howard University Hospital to Holy
17    Cross Hospital in Maryland?
18    A    Yes.
19    Q    Okay.  Who was in the car?
20    A    My sister and myself.
21    Q    Okay.  What about Kerston?
22    A    She had gone home.

VIDEOTAPED DEPOSITION OF RAEGEN MCGAUGHEY
CONDUCTED ON MONDAY, MARCH 31, 2008

45 (Pages 177 to 180)

177

1    accompany her?
2        A    Yes.
3        Q    Okay.  From that point in time until the time
4    that your sister was discharged, were you by her side
5    for the entire remainder of the visit?
6        A    No.
7        Q    Okay.  Tell me at what points in time you
8    would have left your sister's side.
9        A    Um, when we entered the ER, we had to wait
10   still and sit there, and, um, eventually I asked the
11   charge nurse if we could be seen, because we were just
12   sitting there without anyone asking us anything or
13   attending to us.
14           And, um, she was very distant at first, and
15   then she handed my sister the telephone, so I remained
16   seated while my sister was on the phone, so I wouldn't
17   have been, like, near her but I could see her at that
18   point.
19           And then she was on the phone I guess with
20   whatever member of the D.C. Police Department, and then
21   she came back, and then I had to basically beg the
22   charge nurse to help us and ask that she be seen.

178

1        Q    Okay.  So, your sister -- you and your sister
2    were -- were sitting inside the emergency department but
3    not in a treatment room --
4        A    Yes.
5        Q    -- when the nurse came and got your sister
6    and told her she that had to speak to somebody on the
7    telephone?
8        A    Yes.
9        Q    Did you -- did you have an understanding that
10   your sister was getting up to go speak with somebody
11   from the police department?
12       A    Yes.
13       Q    Okay.  Um, did the charge nurse say anything
14   about why your sister had to speak to the police?
15       A    No.
16       Q    Okay.  How long would you say your sister was
17   on the phone with the police officer?
18       A    Five to seven minutes.
19       Q    Okay.  And you were able to see her?
20       A    Yes.
21       Q    Okay.  When your sister returned to your side
22   and sat down again, what did she say to you about the

179

1    conversation that she had just had with the police
2    officer?
3        A    She said that they informed her a rape kit
4    could not be administered.
5        Q    And did she tell you which officer it was
6    that she spoke to on the phone?
7        A    Yes.
8        Q    Who was it?
9        A    I can't recall.
10       Q    Is that something that you wrote down?
11       A    Probably.
12       Q    Did your sister tell you that the police
13   officer that she had spoken to on the phone had
14   explained to her why a rape kit could not be performed?
15       A    I'm unsure; so many different explanations
16   throughout the day.
17       Q    Well, do you have a memory of your sister
18   giving you any sort of reason that the police gave her?
19       A    All I know is the answer was no.  The reason
20   from that one officer, I can't say, so many different
21   officers.
22       Q    Do you recall your sister speaking with more

180

1    than one officer by telephone while she was at George
2    Washington University Hospital?
3        A    Just one to my knowledge.
4        Q    To your knowledge, did you or your sister
5    ever speak in person with any police officers at George
6    Washington University Hospital?
7        A    No, never.
8        Q    When you went back, did there come a point in
9    time when your sister was brought into a treatment room
10   for treatment?
11       A    Yes.
12       Q    Did you accompany her into that room for the
13   treatment?
14       A    Yes.
15       Q    Okay.  Um, tell me what happened once you and
16   she arrived in the room.
17       A    We were greeted by Dr. Lang.
18       Q    Okay.  And for the record, Dr. Lang is
19   present.
20           Is that the Dr. Lang that you remember?
21       A    Yes.
22       Q    Okay.  To the best of your knowledge, tell me

# Exhibit C

**(Excerpts of K. Reid Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA MCGAUGHEY,            :

          Plaintiff,         :   Civil Case No.

          vs.                :   1:07-CV-01498(RJL)

HOWARD UNIVERSITY, et al,        :

          Defendants.        :

              - - - - - - -

VIDEOTAPED DEPOSITION OF KERSTON REID

Bethesda, Maryland

Wednesday, May 21, 2008

9:55 A.M.

Job No:  1-129913

Pages 1 - 350

Reported by:  Barbara A. Conner, R.P.R.

349e8d06-e21a-4e74-8958-4d95f9006302

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

Page 18

1    A    Yes.
2    Q    How do you know her?
3    A    Because she's Alex's sister.
4    Q    How did you come to meet her?
5    A    Well, Alex -- I mean, Raegen doesn't live
6  that far and I used to do Raegen's hair. I'm a licensed
7  cosmetologist. So, Raegen would come on campus
8  sometimes and I would do her hair for her, yeah, and
9  that's how I met her.
10   Q    Would you ever go out with Raegen and Alex
11  off-campus anywhere?
12   A    We would go -- I think we went out to eat
13  once with her mom, with Alex's mom, we went to PF
14  Chang's, and to the mall. I think I went to the mall
15  once with them to Tyson's, Tyson's Corner, yeah.
16   Q    What is your understanding of the lawsuit
17  that's brings us here today?
18   A    On a general sense or what do you mean by my
19  understanding?
20   Q    What is your understanding of the lawsuit
21  that was brought by Alexandria McGaughey?
22   A    You mean like what do I think that she's

Page 19

1  suing for?
2    Q    Yes.
3    A    I think that she's suing because she wasn't
4  given the correct treatment at Howard Hospital and I
5  think she's suing because she was denied a case or a
6  rape kit.
7    Q    Are you done with your answer? I don't want
8  to interrupt you.
9    A    Yeah, I think that just about sums it up.
10   Q    When you say she was denied a case, what do
11  you mean by that?
12   A    A case meaning that's what the police kept
13  saying, that she didn't have a case, so since she didn't
14  have a case, they weren't going to give her a rape kit.
15   Q    Does Ms. Hartnett represent you in this
16  lawsuit? Is she your attorney?
17   A    Yes.
18   Q    And when did she become your attorney?
19        MS. HARTNETT: Objection, calls for a legal
20  conclusion.
21   A    What do you mean? Like when she --
22   Q    Have you signed any agreements with

Page 20

1  Ms. Hartnett and her firm?
2    A    Yes.
3    Q    And did you sign an agreement where she would
4  represent you in this case?
5    A    Yes.
6    Q    And when did you sign that agreement?
7    A    April or May. April? Say, April.
8    Q    Your best recollection.
9    A    I think it was April.
10   Q    Of what year?
11   A    2008.
12   Q    And what prompted you to seek the
13  representation of an attorney in this case?
14   A    I didn't seek any representation of an
15  attorney.
16   Q    Okay. Do you know what interest you have in
17  this case?
18   A    Yes.
19   Q    What are those?
20   A    Alex is one of my good friends and I'm here
21  as a witness for her, so I do what I have to, tell the
22  truth, for her.

Page 21

1    Q    Okay. When you say you do what you have to,
2  what do you mean by that?
3    A    Not have to, but do -- I mean, she asked me
4  to do this for her, so, I mean, if I was in the same
5  situation, I would to do it for her. I mean, she would
6  do it for me.
7    Q    And just for clarification, when you say "she
8  asked me to do this," what do you mean? Come here and
9  testify?
10   A    No, not -- I don't know if this is a
11  testimony or whatever you want to call it, but she asked
12  me to -- she asked me if I would speak to her lawyer and
13  I did.
14   Q    Are you yourself seeking any type of relief
15  or damages in this case?
16   A    As far as having to come here not once but
17  twice from two, two and a half hours away, yeah. Gas is
18  high. So, other than that, peace of mind.
19   Q    So, you're seeking reimbursement of your gas
20  mileage, something like that?
21   A    Yeah.
22   Q    And peace of mind?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

349e8d06-e21a-4e74-8958-4d95f9006302

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

Page 158

1    A    I don't remember.  Probably -- I don't
2    remember exactly how long.
3    Q    Who was the first person you guys came in
4    contact with?
5    A    The first person?
6    Q    In the hospital.
7    A    In the hospital?  The lady at the desk.
8    Q    When you filled out the form?
9    A    When we filled out the form.
10   Q    And Ms. McGaughey returned the form to her?
11   A    Yes.
12   Q    Okay.  Did they have any conversation about
13   the information on the form, that you know of?
14   A    I don't remember.
15   Q    Okay.  Then who was the next person you came
16   in contact with, hospital personnel?
17   A    I didn't speak to anyone else in the hospital
18   after that point.
19   Q    So, okay.  After that point, any hospital
20   personnel that was involved in Ms. McGaughey's care and
21   treatment, Ms. McGaughey spoke with them --
22   A    Oh, wait.  Oh, wait.

Page 159

1    Q    Let me finish the question --
2    A    I'm sorry.
3    Q    -- then you can answer however you want to
4    answer.
5         At that point in time, after you arrived at
6    the hospital and Ms. McGaughey filled out the
7    information form, you didn't speak with any hospital
8    personnel, any hospital personnel that was involved in
9    her care and treatment Ms. McGaughey provided
10   information to, is that correct?
11   A    No.
12   Q    Okay.  How am I wrong?
13   A    Okay.  So, I didn't go with her to turn back
14   the form in, she did that.  So, I don't know if she had
15   conversation with the lady, I don't know.  However when
16   Sunny did go in the back, we did speak to someone.  I
17   don't know if she was a nurse or -- I think she was a
18   nurse; I don't know.  But we did speak with someone.  I
19   remember she had -- she had long locks in her hair, she
20   had them pulled back and she put us in like this little
21   room that just had a bed in it and two doors and she
22   said -- she started to explain some things to us.  She

Page 160

1    said, "Okay.  We can't do a rape kit on your friend
2    because," she said, "because she's been eating."  And I
3    said, "Well, the doctor didn't tell us the night before
4    that -- " "not to let her eat, the doctor didn't tell us
5    that," and she was like, "Well, we can't do anything
6    with your friend because she doesn't have a case."  And
7    I said, "What do you mean she doesn't have a case?
8    Something happened to her.  You mean to tell me that
9    she's having pain and like something happened to her,
10   like something had to happen, and for you to say that
11   you're not going to check her out is like crazy."  The
12   lady was like, "Calm down."  She was like, "I'm telling
13   you that we can't do anything without -- " "without a
14   case, we can't do anything."  That's what she said, "We
15   can't do anything."
16   Q    Other than having dreadlocks, can you
17   describe the nurse or the individual for me, please,
18   height, build.
19   A    She wasn't that tall.  I think we were
20   looking eye to eye.  She wasn't that tall.  She was --
21   she was dark.  I can't remember if she had glasses on or
22   not.  I can't remember.  That's about all I can

Page 161

1    remember.
2    Q    Do you know if she was thin, heavyset?
3    A    She was heavyset.
4    Q    You don't remember her name?
5    A    No, I don't remember her name.
6    Q    And this is when you guys went back into the
7    emergency room, with the rooms?  You were in a room?
8    A    Yes.
9    Q    Okay.  Did you provide any information to
10   that nurse before she started telling you, explaining to
11   you what she did?
12   A    Excuse me.
13        Yes.  I told her that we had came in there
14   the night before and that the doctor told me to bring
15   her back in the morning and when she sobered up and
16   that's what I did.  And I remember getting -- I got loud
17   with the lady, I did, and I said, "This doesn't make any
18   sense because if you told me not to let her eat, I
19   wouldn't have let her eat.  Something happened.  I know
20   that," you know, "people don't just wake up from the
21   pain in their anal area, so something happened.  And now
22   that she's up and she's feeling pain, she's back in here

41 (Pages 158 to 161)

349e8d06-e21a-4e74-8958-4d95f9006302

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

Page 162

1  and so you all need to look at her."
2      Q    And this nurse was different from the
3  Dr. Williams that you saw?
4      A    Yes.
5      Q    Or this individual is different from
6  Dr. Williams you saw the previous visit to the hospital?
7      A    Yes.
8      Q    And what was the individual's response to
9  what you said?
10     A    She was like, "We can't do anything because
11 she doesn't have a case and she hasn't seen the SANE
12 nurse."
13     Q    What happened then?
14     A    "And she's been eating."  She was like, "We
15 can't do anything.  I'm sorry, but we can't do
16 anything," and we left out of the room and we waited on
17 Raegen.
18     Q    And how long before Ms. McGaughey's sister
19 Raegen appeared?
20     A    Probably like a few minutes after that
21 because Raegen wasn't far away and by then she was
22 probably like five, five minutes after that, and once we

Page 163

1  got outside, Raegen came.  And once Raegen came, Sunny
2  went back there again with Raegen and I didn't speak to
3  anyone else in the hospital after that point.
4      Q    Were you present for any communications or
5  any conversations that Ms. McGaughey had with any other
6  hospital personnel, though, at that point?
7      A    Not with hospital personnel, no.
8      Q    With who?
9      A    Before we went back into the room with the
10 nurse, there was an officer there and he spoke with
11 Sunny for a while.  I don't know what they were -- they
12 were across the room.  He wanted to speak to her alone.
13 He spoke with Sunny and then he came over and he spoke
14 with me and he asked me where we were and I gave him the
15 address, because at that time I remembered.  I gave him
16 the address of where we were.  I told him what happened
17 and he -- he kept asking me if I -- if Sunny had told me
18 anything else that night once we left the party, other
19 than somebody touched her, and I told him, no, she was
20 out of it and that was it.  I gave him the guy's name
21 that the guy gave me at the door and I told him where he
22 said that he lived, I gave him the address of the place

Page 164

1  we were at and that was that.
2      Q    Okay.
3          MR. DENNIS-KITTLES:  It's about 1 o'clock.
4  Do you want to take a lunch break or do you want to keep
5  going?
6          MS. HARTNETT:  I guess, do we have a sense of
7  how much more time?  I'm happy to take a lunch break if
8  it's going to be a lot more.
9          Can we go off the record.
10         Thank you.
11         THE VIDEOGRAPHER:  We're going off the
12 record.  The time is 1:02 PM.
13         (Recess.)
14         THE VIDEOGRAPHER:  We're back on the record.
15 The time is 1:07 PM.
16     Q    Ms. Reid, before we went off the record, you
17 were talking to me about your conversation you had with
18 a police officer?
19     A    Yes.
20     Q    Was that campus police or Metropolitan Police
21 Department?
22     A    I cannot remember exactly.

Page 165

1      Q    Okay.  Can you describe the officer?  Was it
2  male, female?
3      A    It was a male, short hair, dark skin.  I
4  can't really remember his height because he sat down
5  beside me.
6      Q    How about his build?
7      A    He wasn't too big.  He wasn't that small,
8  either.  He was like me.
9      Q    And then you provided him some information
10 and what was his response to you, if anything?
11     A    He didn't say anything.
12     Q    Okay.
13     A    He got on his walkie-talkie and mumbled
14 something and that was that.
15     Q    Okay.  Did you have any further conversations
16 with anyone else at the hospital that day?
17     A    No.
18     Q    When Raegen arrived, do you know if she
19 went in the back with -- I'm sorry; what happened when
20 Raegen arrived?
21     A    When Raegen arrived, Sunny and Raegen went to
22 the back again.  After waiting a while, they went to the

42 (Pages 162 to 165)

349e8d06-e21a-4e74-8958-4d95f9006302

VIDEOTAPED DEPOSITION OF KERSTON REID
CONDUCTED ON WEDNESDAY, MAY 21, 2008

Page 178

1  smear or something like that on me, thinking it was
2  something wrong down there and it wasn't.  And then they
3  took my blood and they saw that I was dehydrated and
4  something else was going on with my blood and then
5  that's when they admitted me and -- and when they
6  admitted me, the next -- by that time it was like 8
7  o'clock in the morning when they admitted me, or
8  something along those lines.  Yeah, it was late.  I
9  called my mom, but by the time my mom came, they still
10  hadn't done any more tests with me, I still wasn't up to
11  a room.  When I got up to a room, then I finally saw my
12  doctor.  Yeah.  I had -- my hand had swelled all up
13  because my IV was in wrong.  It was just awful.  And
14  then they finally -- like they made me drink all this
15  nasty stuff and put me in a -- they did like an MRI,
16  whatever it's called, CAT scan, whatever -- I don't
17  know, some type of scan and they injected me with iodine
18  and all this stuff, I remember, and to find out I
19  was just like really, really -- it was from a lot of
20  stress and a lot of constipation that made my pancreas
21  become inflamed and, yeah, that was that.
22      Q    Do you remember any of the doctors that

Page 179

1  treated you, their names?
2      A    No.  It was like a weird name, I can't
3  remember.  I remember what they look like, but I don't
4  remember their names.
5      Q    Was that the only occasion where you were a
6  patient at Howard?
7      A    Yeah.  No.  No.  I went there -- I went there
8  again on the weekend, I can't remember when, but I had
9  pink eye and I went -- it was on the weekend and the
10  health center is closed on the weekend, so I had to go
11  to the hospital, and when I went to the hospital just to
12  get drops for my eye, it was evident that I had pink eye
13  and it was irritating me, I was in there -- I caught
14  myself waking up early to go and I was in there all day.
15  I didn't get out of there till late evening just for eye
16  drops.
17      Q    This is the emergency room you're talking
18  about?
19      A    Yes.  Yes.
20      Q    Any other times?
21      A    No.  Other than that, I went to the health
22  center.

Page 180

1      Q    Have you had any conversations with
2  Ms. McGaughey about the incidents, December 8 to
3  December 9, since that time, since her and Raegen left
4  the hospital?
5      A    No.
6      Q    Have you had any conversations with her about
7  whether or not she is going to be taking any action
8  against the person who is thought to have sexually
9  assaulted her?
10      A    Well, I think Sunny felt the same way I did,
11  that, you know, since she didn't hurt -- we told -- I
12  told the police officer everything I knew, I told him
13  where we were, the guy's name, and if she hadn't heard
14  anything, I didn't hear anything, nobody contacted me,
15  you know, to get more information.  She didn't -- we
16  didn't talk about it like -- we didn't talk about it.
17      Q    Have you had any conversations with Raegen
18  McGaughey about those events since that time?
19      A    No.
20      Q    Have you had any conversations with Sade Dike
21  about those events since that time?
22      A    No.

Page 181

1      Q    Were you present at a meeting at
2  Ms. Hartnett's office, I guess prior to April 2008,
3  where you guys discussed these events?
4      A    No.  I wasn't present.
5      Q    You didn't meet with her at any time --
6      A    I wasn't physically there.
7      Q    Okay.  Were you on the phone?
8      A    Yes.
9      Q    Okay.  And when did that meeting take place?
10      A    I don't -- I can't remember the exact date.
11      Q    Was it close in time to the incident?
12      A    I don't remember.
13      Q    Okay.  Was it before April 2008?
14      A    Yes.
15      Q    And what was discussed?
16          MS. HARTNETT:  I just want to interject here
17  that we do assert attorney/client privilege over that
18  conversation because it's our position, as with
19  Ms. Dike, that they were potentially seeking our
20  representation at the time.
21          We don't want to have an issue about this and
22  we are going to waive the privilege with respect to

46 (Pages 178 to 181)

349e8d06-e21a-4e74-8958-4d95f9006302

# Exhibit D

**(Excerpts of M. Minor Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

Michael Minor                                    May 14, 2008

Washington, DC

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - X

ALEXANDRIA McGAUGHEY,              :

            Plaintiff,             :    Case No.

      v.                           :    1:07-cv-01498 (RJL)

DISTRICT OF COLUMBIA, et al., :

            Defendants.            :

- - - - - - - - - - - - - - X

                        Washington, D.C.

                        Wednesday, May 14, 2008

            Telephone Videotape Deposition of MICHAEL

A. MINOR, a witness herein, called for examination by

counsel for Plaintiff in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

SUSAN L. CIMINELLI, a Notary Public in and for the

District of Columbia, taken at the offices of Spiva &

Hartnett, LLP, 1776 Massachusetts Avenue, N.W.,

Washington, D.C. at 9:55 a.m., Wednesday, May 14,

2008, and the proceedings being taken down by

Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and

transcribed under her direction.

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                          May 14, 2008
                        Washington, DC

| Page 10 |
|---|
| 1    Q.   Let me just refresh you on a few of the |

Page 10

1    Q.   Let me just refresh you on a few of the
2 ground rules basically. As you know, we have a court
3 reporter here, and she's taking down what you say and
4 what I say. And so if you can just try to let me get
5 the whole question out before you answer, and I'll do
6 my best to let you get the whole answer out before I
7 ask you another question. If anything I ask you, you
8 know, if it's not clear, if you don't understand,
9 please let me know, so I can do my best to clarify
10 it.
11      If you can remember to give verbal
12 answers, you know, yes, no, explanation as opposed to
13 head shake or a nod, just again, so she can get it
14 down. If you need a break at any time, please let me
15 know. I understand there is some circumstances that
16 may require, you know, a break, and we will take a
17 break right away if you need one.
18      Other than that, counsel around the table
19 may object, your counsel may object to some of the
20 questions that I ask you, but unless they instruct
21 you specifically not to answer, then you can go ahead
22 and answer the question. Let's see. Does that all

Page 11

1 sound pretty clear?
2    A.   Yes.
3    Q.   Okay. And is there any reason why you
4 can't testify completely and accurately today?
5    A.   No.
6    Q.   Okay. All right. Thank you, sir. So you
7 started with MPD 22 years ago. Was this the first
8 police department that you worked for?
9    A.   Exactly. It was.
10    Q.   And did you receive any training at the
11 beginning before you -- before you started on the,
12 with MPD?
13    A.   Yes. At the training academy. Yes.
14    Q.   All right. And what -- can you describe
15 for me the training program. I know it's been a
16 while now, but the training program that you went
17 through prior to starting?
18    A.   It consisted of several things. I can't
19 remember all of them.
20    Q.   Sure.
21    A.   One of them was firearms training.
22 Driving skills. The department general orders. I

Page 12

1 can't remember all of those back then, but we did
2 have classes on those.
3    Q.   Okay. Do you recall whether at that time,
4 before you started, whether you received any
5 instruction or training on dealing with sexual
6 assault cases?
7    A.   No.
8    Q.   Let me just make sure I got it clear for
9 the record, was that no, you don't recall, or no, you
10 did not receive any such training?
11    A.   No. Not for the police department.
12    Q.   Did not receive the training?
13    A.   No. No training. No.
14      MR. JEFFERSON: Bruce, I just want to be
15 clear. You're saying you didn't receive any sexual
16 assault training in police academy?
17      THE WITNESS: No training in police
18 academy. Yes. Right.
19      BY MR. SPIVA:
20    Q.   Thank you. And let me ask you, before we
21 go more into training. Did you have any jobs, work
22 experience prior to starting at the Metropolitan

Page 13

1 Police Department?
2    A.   Yes. I was a security officer about maybe
3 four, five years.
4    Q.   And where did you work as a security
5 officer?
6    A.   It was at a private company in the State
7 of Maryland. Just an officer. I wasn't actually
8 certified to actually carry a gun or anything like
9 that, so it's more like you had limited powers and
10 stuff like that. It's almost like civilian powers.
11    Q.   And prior to that job as a security guard,
12 did you have any work experience prior to that?
13    A.   I did. But I can't remember those.
14 Because after that, it was several after that, but I
15 can't remember.
16    Q.   And were those other security guard
17 positions?
18    A.   No. No.
19    Q.   And have you -- can you describe for me
20 briefly your educational background?
21    A.   Graduated from high school. Started first
22 year of college, didn't finish.

4 (Pages 10 to 13)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                      May 14, 2008
                    Washington, DC

---

Page 14

1    Q.   Okay.  And let's go back to the training
2  prior to beginning with MPD.  What year did you
3  actually assume duties as an officer at MPD?
4    A.   Well, actually, I was sworn in the academy
5  October 14th, 1986.  I actually was assigned to a
6  patrol district in 1987.
7    Q.   And between October and the time that you
8  were assigned to a patrol district in 2007, what were
9  you doing in that period?
10   A.   I actually finished the academy at the end
11  of '87.  So we were still pretty much in training in
12  the academy.  Then once we graduated, I don't know
13  what date in '87, but we had actually been assigned
14  to a district.
15   Q.   So you went straight from graduating from
16  the academy to an assignment in a district?
17   A.   Exactly.
18   Q.   Okay.  What is your current rank and
19  title?
20   A.   Patrol officer.
21   Q.   All right.  And have you had any other
22  ranks or titles within MPD since you -- in your 22

Page 15

1  years there?
2    A.   No.  I haven't.
3    Q.   And I take it from that, that your title,
4  your title or rank as of December of 2006 was also
5  patrol officer?
6    A.   Exactly.
7    Q.   All right.  What district are you
8  currently assigned to?
9    A.   Third district.
10   Q.   And what, I think it's called a PSA.  What
11  PSA are you assigned to currently?
12   A.   At that present time, it was PSA 305.
13   Q.   At the present time?
14   A.   No.  At that present time, 305.  It's a
15  different PSA right now.
16   Q.   Let me go back, then, because I appreciate
17  you clarifying that.  When you say at that present
18  time, you mean December of '06?
19   A.   Yes.  Yes.
20   Q.   And what district were you assigned to in
21  December of '06?
22   A.   Third district.

Page 16

1    Q.   And how about now, currently, as of today,
2  are you still assigned to the same district and PSA?
3    A.   No.  It's a different PSA from that time
4  period.
5    Q.   What PSA are you currently assigned to?
6    A.   304.
7    Q.   Since you started at MPD now going past
8  the academy days, have you had any additional
9  training since you've been an officer with MPD?
10   A.   No.  No additional training, other than
11  what I had in the academy.  No.
12   Q.   Do you have any periodic in-service
13  training or anything like that?
14   A.   Yes.  We do have that.
15   Q.   Can you describe that for me?
16   A.   What it basically covers is what you would
17  cover while you are out this in the street, certain
18  things, refresher courses.  It's a refresher course
19  is what it is.  Pretty much what you had in the
20  academy, just to make sure that you still have
21  knowledge of those items.
22   Q.   And Officer Minor, do you have any -- let

Page 17

1  me back up.  How often does that happen, do the
2  in-service trainings occur?
3    A.   It normally occurs once a year.  Yes.
4    Q.   Okay.  And are there ever other trainings
5  other than the annual trainings you have, the annual
6  in-service trainings --
7    A.   They do have specialized unit trainings,
8  but I haven't applied for those.
9    Q.   Do you recall whether in any of those
10  in-service trainings that you've been to, have you
11  ever received any training on dealing with sexual
12  assault cases?
13   A.   I can't remember.
14   Q.   Okay.  None that you can recall?
15   A.   None.  No.
16   Q.   And this is, this is -- may seem like a
17  charged question, but I ask it of everyone, so take
18  no offense.  Have you ever been disciplined by the
19  Metropolitan Police Department?
20   A.   Yes.  Probably about -- from today's date,
21  probably about eight years ago.
22   Q.   Was that the only time you'd ever been

5 (Pages 14 to 17)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                          May 14, 2008
                          Washington, DC

---

Page 18

1  disciplined by MPD?
2      A.   Yes. Yes.
3      Q.   And can you describe for me what the
4  discipline was?
5      A.   For -- got a -- what we call a one
6  suspension day for missing a couple days of court.
7      Q.   So this is for not attending a court
8  hearing or something?
9      A.   Yes. Yes. Yes.
10     Q.   And was there any other charge related to
11 that discipline?
12     A.   Not that I can remember. No.
13     Q.   And other than that one time eight years
14 ago, either since or before, have you ever been
15 disciplined by the MPD?
16     A.   Not that I can remember.
17     Q.   And have you ever been the subject of a
18 civilian complaint at the Metropolitan Police
19 Department?
20     A.   Not that I recall.
21     Q.   Are you aware that the MPD has a sexual
22 assault unit?

---

Page 19

1      A.   Yes.
2      Q.   And are you a member of MPD's sexual
3  assault unit?
4      A.   No.
5      Q.   And what type of interaction, if any, do
6  you have with the sexual assault unit?
7      A.   The only time I have any type of
8  interaction with them if I'm on a case where a person
9  has been sexually assaulted, where I need to contact
10 one of the detectives. That's the only time, because
11 they pretty much do the investigation. I take the
12 preliminary, such as the complainant's name, date of
13 birth, address, and they do a follow up. They do a
14 detailed investigation.
15     Q.   Okay. Can you describe for me the
16 procedure that you follow in sexual assault cases?
17          MR. JEFFERSON: Objection. Asked and
18 answered.
19          BY MR. SPIVA:
20     Q.   You can answer.
21     A.   Okay. What I would normally do, if I get
22 a call for a case like that, I would go to the

---

Page 20

1  location where the victim is. I would do the initial
2  investigation, such as, you know, getting her name,
3  date of birth, address, suspect information, if I
4  can. And from there, I would relay the information
5  to the sex squad detective, either by having a
6  dispatcher contact him or phone him. I can contact
7  him myself.
8      Q.   Okay. And has that always been the
9  procedure in dealing with sexual assault cases since
10 you've been on the force?
11     A.   Yes.
12     Q.   Has a sexual assault unit been in place
13 for the whole 22 years that you've been there?
14     A.   Yes.
15     Q.   And I know this is -- this is kind of a
16 subset of something I asked you earlier, but I just
17 want to kind of see if this sparks any kind of
18 recollection. Did you ever view a video training
19 about sexual assault investigations?
20     A.   I can't recall.
21     Q.   Okay. And what are MPD's policies for
22 investigating alleged sexual assaults, to your

---

Page 21

1  knowledge?
2          MR. JEFFERSON: Object to form.
3          BY MR. SPIVA:
4      Q.   To your knowledge. You can answer.
5      A.   I don't have the full policy in front of
6  me, so I don't want to give no incorrect answers
7  because I don't have the policy in front of me. But
8  I know what I'd do as patrol officer, which I
9  initially do the initial investigation, then I will
10 contact the sex squad, and have them do the follow-up
11 investigation, because their investigation is more in
12 detail. We don't go into detail with it.
13     Q.   Okay.
14     A.   Yeah.
15     Q.   And when you -- when you contact the
16 sexual assault unit, what type of information do you
17 give them on a sexual assault case?
18     A.   I will give them the victim's name. I
19 will try to give them the date of birth and address,
20 any suspect information, the information about the
21 case, not in detail. I give them what I have, and
22 let them know that it was a sex crime and then they

---

6 (Pages 18 to 21)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                    May 14, 2008
Washington, DC

---

Page 22

1  take it from there.
2     Q.  Okay.  Now, when you say not in detail,
3  what do you mean by that?
4     A.  I don't go into detail as to, you know,
5  the location or where it actually occurred, whether
6  or not it occurred in the B room and stuff like that,
7  or were any people present and stuff like that or any
8  witnesses, anything like that.  I just let them come
9  out because they're going to go into detail more with
10 those questions.  Yeah.
11    Q.  Is that information that you ask of the
12 victim, or do you leave that to the sexual assault
13 unit to ask those kinds of detail?
14    A.  I let the sexual assault detectives ask
15 those questions, because sometimes that will upset a
16 victim, specially when she has to tell her story over
17 and over again, so that's why I don't go into detail.
18    Q.  Okay.  And let me go back to the question
19 about MPD's policies.  To your knowledge, are there
20 any written documents that set forth MPD's policies
21 for the investigation of sexual assaults?
22       MR. JEFFERSON:  Object to form.

---

Page 23

1        BY MR. SPIVA:
2     Q.  Do you know?
3     A.  They do have policies, but like I said, I
4  don't have that in front of me.  I don't know.
5     Q.  Have you been trained on those policies?
6     A.  No.  Not for sex crimes.  No.
7     Q.  And the practice that you described a few
8  minutes ago for how you handle sexual assault cases,
9  is that -- is that something that you -- you find in
10 a written document somewhere or did you, you know,
11 determine that some other way?
12       Actually, let me strike that, because I
13 can see it's a -- it's a confusing question.  And
14 actually because I lost my train of thought in the
15 middle of my question, I actually think I want to
16 ask a different question.
17       The way you describe handling, you know,
18 the way you handle at least the initial, you know,
19 interview with the sexual assault cases, is that any
20 different from the way you would investigate or
21 handle other types of criminal investigations?
22    A.  No.  It wouldn't.  No.  It wouldn't.  No.

---

Page 24

1     Q.  For instance, if you were investigating a
2  robbery, do you -- is there like a robbery unit that
3  you would --
4     A.  There is.  There is.  Yeah.  There is
5  there is.
6     Q.  Are there any types of criminal
7  investigations that you actually handle the entire
8  investigation or -- well, strike that.  Let me step
9  back.  Are there any types of criminal investigations
10 where you handle more of the investigation yourself
11 than you would, say, in a sexual assault
12 investigation?
13    A.  Those investigations that are criminal,
14 they require detective involvement, so I wouldn't go
15 into detail with them.  No.
16    Q.  Have you seen any, that you recall, any
17 general orders from the department dealing with
18 sexual assault investigations?
19    A.  Yes.  I have.
20    Q.  Do you recall anything about what those
21 general orders provided?
22    A.  I've read them, but I can't remember, you

---

Page 25

1  know, what -- the entire thing of them, so I don't
2  want to guess at that.
3     Q.  Okay.  How does -- how does that type of
4  information get to you, information in a general
5  order?  Is there some kind of a standard procedure
6  for you receiving that information?
7     A.  Yes.  We get them from the administrative
8  office.  It comes down to patrol section.  And what
9  they do, they pass them out for each officer and we
10 incorporate them in our general orders.  And I try to
11 read all of them, but a lot of information I can't
12 remember all of it, but I do try to read them.
13    Q.  Sure.  Sure.  Can you give me your best
14 estimate of how many of these general orders come to
15 you say in a given month, let's take it.
16    A.  In a given month, I'll say at least seven.
17    Q.  Okay.  Okay.  So there are a fair number
18 of these?
19    A.  Yes.
20    Q.  Over the course of a year?
21    A.  Yes.
22       MR. JEFFERSON:  Object to form.

7 (Pages 22 to 25)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                    May 14, 2008
                            Washington, DC

---

Page 26

```
 1        BY MR. SPIVA:
 2     Q.  Is there some way that you, that you
 3  personally keep these?  I mean, do you have a
 4  notebook or something like that where you keep all
 5  the general orders?
 6     A.  Yes.  I do have a notebook.  I do.
 7     Q.  Okay.  And do you ever receive any type
 8  of, you know, specific training either in one of
 9  these in-services or otherwise of what's in the
10  general orders?
11     A.  Sometimes.
12     Q.  How does that occur typically?
13     A.  They will pick a general order for a
14  particular day, and they will read them in roll call
15  at the beginning of the tour of duty.  And if we have
16  questions about the general order, we can ask them.
17  And they will give us a chance to, to have any -- if
18  we have any objections to it, we go over that.  They
19  will sometimes, you know, let us know what the
20  appropriate answers could be, or they will have us at
21  least try to give the correct answer and stuff, you
22  know, so --
```

Page 27

```
 1     Q.  And sitting here today, you don't recall
 2  any such specific training like that on a general
 3  order dealing with sexual assaults?
 4     A.  No.
 5     Q.  And are you familiar with the term special
 6  order?
 7     A.  Yes.
 8     Q.  And can you tell me what the difference is
 9  between a special order and a general order, if there
10  is one?
11     A.  I can't give you specific term of it.  A
12  special order is when there is a change that's going
13  to occur to a general order, so it's just that comes
14  out very quickly, and then the change comes after
15  that.
16     Q.  Okay.  And do you ever receive any kind of
17  specific training, say, like what you were talking
18  about a minute ago on the content of a special order?
19     A.  No.
20     Q.  They don't ever read those out at, say,
21  roll call from time to time?
22     A.  They have.  They have.  I do recall.  They
```

Page 28

```
 1  have.
 2     Q.  And do you recall ever receiving any
 3  specific training on a special order involving how to
 4  handle a sexual assault case?
 5     A.  I can't recall that.
 6     Q.  Do you have any familiarity with the term
 7  date rape drug?
 8        MR. JEFFERSON:  Object to form.
 9        BY MR. SPIVA:
10     Q.  You can answer.
11     A.  I've heard about that particular drug, you
12  know, away from the police department.  But no, I
13  have no training in that area.
14     Q.  Okay.  So the police department has not
15  trained you on the issue of date rape drugs?
16     A.  No.  No.
17     Q.  And what have you heard outside of the
18  context of the police department?
19     A.  It's only through what you get through the
20  news media and stuff like that, but as far as having
21  experience in that area, I don't.
22     Q.  Okay.
```

Page 29

```
 1     A.  Yeah.
 2     Q.  And this is probably an obvious question,
 3  based on what you just said, but I have to get it on
 4  the record.  Are you aware of any tests to determine
 5  if a date rape drug is present in a person's body?
 6        MR. JEFFERSON:  Object to form.
 7        THE WITNESS:  No.  I have no knowledge of
 8  that.
 9        BY MR. SPIVA:
10     Q.  Okay.  And I take it you haven't received
11  any training on how long, you know, after a date rape
12  drug is ingested by a person, how long its presence
13  can be detected by a, by a test?
14        MR. JEFFERSON:  Object to form.
15        BY MR. SPIVA:
16     Q.  You can answer.
17     A.  No.  I have no knowledge.
18     Q.  Do you have any familiarity with the
19  sexual assault response team, I think it's called
20  SART for short?
21     A.  There is a sex unit, but I'm familiar --
22  how familiar?
```

8 (Pages 26 to 29)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                          May 14, 2008
                        Washington, DC

| | Page 34 | | Page 36 |
|---|---|---|---|

Page 34

1    A.    I can't remember the details of it.
2    Q.    Do you know how long ago that change was?
3    A.    I believe it was in December 22nd.
4    Q.    Of what --
5    A.    '06.
6    Q.    Okay.  But you don't recall specifically
7  that that required any kind of change in the way that
8  you would respond to, say, a sexual assault?
9    A.    No.
10    Q.    Are you familiar with the -- the notion of
11  finding a sexual assault complaint unfounded?  Have
12  you heard that terminology?
13    A.    Probably with the sex squad detective,
14  they would use that terminology, but I wouldn't.
15    Q.    Okay.
16    A.    Yeah.
17    Q.    What is your understanding of that
18  terminology?
19    A.    My understanding?
20    Q.    Yes.
21    A.    I guess once the sex squad detective does
22  an investigation, and he has all the facts, and it's

Page 35

1  to a point where he can't actually prove anything
2  that a crime was committed, then the case would be
3  unfounded.
4        MR. JEFFERSON:  Object to the
5  responsiveness of the answer.  Speculative.
6        BY MR. SPIVA:
7    Q.    Of the cases you've investigated over the
8  years, I think you said you've investigated about 12
9  approximately.  Do you know how many of those have
10  been found to be founded or unfounded?
11    A.    No.  I don't know.
12    Q.    Is that information that you normally
13  receive, say, from the detective whether or not the
14  allegation is found to be unfounded?
15    A.    He wouldn't exactly tell me like that.
16  More they would say not to take a report, and they
17  would do that investigation, and find out whether or
18  not it would be unfounded.  So yeah.
19    Q.    Now, when you say they would say not to
20  take a report, in what kinds of cases would they say
21  not to take a report?
22    A.    Where they have a case where, you know,

Page 36

1  they can't prove the information, stories are
2  conflicting, they would say do not take a report,
3  we'll handle, you know, so --
4    Q.    Okay.
5    A.    Yes.
6    Q.    And I take it they direct you not to take
7  a report?
8    A.    Exactly.
9    Q.    Okay.  And are there cases in which you
10  actually, they tell you to take a report.
11    A.    Yes.
12    Q.    And what do they typically say to you in a
13  case like that, where they say to take a report?
14    A.    Once they gathered all the information
15  from the victim, and they deemed it to be credible,
16  then they will say yes, go ahead, and get report
17  number for such and such.
18    Q.    And is that something that happens, you
19  know, on the same day that you actually go out and
20  interview the victim, you know, you either take a
21  report or don't take a report?  Is that something
22  that is determined and that either happens or doesn't

Page 37

1  happen on the day that you actually interview the
2  victim?
3    A.    I've had cases where the detectives
4  actually took a report the next day, but they are
5  going to have me take a report right then and there
6  because they handle the situation.  Because you prove
7  the information that the victim was giving at that
8  particular time, so --
9    Q.    And have you had cases where you actually
10  personally did some kind of a report that same day?
11    A.    Yes.  Yes.
12    Q.    And in those cases, what kind of report
13  are you taking, is it a -- for instance, is it a PD
14  251 or PD 252 or something else?
15    A.    That would be a 251.
16    Q.    And in cases where you do take a report,
17  in a sexual assault case, are there any special ways
18  that you handle that, preparing that PD 251 that are
19  different from, say, another type of criminal
20  investigation?
21        MR. JEFFERSON:  Object to form.
22        BY MR. SPIVA:

                Alderson Reporting Company
                    1-800-FOR-DEPO

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                May 14, 2008
                              Washington, DC

| Page 38 | Page 40 |
|---|---|

**Page 38**

1    Q.   Let me just -- what I'm getting at is, is
2  there anything you do differently in terms of
3  identifying the victim on the PD 251 in a sexual
4  assault case, say, as opposed to some other type of
5  case?
6    A.   Yes.  We don't put the victim's name in
7  the report.  We just give the hundred block of where
8  the incident occurred.  We don't put the victim's
9  address in there.
10   Q.   Okay.
11   A.   Yeah.
12   Q.   And how is the victim's name and address
13 and all that kind of information, how is that
14 recorded in a case where you take a PD 251 report?
15   A.   Actually, it's recorded on another report,
16 which is a 252, and a lot of times the detective
17 handling the case, he will prepare that, yes.
18   Q.   Is that typical, the detective is the one
19 that would do the 252?
20   A.   Sometimes it will.  Yes.
21   Q.   Do you sometimes prepare the PD 252?
22   A.   Yes.  If directed, I'll do that, yeah,

**Page 39**

1  yeah.
2    Q.   And would that be the detective that would
3  direct you to do that in the case where you needed to
4  do a PD 252?
5    A.   Yes.
6    Q.   In cases where you don't take a report,
7  cases of sexual assault, how do you document the
8  interview you do of the -- of the victim?
9    A.   I put the information in my notebook.  Get
10 as much information as I can from the victim and keep
11 that in my notebook.
12   Q.   And do you do anything with that
13 information?  What, if anything, do you do with that
14 information?
15   A.   Well, it's there for record, in case I
16 need it again.  That's why everything that I come on
17 the scene, any type of investigation, I try to record
18 the basic information, so I know it's there.  So I
19 can refer to it again if I have to.
20   Q.   Okay.  And do you pass on that information
21 to the detective, for instance, you give him a copy,
22 say, of your pages from your notebook?

**Page 40**

1    A.   No.  No.
2    Q.   And do you convey it some other way to the
3  detective?
4    A.   No.  Either tell him verbally about what I
5  have.  Because he does his own detailed
6  investigation.  What I have in my notebook is the
7  basic information, then there is much more, so --
8  yeah.
9    Q.   Now, in the cases where a detective has
10 directed you not to do a report, have they ever
11 explained why you shouldn't do a report in those
12 cases, and here focusing on the sexual assault
13 investigations?
14   A.   In those cases, where there is further
15 investigation is needed before we actually take the
16 report, that's the only time.  That's one of the
17 times -- that's the only time.
18   Q.   Okay.
19   A.   They need further investigation or if the
20 report -- if the information they feel it's not
21 credible, can't prove anything, they direct me, don't
22 take a report.

**Page 41**

1    Q.   And do they explain why not go ahead and
2  take the report, even if it's deemed to be not
3  credible, or there's some inconsistency?
4    A.   Well, that's their area of expertise.  I
5  won't question that, because they had training and I
6  haven't.
7    Q.   Understood.  Understood.  Do you know
8  whether -- let me step back for a minute.  Would you
9  say that it's the typical practice when a -- when a
10 detective says that a sexual assault case needs
11 further investigation, is it -- is it the typical
12 practice for them to tell you not to take a report?
13       MR. JEFFERSON:  Object to form.
14       BY MR. SPIVA:
15   Q.   You can answer.
16   A.   They can say that.
17   Q.   Is that usually in a case where they say
18 it needs additional investigation?
19       MR. JEFFERSON:  Object to form.
20       THE WITNESS:  It's not always said like
21 that, so it's -- it's rephrased in different verbs,
22 so -- it's not like that.

11 (Pages 38 to 41)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                    May 14, 2008
                            Washington, DC

Page 46

1   take a report in a case of alleged sexual assault?
2          MR. JEFFERSON:  Object to form.
3          THE WITNESS:  Only situation that we have
4   is if a sergeant or somebody demands that you take a
5   report, then the official above the detective demands
6   you take the report, yes, go ahead and take the
7   report.
8          BY MR. SPIVA:
9      Q.   But no one has ever said that in all
10  instances, you should take a report?
11     A.   No.  No.
12         MR. JEFFERSON:  Wait until he finishes his
13  question.
14         BY MR. SPIVA:
15     Q.   I think it probably was clear enough, but
16  you're right, let me just make sure.  Just so we get
17  it clear on the record, it doesn't come across clear
18  in the transcript.  Let me just ask the question
19  again.  It's going to be the same question.  No one
20  has ever said to you that in all instances of sexual
21  assault complaints, that you should take a report?
22         MR. JEFFERSON:  Object to form.

Page 47

1          BY MR. SPIVA:
2      Q.   You can answer.
3      A.   Did I just give an answer to that?
4      Q.   You did.  But I want to make sure it's
5   clear on the record, because it came in the middle of
6   a question, and I didn't finish the question.
7      A.   So I don't want to answer it a different
8   way.
9      Q.   I'm not trying to get you to answer it a
10  different way.  There was nothing wrong with your
11  answer.  It's just that you said -- the transcript
12  says, no, but it's in the middle of the question and
13  so I want to make sure it's clear what you were
14  saying no to.  So let me ask it again and if you
15  could just give the answer again.  No one from MPD
16  has ever said to you that in all cases of alleged
17  sexual assault that you as a patrol officer should
18  take a report?
19         MR. JEFFERSON:  Objection to form.
20         THE WITNESS:  No.
21         BY MR. SPIVA:
22     Q.   And out of the 12 or so sexual assaults

Page 48

1   that you've responded to, do you know
2   approximately -- in approximately how many of those
3   you've had to take a report, and how many of those
4   the detectives have said, don't take a report?
5          MR. JEFFERSON:  Including this case?
6          BY MR. SPIVA:
7      Q.   Including this case.  Yes.
8      A.   I'm trying to understand this correctly.
9   Which I had to take a report?
10     Q.   Yes.
11     A.   Okay.  Probably about seven.
12     Q.   Seven in which you have had to take a
13  report?
14     A.   Yes.  But that's just an estimate.
15     Q.   Best estimate?
16     A.   Yes.  Best estimate.  Yes.
17     Q.   So that means, I take it, that roughly
18  five or so, you did not have to take a report?
19     A.   Yes.
20     Q.   And that's because the detective told you,
21  don't take a report in this case?
22         MR. JEFFERSON:  Object to form.  Leading.

Page 49

1          BY MR. SPIVA:
2      Q.   Is that correct?
3      A.   You said the detective in this case.
4      Q.   In those cases where you didn't take a
5   report, it was because the detective told you that
6   you didn't need to take a report?
7          MR. JEFFERSON:  Same objection.
8          BY MR. SPIVA:
9      Q.   Is that right?
10     A.   Yes.
11     Q.   And in any of those cases, did the
12  detective tell you why you didn't need to take a
13  report?
14     A.   I can't remember his exact words to those
15  cases.  I can only give, you know, my answer, I can't
16  give his, because that's so long ago.  But in most
17  cases like that, they were either unfounded because
18  the information that was given to him by the
19  complainant was conflicting or there was not enough
20  information, so -- but that's, I can't give his
21  because it was so long ago, but in cases like that,
22  it's usually because of conflicting information.

                              13 (Pages 46 to 49)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                              May 14, 2008
                        Washington, DC

| Page 58 | | Page 60 |
|---|---|---|

**Page 58**

1    A.   Yes.  Other than those, nothing else.  No.
2    Q.   Okay.  And apart from your meeting with
3  your attorney, did you review any documents prior to
4  your deposition today?
5    A.   No.
6    Q.   Okay.  And did you speak to anyone to
7  prepare for your deposition?
8        MR. JEFFERSON:  Other than me.
9        BY MR. SPIVA:
10   Q.   Other than your attorney?
11   A.   No one else.
12   Q.   I take it, and I just want to -- I just
13 want to make sure I've covered the waterfront here.
14 You've basically answered this, but I just want to
15 make sure I'm not missing anything.  Did you speak to
16 Officer Leveque?
17   A.   No.  No.
18   Q.   Do you know Officer Leveque?
19   A.   No.  No.  If he don't have the same amount
20 of time on I have on, I probably wouldn't know him.
21   Q.   Okay.  And how about Officer Green.  Did
22 you speak with Officer Green?

**Page 59**

1    A.   No.
2    Q.   Any detectives from the sexual assault
3  unit?
4    A.   No.
5    Q.   Do you have any recollection of December
6  9th, 2006.  That's the date when my client in this
7  lawsuit visited Howard University Hospital.
8    A.   When this was brought to my attention, I
9  didn't even remember the case at all, and just so
10 happened I tried to refer back to see if I even had
11 any notes in the notebook.  That's the only way that
12 brought back some recollection, some recollection of
13 the case, but not a whole lot.
14   Q.   Okay.  When was this first brought to your
15 attention?
16   A.   When I received from the District to come
17 down and meet with my attorney.
18   Q.   When you received a what?
19   A.   A notification by the District to meet
20 with my attorney.
21   Q.   About when was that?
22   A.   Oh --

**Page 60**

1        MR. JEFFERSON:  I'm going to object and
2  instruct the witness not to answer on the basis of
3  attorney work product and attorney-client privilege.
4        MR. SPIVA:  That strikes me as overbroad,
5  but let me ask you this.
6        BY MR. SPIVA:
7    Q.   When you say your attorney, you're
8  referring to Mr. Jefferson?
9    A.   Exactly.  Exactly, yes.
10   Q.   And I take it from that answer, did you --
11 were you notified about this prior to -- about this
12 case prior to that meeting with your attorney?
13   A.   No.
14   Q.   Okay.  And between the time you were at
15 the hospital and December 9th, 2006 and the time you
16 met with Mr. Jefferson, had you had any discussions
17 at all about this matter with anyone at MPD?
18   A.   No.  None whatsoever.
19   Q.   And any discussions with anybody else
20 whether or not they were within MPD?
21   A.   No.  No.
22   Q.   Okay.  Tell me what you recall about

**Page 61**

1  responding to the call from the plaintiff in this
2  lawsuit on December 9th, 2006?
3    A.   It's not a lot.  I can't recall because if
4  the case is not made clear like a situation like this
5  is, I don't really remember a lot other than
6  referring to my notebook and see what type of notes I
7  have at that particular point.  That notebook brought
8  back some memory, but it's not a lot.
9    Q.   Okay.
10   A.   Yeah.
11   Q.   And we'll look at those note in just a
12 minute, but can you tell me what, apart from the
13 notes, what -- what you can recall, if anything,
14 about responding to that call?
15       MR. JEFFERSON:  Objection.  Asked and
16 answered.
17       THE WITNESS:  I can't remember.
18       BY MR. SPIVA:
19   Q.   Okay.  And do you recall anything about
20 what the victim in this case, Miss McGaughey, what
21 she said to you when you went to the hospital?
22       MR. JEFFERSON:  Objection.

Alderson Reporting Company
1-800-FOR-DEPO

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                      May 14, 2008
                              Washington, DC

| Page 70 | Page 72 |
|---|---|

Page 70

1    Q.   Okay.
2    A.   And what they would give to us in roll
3  call for a particular suspect or something like that
4  so --
5    Q.   Okay.  And turning the page, first of all,
6  there is a date, I think it's a date, in the upper
7  right-hand corner on the third page of this exhibit.
8  Can you tell me what that A -- first of all, let me
9  ask you, is that a date?
10    A.   No.  It's actually date of birth.
11    Q.   Okay.  Thank you.  Thank you.  And whose
12  date of birth is that?
13    A.   Miss McGaughey.  Yes.  That's her date of
14  birth.  At least that's what I recorded as her date
15  of birth.
16    Q.   Okay.  Looking at this page, first of all,
17  is this the only page of notes that you have
18  regarding this particular case?
19    A.   Yes.  I've checked any notebook entirely.
20  This is the only one.
21    Q.   Okay.  And do you have any other types of
22  notes or information of any kind about this case

Page 71

1  other than what's on this page?
2    A.   No.
3    Q.   Okay.  And does this page refresh your
4  recollection to the events of December 9th, 2006?
5    A.   Only that this person reported a crime,
6  but the details of it are blank, you know, and stuff
7  like that.  I can't -- I don't remember a lot of
8  details about it.  You know, but I knew I had to talk
9  to her to get this information, so --
10    Q.   Okay.  Do you recall what she was
11  complaining about?
12    A.   It was definitely a sex offense.
13    Q.   And either from this page or anything
14  else, do you recall anything about what she said to
15  you about that?
16    MR. JEFFERSON:  Objection.
17    THE WITNESS:  No.
18    BY MR. SPIVA:
19    Q.   Down here is a name, McGaughey,
20  Alexandria, and then there is an address under that.
21  Do you know whose address -- address and phone
22  number.  Do you know whose address and phone number

Page 72

1  that is that's right underneath the name McGaughey,
2  Alexandria?
3    A.   That would have been her address.
4    Q.   And then there is another address -- I'm
5  sorry.  Let me step back.  There is a date a few
6  lines down, 12-9-06, and then there is a number 0100.
7  What is the 0100?  What does that signify?
8    A.   That would signify that the event occurred
9  about that time frame.
10    Q.   Okay.  When you say the event, what are
11  you referring to?
12    A.   The crime period.  It happened during that
13  time frame.
14    Q.   Whatever she was complaining about?
15    A.   Yes.  Yes.
16    Q.   All right.  And then is that -- beside the
17  0100, is that -- what are those letters beside --
18    A.   HRS stand for hours.
19    Q.   Okay.  And then there is an address under
20  that, 21 Bryant Street, Northwest, do you know what
21  address that is?
22    A.   It's related to this case.  But I'm not a

Page 73

1  hundred percent sure that it's the address where the
2  event occurred at, so -- but normally, in situations
3  like this, I would try to at least get the -- the
4  address where the offense occurred.  That's what I
5  normally put in my notebook and stuff like that.
6    Q.   Okay.  And can you -- I don't want you to
7  guess, but can you read us the portion underneath the
8  address, 21 Bryant Street.  It starts with -- looks
9  like a B/M?
10    A.   Yes.  It's -- it's suspect information.
11  It's a black male, light complected, 23 years old, 5
12  foot 11, heavy set, white hoodie, baseball cap and
13  also got hat, but actually baseball cap.
14    Q.   Okay.  And that description, that's a
15  description, I take it, of a person?
16    A.   Yes.  Of an alleged suspect.
17    Q.   And does that at all refresh your
18  recollection about what Ms. McGaughey told you, if
19  anything, about the alleged suspect?
20    MR. JEFFERSON:  You mean anything further
21  than what was just read into the record?
22    BY MR. SPIVA:

19 (Pages 70 to 73)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                              May 14, 2008
                        Washington, DC

| Page 74 | Page 76 |
|---|---|

**Page 74**

1    Q.   Or even more specific.  I don't know if he
2  has a recollection even of that.  I mean, do you --
3  it's fine if it doesn't.
4    A.   No.  It doesn't.
5    Q.   Okay.  And then there is a phone number
6  below that.  What is that?  Do you recall?
7    A.   It's a phone number, I'm not a hundred
8  percent sure about this, but it could be to our sex
9  branch, because I know I had a habit of jotting it
10  down.
11    Q.   Okay.  And then under that, there is a --
12  a W-1, is that right, it's a W-1?
13    A.   Yes.
14    Q.   What does that stand for?
15    A.   For witness.
16    Q.   Okay.  And it says, Reid, Kerston, do you
17  recall what this note is about?
18    A.   There was a witness on the scene, you
19  know.  I did record her information because it's in
20  my notebook, but the -- the detail of a conversation,
21  I can't remember that, but I know I would have that
22  information anyway.

**Page 76**

1  were at the hospital interviewing Ms. McGaughey?
2    A.   Well, in a case like this, I would have.
3  I had no choice.  I would have.  But whom I spoke to
4  and the details of it, I can't remember that.
5    Q.   Okay.
6    A.   Yes.
7    Q.   And I take it, you don't recall -- from
8  what you just said, I take it you don't recall what
9  the detective, if you spoke to a detective, you don't
10  recall what the detective said to you?
11    A.   No.  Not at this particular point.
12    Q.   Okay.  Is there anything else that you
13  could look at that would refresh your recollection
14  about what the detective said to you?
15    A.   There is actually nothing else at this
16  particular point.
17    Q.   Sure.
18    A.   Because when I looked at the notes, her
19  name is -- I was at Howard University Hospital, but
20  the details of it, I can't remember at this point.
21    Q.   Okay.  And do you recall anything about a
22  detective, while you were at Howard University

**Page 75**

1    Q.   Okay.  And is the date that's next to her
2  name, would that have been her date of birth?
3    A.   Yes.  That's her date of birth.
4    Q.   And then there is an address and a phone
5  number under there.  Is that her phone number?
6    A.   Yes.  That's the phone number she gave me.
7    Q.   Do you recall anything, do you recall
8  speaking to Kerston Reid?
9    A.   At this particular date, no.
10    Q.   And I take it, based on that, that you
11  don't recall anything that she said to you?
12    A.   No.
13    Q.   After looking at this, does this refresh
14  your recollection at all about any, any -- in any
15  respect about any of the circumstances of responding
16  to this call from Alex McGaughey?
17    A.   No.  It doesn't.  I know this is how I
18  normally set my notebook up.  When I interview a
19  person, this is how I would do it, so -- but I can't
20  remember the details, because it's been so far back.
21    Q.   Okay.  Do you recall speaking to a
22  detective that day, December 9th, 2006, while you

**Page 77**

1  Hospital, a detective speaking with Ms. McGaughey?
2    A.   I'm going to have to answer it like this.
3  I can't remember, but with a case like this, he had
4  to.
5    Q.   And why do you say that, that he had to?
6    A.   Because in all sex situations, I know the
7  way I handle cases, I will definitely call a
8  detective, so he had to speak to her.  Because for me
9  to get this information, you know, I just don't
10  record it for nothing, especially in a situation like
11  this.  I just can't remember, you know, what the
12  details were, you know, so --
13    Q.   Sure.
14    A.   Yeah.
15    Q.   And in a situation like this, where you're
16  responding to a sexual assault call, is it your
17  practice to actually have the detective speak to
18  the -- to the victim?
19    A.   Yes.  It is.  It is.  Yes.
20        MR. JEFFERSON:  Bruce, hold on a second.
21  Are you okay?
22        THE WITNESS:  I'm fine.  I'm fine.

                                    20  (Pages 74 to 77)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

Michael Minor                                                                    May 14, 2008
                              Washington, DC

Page 82

1   the answer.
2       A.   No.
3       Q.   Wait a minute.  Let me just finish the
4   question.  That's not something you've ever told
5   hospital personnel that they should not or could not
6   do a sexual assault examination?
7       A.   No.
8       Q.   Okay.  And do you know, have you ever
9   heard a detective tell any hospital personnel that
10  they either should not or could not do a sexual
11  assault examination?
12          MR. McAFEE:  Objection to form.
13          MS. DENNIS-KITTLES:  I join in the
14  objection.
15          BY MR. SPIVA:
16      Q.   You can answer that.
17      A.   I can't recall.
18      Q.   Do you know, to your knowledge, was any
19  further investigation of this complaint done after
20  you told the detective that you spoke to about it?
21      A.   I can't recall.
22      Q.   Okay.  But you didn't do any further

Page 83

1   investigation?
2       A.   No.
3       Q.   And that's because that's not -- that
4   wouldn't be your role?
5       A.   No.  Correct.  Yes.  That's true.
6       Q.   Is it consistent with your experience
7   responding to sexual cases where they just speak to
8   the victim over the phone, as opposed to cases where
9   hospital to talk directly with the victim?
10      A.   It is consistent, but sometimes I had
11  cases where, you know, they didn't come out, so they
12  actually spoke to the victim over the phone.
13      Q.   And do you have any -- is there any way of
14  characterizing those cases where they just speak to
15  the victim over the phone, as opposed to cases where
16  they actually came and talked to the victim in
17  person?
18      A.   Well, the case I was telling you about the
19  victim that was intoxicated, where the detective
20  actually spoke to her over the phone.  He couldn't go
21  any further with her, so I guess he made the decision
22  not to respond, so -- yeah, so --

Page 84

1       Q.   Okay.  And in this case, I think you said
2   this, but I just want to make sure I've got it clear,
3   the detective, you don't recall whether the detective
4   actually came in person to the hospital?
5       A.   No.  No.
6       Q.   Do you -- do you know what role the police
7   department plays, if any, in the determination of
8   whether the hospital actually does a sexual assault
9   examination?
10      A.   The police department will -- the sex
11  squad unit, they have a great role in.  In most
12  cases, they would, you know, proceed with whether or
13  not they were going to let the nurse know, is a SANE
14  kit needed for a particular case.  That's in most
15  cases.  Yeah.  Yeah.
16      Q.   Okay.  And when you say they have a great
17  role, what do you mean?
18      A.   Well, once they actually do the detailed
19  investigation, they can determine whether or not they
20  have enough sufficient evidence to proceed forth with
21  actually making a report.  And like I said, they go
22  into great detail, so --

Page 85

1       Q.   And is it your understanding that they
2   have to -- that they only tell the hospital to do a
3   SANE kit if they actually, you know, do this detailed
4   report you're talking about?
5       A.   Yes.  And once they speak to the victim,
6   yes, and they proceed from there, so --
7       Q.   Do you have any understanding of whether
8   police authorization is needed in order for the
9   hospital to do a sexual assault examination?
10      A.   I'm not a hundred percent sure.  The
11  hospital has their policy.  They can proceed, I
12  guess, if they wanted to, so --
13      Q.   Okay.
14      A.   Yeah.
15      Q.   And has anybody ever told you, either from
16  the MPD or otherwise, that there is some requirement
17  that the police authorize the hospital to proceed
18  with the sexual assault examination?
19      A.   No.
20      Q.   No one has ever told you that?
21      A.   No.
22      Q.   Just going back to the notes for a minute,

                                        22  (Pages 82 to 85)

a4b75f3c-589f-443b-8ede-0b777b3e0eb2

# Exhibit E

**(Excerpts of T. Green Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

Tandreia Green                                          May 8, 2008

Washington, DC

Page 1

          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,           :
                                :
          Plaintiff,            :
                                :
              v.                : Case No.
                                : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al.,   :
                                :
          Defendants.           :
- - - - - - - - - - - - - - - x

                         Washington, D.C.

                         Thursday, May 8, 2008

Video Deposition of

        OFFICER TANDREIA GREEN, called for

examination by counsel for Plaintiff, pursuant

to notice, at the Law Offices of Spiva & Hartnett,

LLP, 1776 Massachusetts Avenue, NW, Suite 600,

Washington, D.C., commensing at 9:58 a.m., before

Barbara A. Huber, Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                              May 8, 2008
                        Washington, DC

Page 26

1  video, do you recall, about doing sexual assault
2  investigations?
3      A   I don't recall.
4      Q   And are you -- are you aware that the --
5  the MPD has a Sexual Assault Unit?
6      A   Yes, I am.
7      Q   Okay.  And are you a member of the -- of
8  the Sexual Assault Unit?
9      A   No, I am not.
10     Q   What -- what, if any, interaction do you
11  have with -- with the Sexual Assault Unit?
12     A   As it pertains to what?
13     Q   Anything.
14     A   I don't have any dealings with them
15  unless it's in reference to a -- call for
16  service and they are summonsed.
17     Q   Uh-huh.  And when you say, "a call for
18  service," and -- and you said they are -- they are
19  summonsed?
20        Is that what you said?
21     A   Correct.
22     Q   What -- what do you mean by that?

Page 27

1      A   They're called.
2      Q   Uh-huh.  And under what circumstances
3  does that happen?
4      A   Sexual abuse, criminal assault.
5      Q   Uh-huh.  And -- and -- and tell me about
6  that.  What -- what's the procedure?  In what
7  circumstances would you -- strike that.
8        How would that come about that --
9        Are you the one who would call them?
10     A   In reference to a criminal assault?
11     Q   Yes.
12     A   Yes.
13     Q   Okay.  And -- and describe for me the
14  circumstances in which you would -- you would need
15  to call them in reference to a -- a sexual
16  assault?
17     A   Any time a criminal assault comes out,
18  we -- we notify them of that.
19     Q   Okay.  Have you had any training by
20  anyone in the Sexual Assault Unit?
21     A   No.
22     Q   Do you recall reviewing any documents

Page 28

1  regarding investigating sexual assaults?
2      A   When?
3      Q   Any time since you've been on the MPD.
4      A   Do I recall -- I'm sorry.  Repeat it --
5  the question.
6      Q   Reviewing any documents -- let me -- let
7  me be a little more specific.
8        Do you -- did you ever have to study any
9  documents about the procedures for investigating
10  sexual assault?
11     A   Those procedures are in the -- in the
12  general order.
13     Q   Uh-huh.  Okay.  And isn't that the --
14  the general order you -- you made reference to
15  earlier in the deposition?
16     A   Yes.
17     Q   Okay.  Anything other than that you've
18  had -- you've had to review or study in terms of
19  documents about the procedures for investigating a
20  sexual assault?
21     A   No.
22     Q   Okay.  What are -- if -- if you can,

Page 29

1  describe for me MPD's policies for investigating
2  alleged sexual assaults?
3      A   Well, generally if we get a call, we go
4  out.  The -- the officer conducts an interview.
5      Q   Uh-huh.
6      A   Does the preliminary investigation and
7  find out if a criminal assault took place.
8        After I get that information, I notify
9  my sergeant and somebody from the Sexual -- Sexual
10  Assault Unit.
11     Q   Uh-huh.  And you said that you -- you go
12  out and you conduct an -- an interview.
13        An interview with -- with who?
14     A   The Complainant.  Whoever -- whoever is
15  there.
16     Q   Okay.
17     A   The Complainant.
18     Q   All right.  And you said, I think, that
19  part of the purpose of the interview is to
20  determine whether a sexual assault took place; is
21  that correct?
22     A   To find out what type of sexual assault

8 (Pages 26 to 29)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                              May 8, 2008

Washington, DC

---

Page 30

1  took place.
2      Q   Okay.  And whenever you end up doing one
3  of these interviews with a Complainant, is it --
4  is it standard procedure for you to call the
5  Sexual Assault Unit, you know, regardless?
6          Or -- or is there some -- some
7  circumstances where you don't call the Sexual
8  Assault Unit?
9      A   No.  You call them regardless.
10     Q   Okay.  And do you -- do you make any
11 kind of assessment of whether the -- the complaint
12 that you're -- you're -- you're there to interview
13 the -- the Complainant about is -- is founded or
14 unfounded?
15     A   No.  That's not in my job criteria.
16     Q   Okay.
17     A   That's the Sexual Assault Unit.
18     Q   Okay.  And -- and in terms of
19 interviewing the -- the Complainant, what type of
20 training have you had in terms of, you know, what
21 types of questions you would need to ask them?
22     A   You ask them types of questions about

---

Page 31

1  what took place, suspect's information, location,
2  time, place.
3      Q   Uh-huh.
4      A   That type of stuff.
5      Q   Okay.  And -- and is that -- did -- how
6  did you know -- you know, I mean, what -- what --
7  how did you -- how do you know what questions are
8  pertinent?  I mean, is it -- from -- from your
9  training, is there some --
10     A   From -- from training.  And -- and some
11 of that information is in the general order.
12     Q   Uh-huh.  Let me -- let me step back for
13 a minute.  Because I -- these general orders, I
14 mean, how -- do you have any idea how many there
15 are, just in general, I mean, that -- that are
16 pertinent to your -- your job?
17         I'm not just specifying sexual assault.
18 But just, you know, for any -- any type of
19 investigation that you might have to do as an
20 officer?
21     A   I don't know.  I -- I couldn't tell you
22 how many specific.  But there -- there -- there's

---

Page 32

1  different series, from 100 to 800, I believe.
2      Q   Uh-huh.  Okay.  And do each of the
3  series pertain to a particular --
4      A   Different subjects.
5      Q   Different subjects.  Okay.
6          And it -- and is -- and I -- and I take
7  it there's a series dealing with sexual assault
8  investigations?
9      A   Yes.
10     Q   Okay.  And -- and where are -- where are
11 these general orders kept?  I mean, if you wanted
12 to access them, where -- where do you go to get
13 them?
14     A   Well, everyone is given general orders.
15     Q   Uh-huh.  Do you have like a book or
16 something that has all of them in it -- in them?
17     A   Yes.
18     Q   And do you -- do you -- do you review
19 that periodically?
20     A   If I have time.
21     Q   Uh-huh.  Okay.  How about when there are
22 new general orders that come out, how do -- how do

---

Page 33

1  you find out about those?
2      A   They send them to the district, and you
3  have to sign for them.
4      Q   And then do -- is there -- this book
5  that you have with them, is that like a notebook
6  or something where you can put new ones in?
7      A   I mean, if you -- if you put holes in
8  them and you put them a binder, then that's --
9  that's fine.  If you have a folder in your place
10 and you do it that way -- you know, however you
11 handle your general orders.
12     Q   Okay.  But it's -- that's kind of up to
13 the individual officer?
14     A   Uh-huh.
15     Q   Where do -- where do -- how do you keep
16 yours?
17     A   I just have a stack.
18     Q   Uh-huh.  And what -- tell me, what is
19 a -- what is a special order?  It's -- it's a term
20 I've seen in some of the documents.
21         Do you know -- have any familiarity with
22 what a special order is?

---

9  (Pages 30 to 33)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                              May 8, 2008
                        Washington, DC

| | |
|---|---|
| Page 46 | Page 48 |

**Page 46**

1    A   I didn't say nothing about the test --
2    top -- top -- test.
3    Q   Oh, okay.  I'm sorry.  I misunderstood.
4        The training touched on -- on -- on the
5    issue of date rape drugs?
6    A   There was a training --
7    Q   Uh-huh.
8    A   -- that talked about date rape drugs.
9    Q   Okay.  And do you recall anything about
10   that training?
11   A   No.
12   Q   Okay.  Do you recall when it occurred,
13   in terms of year?
14   A   I don't recall.
15   Q   Okay.  But it was during one of these
16   in-services?
17   A   Yes.
18   Q   Okay.  Do you recall who the person was
19   who gave the training?
20   A   No.
21   Q   Have -- have you been trained regarding
22   the importance of -- of testing for such drugs,

**Page 47**

1    for date rape drugs?
2        MR. JEFFERSON:  Object to form.
3    BY MR. SPIVA:
4    Q   You can answer.
5    A   That's -- that's not even in my job
6    description.
7    Q   Okay.  So -- so you haven't been trained
8    regarding the importance of testing for date rape
9    drugs?
10       MR. JEFFERSON:  Asked and answered.
11       MR. BANKS:  Asked and answered.
12   BY MR. SPIVA:
13   Q   I just want to make sure the answer's
14   no, you -- you haven't been trained regarding the
15   importance of testing for date rape drugs?
16   A   It's not in my job to do that.
17   Q   So that's no?
18   A   No.
19   Q   Okay.  And -- and would -- do you know
20   whether a test for the presence of date rape
21   drugs, would that be relevant to a criminal
22   investigation of rape?

**Page 48**

1        MR. JEFFERSON:  Object to form.
2        THE WITNESS:  You're asking me -- repeat
3    the question.
4    BY MR. SPIVA:
5    Q   Yeah.  Would a -- would a -- would a
6    test for -- talking about a test of, you know,
7    someone's bloodstream for the presence of a date
8    rape drug.
9        Would such a test be relevant to a
10   criminal investigation of rape?
11       MR. BANKS:  Objection to foundation.
12   BY MR. SPIVA:
13   Q   You can answer.
14   A   You would have to ask somebody from the
15   Sexual Assault Unit.  They -- they deal with that.
16   Q   Okay.  So -- and just -- just to make
17   sure the record is clear.
18       The answer is no, you don't know whether
19   or not that would be relevant to a criminal
20   investigation of rape?
21       MR. JEFFERSON:  Objection.  Asked and
22   answered.

**Page 49**

1    BY MR. SPIVA:
2    Q   Is the answer no?
3    A   The answer's no.
4    Q   Okay.  What is the SART program, if you
5    know?
6    A   I'm sorry.  The who?
7    Q   The SART program.  The Sexual Assault
8    Response Team.  Do you -- do you know anything
9    about that?
10   A   No.
11   Q   Okay.  Have you had any interaction at
12   all with -- with the SART team?
13       That's short for the Sexual Assault
14   Response Team.
15   A   No.
16   Q   Are you familiar with the SANE program?
17   The Sexual Assault Nurse Examiner program?
18   A   I know what that -- that pertains to.
19   But that doesn't really fall under what I do.
20   Q   Okay.  Can you describe for me, as best
21   you know, what the -- what the SANE program is?
22   A   I know at -- at Howard, they have a SANE

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008
                              Washington, DC

Page 62

1    A   I'm no longer in the picture.
2    Q   Okay.  But do you come to know whether
3  or not the -- the -- the sexual assault is
4  determined to be, you know, founded or unfounded?
5    A   Sometimes.
6    Q   Okay.  How do you come to know that?
7    A   They make -- when they tell me they're
8  taking over.
9    Q   Okay.  Let me -- let me back up and ask
10 you -- I'm sorry.
11       When they tell you they're taking over,
12 what -- what do you mean by that?  That -- that
13 they tell you whether or not it's --
14   A   That they're -- they're handling the
15 report.  They're handling the investigation.
16   Q   Okay.  And what -- does that mean that
17 it's founded if they're taking over?
18   A   Generally.
19   Q   Okay.
20   A   It means that they're going to do an
21 investigation.
22   Q   Okay.  And -- and what happens when it's

Page 63

1  unfounded?
2    A   On my part or their part?
3    Q   On your part.
4    A   When it's unfounded?
5    Q   Yes.
6    A   They tell me -- if the SAU tells me that
7  it's unfounded, then nothing happens on my part.
8    Q   Okay.  Do you do any kind of report?
9    A   Generally, no.
10   Q   Okay.  What does founded and unfounded
11 mean, if you know?
12   A   What does founded and unfounded mean?
13   Q   Yeah.  In this context.  Of course, I
14 know you know -- I know you know what the words
15 mean.  But in this context that we've been
16 discussing of -- of sexual assault complaints.
17   A   In this -- in this context, founded
18 means that they have some -- some ground basis for
19 furthering their investigation.
20   Q   Okay.  And --
21   A   Unfounded, there's -- there's no grounds
22 for them to continue.

Page 64

1    Q   Okay.  And in an unfounded case, do you
2  fill out any kind of a form, you know, PD -- you
3  got all of these numbers, PD 251, PD 252.
4        Do you -- do you fill out any of that?
5        MR. JEFFERSON:  Objection.  Asked and
6  answered.
7        THE WITNESS:  No.  Generally, no.
8  BY MR. SPIVA:
9    Q   Of the -- of the sexual assaults that
10 you've responded to -- sexual assault complaints
11 that you respond to, how many have resulted in
12 no report being filed?  Approximately?
13   A   Several.
14   Q   Uh-huh.  Would you say it's the majority
15 of the ones that you've responded to?
16       MR. JEFFERSON:  Objection.
17       THE WITNESS:  I don't -- I don't recall.
18 It would probably be half-and-half, maybe.
19 BY MR. SPIVA:
20   Q   Uh-huh.  And is that because the --
21       MR. SPIVA:  Did you have something you
22 want to say?

Page 65

1        MR. JEFFERSON:  I'm just going to
2  instruct the witness not to speculate.
3        MR. SPIVA:  Okay.  I -- she's not
4  speculating.  And I don't think that's a proper
5  instruction.
6        She's -- you know, she's -- she's giving
7  her best recollection.
8        MR. JEFFERSON:  Barbara, could you read
9  her last response, please?
10       (Whereupon the reporter read
11        the record as requested.)
12       MR. SPIVA:  Not speculation.  It's
13 best -- best recollection.
14 BY MR. SPIVA:
15   Q   So -- and let me ask you, was that
16 because those were deemed to be unfounded, the
17 ones where no report was done?
18   A   Yes.
19   Q   And -- and that was a determination, I
20 take it, that was made by the Sexual Assault Unit?
21       MR. JEFFERSON:  Objection.  Asked and
22 answered.

17 (Pages 62 to 65)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008
Washington, DC

---

Page 66

```
 1   BY MR. SPIVA:
 2      Q   Is that right?
 3      A   Yes.
 4      Q   Okay.  And they told you it's not
 5   necessary to do the report because it's unfounded?
 6      A   Yes.
 7      Q   Do you remember the circumstances of any
 8   of these that were -- other than the case we're
 9   here for, do you remember the circumstances of any
10   of these other ones that were deemed to be
11   unfounded?
12      A   Yes.
13      Q   Can -- can you describe the ones that
14   you can recall?
15          MR. JEFFERSON:  At this point, I'm just
16   going to enter a general objection to the extent
17   that any information that this question elicits
18   infringes upon any privacy interests of the
19   victims of sexual assault or people who came with
20   complaints of sexual assault.
21          But subject to that, certainly answer.
22   BY MR. SPIVA:
```

Page 67

```
 1      Q   Okay.  And I'm not asking for names.
 2   I'm just asking you to --
 3          MR. BANKS:  I also want to object on the
 4   basis that this line of questioning is irrelevant.
 5   Just note a continuing objection.
 6   BY MR. SPIVA:
 7      Q   Okay.  You -- you can answer.  These are
 8   all abjections for the record.
 9          And I'm not asking you for the names
10   of -- of any of these individuals.
11          But can you describe the circumstances
12   that you can -- that you can recall where the
13   sexual assault complaint was found to be
14   unfounded?
15      A   In one instance -- incident, one lady
16   comes in -- in Howard maybe once a month, or
17   frequently.
18      Q   Uh-huh.
19      A   She reports a sexual assault all the
20   time.
21      Q   Uh-huh.
22      A   And every time she -- she comes -- I
```

Page 68

```
 1   know that I've been on maybe three calls for her
 2   alone.
 3      Q   Uh-huh.
 4      A   On different occasions.
 5      Q   Uh-huh.
 6      A   They were all unfounded.
 7      Q   Uh-huh.  And do -- do you know whether
 8   she -- has she -- has she -- do you know whether
 9   she has some kind of mental illness or something
10   like that that, you know, leads her to think she's
11   been sexual assault -- assaulted, when she hasn't
12   been?
13      A   I don't know.
14      Q   Okay.  Has she been claiming that she's
15   been sexually assaulted by someone she knows, like
16   a spouse?
17      A   No.
18      Q   And is there any documentation that is
19   kept when this woman who comes in, you know, once
20   a month or whatever, any documentation of that?
21      A   No.
22      Q   Okay.  And let me back up for just a
```

Page 69

```
 1   second before I ask you about the other
 2   incidences.
 3          When there's no report done, do you have
 4   any documentation at all of -- of the call and --
 5   and the circumstances?
 6      A   Generally, no.
 7      Q   Okay.  What about your field notebook?
 8   Do you make notes in your -- in your field
 9   notebook?
10      A   Some people do on the scene.  But I
11   don't -- didn't have any.
12      Q   Okay.  You -- you -- it's generally your
13   practice not to make notes when -- when this
14   happens?
15      A   Right.  I'm just there to -- to get the
16   basis of the story.
17      Q   Uh-huh.
18      A   And if there's a report to be done, then
19   someone from SAU will do it.
20      Q   Uh-huh.  Okay.  And it's typically --
21   whether it's founded or unfounded, typically
22   you -- you are not the one who writes the report?
```

18 (Pages 66 to 69)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                            May 8, 2008

Washington, DC

Page 70

1    A   Correct.
2    Q   Okay.  Let me -- you -- you told us
3  about the instance of the -- the woman who came in
4  repeatedly.
5        Can you recall any of the other
6  instances where the sexual assault complaint
7  was -- was found to be unfounded?
8    A   Another female came in and she didn't
9  know if any anything had happened to her.  And
10 they interviewed her further.  And that was
11 unfounded.
12   Q   Uh-huh.  And -- and why was it she
13 didn't know if anything had happened to her?
14   A   I don't know.
15   Q   Why was she -- I mean, you -- you
16 interviewed her, I take it?
17   A   Yes.
18   Q   Okay.  And did she say why she was
19 there?
20   A   She was high.
21   Q   She was -- she was high?
22   A   Uh-huh.

Page 71

1    Q   At the time you interviewed her?
2    A   No.
3    Q   At -- when was she high?
4    A   She was high at some point during the --
5  during the time of that incident.
6    Q   Okay.  And -- but -- and -- and what did
7  she say about what happened when she was high?
8    A   I don't recall any of that.
9    Q   Okay.  But was she there because she
10 thought she had been sexually assaulted?
11   A   She was there to see if she can get a
12 sexual assault kit.
13   Q   Okay.  And -- and -- and she -- is that
14 because she thought she had been sexually
15 assaulted.
16       MR. JEFFERSON:  Object to form.
17       THE WITNESS:  She just wouldn't -- from
18 her explanation, she just wanted to see if
19 something happened.
20 BY MR. SPIVA:
21   Q   Okay.  Is that what -- what she said, I
22 just want to see if something happened?

Page 72

1    A   She wanted to know if something happened
2  to her.
3    Q   Okay.  But she didn't know for sure
4  whether --
5    A   Correct.
6    Q   And -- and was the reason that she gave
7  you that she didn't know whether something
8  happened was that she was high during the time
9  that something might have happened?
10   A   No.  The reason she gave me was that she
11 was -- she was high.
12   Q   Okay.
13   A   She had done some -- done some drugs.
14   Q   Uh-huh.  Uh-huh.  Did -- did she say
15 that she was with someone during the time that --
16 that -- that she was high?
17   A   I don't recall.
18   Q   Okay.  And -- and -- and did she say
19 that she thought that someone had -- had sexually
20 assaulted her during the time she was high?
21   A   I don't recall her saying that.
22   Q   Okay.  Do you recall whether she said

Page 73

1  why she came to the hospital?
2    A   To -- to see if something happened to
3  her.
4    Q   Uh-huh.
5    A   To get a kit.
6    Q   Okay.  And do you recall whether she
7  said why she wanted to get a -- a kit?
8    A   Because she was high.
9    Q   So she was high, and therefore she
10 came -- she told you she came to the hospital just
11 to see if something might have happened?
12   A   Yes.
13       MR. JEFFERSON:  Objection.  Asked and
14 answered.
15 BY MR. SPIVA:
16   Q   Okay.  Any -- any other circumstances
17 that you can recall where the complaint of sexual
18 assault was -- was found to be unfounded?
19   A   No.
20   Q   Okay.  But there were others, I take it,
21 other than these --
22   A   Yes.

19  (Pages 70 to 73)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                      May 8, 2008

Washington, DC

Page 82

1  center in general?
2      Q    Just in general.
3          What -- what do you know about it, if
4  anything?
5      A   I don't know anything about it.
6      Q   Okay.
7      A   Except for they have a hotline.
8      Q   Okay.  What's the purpose of the
9  hotline?
10      A   It's to assist people that, you know,
11  have been sexually assaulted.
12      Q   Uh-huh.
13      A   Give them some -- a support system.
14      Q   Have you ever had to interact with
15  anybody at the D.C. Rape Crisis Center?
16      A   No.  Not to my knowledge, I haven't.
17      Q   Okay.  And have you ever received any
18  training or a presentation from anyone at the D.C.
19  Rape Crisis Center?
20      A   Not that I recall.
21      Q   Okay.  Do you know what their role is in
22  sexual assault cases?

Page 83

1      A   No, I don't.
2      Q   Okay.  What did you do to prepare for
3  the deposition today?
4      A   Nothing.
5      Q   Okay.  You -- you didn't review any
6  documents?
7      A   When I met with counsel.
8      Q   Okay.
9          MR. JEFFERSON:  And just -- I'll state
10  for the record that any communications between
11  Officer Green and myself are protected by the
12  attorney/client privilege.  Certainly you can know
13  that -- that we met.
14          And I'll state for the record that she
15  did review the incident report, as well as the
16  citizen complaint that was produced in discovery.
17          MR. SPIVA:  Uh-huh.
18          MR. JEFFERSON:  And you're certainly
19  free to ask about those items.
20  BY MR. SPIVA:
21      Q   Okay.  Did -- did any of the documents
22  that you reviewed when you met with counsel

Page 84

1  refresh your recollection about the events in this
2  lawsuit?
3      A   No more than what I generally already
4  had.
5      Q   Okay.  And did you review anything else
6  other than the two documents here your counsel
7  just mentioned?
8      A   No.
9      Q   Okay.  Did you speak to anyone else
10  prior to your deposition regarding, you know, this
11  case?
12      A   No.
13      Q   Okay.  Didn't speak to Officer Leveque?
14      A   No.
15      Q   And I take it from that answer that you
16  haven't talked to her about her deposition since
17  then?
18      A   No.
19      Q   Okay.  Do you have any recollection of
20  the events that occurred on December 9th, 2006,
21  that are the subject of this law -- lawsuit?
22      A   Generally.

Page 85

1      Q   Okay.  Give -- give me your best
2  recollection.
3      A   We got a call for -- a criminal assault
4  call.  Responded to the hospital.
5      Q   Uh-huh.
6      A   We interviewed the Complainant.  She
7  stated that she wanted to get a sex kit done.
8  That she had been to a party on Bryant Street
9  somewhere.  And she don't know if anything
10  happened or not, but she wanted to get a sexual
11  kit done.
12          And the nurse told her that the only way
13  she could get it done was to get the police to say
14  to do one.
15      Q   Uh-huh.  Okay.  And you say she said she
16  didn't know whether anything happened or not.
17          Did -- did you ask her what she meant by
18  that?
19          MR. JEFFERSON:  Object to form.
20          THE WITNESS:  Yes.
21  BY MR. SPIVA:
22      Q   Okay.  And what did she say?

22 (Pages 82 to 85)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008
                        Washington, DC

| Page 86 | Page 88 |
|---|---|

**Page 86**

1    A   I asked her did she think something
2  happened --
3    Q   Uh-huh.
4    A   -- or she had an idea.  She says no.
5  She just didn't know.  She just wanted to get a
6  sex kit done because she had been to that party
7  and she doesn't know if anything happened or not.
8    Q   Uh-huh.  And -- and -- and why did
9  she -- did she say why she wanted to get the sex
10  kit done?
11        I'm -- I'm sorry.  I'm going to step
12  back.  I don't -- I'm not -- I'm not going to use
13  the term "sex kit."
14        I'm going to -- I'm going to use the
15  term "SANE kit" or -- or "sexual assault medical
16  forensic exam."  But I'll probably use the term
17  "SANE -- SANE kit."
18        But you'll -- you'll -- you'll
19  understand me to be talking about the same thing
20  you're referring to as a sex kit?
21    A   Uh-huh.
22    Q   Okay.  I mean, you should feel free to

**Page 87**

1  refer to it however you want, but I -- I just --
2        So did she say to you why she wanted to
3  get the -- the SANE kit done?
4    A   Just to see if anything happened or not.
5    Q   Did she say that she thought something
6  had happened?
7    A   No.
8    Q   Did she say she thought something might
9  have happened?
10    A   She didn't know if anything happened or
11  not.
12    Q   Okay.  And did she say why this day was
13  any different than any other day where something
14  may or may not have happened to her?
15    A   She was drunk.
16    Q   Okay.  And did she give you some
17  indication that she comes to the hospital to get a
18  SANE kit done every time she gets drunk?
19        MR. JEFFERSON:  Object to form.
20        THE WITNESS:  I'm sorry.  That she gives
21  me what?
22  BY MR. SPIVA:

**Page 88**

1    Q   Did she say she comes to the hospital to
2  get a SANE kit done every time she gets drunk?
3        MR. JEFFERSON:  Objection.
4        THE WITNESS:  No.
5  BY MR. SPIVA:
6    Q   Okay.  Did she explain why this time was
7  any different than any other time she might have,
8  you know, been drunk?
9        MR. JEFFERSON:  Objection.  Asked and
10  answered.
11        THE WITNESS:  No.
12  BY MR. SPIVA:
13    Q   Was hers the only sexual assault you
14  investigated that day?
15    A   Yes.
16    Q   Okay.  How about that week?
17    A   I don't recall.
18    Q   Okay.  And you mentioned that she said
19  that the nurse told her that she would have to get
20  the police authorization to get the SANE kit done;
21  is that correct?
22    A   Yes.

**Page 89**

1    Q   Did she tell you which nurse had told
2  her that?
3    A   No.
4    Q   Okay.  And is that accurate, did -- did
5  she need police authorization to get the SANE kit
6  done?
7    A   I don't know.
8    Q   Okay.  Did you tell her whether or not
9  she needed your authorization or police
10  authorization to get the -- the SANE kit done?
11    A   Did I tell her that?
12    Q   Yeah.
13    A   No.
14    Q   Okay.  And did you tell anyone at the
15  hospital, you know, whether or not you thought
16  police authorization was -- was required for her
17  to get a SANE kit done?
18    A   No.
19    Q   Okay.  Did you have any kind of a -- a
20  view or understanding of whether or not police
21  authorization was required in order for her to --
22  to have the -- the SANE kit done?

23  (Pages 86 to 89)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008
                          Washington, DC

Page 90

1      MR. JEFFERSON:  Objection.  Asked and
2  answered.
3  BY MR. SPIVA:
4      Q   You can answer.
5      A   No.
6      Q   Okay.  On that day, December 9th, the
7  day of the event, when did you go on duty?
8      A   Evening shift.  So it had to be like
9  between 1:00 and 2:00.
10     Q   1:00 p.m. and 2:00 p.m.?
11     A   Yes.
12     Q   Okay.  And -- and how long does an
13  evening -- or at that time, how long did it -- did
14  your evening shift last?
15     A   Eight hours.
16     Q   Eight hours.  Okay.
17         And about what time did you get the call
18  to go to the hospital?
19     A   I don't recall.
20     Q   And do you recall what you did that day
21  prior to going to the hospital?
22     A   No.

Page 91

1      Q   Do you recall -- just to prompt your
2  memory a little bit, do you recall, was there any
3  other investigation complaint that you had had to
4  respond to prior to going to the hospital?
5      MR. JEFFERSON:  Objection.  Asked and
6  answered.
7  BY MR. SPIVA:
8      Q   You can answer.
9      A   No.
10     Q   Do you recall who called you and asked
11  you to go to the hospital?
12     A   The hospital.
13     Q   The hospital called.
14         Did they call you directly?
15     A   No.  They called the dispatch, I
16  believe.
17     Q   Okay.  And then the dispatch called you?
18     A   And then the dispatcher called the unit.
19         And I was the unit.
20     Q   And -- and you were the unit?
21     A   Yes, sir.
22     Q   Were -- who -- who were you with when

Page 92

1  you got the call?
2      A   Officer Leveque.
3      Q   Okay.  Were you all partners at the
4  time?
5      A   Yes.
6      Q   Okay.  And when you got to the
7  hospital -- or when you went -- went to the
8  hospital, were you aware that another officer had
9  been there before you?
10     A   No.
11     Q   Okay.  And did you have a conversation
12  with anyone at the police department, any officer,
13  detective, anyone, about Ms. McGaughey's case
14  prior to going to the hospital?
15     A   No.
16     Q   Okay.  When you got to the hospital,
17  what -- what did you do?
18     A   I asked them where was the Complainant.
19     Q   Uh-huh.  And -- and to the best of your
20  recollection, where was she when you got there?
21     A   She was in one of them little rooms in
22  the back.

Page 93

1      Q   Okay.  And -- and what did you do next?
2      A   Went to talk to her.
3      Q   And who did the talking?
4      A   Kind of both of us.  But I probably did
5  the most.
6      Q   And when you say "both of us," do you
7  mean --
8      A   Officer Leveque.
9      Q   Okay.  And can you describe the
10  conversation?
11     A   I asked her about what happened.
12     Q   Uh-huh.
13     A   And she told me that she wanted to get a
14  sexual kit done because she had been to the party
15  on Bryant Street.  And she doesn't know if
16  anything happened or not, so she just wanted to
17  get a kit done.
18         And the nurse told her that she had to
19  get -- to see MPD to get the kit approved.
20     Q   Uh-huh.  And -- and do you recall
21  whether or not she told you anything else about
22  why she was there?

24  (Pages 90 to 93)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green

May 8, 2008

Washington, DC

---

Page 94

1    A    In reference to why she came there?
2    Q    Yeah.
3    A    Yes.
4        MR. JEFFERSON:  If I could -- sorry.
5        The "there" that you're referring to, is
6    the party or the --
7        MR. SPIVA:  The hospital.  The hospital.
8    Sorry.  Good point.  The hospital.
9        THE WITNESS:  I'm sorry.  Repeat it
10   again.
11   BY MR. SPIVA:
12   Q    Sure.
13       What -- did she -- do you recall
14   anything else about -- step back again.
15       Do you recall whether she told you
16   anything else about why she was there at the
17   hospital?
18   A    No.
19   Q    Okay.  And do you recall her saying
20   anything else about why she thought something
21   might have happened to her?
22   A    No.

---

Page 95

1    Q    Okay.  Did she tell you about any pain
2    she was experiencing, to your recollection?
3    A    Yes.
4    Q    What did she tell you?
5    A    She said her butt hurt.
6    Q    Uh-huh.  And did she say anything more
7    specific than that?
8    A    No.
9    Q    Okay.  And what did you ask her about
10   that, if anything?
11   A    Well, you -- you have to go back to when
12   she asked it.
13   Q    Uh-huh.
14   A    So she -- she was telling me a story.
15   And then she said, what if she said if her butt
16   hurt, would that get her the sex kit done.
17   Q    Uh-huh.  Okay.  And -- and what did --
18   what did you say?
19   A    I just -- I relayed that information to
20   Detective Willard --
21   Q    Uh-huh.
22   A    -- I believe it was.

---

Page 96

1    Q    Uh-huh.  And did you have the impression
2    from this conversation with her, that her butt, in
3    fact, did not hurt?
4    A    I wouldn't make no judgment like that.
5    Q    Okay.  Did you think she was lying?
6    A    Did I think she was lying?
7    Q    About her --
8        MR. JEFFERSON:  Objection.
9    BY MR. SPIVA:
10   Q    About her butt hurting?
11       MR. JEFFERSON:  Objection.  Asked and
12   answered.
13       THE WITNESS:  I wouldn't make no -- I
14   don't make any assumptions like that, whether it
15   was hurting or not.
16   BY MR. SPIVA:
17   Q    Okay.  And -- and you didn't have a
18   view, at the time, that she was lying about when
19   she said that her butt hurt?
20       MR. JEFFERSON:  Objection.  Asked and
21   answered.
22       THE WITNESS:  No.

---

Page 97

1    BY MR. SPIVA:
2    Q    And did you ask her why she thought
3    her -- her -- her bottom hurt?
4    A    Yes.
5    Q    And what did she say?
6    A    She didn't give an explanation.
7    Q    Uh-huh.  And when you talked -- when you
8    had the interview with Plaintiff, you were in a
9    room, you mentioned; is that right?
10   A    Yes.
11   Q    Okay.  Was there anyone else in the room
12   with you other than Officer Leveque?
13   A    No.
14   Q    Was this like a private room?
15   A    Yes.
16   Q    Okay.  And -- and what do you recall, if
17   anything, about what Officer Leveque asked her?
18   A    I don't recall.
19   Q    Okay.  Do you recall that she asked her
20   anything at all?
21   A    I know she asked something.  But I don't
22   recall.

---

25 (Pages 94 to 97)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008
Washington, DC

---

Page 98

1    Q   Okay.  How -- how would you describe
2  Ms. McGaughey's, you know, emotional state at the
3  time that you interviewed her?
4    A   Calm.
5    Q   Uh-huh.  And what conclusion did you
6  reach, if any, after you talked to her?
7    A   I didn't reach any conclusion.
8    Q   Okay.  Did you think, based on your
9  interview -- no.  No.  Let me -- let me back up.
10 I just want to --
11       So from -- from what you just said,
12 is it -- is it fair to say that you did not
13 conclude, based on your interview with
14 Ms. McGaughey, that she was lying about what she
15 was telling you?
16       MR. JEFFERSON:  Object to form.
17       MR. BANKS:  Objection.  Asked and
18 answered.
19 BY MR. SPIVA:
20   Q   You -- you can answer.
21   A   The question was, did I what?
22   Q   Is it fair to say that you -- based on

---

Page 99

1  your conversation with her, that you -- you did
2  not come to the conclusion that she was lying
3  about the story that she was telling you?
4        MR. SPIVA:  Same objection.
5  BY MR. SPIVA:
6    Q   She related to you?
7        MR. JEFFERSON:  Object to form.
8        THE WITNESS:  Based on was she lying
9  during the whole process or during just that part?
10 BY MR. SPIVA:
11   Q   Well, let me ask you.  Did you come to a
12 conclusion that she was lying about any or
13 everything that she was telling you?
14   A   No.  I didn't come to no conclusion that
15 she was lying.
16   Q   Okay.  And -- and -- and can you just
17 explain to us, why -- why is it that you didn't
18 reach any conclusions?
19   A   Because that's not -- that's not for me
20 to do.
21   Q   Uh-huh.
22   A   I mean, whatever she say happened, I'll

---

Page 100

1  relay it.
2    Q   Uh-huh.
3    A   And that's it.
4    Q   Okay.  You -- you relay it to the Sexual
5  Assault Unit?
6    A   Yes.
7    Q   And it's for them to make the conclusion
8  whether or not it's a founded complaint, you know,
9  whether she's telling the truth?
10   A   Yes.
11   Q   Okay.  And did -- did you tell the
12 Sexual Assault Unit that you believed that she was
13 lying in any respect?
14       MR. JEFFERSON:  Objection.  Asked and
15 answered now for I don't know how many times.
16 BY MR. SPIVA:
17   Q   Did you --
18       MR. JEFFERSON:  We're going to --
19 BY MR. SPIVA:
20   Q   Did you -- did you tell them that?
21       MR. JEFFERSON:  We're going to allow the
22 witness to answer.  She'll answer any question you

---

Page 101

1  want.
2        But, you know, if you could kind of wrap
3  this part up about her lying, that would be --
4        THE WITNESS:  No.
5        MR. JEFFERSON:  -- would be helpful.
6  BY MR. SPIVA:
7    Q   Okay.  And did -- did you pass on all
8  the information that you had gotten from
9  Ms. McGaughey to the Sexual Assault Unit?
10   A   Yes.
11   Q   Okay.  And who is it that you talked to
12 in the Sexual Assault Unit?
13   A   Detective Wheeler.
14   Q   Uh-huh.  And what -- what did you say to
15 Detective Wheeler?
16   A   I can't recall word for word.
17   Q   Uh-huh.  You talked to him on the phone?
18   A   Yes.
19   Q   Okay.  And is Detective Wheeler in the
20 Sexual Assault Unit?
21   A   Yes, he is.
22   Q   Okay.  Did he come to the hospital

---

26 (Pages 98 to 101)

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                    May 8, 2008
                        Washington, DC

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  during the time that you were there?
2     A    No.
3     Q    Do you know whether he came to the
4  hospital at any time?
5     A    I don't know.
6     Q    And can you give me -- I know you can't
7  recall, you said word for word, but can you give
8  me a general description of what you said to
9  Detective Wheeler on the phone?
10    A    Basically anything that she reported to
11  me, I told to him.
12    Q    Okay.  And what did he say to you in
13  response?
14    A    I don't recall all -- everything that he
15  said.
16    Q    Uh-huh.  Do you recall anything
17  generally that he said?
18    A    No.
19    Q    Okay.  Do you recall whether he spoke
20  with Ms. McGaughey?
21    A    I don't recall if he spoke to her.
22    Q    Okay.  And do you recall whether he

**Page 103**

1  spoke with Officer Leveque?
2     A    I don't recall.
3     Q    Okay.  Did -- did you do a report -- I'm
4  sorry.  Let -- let --
5        Do you recall whether this complaint of
6  sexual assault was -- was found to be unfounded or
7  founded?
8     A    Yes, I do.
9     Q    Okay.  What do you recall about that?
10    A    Detective Wheeler informed me that no
11  report was going to be done.
12    Q    Okay.  And did he say why no report was
13  going to be done?
14    A    No.
15    Q    Okay.  And when he said no report was
16  going to be done, what did you understand him to
17  mean?
18    A    That there was no -- there was no report
19  going to be done for a sexual crime or kit.
20    Q    Okay.  But he didn't explain why?
21    A    No.
22    Q    Okay.  And did you do any kind of a

**Page 104**

1  report?
2     A    Yes, I did.
3     Q    What did you do?
4     A    A Miscellaneous report.
5     Q    Okay.  And why did you do a
6  miscellaneous report?
7     A    To document what happened on the scene.
8     Q    Okay.  Now, if I recall correctly from
9  our discussion of kind of other sexual assault
10  investigations, you had said that typically you
11  don't do any kind of a report when -- when a case
12  is found to be unfounded.
13        Why did you do one in this case?
14    MR. JEFFERSON:  Object to the form to
15  the extent it mischaracterizes the witness's
16  testimony.
17        I think the precise term she used was
18  "generally."
19    MR. SPIVA:  All right.  You can object
20  to the form.
21        But you're -- you're now moving into
22  coaching.

**Page 105**

1  BY MR. SPIVA:
2     Q    But, Officer Green, if I mischaracterize
3  your testimony at some point, it's certainly
4  unintentional.  And please just let me know.
5        I'm -- I'm just trying to situate the
6  question here so we both know what -- what I'm --
7  what I'm asking you.
8        I think you said that generally you
9  don't do a report when it's -- it's found to be
10  unfounded.
11        And I guess what I'm asking is, here you
12  did do some type of report, a miscellaneous
13  report.
14        Why -- why was this different, if it was
15  different?
16    A    I did a report because basically my
17  sergeant advised me either notebook or do a
18  miscellaneous report.  Because I have never had
19  anybody on any case that I've been on tell me that
20  they would lie to get the report done.
21    Q    Uh-huh.  And so you -- you thought this
22  was -- you thought this was unusual because you --

                                    27 (Pages 102 to 105)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008
                        Washington, DC

| Page 106 | Page 108 |
|---|---|
| 1 you said that -- your testimony is that she said | 1   Q   Okay. |
| 2 she would lie to get the -- the SANE kit done? | 2   A   Came at a different time. |
| 3        MR. JEFFERSON:  Object to form. | 3   Q   Okay.  Did he do any interviewing of -- |
| 4        You can answer. | 4 of Ms. McGaughey? |
| 5        THE WITNESS:  Yes. | 5   A   No. |
| 6 BY MR. SPIVA: | 6        MR. JEFFERSON:  Objection.  Asked and |
| 7   Q   Okay.  And you said your sergeant told | 7 answered. |
| 8 you to do the report? | 8 BY MR. SPIVA: |
| 9   A   Yes. | 9   Q   Okay.  And so what does it mean to |
| 10   Q   Okay.  And who was that? | 10 respond to the scene?  What does -- what does that |
| 11   A   Sergeant Maradiaga. | 11 mean? |
| 12   Q   Okay.  And when -- when did -- when did | 12   A   Means you go to the scene. |
| 13 he tell you that? | 13   Q   Uh-huh.  Okay.  Is Sergeant -- |
| 14   A   He came to the hospital. | 14        Can you say his name again? |
| 15   Q   Okay.  And -- and when did he come to | 15   A   Where Maradiaga. |
| 16 the hospital? | 16   Q   -- Maradiaga, is he -- is he part of the |
| 17   A   I can't give you the exact time. | 17 Sexual Assault Unit. |
| 18   Q   Okay.  Approximately when in the time | 18   A   No. |
| 19 period that -- that you were there? | 19   Q   Do you know what unit he is a part of? |
| 20   A   During the -- the process when we were | 20   A   Sergeant at 3-D. |
| 21 interviewing back and forth. | 21   Q   Uh-huh.  Okay.  So he's not part of a |
| 22   Q   Uh-huh.  Did he interview Ms. McGaughey? | 22 specific unit? |

| Page 107 | Page 109 |
|---|---|
| 1   A   No. | 1   A   No. |
| 2   Q   Was he present during any of the | 2   Q   Okay. |
| 3 interview? | 3        MR. SPIVA:  By the way, he's never been |
| 4   A   No, he wasn't -- he was present.  But | 4 disclosed on any disclosures.  The -- the first |
| 5 like I said, I can't recall exactly at what point. | 5 time we saw his name was on one of the -- you |
| 6   Q   But was -- was he present in the room, | 6 know -- |
| 7 the same room with you and Officer Leveque and -- | 7        MR. JEFFERSON:  The citizen's complaint? |
| 8 and the Plaintiff when you were doing the | 8        MR. SPIVA:  -- the documents.  Yeah. |
| 9 interview? | 9        MR. JEFFERSON:  I think that the |
| 10   A   He came into the room.  But he -- he did | 10 explanation for that is that when we prepared -- |
| 11 not stay. | 11        MR. SPIVA:  Uh-huh. |
| 12   Q   Okay. | 12        MR. JEFFERSON:  -- although I didn't |
| 13   A   So like I said, I don't know what point | 13 prepare the -- |
| 14 that was. | 14        MR. SPIVA:  Uh-huh. |
| 15   Q   Okay.  Why was he there? | 15        MR. JEFFERSON:  -- disclosure, Maradiaga |
| 16   A   Because the -- the general order | 16 is not mentioned on that 251. |
| 17 requires that the sergeant respond to the scene. | 17        MR. SPIVA:  Yeah. |
| 18   Q   Uh-huh.  And when did he -- so you -- | 18        MR. JEFFERSON:  And certainly his name |
| 19 you mentioned that you had gotten the call. | 19 is on the complaint, as you've mentioned. |
| 20        And did he come to the scene at the same | 20        MR. SPIVA:  Uh-huh. |
| 21 time that -- that you all came to the scene? | 21        MR. JEFFERSON:  You know, if we need to |
| 22   A   Not at the same time. | 22 amend, we will. |

                                    28  (Pages 106 to 109)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                May 8, 2008
Washington, DC

---

Page 110

1      MR. SPIVA:  Yeah.  Well, we -- we are
2  going to want to add him, obviously, to the
3  deposition list.
4      But -- but I just wanted to let you
5  know, we had not -- we had not previously known of
6  him, so --
7      MR. JEFFERSON:  We've made all our
8  witnesses available to you.  And we'll continue to
9  do so.
10 BY MR. SPIVA:
11     Q   Did you have any conversation with
12 Sergeant Maradiaga --
13     Is that the way you pronounce it?
14     A   Maradiaga, yes.
15     Q   Maradiaga, did you have any
16 conversations with him on December 9th concerning
17 this -- this matter?
18     A   Yes.
19     Q   What -- and describe that conversation
20 for me.
21     A   I described the conversation in
22 reference to what she said and what she reported

---

Page 111

1  and what Detective Wheeler had said.
2      Q   Uh-huh.
3      A   And what his disposition was.  And that
4  was basically it.
5      Q   Uh-huh.  Okay.  Let me just get -- make
6  sure I have -- I have one thing clear.  Because
7  you said you thought this was unusual because you
8  had never had someone say that they would lie.
9      Had you ever done a miscellaneous report
10 in connection with a complaint of sexual assault
11 prior to this case?
12     MR. JEFFERSON:  Object to form to the
13 extent that counsel, in his questioning, said, "it
14 was unusual."  The witness never stated that.
15     Subject to that objection, you can
16 answer.
17     THE WITNESS:  The question was, have I
18 done a miscellaneous report in reference to a
19 sexual assault case?
20 BY MR. SPIVA:
21     Q   Yes.
22     A   Not -- not a sexual assault case, no.

---

Page 112

1      Q   Okay.  In -- I -- I would -- I had
2  limited it prior to that point.  But I think from
3  your answer --
4      Does your answer include all time; in
5  other words, have you ever done it, you know --
6  either before or after December 9th, have you ever
7  done a miscellaneous report in reference to a
8  sexual assault case, other than in this case?
9      A   Not --
10     MR. BANKS:  Objection to form.
11     THE WITNESS:  Not in reference to a
12 sexual assault case.
13 BY MR. SPIVA:
14     Q   Okay.  And -- and it sounds like you're
15 distinguishing that from some other type of case;
16 is that -- is that fair?
17     A   Yes.
18     Q   Okay.  And what's the -- what's the
19 other type of case that you have in mind?
20     A   Well, it -- it depends.  I have done
21 miscellaneous reports --
22     Q   Uh-huh.

---

Page 113

1      A   -- in the past --
2      Q   Uh-huh.
3      A   -- for incidents.
4      Q   Uh-huh.  Okay.  But I take it that those
5  incidents did not involve any complaint --
6  allegation of sexual assault or sexual abuse?
7      A   No.
8      Q   Okay.  Did you provide Ms. McGaughey any
9  information regarding victim or witness assistance
10 services?
11     A   No.
12     Q   Okay.  Did you advise Ms. McGaughey what
13 to do if the suspect or anyone known to the
14 suspect threatened or otherwise intimidated her?
15     MR. JEFFERSON:  Object to the form.
16 Assumes facts not in evidence.
17 BY MR. SPIVA:
18     Q   You can answer.
19     A   There was no suspect, so no.
20     Q   Okay.  Did you talk to Ms. McGaughey's
21 sister?
22     A   No.

29  (Pages 110 to 113)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008
                          Washington, DC

| Page 114 | Page 116 |
|---|---|
| 1     Q   Okay.  Did Ms. McGaughey's sister say<br>2 anything to you?<br>3        MR. JEFFERSON:  Objection.  Asked and<br>4 answered.<br>5        THE WITNESS:  No.<br>6 BY MR. SPIVA:<br>7     Q   And do you recall having any interaction<br>8 whatsoever with -- with Ms. McGaughey's sister?<br>9     A   There was a female with her.  I -- I<br>10 don't know who she was.<br>11     Q   Uh-huh.<br>12     A   She was not a part of the -- she wasn't<br>13 a witness or anything like that.<br>14        So, no, I had no contact with her.<br>15     Q   Uh-huh.  Okay.  And did you talk with<br>16 anyone else, any other, you know, witnesses or<br>17 potential witnesses other than Ms. McGaughey?<br>18     A   No.<br>19        MR. JEFFERSON:  Object to form.<br>20 BY MR. SPIVA:<br>21     Q   Do you recall whether you talked to<br>22 someone named Kerston Reid at the hospital? | 1     Q   Said no -- and when you said -- you said<br>2 no, what did -- what did you mean?<br>3     A   In reference to having a sexual kit<br>4 performed.<br>5     Q   That -- that -- that Detective Wheeler<br>6 said that no sexual assault kit should be<br>7 performed?<br>8     A   That no -- there would be no sexual kit<br>9 done.<br>10     Q   Okay.  You told the nurse that Detective<br>11 Wheeler said that no sexual assault kit would be<br>12 done?<br>13        MR. BANKS:  Objection.  Asked and<br>14 answered.<br>15        MR. JEFFERSON:  Objection.  Asked and<br>16 answered.<br>17        MS. COSTANTINO:  Just joining in the<br>18 objection.<br>19 BY MR. SPIVA:<br>20     Q   Is that correct?<br>21     A   That's correct.<br>22     Q   And -- and why did you tell her that? |
| Page 115 | Page 117 |
| 1     A   No, I don't recall.<br>2     Q   Okay.  And did you speak with any of the<br>3 hospital personnel?<br>4     A   On the -- on the time of the interview,<br>5 or afterwards, or what?<br>6     Q   At the -- at the time -- well, any time<br>7 on that day concerning, you know, this matter.<br>8     A   No.<br>9     Q   Okay.  Did any of them seek to ask you<br>10 any questions?<br>11     A   No.<br>12     Q   I'm sorry.  When I say "them," I'm<br>13 talking about any hospital personnel?<br>14     A   No.  Just a disposition.<br>15     Q   When -- and when you say "disposition,"<br>16 what do you mean?<br>17     A   What did the -- what the Sexual Assault<br>18 Unit detective said in reference to a sexual kit.<br>19     Q   Okay.  And who asked you about that?<br>20     A   It was one of the nurse.<br>21     Q   Uh-huh.  And what did you tell her?<br>22     A   Told her that Detective Wheeler said no. | 1     A   Because they wanted to know whether or<br>2 not they needed to do a kit.<br>3     Q   Uh-huh.  Okay.  Did you talk to anybody<br>4 else at the hospital about that?<br>5     A   No.<br>6     Q   Did Detective Wheeler tell you why --<br>7 why no sexual assault kit should be done?<br>8     A   No.<br>9     Q   I think I -- I -- you may have answered<br>10 this.  I apologize.  But I just want to make sure<br>11 I've got this clear.<br>12        Did any detective come to the hospital<br>13 during the time that -- that you were there?<br>14     A   No.<br>15     Q   And I think you mentioned that -- that<br>16 there was some kind of policy or something that<br>17 said that the -- the sergeant needed to respond to<br>18 the -- the scene when there's a complaint of<br>19 sexual assault.<br>20        Was that -- is that what you said?<br>21     A   Yes.<br>22     Q   And -- and what -- what is that policy |

30 (Pages 114 to 117)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008

Washington, DC

---

Page 118

1  that -- that says that?
2      A   It's in the general orders for 304, like
3  I said, on sexual assaults.
4      Q   Uh-huh.  And do you recall whether it
5  says anything else about who should respond to the
6  scene for a complaint of sexual assault?
7      A   I don't recall what else.
8          MR. JEFFERSON:  Bruce, give me a second.
9          Are you doing okay?
10         THE WITNESS:  Uh-huh.
11 BY MR. SPIVA:
12     Q   You sure?  You -- you need a break?
13     A   Uh-uh.
14     Q   Okay.  After you left the hospital, did
15 you do anything else on this matter?
16     A   I faxed a copy of the miscellaneous
17 report to the Sexual Assault Unit.
18     Q   Okay.  Who did you fax it to?
19     A   Detective Wheeler.
20     Q   Uh-huh.  Anything else?
21     A   I gave -- I gave her a piece of paper
22 with my name and badge number, Leveque name and

---

Page 119

1  badge number, and Detective Wheeler name and phone
2  number.
3      Q   Uh-huh.  Okay.  And did you do any
4  additional investigation after you left the
5  hospital?
6      A   No.
7      Q   Okay.  And would that be something that
8  you would do, or is that somebody else's job?
9          If there were -- if there were going to
10 be additional investigation, would that -- would
11 that be somebody else's job to do that?
12     A   Investigation in reference to?
13     Q   The sexual assault complaint.
14     A   It would be somebody else's.
15     Q   Okay.  And, to your knowledge, did
16 anyone on the police force do any additional
17 investigation after you left the hospital?
18     A   I don't have no idea.
19     Q   Okay.  And you don't know whether -- it
20 I take it, from that answer, whether anyone
21 attempted to, say, locate any of the young men at
22 the party?

---

Page 120

1      A   I have no idea.
2      Q   Okay.  Did the -- did -- did -- the
3  Plaintiff, did she describe for you the events of
4  the night before in terms of the party and that
5  type of thing?
6          She give you any kind of description?
7      A   Description of what?
8      Q   The party, you know, who was there,
9  where -- address?
10     A   She gave -- she gave the address of the
11 party.
12     Q   Uh-huh.
13     A   She didn't give a description of who
14 and -- who was at the party, no.
15     Q   Did she tell you who she was with?
16     A   No.
17     Q   Okay.  Did -- did she -- did you realize
18 when you were questioning her that she had been to
19 the hospital the -- earlier that day in kind of
20 the middle of the night, the wee hours of the
21 morning?
22     A   Not until after I spoke to Detective

---

Page 121

1  Wheeler.
2      Q   Okay.  When you spoke to him while you
3  were still at the hospital?
4      A   Yes.
5      Q   Okay.  And -- and what did -- what did
6  he tell you?
7          Was he the one who told you that they
8  had been there previously?
9      A   Yes.
10     Q   What did he tell you about that?
11     A   If I recall --
12         MR. JEFFERSON:  Don't speculate.
13         MR. SPIVA:  You know, Dwayne, it's
14 totally improper.  And I'm going to have to call
15 the judge on this if you keep it up.
16         She -- she's giving her best
17 recollection.  And, you know, that's -- that's
18 perfectly acceptable.  And so to cut her off in
19 the middle of the answer and say, don't speculate,
20 when she's clearly giving her best recollection,
21 it's just -- it's just improper.  You know, it
22 really is.

Alderson Reporting Company
1-800-FOR-DEPO

Tandreia Green                                          May 8, 2008

Washington, DC

Page 122

1        And -- and, you know, I -- I've kind --
2   I've kind of tolerated it.  But I -- you know,
3   we'll have to have Judge Leon straighten this out
4   if -- if it keeps up.  It's just -- it's just --
5        MR. JEFFERSON:  She's here to answer
6   your questions.
7        MR. SPIVA:  It's just not proper.
8        MR. JEFFERSON:  And she will do so.
9   BY MR. SPIVA:
10     Q    Okay.  Please, will -- will you
11  continue?
12     A    What's the question?
13     Q    I've forgotten, too.
14     I think the question was -- although I
15  don't want to speculate about this.
16       MR. SPIVA:  Can you read it back,
17  please?
18       Totally lost my train of thought.
19          (Whereupon the reporter read
20          the record as requested.)
21       MR. SPIVA:  I think we might have to go
22  back one more to --

Page 123

1          (Whereupon the reporter read
2          the record as requested.)
3        MR. SPIVA:  I think we need -- I'm
4   sorry.  We're going to have to go back a little
5   bit further, yeah.
6          (Whereupon the reporter read
7          the record as requested.)
8        MR. SPIVA:  Okay.  Let -- let me -- I
9   think I've got it.  Let me -- let me just rephrase
10  it.  It'll be easier than trying to read it back.
11  BY MR. SPIVA:
12     Q    We had -- we had talked about when you
13  learned about the fact that she had been there
14  earlier -- been to Howard University Hospital
15  earlier.
16       And I think my question was, what did
17  Detective Wheeler tell you about that, the fact
18  that she had been to the hospital previously?
19     A    Stated something to the nature that she
20  had been there earlier for the same thing, for a
21  sex kit.
22     Q    Okay.

Page 124

1     A    And that he was familiar with the case.
2     Q    Okay.  Do you recall anything else about
3   what, if anything, he told you about the previous
4   visit to the hospital?
5     A    No.
6     Q    Okay.  Do you know whether or not she
7   was conscious when she came to the hospital
8   previously?
9     A    I have no idea.
10     Q    Okay.  Do you know whether or not she
11  was accompanied by anyone else when she came to
12  the hospital the first time?
13     A    No.  I don't know.
14     Q    Do you know anything about what physical
15  condition she was in, you know, when she came to
16  the hospital the first time?
17     A    No.
18     Q    Okay.
19       MR. JEFFERSON:  You okay?
20       THE WITNESS:  Uh-huh.
21  BY MR. SPIVA:
22     Q    The nurse you talked to, to give her I

Page 125

1   think what you called the disposition, did -- did
2   she say anything else or ask you anything else
3   other than what's the -- what's the disposition?
4     A    No.  Not to my knowledge, she didn't.
5     Q    And -- and did you say anything else to
6   her?
7     A    No.
8     Q    Okay.  Can you describe the nurse that
9   you talked to?
10     A    No.
11     Q    Was she black or white?
12     A    She was black.
13     Q    Asian?
14       Black.  Okay.
15       And, you know, approximate age?
16     A    No.
17     Q    Okay.  Nothing that stands out in your
18  mind about her?
19     A    No.
20     Q    Okay.  Did you call or contact the D.C.
21  Rape Crisis Center when you were there at the
22  hospital?

32 (Pages 122 to 125)

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                          May 8, 2008
                        Washington, DC

Page 126

1    A   No.
2         MR. JEFFERSON:  Objection.  Asked and
3  answered.
4         MR. BANKS:  Objection.  Asked and
5  answered.
6  BY MR. SPIVA:
7    Q   Did -- to your knowledge, did Detective
8  Wheeler or anybody else in the police department
9  call the -- the D.C. Rape Crisis Center?
10   A   I don't know.
11   Q   Okay.  Did you call the SANE nurse when
12 you were there?
13   A   No.
14   Q   And to your knowledge -- or do you know
15 whether anyone else in the police department
16 called the SANE nurse?
17   A   No.  I don't know.
18   Q   Did you ever speak any -- with anyone at
19 the George Washington University Hospital about
20 this case?
21   A   No.
22   Q   Okay.  And did you speak either on

Page 127

1  December 9th or sometime -- no.  No.  Strike that.
2         Did you speak with any other police
3  officers or detective -- detectives about
4  Ms. McGaughey seeking to have a sexual assault kit
5  done at George Washington University Hospital?
6    A   No.
7    Q   Okay.  I'm going to hand you what will
8  be marked as --
9         MR. SPIVA:  Why don't we call these
10 Green 1.
11        I'm going to hand it to the court
12 reporter first for identification.
13            (Green Deposition Exhibit
14             No. 1 marked for
15             identification.)
16        MR. SPIVA:  This is off the -- off the
17 transcribed record.
18            (Discussion off the record)
19 BY MR. SPIVA:
20   Q   Okay.  Officer Green, I've -- I handed
21 you what's been marked as Green Exhibit 1.  And if
22 you can just take a couple minutes to look over

Page 128

1  it, I'm going to ask you specific questions about
2  it.  But take as much time as you want now.
3         And then when I start asking you
4  questions, if you want more time, obviously you
5  can take more time to look at it, too.
6    A   (Witness examined document).  Okay.
7    Q   You ready?
8         Okay.  Can -- can -- do you recognize
9  this document?
10   A   Yes, I do.
11   Q   What is it?
12   A   It's a 251.
13   Q   Okay.  What -- specifically what 251 is
14 it?
15   A   It's a piece of paper that we use to
16 write an offense or incident report on.
17   Q   Okay.  And is this the miscellaneous
18 incident report that you referred to earlier in
19 your testimony that you did in -- in connection
20 with this complaint by the Plaintiff in this case?
21   A   Yes, it is.
22   Q   Okay.  When did -- and did you fill this

Page 129

1  out?
2    A   Yes, I did.
3    Q   Okay.  And there's some handwriting on
4  the -- like the third page of this.
5         Is that your handwriting?
6    A   (Witness examined document).  Yes.
7    Q   Okay.  Did you fill out the whole
8  report?
9    A   Yes.
10   Q   Okay.  When did you fill out the report?
11   A   At the hospital.
12   Q   Okay.  The -- the whole thing?
13   A   Yes.
14   Q   Okay.  Including the -- the -- the
15 narrative portion --
16   A   Yes.
17   Q   -- on page 3?
18        Okay.  And was this your best
19 understanding of what Ms. McGaughey was saying to
20 you at the time?
21        MR. JEFFERSON:  Objection.  The document
22 speaks for itself.

33 (Pages 126 to 129)

Alderson Reporting Company
1-800-FOR-DEPO

Tandreia Green                                                    May 8, 2008
Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1    Q   Okay.  And what does it mean to clear in | 1    A   They'll let you know in the orders. |
| 2  this context? | 2    Q   I see. |
| 3    A   It means that you're -- you're finished | 3       Where -- where would they let you know |
| 4  on that assignment. | 4  that?  Is there somewhere up front or something? |
| 5    Q   Okay.  Let me -- let me give you -- let | 5    A   No.  Once -- once you read them. |
| 6  me have another document marked. | 6    Q   Oh, you mean somebody will actually tell |
| 7       MR. JEFFERSON:  We're done with Green 1? | 7  you that this is something that's applicable to |
| 8       MR. SPIVA:  I think so.  We may return | 8  you? |
| 9  to it later.  But I think we're done with it. | 9    A   No.  The -- the writing will indicate |
| 10      If we could mark this as Green Exhibit | 10  what you're -- what you're supposed to do. |
| 11  2. | 11    Q   Okay.  Okay.  Since you haven't reviewed |
| 12          (Green Deposition Exhibit | 12  this, I'm -- I'm not going to ask you any more |
| 13           No. 2 marked for | 13  questions about it. |
| 14           identification.) | 14       But let me -- let me ask you one more |
| 15  BY MR. SPIVA: | 15  question about Exhibit 1, Green 1, your report. |
| 16    Q   Okay.  Officer Green, you've been handed | 16       MR. JEFFERSON:  What -- what page? |
| 17  what has been marked as Green Exhibit 2.  And its | 17       MR. SPIVA:  I think it's on the first |
| 18  title is, Handling Sexual Abuse Cases. | 18  page.  It's where Detective Wheeler signed this. |
| 19       First of all, have -- do you recognize | 19  BY MR. SPIVA: |
| 20  this document at all? | 20    Q   And I -- I guess my question doesn't |
| 21    A   No. | 21  actually require you to look at the report. |
| 22    Q   Okay.  And -- and I take it from that, | 22       But do you know whether Detective |

| Page 179 | Page 181 |
|---|---|
| 1  you've never reviewed it? | 1  Wheeler actually reviewed this report? |
| 2    A   I don't recall. | 2    A   I don't know.  I faxed it.  I couldn't |
| 3    Q   This is labeled SO-07. | 3  tell you if he reviewed it or not. |
| 4    I take it "SO" is special order? | 4    Q   Okay.  He never said to you, I've -- |
| 5    A   Yes. | 5  I've taken a look at it and I'm going to sign off |
| 6    Q   Okay.  And -- and you may have answered | 6  on it? |
| 7  this earlier.  So I apologize if you did. | 7    A   No.  I just faxed it over there. |
| 8       But are special orders something that | 8    Q   Okay.  Let me give you another document. |
| 9  are disseminated to all officers? | 9  I'm going to have it marked as Green Exhibit 3. |
| 10    A   To my knowledge, yes. | 10          (Green Deposition Exhibit |
| 11    Q   Okay.  Do you know whether this SO-07, | 11           No. 3 marked for |
| 12  whether that's still in effect? | 12           identification.) |
| 13    A   I don't know. | 13       MR. SPIVA:  Hopefully -- |
| 14    Q   Officer Green, do -- do you know from | 14       This, again, can be off the record, at |
| 15  looking at this whether this is an order that | 15  least the typing record. |
| 16  would apply to you as an officer? | 16          (Discussion off the record) |
| 17    A   There's probably some sections in here | 17       THE WITNESS:  (Witness examined |
| 18  that would apply to me as an officer.  But most -- | 18  document.) |
| 19    Q   Okay. | 19       MR. JEFFERSON:  I think the witness is |
| 20    A   -- most of the orders, they'll let you | 20  ready. |
| 21  know. | 21  BY MR. SPIVA: |
| 22    Q   I'm sorry? | 22    Q   Oh, okay.  Sorry. |

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                              May 8, 2008
                        Washington, DC

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  that?
2      A    Sometimes, maybe.
3      Q    Okay.  And -- and why is it that you
4  sometimes put notes in your field notebook for,
5  say, someone who's a victim of robbery that you're
6  interviewing, but you never put notes in your
7  field notebook with respect to individuals who
8  have complained of sexual assault?
9          MR. JEFFERSON:  Object to the form.
10         THE WITNESS:  Because if it's a sexual
11 assault, it's going to be handled by SAU.  So
12 they're -- all I'm doing is the preliminary
13 investigation to ask them questions.  They're
14 going to go into details.  They're going to -- if
15 there is a crime scene, they're -- they're going
16 to handle all that.
17 BY MR. SPIVA:
18     Q    Okay.  And -- and with respect to, say,
19 for instance, the example of the robbery we were
20 talking about, who handles that?
21     A    If it's -- if it's a robbery case, then
22 I would be responsible.

**Page 199**

1      Q    Is -- is that because there's not some
2  separate unit akin to the Sexual Assault Unit who
3  would handle the follow-up on robberies?
4      A    Correct.
5          MR. JEFFERSON:  Object to form.
6  BY MR. SPIVA:
7      Q    In the -- in the -- in the District's
8  initial disclosures to us in this case, they refer
9  to a category of documents called, internal
10 unpublished guidelines governing the MPD Sex
11 Assault Unit.
12         Have you ever seen any such guidelines?
13     A    No.
14     Q    Okay.
15     A    Not that I recall.
16     Q    Have you ever been trained on them?
17         MR. JEFFERSON:  Object to the form.
18         THE WITNESS:  Not that I recall.
19 BY MR. SPIVA:
20     Q    Let me give you one more document.
21         MR. SPIVA:  And if we could mark this
22 Green 4, I think we're at.

**Page 200**

1              (Green Deposition Exhibit
2              No. 4 marked for
3              identification.)
4          MR. SPIVA:  Again, this part doesn't
5  need to be on the record.
6              (Discussion off the record)
7          THE WITNESS:  (Witness examined
8  document).
9          MR. JEFFERSON:  Are you ready?
10         THE WITNESS:  Yep.
11         MR. JEFFERSON:  The witness is ready.
12         MR. SPIVA:  Okay.
13 BY MR. SPIVA:
14     Q    Officer Green, you've been handed
15 what's been marked Green Exhibit 4.  And the title
16 of it is, Field Reporting System.  It has a topic
17 number GOSPT 401.01.  And it says, effective date,
18 March 4th, 2004.
19         First of all, do you recognize this
20 document?
21     A    I've -- I've seen it before.  I can't
22 recall everything that's in it, but yes.

**Page 201**

1      Q    Okay.  And -- and is this -- have you
2  been trained on it?
3          Has anybody kind of walked you through
4  it in a training?
5          MR. BANKS:  Objection to form.
6          THE WITNESS:  No.
7  BY MR. SPIVA:
8      Q    Okay.  Do you know what it -- what the
9  purpose of it -- of the document is?
10     A    It's a guideline.
11     Q    Uh-huh.  And is it something that
12 applies to you as an officer?
13     A    Some of it pertains to me.
14     Q    Okay.  And, again, here, this -- this
15 notes that it replaces or rescinds several other
16 -- or a couple of other orders or general orders
17 or special orders.
18         What is your practice when you get --
19 when you receive a general order that says it
20 replaces another order?
21         How do you -- how do you deal with that?
22     A    Just add it to my -- my pile.

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

Tandreia Green                                                    May 8, 2008
                          Washington, DC

| Page 202 | Page 204 |
|---|---|
| 1    Q   Okay.  Do you take the other one out? | 1   practice of, say, the detectives in the Sexual |
| 2        Or -- or what's -- what's your practice | 2   Assault Unit to file a report where they find a |
| 3   in respect to that? | 3   sexual assault claim to be unfounded? |
| 4    A   No.  I just add it to my pile. | 4    A   I couldn't answer that. |
| 5    Q   Okay.  Is this something that you -- | 5    Q   Don't -- don't know? |
| 6   that was reviewed in any of the in-service | 6    A   No. |
| 7   trainings that you've had over the years? | 7    Q   Officer Green, have -- are you familiar |
| 8    A   I can't recall. | 8   with someone named David Rosenbaum? |
| 9    Q   Okay.  Are the general -- well, strike | 9        MR. JEFFERSON:  Objection.  Relevance. |
| 10   that. | 10   I'm going to make my objection continuing. |
| 11       Let me refer you to page 1, Roman | 11       And certainly, Counsel, we'll entertain |
| 12   Numeral II.  It says there, among other things, | 12   some of these questions, particularly the one |
| 13   that the policy of the Metropolitan Police | 13   you've just asked. |
| 14   Department is that members shall file a report for | 14       MR. BANKS:  I'll join. |
| 15   all reported crimes and incidents brought to his | 15       MS. COSTANTINO:  I'll join in the |
| 16   or her attention. | 16   objection. |
| 17       Is that part -- is that part of this | 17       MR. JEFFERSON:  But going forward. |
| 18   policy, is that something that would be applicable | 18   BY MR. JEFFERSON: |
| 19   to you as an officer, or no? | 19    Q   You -- you familiar with someone named |
| 20    A   Yes. | 20   David Rosenbaum? |
| 21    Q   And you -- you had stated earlier when | 21    A   Not that I recall. |
| 22   we were talking about the investigations -- or | 22    Q   Okay.  And do -- do you know anything |

| Page 203 | Page 205 |
|---|---|
| 1   interviews of other sexual assaults, that other | 1   about an investigation into the handling of -- of |
| 2   than this case where you filed the miscellaneous | 2   someone named David Rosenbaum's case? |
| 3   report, that you typically don't file a report. | 3        MR. JEFFERSON:  Objection.  Asked and |
| 4        Is that -- is that a fair characterization | 4   answered. |
| 5   of your testimony? | 5        THE WITNESS:  Don't recall. |
| 6        MR. JEFFERSON:  Object to the form. | 6        MR. SPIVA:  I have no further questions |
| 7        THE WITNESS:  Now, what are you asking | 7   at this time. |
| 8   me? | 8        MR. BANKS:  No questions here. |
| 9   BY MR. SPIVA: | 9        MR. JEFFERSON:  Going once, going twice. |
| 10    Q   In other sexual assault cases that | 10       MR. SPIVA:  Now, the only thing, I'll -- |
| 11   you've done where -- where it's been found to be | 11   I'll do my usual reservations.  If we get some of |
| 12   unfounded, it's -- it's typically not your | 12   these other documents -- |
| 13   practice to file a report? | 13       MR. JEFFERSON:  Right. |
| 14    A   This is -- no.  I don't file a report. | 14       MR. SPIVA:  -- and there's a need, I |
| 15    Q   Okay.  And -- and as far as you know, no | 15   may -- I'm going to keep it -- formally keep it |
| 16   one within the Department files a report in those | 16   open. |
| 17   instances? | 17       But I don't have any other questions. |
| 18       MR. JEFFERSON:  Object to form. | 18       MR. JEFFERSON:  Right.  Specifically |
| 19       THE WITNESS:  I couldn't answer for | 19   you're talking about the precursors to 3046? |
| 20   everybody else. | 20       MR. SPIVA:  Specifically that's what I |
| 21   BY MR. SPIVA: | 21   have in mind now. |
| 22    Q   Okay.  Do you know whether it's the | 22       But if I get something else at a later |

Alderson Reporting Company
1-800-FOR-DEPO

c7ee286b-4d17-4f83-962d-e6c18b9bec1e

# Exhibit F

**(Excerpts of G. Leveque Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

Ginette Leveque                                    April 14, 2008
                        Washington, DC

Page 1

          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,          :
                               :
        Plaintiff,             :
                               :
             v.                : Case No.
                               : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al., :
                               :
        Defendants.            :
- - - - - - - - - - - - - - - x

                          Washington, D.C.

                    Monday, April 14, 2008


Video Deposition of

        OFFICER GINETTE LEVEQUE, called for

examination by counsel for Plaintiff, pursuant

to notice, at the Law Offices of Spiva & Hartnett,

LLP, 1776 Massachusetts Avenue, NW, Suite 600,

Washington, D.C., commensing at 12:54 p.m., before

Barbara A. Huber, Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Page 38

1    Q   Okay.  And are you a member of the MPD
2  sexual assault unit?
3    A   No.
4    Q   And were you ever a member of the MPD
5  sexual assault unit?
6    A   No.
7    Q   Have you ever had any training in the
8  investigation of sexual assaults?
9    A   No.
10   Q   Have you ever had any training in the
11 treatment of sexual assault victims?
12   A   No.
13   Q   Have you ever had any training in -- let
14 me back up.
15       Have you -- have you ever been trained
16 about -- on the subject of date rape drugs?
17   A   No.
18   Q   And what are -- what are MPD's policies,
19 if you know, for investigating alleged sexual
20 assaults?
21   A   Repeat the question.
22   Q   What are MPD's policies for

Page 39

1  investigating alleged sexual assaults?
2    A   I can't tell you exactly what MPD's
3  policies are for sexual assaults.  But I know from
4  an officer's standpoint.
5    Q   Okay.  Tell me from an officer's
6  standpoint what the policies are for investigating
7  sexual assaults.
8    A   I respond to the location.  I interview
9  the complainant.  And I notify a sex squad
10 detective.  They respond to the location.  And
11 they deem it a confirmed sexual assault or a
12 matter that needs to be further investigated.  And
13 I take the report.
14   Q   And you said you notify a sexual assault
15 detective.
16       How do you -- how do you typically do
17 that?
18       What's the procedure for doing that?
19   A   I go through the Third District
20 dispatcher.
21   Q   Okay.  And do you actually talk -- is
22 the -- is the procedure to actually -- for you

Page 40

1  actually to talk with the sexual assault
2  detective?
3    A   You can either notify the dispatcher to
4  have them snap page them, or if you have their
5  land line, you can call them on a land line, as
6  well.
7    Q   Okay.  And you -- you mentioned that the
8  procedure is that they respond to the location.
9       What do you mean by that?
10      I'm sorry.  Let me make sure I'm -- the
11 record's clear.
12      When I say "they," I'm talking about
13 that the -- the -- the sexual assault detective
14 actually responds to the location.
15      What do you mean by that?
16   A   They come interview the complainant.
17   Q   In person?
18   A   In person.  Or I've had them also --
19 scratch that.  Excuse me.  I'm sorry.  I'm a bit
20 nervous.
21   Q   That's okay.
22   A   They could respond to the location.

Page 41

1    Q   Okay.  Well, but now I -- that kind of
2  repeats the original phrase.  And I want to make
3  sure I understand.
4       When you say --
5    A   Sure.
6    Q   -- respond to the location, do you mean
7  that they actually come physically to the
8  location?
9    A   Yes.
10   Q   Okay.  And -- and do they come there and
11 they talk to the -- the victim, the person that
12 you've talked to?  Was that the policy or the
13 procedure?
14      MR. JEFFERSON:  Objection, to the extent
15 that this is being characterized as the policy or
16 procedures.  This officer's already testified that
17 she is speaking from an officer's --
18      MR. SPIVA:  Now you're --
19      MR. JEFFERSON:  -- perspective.
20      MR. SPIVA:  -- coaching.  Wait a minute.
21 Wait a minute.  You can -- you can object if you
22 want to, but --

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008
                        Washington, DC

| Page 42 |
| --- |

1      MR. JEFFERSON: -- understanding what
2  she said.
3      MR. SPIVA: -- but -- but -- but you're
4  not going to coach the witness.
5      MR. JEFFERSON: She said she's speaking
6  from the officer's perspective.
7  BY MR. SPIVA:
8    Q   Yeah, yeah.
9      I -- my question is -- and the record
10 reflects what it reflects -- is it the -- the
11 procedure, in your understanding, that the
12 officer -- when you say that the officer responds
13 to the location, that the officer physically comes
14 to at the location?
15     MR. JEFFERSON: Same objection.
16     THE WITNESS: I respond to the location,
17 yes. And I'm supposed to notify a sex squad
18 detective.
19 BY MR. SPIVA:
20   Q   Uh-huh. Okay. And then you -- you said
21 earlier, though, that then the detective responds
22 to the location; is that right?

| Page 43 |
| --- |

1    A   Yeah, they respond.
2    Q   Okay.
3    A   Yes, they respond.
4    Q   Okay. When you said that they respond
5  to the location, did you mean that they actually
6  physically come to the location?
7    A   Yes, they do. But I've had some
8  instances where they don't respond to the
9  location.
10   Q   Okay. Now, is the -- do you know
11 whether it is MPD policy and procedure for the
12 sexual assault detective to come to the location,
13 physically come to the location?
14     MR. JEFFERSON: Objection. Asked and
15 answered.
16     MR. SPIVA: No, it's not.
17 BY MR. SPIVA:
18   Q   You can answer.
19   A   That, I don't know. What their aspect
20 of -- you know, their part of the sexual assault
21 investigation, that, I don't know. But from an
22 officer's standpoint, I know what I'm supposed to

| Page 44 |
| --- |

1  do.
2    Q   Okay. And from an officer's standpoint,
3  do you know what the detective is supposed to do?
4    A   I know they're supposed to -- well,
5  through what I tell them, they investigate --
6  because I get their version first. And then I
7  tell them.
8    Q   Uh-huh.
9    A   And then from there, they decipher what
10 they're going to do in reference to whatever I've
11 told them.
12   Q   Okay. And in your experience, has that
13 included the detective actually coming physically
14 to the location to interview the victim?
15   A   I've had -- I've had them respond and
16 also not respond.
17   Q   Now, you say respond and also not
18 respond.
19     When you say respond, you mean actually
20 come to the location?
21   A   Yes.
22   Q   Okay. And when you say not respond,

| Page 45 |
| --- |

1  what do you mean by that?
2    A   I've also had them not respond to the
3  location.
4    Q   So not come physically to the location?
5    A   Yes.
6    Q   Okay. And when they don't come
7  physically to the location, what do they do, if
8  anything?
9    A   I don't know. They -- because they
10 don't respond.
11   Q   Uh-huh.
12   A   I don't know what they -- I can't answer
13 for them. I don't --
14   Q   Okay.
15   A   -- know what they do.
16   Q   That -- that's fair enough.
17     When you -- after you've interviewed
18 the -- the victim and you've communicated with the
19 sexual assault detective, do you remain at the
20 location until a detective comes to the location?
21     MR. JEFFERSON: Objection, to the extent
22 that the hypothet -- that's been posed can't apply

                          12  (Pages 42 to 45)

acdb92dc-75db-46dd-b9a9-dde063d80fe

Ginette Leveque                                    April 14, 2008
                        Washington, DC

| Page 46 | Page 48 |
|---------|---------|

**Page 46**

1  in circumstances where the -- as she testified
2  already -- where the detective does not respond to
3  the location.
4  BY MR. SPIVA:
5      Q   Okay.  When the -- when the detective
6  responds to the location, do you stay there until
7  they get there?  Is that -- is -- is that --
8      A   Yes.
9      Q   -- your experience?
10         Yes, it is?
11     A   Yes, sir.
12     Q   Okay.  And when the -- in the -- in the
13  instances where the detective has not responded to
14  the location, when do you leave?
15     A   When I clear my assignment with the
16  dispatcher.
17     Q   Okay.  And what does that mean, you
18  clear your assignment with the dispatcher?
19     A   Meaning that I'm done with my assignment
20  and I'm ready to take a call.
21     Q   Okay.  And -- and how do you know that?
22  Is that based on a communication with the

**Page 47**

1  dispatcher?
2      A   No.  I'm just -- the -- the matter is
3  not being investigated, so I'm done with the call.
4      Q   Uh-huh.  How do you know that you're
5  done with the call?
6      A   Because I -- it depends on the call.  If
7  the -- if there isn't a crime that hasn't been
8  committed or it's unfounded or there's not enough
9  to investigate, I clear the assignment.
10     Q   Do you decide when to clear the
11  assignment, or is that a determination that's made
12  by someone else?
13     A   Usually through communication with the
14  sex squad detective --
15     Q   Uh-huh.
16     A   -- it's determined whether the case is
17  unfounded or founded.
18     Q   Uh-huh.  And -- and if the sex squad
19  detective is determines that the case is
20  unfounded, at that point you leave the scene?
21     A   Yes, sir.
22     Q   And if the detective determines that the

**Page 48**

1  sexual assault is founded, what -- what -- what
2  role, if any, do you have from that point on?
3      A   I take the report.
4      Q   Okay.  And when you say take the report,
5  what are you referring to?  What report are you
6  returning to?
7      A   251, a PD 251 and PD 252.
8      Q   Okay.  And if the -- and who do you take
9  that report from?
10     A   The complainant.
11     Q   Uh-huh.  If the detective determines
12  that the complaint is unfounded, does that mean
13  you don't take a report?
14     A   I don't take arrest report.  What the
15  detectives do, I don't -- that's up to them.
16     Q   Okay.  But -- but -- but your
17  understanding is that -- well, let me strike --
18  let me step back.
19         Your practice at that point is not to
20  take a report?
21     A   From an officer's point of view, I don't
22  take the report as an officer.  I can't testify as

**Page 49**

1  to what they do.
2      Q   Okay.  And is that something that you
3  have been trained to do?
4          And when I say "that," I mean when
5  the -- when the complaint is -- is determined to
6  be unfounded by the detective, that you're trained
7  to not take a report?
8      A   There's not a report that needs to be
9  taken, so I -- yes.
10     Q   And -- and -- and when you say there
11  isn't a report that needs to be taken --
12     A   I --
13         MR. JEFFERSON:  Let him finish.
14  BY MR. SPIVA:
15     Q   -- are you basing that on a policy of
16  MPD, or -- or something else?
17     A   Like I said before, I'm not sure of the
18  policies.  I just know how to respond to a scene
19  when I respond as an officer.
20     Q   Okay.  And -- and what -- how do you
21  know how to respond to a scene as an officer?
22  Where do you -- where do you get that

13  (Pages 46 to 49)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                April 14, 2008
                    Washington, DC

---

Page 50

1  understanding?
2      A   It's just the protocol that I take for
3  taking reports.
4      Q   Okay.  Where do you get that protocol?
5      A   From experience.
6      Q   Okay.  So just from your experience,
7  that's it?
8      A   Right.  If a crime is committed, I -- I
9  take down the information, and I take a report.
10     Q   And so -- so you determine whether or
11  not you need to actually take a report based on
12  your experience; is that correct?
13     A   Based on what the complaint -- the
14  interview, the circumstances --
15     Q   Uh-huh.
16     A   -- what exactly has happened.
17     Q   Uh-huh.
18     A   And then I base it on the report.  You
19  know, I write a report, excuse me.
20     Q   Are there any policies or procedures of
21  MPD, that you're aware of, that state when you are
22  and are not to take a report?

Page 51

1      A   I can't recall what exactly what
2  policies that I -- you know, I follow.  But I know
3  when to take a report when a crime has been
4  committed.
5      Q   Do -- do you know if such policies
6  exist?
7          Am I confusing you with the question?
8      A   Yes, you are.
9      Q   I'm sorry.
10         Do you know if such policies that tell
11  you when you need to take a report and when, if
12  ever, you don't need to take a report, whether --
13  whether such policies exist?
14     A   In my general orders.
15     Q   There -- there are policies within your
16  general orders?
17     A   (Nodding).
18     Q   Okay.  And what do you --
19         THE REPORTER:  I didn't hear the
20  response to the question.
21         THE WITNESS:  In my general orders.
22  BY MR. SPIVA:

Page 52

1      Q   And, actually, this is another thing.
2  You got to remember to say "yes" or "no," rather
3  than -- I -- I -- I heard you because you nodded,
4  but --
5      A   Right.
6      Q   -- but it's a good reminder to both of
7  us.
8          When you -- you said that there are the
9  policies that tell you when and when not to take a
10  report are in your general orders?  Is that what
11  you said?
12     A   Yes.
13     Q   Okay.  And what do those general orders
14  -- well, first of all, can you -- can -- do -- can
15  you tell me what -- which general orders you're
16  referring to?
17     A   No.
18     Q   And who puts out general orders?
19     A   I'm not sure.
20     Q   Are general orders something that you as
21  an officer are required to abide by?
22     A   Yes.

Page 53

1      Q   And are you trained in the content of
2  general orders that apply to you as an officer?
3      A   Yes.
4      Q   Okay.  Where did you receive that
5  training?
6      A   In the academy we received our general
7  orders.
8      Q   And do you ever get any kind of updated
9  training or, you know, ongoing, continuing
10  training about what -- what's required by general
11  orders that pertain to you as an officer?
12     A   Yes.
13     Q   Okay.  And how does that happen?
14     A   Forty-hour in-service training at the
15  academy.
16     Q   Uh-huh.  What is the 40-hour in-service
17  training at the academy?
18     A   It's a refresher course at the academy
19  for officers to take once a year.
20     Q   So every year you have to take 40 hours
21  in-service training at -- at the academy?
22     A   Yes.

14 (Pages 50 to 53)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063d80fe

Ginette Leveque                                          April 14, 2008

Washington, DC

---

Page 54

1    Q   And that's something that's required of
2  all officers in the MPD?
3    A   Yes.
4    Q   All right.  And how many times have you
5  had to do that since your initial training?
6    A   Since I've been -- since I've been an
7  officer.
8    Q   Uh-huh.  How many times have you had to
9  go back for the 40-hour training?
10    A   Three times.
11    Q   And how much of that training involves
12  education, updating about the general orders?
13    A   I can't recall.
14    Q   Is it a substantial part of the training
15  or -- or -- or a, you know, a minimal part of the
16  training?
17    A   I can't recall.
18    Q   Uh-huh.  And you said you recalled that
19  there is something in the general orders that says
20  when you are or are not supposed to take a report.
21       Can you recall -- I know you can't
22  recall what the report specifically is, but can

---

Page 55

1  you recall what the general orders say about when
2  you are or are not supposed to take a report?
3       MR. JEFFERSON:  Objection, to the extent
4  that counsel's summarization of the testimony
5  mischaracterizes it.
6       But you can --
7  BY MR. SPIVA:
8    Q   Okay.  If I mischaracterize your
9  testimony, just -- just correct me.  But I -- I
10  think I'm actually just -- I think that's what you
11  said, is that there was -- there was something in
12  the general orders that told you when or when
13  you -- when you needed to or didn't need to take a
14  report.
15       Is that -- is that a fair
16  characterization of what you said?
17    A   Repeat that.
18    Q   That there is something in the general
19  orders or in a general order that gives you
20  guidance on when you need to take a report and
21  when you don't need to take a report?
22    A   Yes.

---

Page 56

1    Q   Okay.  And can you tell me what that
2  guidance provides?
3    A   I can't recall.
4    Q   Okay.  Can you recall anything about it?
5    A   No.
6    Q   Okay.  And as it pertains to sexual
7  assault cases, do you have any recollection
8  sitting here today of what the general orders or
9  order say about when you should or should not take
10  a report?
11       MR. JEFFERSON:  Objection, to the extent
12  that the witness has already testified about her
13  training or absence of training in sexual assault.
14  BY MR. SPIVA:
15    Q   Can -- can -- can you answer that?
16    A   No.
17    Q   Okay.  I better -- we better clarify the
18  record, because I want to make sure I understand
19  what the "no" is to.
20       Sitting here today, do you have any
21  recollection of anything in any general order that
22  gives you any guidance about when in a

---

Page 57

1  assault case you should or should not take a
2  report?
3       MR. JEFFERSON:  Same objection.
4       THE WITNESS:  I can't -- I can't recall.
5  BY MR. SPIVA:
6    Q   Okay.  Have you studied or reviewed any
7  documents dealing with the proper treatment of
8  sexual assault victims?
9    A   No.
10    Q   Have you studied or reviewed any
11  documents dealing with the proper investigation of
12  sexual assault complaints?
13    A   No.
14    Q   Have you studied or reviewed any
15  documents involving the protocol for the
16  administration of sexual assault forensic
17  examinations?
18    A   No.
19    Q   Do you -- when I say sexual assault
20  forensic examination, do you -- do you know what
21  I'm referring to?
22    A   Yes.

---

15 (Pages 54 to 57)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008

Washington, DC

Page 58

1    Q   Okay.  Is that what you've been calling
2 a sex kit?
3    A   Yes.
4    Q   Okay.  And if I call it a rape kit,
5 would -- would that -- would you consider that to
6 be the same thing?
7    A   It's not the term that I use.
8    Q   Okay.  Where did you learn the term "sex
9 kit"?
10   A   From my experiences with these types of
11 calls.
12   Q   Okay.  And can you specifically tell me
13 where -- where you first heard that term "sex
14 kit"?
15   A   In the hospitals --
16   Q   Okay.
17   A   -- when I responded to the calls.
18   Q   Okay.  Did you hear that at Howard
19 University Hospital?
20   A   Yes.
21   Q   Who used the term "sex kit" at Howard
22 University Hospital?

Page 59

1        MR. JEFFERSON:  Objection, to the extent
2 that this question is overly vague.  I mean if
3 there's a particular time or instance you want to
4 point to, or all the times that she's heard it.  I
5 mean it's confusing.
6 BY MR. SPIVA:
7    Q   Can you recall any particular time when
8 you heard somebody at Howard University use the
9 term "sex kit"?
10   A   From the complainant.
11   Q   Okay.  Have you heard any doctor use the
12 term "sex kit"?
13   A   No.
14   Q   Okay.  Any nurse?
15   A   No.
16   Q   Okay.  And when you say the
17 complainants, you're talking other -- I mean
18 strike that.
19       When you say complainants, who are you
20 referring to?
21   A   From -- from the person that's
22 allegating a criminal assault.

Page 60

1    Q   Is that the term you've heard used by
2 victims of sexual assault?
3    A   Yes.
4    Q   Okay.  Have you ever reviewed -- strike
5 that.
6        What -- what's your understanding of the
7 term "date rape drug," if any?
8    A   It's -- from my understanding --
9    Q   Uh-huh.
10   A   -- something used to -- something used
11 to lower a -- a young lady's inhibitions so that
12 she can give in to, you know, sex.
13   Q   Uh-huh.  And can you -- can you name
14 any -- any date rape drugs?
15   A   Not off the top of my head, no.
16   Q   Have you ever had any training in -- in
17 identifying date rape drugs?
18   A   No.
19   Q   You ever read any literature on -- on
20 the affects of date rape drugs?
21   A   No.
22   Q   At the academy, did they have any kind

Page 61

1 of a -- a module or training on -- on the affect
2 of date rape drugs?
3    A   No.
4    Q   What are the typical affects of a date
5 rape drug, if you know?
6    A   I don't know.  I'm not --
7    Q   Okay.
8    A   -- I'm not sure.
9    Q   Do you know of any of the symptoms of --
10 that someone would display if they used any type
11 of -- or if they were given any type of a date
12 rape drug?
13       MR. JEFFERSON:  Objection.  Asked and
14 answered.  Symptoms, affects, it's the -- it's the
15 same thing.
16       But subject to that.
17 BY MR. SPIVA:
18   Q   Do -- do you know of any symptoms that
19 might be displayed by a person who had ingested a
20 date rape drug?
21   A   I've heard that someone can get
22 sluggish.

16 (Pages 58 to 61)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                          April 14, 2008

Washington, DC

Page 62

1    Q   Uh-huh.
2        MR. JEFFERSON:  Go ahead and finish your
3    answer.
4        THE WITNESS:  That's my answer.
5    BY MR. SPIVA:
6    Q   Uh-huh.  Okay.
7        Anything else?
8    A   No.
9    Q   Are you aware of whether there are any
10   tests to determine if a date rape drug is present
11   in someone's body?
12   A   No.
13   Q   And I take it from that answer that you
14   are prob -- that you're not aware of how long
15   after a date rape drug is ingested its presence
16   can be detected in the body by any type of test?
17   A   No.
18   Q   And I take it from your answer earlier,
19   but I just want to make -- this is a slightly
20   different question, but I apologize it does sound
21   very similar.
22        Have you -- have you been trained

Page 63

1    regarding the importance of testing for such drugs
2    as early as possible after their ingestion?
3    A   No.
4    Q   In your experience as an officer,
5    would -- would such a test be relevant to a
6    criminal investigation of rape?
7    A   Repeat that question.
8    Q   As an officer, would you consider it
9    important to have a test -- strike that.  Let
10   me -- let me -- let me start over.
11        As an officer, would you consider it
12   important to your criminal investigation of -- of
13   rape to know whether the alleged victim had
14   ingested a date rape drug?
15       MR. MONAHAN:  Objection, foundation.
16       MS. TURNER:  Same objection.
17   BY MR. SPIVA:
18   Q   Would you consider that important to
19   your investigation?
20       MR. MONAHAN:  Same objection.
21       MS. TURNER:  Same objection.
22   BY MR. SPIVA:

Page 64

1    Q   You can answer.
2    A   That's up to a detective.
3    Q   Uh-huh.  Okay.
4    A   I can't -- I can't further investigate
5    that.  That's up to a detective, sir.
6    Q   Okay.  Now, if -- if a -- if a -- if
7    a -- an alleged victim of sexual assault told you
8    that they believed they had been drugged, is that
9    information that you would pass on to the sexual
10   assault detective when you -- when you talked to
11   them?
12   A   Yes.
13   Q   And why would you pass that information
14   on?
15   A   It's a part of the investigation.  I
16   have to pass on all the information from the
17   complainant to the detective.
18   Q   And is that because you consider it
19   important in some way to the detective's invest --
20   investigation?
21   A   Yes.
22   Q   Okay.  Why do you consider it important?

Page 65

1    A   It's her version of events that I have
2    to tell the detective.
3    Q   Uh-huh.  Have you been told by any
4    detective that that's important information for
5    them know?
6        And when I say "that information,"
7    whether the -- the victim complains of having been
8    drugged?
9    A   No.  A detective's never told me to tell
10   them that.  I know to tell them that.
11   Q   And -- and -- and why do you -- how do
12   you know?
13       MR. JEFFERSON:  Objection.  Asked and
14   answered.
15       THE WITNESS:  Because I have to tell the
16   detective everything the complainant tells me.
17   BY MR. SPIVA:
18   Q   Uh-huh.  Do you consider it important
19   information?
20       MR. JEFFERSON:  Same objection.
21   BY MR. SPIVA:
22   Q   You can answer.

17 (Pages 62 to 65)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                         April 14, 2008

Washington, DC

Page 66

1    A   Yeah.
2        MS. TURNER:  I also object.
3    BY MR. SPIVA:
4    Q   Do -- do you consider it important
5    information?
6    A   Yes.
7    Q   Uh-huh.  Why?
8        MR. JEFFERSON:  Asked and answered.
9        THE WITNESS:  Because it's what the
10   complainant has told me.
11   BY MR. SPIVA:
12   Q   Uh-huh.  If the complainant told you
13   that, you know, she'd had eggs for breakfast,
14   would you pass that on to the detective?
15       MS. TURNER:  Objection.
16       THE WITNESS:  That does not pertain to
17   the investigation, so no.
18   BY MR. SPIVA:
19   Q   Okay.  But whether the complainant said
20   that she had been drugged, that does pertain to
21   the investigation?
22   A   Yes.

Page 67

1    Q   Okay.  What is the SART program?
2    A   Repeat.
3    Q   What is the SART program?
4    A   I don't know.
5    Q   Have you ever heard of the sexual
6    assault response team?
7    A   No.
8    Q   Okay.  And are you familiar with the --
9    the SANE program?
10   A   No.
11   Q   Okay.  Have you ever heard of a -- of a
12   sexual assault nurse examiner?
13   A   No.
14   Q   Do you have any familiarity with the
15   D.C. Rape Crisis Center?
16   A   No.
17   Q   How many sexual assault complaints have
18   you responded to in your police career?
19   A   I would say approximately maybe five.
20   Q   Uh-huh.  And how many of those five have
21   been determined, to use our terminology from
22   earlier, to be founded?

Page 68

1        MR. MONAHAN:  Objection.  Foundation.
2    BY MR. SPIVA:
3    Q   You can answer.
4    A   One.
5    Q   And when -- when was that?
6    A   I don't recall.
7    Q   Do you recall what year it was?
8    A   I believe last year.
9    Q   When you say last year, you mean 2007?
10   A   Yes, sir.
11   Q   Okay.  Do you remember what season of
12   the year it was?
13   A   I can't --
14       MR. JEFFERSON:  Objection.  Asked and
15   answered.
16   BY MR. SPIVA:
17   Q   And do you -- was that a -- a sexual
18   assault complaint that you received at Howard
19   University Hospital?
20   A   Yes, sir.
21   Q   And who were the detectives who were
22   involved in -- in investigating that sexual

Page 69

1    assault?
2    A   Detective Paci.
3    Q   "Casey," did you say?
4    A   Pasi.
5    Q   How do you spell that?
6    A   P-A-C-I.
7    Q   Uh-huh.  Anybody else?
8    A   I can't recall the other.
9    Q   And in that particular complaint where I
10   take it Detective Paci was the one who determined
11   that it was -- that it was founded?
12   A   I believe so, yes, sir.
13   Q   Okay.  What was the procedure which was
14   followed after Detective Paci determined that the
15   sexual assault was founded?
16   A   I don't know what she did.  I took the
17   report.
18   Q   Okay.  Do you know what happened at the
19   hospital after that point?
20   A   No, sir.
21   Q   Did Detective Paci come to the hospital
22   to talk to the victim?

18  (Pages 66 to 69)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                     April 14, 2008
                      Washington, DC

| Page 70 | Page 72 |
|---|---|

**Page 70**

1    A   Yes.
2    Q   And did you interview the victim also?
3    A   Yes.
4    Q   And were you there -- were you present
5  during Detective Paci's interview of the victim?
6    A   Yes.
7    Q   Can you describe the circumstances of
8  that sexual assault complaint?
9        MR. JEFFERSON:  At this point, I'm just
10  going to object to the extent that this line of
11  questioning fridges upon any privacy rights that
12  particular victim may have.  This is a delicate
13  area.  And I would counsel some measure of
14  trepidation in that regard.
15  BY MR. SPIVA:
16    Q   Yeah.  Well, we'll -- we'll certainly
17  get to that topic in a minute.  I haven't asked
18  for anybody's name.  But I would like to know the
19  circumstances of that -- that sexual assault
20  report.  So you can answer the question.
21    A   The complainant advised me that her
22  husband beat her, dragged her into the bathroom,

**Page 72**

1    Q   Okay.  And so there were three others.
2        When did those occur?
3    A   I can't recall, sir.
4    Q   Okay.  Did they occur before or after
5  December 9th -- before or after the -- the
6  complaint at issue here, December --
7    A   I don't know.
8    Q   Okay.  Could be before, could be after?
9    A   Sure.
10    Q   Okay.  And why were those complaints
11  found to be unfounded?
12    A   I can't recall, sir.
13    Q   Okay.  Do you recall the circumstances
14  of any of those complaints?
15        MR. JEFFERSON:  Here again I'm going to
16  state the objection on privacy grounds with
17  respect to these other incidents.
18        But subject to that.
19  BY MR. SPIVA:
20    Q   You can answer.
21    A   No, I don't -- I can't recall the
22  circumstances.

**Page 71**

1  placed his fingers in her anus, continued to have
2  sex without her consent, fondled her with an
3  hanger, and beat her with a belt.
4    Q   Uh-huh.  Okay.  And you related that to
5  the detective?
6    A   Yes.
7    Q   Okay.  And to your knowledge, did -- was
8  a -- was a -- a rape kit performed on the
9  complainant?
10        MS. TURNER:  Objection.
11        THE WITNESS:  I don't know.  I took the
12  report.
13  BY MR. SPIVA:
14    Q   Okay.  And you said in the other four
15  out of the five the complaint was the determined
16  to be unfounded; is that right?
17    A   Yes.
18    Q   Okay.  And in those four instances -- I
19  take it one of those four is the instance
20  involving my client, the Plaintiff; is that
21  correct?
22    A   Yes.

**Page 73**

1    Q   Okay.  Do you -- did you take a report
2  in any of those other cert -- any of those other
3  cases where the -- the complaint was -- was found
4  to be unfounded?
5    A   No.
6    Q   And who made the determination that
7  those other complaints -- I'm excluding now the --
8  the -- you know, my client's complaint.
9        Who made the determination that those
10  complaints were unfounded?
11    A   Sex squad detectives.
12    Q   Uh-huh.  And can you name those sex
13  squad detectives?
14    A   No, I can't.
15    Q   Okay.  Do you recall any of the sex
16  squad detectives who made any such determination?
17    A   No.
18    Q   Okay.  And you said you did not take a
19  report?
20    A   No.
21    Q   Okay.  Is there any paperwork whatsoever
22  in existence relating to those three instances?

19 (Pages 70 to 73)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008

Washington, DC

Page 74

1    A   No.
2    Q   And did the detective in those three
3 instances come to the hos -- any of those three
4 instances come to the hospital -- let me step
5 back.
6        Did the detective come to the location
7 to interview the victim?
8    A   I can't recall which times a detective
9 did or did not.  There are times when they don't,
10 and there are times when they do.
11   Q   Okay.  Let -- let's out of those three,
12 how many times did they actually come to the
13 location?
14       MR. JEFFERSON:  Objection.  Asked and
15 answered.  She already said that she can't recall.
16       MR. SPIVA:  No, she didn't.
17 BY MR. SPIVA:
18   Q   Out of those three, how many times did
19 they actually come to the location?
20   A   I can't recall, sir.
21   Q   Okay.  And can you recall any of the
22 instances -- in any of the instances where they

Page 75

1 did not come to the location why they did not come
2 to the location?
3    A   One instance was because it was the
4 second time that they had been notified, and they
5 were aware of the situation.  And it was like a
6 repeat call, so they didn't come.  And the other
7 circumstance, I can't recall; or the other
8 circumstances, the other times when they didn't
9 come, I can't recall.
10   Q   Uh-huh.  In those other circumstances --
11 and, again, I want to put to one side the
12 complaint of my client -- did you come to a
13 conclusion that the complaint was unfounded, in
14 any of those three circumstances?
15   A   I can't recall the circumstances, so
16 therefore I can't answer that question.
17   Q   Uh-huh.  But -- but now I'm not asking
18 you about the particular circumstances.
19       I'm asking you whether you actually came
20 to a conclusion about whether or not any of those
21 complaints were founded or unfounded?
22   A   No, I --

Page 76

1        MR. JEFFERSON:  Objection.  Asked and
2 answered.
3        MR. SPIVA:  Wait a second.  Wait --
4 she's --
5 BY MS. HARTNETT:
6    Q   Go -- go ahead.
7    A   No, I don't -- no, I don't come to the
8 conclusion.
9    Q   Okay.  Was there anything that you
10 related to the detective that you, in your view as
11 an officer, supported the conclusion that the
12 complaint was unfounded?
13   A   No.
14   Q   So did you think that those complaints
15 actually were founded?
16   A   I don't have --
17       MR. JEFFERSON:  Objection.  Asked and
18 answered.
19 BY MR. SPIVA:
20   Q   You can answer.
21   A   I don't have an opinion.  The
22 complainant tells me their version of the events.

Page 77

1 And I tell the detective.  I'm unbiased.
2    Q   Okay.  So just -- let me just make sure
3 I understand the procedure that you follow for
4 investigating sexual assault.
5        You don't apply any judgment whatsoever
6 to the facts you received from the victim?
7    A   I can't.  No.
8    Q   Okay.  You just take down what they say?
9    A   Yes, sir.
10   Q   Okay.  And then you relate it to the
11 detective?
12   A   Yes, sir.
13   Q   Okay.  And what is the purpose of having
14 you do that as opposed to having the victim talk
15 directly to the detective?
16   A   Because I'm going to be the reporting
17 officer.  I have to respond to the location which
18 is on my beat which is a part of routine patrol.
19 I respond.  I interview the complainant, and
20 notify the detective.
21   Q   Okay.  Are there any differences in the
22 procedure you fol -- the procedures you follow

20  (Pages 74 to 77)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                      April 14, 2008
Washington, DC

---

Page 86

1    Q   Uh-huh.  And does that mean that you
2  don't have a beat now?
3    A   I'm dis -- I'm district-wide --
4    Q   Okay.
5    A   -- in the Third District.
6    Q   Okay.  And what is a vice officer?
7    A   I work in the drugs and gun recovery
8  unit in the Third District.
9    Q   Okay.  Now, just going back to the --
10 the -- that day, was Howard University Hospital
11 within your beat?
12   A   Yes, sir.
13   Q   Okay.  Why were you assigned to handle
14 the call?
15   A   It was just dispatched to me by the
16 Third District dispatcher.
17   Q   And you went with Officer Green?
18   A   Yes.
19   Q   She -- she -- was she your regular
20 partner at that time?
21   A   Yes.
22   Q   Okay.  So you all rode together on the

---

Page 87

1  beat --
2    A   Yes.
3    Q   -- that you worked?  Okay.
4        Who did you talk to before going to the
5  hospital, if anyone?
6    A   I can't recall that, sir.
7    Q   Okay.  Were you aware, when you went,
8  that an officer had been there before you?
9    A   No, sir.
10   Q   And I take it from that that you didn't
11 have any conversation with any officer or
12 detective who had -- had -- had --
13   A   No.
14   Q   -- been involved in the situation before
15 you got there?
16   A   No, sir.
17   Q   Okay.  When you got to the hospital,
18 what did you do?
19   A   I marked on the scene, telling the
20 dispatcher that -- of my arrival --
21   Q   Okay.
22   A   -- and went to the family planning room

---

Page 88

1  to interview the complainant.
2    Q   Okay.  And let me back up.
3        When you got the call, what did -- what
4  were you told?
5    A   It was in reference to a criminal
6  assault.
7    Q   Uh-huh.  Anything more specific than
8  that?
9    A   No.
10   Q   Did you have any idea that it involved
11 an allegation of sexual assault?
12   A   Yes.
13   Q   Okay.  And who told you that?
14   A   Criminal assault is a -- a term used to
15 let me know that it's a sexual assault.
16   Q   Oh, because that's a -- that's a -- a --
17 that's defined -- is that defined by MPD policy?
18   A   I can't say who it's defined by, sir.
19   Q   But it's known within the department
20 or -- it's known within the department that when
21 you say criminal assault you mean -- it -- it
22 refers to sexual assault?

---

Page 89

1    A   Yes.
2    Q   Okay.  Were you told anything else
3  before you got there?
4    A   No.
5    Q   Okay.  You mentioned that when you got
6  there, you proceeded to the -- I think you said
7  the family room was -- or what -- what did you
8  say?
9    A   Yes.
10   Q   The family --
11   A   The family -- family room.
12   Q   Okay.  And what -- what -- where was the
13 family room within the -- the hospital?
14   A   It's -- it's in the back by the triage
15 room.
16   Q   Uh-huh.  And is that in a public area of
17 the hospital, or is that like a private room?
18   A   It's a private room.
19   Q   Is it in the emergency department?
20   A   Yes.
21   Q   Okay.  And were there -- who was there
22 when you got there to the family room?

---

23 (Pages 86 to 89)

acdb92dc-75db-46dd-b9a9-dde063d80fe

Ginette Leveque                                    April 14, 2008
                        Washington, DC

---

Page 90

1    A   The complainant.
2    Q   Uh-huh.  Was there anybody else there?
3    A   No.  Not when I arrived.
4    Q   Okay.  Were there other people in that
5  room or in that area that you were in?
6        I'm not asking for names, but were there
7  other people there?
8    A   No.
9    Q   So you were in a private area just with
10 the -- the complainant?
11   A   Yes.
12   Q   And who did you talk to first?
13   A   I spoke to the complainant.
14   Q   Okay.  What did you -- can you describe
15 that conversation?
16   A   I introduced myself.
17   Q   Uh-huh.
18   A   And then from there, my partner did the
19 interview.
20   Q   Uh-huh.  Okay.
21       Did you ask any questions?
22   A   No.

---

Page 91

1    Q   Okay.  And what did your -- what did
2  your partner say, Officer Green?
3    A   I can't recall exactly the question that
4  she asked --
5    Q   Uh-huh.
6    A   -- the complainant.
7    Q   Can you remember generally what she
8  asked?
9        MR. JEFFERSON:  Objection.  Calls for
10 speculation.
11       MR. SPIVA:  She was there.
12       THE WITNESS:  No.  I --
13 BY MR. SPIVA:
14   Q   You can't --
15   A   -- can't recall.
16   Q   -- remember?  Okay.
17       Can you remember anything about what she
18 asked the complainant?
19   A   No, I don't remember the -- the
20 interview questions that Officer Green had for
21 her.
22   Q   Okay.  Do you remember anything she

---

Page 92

1  said?
2        MR. JEFFERSON:  Objection.  Asked and
3  answered.
4  BY MR. SPIVA:
5    Q   You can respond.?
6        MR. MONAHAN:  "She," meaning doctor -- I
7  mean Officer Green?
8        MR. SPIVA:  Yes.  Thank you.
9  BY MR. SPIVA:
10   Q   Do you recall anything that Officer
11 Green said?
12   A   No.
13   Q   Okay.  And what did -- what did
14 Ms. McGaughey say to the two of you?
15   A   Ms. McGaughey stated that she had went
16 to a party, that she went upstairs to use the
17 bathroom, and she believed that a young man had
18 followed her up the steps and touched her breasts
19 and private parts.  And then from there, she said
20 she doesn't remember -- recall anything, that she
21 blacked out.
22       And then she stated, well, I was drunk.

---

Page 93

1  And then she said, well, someone must have put
2  something in my drink.  And then she stated that
3  she wanted a sex kit done to see if she had been
4  raped.  And Officer Green advised her that for a
5  sex kit to be done, we needed more -- more
6  facts --
7    Q   Uh-huh.
8    A   -- and more, you know, information --
9    Q   Uh-huh.
10   A   -- as to what exactly happened in the
11 bathroom or -- and she also asked her if she know
12 for sure if -- if she knew for sure that if
13 anything had happened.  And the complainant stated
14 that she didn't know if anything had happened.
15 And then -- well, Officer Green advised her, well,
16 we -- we kind of need more information.
17   Q   Uh-huh.
18   A   And she said, well, I'll -- can you guys
19 just say something in the report so that I can get
20 a sex kit.  And Officer Green advised her that we
21 couldn't lie on a police report.  And she said,
22 well, I'll lie.  I'll say that something happened

---

24  (Pages 90 to 93)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008
                        Washington, DC

---

Page 94

1  so I can get a sex kit.  And we -- Officer Green
2  advised her, you know, you -- you can't lie on a
3  police report.
4     Q   Uh-huh.
5     A   And then she asked us if -- she asked
6  myself and Officer Green if I had any children or
7  any sisters, and that if I did have any sisters
8  or -- or children, wouldn't I want them to know if
9  they had been raped.  And I believe Officer Green
10 from there notified the detective.  And that --
11 that's basically what she told us.
12    Q   Well, you have -- you have very good
13 recall of what Ms. McGaughey actually related
14 to -- to the two of you?
15        MR. GLEASON:  Objection.
16 BY MR. SPIVA:
17    Q   Is that correct?
18        MS. TURNER:  Same objection.
19 BY MR. SPIVA:
20    Q   Is that correct?
21        MS. ROBOKOS:  Objection.
22 BY MR. SPIVA:

---

Page 95

1     Q   Is that correct?
2     A   I remember what she said.
3     Q   Okay.  But you don't remember anything
4  about what either you or -- or Officer Green asked
5  her or said to her?
6         MR. JEFFERSON:  Objection.
7         MS. TURNER:  Objection.
8         MR. MONAHAN:  Objection.  She just
9  testified what she said to her.
10        MS. TURNER:  That's right.
11 BY MR. SPIVA:
12    Q   Okay.  You don't recall anything about
13 what Ms. Green asked her, what questions she asked
14 her, Officer Green?
15    A   No.
16    Q   Now, you said that she -- that
17 Ms. McGaughey said that she believed that someone
18 had touched her in a bathroom.
19        Why did she believe someone had touched
20 her?
21        MR. JEFFERSON:  Objection --
22        MS. TURNER:  Objection.

---

Page 96

1         MR. JEFFERSON:  -- calls for
2  speculation.
3         MS. ROBOKOS:  Objection.
4         MR. MONAHAN:  Objection.
5  BY MR. SPIVA:
6     Q   Did you ask her why she believed someone
7  had touched her?
8     A   I didn't ask her --
9     Q   Did --
10    A   -- any questions.
11    Q   -- did Officer Green ask why someone --
12 why she said that she believed someone had touched
13 her?
14    A   I can't recall if that question -- that
15 specific question was asked by Officer Green.  I
16 don't --
17    Q   Okay.  You don't know whether she asked
18 that or not?
19    A   No.  I don't.  Uh-uh.
20    Q   Okay.  And you said that Ms. McGaughey,
21 the complainant, said that she had blacked out.
22        Did you have an understanding of what

---

Page 97

1  she meant?
2     A   No, not at -- not when she said that
3  statement.
4     Q   Uh-huh.  Did you come to some
5  understanding of what she meant later?
6     A   She told me that she was drunk --
7     Q   Uh-huh.
8     A   -- she had been drinking.
9     Q   Uh-huh.
10    A   And then she changed her story and said,
11 well, someone must have put something in my drink.
12    Q   Okay.  And you say she changed her
13 story.
14        Why do you say she changed her story?
15    A   Because she said she was drunk.  And
16 then she would say, well, someone must have put
17 something in my drink.
18    Q   So -- so I take it from that answer that
19 you're leaving the possibility that she might have
20 been drunk and that somebody might have put
21 something in her drink?
22    A   Repeat that.

25 (Pages 94 to 97)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008

Washington, DC

| Page 98 | Page 100 |
|---|---|
| 1    Q    Yeah. | 1    Q    Okay.  And did either you or Officer |
| 2    A    I'm -- | 2    Green ask her why she thought she had pain in her |
| 3    Q    Are -- are you assuming that if she was | 3    anus? |
| 4    drunk, that it was not a possibility that someone | 4    A    I can't recall exactly if -- if that |
| 5    also might have put something in her drink? | 5    question was asked. |
| 6    A    Oh, I didn't assume anything, sir. | 6    Q    Okay.  Did you think or did you |
| 7    Q    Okay.  So why did you say she changed | 7    conclude -- strike that. |
| 8    her story then? | 8         Did you -- did you have a view on |
| 9    A    Because she told me she was drunk.  And | 9    whether that pain was related to her complaint |
| 10   then she told me, well, maybe somebody put | 10   about a -- a sexual assault? |
| 11   something in my drink. | 11   A    I didn't know if it came from what she's |
| 12   Q    Uh-huh.  And then what was your | 12   alleging, or from something else.  I didn't have |
| 13   understanding at that point of what she meant by | 13   enough information.  I didn't know -- |
| 14   the fact that she -- by state -- stating that she | 14   Q    Uh-huh. |
| 15   had blacked out? | 15   A    -- what had happened. |
| 16   A    That she has lost recollection of | 16   Q    Okay.  And -- and did -- did either you |
| 17   exactly what had happened that night. | 17   or Officer Green ask her whether she thought that |
| 18   Q    Uh-huh.  Okay. | 18   pain came from somebody sexually assaulting her? |
| 19         How would you describe her emotional | 19   A    I didn't ask her.  But I can't recall |
| 20   state? | 20   what Officer Green asked her. |
| 21   A    She was upset. | 21   Q    Okay.  So you can't recall whether |
| 22   Q    And when you say upset, what do you | 22   Officer Green asked her if she thought that the |

| Page 99 | Page 101 |
|---|---|
| 1    mean? | 1    pain in her anus or rectum was related to someone |
| 2    A    She was upset with myself and Officer | 2    sexually assaulting her? |
| 3    Green. | 3    A    Yes.  I can't -- I can't recall the |
| 4    Q    Uh-huh.  And how did she -- can you | 4    exact questions Officer Green asked in the -- |
| 5    describe more specifically what you mean by she | 5    while interviewing her. |
| 6    was upset with you -- yourself and Officer Green? | 6    Q    Okay.  And -- and you can't recall |
| 7    A    She kept asking me if I had children or | 7    whether she asked that question that I just asked |
| 8    sisters -- | 8    about? |
| 9    Q    Uh-huh. | 9    A    No. |
| 10   A    -- and that wouldn't I want them to get | 10   Q    Okay.  And what conclusion, if any, did |
| 11   checked out or -- | 11   you reach after talking to her? |
| 12   Q    Uh-huh. | 12   A    What conclusion did I reach? |
| 13   A    -- don't you -- questions in that line. | 13   Q    Ms. McGaughey. |
| 14   Q    Uh-huh. | 14   A    Repeat the question again. |
| 15   A    Just -- | 15   Q    What conclusion did you reach, if any, |
| 16   Q    Okay.  Now, you -- you mentioned that | 16   after talking to Ms. McGaughey? |
| 17   she said that her anus was hurting?  Did you say | 17   A    My conclusion was I didn't know exactly |
| 18   that? | 18   what had happened to her. |
| 19   A    Yes. | 19   Q    Uh-huh. |
| 20   Q    Okay.  And what -- what was your | 20   A    I didn't -- I didn't know what happened. |
| 21   understanding of what she meant by that? | 21   Q    Did -- did you conclude at that point |
| 22   A    That she had some pain in her anus. | 22   that she was lying in some respect? |

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063d80ffe

Ginette Leveque                                         April 14, 2008

Washington, DC

| Page 102 |
|---|

1    A   No.
2    Q   Okay.  Did you pro -- did you or Officer
3  Green provide her any information regarding a
4  victim or wit -- witness assistance services?
5    A   No.
6    Q   And did you provide Ms. McGaughey with
7  any information concerning obtaining counseling?
8    A   No.
9    Q   Did you or miss -- Officer Green provide
10  Ms. McGaughey with any information concerning
11  obtaining medical attention?
12    A   No.
13    Q   Did you or Officer Green provide
14  Ms. McGaughey with any information concerning the
15  crime victims compensation program?
16        MR. JEFFERSON:  I'm just going to enter
17  an objection to this line of questions, to the
18  extent that counsel is including Officer Green's
19  name in this --
20        MR. SPIVA:  Okay.  Whoa --
21        MR. JEFFERSON:  -- line --
22        MR. SPIVA:  -- whoa, whoa, whoa.

| Page 103 |
|---|

1        MR. JEFFERSON:  Let me finish the
2  objection.
3        MR. SPIVA:  You can state it as -- as
4  lack of foundation.  You can state your basis --
5        MR. JEFFERSON:  Well --
6        MR. SPIVA:  -- but I -- I don't want a
7  coaching session.
8        MR. JEFFERSON:  Well, this is not a
9  coaching --
10        MR. SPIVA:  I think it's --
11        MR. JEFFERSON:  -- I'm speaking directly
12  to your line of questions --
13        MR. SPIVA:  I think -- I think --
14        MR. JEFFERSON:  -- this grievance.
15        MR. SPIVA:  -- your objection is calls
16  for speculation.  And that's fine if you want to
17  make it.  But --
18        MR. JEFFERSON:  It's --
19        MR. SPIVA:  -- I don't want her coached
20  about --
21        MR. JEFFERSON:  -- not speculation.
22        MR. SPIVA:  -- about how to answer.

| Page 104 |
|---|

1        MR. JEFFERSON:  It's -- it's
2  basically -- the question that you're asking her,
3  she's already testified that she doesn't know what
4  Officer Green asked her about, or the information
5  that --
6        MR. SPIVA:  You're now testifying,
7  Counsel.  This is inappropriate.
8        MR. JEFFERSON:  I'll -- I'll --
9        MR. SPIVA:  She -- she has not answered
10  these questions.  And I'm -- I'm going to continue
11  to ask them of her.  She was there.  If she
12  doesn't remember, she can say so.
13        MR. JEFFERSON:  She's going to answer
14  the question.
15        MR. SPIVA:  But I want her to tell me
16  what she remembers about what she and Officer
17  Green said when she was there.
18        MR. JEFFERSON:  The objection is
19  foundation.  The objection is that the question's
20  vague.  The quest -- the objection also is that it
21  mischaracterizes the witness's testimony.
22        But subject to that.

| Page 105 |
|---|

1        MR. SPIVA:  Objection's noted.  Okay.
2  BY MR. SPIVA:
3    Q   Did you or Officer Green provide
4  Ms. McGaughey with any information concerning the
5  crime victims compensation program?
6        MR. JEFFERSON:  Same objection,
7  continuing.
8  BY MR. SPIVA:
9    Q   You can answer.
10    A   No.
11    Q   Okay.  Did you or Officer Green advise
12  Ms. McGaughey what to do if the suspect or anyone
13  known to the suspect threatened or otherwise
14  intimidated her?
15        MS. TURNER:  Objection.
16        MR. MONAHAN:  Objection.  Foundation.
17        THE WITNESS:  Repeat that question.
18  BY MR. SPIVA:
19    Q   Did you or Officer Green advise
20  Ms. McGaughey what to do if a -- the suspect or
21  anyone known to the suspect threatened or
22  otherwise intimidated her?

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                                    April 14, 2008
                          Washington, DC

| | Page 106 |
|---|---|

1      MR. MONAHAN:  Same objection.
2      MS. TURNER:  Same objection.
3      THE WITNESS:  No.  Because she doesn't
4  know who the suspect is.
5  BY MR. SPIVA:
6      Q    Okay.  Did you talk to anyone else while
7  you were at the hospital?
8      A    No.
9      Q    Did Officer Green talk to anyone else
10  while you were at the hospital?
11      MR. JEFFERSON:  Objection.  Calls for
12  speculation.
13      THE WITNESS:  Yes.
14  BY MR. SPIVA:
15      Q    Who -- who did -- who else did -- let me
16  first ask you were you and Officer Green together
17  the whole time at the hospital?
18      A    Yes, sir.
19      Q    Okay.  And who else did Officer Green
20  speak to at the hospital?
21      A    While at the hospital, is your question?
22      Q    Yes.

| | Page 107 |
|---|---|

1      A    She spoke to the complainant's sister.
2      Q    Okay.  And what did she say to the
3  complainant's sister?
4      A    I don't recall that conversation.
5      Q    Okay.  Do you recall what the
6  complainant's sister said --
7      A    No.
8      Q    -- to her?  Okay.
9          Did the complainant's sister speak to
10  you?
11      A    No.
12      Q    And did you speak to the complainant's
13  sister?
14      A    No.
15      Q    Do you know what the complainant's
16  sister's name is?
17      A    No.
18      MR. MONAHAN:  Is this a good time to
19  take a break?
20      MR. SPIVA:  Sure.  We can take a break
21  now if you want.
22      VIDEOGRAPHER:  The time is 2:14 p.m.

| | Page 108 |
|---|---|

1  This concludes tape number one.
2      (Recess)
3      VIDEOGRAPHER:  The time the 2:25 p.m.
4  This is tape number two.
5  BY MR. SPIVA:
6      Q    Officer Leveque, before the break, we
7  were talking about your response to the call at
8  Howard University.
9          Was this the first sexual assault you
10  had ever responded to, complaint of sexual
11  assault?
12      A    No.
13      Q    Do you know how many you had had prior
14  to that?
15      A    No.
16      Q    Okay.  But you do recall with certainty
17  that you had before December of 2006 previously
18  responded to a -- a sexual assault complaint?
19      A    Beyond what date?
20      Q    Before December of 2006, before this --
21  before the --
22      A    Okay.

| | Page 109 |
|---|---|

1      Q    -- response in this case, which I --
2  just so for ease, you know, it happened in
3  December of 2006 -- you -- you do recall with --
4  with some certainty that you had prior to that
5  response responded to other sexual assault
6  complaints?
7      A    Yes.
8      Q    Okay.  Do you recall how many you had
9  responded to?
10      A    No.
11      Q    Okay.  And I think you testified that
12  Officer Green was the officer on -- on -- on this
13  complaint, the -- the complaint in this case who
14  wrote the report; is that accurate?
15      A    Yes.
16      Q    Okay.  Have you ever authored a report
17  relating to a complaint of sexual assault?
18      A    Yes.
19      Q    And when did you do that?
20      A    I can't recall exactly when I wrote a
21  report, but I know for sure I've taken a report.
22      Q    Okay.  Was it the one time that you

28  (Pages 106 to 109)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008
Washington, DC

| Page 110 |
|---|

1  recall having responded to a complaint of sexual
2  assault where the complaint was -- was found to be
3  founded?
4      A   Yes.
5      Q   Have you written any other reports other
6  than in that instance?
7          Involving allegations of sexual assault,
8  I should add.
9      A   I can't --
10     Q   Were you the -- I'm sorry.  Go ahead.
11     A   I can't -- I can't recall.
12     Q   Okay.
13     A   I'm not sure.
14     Q   Have you ever been the one who actually
15  did -- let me step back.
16         I think you testified that in this -- in
17  response to the complainant in this case's
18  complaint, that Officer Green did the interviewing
19  of -- of my client, the complainant?
20     A   Yes.
21     Q   Okay.  And have you ever done an
22  interview of a -- a sexual assault victim or

| Page 111 |
|---|

1  someone who was complaining that they were a
2  sexual assault victim?
3      A   Yes.
4      Q   Okay.  And when did you do that?
5      A   On the other times I've been called to
6  respond for a criminal assault.
7      Q   Okay.  And I think you testified earlier
8  that there had been five times total that you had
9  responded?
10     A   Approximately.
11     Q   Okay.  And so on every other time other
12  than this one you've been the one to -- to do the
13  interviewing?
14     A   Yes.
15     Q   Okay.  And why -- why was that that
16  Officer Green did the interview in this instance?
17     A   That's her personality.
18     Q   Okay.  On the other -- in the other
19  instances, were you not with Officer Green?
20     A   Exactly.
21     Q   Okay.  Were you -- were you with the
22  same officer in all -- each of those other

| Page 112 |
|---|

1  instances?
2      A   No.  The other instances I was by
3  myself.
4      Q   Okay.  Now, before the break, we had
5  started talking about who else you or Officer
6  Green had spoken to at the hospital.
7          And I believe you testified that Officer
8  Green had spoken with the complainant's sister --
9      A   Yes.
10     Q   -- is that right?
11         What did -- what did Officer Green say
12  to the complainant's sister?
13     A   I --
14         MR. JEFFERSON:  Objection.  Calls for
15  speculation.
16  BY MR. SPIVA:
17     Q   You can answer.
18     A   I can't recall that conversation.
19     Q   Okay.  Do you recall anything about it?
20     A   No.
21     Q   Okay.  And do you recall anything about
22  what the complainant's sister said to you or

| Page 113 |
|---|

1  Officer Green?
2      A   No.
3      Q   Okay.  And do you recall anything about
4  the complainant's sister's demeanor?
5      A   No.
6      Q   Do you recall anything about her
7  emotional state?
8      A   No.
9      Q   Did the -- the complainant's sister ask
10  for your and Officer Green's names at some point?
11     A   Yes.
12     Q   You recall her asking for your names?
13     A   Yes.
14     Q   Okay.  And what did you say to her?
15     A   I didn't answer.  I -- Officer Green
16  gave her my name --
17     Q   Uh-huh.
18     A   -- and her name.
19     Q   Okay.  Did Officer Green say to get the
20  names of your badges?
21     A   Oh, I can't recall.
22     Q   Okay.  She may -- she may have said get

29 (Pages 110 to 113)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                          April 14, 2008

Washington, DC

| Page 114 | Page 116 |
|---|---|

**Page 114**

1  it off our badges, but you don't recall?
2        MR. JEFFERSON: Objection. Asked and
3  answered.
4  BY MR. SPIVA:
5     Q  You can answer.
6     A  I don't know what she said.
7     Q  Okay. And if -- if the complainant's
8  sister testified that -- that -- that Officer
9  Green had said that to get it from our badges,
10  would you have any reason to dispute that?
11        MR. JEFFERSON: Objection. Calls for
12  speculation.
13        Subject to that, if you know you can
14  answer.
15        THE WITNESS: I don't know.
16  BY MR. SPIVA:
17     Q  Okay. And you don't have any particular
18  reason to dispute -- to dispute that, if she -- if
19  she says that -- that Officer Green said get it
20  from our badges?
21        MR. JEFFERSON: Asked and answered.
22        THE WITNESS: I don't know if she said

**Page 115**

1  that, sir.
2  BY MR. SPIVA:
3     Q  Okay. You don't know if who said what?
4  I'm sorry.
5        MR. JEFFERSON: Objection.
6  BY MR. SPIVA:
7     Q  You don't know if -- if --
8        MR. JEFFERSON: Objection.
9  BY MR. SPIVA:
10     Q  -- tell me --
11        MR. JEFFERSON: Can you read his
12  question back?
13        MR. SPIVA: No, no. I'm going to -- I'm
14  going to -- I'm going to ask another question.
15  BY MR. SPIVA:
16     Q  You don't recall whether Officer Green
17  said get it from our badges?
18     A  I don't know what she said to the
19  complainant's sister.
20     Q  Okay. But you do recall the
21  complainant's sister asked for the names?
22     A  Yes.

**Page 116**

1     Q  Okay. And I take it from your earlier
2  answers you were present when they were talking,
3  correct?
4     A  Yes.
5     Q  Now, let me make sure I get the "they"
6  right.
7        When I say "they," I'm referring to
8  Officer Green and the complainant's sister?
9     A  Yes.
10     Q  Okay. Did you or Officer Green
11  interview anyone else at the hospital other than
12  the complainant?
13     A  I didn't interview anybody else.
14     Q  Did Officer Green?
15     A  I'm not sure.
16     Q  Okay. But you were with Officer Green
17  the whole time, correct?
18     A  Yes.
19     Q  Okay. Did you observe her interviewing
20  anybody else other than -- at the hospital, did
21  you observe Officer Green interviewing anyone else
22  at the hospital other than the complainant?

**Page 117**

1     A  I can't recall that.
2     Q  Okay. And other than the complainant or
3  her sister, can you recall Officer Green speaking
4  with anyone else at the hospital?
5     A  I can't remember. I don't know.
6     Q  Okay. And did you speak to anyone else
7  at the hospital other than the complainant?
8     A  No.
9     Q  Okay. So I take it you don't recall
10  whether or not you or Officer Green spoke to any
11  of the hospital personnel?
12     A  No, I don't -- I don't recall. So I
13  don't want to --
14     Q  Okay. Did you or Officer Green
15  interview any of the friends of the complainant at
16  the hospital?
17        MR. JEFFERSON: Objection. Lack of
18  foundation.
19  BY MR. SPIVA:
20     Q  You can answer.
21     A  No.
22     Q  Okay. And after -- I just want to -- I

30 (Pages 114 to 117)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                      April 14, 2008

Washington, DC

| Page 118 |
|---|

1  think I know the answer to this, but I just want
2  to clarify it for the record.
3        After you left the hospital that day,
4  did you have any role whatsoever in investigating
5  or following up on the complainant's complaint of
6  sexual assault?
7     A   I'm not a detective, sir; so no, I did
8  not.
9     Q   Did not.  Okay.
10       And to your knowledge, did Officer Green
11  have any role in following up or investigating in
12  any way complainant's complaint of sexual assault?
13    A   She's not a detective, either.  And
14  officers don't follow up.
15    Q   Okay.  And so I take it from that you
16  didn't talk -- you didn't visit the scene or -- or
17  talk to any other potential witnesses?
18    A   We're not detectives.  That's -- we
19  don't do that.
20    Q   And I gather from your answers that
21  that's something that would be the detective's
22  role to do?

| Page 119 |
|---|

1     A   Yes, sir.
2     Q   Okay.  What is your understanding of a
3  sexual assault medical forensic examination or a
4  rape kit?
5     A   I don't -- I don't deal with the -- the
6  sex kit.
7     Q   Okay.  Do you have any idea what one
8  entails?
9     A   No.
10       MR. JEFFERSON:  Objection, to the extent
11  that it calls for speculation, and asked and
12  answered.
13  BY MR. SPIVA:
14    Q   Do you have any idea what the purpose of
15  a -- rape kit is?
16    A   No.  That's for the detectives.
17    Q   Okay.  And I take it from that that you
18  wouldn't have any idea whether the length of time
19  between a sexual assault and the time a rape kit
20  is administered makes any difference in terms of
21  the kit's effectiveness in collecting evidence?
22       MS. TURNER:  Objection.

| Page 120 |
|---|

1  BY MR. SPIVA:
2     Q   You can answer.
3     A   I wouldn't know anything about that,
4  sir.
5     Q   Okay.  Do you know anything about
6  whether any precautions must be taken to make sure
7  that evidence on a victim's body is not
8  inadvertently destroyed?
9     A   That -- no, sir.
10    Q   Okay.  Is it part of your duty as a
11  responding officer to ensure that evidence of a
12  crime is not destroyed?
13    A   Yes, when there's a crime scene
14  established.
15    Q   Would you consider the victim of a
16  sexual assault's body to be a crime scene?
17    A   That decision is made by the sex squad
18  after I tell them what the complainant has told
19  me.
20    Q   Have you ever received any training in
21  what -- what to advise victims of sexual assault
22  in terms of preserving evidence on their body

| Page 121 |
|---|

1  until the determination by the detective is made?
2     A   No.
3     Q   What, to your knowledge, is the police
4  role in the administration of rape kits?
5     A   I don't have any knowledge of that, sir.
6     Q   Okay.  Is it your understanding that in
7  the District of Columbia police authorization is
8  required before a hospital can administer a rape
9  kit?
10    A   I don't know what the hospital can or
11  cannot do.  I know what -- as an officer, what I'm
12  supposed to do.
13    Q   And do you -- as an officer, is -- is
14  your authorization required before the hospital
15  can administer a rape kit?
16       MR. JEFFERSON:  Objection.  Asked and
17  answered.
18       MS. TURNER:  Objection.
19       MR. SPIVA:  No, it hasn't been.
20  BY MR. SPIVA:
21    Q   You can answer.
22    A   I don't --

31 (Pages 118 to 121)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                          April 14, 2008
                        Washington, DC

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  the full name and address and phone number of --
2  of the wife on -- on a public document?
3     A   Because it's a public document, meaning
4  anyone might be able to gain access to that
5  report.  And we went to respect their privacy.
6     Q   Okay.  And is that a particular rule in
7  sexual -- in -- in cases of allegations of sexual
8  assault, that you don't put the -- the -- the full
9  name, address, and other personally identifying
10 information of the alleged victim in a PD 251?
11    A   If their report is classified as a
12 sexual abuse crime, yes.
13    Q   Okay.  And so I take it that if this
14 report had been classified as a sexual abuse
15 report, then it would not have been proper
16 procedure to do -- to put down Ms. McGaughey's
17 full name, address, or it's date, telephone
18 number; is that correct?
19    A   Repeat the question one more time.
20    Q   If this had been classified as a sexual
21 abuse report, it would not have been proper under
22 D.C. -- MPD policy to put down Ms. McGaughey's

**Page 155**

1  full name, address, birth date, phone number,
2  would it have been?
3     A   No, it wouldn't have been proper if it
4  was deemed sexual abuse.
5     Q   Who decides what gets put in box number
6  13?
7     A   The reporting officer.
8     Q   Okay.  So in this instance, Officer
9  Green would have decided what got put in box
10 number 13; is that right?
11    A   I didn't write the report, sir.
12    Q   It's my question.  I -- I -- I didn't
13 ask you what.  I said I -- okay.  Sorry.  Let me
14 step back.
15       In -- in this in this particular report,
16 would it have been Officer Green who would have
17 made the determination of what to put in box
18 number 13?
19    A   Yes.
20    Q   And just as in the case that you
21 described a minute ago, the wife who was sexually
22 abused by her husband, you made the determination,

**Page 156**

1  as the reporting officer, to put sexual abuse in
2  box number 13; isn't that correct?
3     A   Negative.
4     Q   Why is that negative?
5     A   The sexual assault detective advises
6  what classification to put on the report.  I take
7  the report.
8     Q   Okay.
9     A   They advice me the classification of the
10 report.
11    Q   Okay.  So you -- so the detective told
12 you what to put in box number 13 in the -- in that
13 instance?
14    A   In my -- yes.
15    Q   Okay.  And is that standard policy, that
16 the detective tells you what to put in box number
17 13?
18    A   If deemed a sexual crime of some sort,
19 yes.
20    Q   Uh-huh.  And if not deemed a sexual
21 crime of some sort, how is it determined what to
22 put in box number 13 for a -- excuse me -- who

**Page 157**

1  determines what to put in box number 13?
2     A   The reporting officer.
3     Q   Okay.  So and -- and in the instances
4  where -- in the -- in the cases of the -- of
5  alleged sexual abuse, other than the one of the
6  wife and the -- the husband that you've described,
7  what did you put in box number 13?
8     A   That is advised to me by a sexual squad
9  detective.  It de -- it determines on the crime.
10    Q   Uh-huh.  Okay.  But you've already said
11 that -- that that was the only one where the
12 allegation of sexual abuse was deemed to be
13 founded.
14       So I take it all the others were deemed
15 to be unfounded; is --
16    A   That's correct.
17    Q   -- that right?  Okay.
18       And in those instances, who decided what
19 to put in box number 13?
20    A   I didn't take a report when they were
21 unfounded.
22    Q   So you didn't take any report

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                        April 14, 2008
Washington, DC

| Page 158 | Page 160 |
|---|---|
| 1  whatsoever? | 1        MR. JEFFERSON: Objection. Foundation. |
| 2    A    None. | 2  And I think you meant to put in there when it's |
| 3    Q    Okay.  No PD 251? | 3  unfounded.  I don't think that's in your question. |
| 4    A    None. | 4  BY MR. SPIVA: |
| 5    Q    Okay.  No PD 252? | 5    Q    Well, let's -- let's leave it -- let's |
| 6    A    None. | 6  leave it broader than that.  Because I -- you have |
| 7    Q    And do you know whether that is | 7  some confusion with the question.  And I think it |
| 8  consistent with -- with police policy? | 8  might be easier if we break it -- if we -- if we |
| 9        MR. JEFFERSON: Objection. | 9  start it broader.  And we can then go narrower if |
| 10  BY MR. SPIVA: | 10  need be.  Let me repeat the question. |
| 11    Q    Of MPD policy? | 11        The question is do you know, in a case |
| 12        MR. JEFFERSON: Foundation. | 12  of alleged sexual abuse, whether it is consistent |
| 13        MR. SPIVA: I'm asking her if she know | 13  with MPD policy not -- for the reporting not to |
| 14  whether that's consistent with MPD policy. | 14  take a report? |
| 15        MR. JEFFERSON: What's the "that" to | 15    A    I know that as a reporting officer I do |
| 16  which you refer? | 16  not take report if there's a report that doesn't |
| 17        MR. SPIVA: The "that" is not to take a | 17  need to be made.  Unfounded, it's clear.  I don't |
| 18  report at all when the allegation of sexual | 18  take a report. |
| 19  assault is found to be unfounded. | 19    Q    Okay.  Okay.  Now limiting it to an |
| 20        THE WITNESS: As the reporting officer, | 20  instance where it -- the allegation has been |
| 21  yes. | 21  deemed to be unfounded, do you know whether it is |
| 22  BY MR. SPIVA: | 22  consistent with MPD policy not to take a report in |

| Page 159 | Page 161 |
|---|---|
| 1    Q    And when you say as the reporting | 1  a case of alleged sexual abuse? |
| 2  officer, are you making a distinction as between | 2    A    Yes. |
| 3  the reporting officer and some other police | 3    Q    You believe that is consistent with MPD |
| 4  personnel? | 4  policy? |
| 5    A    Yes. | 5        MR. JEFFERSON:  Asked and answered. |
| 6    Q    Okay.  Who -- who -- | 6        THE WITNESS:  Yes. |
| 7    A    I don't take the report. I'm done with | 7  BY MR. SPIVA: |
| 8  the assignment.  What the sex squad's detectives | 8    Q    And in such a case, such a case being a |
| 9  do, I don't know. | 9  case where the allegation is deemed by the |
| 10    Q    Okay.  But as the reporting officer, you | 10  detective to be unfounded, is it consistent with |
| 11  take no report if the allegation of sexual assault | 11  MPD policy, to your knowledge, to set forth |
| 12  is -- is found to be unfounded? | 12  personally identifying details of the victim in a |
| 13    A    Yes. | 13  PD 251? |
| 14    Q    And do you know whether that, and "that" | 14    A    Repeat the question.  Because it doesn't |
| 15  meaning as a -- the reporting officer doing no | 15  make sense to me.  Can you repeat it? |
| 16  report, in a -- in a case involving alleged sexual | 16    Q    Actually, let me ask you a different |
| 17  abuse is consistent with MPD policy? | 17  question. |
| 18    A    You're confusing me.  Repeat the | 18        Do you consider this to be a report? |
| 19  question. | 19    A    Yes. |
| 20    Q    The question is do you know whether not | 20    Q    Okay.  But this was a case where the |
| 21  doing a report at all in a case of alleged sexual | 21  allegation was deemed by the detective to be |
| 22  abuse is consistent with MPD policy? | 22  unfounded, correct? |

41 (Pages 158 to 161)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                            April 14, 2008

Washington, DC

Page 202

1  friends, about her friends, 3:00 a.m.  I don't
2  know anything about that.
3      Q   Okay.  And so even though the report
4  that you signed characterizes what happened on --
5  at that day and visit, you actually, in fact, have
6  no knowledge whatsoever about what happened on
7  that 3:00 a.m. visit?
8          MS. TURNER:  Objection.
9          MR. JEFFERSON:  Objection.
10         MR. MONAHAN:  Objection to the
11 foundation.
12         MS. ROBOKOS:  Same objection.
13         THE WITNESS:  Sir, I don't know.  That's
14 all I'm going to say.  I don't know.
15 BY MR. SPIVA:
16     Q   Okay.  In the report that you signed, it
17 says that C1 reported to both officers on the
18 scene.
19         I assume that's you and Officer Green?
20     A   Yes.
21     Q   Okay.  That she attended a house party
22 at the listed location, and doesn't know if

Page 203

1  anything happened to her.  C1 reports she blacked
2  out.
3          What is your recollection, if any, about
4  why she thought something might have happened to
5  her?
6      A   Let's see.  She stated she blacked out.
7  She said I think someone have put something
8  in my drink.  And then she said I was drunk.
9      Q   Uh-huh.  Did she say anything else about
10 why she thought something -- some type of sexual
11 assault or sexual abuse might have happened to her
12 at that party?
13     A   She said she didn't know what had
14 happened.
15     Q   Okay.  Did she say that she thought
16 something had happened?
17     A   No.  Actually, she said I don't know
18 what happened.
19     Q   Okay.  Did she tell you why she bothered
20 to come to the hospital?
21     A   She wanted a sex kit --
22     Q   Okay.

Page 204

1      A   -- to see if she had been assaulted.
2  She didn't know whether she had or not.
3      Q   Okay.  But she had no reason -- she
4  didn't give you any reason whatsoever why she
5  thought she might have been assaulted?
6      A   She didn't know what happened.  She said
7  she blacked out.
8      Q   Okay.  Did she tell you why she had
9  bothered to call the police?
10     A   She came to the hospital.
11     Q   Uh-huh.
12         MS. TURNER:  Objection.
13         MR. MONAHAN:  Objection to foundation.
14         MS. ROBOKOS:  Same objection.
15 BY MR. SPIVA:
16     Q   Go ahead.
17     A   She came to the hospital.
18     Q   Uh-huh.
19     A   For a sex kit.
20     Q   Uh-huh.
21     A   I don't know who called the police.  I
22 responded to my radio run.

Page 205

1      Q   Uh-huh.  Uh-uh.  Okay.
2          Did the fact -- did the fact that she
3  had blacked out at the party seem suspicious to
4  you?
5          MR. JEFFERSON:  Objection.
6          THE WITNESS:  No.
7  BY MR. SPIVA:
8      Q   Did you have a basis to think that she
9  was lying about that?
10     A   No.
11     Q   Have you ever, other than this instance,
12 had a -- an alleged rape victim report to you
13 having blacked out?
14     A   Repeat that question again.
15     Q   Have you ever had, other than in this
16 matter, a potential or a -- an alleged rape victim
17 report to you having blacked out?
18     A   Yes.
19     Q   Okay.  When did that happen?
20     A   When?  I can't recall when that was.
21     Q   And was that in the matter involving
22 the -- the husband and wife that you described

                              52 (Pages 202 to 205)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                          April 14, 2008
Washington, DC

| Page 206 | Page 208 |
|---|---|

**Page 206**

1  earlier?
2     A   No.
3     Q   Okay.  Was -- it was one of the five
4  instances that you've reported on in terms of
5  sexual assault?
6     A   Yes.
7     Q   Okay.  And can you describe that
8  incident?
9        MR. JEFFERSON:  And just -- before she
10  goes into that, I'm going to renew my statement
11  about the privacy of the people involved.  Subject
12  to that, she can answer the question.
13       MR. MONAHAN:  I object to relevancy.
14       MS. ROBOKOS:  Same objection.
15  BY MR. SPIVA:
16     Q   You can -- you can answer.
17       MS. TURNER:  Join.
18       THE WITNESS:  I had a young lady tell me
19  that she got drunk at a business party, and she
20  passed out and thought she might have had sex with
21  a co-worker and didn't know if it was consentual
22  or not.

**Page 208**

1     Q   And was that one of the instances that
2  was found to be unfounded?
3     A   Yes.
4     Q   Okay.  Do you know why that was
5  determined to be unfounded?
6     A   No.
7     Q   Do you know the detective -- first of
8  all let me ask you, was it a detective who made
9  the determination that it was unfounded?
10     A   Yes.
11     Q   And do you know which detective it was
12  that made that determination?
13     A   I can't recall.  A dif -- a different
14  detective comes out every time --
15     Q   Uh-huh.
16     A   -- so I can't recall.
17     Q   And did that detective actually come out
18  to the scene and interview the -- the victim?
19     A   Yes.
20     Q   Okay.  And you were present there when
21  he interviewed her, he or she?
22     A   Yes.

| Page 207 | Page 209 |
|---|---|

**Page 207**

1  BY MR. SPIVA:
2     Q   Where did they report that to you?
3     A   I can't recall.
4     Q   Do you recall whether it was at a
5  hospital or somewhere else?
6     A   Oh, at a hospital.
7     Q   Okay.  Which hospital?
8     A   Howard.
9     Q   Uh-huh.  And did she -- she said that
10  she -- that -- that complainant said that she had
11  believed she had had some type of sexual contact
12  with someone while she was blacked out?
13     A   She said she just got drunk and didn't
14  know if she had had sexual contact.
15     Q   Was there something that made her think
16  that she might have had sexual contact?
17       MS. ROBOKOS:  Note my objection.
18       MS. TURNER:  Continuing objection.
19  BY MR. SPIVA:
20     Q   You can answer.
21     A   I can't recall the exact like
22  circumstances.

**Page 209**

1     Q   Okay.  Did he tell you why he was making
2  the determination that it was unfounded?
3     A   I can't recall, sir.
4     Q   Can't recall whether he told you?
5     A   Yeah.
6     Q   Is there anything that would refresh
7  your recollection?
8     A   No.
9     Q   Is there any document that exists that
10  would refresh your recollection?
11     A   No.
12     Q   Was a report taken in that instance?
13     A   No.
14     Q   Do you know whether Howard administered
15  a rape kit in that instance?
16       MS. TURNER:  Objection.
17       THE WITNESS:  No.
18  BY MR. SPIVA:
19     Q   I'm sorry.  When you say no, you mean no
20  you don't recall whether or not they administered
21  one, or no you don't know whether they
22  administered one?

53 (Pages 206 to 209)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                              April 14, 2008
Washington, DC

| Page 210 | Page 212 |
|---|---|

**Page 210**

1      MR. MONAHAN:  Or no none exists.
2      MR. JEFFERSON:  Can you repeat his
3  question and her answer?
4          (Whereupon the reporter read
5          the record as requested.)
6      MR. JEFFERSON:  Okay.  In that context,
7  you can answer his current question.
8      And if you would read, too, the one
9  that's pending from the gentleman.
10         (Whereupon the reporter read
11         the record as requested.)
12 BY MR. SPIVA:
13   Q   And I -- actually, I want to adopt
14  the -- the part of the objection, or no none was
15  administered?
16   A   No, none was administered.
17   Q   And so you know, sitting here today,
18  that none was administered in that instance?
19   A   Yes.
20   Q   Okay.  Do you know why one wasn't
21  administered?
22   A   No.

**Page 211**

1   Q   Did you talk to any of the hospital
2  personnel in that instance?
3   A   No.
4   Q   Was that something that happened this
5  year?
6   A   I can't recall.
7   Q   It may have happened this year but you
8  just can't recall?
9   A   I can't recall, sir.
10   Q   Okay.  Was it something that happened
11  before or after the -- the complaint in this case?
12   A   I can't -- I can't -- I can't recall the
13  date, sir.
14   Q   So -- so you don't know whether it was
15  before or after December of 2006?
16     MR. JEFFERSON:  Objection --
17     MS. TURNER:  Objection.
18     MR. JEFFERSON:  -- asked and answered.
19     THE WITNESS:  No, I -- sir, I don't
20  know.
21 BY MR. SPIVA:
22   Q   Okay.  Did you take any notes of -- of

**Page 212**

1  your interview with Ms. McGaughey?
2   A   No.
3   Q   Okay.  Do you have a field notebook?
4   A   Yes.
5   Q   And did you put anything in the field
6  notebook during your -- as a result of your
7  interview with Ms. McGaughey?
8   A   No.
9   Q   Okay.  The other incident or reported
10  rape that you mentioned a minute ago, where the
11  other victim reported having blacked out and where
12  it was determined to be unfounded, did you keep
13  any notes of that?
14   A   No.
15   Q   Okay.  Did you take any report of that?
16   A   No.
17   Q   What do you use your field notebook for?
18   A   To take notes.
19   Q   And in what circumstances do you use it
20  to take notes?
21   A   When I take reports.
22   Q   So you only -- you only use it when

**Page 213**

1  you're going to take a report?
2   A   No.  I take notes when it's necessary,
3  when I -- when I need to take notes on a matter
4  or --
5   Q   Uh-huh.  How do you decide when it's
6  necessary.
7   A   Usually when I take a report, when I
8  take a look out for a robbery --
9   Q   Uh-huh.
10   A   -- tags, stollen tags, things of that
11  nature, police matter.
12   Q   Why didn't you take any notes of your
13  interview with Ms. McGaughey?
14     MS. TURNER:  Objection.
15     MR. MONAHAN:  Objection to foundation.
16     THE WITNESS:  At that time, my partner
17  was -- like -- like I said, her personality, she
18  was the lead officer on this scene.
19 BY MR. SPIVA:
20   Q   Uh-huh.
21   A   So I kind of just let her be the lead
22  officer on the scene.  And I didn't feel as if I

54 (Pages 210 to 213)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                        April 14, 2008

Washington, DC

| Page 218 |
|---|
| 1  he look like, excuse me, what's he look like, his |
| 2  name -- |
| 3      Q   Uh-huh. |
| 4      A   -- date of birth, social.  I can't |
| 5  remember that off the top of the head.  That's a |
| 6  suspect. |
| 7      Q   Uh-huh.  Uh-huh.  And -- and when did |
| 8  you -- did you take the notes before you wrote the |
| 9  report or -- or after you wrote the report? |
| 10     MR. JEFFERSON:  This is in the context |
| 11  of what -- |
| 12     MR. SPIVA:  The same incident she just |
| 13  described, yes. |
| 14     THE WITNESS:  Actually, like |
| 15  simultaneously while -- while I'm taking the |
| 16  report, I'm taking notes in my notebook that I |
| 17  will need. |
| 18  BY MR. SPIVA: |
| 19     Q   Uh-huh.  Uh-huh.  And when in that |
| 20  instance, where the -- the event -- the alleged |
| 21  sexual abuse was -- was determined to be founded, |
| 22  when did you decide you were going to need notes? |

| Page 219 |
|---|
| 1      A   While I was taking the report. |
| 2      Q   Uh-huh. |
| 3      A   And then -- she told her story to me |
| 4  several times, so it depends on when -- at which |
| 5  point she told -- |
| 6      Q   Uh-huh. |
| 7      A   -- you know, the story over again at |
| 8  that -- |
| 9      Q   Uh-huh. |
| 10     A   -- at which time, I don't know. |
| 11     Q   So if first she you told the story you |
| 12  didn't take notes? |
| 13     A   No.  Because I listened. |
| 14     Q   Okay. |
| 15     A   The first thing I do is listen. |
| 16     Q   But the second time she told, you |
| 17  started taking notes? |
| 18     A   Like I just said, I can't recall which |
| 19  time -- |
| 20     Q   Uh-huh. |
| 21     A   -- which time she told me -- |
| 22     Q   Uh-huh. |

| Page 220 |
|---|
| 1      A   -- the story when I started to take |
| 2  notes. |
| 3      Q   Okay. |
| 4      A   The first time I listened. |
| 5      Q   Further on in this -- we're back to |
| 6  Exhibit Leveque 2. |
| 7          It says, C1 was informed that a |
| 8  report -- a report could not be taken based on the |
| 9  statement she things something happened. |
| 10         What does -- what does that mean when |
| 11  it -- when it refers to a report? |
| 12     MR. JEFFERSON:  Where are you reading |
| 13  from, Counsel? |
| 14     MR. SPIVA:  It's in the narrative.  And |
| 15  it is -- |
| 16     MR. GLEASON:  After she -- |
| 17     MR. JEFFERSON:  Okay. |
| 18     MR. GLEASON:  -- blacked out. |
| 19     MR. JEFFERSON:  Okay. |
| 20     MR. SPIVA:  Yeah.  Exactly. |
| 21     MR. JEFFERSON:  Got it. |
| 22  BY MR. SPIVA: |

| Page 221 |
|---|
| 1      Q   Do you see that, where it says, C1 was |
| 2  informed that a report could not be taken based on |
| 3  the statement she thinks something happened? |
| 4      A   Yes. |
| 5      Q   And what report that you signed -- I'm |
| 6  sorry.  Strike that. |
| 7          What report is being referred to here? |
| 8      A   Sexual abuse report. |
| 9      Q   Okay.  In your view, could she have |
| 10  pressed charges against anyone based on what she |
| 11  told you? |
| 12     A   There was no suspect.  No. |
| 13     Q   So the answer is she could not have |
| 14  pressed charges at that point based on what she |
| 15  told you? |
| 16     A   There's no suspect information.  No. |
| 17     Q   I just want to get clear. |
| 18         So that -- the answer to my question is |
| 19  no? |
| 20     A   No. |
| 21     Q   Okay.  Why couldn't a sexual assault |
| 22  report be taken based on an alleged rape victim |

56 (Pages 218 to 221)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                        April 14, 2008
                            Washington, DC

| Page 222 | Page 224 |
|---|---|

**Page 222**

1  thinking something had happened to her?
2      A   Because she doesn't know what happened
3  to her, and there is no suspect.
4      Q   So in your view, there has to be a
5  suspect in order for a sexual assault report to be
6  taken?
7      A   In this instance she had no suspect, she
8  doesn't know what happened to her, she doesn't
9  know how she even sustained the pain in her anus.
10     Q   Uh-huh.
11     A   There's no -- I don't know -- I don't
12  know what a detective could investigate.
13     Q   Uh-huh.  Who -- who made the
14  determination that a -- sorry.  Let -- let me
15  strike.
16          This report is -- is -- is relating in
17  that sentence what she was told, correct, by -- by
18  Officer Green, correct?
19     A   Yes.
20     Q   Okay.  What -- and Officer Green told
21  her that?
22          And it's an obvious question, but I just

**Page 223**

1  want to make sure that Officer Green in fact told
2  her that a report could not be taken based on what
3  she was telling her?
4      A   Could I refresh this --
5      Q   Sure.  Sure.
6      A   -- to see what Officer Green wrote in
7  the report?
8      Q   Sure.
9      A   (Witness examined document).
10         MR. JEFFERSON:  Take your time.
11         THE WITNESS:  (Witness examined
12  document).  She was informed that a report could
13  not be taken based on that she -- just -- just on
14  the fact that something had happened.
15  BY MR. SPIVA:
16     Q   Okay.  And she was informed that by
17  Officer Green, correct?
18     A   Yes.
19     Q   Okay.  Did -- did she -- did Officer
20  Green inform her of -- of that before or after
21  talking to the sexual assault detective?
22         MR. JEFFERSON:  Objection.  Foundation.

**Page 224**

1          Answer to --
2  BY MR. SPIVA:
3      Q   You can answer.
4          MR. JEFFERSON:  -- the extent that you
5  know.
6          THE WITNESS:  I can't recall when she
7  informed her, but I do know she informed her of
8  that.
9  BY MR. SPIVA:
10     Q   Okay.  You can't recall whether she told
11  her that before calling the detective?
12     A   Yeah, that -- yeah --
13     Q   That's --
14     A   -- I can't recall that.
15     Q   -- that's fuzzy?
16     A   Yeah.
17     Q   Okay.  Now, is that, to your knowledge,
18  MPD policy, that a report can't be taken based on
19  alleged rape victim thinking something had
20  happened?
21     A   I can't quote MPD policies --
22     Q   Uh-huh.

**Page 225**

1      A   -- but an officer can't take a report if
2  they can't establish that a crime has been
3  committed.
4      Q   Okay.  And what -- what is -- what is
5  your understanding of what constitutes the crime
6  of sex abuse?
7      A   What constitutes the crime of sex abuse?
8  Non-consentual sex.
9      Q   Uh-huh.  What is a sexual act?
10     A   A sexual act could be just like fondling
11  or touching --
12     Q   Uh-huh.
13     A   -- which is also a form of sexual abuse,
14  but it's in a -- in a lesser -- in a certain other
15  degree.  I can't say which one.  I'd have to refer
16  to my general -- my D.C. code to be exact.
17     Q   Okay.  Have you -- have you had to -- to
18  look at the D.C. code on that as part of your
19  training at any point?
20     A   In the academy --
21     Q   Uh-huh.
22     A   -- for testing purposes.

57 (Pages 222 to 225)

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                April 14, 2008
                    Washington, DC

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  the bathroom and a guy followed her in there and
2  touched her breasts and private parts and then she
3  blacked out.
4          That's what your -- you -- you sign --
5  that's what the report that you signed says she
6  told you, correct?
7          MR. JEFFERSON: Objection. Foundation.
8          THE WITNESS: Yeah. Yes.
9  BY MR. SPIVA:
10    Q   And -- and my only question is -- is --
11  is not whether in fact that happened; but does
12  a -- does a person following a woman into a
13  bathroom and touching her breasts and private
14  party without permission constitute a crime in the
15  District of Columbia?
16          MR. JEFFERSON: Objection. Asked and
17  answered.
18          THE WITNESS: Not --
19          MR. JEFFERSON: In fact, she's going to
20  stand by her prior answer. Okay. I mean --
21          MR. SPIVA: Counsel, it's totally
22  inappropriate.

**Page 235**

1          MR. JEFFERSON: If you could --
2          MR. SPIVA: Totally inappropriate.
3          MR. JEFFERSON: -- ask her a question --
4          MR. SPIVA: Yeah.
5          MR. JEFFERSON: -- and then continue on.
6          MR. SPIVA: Yeah.
7          MR. JEFFERSON: I'll tell you what. I'm
8  going to let her answer this question --
9          MR. SPIVA: Uh-huh.
10          MR. JEFFERSON: -- but, you know, you've
11  only got seven hours.
12          MR. SPIVA: Yeah. Well, that's right.
13  We do.
14          MR. JEFFERSON: I wish we could get a
15  question and answer move on.
16          MR. SPIVA: If -- if we stop having
17  these kinds of interruptions, we -- we --
18          MR. JEFFERSON: There have been very
19  few.
20          MR. SPIVA: -- we'd be just fine.
21  BY MR. SPIVA:
22    Q   Does -- does a -- does a person

**Page 236**

1  following a woman into a bathroom and touching her
2  breasts and private parts without permission
3  constitute a crime in the District of Columbia?
4    A   Not in this incident, sir. She --
5    Q   Okay.
6    A   -- could not establish what had happened
7  to her clearly, and had no suspect information.
8    Q   Okay. So in order to have it constitute
9  a crime, does the victim have to have suspect
10  information?
11    A   She has to know what had happened to
12  her.
13    Q   Okay.
14    A   She doesn't --
15    Q   Okay. Let's -- let's -- let's -- we're
16  not talking about this incident now.
17          We're talking about as a general matter,
18  does a person following a woman into a bathroom
19  and touching a breasts and private parts without
20  permission constitute a crime in the District of
21  Columbia?
22    A   I don't know.

**Page 237**

1    Q   Does an unwanted touching or invasion of
2  one's rectum by another constitute a crime in the
3  District of Columbia?
4          MR. JEFFERSON: Objection. Foundation.
5  BY MR. SPIVA:
6    Q   I'm not asking about this instance.
7          I'm asking you just in general does an
8  unwanting -- wanted touching or invasion of one's
9  rectum by another constitute a crime in the
10  District of Columbia?
11          MS. ROBOKOS: Objection to the form of
12  the question.
13          THE WITNESS: Repeat the question.
14  BY MR. SPIVA:
15    Q   Does an unwanted touching or invasion of
16  one's rectum by another constitute a crime in the
17  District of Columbia?
18    A   If you know it's unwanted, yeah.
19    Q   I'm sorry. I didn't understand your
20  answer.
21          What do you mean if --
22    A   Yes.

                                60 (Pages 234 to 237)

                Alderson Reporting Company
                    1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063d80fe

Ginette Leveque                                    April 14, 2008

Washington, DC

Page 242

1    touching or penetrating her rectum?
2          MS. TURNER: Objection.
3          MR. JEFFERSON: Objection. Foundation.
4    Presupposes facts not in evidence.
5          MS. ROBOKOS: Same objection.
6    BY MR. SPIVA:
7      Q    You can answer.
8      A    She didn't discuss cons -- con --
9    consentual actively at all. She didn't know what
10   had happened.
11     Q    Okay. Now, she told you and Officer
12   Green that her rectum hurt.
13         Did you have any reason to believe that
14   she was lying about that?
15         MR. MONAHAN: That's been asked about --
16         MS. TURNER: Objection.
17         MR. MONAHAN: -- six times. Can we move
18   on?
19   BY MR. SPIVA:
20     Q    You can answer the question.
21     A    No.
22     Q    Okay. Now, in -- in the next part of

Page 243

1    the report it says, C1 stated she went from one
2    extreme to another so someone had to put something
3    in her drink. Then C1 changed her story and
4    stated I was drunk.
5          What -- what did -- what did -- what was
6    your understanding of what she meant by she went
7    from one stream to another?
8          MR. JEFFERSON: Objection. Foundation.
9    BY MR. SPIVA:
10     Q    You can answer.
11     A    She stated that she was really, really
12   drunk and out of it.
13     Q    Uh-huh. Did -- did it matter to your
14   investigation of a potential rape whether the
15   victim was -- was drunk?
16     A    Repeat the question, sir.
17     Q    Did it matter to your potential -- your
18   investigation of a potential rape that the victim
19   was drunk?
20     A    No.
21     Q    Okay. Now, if she -- if she had been
22   drunk, would that mean that she could not have

Page 244

1    been the victim of -- of the crime of sexual
2    abuse?
3      A    Repeat the question.
4      Q    If she had been drunk, would that mean
5    that she could not have been the victim of the
6    crime of sexual abuse?
7      A    Yes, she -- I -- I'm confused again.
8    Repeat it one more time.
9      Q    Okay. If she had been drunk --
10     A    Yes.
11     Q    -- would that mean she could -- she
12   could not have been the victim of the crime of
13   sexual abuse?
14     A    Could not have been?
15     Q    Yeah.
16     A    No, she still -- no.
17     Q    You can be drunk and still be sexually
18   abused, correct?
19     A    Yes.
20     Q    Okay. C1 -- the next part says, C1 was
21   then advised that in order to take a report I
22   have -- it's got a little error in here. It says

Page 245

1    I have -- I think it's have to have something, but
2    it says have have something concrete and not have
3    anything any guesses.
4          What did -- did you view as concrete?
5      A    That a crime had to be established.
6      Q    Uh-huh. And did you think she needed to
7    know what had happened to her exactly?
8      A    Yes.
9      Q    Okay. And did you think she needed to
10   know that she had been penetrated?
11     A    Yes.
12     Q    And do you think she needed to know that
13   she had been touched?
14     A    Yes.
15     Q    And did you think she needed to know who
16   had sexually assaulted her?
17     A    Not necessarily.
18     Q    Okay. I take it that you did not view
19   her claim that she had been touched on her breasts
20   and private parts as concrete?
21     A    I didn't know -- I didn't know what her
22   claim was because she didn't know what had

62 (Pages 242 to 245)

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

Ginette Leveque                                    April 14, 2008
                     Washington, DC

| Page 254 |
| --- |

1  done.  C1 then asked if we had sisters or kids and
2  wouldn't we want them to be tested.  C1 was
3  informed again that we are not going to lie.  C1
4  then stated okay I'll just say I was raped to get
5  the kit done.  C1 was advised that it doesn't work
6  like that, and advised about the importance of
7  truth.  That's -- that's the part that wasn't
8  read.
9          MR. JEFFERSON:  Thank you, Counsel.
10         MR. SPIVA:  And that has nothing to do
11 with my question.
12         MR. GLEASON:  You said it was the next
13 section in --
14         MR. SPIVA:  Well, that --
15         MR. GLEASON:  -- the report, Counsel.
16         MR. SPIVA:  -- okay.
17         MR. GLEASON:  And I -- I don't want that
18 misrepresentation to go --
19         MR. SPIVA:  You don't --
20         MR. GLEASON:  -- un-commented --
21         MR. SPIVA:  -- Counsel --
22         MR. GLEASON:  -- I -- I'm speaking.  I'm

| Page 255 |
| --- |

1  not raising my voice --
2          MR. SPIVA:  Yes.
3          MR. GLEASON:  -- and I'm not
4  interrupting you while you're speaking.  You said
5  this was the next section in the report.  That's
6  not correct.  You omitted a significant portion of
7  the report.  I have now read it into the record.
8          MR. JEFFERSON:  Okay.  Thank you,
9  Counsel.
10         MR. SPIVA:  Yeah, Counsel, my reference
11 to the next section was an error.  But it had
12 nothing to do with my question.  The report is a
13 written document that speaks for itself.  So the
14 idea that I would somehow omit that with the
15 thought that it was somehow never going to appear
16 again is absurd.
17         MS. TURNER:  Just like your objection
18 earlier.  It speaks for itself.
19 BY MR. SPIVA:
20   Q   All right.  Let me go back to the
21 section that I wanted to ask you about, which was
22 the section that reads, C1 was advised that we

| Page 256 |
| --- |

1  didn't have enough to take a sexual report but we
2  would notify detective at the sexual assault unit
3  and report our conversation and her statements.
4  Detective Wheeler was notified.  Detective Wheeler
5  advised he talked to his supervisor who was aware
6  of her case earlier that the previous unit cleared
7  with no report.  A copy of this report was faxed
8  to Detective Wheeler.
9          What was your understanding, if any,
10 about the previous interview with -- with the
11 complainant?
12   A   I don't really know anything about the
13 previous --
14   Q   Okay.
15   A   -- assignment or whoever reported it.  I
16 don't know.
17   Q   Okay.  And what would have been enough
18 to take a sexual assault report, in your view?
19   A   If she knew what happened.
20   Q   Uh-huh.  Is there a certain standard a
21 victim must prove in order for you to take a
22 sexual assault report?

| Page 257 |
| --- |

1    A   I don't know.  The sex squad detective
2  would know more about the standards of classifying
3  and when a report is taken.
4    Q   Okay.  Are you aware that it's -- that
5  MPD policy requires that a sexual assault report
6  be taken in all cases of reported sexual abuse?
7          MR. JEFFERSON:  Objection.  Foundation.
8          MR. MONAHAN:  Object to the foundation.
9  BY MR. SPIVA:
10   Q   You can answer.
11         MS. ROBOKOS:  Objection.
12         THE WITNESS:  No.
13 BY MR. SPIVA:
14   Q   You say you -- well, the report that you
15 signed states that Detective Wheeler was notified.
16         Is he in the sexual assault unit?
17   A   Yes.
18   Q   Okay.  And when was he notified?
19   A   I -- I don't know.  When he was on the
20 scene --
21   Q   Uh-huh.
22   A   -- by Officer Green.  But I can't say

Alderson Reporting Company
1-800-FOR-DEPO

acdb92dc-75db-46dd-b9a9-dde063dd80fe

# Exhibit G

**(Excerpts of G. Maradiaga Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

Sgt. George Maradiaga                                July 14, 2008
Washington, DC

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - -   X

ALEXANDRIA McGAUGHEY,            :

     Plaintiff,              :   Case No.
             v.
DISTRICT OF COLUMBIA,            :   151:07-cv-01498(RJL)

et al.,                          :

     Defendants.              :

- - - - - - - - - - - - -   X

Washington, D.C.

Monday, July 14, 2008

     Deposition of SERGEANT GEORGE MARADIAGA, a

witness herein, called for examination by counsel for

Plaintiff in the above-entitled matter, pursuant to

notice, the witness being duly sworn by MARY GRACE

CASTLEBERRY, a Notary Public in and for the District

of Columbia, taken at the offices of Alderson Court

Reporting, 1155 Connecticut Avenue, N.W., Washington,

D.C., at 1:42 p.m., Monday, July 14, 2008, and the

proceedings being taken down by Stenotype by MARY

GRACE CASTLEBERRY, RPR, and transcribed under her

direction.

Alderson Reporting Company
1-800-FOR-DEPO

f990a295-6ede-4c23-b5c3-24dcd67c5ce4

Sgt. George Maradiaga                              July 14, 2008
                    Washington, DC

| Page 162 | Page 164 |
|---|---|

**Page 162**

1    Q.   You would agree with me that subsection E
2  says, "Members initiating reports shall not be
3  relieved from duty until all reports are completed
4  accurately and have been submitted and corrected as
5  necessary, unless an illness or injury has occurred
6  while in the performance of duty.  In that case, the
7  member's supervisor shall ensure the report is
8  submitted before relieved from duty."  I read that
9  accurately?
10    A.   Yes.
11    Q.   Is that something that applies to patrol
12  sergeants in their supervision of patrol officers?
13       MR. JEFFERSON:  Object to form,
14  foundation.
15       THE WITNESS:  What is your question?
16       BY MR. SPIVA:
17    Q.   Is that directive in subsection E
18  something that is applicable to patrol sergeants in
19  their supervision of patrol officers?
20       MR. JEFFERSON:  Object to form,
21  foundation.
22       THE WITNESS:  I still don't understand

**Page 163**

1  your question.  Could you clarify?
2       BY MR. SPIVA:
3    Q.   Does that apply to you as a patrol
4  sergeant, that members initiating reports shall not
5  be relieved from their duty, in other words --
6    A.   If I take a report, will I be bound by
7  this?
8    Q.   I see the source of the confusion.  Let me
9  just clarify.  Are you bound as a sergeant to not
10  relieve patrol sergeants under your supervision from
11  duty until they complete the reports required by this
12  general order?
13       MR. JEFFERSON:  Object to form,
14  particularly the phrase patrol sergeants.
15       BY MR. SPIVA:
16    Q.   Patrol officers.
17    A.   If I understand the question you're
18  asking, patrol officers are not to be relieved of
19  duty until they complete the reports.
20    Q.   Correct.
21    A.   That is correct.
22    Q.   Let me ask you specifically about the day

**Page 164**

1  giving rise to this lawsuit, December 9th, 2006.
2  First of all, do you have any recollection of what
3  you were doing that day?
4       MR. JEFFERSON:  Object to form.
5       THE WITNESS:  What I was doing?
6       BY MR. SPIVA:
7    Q.   Do you have any recollection of what you
8  were doing on December 9th, 2006?
9    A.   No.
10    Q.   December 8th, 2006?
11    A.   No.  What particular time?  I mean, any
12  particular time what I was doing?  What are you
13  talking about?
14    Q.   Any time.  Do you recall anything about,
15  say, December 8th, 2006?
16       MR. JEFFERSON:  Object to form.
17       THE WITNESS:  No.
18       BY MR. SPIVA:
19    Q.   How about December 10th, 2006.  Do you
20  remember anything about that day?
21    A.   Not anything in particular.
22    Q.   Anything about December 20th, 2006?

**Page 165**

1       MR. JEFFERSON:  Object to form.  Object,
2  relevance.
3       BY MR. SPIVA:
4    Q.   Do you remember anything about December
5  20th, 2006?
6    A.   Unless you make a specific reference to
7  any particular moment in time, specifically in that
8  day or to an incident that I may recall, no.
9    Q.   Tell me what if anything you can recall --
10  first of all, let me ask you what do you know about
11  this lawsuit?
12    A.   Specifically?
13    Q.   Yes.  Tell me what you know about this
14  lawsuit.
15    A.   Nothing, that the female is suing the
16  city.
17    Q.   Have you seen the complaint that was filed
18  in this lawsuit?
19    A.   No.
20    Q.   And do you know what her claims are?
21    A.   No.
22    Q.   Do you recall responding to Howard

Alderson Reporting Company
1-800-FOR-DEPO

f990a295-6ede-4c23-b5c3-24dcd67c5ce4

Sgt. George Maradiaga                                    July 14, 2008
                        Washington, DC

| Page 166 | Page 168 |
|---|---|

**Page 166**

1  University Hospital on December 9th, 2006 in response
2  to a sexual assault complaint?
3          MR. JEFFERSON:  Object to form,
4  foundation.
5          THE WITNESS:  Yes.
6          BY MR. SPIVA:
7      Q.    What do you recall about that?
8      A.    I responded to a call for a supervisor by
9  Officer Green or Leveque.  I responded to the scene
10  where I briefed the officers concerning a female who
11  had called the police.
12      Q.    And you said you got the call from Officer
13  Green?
14      A.    I received the call from the dispatcher.
15      Q.    But the dispatcher was responding to a
16  call from Officer Green asking for a supervisor to be
17  sent?
18          MR. JEFFERSON:  Object to form,
19  foundation.
20          BY MR. SPIVA:
21      Q.    Is that what you just said?
22      A.    By Officer Leveque or Green.

**Page 167**

1      Q.    You don't know which one it was?
2      A.    Correct.
3      Q.    And you said that you received a debrief
4  from Officer Green and Leveque, is that correct?
5      A.    Yes.
6      Q.    What did they say to you?
7      A.    That a female had responded to Howard
8  Hospital wanting a SANE kit completed on her.
9      Q.    Did they say anything else?
10      A.    They stated that the female stated to them
11  that she was -- I do not recall if it was a party or
12  at a club or something where she was intoxicated and
13  the following morning, she awoke and found that she
14  was not wearing her undergarments or her panties.
15  She wanted to know if she had sexual intercourse so
16  she responded to Howard Hospital to have a kit
17  completed.
18      Q.    What else if anything can you remember
19  about what Officer Green and Officer Leveque told
20  you?
21      A.    That a kit would not be completed if she
22  was only curious as to whether she had sex with an

**Page 168**

1  individual or not, at which point the -- she was
2  informed that the kits are only completed on assault
3  victims or criminal assault victims, criminal
4  assaults meaning sexual assaults, at which time the
5  victim or the complainant in this case changed her
6  story and stated that, yes, she was sexually
7  assaulted and that she was adamant that she wanted a
8  SANE kit completed.
9      Q.    What else if anything can you remember
10  that Officer Green and/or Officer Leveque told you?
11      A.    That they had notified a sexual assault
12  detective and debriefed the detective and that
13  detective was already aware of the situation.
14      Q.    Do you recall anything else that Officer
15  Green and/or Officer Leveque told you?
16      A.    No, that's it.
17      Q.    And the various things that you've just
18  related that they said to you, was that Officer Green
19  speaking, Officer Leveque speaking or some
20  combination of the two of them?
21      A.    Correct.
22      Q.    Some combination of the two of them?

**Page 169**

1      A.    Correct.
2      Q.    And what did you say in response to them,
3  if anything?
4      A.    To complete a report.
5      Q.    What kind of report?
6      A.    A 251.
7      Q.    Did you specify how they should classify
8  the 251 report?
9      A.    The classification, I believe, was
10  allegation of sexual assault.
11      Q.    Did you say anything else to them?
12      A.    I recall that the officer stated that the
13  female had responded to the hospital prior and made
14  the same allegations and that a previous officer had
15  responded to the scene.  They did not have the name
16  of the officer who responded and we could not locate
17  the report numbers.
18      Q.    Did you know where they had gotten the
19  information that she had previously come to the
20  hospital?
21      A.    I can't recall.
22      Q.    And did they indicate whether the officer

43 (Pages 166 to 169)

f990a295-6ede-4c23-b5c3-24dcd67c5ce4

Sgt. George Maradiaga                                      July 14, 2008
                          Washington, DC

| Page 170 | Page 172 |
|---|---|
| 1  who had previously responded had responded during her | 1  direct her to whatever sexual assault detective is |
| 2  previous visit to the hospital or during the visit in | 2  handling the incident. |
| 3  which you and Officer Leveque and Officer Green | 3    Q.  Let me step back from this particular |
| 4  responded? | 4  situation, but when you're looking to see whether a |
| 5    A.  It had to be a previous occasion.  It was | 5  report has previously been filed, how do you go about |
| 6  not the same occasion as to when I was there. | 6  determining that? |
| 7    Q.  And did they indicate where they got the | 7    A.  Utilizing the radio, I'll call the |
| 8  information that an officer had previously responded? | 8  dispatcher and see if a report was generated for that |
| 9      MR. JEFFERSON:  Objection, asked and | 9  address or that particular complainant. |
| 10  answered. | 10    Q.  And there is some way that the dispatcher |
| 11    BY MR. SPIVA: | 11  can look that up? |
| 12    Q.  I don't think I asked you that.  I asked | 12    A.  Yes. |
| 13  you -- | 13    Q.  And you mentioned that if there had been a |
| 14    A.  I don't recall. | 14  report, but that it just hadn't been found, you know, |
| 15    Q.  What else, if anything, did you say to | 15  was later discovered that there had been a report, |
| 16  Officer Green and Officer Leveque other than to | 16  that they could cancel the one that they were doing |
| 17  prepare a PD-251 report? | 17  that you told them to do, is that accurate? |
| 18    A.  That they should take the report, that in | 18    A.  Correct. |
| 19  case the complainant returned, that it was documented | 19    Q.  What's the process for canceling a report |
| 20  so it wouldn't have to be redone again.  And if a | 20  once one has been written? |
| 21  report was already taken, that this one could be | 21    A.  A 252 supplemental report is completed |
| 22  canceled. | 22  just canceling the report, stating that it's a |

| Page 171 | Page 173 |
|---|---|
| 1    Q.  Can you explain what you mean when you | 1  duplicate of a previously reported incident. |
| 2  say, "Take the report in case the complainant | 2    Q.  Did you speak with anyone else when you |
| 3  returned"? | 3  were at the hospital about this particular case? |
| 4    A.  The understanding I had is that the | 4    A.  I don't recall. |
| 5  complainant had come on a previous occasion, the same | 5    Q.  Did you speak with the victim? |
| 6  day, I believe, within a 24-hour period, asking for a | 6    A.  No. |
| 7  sex kit, that an officer had responded.  I'm not too | 7    Q.  And did you speak with the sexual assault |
| 8  sure what had occurred in that instance, but the | 8  detective? |
| 9  complainant left and the complainant returned and | 9    A.  I don't recall. |
| 10  Officer Green and Officer Leveque were summoned to | 10    Q.  Do you know whether the sexual assault |
| 11  the hospital. | 11  detective actually responded to the hospital at any |
| 12      Since we -- since Officer Green and | 12  point? |
| 13  Leveque responded a second time, since somebody had | 13    A.  I don't know. |
| 14  stated that an officer was already there, we did not | 14    Q.  And if he did or she did, you didn't see |
| 15  want to take duplicate reports.  But in this case, | 15  him or her, the sexual assault detective? |
| 16  since I couldn't find the original report or report | 16    MR. JEFFERSON:  Object to form. |
| 17  numbers, I instructed the officers to take a report. | 17    MR. BANKS:  Objection. |
| 18  And if later on we did find a report, that we could | 18    BY MR. SPIVA: |
| 19  cancel theirs, in case this female had already -- she | 19    Q.  Do you understand the question?  If the |
| 20  had already responded to the hospital on a second | 20  sexual assault detective did respond to the hospital, |
| 21  occasion.  If she responds there on a third occasion, | 21  you didn't see them there? |
| 22  that the incidents are recorded and the officers can | 22    A.  Correct. |

Alderson Reporting Company
1-800-FOR-DEPO

f990a295-6ede-4c23-b5c3-24dcd67c5ce4

Sgt. George Maradiaga                    July 14, 2008
                    Washington, DC

| Page 174 |
| --- |

1    Q.   And did you speak with any hospital
2  personnel?
3    A.   No.
4    Q.   Did you speak with any friends or
5  relatives of the victim?
6        MR. JEFFERSON:  Object to form,
7  foundation.
8        THE WITNESS:  I don't recall.
9        BY MR. SPIVA:
10   Q.   I take it that you didn't speak to any
11 potential witnesses of the sexual assault?
12       MR. JEFFERSON:  Object to form,
13 foundation.
14       THE WITNESS:  Not that I recall.
15       BY MR. SPIVA:
16   Q.   And after you had your discussion with
17 Officer Green and Officer Leveque, what did you do
18 next?
19       MR. JEFFERSON:  Object to the extent that
20 the question suggests there is only one conversation.
21       THE WITNESS:  I gave them their
22 instructions and I left.

| Page 175 |
| --- |

1        BY MR. SPIVA:
2    Q.   And did you create any kind of
3  documentation concerning your visit to the hospital
4  and your discussions with Officer Leveque or Officer
5  Green?
6    A.   No.
7    Q.   Did you have any other conversations with
8  Officer Leveque or Green about this particular case
9  after you left the hospital?
10       MR. JEFFERSON:  Objection, asked and
11 answered.
12       MR. SPIVA:  I love this.  You just
13 objected that it assumed that there was only one
14 conversation, and now when I ask him whether there is
15 a second conversation, you object that it's asked and
16 answered, but okay.  That's fine.  Your objection is
17 noted.
18       BY MR. SPIVA:
19   Q.   Did you speak with Officer Leveque or
20 Officer Green after you left the hospital?
21   A.   I don't recall.  I may have.
22   Q.   But if you did speak to them about this

| Page 176 |
| --- |

1  case, you don't have any recollection of what was
2  said?
3    A.   Correct.
4    Q.   And did you speak with anyone else
5  concerning this case after you left the hospital
6  other than Officer -- I'm sorry.  You spoke to
7  Officer Green and Leveque at the hospital and you
8  said you don't recall whether you spoke to them after
9  you left the hospital.  Putting them aside, did you
10 speak to anybody else concerning this case after you
11 left the hospital?
12   A.   Yes.
13   Q.   What's that?
14   A.   Yes.
15   Q.   Who did you speak with?
16   A.   My attorney.
17   Q.   Other than your attorney, did you speak
18 with anyone else?
19   A.   Not that I recall.
20   Q.   So in terms of what the victim said to
21 Officer Leveque and Officer Green, your sole source
22 of knowledge is what either Officer Leveque or

| Page 177 |
| --- |

1  Officer Green told you about what the victim said to
2  them, is that correct?
3        MR. JEFFERSON:  Object to the form.
4        THE WITNESS:  My only understanding of the
5  case is what was relayed to me by the officers, yes.
6        BY MR. SPIVA:
7    Q.   And you don't have any other source of
8  information about the case other than what was
9  related to you by the officers?
10       MR. JEFFERSON:  Object to the form.
11 Bruce, we are on record that he did look at the
12 report, just to make you aware.
13       BY MR. SPIVA:
14   Q.   I guess what I'm saying is, is there any
15 other source of information other than anything that
16 Officer Leveque and Officer Green said to you about
17 this case?  Do you have any other source of
18 information?
19   A.   The only source of information I have
20 concerning this case is what was presented to me by
21 the officers either in verbal or written form.
22   Q.   And your counsel just said that you did

                    45 (Pages 174 to 177)

f990a295-6ede-4c23-b5c3-24dcd67c5ce4

**Exhibit H**

**(MPD Webpage)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

| District of Columbia | MAYOR FENTY | DC GUIDE | RESIDENTS | BUSINESS |

## Metropolitan Police Department

MPDC HOME

SERVICES

INFORMATION

**Street Safety**
Bus and Train Personal
  Safety
Guarding Against Robbery
  and Assault
Safety for Runners,
  Walkers, and Bikers
Safety for Seniors
Sexual Assault—
Reducing
  the Risk
Theft and Pickpocket
  Prevention

ONLINE SERVICE
  REQUESTS

# Sexual Assault—Reducing the Risk

### What is Sexual Assault?

A sexual assault is about power, anger, and control. It is an act of violence and an attempt to degrade someone using sex as a weapon. Above all, sexual assault is a crime.

Sexual assaults can happen to anyone: children, students, wives, mothers, working women, grandmothers, the rich and poor, and boys and men. The assailants can be anyone: classmates, co-workers, a neighbor or delivery person, total strangers, outgoing or shy, often a friend or a family member. These crimes are often committed again and again, until the assailants are caught.

- How You Can Protect Yourself
- If the Unthinkable Happens
- Surviving a Sexual Assault
- Additional Sexual Assault Resources

### How You Can Protect Yourself

#### *Use Your Head*

- Be alert—Walk with confidence and purpose.
- Be aware of your surroundings—know who's out there and what's going on.
- Don't let alcohol or other drugs cloud your judgment.
- Trust your instincts—if a situation or place makes you feel uncomfortable or uneasy, leave.

#### *When You're Indoors*

- Make sure all doors (don't forget sliding glass doors) and windows have sturdy, well-installed locks, and use them. Install a wide-angle peephole in the door. Keep entrances well-lit.
- Never open your door to strangers. Offer to make an emergency call while someone waits outside. Check the identification of sales or service people before letting them in. Don't be embarrassed to phone for verification.
- Be wary of isolated spots—apartment laundry rooms, underground garages, parking lots, offices after business hours. Walk with a friend, co-worker, or security guard, particularly at night.
- Know your neighbors, so you have someone to call or go to if you're uncomfortable or frightened.
- If you come home and see a door or window open, or broken, don't go in. Call the police from a cell phone, public phone or a neighbor's phone.

#### *When You're Outdoors*

- Avoid walking or jogging alone, especially at night. Stay in well-traveled, well-lit areas.

- Wear clothes and shoes that give you freedom of movement.
- Be careful if anyone in a car asks you for directions; if you answer, keep your distance from the car.
- Have your key ready before you reach the door—home, car, or office.
- If you think you're being followed, change direction and head for open stores, restaurants, theaters, or a house with its lights on.

### When You're in Your Car

- Park in areas that will be well-lit and well-traveled when you return.
- Always lock your car—when you get in and when you get out.
- Look around and under your car and in the back seat before you get in.
- If your car breaks down, lift the hood, lock the doors, and turn on your flashers. Call police on a cell phone, or use a Call Police banner or flares. If someone stops, roll the window down slightly and ask the person to call the police or a tow service.
- Don't hitchhike, ever. And don't ever pick up a hitchhiker.



### If the Unthinkable Happens

How does one handle a sexual assault? It really depends on a number of factors, such as your physical and emotional state, the situation, and the rapist's personality. Just remember, there are no hard and fast rules, no right or wrong answers. Your goal is to survive.

- Try to escape. Scream. Be rude. Make noise to discourage your attacker from following.
- Use a whistle to alert others if you are threatened.
- Talk, stall for time, and assess your options.
- If the assailant has a weapon, you may have no choice but to submit. Do whatever it takes to survive.
- If you decide to fight back, you must be quick, determined and effective. Target the eyes or groin.



### Surviving a Sexual Assault

- Remember, sexual assault is not your fault. Do not accept blame for being an innocent victim.
- Go to a hospital emergency room or your own doctor for medical care immediately. The Metropolitan Police Department, in conjunction with Howard University Hospital and the DC Rape Crisis Center, has developed the Sexual Assault Nurse Examiner (SANE) program. In this program, a victim of a sexual assault (over the age of 17) will be in a private examination room while waiting to be seen, the wait will not be more than one hour, and the victim will be examined by someone specially trained in this area.
- Don't go alone. Ask a friend or family member to go with you, or call a rape crisis center or school counselor. The DC Rape Crisis Center - (202) 333-7273 - has a hotline staffed with caring, concerned individuals who can help.
- Preserve all physical evidence. Don't shower, bathe, change clothes, douche, or throw any clothing away until the police or counselor say it's okay.

- Get counseling to help deal with feelings of anger, helplessness, fear, and shame caused by rape. It helps to talk to someone about the assault, whether it happened last night, last week, or years ago.
- You have been the victim of a crime and you should call the police. The sooner you tell, the greater the chances the rapist will be caught. But if you are uncomfortable about calling the police, contact a rape crisis center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Top

# Exhibit I

**(Excerpts of M. Pinn Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,          :
                               :
        Plaintiff,             :
                               :
            v.                 : Case No.
                               : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al., :
                               :
        Defendants.            :
- - - - - - - - - - - - - - - x

                         Washington, D.C.

                   Monday, April 28, 2008


Deposition of

        MARY S. PINN, R.N., called for

examination by counsel for Plaintiff, pursuant to

notice, at the Law Offices of Spiva & Hartnett,

LLP, 1776 Massachusetts Avenue, NW, Suite 600,

Washington, D.C., commencing at 12:54 p.m., before

Barbara A. Huber, Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:
```

5710bd74-bb00-44e5-92d7-41140419ec11

Mary S. Pinn, R.N.                                    April 28, 2008
                        Washington, DC

| Page 22 |
|---|

1  of the SANE nurses at Howard University Hospital.
2      Q    Is there a -- to your knowledge, is
3  there a effort being made to find a permanent SANE
4  director?
5      A    I'm hoping they will.
6      Q    I had a feeling.
7          Are you aware of any candidates at
8  present for that position, for permanent SANE
9  director?
10     A    No, I'm not.
11     Q    And are you compensated separately for
12  serving as the interim SANE director in addition
13  to your on-call time?
14     A    Yes.
15     Q    And how are you compensated for that
16  position?
17     A    I'm compensated by the D.C. Rape Crisis
18  Center.
19     Q    And how much do you receive for that
20  position?
21     A    My consulting fee is 5,000 per quarter.
22     Q    And that's paid to you by the D.C. Rape

| Page 23 |
|---|

1  Crisis Center?
2      A    Yes.
3      Q    And if I understand, you are a
4  consultant but not an employee of the D.C. Rape
5  Crisis Center?
6      A    That's correct.
7      Q    Do you have a consulting agreement with
8  the D.C. Rape Crisis Center?
9      A    Yes, I do.
10     Q    Is that agreement between you and -- is
11  that agreement -- is Howard University Hospital a
12  party to that agreement?
13     A    No.
14     Q    Do you have an employment agreement with
15  Howard University Hospital, a written employment
16  agreement?
17     A    Yes, as a SANE nurse.
18     Q    And just getting back to some of the
19  duties you listed as -- you perform in your --
20  your scene office. You mentioned statistics.
21          Can you explain what you mean by that?
22     A    I keep account of the number of SANE

| Page 24 |
|---|

1  cases that we have. I also keep account of the
2  chain of custody reports. I do quality assurance
3  and improvement -- performance improvement
4  reports. Oh, let's see. What else do I have?
5          Okay. I also update any type of
6  information that's needed by others. I receive
7  communication from different hospitals, and anyone
8  who is interested in the SANE program. I do
9  interviews with students who are interested in the
10  SANE program as part of their education. I give
11  presentations around the District of Columbia. I
12  also teach the D.C. Rape Crisis advocates, as far
13  as the SANE program is concerned.
14          And let's see. I go to different
15  training sessions also, regarding the SANE
16  program, and also to meetings regarding SANE, and
17  also regarding SART.
18          MS. TURNER:  SART, S-A-R-T.
19          THE WITNESS:  S-A-R-T.
20  BY MS. HARTNETT:
21     Q    Before we go further, what is the SANE
22  program?

| Page 25 |
|---|

1          Can you explain what that is?
2      A    The SANE program is a program that has
3  been structured, as of 1976, so that nurses are
4  specially trained to assess patients who present
5  at the hospital for sexual assault, and also to
6  collect forensic evidence, to medicate and treat
7  those patients, and to discharge them, and give
8  them also support as far as any problems they may
9  have concerning the sexual assault.
10     Q    You said as of 1976.
11          Is that the date of the program
12  beginning at the Howard Hospital?
13     A    I have no idea when Howard got the
14  program. But the SANE program all over the
15  country, that was the initiating date.
16     Q    And were you in any way involved in
17  initiating that program back in 1976?
18     A    No.
19     Q    Do you know who did initiate it?
20     A    No, I don't.
21     Q    And you also mentioned SART.
22          Can you describe what that is?

Alderson Reporting Company
1-800-FOR-DEPO

5710bd74-bb00-44e5-92d7-41140419ec11

Mary S. Pinn, R.N.                                    April 28, 2008
Washington, DC

| Page 210 | Page 212 |

**Page 210**

1  question. And then if so, they will call me in.
2      Q    In that situation, does the patient need
3  to be re-authorized by the police to have the
4  exam, if they've been authorized as a SANE
5  patient, then they leave because they're under
6  the --
7      A    Oh, if they have been authorized as a --
8  by the police, then all I have to do is wait for
9  them to come back in.
10     Q    And what we've just described for the
11  under the influence of drugs, is that same too
12  with respect to intoxication by alcohol?
13     A    Yes.
14     Q    Can you perform the SANE exam on a
15  patient that is vomiting?
16     A    If a patient starts vomiting, I give the
17  patient a chance to complete the vomiting. I
18  check with the doctor. And I would get
19  medications to give to that patient to control the
20  vomiting, and then proceed with the exam.
21     Q    What medication would you give to
22  control the vomiting?

**Page 211**

1      A    Phenergan 25 milligrams by intramuscular
2  injection.
3      Q    And does that depend on what the reason
4  is for the vomiting, or is that prescribed
5  regardless?
6      A    That's the only --
7      MS. TURNER: Objection.
8      Go ahead.
9      THE WITNESS: That's the only medication
10  that we give at this time for vomiting.
11  BY MS. HARTNETT:
12     Q    Okay. Do you recall anything about my
13  client's attempt to seek treatment in December of
14  2006 at Howard University Hospital and GW
15  Hospital?
16     A    No. I did not know at the time of this
17  patient tried to seek treatment at the hospital.
18     Q    So you don't know anything at the time
19  about that case?
20     A    Only that I was called by someone who
21  said that they were her father from Chicago.
22     Q    So you recall being -- being called by

**Page 212**

1  someone who said they were her father from Chicago
2  in December of 2006?
3      A    Yes.
4      Q    And do you recall anything else with
5  respect to the Plaintiff from December of 2006?
6      A    Only that I referred that person to call
7  the sexual assault unit.
8      Q    At the police department?
9      A    That's correct.
10     Q    So you have no recollection of ever
11  speaking to the Plaintiff in this case from 2006
12  forward?
13     A    I spoke to someone over the phone, and
14  just told them to hold onto their urine and keep
15  that, you know, so that it can be -- there would
16  be no question regarding chain of custody where
17  that urine was concerned.
18     Q    Do you remember who you spoke to in that
19  respect?
20     A    No. I can't recall.
21     Q    Have you reviewed the complaint in --
22  that was filed in this case?

**Page 213**

1      A    Yes, I have.
2      Q    And when did you review that?
3      A    This weekend.
4      Q    Prior to reviewing the complaint this
5  weekend, have you ever reviewed it previously?
6      A    No.
7      Q    Prior to reviewing the complaint, did
8  you recall these interactions that you've
9  described in December of 2006?
10     A    Which interactions?
11     Q    With the father that called from
12  Chicago, and then talking to someone on the phone
13  about the urine?
14     A    Yeah, those are the only two encounters
15  that I do recall having with this incident.
16     Q    And I guess what I'm trying to figure
17  out is did you have to read the complaint to
18  refresh your recollection about that, or is that
19  something that you remembered even before
20  reviewing the complaint?
21     A    I remember that.
22     Q    And why did that -- why did you remember

54 (Pages 210 to 213)

5710bd74-bb00-44e5-92d7-41140419ec11

# Exhibit J

**(Excerpts of A. Postell Deposition)**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended Complaint and Alternative Motion for Summary Judgment**

*McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)

Page 1

              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ALEXANDRIA McGAUGHEY,            :
                                 :
        Plaintiff,               :
                                 :
            v.                   : Case No.
                                 : 1:07-cv-01498(RJL)
DISTRICT OF COLUMBIA, et al.,    :
                                 :
        Defendants.              :
- - - - - - - - - - - - - - - x

                   Washington, D.C.

                Thursday, June 19, 2008

Deposition of

        AUDREY POSTELL, R.N., called for

examination by counsel for Plaintiff, pursuant

to notice, at the Howard University Hospital,

2041 Georgia Avenue, NW, Washington, DC, commencing

at 10:06 a.m., before Barbara A. Huber, Notary

Public in and for the District of Columbia, when

were present on behalf of the respective parties:

Audrey Postell, R.N.                                    June 19, 2008
Washington, DC

---

Page 290

1      MR. HAMILTON:  I got the impression that
2  counsel was asking, in terms of the police officer
3  or detective, what policeman was with the patient
4  in the room?
5      THE WITNESS:  No.  When they came out of
6  the room, the sister was still --
7      MR. HAMILTON:  That's why we're trying
8  to --
9      THE WITNESS:  Oh, okay.  The sister --
10      MR. HAMILTON:  Wait a minute.
11      I just want this record to be clear that
12  the conversation with the officer and the patient
13  took place in the room and then they, the officer
14  and the patient, came out?
15      THE WITNESS:  Right.
16      MR. HAMILTON:  And that's where you and
17  the patient's sister were?
18      THE WITNESS:  Me and the patient's
19  sister, yes.
20      MR. HAMILTON:  Because I thought
21  counsel's question was what room or whatever they
22  were in.

---

Page 291

1      Maybe I misunderstood counsel.
2  BY MS. HARTNETT:
3      Q    Yeah.  What I was trying to understand
4  is how you were able to overhear their
5  conversation.
6      But it sounds like they were in a place
7  where you were?
8      A    No.  They -- they had their conversation
9  in the family room.  When they came out and the
10  sister saw the other -- the patient, the first
11  thing she did was start questioning things.
12      The officer, in turn, was telling us she
13  wasn't going to be a SANE.  The sister -- she says
14  to her sister, well, I'll say whatever they want
15  me to say if it going to get me a test done.  The
16  officer says, no, you can't do that, you know.
17      Q    You -- you -- you saw --
18      A    Of that conversation.
19      Q    You saw that part of the conversation?
20      A    Yes.
21      MR. JEFFERSON:  Just so we're clear,
22  again, your counsel instructed you to distinguish

---

Page 292

1  between the patient and the sister.
2      In your statement just now you said the
3  sister.  And I'm not sure if you were referring to
4  the patient or the sister who said, I'll say
5  whatever they want me to say.
6      THE WITNESS:  The patient said that.
7      MS. HARTNETT:  I think that was clear,
8  for the record, so we don't get -- I prefer to
9  just ask the questions.  But I appreciate your
10  attempting to clarify.
11      MR. JEFFERSON:  No.  I didn't get it.
12      THE WITNESS:  But I gathered she was
13  saying it to her sister or how ever, you know --
14  but that by that time they were at the front desk
15  where we were.
16  BY MS. HARTNETT:
17      Q    That's a different -- when you overheard
18  the patient saying, I'll say whatever they want me
19  to say, was she saying that to her sister or to
20  the police?
21      A    She was saying it to -- they were there
22  together as a group.  She just like met her as

---

Page 293

1  they were coming out, so I'm -- I'm gathering she
2  was saying it to her sister.  But the officer
3  was there.
4      Q    Is the officer there after responding
5  that that's not -- you can't do it that way --
6      A    Right.
7      Q    -- something to that effect?
8      A    Yes.
9      Q    Okay.  And just backing up to the first
10  part where you were with the sister before the
11  patient came out and you said she was fussing.
12      Can you -- or explain a little more, if
13  you can, about what you meant by that?
14      A    She -- I guess she was just talking
15  about the whole process of having to call the
16  police and why we couldn't do a kit without the
17  officer -- you know, without waiting for the
18  police.  It was just the whole realm of questions,
19  why, why, why.
20      Q    And when you saw the patient later, did
21  you -- well, let's start with the sister.
22      The sister describe to you any of the

Alderson Reporting Company
1-800-FOR-DEPO

4a14e2e6-7bf5-4a5d-9290-e9934e2620cc

Audrey Postell, R.N.                                June 19, 2008
                        Washington, DC

| Page 306 | Page 308 |
|---|---|
| 1   Q   And I take it you didn't ask her about | 1   officers? |
| 2   that either? | 2       A   I talked with the one that said she's |
| 3       A   No. | 3   not going to be a SANE case.  And the one that |
| 4       Q   Did she report any pain in her rectum | 4   responded, no, you can't say that, that's the same |
| 5   while you were present? | 5   person, the same officer. |
| 6       A   No. | 6       Q   Uh-huh. |
| 7       Q   And would you have -- but the rectal | 7       A   The other officer didn't say anything to |
| 8   exam was offered nonetheless? | 8   me. |
| 9       A   It was offered, yes. | 9       Q   And was it you that communicated the |
| 10      Q   Did she report any pain in her leg while | 10  information from the officers to the doctor? |
| 11  you were present? | 11      A   The doctor was there.  Dr. Yohannes, if |
| 12      A   No. | 12  I'm not mistaken, was at the desk at the time. |
| 13      Q   Just to -- on to an earlier point about | 13      Q   So this is like the Fast Track, there's |
| 14  the -- did -- what you're describing -- the | 14  a desk there? |
| 15  recollection you've described in our conversation | 15      A   Yes. |
| 16  to this point, is this something you remembered | 16      Q   And so your recollection is that |
| 17  prior to reviewing the medical record in this | 17  Dr. Yohannes overheard this at the same time that |
| 18  case? | 18  you were hearing this news? |
| 19      A   The -- | 19      A   Yes.  But still at that time -- I'm |
| 20          MR. JEFFERSON:  Object to the form. | 20  going to put the patient in the room.  She's not a |
| 21          THE WITNESS:  What I'm saying to you? | 21  SANE.  She's going to -- you know, we need to go |
| 22  BY MS. HARTNETT: | 22  in there and evaluate her.  But that's it. |

| Page 307 | Page 309 |
|---|---|
| 1       Q   Yes. | 1       Q   But at that point she hadn't yet said |
| 2       A   Yes, I remember. | 2   anything about not being raped? |
| 3       Q   And is there some reason why this sticks | 3       A   No. |
| 4   out in your mind? | 4       Q   So it's once you're in the room that |
| 5          MR. JEFFERSON:  Object to form. | 5   that happens? |
| 6          THE WITNESS:  It sticks out into mind I | 6       A   Right. |
| 7   guess because the situation with the sister | 7       Q   Did you make any notation in your record |
| 8   fussing.  I just recall.  That one I recall. | 8   to reflect the fact that this was not -- not a |
| 9          It's not too often that -- it's not | 9   SANE case? |
| 10  often at all that I'll have a SANE case, so -- | 10      A   Yes. |
| 11         And besides the argument with the | 11      Q   And how did you note that? |
| 12  sister -- I mean the talking with sister, the | 12      A   Patient deemed not a SANE. |
| 13  phone call from Ms. Pinn, it just stayed, so -- | 13      Q   Uh-huh.  And did you make a notation |
| 14  BY MS. HARTNETT: | 14  that she stated that she wasn't raped? |
| 15      Q   Do you remember, were there -- what the | 15      A   No. |
| 16  officer -- the officer's name? | 16      Q   Why didn't you note that? |
| 17      A   No, I don't. | 17      A   Because we're not supposed to document |
| 18      Q   Was it male or female? | 18  that. |
| 19      A   Female. | 19      Q   Why not? |
| 20      Q   Were there more than one officer? | 20      A   Part of the policy, we don't document |
| 21      A   There was two. | 21  direct anything with the SANE.  We ask them are |
| 22      Q   And did you talk to one or both of the | 22  they hurt.  Any other information we're not |

Alderson Reporting Company
1-800-FOR-DEPO

a4a14e2e6-7bf5-4a5d-9290-e9934e2620cc

# Exhibit K

**(MPD General Order SPT-401.01 (Field Reporting System, Mar. 4, 2004))**

**To Plaintiff's Opposition to the District of Columbia's Motion to Dismiss First Amended
Complaint and Alternative Motion for Summary Judgment**

***McGaughey v. District of Columbia, et al.*, No. 1:07-cv-01498 (RJL)**

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Title**<br>**Field Reporting System** | |
| **Topic/Number**<br>**GO-SPT-401.01** | |
| **Effective Date**<br>**March 4, 2004** | **Distribution**<br>**A** |
| **Replaces/** Rescinds:<br>**General Order 401.1 (Field Reporting System)**<br>**Special Order 86-12 (Canceling Central Complaint Numbers)** | |

I. Background……...………..Page  1
II. Policy……………………......Page  1
III. Definitions ………...…...……..Page  1

IV. Regulations…………………Page  2
V. Procedural Guidelines ..........Page  3
VI. Cross References……………Page  16

## I. BACKGROUND

A Field Reporting System that provides accurate information to members within the Department and to the citizens we serve is an essential part of delivering effective law enforcement services.  The Metropolitan Police Department (MPD) has a comprehensive reporting system that captures information of reported crimes and incidents, which occur within the District of Columbia, in violation of local and federal laws.

The need to document and preserve information gathered from reported crimes and incidents serves two purposes.  First, it provides a record for action taken by law enforcement members, whether it is self-initiated or in response to a request for police service.  This will help to ensure that appropriate enforcement action is taken when conducting investigations.  Second, the information can be internally used to identify crime trends and solve crimes.

## II. POLICY

The policy of the Metropolitan Police Department is that members shall file a report for all reported crimes and incidents brought to his/her attention.  Self-initiated police action taken and calls for police service shall be accurately and thoroughly documented to ensure that a follow-up investigation can be conducted for potential adjudication.

## III. DEFINITIONS

For the purpose of this directive, the following terms shall have the designated meanings:

1. Serious Crimes - homicides, rapes, critical injury assaults, robberies, burglaries, stolen autos, bombings, arsons and a loss of other property in excess of $10,000.00.

2.    Unusual Incidents – deaths, other than homicides, that fall under the statutory jurisdiction of the Medical Examiner's office, missing persons, bomb scares and natural disasters.

3.    Preliminary Investigations - the first investigative effort undertaken by a member of the MPD; normally, the investigative effort of a patrol officer seeking to verify that a crime has occurred and identifying whether there are solvability factors present.

4.    Follow-up Investigations - the continued inquiry into a crime or incident due to pending leads, the complexity of the case, new information or time constraints.  This process can involve interviews, press releases, and further evidence examination.

5.    Solvability Factors - leads that require further investigation to determine if they will lead investigators to identifying the person(s) who committed the criminal act.  The factors include the suspect's name and/or address, their description, physical evidence, identifiable automobile, known modus operandi, etc.

## IV.    REGULATIONS

A.    Members shall investigate and complete the appropriate reports and paperwork as outlined in this General Order in the following situations: (CALEA 82.2.2)

1.    For all reports of crimes or offenses that occurred in the District of Columbia as defined by the D.C. Official Code. (CALEA 82.2.2 a)

2.    For all citizens' complaints filed against Metropolitan Police Officers, that are not investigated by the Office of Citizen Complaint Review (OCCR).  (CALEA 82.2.2 b)

3.    Any incident or crime that results in a member being dispatched or assigned to calls for service.  (CALEA 82.2.2 c)

4.    All criminal or incident responses initiated by sworn members. (CALEA 82.2.2 d)

5.    All incidents or crimes resulting in an arrest, the issuance of a citation, or the issuance of a summons.   (CALEA 82.2.2 e)

B.    A report shall be written for all reported offenses or incidents that occurred in the District of Columbia and shall be classified based on the elements of the crime if the offense/incident is in violation of the law established in the District of Columbia or U.S. Criminal Codes.   (CALEA 82.2.1 a)

C.      Complaints in which multiple offenses have occurred shall be classified to reflect the most serious offense, as determined by the penalty in the D.C. Official Code.  Remaining offenses shall be listed in the additional reporting blocks and described in the narrative portion of the report.

D.      It shall be the responsibility of the first member on the scene, regardless of his/her assignment, to begin conducting the preliminary investigation after safety precautions have been taken and the investigation does not interfere with the criminal case or defeat the ends of justice.  Such determination shall be made in conjunction with the field supervisor.  Once the assigned unit arrives on the scene, he/she shall resume the primary preliminary investigation, unless directed otherwise by an official.

E.      Whenever members prepare reports on the scene involving serious offenses or unusual incidents, he/she shall request a district official to respond to the scene of the offense or incident.  The reporting member shall be responsible for preparing all applicable reports and making the necessary notifications. The report prepared for a serious crime or unusual incident shall include the name and organizational element of the supervising official who responded to the scene, the station clerk notified, if necessary, and any additional notifications made regarding the crime/incident.  (CALEA 82.2.1 a)

F.      Members shall canvass the area with complainant(s), in instances when the suspect may still be in the immediate area and identification can be made. Further, a member shall advise the dispatcher that the complainant(s) is in the vehicle and gives the vehicle mileage, prior to canvassing and immediately after the complainant(s) exits the vehicle.

G.      Members may find it necessary to leave a scene immediately with a complainant when there is a concern for safety.  Under these circumstances, the dispatcher shall be advised.  The location and mileage shall be given to the dispatcher upon leaving the scene and once a destination is reached.

H.      If a member, other than the primary assigned member, handles the report, the dispatcher shall be notified and the Central Complaint Number (CCN) issued for that report shall be turned over to the member preparing the report.  The dispatcher shall confirm the name and CAD identification number of the member who is now responsible for the report.

## V.    PROCEDURAL GUIDELINES

A.      The preliminary investigation is the combination of those actions that should be carried out, as soon as possible, after the first responding member arrives on the scene.  At a minimum, he/she shall:

1.      Ensure that injured or sick persons receive medical attention.

2.      Secure the crime scene to prevent the evidence from being lost or contaminated.

3.    Determine whether a crime has been committed and, if so, the exact nature of the offense or incident.

4.    Determine the identity of the suspect and make an apprehension when appropriate.

5.    Provide lookout information to the dispatcher and other units, such as descriptions, method and direction of travel, whether armed or unarmed, and any other identifiable information about any suspect(s) and/or the suspect's vehicle.

6.    Identify, interview, and take statements from all victims, witnesses and suspects to determine in detail the exact circumstances of the offense or incident.

7.    Arrange for the collection of evidence.

8.    Take any other action that may aid in resolving the situation or solving the crime as directed by a supervisor.

B.    The preliminary investigation begins when the first Metropolitan Police Officer arrives on the scene of a crime or incident.  The purpose of the investigation is to determine the facts of an offense or incident.  Report numbers (CCN) and all information obtained shall be documented on the appropriate forms and submitted to the supervisor for review and signature.  The reports generated from the investigation should contain information gathered at the scene.  If known, the reports should also include the following:  (CALEA 82.2.1 c)

1.    The names and demographic information of all victims, suspects and witnesses;

2.    The type of crime committed, what was used to commit the crime and whether any evidence was recovered;

3.    In the case of property crimes, a description of, and value assigned to, any property that was stolen, damaged or destroyed (including the make, model, tag and VIN number of any vehicles stolen);

4.    In the case of property crimes, a description and the location of any stolen property that has been recovered;

5.    In the case of drug-related offenses, the results of any drug tests taken by the suspect(s);

6.    The time, date and location where the crime or incident occurred;

7.    The condition of the victim and where he/she was found and taken for treatment;

8.      How was the crime committed, sometimes referred to as the "Modus Operandi;"

9.      The circumstances surrounding the commission of the crime, including, but not limited to, any motive the suspect(s) had to commit the crime and the relationship between the suspect(s), victim(s) and witness(es);

10.     Information about whether the crime involved a domestic relationship and/or disagreement, whether a TPO/CPO was outstanding and whether a PD Form 387-A (Domestic Violence Brochure) was issued.

11.     The current case status information (whether the case is open, suspended or unfounded (and the reason for unfounding it), or whether an arrest has been made.

C.      The objective of a follow-up investigation is to accumulate sufficient information and evidence that corroborates probable cause for affecting an arrest.  It typically involves interviewing victims and witnesses, as well as interrogation and interview of suspects.

D.      The solvability factors can give insight for potentially solving criminal cases. The information supplied can be examined in its totality to help determine the likelihood an arrest will be made, and any resources that may need to be allocated.  The following factors shall be submitted on a PD Form 252 (Supplement), if known, as a part of the preliminary investigation:

Note:  Each offense specified for a particular case shall be closed on a separate PD Form 252.

1.      A summary of the names of witnesses to the crime and statements, if provided.

2.      The name and location of the suspect, if known.  If the suspect is not known, the member shall report whether the witnesses or victim(s) can identify or construct a composite of the suspect.  Any criminal history on the suspect should be included.

3.      The member shall report a listing of any evidence, contraband, fruits or instruments involved in the crime.  The member shall also report whether the suspect may have the "fruits of the crime" or evidence. The report should relate the current condition and location of any evidence.

4.      The reporting member shall document statements made by the victim, including a description of the crime.  When necessary, describe the exact injuries and/or the medical or mental condition of the victim.

E.  Members initiating reports shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary, unless an illness or injury has occurred while in the performance of duty.  In that case, the member's supervisor shall ensure the report is submitted before relieved from duty.  (CALEA 82.2.1 e)

F.  The check-off official for that tour of duty shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary to the district Crime Analysis Unit.

G.  The district Crime Analyst/PD-93 Clerk shall prepare a PD Form 93 (24-Hour Crime Report) each morning for his/her commander, and enter basic information from the PD Form 251s (Event Report) associated with reports received over the past 24 hours into the Analytical Services Application (ASAP).

H.  Within 24 hours after submission of the report, the district Crime Analyst/PD 93 Clerk shall forward the original and two (2) copies of offense/incident and traffic reports for analysis and screening, with an attached transmittal, as follows:

1.  Homicides - to the Office of Superintendent of Detectives (OSD) Violent Crimes Branch;

2.  Sexual assaults against adults - to the OSD Sex Crimes Branch;

3.  Sexual assaults against juveniles - to the Youth and Preventive Services Division;

4.  Arsons – to the OSD Arson Unit; and

5.  All other reports – to the OSD Investigative Review Officer (IRO).

Note:  The IRO and/or reporting official in the specialty unit shall make a determination about whether the case shall be returned to the officer assigned to a specialty unit or maintained within the district OSD.  (CALEA 82.2.5)

I.  Field reporting procedures.  (CALEA 82.2.1 d)

1.  Each member initiating a field report shall sign the report in the appropriate space on the form.  Only the reporting member shall sign the field report (unless incapacitated), then an official shall sign the report.

2.  All field reports shall either be computer-generated, typed or hand printed in black ink.  The reporting member is responsible for ensuring that the report is accurate and legible prior to submitting it to a supervisor.  Also, the reporting member shall maintain adequate notes of the offense in his/her notebook.  (CALEA 82.2.1 e)

3.  All field reports shall have a valid (non-duplicate, non-transposed) CCN number.  The member shall ensure that the CCN is printed in all designated areas of the appropriate form.

4.  Supervisory officials shall be held responsible for collecting the completed reports and reviewing them for legibility, accuracy and completeness at the end of each tour of duty.  When a discrepancy is found in a report, the supervisor shall counsel the reporting member and require the member to make the necessary corrections.  (CALEA 82.2.4)

5.  Supervisory officials shall conduct periodic inspections of a member's field notebooks to ensure members are properly documenting events.  Because the field notebook is considered potential discoverable material, it shall be retained for a period of three years.

6.  When completing the field reporting forms, members shall enter the appropriate information in each numbered item on the form.  If the information requested on the form is unknown, enter "UNK" or if it is not applicable, enter "N/A" in the numbered space.  Members should refer to the list below for the most frequently used field reporting forms.  (CALEA 82.2.1 b and d)

    a.  PD Form 251 (Event Report) - for documenting reported incidents or offenses that indicate a violation of the laws and ordinances established in the District of Columbia and the United States, as well as for documenting miscellaneous reports.

    b.  PD Form 252 (Supplement) - used to change the classification/case status of reports and record additional information regarding the crime, suspect(s), witness(es) and complainant(s).

    c.  PD Form 256 (Quick Booking Form) – used by a member on the scene of an arrest to obtain basic information on a defendant, which will be transported with the defendant to the elements station house so the station clerk may begin the booking process.

    d.  PD Form 163 (Prosecution Report) - used to document arrests and charges lodged against suspects.  This report records the violation of the laws and ordinances established in the District of Columbia and the United States.

    e.  PD Form 163A (Prosecution Report ) - used to record Driving Under the Influence/Driving While Intoxicated arrests.  This report cites the violation of the laws and ordinances established in the District of Columbia.

f.    PD Form 47 (Miranda Right's Card) - used to document and advise a suspect of his/her rights.

g.    PD Form 379 (Juvenile Truant, Court, Contact and Juvenile Curfew) - used to document all physical contact made with juveniles.  Records the reported incidents or offenses committed by juveniles.  This report records the violation of the laws and ordinances established in the District of Columbia and the United States.

h.    PD Form 118 (Defendant/Suspect Statement) - for documenting statements taken from a defendant/suspect.

i.    PD Form 119 (Complainant/Witness Statement) - for documenting statements taken from complainants/witnesses and members of the Department.

j.    PD Form 119A (Witness Statement - Driving Under the Influence/Driving While Intoxicated) – for documenting statements taken from witnesses and members for DUI/DWI investigations.

k.    PD Form 202A (Continuation Report) a continuation form.

l.    PD Form 10 (Traffic Accident Report) - for recording traffic accident investigations.

m.    PD Form 81 (Property Record) - for documenting all property that comes into the custody of the Department.

n.    BTA Form 51 (Notice of Infraction) - used to cite violators of the District of Columbia Municipal Regulations, Title 18, Vehicle and Traffic.

o.    PD Form 61D (Warning/Violation Citation) - used to cite violators of the District of Columbia Municipal Regulations, Title 24, Public Space and Safety.

p.    PD Form 901-e (Use of Force Incident Report) – used for any use of force by a member, which is required by GO-RAR-901.08 (Use of Force Investigations).

q.    PD Form 387-A (Domestic Violence Brochure).

7.    Members assigned to foot, bike or scooter patrol shall assist with canvasses when lookouts are broadcast in his/her patrol area.  When in receipt of an original complaint in which an offense or incident report is required, member(s) shall record the necessary information in his/her notebook and prepare the report.  At a minimum, these

members shall handle the following reports, unless directed otherwise by an official: (CALEA 82.2.1 a)

    a.      Animal bite;

    b.      Destruction of property;

    c.      Thefts (all types);

    d.      Lost property;

    e.      Robbery (PBS and pickpocket);

    f.      Sick or injured person (only those occurring on public space);

    g.      Simple assault;

    h.      Stolen bicycle;

    i.      Stolen automobile;

    j.      Miscellaneous reports.

8.    When a member is assigned to a school crossing or traffic post, he/she shall not leave it to take a report.  In such cases, he/she shall assist the complainant by contacting the dispatcher and requesting a uniform patrol car to respond to the scene to handle the complaint.

9.    During the course of a preliminary investigation and when appropriate, members shall provide referral information to individuals who are in need of victim/witness assistance services. (See GO-OPS-204.06, Victim Services Program)

    a.      Members shall provide information to the victim/witness about applicable services available within the District of Columbia, such as counseling, medical attention, and the crime victims compensation program.  (CALEA 55.2.3 a)

    b.      Members shall advise the victim/witness about what to do if the suspect or anyone known to the suspect, threatens or otherwise intimidates him or her.   (CALEA 55.2.3 b)

    c.      Members shall give the victim/witness the CCN numbers, explain the immediate steps in processing the case, consistent with the Department 's guidelines, and a contact telephone number, so that the victim/ witness can call to report additional information or inquire about the status of the case.  (CALEA 55.2.3 c & d)

J.    Reports involving juveniles

1.    When members are preparing a PD Form 251 on a juvenile victim, he/she shall not disclose identifiers of the complainant.  First and last initials shall be used in the name category, age range only shall be given, street blocks shall be used rather than specific addresses, and phone numbers shall be omitted.  The PD Form 251 should only include basic information (a brief description of what happened) so the complainant is not forced to repeat him or herself, especially in more sensitive cases.

2.    When members are preparing a PD Form 251, incident report, on a juvenile victim, he/she shall not disclose the complainant's full name, exact address, exact age and phone number, if applicable.  Otherwise, a full detailed description of what happened shall be given and the report filled out as described in section V, B and D, of this directive.

3.    The PD Form 252 shall be used to disclose all pertinent information involving juvenile victims.

K.    Evaluation of lost or stolen property.  (CALEA 82.2.1 d)

1.    When a member completes a PD Form 251 or 252 for a lost or stolen property report, if available, the serial numbers, as well as identifiable marking, shall be listed in the report.  The member shall comply with the following guidelines when assigning a fair and equitable valuation to the property:

a.    The fair market value shall be used for articles, which are subject to depreciation because of wear and tear, age, or other factors that cause the value to decrease with use.

b.    The wholesale cost to the merchant shall be used for goods stolen from retail establishments or warehouses.  Members shall use the dollar value representing the actual cash loss to the victim, without any markup or profit added.

c.    The complainant's evaluation shall be used on items such as jewelry, watches, antiques and other similar goods, which decrease in value only slightly or not at all.

d.    The replacement cost or actual cash cost to the victim shall be used for new or almost new items such as clothing, auto accessories, and bicycles.

2.    Instruments such as traveler's checks, personal checks, money orders, stocks and bonds shall be reported as a theft or loss, and a monetary value of twenty-five cents (.25) shall be assigned to each item, or items so reported.

3.    Instruments such as bonds payable to the bearer, U.S. Government Bonds and U.S. Treasury Bonds, shall be valued at current market price at the time of theft or loss.

4.    When completing reports on lost or stolen property, members shall enter in the blocks provided, the complainant's estimate of the value of the property and his/her own estimated evaluation of the property.

5.    When more than one item is reported lost or stolen, the property shall be itemized and each item assigned a police department value.

6.    When property is recovered, the value originally reported shall be assigned, unless it is obvious that the value has depreciated.  This procedure does not apply to vehicles.

L.    Canceling Central Complaint Numbers and unfounded reports.  (CALEA 82.2.3)

1.    A PD Form 252 must be prepared to cancel or unfound a CCN number.  The Staff Review Unit of the Records Department, Corporate Support, shall also accept PD Form 252 to cancel CCNs under the following conditions:

   a.    Duplicate Numbers - If a situation occurs where two numbers are issued for the same report, a PD Form 252 must be prepared bearing the CCN that will be cancelled.  The body of the report must state it is a duplicate number and list the CCN reflecting the actual PD Form 251 report that was prepared.

   b.    Dispatcher's Error - If a unit is credited with a report due for a CCN that was given in error, the unit being held accountable shall prepare a PD 252, explaining the circumstances for a "No Report" disposition and identify the dispatcher that committed the error.  A Communications official shall then cancel the CCN.

2.    The PD Form 252 is filed in the above situations to provide continuity and documentation to support the integrity of the reporting system.

3.    When Computer Aided Dispatcher has issued a CCN for a report and it is immediately determined the incident or crime did not occur, the original PD Form 251 is to be prepared and marked as unfounded.  A PD Form 252 shall only be accepted after the original PD Form 251 has been submitted, or if it is submitted along with the PD Form 251.  In both cases, a statement must be written in the body of the report confirming the fact that after conducting an investigation it was determined the incident did not occur.

4.    A supervisor must approve all unfounded reports.

M.    Reporting offenses or incidents occurring in another district.
      (CALEA 82.2.2 c)

      1.    When members are dispatched to the scene of an incident outside
            his/her assigned district, or when an incident is reported to them that
            occurred outside of his/her assigned district, they shall prepare the
            appropriate report.  A CCN number from the Public Safety
            Communications Center (PSCC) shall be obtained and the report shall
            be forwarded through normal channels to be processed in the Staff
            Review Unit, Records Department, Corporate Support.

      2.    The reporting member shall also relay all information on the report to
            the Station Clerk of the district in which the event occurred, by faxing a
            copy of the report, if possible.  The name and unit of the member
            receiving the information shall be entered in the narrative portion of the
            PD Form 251.  The Station Clerk of the district where the reporting
            member is assigned shall be responsible for transmitting the report
            over the teletype when appropriate.

      3.    When a motor vehicle is stolen from the District of Columbia and
            recovered in the District of Columbia, members shall:

            a.    Enter the district/PSA where the motor vehicle was stolen from
                  in boxes #1 and #2 of the PD Form 252, the district/PSA where
                  the motor vehicle was recovered from in box #7 and both pieces
                  of information in the narrative (or at least the location of the
                  recovery).

            b.    If the district where the motor vehicle is stolen is different from
                  the district where it is recovered, the original of the PD Form
                  252 for the recovery shall be sent to the district from which the
                  motor vehicle was stolen.

N.    Reporting the recovery of property stolen from another jurisdiction, members
      shall:

      1.    Obtain CCN numbers and prepare a PD Form 251 (Recovered Stolen
            Property), PD Form 252 and a PD Form 81 (Property Record);

      2.    Obtain the Originating Case Agency (OCA) numbers from the
            originating jurisdiction where the property was stolen and add them in
            the narrative part of the PD Form 251.

O.    Reports requiring response to medical facilities.  (CALEA 82.2.2 c)

      1.    Members dispatched to a medical facility located outside of his/her
            assigned organizational element, to take or complete a sick or injured
            person's report, shall notify the dispatcher to contact a district official
            for authorization, prior to responding.

2.      Members, who respond to a medical facility to investigate complaints, shall prepare the necessary reports, as well as sign and date the patient's chart when requested by hospital authorities.

3.      If there is any indication that an individual shall be or is admitted into the hospital and no next of kin has been notified, the reporting member shall notify the Telecommunications Branch of the Information Technology Division by telephone. The teletype operator shall be given the individual's identity, a brief report of his/her circumstances and the CCN, when applicable.

4.      In cases when persons are transported to a District of Columbia medical facility for treatment of injuries that occurred in another jurisdiction and requires a police investigation, the member responding for the assignment shall notify the dispatcher to contact the appropriate agency that is responsible for conducting the investigation.

5.      In the interest of expediting police action in the above cases, the reporting member shall provide all necessary information to that agency. Telephone calls involving toll charges shall be handled in accordance with GO-SPT-302.03 (Department Telephones).

6.      When persons are admitted to hospitals in the District of Columbia, as the result of a traffic accident that occurred outside the District of Columbia, and their condition is listed as critical or death occurs, the reporting member shall notify the Major Crash Unit of the Special Investigation Division. If the member is unable to notify a member of the Major Crash Unit, the dispatcher shall make the notification. In the case of a death, a PSCC supervisor shall notify the appropriate law enforcement agency where the next of kin resides to make the notification.

P.      Reports involving a community correctional facility (Halfway House). (CALEA 82.2.2 c)

1.      Members dispatched to investigate an offense that occurred within the confines of a community correctional facility shall notify his/her district official who shall monitor the call. If necessary, an official shall respond to the scene and assist the reporting member.

2.      Upon completion of all required reports, the responding official shall notify the Watch Commander and provide a brief account of the

incident or offense to be documented on the PD Form 150 (Watch Commanders Report).

Q.      Inter-jurisdictional police departments. (CALEA 82.2.2 c)

1.      Inter-jurisdictional police departments are responsible for conducting their own investigations of those incidents/offenses that occur in their

jurisdictions, except deaths.  Members shall promptly notify the appropriate police agency of any incident or offense brought to their attention that occurs inter-jurisdictional.

2.     All deaths shall be reported to and investigated by MPD.  In addition, the  required Metropolitan Police Department's reports dealing with deaths shall reflect the time and date the inter-jurisdictional police agency was notified, including the name of the official or member receiving the information.

R.     Industrial accidents are those incidents occurring at the workplace and involving bodily injury.  In such circumstances, MPD shall respond to assist at the scene.  (CALEA  82.2.2 c)

1.     Members who respond to an industrial accident shall prepare a PD Form 251 and, as soon as practicable, notify the Office of Occupational Safety and Health of the D.C. Department of Employment Services. Members shall report the date, time and location of the accident, as well as any other information required by the Office of Occupational Safety and Health.

2.     The date, time and name of the person notified, at the Office of Occupational Safety and Health, shall be entered on PD Form 251, along with the name of the member who made the notification. If unable to notify a member of the Office of Occupational Safety and Health, the Emergency Management Agency shall be notified and the above information shall be recorded on the PD Form 251.

3.     The Office of Occupational Safety and Health business hours are from 0830 to 1700, Monday through Friday.

       Note:  Any serious crimes or unusual incidents shall be reported to the elements watch commander and the Synchronized Operations Command Center (SOCC), by the reporting member, as soon as practicable.

S.     Station Clerk responsibilities.

1.     When a Station Clerk receives notification that a crime or incident has occurred in a district, from a member of another district, that does not require any investigation, he/she shall obtain the pertinent information and prepare a report.  The Watch Commander shall be notified if it is a serious crime or unusual incident.

2.     The Station Clerk receiving a crime, incident or traffic report from a sworn member in another district shall be responsible for preparing a duplicate and information-only copy for the OSD and the Crime Analysis Section.  The Crime Analyst/PD 93 Clerk shall be responsible for all Part 1 offenses on the occurring district's PD Form 93 (24-Hour Crime Report).  The notation "duplicate report" shall be written in bold

print at the top of the PD Form 251, and this report shall not be forwarded to Staff Review Unit.  The duplicate, information-only report, shall be filed in the district for a 90-day period. (CALEA 82.2.5)

3.    The Station Clerks who receives a formal letter from a complainant detailing an incident or offense shall forward the letter, in a separate envelope, to the Telephone Reporting Unit, Communications Division, where the report is prepared.

4.    Station Clerks shall be responsible for the completion of applicable teletype message reports as directed by supervisory officials, and for making any necessary notifications.

5.    For reports involving industrial accidents and where members of the Office of Occupational Safety and Health Division are not available, a station record shall be made.  The day Station Clerk shall report the incident to this division as soon as possible on the next business day.

T.    Distribution and files.  (CALEA 82.2.5)

1.    The district IRO or specialty unit reporting official shall forward:

a.    The original report(s) to the Staff Review Unit, Records Department, within 24 hours.

b.    If the status of the offense is "Closed by Arrest" or "Unfounded," the corresponding PD Form 252 shall be attached to the PD Form 251 before it is forwarded to the Staff Review Unit.

2.    One (1) reproduced copy shall be made of all incident reports and all supplements to incident reports.  (NOTE:  The category "incident report" includes missing person reports.)

a.    The original shall be forwarded to the Staff Review Unit, Records Department, within 24 hours.  In the event of a holiday or weekend, the original shall be forwarded on the next business day with the morning papers.

b.    The reproduced copy shall be filed in the element's 90-day file.

U.    Staff Review Unit, Records Department.

1.    The Staff Review Unit shall re-classify all offenses and incidents that were classified incorrectly.  The section is also responsible for the return of a copy of any report needing to be corrected to the original reporting element for correction.

2.    An original corrected report shall be forwarded back to the Staff Review Unit within 7 days from the date the report was returned for correction.

## VI.    CROSS REFERENCES

1.    GO-RAR-901.08 (Use of Force Investigations)

2.    GO-OPS-204.06 (Victim Services Program)

3.    GO-SPT-302.03 (Department Telephones)

// SIGNED //
Charles H. Ramsey
Chief of Police

CHR:NMJ:MAR:njg

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALEXANDRIA McGAUGHEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-01498 (RJL) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**[PROPOSED] ORDER DENYING THE DISTRICT OF COLUMBIA'S**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Upon consideration of the District of Columbia's Motion to Dismiss First Amended

Complaint and Alternative Motion for Summary Judgment, the opposition thereto, any additional

supporting briefs and materials submitted by the parties, and the record herein, the Motion is

hereby DENIED.

So ORDERED this ___＿＿＿ day of ＿＿＿＿＿＿＿＿＿＿＿, 2008

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Honorable Richard J. Leon

Copies to:

Bruce V. Spiva, D.C. Bar. No. 443754
  bspiva@spivahartnett.com
Kathleen R. Hartnett, D.C. Bar. No. 483250
  khartnett@spivahartnett.com
SPIVA & HARTNETT LLP
1776 Massachusetts Avenue, N.W., Suite 600
Washington, D.C. 20036
Telephone:  (202) 785-0601
Facsimile:  (202) 785-0697

*Counsel for Plaintiff*


Karen R. Turner, D.C. Bar No. 434543
  karen.turner@hacdlaw.com
HAMILTON ALTMAN CANALE & DILLON, LLC
4600 East-West Highway, Suite 201
Bethesda, MD 20814
Telephone:  (301) 652-7332

*Counsel for Defendants Howard University; Howard University Hospital; Wendie Williams, M.D.; Dawit Yohannes, M.D.*


DWAYNE C. JEFFERSON, D.C. BAR NO. 980813
OFFICE OF THE ATTORNEY GENERAL
  FOR THE DISTRICT OF COLUMBIA
Sixth Floor South, 441 4th Street, N.W.
Washington, DC 20001
Telephone:  (202) 724-6649
Facsimile (202) 741-0554

*Counsel for Defendant District of Columbia*


Thomas V. Monahan, Jr., Bar No. 04471
  tvm@gdldlaw.com
Adam Kelley, Bar No. 26663
  axk@gdldlaw.com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
Telephone: (410) 783-4000

*Counsel for Defendant District Hospital Partners, LP*

Robert W. Goodson,  D.C. Bar No. 935239
  Robert.Goodson@wilsonelser.com
Deidre L. Robokos, D.C. Bar No. 492013
  deidre.robokos@wilsonelser.com
Christine M. Costantino
  chrissy.costantino@wilsonelser.com
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, NW, Suite 500
Washington, D.C. 20005
Telephone:  (202) 626-7660
Facsimile:  (202) 628-3606

*Counsel for Defendant Christopher Lang, M.D.*


James P. Gleason, Jr., D.C. Bar No. 291005
Larry D. McAfee, D.C. Bar No. 457226
  lmcafee@gleason-law.com
Christopher R. Smith, D.C. Bar No. 477393
GLEASON, FLYNN, EMIG & FOGLEMAN, Chartered
11 North Washington Street, Suite 400
Rockville, MD 20850
Telephone:  (301) 294-2110

*Counsel for Defendant The George Washington University*